# EXHIBIT A

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

Electronically FILED by Superior Court of California, County of Los Angeles 7/06/2023 12:33 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
DANIEL ROSSI, individually and on behalf of all others similarly situated,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California* (www.sucorte.ca.gov)*, en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services,* (www.lawhelpcalifornia.org)*, en el Centro de Ayuda de las Cortes de California,* (www.sucorte.ca.gov) *o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California, County of Los Angeles
111 North Hill Street, Los Angeles, CA 90012
Stanley Mosk Courthouse

CASE NUMBER:
*(Número del Caso):*
23STCV15674

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Abbas Kazerounian, David McGlothlin, Mona Amini, Gustavo Ponce;
Kazerouni Law Group, APC; 245 Fischer Avenue, Suite D1, Costa Mesa, CA 92626; (800) 400-6808

DATE: *(Fecha)* 07/06/2023 Clerk, by *(Secretario)* David W. Slayton, Executive Officer/Clerk of Court J. Nunez , Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*:

# VOLUNTARY EFFICIENT LITIGATION STIPULATIONS

**Superior Court of California**
**County of Los Angeles**

**Los Angeles County Bar Association Litigation Section**

**Los Angeles County Bar Association Labor and Employment Law Section**

**Consumer Attorneys Association of Los Angeles**

**Southern California Defense Counsel**

**Association of Business Trial Lawyers**

**California Employment Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

**◆Los Angeles County Bar Association Litigation Section◆**

**◆ Los Angeles County Bar Association Labor and Employment Law Section◆**

**◆Consumer Attorneys Association of Los Angeles◆**

**◆Southern California Defense Counsel◆**

**◆Association of Business Trial Lawyers◆**

**◆California Employment Lawyers Association◆**

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION – EARLY ORGANIZATIONAL MEETING** | | CASE NUMBER: |

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at **www.lacourt.org** under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to ____________________ (INSERT DATE) for the complaint, and ______________________ (INSERT DATE) for the cross-complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at www.lacourt.org under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

______________________________ ➢ ______________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR PLAINTIFF)

Date:

______________________________ ➢ ______________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

______________________________ ➢ ______________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

______________________________ ➢ ______________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

______________________________ ➢ ______________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR ____________________)

Date:

______________________________ ➢ ______________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR ____________________)

Date:

______________________________ ➢ ______________________________
(TYPE OR PRINT NAME) (ATTORNEY FOR ____________________)



Print Save Clear

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION – DISCOVERY RESOLUTION** | | CASE NUMBER: |

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

    a. The party requesting the Informal Discovery Conference will:

        i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

        ii. Include a brief summary of the dispute and specify the relief requested; and

        iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

    b. Any Answer to a Request for Informal Discovery Conference must:

        i. Also be filed on the approved form (copy attached);

        ii. Include a brief summary of why the requested relief should be denied;

| SHORT TITLE: | CASE NUMBER: |
| --- | --- |
| | |

iii. Be filed within two (2) court days of receipt of the Request; and

iv. Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c. No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d. If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e. If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4. If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5. The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

   It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a “specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing,” within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6. Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7. Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8. References to “days” mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR PLAINTIFF)

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR ____________________________)

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR ____________________________)

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR ____________________________)

Print Save Clear

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | | CASE NUMBER: |

1. This document relates to:

   ☐ Request for Informal Discovery Conference
   ☐ Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _______________ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _______________ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, briefly describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, briefly describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**



Print Save Clear

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | FAX NO. (Optional): | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | | CASE NUMBER: |

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least ____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR PLAINTIFF)

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR ____________________)

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR ____________________)

Date:

➢

(TYPE OR PRINT NAME) (ATTORNEY FOR ____________________)

**THE COURT SO ORDERS.**

Date: ____________________

JUDICIAL OFFICER

Print Save Clear

FILED
LOS ANGELES SUPERIOR COURT
MAY 11 2011
JOHN A. CLARKE, CLERK
N. Navarro
BY NANCY NAVARRO, DEPUTY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| General Order Re Use of Voluntary Efficient Litigation Stipulations | ORDER PURSUANT TO CCP 1054(a), EXTENDING TIME TO RESPOND BY 30 DAYS WHEN PARTIES AGREE TO EARLY ORGANIZATIONAL MEETING STIPULATION |

Whereas the Los Angeles Superior Court and the Executive Committee of the Litigation Section of the Los Angeles County Bar Association have cooperated in drafting "Voluntary Efficient Litigation Stipulations" and in proposing the stipulations for use in general jurisdiction civil litigation in Los Angeles County;

Whereas the Los Angeles County Bar Association Litigation Section; the Los Angeles County Bar Association Labor and Employment Law Section; the Consumer Attorneys Association of Los Angeles; the Association of Southern California Defense Counsel; the Association of Business Trial Lawyers of Los Angeles; and the California Employment Lawyers Association all "endorse the goal of promoting efficiency in litigation, and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases;"

Whereas the Early Organizational Meeting Stipulation is intended to encourage cooperation among the parties at an early stage in litigation in order to achieve litigation efficiencies;

Whereas it is intended that use of the Early Organizational Meeting Stipulation will promote economic case resolution and judicial efficiency;

Whereas, in order to promote a meaningful discussion of pleading issues at the Early Organizational Meeting and potentially to reduce the need for motions to challenge the pleadings, it is necessary to allow additional time to conduct the Early Organizational Meeting before the time to respond to a complaint or cross complaint has expired;

Whereas Code of Civil Procedure section 1054(a) allows a judge of the court in which an action is pending to extend for not more than 30 days the time to respond to a pleading "upon good cause shown";

Now, therefore, this Court hereby finds that there is good cause to extend for 30 days the time to respond to a complaint or to a cross complaint in any action in which the parties have entered into the Early Organizational Meeting Stipulation. This finding of good cause is based on the anticipated judicial efficiency and benefits of economic case resolution that the Early Organizational Meeting Stipulation is intended to promote.

IT IS HEREBY ORDERED that, in any case in which the parties have entered into an Early Organizational Meeting Stipulation, the time for a defending party to respond to a complaint or cross complaint shall be extended by the 30 days permitted

by Code of Civil Procedure section 1054(a) without further need of a specific court order.

DATED: May 11, 2011

Carolyn B. Kuhl, Supervising Judge of the Civil Departments, Los Angeles Superior Court

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp<br>**FILED**<br>Superior Court of California<br>County of Los Angeles<br>07/06/2023<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: J. Nunez Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | |
| **NOTICE OF CASE ASSIGNMENT**<br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>23STCV15674 |

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Stuart M. Rice | 1 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record David W. Slayton, Executive Officer / Clerk of Court

on 07/06/2023 By J. Nunez, Deputy Clerk
(Date)

# INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

**APPLICATION**
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

**PRIORITY OVER OTHER RULES**
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

**CHALLENGE TO ASSIGNED JUDGE**
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

**TIME STANDARDS**
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

**COMPLAINTS**
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

**CROSS-COMPLAINTS**
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

**STATUS CONFERENCE**
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

**FINAL STATUS CONFERENCE**
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

**SANCTIONS**
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

**Class Actions**
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

***Provisionally Complex Cases**
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

2019-GEN-014-00

FILED
Superior Court of California
County of Los Angeles

MAY 03 2019

Sherri R. Carter, Executive Officer/Clerk
By Rizalinda Mina, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| IN RE LOS ANGELES SUPERIOR COURT – MANDATORY ELECTRONIC FILING FOR CIVIL | FIRST AMENDED GENERAL ORDER |

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

a) **"Bookmark"** A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

b) **"Efiling Portal"** The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

c) **"Electronic Envelope"** A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

d) **"Electronic Filing"** Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

e) **"Electronic Filing Service Provider"** An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court. (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"** For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"** An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"** A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format. Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs. Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) EXEMPT LITIGANTS

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) EXEMPT FILINGS

a) The following documents shall not be filed electronically:

i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

ii) Bonds/Undertaking documents;

iii) Trial and Evidentiary Hearing Exhibits

iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image**.**

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4). Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked. Examples include, but are not limited to, the following:

i) Depositions;

ii) Declarations;

iii) Exhibits (including exhibits to declarations);

iv) Transcripts (including excerpts within transcripts);

v) Points and Authorities;

vi) Citations; and

vii) Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted. (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day <u>before</u> the ex parte hearing.

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing. A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled. If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

i) Any printed document required pursuant to a Standing or General Order;

ii) Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

iii) Pleadings and motions that include points and authorities;

iv) Demurrers;

v) Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

vi) Motions for Summary Judgment/Adjudication; and

vii) Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents. Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver. (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

11) SIGNATURES ON ELECTRONIC FILING

For purposes of this General Order, all electronic filings must be in compliance with California Rules of Court, rule 2.257. This General Order applies to documents filed within the Civil Division of the Los Angeles County Superior Court.

This First Amended General Order supersedes any previous order related to electronic filing, and is effective immediately, and is to remain in effect until otherwise ordered by the Civil Supervising Judge and/or Presiding Judge.

DATED: May 3, 2019

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

KEVIN C. BRAZILE
Presiding Judge

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

Electronically FILED by
Superior Court of California,
County of Los Angeles
7/06/2023 12:33 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Nunez, Deputy Clerk

*Attorneys for Plaintiff,*
Daniel Rossi

KAZEROUNI LAW GROUP, APC

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No.: 23STCV15674

**COMPLAINT FOR VIOLATIONS OF:**

1) **CONSUMERS LEGAL REMEDIES ACT, CAL. CIVIL CODE §§ 1750, ET SEQ.;**
2) **CALIFORNIA'S FALSE ADVERTISING LAW, BUS. & PROF. CODE §§ 17500 ET SEQ.;**
3) **CALIFORNIA BUS. & PROF. §§ 17200 ET SEQ.;**
4) **NEGLIGENT MISREPRESENTATION; AND**
5) **INTENTIONAL MISREPRESENTATION**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. Plaintiff DANIEL ROSSI ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY ("Defendant") in unlawfully representing and advertising Defendant's consumable consumer dietary supplement products with the false designation and representation that the products are/were made and/or manufactured in the USA. The unlawfully represented products are sold online on Defendant's website and other third-party vendors, such as Amazon.com, throughout the United States, and advertised on Defendant's website.[1] Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

2. Specifically, Plaintiff purchased Defendant's Nitrosurge Pre-workout[2] dietary supplement (hereinafter the "Product"), which, as advertised on Defendant's website and other third-party vendors, represents to consumers that the product is/was made and/or manufactured in the USA. However, Defendant's Product contains or is made with ingredients that are not "Manufactured in the USA."

3. The "Manufactured in the USA" claim (or some derivative thereof) is prominently printed on Defendant's website and advertisements, as well as the websites of third-party vendors, including the product purchased by Plaintiff. Contrary to Defendant's representation and in violation of California law, Defendant's Class Products[3], including the specific product purchased by Plaintiff, are actually made with or contain ingredients that are not "Manufactured in the USA."

---

[1] Plaintiff seeks class wide relief on behalf of all purchasers of any of Defendant's products that are substantially similar to the consumable consumer packaged product purchased by Plaintiff that are advertised as being "Manufactured in the USA" in violation of California law(s).

[2] As titled on Amazon.com when Plaintiff purchased the Product; "NITROSURGE Pre Workout Supplement – Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps – Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White."

[3] A non-comprehensive list of the Class Products is attached hereto as Exhibit A.



KAZEROUNI LAW GROUP, APC

4. This nationwide sale and advertising of deceptively advertised products constitutes violations of: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (2) California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17533.7; (3) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 et seq.; and (4) negligent misrepresentation. This conduct caused Plaintiff, and others similarly situated, damages, and requires restitution and injunctive relief to remedy and prevent further harm.

5. Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of Defendant.

## JURISDICTION AND VENUE

6. Jurisdiction is proper pursuant to this Court's general jurisdiction.

7. The Court has jurisdiction over Plaintiff's claims for damages, restitution, injunctive relief, and declaratory relief arising from Defendant's unlawful business practices under California's CLRA, FAL, and UCL; as well as negligent misrepresentation.

8. This Court has personal jurisdiction over Defendant because Defendant conducts substantial business in the State of California and County of Los Angeles, has sufficient minimum contacts with this State and County, and otherwise purposefully avails itself of the markets in this State and County through the promotion, sale, and marketing of its services in this State, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this Court pursuant to California Code of Civil Procedure section 395(a) because Plaintiff resides within this county and many of the acts and transactions giving rise to this action occurred in this district because Defendant:

   a. is authorized to conduct business in this district and has intentionally availed itself of the laws and markets within this county;

   b. does substantial business within this county; and is subject to personal jurisdiction in this county;

   c. and is subject to personal jurisdiction in this county.

KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

## PARTIES

10. Plaintiff is an individual residing in the City of Northridge, County of Los Angeles, State of California.

11. Defendant is a corporation with its principal place of business in St. Johnson, Canada, and which is regularly doing business in the State of California and within this county.

12. Defendant is a manufacturer and seller of dietary supplements that conducts business through its website and the websites of third-party vendors. One of the products sold by Defendant is Nitrosurge Pre-workout, the Product and Class Products, which was purchased by Plaintiff.

## NATURE OF THE CASE

13. At all times relevant, Defendant made, and continues to make, affirmative misrepresentations regarding the Class Products, including the Product purchased by Plaintiff, it manufactures, markets and sells. Specifically, Defendant marketed, advertised, and sold its Class Products as "Manufactured in the USA".

14. However, although Defendant represents that its Class Products are "Manufactured in the USA," Defendant's Class Products contain or are made with ingredients that are not "Manufactured in the USA."

15. Each consumer, including Plaintiff, was exposed to virtually the same material misrepresentations, as similar advertisements and misrepresentations were prominently placed on all of Defendant's website and the websites of third-party vendors, and are currently being sold, throughout the United States and within the State of California.

16. As a consequence of Defendant's unfair and deceptive practices, Plaintiff and other similarly situated consumers have purchased Defendant's Class Products under the false impression that the products were actually manufactured and/or made in the USA.

17. As a result of Defendant's misrepresentations, Plaintiff and other consumers similarly situated overpaid for Defendant's Class Products, and/or purchased the Class Products under the false belief that the product they purchased was made and/or manufactured in the USA. Had Plaintiff and other consumers similarly situated been made aware that Defendant's Class Products were

not actually made and/or manufactured in the USA, they would not have purchased the products.

18. As a result of Defendant's false and misleading statements and failure to disclose (or adequately disclose), as well as Defendant's other conduct described herein, Plaintiff and other similarly situated consumers purchased thousands, if not millions, of Defendant's Class Products and have suffered, and continue to suffer, injury in fact, including the loss of money and/or property.

19. Defendant's conduct as alleged herein violates several California laws, as more fully set forth herein.

20. This action seeks, among other things, equitable and injunctive relief; restitution of all amounts illegally retained by Defendant; and disgorgement of all ill-gotten profits from Defendant's wrongdoing alleged herein.

## FACTUAL ALLEGATIONS

21. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

22. Defendant manufactures, markets and/or sells various dietary supplements that have been and are currently still represented and advertised as "Manufactured in the USA." Defendant makes these representations on its website and on the websites of its third-party vendors.

23. Contrary to the representation, Defendant's Class Products are wholly and/or substantially made with ingredients that are not "Manufactured in the USA."

24. Based upon information and belief, the offending Product purchased by Plaintiff contains or is made with ingredients that are not "Manufactured in the USA."

25. Based upon information and belief, the offending Product purchased by Plaintiff, and presumably all of Defendant's Class Products are substantially similar, contain or are made with ingredients that are not "Manufactured in the USA," contrary to Defendant's "Manufactured in the USA" advertisement and representations.

26. Defendant markets, and continues to sell, and represent to the general public via its website, the website of its third-party vendors and other forms of advertising and marketing that the Class Products are "Manufactured in the USA." As such, Defendant has inaccurately represented that



KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

its Class Products are "Manufactured in the USA," which conveys to a reasonable consumer that the Class Products, including the product, are made entirely in the United States, made of ingredients from the United States, made pursuant to United States labor standards, and are therefore superior quality (i.e., contain better grown ingredients that non-US made products or raw materials). Defendant possesses superior knowledge of the true facts that were not disclosed, thereby tolling the running of any applicable statute of limitations.

27. Most consumers possess limited knowledge of the likelihood that products are made with or contain ingredients that are not "Manufactured in the USA" when they are advertised and represented to be "Manufactured in the USA." This is a material factor in many individuals' purchasing decisions, as they believe they are purchasing a product that is "Manufactured in the USA."

28. Consumers generally believe that products that are "Manufactured in the USA" are made entirely in the United States, made of ingredients from the United States, made pursuant to United States labor standards, and are therefore superior quality (i.e., contain better grown ingredients that non-US made products or raw materials).

29. On information and belief, Defendant's misrepresented Class Products were purchased by consumers over Defendant's competitors' properly and legally marketed products, competitors during the entirety of the relevant four-year statutory time period, based on the false "Manufactured in the USA" designation (or some derivative thereof). California laws are designed to protect consumers from such false representations and predatory conduct.

30. On or about January 24, 2023, Plaintiff searched online for a pre-workout supplement when he discovered the Product and its misrepresented "Manufactured in the USA" claim. Plaintiff subsequently purchased the product on Amazon.com.

31. At the time of Plaintiff's purchase, the description of the offending product described the product as "Manufactured in the USA" when the product was actually made with or contained ingredients that were not "Manufactured in the USA." Accordingly, Defendant is not entitled to lawfully make representations that the product was "Manufactured in the USA."

KAZEROUNI LAW GROUP, APC

32. It is widely and generally known that consumers prefer products that are "Manufactured in the USA" due to quality, support for local businesses, national economic and other reasons. The preference is increased when the products are health related and ingestible due to the potential for inferior ingredients and components being manufactured overseas. In making the decision to purchase Defendant's Product, Plaintiff relied upon the advertising, marketing and/or other promotional materials prepared, approved and distributed and/or published by Defendant and its agents and disseminated through its Class Products' advertising containing the misrepresentations alleged herein.

33. Had Plaintiff been made aware that the Product was not actually "Manufactured in the USA," he would not have purchased the Product. In other words, Plaintiff would not have purchased Defendant's Product, but for the "Manufactured in the USA" representations on Defendant's website and advertising on the websites of its third-party vendors.

34. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's false "Manufactured in the USA" designation set forth on Defendant's website and advertising on the websites of its third-party vendors.

35. In each case when Plaintiff and putative Class members purchased a Class Product, they relied upon Defendant's "Manufactured in the USA" representation in their purchasing decision, which is typical of most U.S. consumers. Consequently, they were deceived as a result of Defendant's actions. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA.

36. On information and belief, Defendant's products are made with or contain products that are not manufactured in the USA, including the Product purchased by Plaintiff, Plaintiff and putative Class members purchased Defendant's misrepresented Class Products over Defendant's competitors' properly and legally marketed products. The precise amount of damages will be proven at the time of trial, in large part, by expert testimony.

37. Plaintiff and Class members were undoubtedly injured as a result of Defendant's false "Manufactured in the USA" representations that are at issue in this matter.

## CLASS ACTION ALLEGATIONS

38. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

39. Plaintiff brings this action individually and on behalf of all others similarly situated against Defendant, pursuant to California Code of Civil Procedure Section 378.

40. Plaintiff represents, and is a member of the class, ("the Class") consisting of:

> "All persons similarly situated within the state of California who purchased one or more of Defendant's Class Products, which were represented and/or advertised as "Manufactured in the USA" (or similar words), that were made with or contained ingredients that were not manufactured in the USA, within the four years prior to the filing of the Complaint."

41. Excluded from the Class are Defendant and any of its officers, directors, and employees.

42. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

43. The "Class Period" means four years prior to the filing of the Complaint in this action.

44. This action has been brought and may properly be maintained as a class action under the provisions of § 382 of the California Code of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

45. **Ascertainability**. Plaintiff does not know the number of members in the Class, but Plaintiff currently believes that there are hundreds of thousands, if not more, members of the Class within the State of California. Because of the nature of Defendant's products, Defendant must keep detailed and accurate records of sale and distribution. Therefore, the members of the Class are ascertainable through Defendant's records and/or Defendant's agents' records regarding retail and sales, as well as through public notice. This matter should therefore be certified as a Class action to assist in the expeditious litigation of this matter.

46. **Numerosity**. The members of the Class are so numerous and geographically disbursed that joinder of all Class members is impractical, and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court.



KAZEROUNI LAW GROUP, APC

47. **Existence and Predominance of Common Questions of Law and Fact**. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. Common questions of fact and law exist in this matter that predominate over questions that may affect individual Class members, including, but not limited to, the following:

a. Whether Defendant committed the wrongful conduct alleged herein;

b. Whether Defendant's claims and representations, as alleged herein, are untrue, misleading, and/or reasonably likely to deceive the average consumer;

c. Whether Defendant's acts, transactions, or course of conduct constitute the violations of law alleged herein;

d. Whether Defendant's conduct violates California Civil Code §§ 1750, *et seq*.;

e. Whether Defendant's advertising is false, untrue, or misleading within the meaning of California Business & Professions Code §§ 17500, *et seq*.;

f. Whether Defendant's conduct is an unfair, fraudulent, or unlawful act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

g. Whether Defendant's advertising is unfair, deceptive, untrue or misleading within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

h. Whether Defendant acted negligently or intentionally in making the misrepresentations contained regarding the Products thought its website and the websites of its third-party vendors;

i. Whether Defendant, through its conduct, received money that, in equity and good conscience, belongs to Plaintiff and members of the Class;

j. Whether the members of the Class sustained and/or continue to sustain damages attributable to Defendant's conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages; and

k. Whether the members of the Class are entitled to injunctive and/or any other equitable relief, including but not limited to restitution and/or disgorgement of ill-gotten gains.



KAZEROUNI LAW GROUP, APC

48. **Typicality**. As a person who purchased one or more of Defendant's products, that were advertised as "Manufactured in the USA" but are made with or contain ingredients that are not manufactured in the USA, Plaintiff is asserting claims that are typical of the Class. Plaintiff's claims involve the same violations of law by Defendant as other Class Members' claims. Plaintiff and members of the Class also sustained damages arising out of Defendant's common course of conduct complained herein. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent members of the Class. Defendant has no defenses unique to the Plaintiff.

49. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of other members of the Class in that Plaintiff has no interests antagonistic to any member of the Class. Further, Plaintiff has retained counsel experienced in handling class action claims and claims involving violations of the consumer laws like violations of the California Business and Professions Code, and, specifically, false and deceptive advertising. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and proposed Class.

50. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent and/or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendant. The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them. Even if the members of the proposed Class could afford such litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and



KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable pursuant to Cal. Code of Civil Procedure § 382.

51. Unless the Class is certified, Defendant will retain monies received as a result of Defendant's unlawful and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendant will also likely continue to, or allow its agents to, advertise, market, promote and package Defendant's Class Products in an unlawful and misleading manner, and members of the Class will continue to be misled, harmed, and denied their rights under California law.

52. Further, Defendant has acted or refused to act on grounds that are generally applicable to the class so that declaratory and injunctive relief is appropriate to the Class as a whole, making class certification appropriate.

## FIRST CAUSE OF ACTION

## VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

## CAL. CIV. CODE SECTION 1750, ET SEQ.

53. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

54. California Civil Code Section 1750 et seq., entitled the Consumers Legal Remedies Act (hereinafter "CLRA"), provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer." The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, *inter alia*, that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.

55. Defendant's products constitute "goods" as defined pursuant to Civil Code Section 1761(a).

56. Plaintiff, and the Class members, are each a "consumer" as defined pursuant to Civil Code Section 1761(d).

KAZEROUNI LAW GROUP, APC

57. Each of Plaintiff's and the Class members' purchases of Defendant's products constituted a "Transaction" as defined pursuant to Civil Code Section 1761(e).

58. Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) provides that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> (2) [m]isrepresenting the source, sponsorship, approval, or certification of goods or services;
> (3) [m]isrepresenting the affiliation, connection, or association with, or certification by, another;
> (4) [u]sing deceptive representations or designations of geographic origin in connection with goods and services;
> (5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;
> (7) [r]epresenting that goods or services are of a particular standard, quality, or grade…; [and]
> (9) [a]dvertising goods or services with intent not to sell them as advertised."

59. Defendant violated Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) by marketing and representing that its Class Products are "Manufactured in the USA" when they are made with or contain ingredients that are not manufactured in the USA.

60. Pursuant to section 1782(d) by letter dated March 8, 2023, Plaintiff notified Defendant in writing by certified mail of the particular violations of section 1770 and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. Defendant failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within thirty days of the date of written notice pursuant to section 1782. Therefore, Plaintiff and the Class further seek actual, punitive, and statutory damages, as deemed appropriate.

61. On information and belief, Defendant's violations of the CLRA set forth herein were done with awareness of the fact that the conduct alleged was wrongful and was motivated solely for Defendant's self-interest, monetary gain and increased profit. Plaintiff further alleges that Defendant committed these acts knowing the harm that would result to Plaintiff and Defendant engaged in such unfair and deceptive conduct notwithstanding such knowledge.

62. Plaintiff further alleges that Defendant committed these acts knowing the harm that would result to Plaintiff and Defendant engaged in such unfair and deceptive conduct notwithstanding such knowledge.

63. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's false "Manufactured in the USA representations set forth in Defendant's website and the websites of its third-party vendors.

64. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiff and members of the Class are entitled to a declaration that Defendant violated the Consumer Legal Remedies Act.

65. Plaintiff, on behalf of himself and the Class demands judgment against Defendant for damages, restitution, punitive damages, statutory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

66. Pursuant to section 1780(e) of the California Civil Code, Plaintiff and the Class make claims for damages and attorneys' fees and costs.

67. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

**SECOND CAUSE OF ACTION**

**VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")**

**BUS. & PROF. CODE §§ 17500, *ET SEQ*.**

68. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.



KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

69. Plaintiff and Defendant are both “person[s]” as defined by Cal. Bus. & Prof. Code § 17506.

70. Cal. Bus. & Prof. Code § 17535 authorizes a private right of action on both an individual and representative basis.

71. Defendant misrepresents its products as “Manufactured in the USA” when in fact Defendant’s products are made with or contain ingredients that are not manufactured in the USA.

72. These misrepresentations, acts, and non-disclosures by Defendant constitute false and misleading advertising in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

73. At all times relevant, Defendant’s representations and advertising its products was, and is, untrue, misleading, and likely to deceive the reasonable consumer and the public.

74. Defendant engaged in the false and/or misleading advertising and marketing of its Product, as alleged herein, with the intent to directly or indirectly induce consumers to purchase its products, which Defendant knew, or had reason to know, that the Class products were made with or contained ingredients that were not manufactured in the USA.

75. Because Defendant knew or should have known that the representations and/or omissions alleged herein were untrue or misleading, Defendant acted in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

76. Had Defendant truthfully advertised that its products were made with or contained ingredients that were not manufactured in the USA, Plaintiff and the putative Class members would not have purchased the products or would have purchased a different product from another company.

77. This false and misleading advertising of the products by Defendant presents a continuing threat to consumers, as Defendant’s conduct is ongoing to this day.

78. As a direct and proximate result of the aforementioned acts and omissions by Defendant, Defendant received and continues to hold monies rightfully belonging to Plaintiff and the putative Class members, who were led to purchase Defendant’s product during the Class Period.

**THIRD CAUSE OF ACTION**

**VIOLATION OF BUSINESS & PROFESSIONS CODE**

KAZEROUNI LAW GROUP, APC

**BUS. & PROF. CODE, SECTION 17200, ET SEQ.**

79. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

80. Plaintiff and Defendant are each "person[s]" as defined by California Business & Professions Code § 17201. California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

81. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

82. By and through Defendant's conduct alleged in further detail above and herein, Defendant engaged in conduct which constitutes unlawful, unfair, and/or fraudulent business practices prohibited by Bus. & Prof. Code § 17200 et seq.

***A. "Unlawful" Prong***

83. Beginning at a date currently unknown through the time of this Complaint, Defendant has committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code § 17200 et seq. by manufacturing, distributing, and/or marketing Defendant's Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq., and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq., by falsely representing that the products referenced herein are "Manufactured in the USA" when Defendant's products are in fact made with or contain ingredients that are not manufactured in the USA.

***B. "Unfair" Prong***

84. Beginning at a date currently unknown and continuing up through the time of this Complaint, Defendant has committed acts of unfair competition that are prohibited by Bus. & Prof. Code

section 17200 et seq. Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes by engaging conduct and practices that threaten an incipient violation of law/s or violate the policy or spirit of law/s by manufacturing, distributing, and/or marketing Defendant's products with a false ingredient origin information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the products referenced herein are "Manufactured in the USA" when Defendant's products are in fact made with or contain ingredients that are not manufactured in the USA.

85. Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices that are immoral, unethical, oppressive or unscrupulous, the utility of such conduct, if any, being far outweighed by the harm done to consumers and against public policy by manufacturing, distributing, and/or marketing Defendant's Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the products referenced herein are "Manufactured in the USA" when Defendant's products are in fact made with or contain ingredients that are not manufactured in the USA.

86. Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices, including manufacturing, distributing, marketing, and/or advertising Defendant's products with false ingredient information, wherein: (1) the injury to the consumer was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was not of the kind that consumers themselves could not have reasonably avoided.

***C. "Fraudulent" Prong***

87. Beginning at a date currently unknown and continuing up through the time of this Complaint, Defendant engaged in acts of unfair competition, including those described above and herein, prohibited and in violation of Bus. & Prof. Code § 17200 et seq., by engaging in a pattern of "fraudulent" business practices within the meaning of Bus. & Prof. Code § 17200 et seq, by

KAZEROUNI LAW GROUP, APC

manufacturing, distributing, and/or marketing Defendant's Class Products in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the products referenced herein are "Manufactured in the USA" when Defendant's products are in fact made with or contain ingredients that are not manufactured in the USA.

88. Plaintiff reserves the right to allege further conduct that constitutes other fraudulent business acts or practices. Such conduct is ongoing and continues to this date.

***D. "Unfair, Deceptive, Untrue or Misleading Advertising" Prong***

89. Defendant's advertising is unfair, deceptive, untrue and/or misleading in that consumers are led to believe that Defendant's Class Products are "Manufactured in the USA" when Defendant's products are in fact made with or contain ingredients that are not manufactured in the USA.

90. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendant's representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the products are actually manufactured in the USA.

91. Defendant's unlawful, unfair, and fraudulent business practices and unfair, deceptive, untrue or misleading advertising presents a continuing threat to the public in that Defendant continues to engage in unlawful conduct resulting in harm to consumers.

92. Defendant engaged in these unlawful, unfair, and fraudulent business practices motivated solely by Defendant's self-interest with the primary purpose of collecting unlawful and unauthorized monies from Plaintiff and all others similarly situated; thereby unjustly enriching Defendant.

93. Such acts and omissions by Defendant are unlawful and/or unfair and/or fraudulent and constitute a violation of Business & Professions Code §§ 17200, et seq. Plaintiff reserves the right to identify additional violations by Defendant as may be established through discovery.

94. As a direct and proximate result of the aforementioned acts and representations described above and herein, Defendant received and continues to receive unearned commercial benefits at the expense of their competitors and the public.



KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

95. As a direct and proximate result of Defendant's unlawful, unfair and fraudulent conduct described herein, Defendant has been and will continue to be unjustly enriched by the receipt of ill-gotten gains from customers, including Plaintiff, who unwittingly provided money to Defendant based on Defendant's representations.

96. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's false representations set forth on the Defendant's Products.

97. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

## FOURTH CAUSE OF ACTION FOR
## NEGLIGENT MISREPRESENTATION

98. Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully stated herein.

99. At a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendant represented to the public, including Plaintiff, by packaging and other means, that Defendant's Class Products are "Manufactured in the USA" when Defendant's products are in fact made with or contain ingredients that are not manufactured in the USA.

100. Defendant made the representations herein alleged with the intention of inducing the public, including Plaintiff and putative class members, to purchase Defendant's Class Products.

101. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendant's advertising representations and, in reliance on them, purchased the Class Products, as described herein.

102. At all times relevant, Defendant made the misrepresentations herein alleged when Defendant should have known these representations to be untrue, and Defendant had no reasonable basis for believing the representations to be true.

103. As a proximate result of Defendant's negligent misrepresentations, Plaintiff and other consumers similarly situated were induced to purchase, purchase more of, purchase instead of

104.

105. , or pay more for Defendant's Class Products, due to the unlawful acts of Defendant, in an amount to be determined at trial, during the Class Period.

**FIFTH CAUSE OF ACTION FOR**

**INTENTIONAL MISREPRESENTATION**

106. Plaintiff repeats, re-alleges and incorporates herein by reference the above allegations as if fully stated herein.

107. At a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendant intentionally represented to the public, including Plaintiff, by promoting and other means, that Defendant's Class Products were "Manufactured in the USA" when Defendant's products are in fact made with or contain ingredients that are not manufactured in the USA.

108. Defendant made the representations herein alleged with the intention of inducing the public, including Plaintiff, to purchase Defendant's Class Products for Defendant's own financial gain.

109. Defendant intentionally made such misrepresentations by printing and advertising its misrepresentations its website and the websites of its third-party vendors.

110. Defendant's misrepresentations of the Class Products as "Manufactured in the USA" was misleading because Defendant's products are in fact made with or contain ingredients that are not manufactured in the USA.

111. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendant's advertising representations and, in reliance on such representations, purchased the Class Products, as described above.

112. At all times relevant, Defendant intentionally made the misrepresentations herein alleged, allowed the misrepresentations to continue to be made by its resellers and Defendant knew the representations to be false.

113. As a proximate result of Defendant's intentional misrepresentations, Plaintiff and other consumers similarly situated were induced to spend an amount of money to be determined at trial on Defendant's misrepresented Products.

KAZEROUNI LAW GROUP, APC

114. Defendant knew that its Class Products were in fact not "Manufactured in the USA" but instead made with or contain ingredients that are not manufactured in the USA**,** but nevertheless made the representations described herein with the intention that consumers rely on Defendant's representations.

115. Defendant also knew that its website, as well as the websites of its third-party vendors, were advertising its Class Products as "Manufactured in the USA," when Defendant clearly knew that its Class Products were in fact made with or contained ingredients that were not manufactured in the USA.

116. Plaintiff and other consumers similarly situated, in purchasing and using the Class Products as herein alleged, did rely on Defendant's representations, including the representations on Defendant's advertisements and website, all to their damage and/or detriment as herein alleged.

117. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendant as follows:

i. The "who" is Defendant;

ii. The "what" is representation that Defendant's Class Products are "Manufactured in the USA" when in fact the Products are made with or contain ingredients that re not manufactured in the USA;

iii. The "when" is the date Plaintiff purchased the product and the Class Period of four years prior to the filing of the Complaint;

iv. The "where" is in Defendant's product advertisements and marketing; and

v. The "how" is the allegation that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" but instead made with or contain ingredients not manufactured in the USA.

118. By engaging in the acts described above, Defendant is guilty of malice, oppression, and fraud, and each Plaintiff is therefore entitled to recover exemplary or punitive damages.

///

///

///



KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the Court grant Plaintiff and the putative Class members the following relief:

- That this action be certified as a Class Action;
- That Plaintiff be appointed as the Class Representative;
- That Plaintiff's attorneys be appointed as Class Counsel;
- That Defendant's and Does' wrongful conduct be adjudged and decreed to violate the consumer protection statutes raised herein;
- That Plaintiff and each of the other members of the Class recover the amounts by which Defendant and Does has been unjustly enriched;
- An order requiring imposition of a constructive trust and and/or disgorgement of Defendant's and Does' ill-gotten gains and to pay restitution to Plaintiff and all members of the Class and to restore to the plaintiff and members of the class all funds acquired by means of any act or practice declared by this court to be an unlawful, fraudulent or unfair business act or practice, in violation of laws, statutes or regulations, or constituting unfair competition;
- Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery were necessary and as applicable, to prevent Defendant or Does from retaining the benefits of their wrongful conduct;
- That Defendant and Does be enjoined from continuing the wrongful conduct alleged herein and be required to comply with all applicable laws;
- A temporary, preliminary and/or permanent order for injunctive relief requiring Defendant and Does to: (i) discontinue its false and/or misleading statement/s; and (ii) undertake an immediate public information campaign to inform members of the proposed class as to their prior practices;
- Pre-judgment interests from the date of filing of this suit;
- that Plaintiff and each member of the putative Class recover their costs of suit.

**FIRST CAUSE OF ACTION FOR
VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT
CAL. BUS. & PROF. CODE §§ 1750, *ET SEQ.***

- Actual damages, injunctive relief, restitution, and punitive damages pursuant to Cal. Civ. Code § 1780(a); and
- an award of costs and attorney's fees pursuant to Cal. Civ. Code § 1780(d).

**SECOND CAUSE OF ACTION FOR
VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW
CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17535; and
- Recovery of reasonably attorney's fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**THIRD CAUSE OF ACTION FOR
VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW
CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17203; and
- Recovery of reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**FOURTH CAUSE OF ACTION FOR
NEGLIGENT MISREPRESENTATION**

- A judgment against Defendant and Does for general and compensatory damages in an amount to be determined at trial; and

**FIFTH CAUSE OF ACTION FOR**

**INTENTIONAL MISREPRESENTATION**

- A judgment against Defendant and Does for general and compensatory damages in an amount to be determined at trial;
- Punitive damages pursuant to Cal. Civ. Code § 3294; and
- That Plaintiff and the members of the Class be granted any other relief the Court may deem just and proper.

///

///



KAZEROUNI LAW GROUP, APC

## TRIAL BY JURY

119. Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff is entitled, and demands, a trial by jury.

Dated: July 6, 2023

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: ______________________

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*

KAZEROUNI LAW GROUP, APC

# EXHIBIT A

KAZEROUNI LAW GROUP, APC

**AFFIDAVIT OF DANIEL ROSSI**

I, DANIEL ROSSI, DECLARE:

1. On or about January 24, 2023, I visited Amazon.com and purchased Defendant's Nitrosurge Pre-workout dietary supplement (the "Product").
2. At the time of my purchase and review of the Product, I was in the County of Los Angeles, California, where I also reside.
3. It is my understanding that Defendants NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY conducts business in the County of Los Angeles, State of California.

I declare under the penalty of perjury under the laws of the state of California that the foregoing is true and correct, executed on July 6, 2023.

By:______________________

Daniel Rossi

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Kazerouni Law Group, APC; Abbas Kazerounian, Esq (249203); David J. McGlothlin, Esq. (253265); Mona Amini (296829); Gustavo Ponce, Esq. (343430)
245 Fischer Avenue, Suite D1, Costa Mesa, CA 92626
TELEPHONE NO.: (800) 400-6808 FAX NO. (Optional): (800) 520-5523
E-MAIL ADDRESS: ak@kazlg.com; david@kazlg.com; mona@kazlg.com;
ATTORNEY FOR (Name): Plaintiff Daniel Rossi

FOR COURT USE ONLY

**Electronically FILED by Superior Court of California, County of Los Angeles 7/06/2023 12:33 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: same as above
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME: Daniel Rossi v. Nutra Holdings, Inc. d/b/a Jacked Factory

## CIVIL CASE COVER SHEET

[X] **Unlimited** (Amount demanded exceeds $25,000)
[ ] **Limited** (Amount demanded is $25,000 or less)

**Complex Case Designation**
[ ] Counter [ ] Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 23STCV15674
JUDGE:
DEPT.:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[X] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [X] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [X] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [X] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive
4. Number of causes of action *(specify)*: 5: including violations of the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq.
5. This case [X] is [ ] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 7/6/2023
Abbas Kazerounian, Esq.
(TYPE OR PRINT NAME)
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
- Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
- Confession of Judgment *(non-domestic relations)*
- Sister State Judgment
- Administrative Agency Award *(not unpaid taxes)*
- Petition/Certification of Entry of Judgment on Unpaid Taxes
- Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition



For your protection and privacy, please press the Clear

| SHORT TITLE Daniel Rossi v. Nutra Holdings, Inc. d/b/a Jacked Factory | CASE NUMBER 23STCV15674 |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

**Applicable Reasons for Choosing Courthouse Location (Column C)**

| | |
|---|---|
| 1. Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. Location where petitioner lives. |
| 2. Permissive filing in Central District. | 8. Location wherein defendant/respondent functions wholly. |
| 3. Location where cause of action arose. | 9. Location where one or more of the parties reside. |
| 4. Mandatory personal injury filing in North District. | 10. Location of Labor Commissioner Office. |
| 5. Location where performance required, or defendant resides. | 11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury). |
| 6. Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons<br>(See Step 3 above) |
|---|---|---|---|
| **Personal Injury Cases Assigned to the Personal Injury Hub Courts** | | | |
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4, 11 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4, 11 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | | ☐ 2307 Construction Accidents | 1, 4, 11 |

| SHORT TITLE Daniel Rossi v. Nutra Holdings, Inc. d/b/a Jacked Factory | CASE NUMBER |
|---|---|

| | A Civil Case Cover Sheet Case Type | B Type of Action (check only one) | C Applicable Reasons (See Step 3 above) |
|---|---|---|---|
| **Personal Injury Cases Assigned to the Independent Calendar Courts** | | | |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 3, 5 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 3, 5 |
| | | ☐ 4502 Other Professional Health Case Malpractice | 1, 3, 5 |
| | Other Personal Injury / Property Damage / Wrongful Death (23) | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 3, 5 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 3, 5 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 3, 5 |
| **Other Civil Cases Assigned to Independent Calendar Courts** | | | |
| **Non-Personal Injury/Property Damage /Wrongful Death Tort** | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☒ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |

| SHORT TITLE | CASE NUMBER |
| --- | --- |
| Daniel Rossi v. Nutra Holdings, Inc. d/b/a Jacked Factory | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action (check only one) | C<br>Applicable Reasons (See Step 3 above) |
| --- | --- | --- | --- |
| Contract | Breach of Contract/ Warranty (06) (not insurance) | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence)<br>☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 1, 2, 5<br>2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff<br>☐ 0902 Other Promissory Note/Collections Case<br>☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014)<br>☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 6, 11<br>5, 11<br>5, 6, 11<br>5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ 3701 Contractual Fraud<br>☐ 3702 Tortious Interference<br>☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 5<br>1, 2, 3, 5<br>1, 2, 3, 8, 9 |
| Real Property | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br>Number of Parcels ___________ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure<br>☐ 2602 Quiet Title<br>☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6<br>2, 6<br>2, 6 |
| Unlawful Detainer | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| Judicial Review | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus<br>☐ 0202 Writ – Mandamus on Limited Court Case Matter<br>☐ 0203 Writ – Other Limited Court Case Review | 2, 8<br>2<br>2 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Daniel Rossi v. Nutra Holdings, Inc. d/b/a Jacked Factory | |

| | A<br>Civil Case Cover Sheet<br>Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons<br>(See Step 3 above) |
|---|---|---|---|
| Judicial Review | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| Provisionally Complex Litigation | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |
| | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| Enforcement of Judgment | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2003 Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| Miscellaneous Civil Complaints | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ 4304 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| Miscellaneous Civil Petitions | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |

| SHORT TITLE Daniel Rossi v. Nutra Holdings, Inc. d/b/a Jacked Factory | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons<br>(See Step 3 above) |
|---|---|---|---|
| Miscellaneous Civil Petitions | Other Petitions<br>(not specified above) (43) | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases).

| REASON:<br>☒ 1. ☐ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | | | ADDRESS: |
|---|---|---|---|
| CITY: | STATE: | ZIP CODE: | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the Central District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: 7/6/2023

[signature]
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (05/22).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

Superior Court of California, County of Los Angeles

# ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

## What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

## Advantages of ADR

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

## Disadvantages of ADR

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or decision by a judge or jury.

## Main Types of ADR

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

## How to Arrange Mediation in Los Angeles County

Mediation for **civil cases** is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

- **ADR Services, Inc.** Assistant Case Manager Janet Solis, janet@adrservices.com (213) 683-1600
- **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

**These organizations cannot accept every case and they may decline cases at their discretion.** They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

**NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate, or small claims cases.**

b. **Los Angeles County Dispute Resolution Programs.** Los Angeles County-funded agencies provide mediation services on the day of hearings in small claims, unlawful detainer (eviction), civil harassment, and limited civil (collections and non-collection) cases.
https://dcba.lacounty.gov/countywidedrp/

**Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case. https://my.lacourt.org/odr/

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit https://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit https://www.lacourt.org/division/civil/CI0047.aspx

Los Angeles Superior Court ADR website: https://www.lacourt.org/division/civil/CI0109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

July 19, 2023
3:10 PM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: None

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Court Order Re: Newly Filed Class Action

By this order, the Court determines this case to be Complex according to Rule 3.400 of the California Rules of Court. The Clerk's Office has assigned this case to this department for all purposes.

Pursuant to Government Code Sections 70616(a) and 70616(b), a single complex fee of one thousand dollars ($1,000.00) must be paid on behalf of all plaintiffs. For defendants, a complex fee of one thousand dollars ($1,000.00) must be paid for each defendant, intervenor, respondent or adverse party, not to exceed, for each separate case number, a total of eighteen thousand dollars ($18,000.00), collected from all defendants, intervenors, respondents, or adverse parties. All such fees are ordered to be paid to Los Angeles Superior Court, within ten (10) days of service of this order.

By this order, the Court stays the case, except for service of the Summons and Complaint. The stay continues at least until the Initial Status Conference. Initial Status Conference is set for 10/23/2023 at 09:00 AM in this department. At least ten (10) days prior to the Initial Status Conference, counsel for all parties must discuss the issues set forth in the Initial Status Conference Order issued this date. Counsel must file a Joint Initial Status Conference Response Statement five (5) court days before the Initial Status Conference.

The Initial Status Conference Order, served concurrently with this Minute Order, is to help the Court and the parties manage this complex case by developing an orderly schedule for briefing, discovery, and court hearings. The parties are informally encouraged to exchange documents and information as may be useful for case evaluation.

Responsive pleadings shall not be filed until further Order of the Court. Parties must file a Notice of Appearance in lieu of an Answer or other responsive pleading. The filing of a Notice of Appearance shall not constitute a waiver of any substantive or procedural challenge to the

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

July 19, 2023
3:10 PM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: None

CSR: None
ERM: None
Deputy Sheriff: None

Complaint. Nothing in this order stays the time for filing an Affidavit of Prejudice pursuant to Code of Civil Procedure Section 170.6. Nothing in this order stays the filing of an Amended Complaint pursuant to Labor Code Section 2699.3(a)(2)(C) by a plaintiff wishing to add a Private Attorney General Act ("PAGA") claim.

For information on electronic filing in the Complex Courts, please refer to https://www.lacourt.org/division/efiling/efiling2.aspx#civil. See, in particular, the link therein for "Complex Civil efiling." Parties shall file all documents in conformity with the Presiding Judge's First Amended General Order of May 3, 2019, particularly including the provisions therein requiring Bookmarking with links to primary documents and citations; that Order is available on the Court's website at the link shown above.

For efficiency in communication with counsel, the complex program requires the parties in every new case to use an approved third-party cloud service that provides an electronic message board. In order to facilitate communication with counsel prior to the Initial Status Conference, the parties must sign-up with the e-service provider at least ten (10) court days in advance of the Initial Status Conference and advise the Court which provider was selected.

The court has implemented LACourtConnect to allow attorneys, self-represented litigants and parties to make audio or video appearances in Los Angeles County courtrooms. LACourtConnect technology provides a secure, safe and convenient way to attend hearings remotely. A key element of the Court's Access LACourt YOUR WAY program to provide services and access to justice, LACourtConnect is intended to enhance social distancing and change the traditional in-person courtroom appearance model. See https://my.lacourt.org/laccwelcome for more information.

This Complex Courtroom does not use Los Angeles Superior Court's Court Reservation ("CRS") portal to reserve motion hearing dates. Rather, counsel may secure dates by calling the Courtroom Assistant at 213-310-70xx with the "xx" being the Department number, e.g. Dept. 1 is 01 and Dept. 10 is 10.

Court reporters are not provided for hearings or trials. The parties should make their own arrangements for any hearing where a transcript is desired.

If you believe a party or witness will need an interpreter, see the court's website for information on how to make such a request in a timely manner. https://www.lacourt.org/irud/UI/index.aspx

Counsel are directed to access the following link for further information on procedures in the

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

July 19, 2023
3:10 PM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: None

CSR: None
ERM: None
Deputy Sheriff: None

---

Complex litigation Program courtrooms: https://www.lacourt.org/division/civil/CI0042.aspx.

The plaintiff must serve a copy of this minute order and the attached Initial Status Conference Order on all parties forthwith and file a Proof of Service in this department within seven (7) days of service.

Certificate of Mailing is attached.

FILED
Superior Court of California
County of Los Angeles
07/19/2023
David W. Slayton, Executive Officer / Clerk of Court
By: A. He Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No.: 23STCV15674

**INITIAL STATUS CONFERENCE ORDER (COMPLEX CLASS ACTIONS)**

Case Assigned for All Purposes to Judge Stuart M. Rice

Department: 1

This action has been designated as complex pursuant to CRC 3.400(a), and thus requires exceptional judicial management to carry out the purposes of Rule 3.400(a) and to promote effective decision-making by the Court. This Initial Status Conference Order (Complex Class Actions) supplements a Minute Order served concurrently herewith. That Minute Order sets a date and time for the Initial Status Conference and includes many other important provisions which are NOT repeated in this Order. Counsel must review that Minute Order carefully to be fully informed of your obligations and the unique processes used in the Los Angeles Superior Court Complex Courtrooms.

Note: Some provisions of this Order are in reference to wage-and-hour class actions and may not be applicable to other types of class actions. Insofar as they are irrelevant to your case, say so in your Joint Initial Status Conference Response Statement.

Pending further order, the following is ordered:

The Court orders counsel to prepare for the Initial Status Conference ("ISC") by identifying and discussing the central legal and factual issues in the case. Counsel for plaintiff is ordered to initiate contact with counsel for defense to begin this process. Counsel then must negotiate and agree, as much as possible, on a case management plan. To this end, counsel must file a Joint Initial Status Conference Response Statement five (5) court days before the Initial Status Conference. The Joint Response Statement must be filed on line-numbered pleading paper and must specifically answer each of the below-numbered questions. Do not use the Judicial Council Form CM-110 (Case Management Statement).

**1. PARTIES AND COUNSEL:** Please list all presently-named class representatives and presently-named defendants, together with all counsel of record, including counsel's contact and email information.

**2. STATUS OF PLEADINGS:** Please indicate whether defendant has filed a Notice of Appearance or an Answer to the Complaint, and, if so, indicate the filing date(s).

**3. POTENTIAL ADDITIONAL PARTIES:** Indicate whether any plaintiff presently intends to add additional class representatives, and, if so, the name(s) and date by which these class representatives will be added. Indicate whether any plaintiff presently intends to name additional defendants, and, if so, the name(s) and date by which the defendant(s) will be added. Indicate whether any appearing defendant presently intends to file a cross-complaint and, if so, the names of cross-defendants and the date by which the cross-complaint will be filed.

**4. IMPROPERLY NAMED DEFENDANT(S):** If the complaint names the wrong person or entity, please explain why the named defendant is improperly named and the proposed procedure to correct this error.

**5. ADEQUACY OF PROPOSED CLASS REPRESENTATIVE(S):** If any party believes one or more named plaintiffs might not be an adequate class representative, including reasons of conflict of interest as described in *Apple Computer v. Superior Court* (2005) 126 Cal.App.4th 1253, please explain. No prejudice will attach to these responses.

**6. ESTIMATED CLASS SIZE:** Please discuss and indicate the estimated class size.

**7. OTHER ACTIONS WITH OVERLAPPING CLASS DEFINITIONS:** Please list other cases with overlapping class definitions. Please identify the court, the short caption title, the docket number, and the case status.

**8. POTENTIALLY RELEVANT ARBITRATION AND/OR CLASS ACTION WAIVER CLAUSES:** Please state whether arbitration is an issue in this case and attach a sample of any relevant clause of this sort. Opposing parties must summarize their views on this issue.

**9. POTENTIAL EARLY CRUCIAL MOTIONS:** Opposing counsel should identify and describe the significant core issues in the case, and then identify efficient ways to resolve those issues, including one or more of the following:

- Motion to Compel Arbitration,
- Early motions in limine,
- Early motions about particular jury instructions and verdict forms,
- Demurrers,
- Motions to strike,
- Motions for judgment on the pleadings, and
- Motions for summary judgment and summary adjudication.

**10. CLASS CONTACT INFORMATION:** Counsel should discuss whether obtaining class contact information from defendant' s records is necessary in this case and, if so, whether the parties consent to an "opt-out" notice process (as approved in *Belaire-West Landscape, Inc. v. Superior Court* (2007) 149 Cal.App.4th 554, 561). Counsel should address timing and procedure, including allocation of cost and the necessity of a third party administrator.

**11. PROTECTIVE ORDERS:** Parties considering an order to protect confidential information from general disclosure should begin with the model protective orders found on the Los Angeles Superior Court Website under "Civil Tools for Litigators."

**12. DISCOVERY:** Discovery is stayed until further order of the Court. Please discuss a discovery plan. If the parties cannot agree on a plan, summarize each side's views on discovery. The court generally allows discovery on matters relevant to class certification, which (depending on circumstances) may include factual issues also touching the merits. The Court generally does not permit

extensive or expensive discovery relevant only to the merits (for example, detailed damages discovery) at the initial stage unless a persuasive showing establishes early need. If any party seeks discovery from absent class members, please estimate how many, and also state the kind of discovery you propose. See California Rule of Court, Rule 3.768

**13. INSURANCE COVERAGE:** Please state if (1) there is insurance for indemnity or reimbursement, and (2) whether there are any insurance coverage issues which might affect settlement.

**14. ALTERNATIVE DISPUTE RESOLUTION:** Please discuss ADR and state each party's position about it. If pertinent, how can the court help identify the correct neutral and prepare the case for a successful settlement negotiation?

**15. TIMELINE FOR CASE MANAGEMENT:** Please recommend dates and times for the following:

- The next status conference,
- A schedule for alternative dispute resolution, if it is relevant,
- A filing deadline for the motion for class certification, and
- Filing deadlines and descriptions for other anticipated non-discovery motions.

**16. REMINDER WHEN SEEKING TO DISMISS:**

> "A dismissal of an entire class action, or of any party or cause of action in a class action, requires court approval. . . Requests for dismissal must be accompanied by a declaration setting forth the facts on which the party relies. The declaration must clearly state whether consideration, direct or indirect, is being given for the dismissal and must describe the consideration in detail."
>
> California Rule of Court, Rule 3.770.

If the parties settle the class action, that too will require judicial approval based on a noticed motion.

**17. REMINDER WHEN SEEKING APPROVAL OF A SETTLEMENT:**

Plaintiff(s) must address the issue of any fee splitting agreement in their motion for preliminary approval and demonstrate compliance with California Rule of Court 3.769, and the Rules of Professional Conduct 2-200(a) as required by *Mark v. Spencer* (2008) 166 Cal.App. 4th 219.

**18. NOTICE OF THE INITIAL STATUS CONFERENCE ORDER:**

Plaintiff's counsel shall serve this Initial Status Conference Order on all defense counsel, or if counsel is not known, on each defendant and file a Proof of Service with the court within seven (7) days of the date of this Order. If the Complaint has not been served as of the date of this Order, plaintiff(s) must serve the Complaint, along with a copy of this Order, within five (5) days of the date of this Order. Once served, each as yet non-appearing defendant shall file a Notice of Appearance (identifying counsel by name, firm name, address, email address, telephone number and fax number). The filing of a Notice of Appearance is without prejudice to (a) any jurisdictional, substantive or procedural challenge to the Complaint, (b) any affirmative defense, and (c) the filing of any cross-complaint in this action.

**19. e-Service Provider**

The parties should refer to the Court's website for the list of e-service providers which are approved for complex cases. The parties must sign up with the provider at least ten court days in advance of the Initial Status Conference and advise the Court, via email to sscdept1@lacourt.org, which provider was selected. While the parties are free to choose any approved service, Department 1 prefers Case Anywhere.

Dated: 7/19/2023



Stuart M. Rice / Judge

Honorable Stuart M. Rice
Judge of the Los Angeles Superior Court

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp<br><br>FILED<br>Superior Court of California<br>County of Los Angeles<br>07/19/2023<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | |
| PLAINTIFF/PETITIONER:<br>Daniel Rossi | |
| DEFENDANT/RESPONDENT:<br>Nutra Holdings, Inc. | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>23STCV15674 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Initial Status Conference Order upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Abbas Kazerounian
Kazerouni Law Group, APC
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626

David W. Slayton, Executive Officer / Clerk of Court

Dated: 07/19/2023

By: A. He
Deputy Clerk

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | FILED<br>Superior Court of California<br>County of Los Angeles<br>07/19/2023<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
| PLAINTIFF/PETITIONER:<br>Daniel Rossi | |
| DEFENDANT/RESPONDENT:<br>Nutra Holdings, Inc. | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>23STCV15674 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Court Order Re: Newly Filed Class Action) of 07/19/2023 upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Abbas Kazerounian
Kazerouni Law Group, APC
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626

David W. Slayton, Executive Officer / Clerk of Court

Dated: 07/19/2023

By: A. He
Deputy Clerk

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**Electronically FILED by Superior Court of California, County of Los Angeles 7/28/2023 4:27 PM David W. Slayton, Executive Officer/Clerk of Court, By K. Martinez, Deputy Clerk**

KAZEROUNI LAW GROUP, APC

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES – UNLIMITED CIVIL**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,<br><br>Defendant. | Case No.: 23STCV15674<br><br>PROOF OF SERVICE |

KAZEROUNI LAW GROUP, APC

**PROOF OF SERVICE**

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On July 28, 2023 I served the herein described document(s):

- **NATURE OF PROCEEDINGS: COURT ORDER REGARDING NEWLY FILED CLASS ACTION**
- **INITIAL STATUS CONFERENCE ORDER (COMPLEX CLASS ACTION)**

☐ FACSIMILE - by transmitting via facsimile the document(s) listed above to the fax number(s) set forth on the attached Telecommunications Cover Page(s) on this date before 5:00 p.m.

☐ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

☒ MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Las Vegas, Nevada addressed as set forth below.

☐ PERSONAL SERVICE - by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

Nutra Holdings, Inc. d/b/a Jacked Factory
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of Nevada and California that the above is true and correct. Executed on July 28, 2023, at Las Vegas, Nevada.

Gustavo Ponce, Esq.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

October 23, 2023
9:00 AM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: C. Vargas

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Gustavo Ponce via LACC

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Initial Status Conference

The case is called for hearing.

There is no service of the Summons and Complaint. Plaintiff indicates he will be attempting service of process via Hague Service Convention. Pursuant to the request of plaintiff, the Initial Status Conference scheduled for 10/23/2023 is continued to 02/27/2024 at 09:00 AM in Department 1 at Spring Street Courthouse. Status Conference Re: Proof of Service is scheduled for 02/27/2024 at 09:00 AM in Department 1 at Spring Street Courthouse.

Plaintiff to provide notice.

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**Electronically FILED by Superior Court of California, County of Los Angeles 1/10/2024 2:50 PM David W. Slayton, Executive Officer/Clerk of Court, By G. Carini, Deputy Clerk**

KAZEROUNI LAW GROUP, APC

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,<br><br>Defendant. | Case No.:23STCV15674<br><br>**PROOF OF SERVICE OF COMPLAINT** |

-

# AFFIDAVIT OF SERVICE

BETWEEN: Nutra Holdings Inc d/b/a Jacked Factory (PLAINTIFF)

AND: (DEFENDANT)

I, Tim O'Neill of St. John's NL, in the Province of Newfoundland and Labrador make oath and say that I did on the Thursday 9 day of Nov. A.D. 20 23, at approximately 2:35 O'clock in the after noon, serve Johnathan Dale (Partner) Stewart McKelvey with the within Document package by leaving a true copy of same with Johnathan Dale (Stewart McKelvey) at 100 New Gower St. and that I endorsed the date of service thereon Thursday, the 9 day of Nov. A.D., 20 23.

**SWORN TO** at St. John's, in the Province of Newfoundland and Labrador, this

10 day of November A.D., 20 23.

[signature]

Notary Public, Justice of the Peace or Commissioner of Oaths

**ANNA ELLWAND**
A Commissioner for Oaths in and for the Province of Newfoundland and Labrador.

T. O'Neill #039
Signature

Nov 9/23
Date

# CERTIFICATE
ATTESTATION

**The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,**
L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,

☑ **1. that the document has been served***
que la demande a été exécutée*

| | |
|---|---|
| **– the (date)** / le (date): | November 9th, 2023 |
| **– at (place, street, number):** à (localité, rue, numéro) : | 100 New Gower St |

**– in one of the following methods authorised by Article 5:**
dans une des formes suivantes prévues à l'article 5 :

| | | |
|---|---|---|
| ☐ | *a)* | **in accordance with the provisions of sub-paragraph *a)* of the first paragraph of Article 5 of the Convention*** selon les formes légales (article 5, alinéa premier, lettre *a*))* |
| ☐ | *b)* | **in accordance with the following particular method*:** selon la forme particulière suivante* : |
| ☒ | *c)* | **by delivery to the addressee, if he accepts it voluntarily*** par remise simple* |

**The documents referred to in the request have been delivered to:**
Les documents mentionnés dans la demande ont été remis à :

| | |
|---|---|
| **Identity and description of person:** Identité et qualité de la personne : | Johnathan Dale |
| **Relationship to the addressee (family, business or other):** Liens de parenté, de subordination ou autres, avec le destinataire de l'acte : | Partner of Stewart Mckelvey |

☐ **2. that the document has not been served, by reason of the following facts*:**
que la demande n'a pas été exécutée, en raison des faits suivants*:

☐ **In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement*.**
Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint*.

***Annexes** / Annexes*

| | |
|---|---|
| **Documents returned:** Pièces renvoyées : | Summons in Complaint, Complaint, Case Cover Sheet, Notice of Case Assignment Unlimited civil Case, First amended General Order, Alternative Dispute Resolution Information packet, Notice, Voluntary Efficient Litigation Stipulations, rossi letter that was sent, Notice of Hearing to the Defendant |
| **In appropriate cases, documents establishing the service:** Le cas échéant, les documents justificatifs de l'exécution : | Affidavit from Sheriff's office showing Service |

* if appropriate / s'il y a lieu

| | |
|---|---|
| **Done at** / Fait à Office of the High Sheriff 319 Duckworth St, St. John's NL, Canada<br>**The** / le November 10th, 2023 | **Signature and/or stamp** Signature et / ou cachet<br>[signature]<br>ANNA ELLWAND<br>A Commissioner for Oaths in and for the Province of Newfoundland and Labrador. |

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp (*pro hac vice forthcoming*)
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

**Electronically FILED by Superior Court of California, County of Los Angeles 2/20/2024 12:24 PM David W. Slayton, Executive Officer/Clerk of Court, By K. Valenzuela, Deputy Clerk**

Attorneys for Defendant NUTRA HOLDINGS, INC.

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br><br>**NOTICE OF APPEARANCE ON BEHALF OF NUTRA HOLDINGS, INC.** |

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Please take notice that Carol R. Brophy, Jennifer K. Singh and Anthony Hopp of Steptoe LLP, hereby enter an appearance as counsel for Defendant NUTRA HOLDINGS, INC. in the above-referenced action. Please serve said counsel with all pleadings and notices in this action.

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp (*pro hac vice forthcoming*)
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Dated: February 20, 2024

**STEPTOE & JOHNSON LLP**

By: [signature]

Carol R. Brophy
Jennifer K. Singh
Anthony Hopp

*Attorneys for Defendant NUTRA HOLDINGS, INC.*

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On February 20, 2024, I served true copies of the following document(s) described as **NOTICE OF APPEARANCE ON BEHALF OF NUTRA HOLDINGS, INC.** on the interested parties in this action as follows:

☒ **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of Steptoe & Johnson LLP for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope was placed in the mail at Los Angeles, California.

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address mabner@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 20, 2024, at Los Angeles, California.

/s/Megan A. Abner
MEGAN A. ABNER

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**Electronically FILED by Superior Court of California, County of Los Angeles 2/20/2024 4:47 PM David W. Slayton, Executive Officer/Clerk of Court, By R. Lozano, Deputy Clerk**

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No.: 23STCV15674

**JOINT INITIAL STATUS CONFERENCE STATEMENT**

Assigned for all purposes to:
Judge Stuart M. Rice

Date: February 27, 2024
Time: 9:00 a.m.
Department: Dept1

Action Filed: July 6, 2023
Trial Date: None

Plaintiff DANIEL ROSSI ("Plaintiff") and Defendant NUTRA HOLDINGS, INC. d/b/a JACKED FACTORY ("Defendant") (collectively, the "Parties") jointly submit this Initial Status Conference Statement in accordance with this Court's Order dated July 19, 2023.

**1. PARTIES AND COUNSEL:**

a. Plaintiff is represented by the following counsel:

KAZEROUNI LAW GROUP, APC

Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

b. Defendant is represented by the following counsel:

Carol R. Brophy (SBN 155767)
cbrophy@steptoe.com
Anthony Hopp (*pro hac vice* application pending)
ahopp@steptoe.com
Jennifer K. Singh (SBN 285000)
jsingh@steptoe.com
STEPTOE LLP
1Market Plaza, Steuart Tower, Ste 1070
San Francisco, California 94105
Telephone: (415) 365-6700
Facsimile: (415) 365-6699

**2. STATUS OF PLEADINGS:**

Pursuant to the Court's Order of July 19, 2023, Defendant has not filed an Answer to the Complaint. Defendant filed a Notice of Appearance on February 20, 2024.

**3. POTENTIAL ADDITIONAL PARTIES:**

Plaintiff's Position:

Plaintiff does not presently anticipate adding additional plaintiffs/class representatives nor naming additional parties but reserves the right to do so following further discovery.

Likewise, Plaintiff does not intend to name additional defendants but reserves the right to do so following further discovery.

Defendant's Position:

Defendant does not presently anticipate adding any third-party defendants.

**4. IMPROPERLY NAMED DEFENDANTS:**

Plaintiff's Position:

It is Plaintiff's understanding that there are no improperly named defendants.

Defendant's Position:

Defendant does not believe that there are any improperly named defendants.

**5. ADEQUACY OF PROPSED CLASS REPRESENTATIVE:**

Plaintiff's Position:

Plaintiff believes the proposed class representative is adequate.

Defendant's Position:

Defendant reserves the right to challenge the adequacy of the proposed class representative.

**6. CLASS ACTION ESTIMATED SIZE:**

Plaintiff's Position:

Plaintiff believes the class size to be in the thousands, if not millions.

Defendant's Position:

Defendant does not believe that a class should be certified.

**7. OTHER ACTIONS WITH OVERLAPPING CLASS DEFINITIONS:**

The parties are not aware of any other overlapping class actions.

**8. POTENTIALLY RELEVANT ARBITRATION AND/OR CLASS ACTION WAIVER CLAUSES:**

Plaintiff's Position

Plaintiff does not believe that there are any arbitration provisions and/or class action waivers that govern the claims in this action.

Defendant's Position

Defendant is not currently aware of any arbitration provisions and/or class action waivers that govern the claims in this action, but Defendant's investigation continues.

**9. POTENTIAL EARLY MOTIONS:**

Plaintiff's Position:

Plaintiff anticipates bringing a motion for class certification.

Defendant's Position:

Defendant intends to file a Demurer, and will oppose class certification.

**10.** CLASS CONTACT INFORMATION:

Plaintiff's Position:

Plaintiff believes Defendant has the means of obtaining the class contact information through their records or the records of third-party companies associated with Defendant. However, Plaintiff does not believe obtaining class contact information from Defendant is necessary as class notice may be achieved through internet publication.

Defendant's Position:

Defendant does not believe that class notice will be necessary, as Defendant will oppose class certification. Should notice be deemed necessary, Defendant does not believe obtaining class contact information from Defendant will be necessary as class notice may be achieved through internet publication.

**11. PROTECTIVE ORDERS:**

Plaintiff's Position:

Plaintiff recognizes that Defendant may require a protective order for confidential information, and Plaintiff is agreeable to a stipulated confidentiality protective order, including the model form found on the Court's website. Plaintiff requests that a stipulated confidentiality protective order be filed no later than April 26, 2024, to avoid any delay in exchange of discovery.

Defendant's Position:

Defendant believes that a protective order will be necessary, based on the model form found on the Court's website.

**12.** DISCOVERY:

The Parties have been engaged in good faith settlement discussions for the past several months. Defendant is currently gathering information requested by Plaintiff for the purpose of settlement discussions. Defendant still believes that settlement discussions could be fruitful, but if Defendant is required to immediately bear the burden and expense of motion practice and discovery, Defendant may be less inclined to further engage in settlement discussions.

Therefore, the Parties request that this Court continue the stay in this matter for thirty (30) additional days, up to and including March 29, 2024, to allow the parties to determine whether they are able to make progress with settlement discussions.

**13.INSURANCE COVERAGE:**

**The Parties do not believe there is any insurance coverage that would apply to this matter.**

**14.ALTERNATIVE DISPUTE RESOLUTION:**

**The Parties have met and conferred regarding ADR.** The Parties both prefer private mediation as the alternative dispute resolution mechanism.

///

///

///

**15. TIMELINE FOR CASE MANAGEMENT:**

The Parties propose that this Court continue the general stay in this matter to March 29, 2024. The Parties propose that this Court set a further status conference for early April 2024 to evaluate the Parties' progress toward settlement and to determine whether a further stay is warranted.

Dated: February 20, 2024

Respectfully submitted,

**KAZEROUNI LAW GROUP APC**

Gustavo Ponce, Esq.
Attorneys for Plaintiff

**STEPTOE LLP**

*/s/ Carol Brophy*

Carol R. Brophy
Anthony Hopp, Esq.
Attorneys for Defendant

**PROOF OF SERVICE**

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On February 20, 2024, I served the foregoing document and accompanying attachments by the means indicated below:

☒ E-MAIL - by transmitting via e-mail the document(s) listed above to the e-mail address(es) set forth below on this date before 11:59 p.m.

☒ MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Las Vegas, Nevada addressed to each counsel registered with the Court's CM/ECF System for this action.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Anthony Hopp
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
*jsingh@steptoe.com*
*ahopp@steptoe.com*
*Attorneys for Defendant*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on February 20, 2024, at Las Vegas, Nevada.

[signature]

GUSTAVO PONCE

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

February 27, 2024
9:00 AM

Judge: Honorable Stuart M. Rice
Judicial Assistant: E. Munoz
Courtroom Assistant: A. Soni

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Gustavo Ponce via LA Court Connect

For Defendant(s): Jennifer Karpinski Singh via LA Court Connect

**NATURE OF PROCEEDINGS:** Initial Status Conference; Status Conference Re: Proof of Service

The matters are called for hearing.

The Court has read and considered the Joint Initial Status Conference Statement filed on 2/20/2024.

The Court and counsel confer regarding the status of the case.

The parties represent that settlement negotiations are still ongoing.

Pursuant to the request of the parties , the Initial Status Conference scheduled for 02/27/2024 is continued to 04/17/2024 at 09:00 AM in Department 1 at Spring Street Courthouse.

A joint report is due three (3) to five (5) court days in advance of the initial status conference.

Notice waived.

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**Electronically FILED by Superior Court of California, County of Los Angeles 4/10/2024 1:25 PM David W. Slayton, Executive Officer/Clerk of Court, By R. Lozano, Deputy Clerk**

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,<br><br>Defendant. | Case No.: 23STCV15674<br><br>**JOINT INITIAL STATUS CONFERENCE STATEMENT**<br><br>Assigned for all purposes to:<br>Judge Stuart M. Rice<br><br>Date: April 17, 2024<br>Time: 9:00 a.m.<br>Department: Dept1<br><br>Action Filed: July 6, 2023<br>Trial Date: None |

Plaintiff DANIEL ROSSI ("Plaintiff") and Defendant NUTRA HOLDINGS, INC. d/b/a JACKED FACTORY ("Defendant") (collectively, the "Parties") jointly submit this Initial Status Conference Statement in accordance with this Court's Order at the February 27, 2024, hearing.

///

///

///

**1. PARTIES AND COUNSEL:**

a. Plaintiff is represented by the following counsel:

KAZEROUNI LAW GROUP, APC
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

b. Defendant is represented by the following counsel:

Carol R. Brophy (SBN 155767)
cbrophy@steptoe.com
Anthony Hopp (*pro hac vice* application pending)
ahopp@steptoe.com
Jennifer K. Singh (SBN 285000)
jsingh@steptoe.com
Angela M. Sousa (SBN 96726)
asousa@steptoe.com
STEPTOE LLP
One Market Plaza, Steuart Tower, Ste 1070
San Francisco, California 94105
Telephone: (415) 365-6700
Facsimile: (415) 365-6699

**2. STATUS OF PLEADINGS:**

Pursuant to the Court's Order of July 19, 2023, Defendant has not filed an Answer to the Complaint. Defendant filed a Notice of Appearance on February 20, 2024. At the February 27, 2024, hearing, the Status Conference was continued.

**3. POTENTIAL ADDITIONAL PARTIES:**

Plaintiff's Position:

Plaintiff does not presently anticipate adding additional plaintiffs/class representatives nor naming additional parties but reserves the right to do so following further discovery.

Likewise, Plaintiff does not intend to name additional defendants but reserves the right to do so following further discovery.

<u>Defendant's Position</u>:

Defendant does not presently anticipate adding any third-party defendants.

**4. IMPROPERLY NAMED DEFENDANTS:**

<u>Plaintiff's Position</u>:

It is Plaintiff's understanding that there are no improperly named defendants.

<u>Defendant's Position</u>:

Defendant does not believe that there are any improperly named defendants.

**5. ADEQUACY OF PROPSED CLASS REPRESENTATIVE:**

<u>Plaintiff's Position</u>:

Plaintiff believes the proposed class representative is adequate.

<u>Defendant's Position</u>:

Defendant reserves the right to challenge the adequacy of the proposed class representative.

**6. CLASS ACTION ESTIMATED SIZE:**

<u>Plaintiff's Position</u>:

Plaintiff believes the class size to be in the thousands, if not millions.

<u>Defendant's Position</u>:

Defendant does not believe that a class should be certified.

**7. OTHER ACTIONS WITH OVERLAPPING CLASS DEFINITIONS:**

The parties are not aware of any other overlapping class actions.

**8. POTENTIALLY RELEVANT ARBITRATION AND/OR CLASS ACTION WAIVER CLAUSES:**

<u>Plaintiff's Position</u>

Plaintiff does not believe that there are any arbitration provisions and/or class action waivers that govern the claims in this action.

Defendant's Position

Defendant is not currently aware of any arbitration provisions and/or class action waivers that govern the claims in this action, but Defendant's investigation continues.

**9. POTENTIAL EARLY MOTIONS:**

Plaintiff's Position:

Plaintiff anticipates bringing a motion for class certification.

Defendant's Position:

Defendant intends to file a Demurer, and will oppose class certification.

**10. CLASS CONTACT INFORMATION:**

Plaintiff's Position:

Plaintiff believes Defendant has the means of obtaining the class contact information through their records or the records of third-party companies associated with Defendant. However, Plaintiff does not believe obtaining class contact information from Defendant is necessary as class notice may be achieved through internet publication.

Defendant's Position:

Defendant does not believe that class notice will be necessary, as Defendant will oppose class certification. Should notice be deemed necessary, Defendant does not believe obtaining class contact information from Defendant will be necessary as class notice may be achieved through internet publication.

**11. PROTECTIVE ORDERS:**

Plaintiff's Position:

Plaintiff recognizes that Defendant may require a protective order for confidential information, and Plaintiff is agreeable to a stipulated confidentiality protective order, including the model form found on the Court's website. Plaintiff requests that a stipulated confidentiality protective order be filed no later than April 26, 2024, to avoid any delay in exchange of discovery.

///

///

Defendant's Position:

Defendant believes that a protective order will be necessary, based on the model form found on the Court's website. Defendant requests through and until Friday, May 3. 2024 to finalize a Stipulated Protective Order.

**12. DISCOVERY:**

Plaintiff's Position:

Plaintiff believes that the discovery should be permitted to commence immediately. Plaintiff does not believe that discovery should be bifurcated between merits discovery and class discovery or conducted in stages in this California putative class action, but Plaintiff is willing to focus initial efforts on discovery relevant to moving for class certification.

To that end, Plaintiff intends to propound written discovery (Requests for Admissions, Requests for Production, Form Interrogatories, and Special Interrogatories), requesting categories of information such as: (a) information relating to the number of California consumers who purchased class products within the last four years; (b) Defendant's advertising and marketing in any form in California of the relevant to substantially similar class products; (c) the average price of the class products sold during the class period; (d) Defendant's sales figures as it concerns the relevant class products and the number of units of the products sold in California; (e) information pertaining to contact information retained by Defendant for class members, including e-mail address and phone numbers; (f) information relating to the putative class members maintained by Defendant or its agent/vendors; (g) information relating the ingredients in the class products; and (h) defenses and documentation that Defendants will rely upon to oppose a motion for class certification.

Plaintiff also intends to depose the Person Most Knowledgeable for Defendant after receipt of sufficient written discovery from Defendant, and potentially other individuals with knowledge, such as employees of Defendant and third parties involved in Defendant's advertising campaigns. Plaintiff anticipates needing seven to eight months for discovery to prepare a motion for class certification. Following a motion for class certification, Plaintiff intends to conduct further fact discovery relating to any certified class and also conduct expert discovery. Plaintiff anticipates requiring at least four

months after the ruling on a motion for class certification to complete fact discovery, including as to class members in any certified action.

Lastly, if Defendant intends to bring a motion to dismiss, Plaintiff believes discovery should commence and proceed and not be stayed pending resolution of the motion.

Defendant's Position:

Defendant believes that bifurcation of discovery which delays or stays discovery of potential class members until after determination of the merits or adequacy of Plaintiff's Complaint is a more efficient and cost-effective procedure. If there is a valid demurrer to Plaintiff's current operative Complaint, some of Plaintiff's causes of action would either be dismissed or at best, amended. The determination of whether Plaintiff's Complaint states one or more valid causes of action would unquestionably affect the definition of a putative class or sub-classes. It makes no sense to undertake voluminous and expensive discovery of information related to purported putative class members as to causes of action that would or might be dismissed. Moreover, since Plaintiff's current Complaint purports that approximately 46 or more products could be involved in Plaintiff's claims, undertaking class discovery first could be unnecessary or irrelevant if these potential class members' claims are barred by statutes of limitation or if some Products were withdrawn or labeling modified or different. Additionally, although Paragraph 40 of Plaintiff's current Complaint seems to limit the putative class to California purchasers, footnote 1 of the Complaint implies the possibility of a nationwide or multistate class. Again, it would be inefficient and unnecessarily burdensome to undertake discovery of possible multistate consumers for whom no valid causes of action are viable.

**13. INSURANCE COVERAGE:**

The Parties do not believe there is any insurance coverage that would apply to this matter.

///

///

///

**14. ALTERNATIVE DISPUTE RESOLUTION:**

The Parties have met and conferred regarding ADR. The Parties both prefer private mediation as the alternative dispute resolution mechanism.

Dated: April 10, 2024

Respectfully submitted,

**KAZEROUNI LAW GROUP APC**

Gustavo Ponce, Esq.
Attorneys for Plaintiff

**STEPTOE LLP**

*/s/ Carol Brophy*
Carol R. Brophy
Anthony Hopp, Esq.
Attorneys for Defendant

**PROOF OF SERVICE**

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On April 10, 2024, I served the foregoing document and accompanying attachments by the means indicated below:

☒ E-MAIL - by transmitting via e-mail the document(s) listed above to the e-mail address(es) set forth below on this date before 11:59 p.m.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Anthony Hopp
Angela M. Sousa
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
*jsingh@steptoe.com*
*ahopp@steptoe.com*
*Attorneys for Defendant*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on April 10, 2024, at Las Vegas, Nevada.

GUSTAVO PONCE

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

April 17, 2024
9:00 AM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: R. Sims

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Gustavo Ponce via LACC

For Defendant(s): Angela Maria Sousa

**NATURE OF PROCEEDINGS:** Initial Status Conference

The case is called for hearing.

Defendant intends to file a pleadings challenge. The Court issues its Case Management Order ("CMO"). Defendant to contact the courtroom to reserve a hearing date before the filing of any pleadings challenge. The pleading stay is lifted pursuant to the CMO. Further Status Conference is scheduled for 07/29/2024 at 10:30 AM in Department 1 at Spring Street Courthouse. A joint report is due three (3) to five (5) court days in advance of the status conference.

Defendant to give notice. Certificate of Mailing is attached.

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp<br><br>FILED<br>Superior Court of California<br>County of Los Angeles<br>04/17/2024<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | |
| PLAINTIFF/PETITIONER:<br>Daniel Rossi | |
| DEFENDANT/RESPONDENT:<br>Nutra Holdings, Inc. | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>23STCV15674 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Initial Status Conference) of 04/17/2024, Case Management Order upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Gustavo Ponce
Kazerouni Law Group APC
245 Fischer Ave
Unit D1
Costa Mesa, CA 92626

Angela Maria Sousa
Steptoe LLP
633 West Fifth Street
19FL
Los Angeles, CA 90071

David W. Slayton, Executive Officer / Clerk of Court

Dated: 04/17/2024

By: A. He
Deputy Clerk

Electronically FILED by Superior Court of California, County of Los Angeles 1/24/2025 2:08 PM David W. Slayton, Executive Officer/Clerk of Court, By L. Smith, Deputy Clerk

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini (SBN: 296829)
mona@kazlg.com
Gustavo Ponce (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, on behalf of himself and all those similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendants

Case No.: 23STCV15674
Assigned to the Hon. Stuart M. Rice

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S DEMURRER TO THE FIRST AMENDED COMPLAINT**

Date: February 10, 2025
Time: 10:30 a.m.
Dept.: 1

[Concurrently filed with Plaintiff's Request for Judicial Notice]

///

///

///

///

///

///

///

///


98

KAZEROUNI LAW GROUP, APC

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 2

III. LEGAL STANDARD ........ 4

A. Demurrer Standard ........ 4

B. Defendant's Submitted Declarations are Inadmissible and Cannot Be Incorporated by Reference ........ 5

IV. ARGUMENT ........ 6

A. Summary of Argument ........ 6

B. Plaintiff's Fourth and Fifth Causes of Action for Negligent and Intentional Misrepresentation Satisfy the Heightened Pleading Requirements. ........ 6

C. Plaintiff Adequately Pled a Cause of Action Under the UCL, FAL and CRA. ........ 8

D. Defendant Cannot Strike Plaintiff's Request for Injunctive Relief ........ 12

E. Plaintiff Has Standing to Sue for Products That Are Substantially Similar to The Product Plaintiff Purchased ........ 13

F. Plaintiff Provided Defendant With Sufficient Notice as Required Under the CLRA. ........ 15

G. The Appropriate Correction was Not Made to the Fullest Extent Under CLRA. ........ 17

H. Leave to Amend is Liberally Provided and Should Be Granted ........ 20

V. CONCLUSION ........ 20



99

TABLE OF AUTHORITIES

Cases

*Aragon-Haas v. Family Security Ins. Services, Inc.*, 231 Cal. App. 3d 232 (1991) ........ 4

*Aubry v. Tri-City Hospital Dist.*, 2 Cal. 4th 962 (1992) ........ 5, 19

*Battle v. Taylor James, LLC* 607 F.Supp.3d 1025 (C.D. Cal. 2022) ........ 13

*Blank v. Kirwan*, 39 Cal. 3d 311 (1985). ........ 4, 12

*Brown v. Hain Celestial Group, Inc.* 913 F.Supp.2d 881 (N.D. Cal. 2012) ........ 13

*Bruce v. Harley-Davidson*, No. CV 09-6588 CAS (RZx), 2010 U.S. Dist. LEXIS 98180 (C.D. Cal. Jan. 15, 2010) ........ 18

*Buford v. State of Cal.*, 104 Cal. App. 3d 811 (1980) ........ 4

*Caro v. Procter & Gamble Co.* 18 Cal.App.4th 644 (1993) ........ 13

*Chapman v. Skype, Inc.*, 220 Cal. App. 4th 217 (2013). ........ 6

*Clancy v. The Bromley Tea Company* 308 F.R.D. 564 (N.D. Cal. 2013) ........ 14

*Cordes v. Boulder Brands USA, Inc.* 2019 WL 1002513 (C.D. Cal., Jan. 30, 2019) ........ 14

*Gervase v. Superior Court*, 31 Cal. App. 4th 1218 (1993). ........ 4, 12

*Goodman v. Kennedy*, 18 Cal.3d 335 (1976) ........ 5

*Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1373 (2010) ........ 5, 19

*Hansen v. Newegg.com Americas, Inc.* 25 Cal. App.5th 714 (2018) ........ 8

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) ........ 13

*Ion Equip. Corp. v. Nelson*, 110 Cal. App. 3d 868 (1980) ........ 4, 12

KAZEROUNI LAW GROUP, APC

*Kagan v. Gibraltar Sav. & Loan Ass'n*,
35 Cal. 3d 582(1984) ........ 17

*Kasky v. Nike, Inc.*,
27 Cal. 4th 939 (2002) ........ 8

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310 (2011). ........ 1, 8, 11

*Landeros v. Flood*,
50 Cal. App. 3d 115 (1975) ........ 4

*Lujan v. Defenders of Wildlife,*
504 U.S. 561 ........ 11

*Matteson v. Wagoner*,
147 Cal. 739 (1905) ........ 5

*Meyer v. Sprint Spectrum* L.P.,
45 Cal. 4th 634 (2009) ........ 17

*Miller v. Ghirardelli Chocolate Co.*
912 F.Supp.2d 861 (N.D. Cal. 2012) ........ 13

*Myer v. Graphic Arts International Union*,
88 Cal. App. 3d 176 (1979) ........ 4

*National Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc.*,
171 Cal.App.4th 35 (2009). ........ 6

*O'Brien v. Camisasca Automotive Manufacturing, Inc.*,
161 Cal. App. 4th 388 (Cal. App. 2d Dist. 2008) ........ 1

*Paz v. AG Goldschmeid, Inc.*,
2014 U.S. Dist. LEXIS 156413 (S.D. Cal. Oct. 27, 2014) ........ 1

*Perkins v. Superior Court*,
117 Cal. App. 3d 1 (1981) ........ 4

*Quelimane v. Stewart Title Guaranty Co.*
19 Cal.4th 26 (1998) ........ 20

*Scott v. Indian Wells*,
6 Cal. 3d 541 (1972). ........ 5

*Selby Realty Co. v. City of San Buenaventura*,
10 Cal. 3d 110 (1973) ........ 5

*Sinatro v. Barilla America, Inc.*
2022 WL 10128276 (N.D. Cal., Oct. 17, 2022) ........ 14

*Stearn v. Ticketmaster Corp.,*
655 F.3d 1013 (9th Cir. 2011). ........ 17, 19

*Troyk v. Farmers Group, Inc.*,
171 Cal.App.4th ........ 11

KAZEROUNI LAW GROUP, APC


101

*Wang v. Massey Chevrolet*,
97 Cal.App.4th 856 (2002). .......... 17

*White v. De La Calle Co.*,
2023 Cal. Super. LEXIS 24017 .......... 14

*Winkelbauer v. Orgain Mgmt.*,
2021 Cal. Super. LEXIS 7158 .......... 13

Statutes

California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq .......... passim

California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq. .......... passim

California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq .......... passim

Code of Civil Procedure § 452 .......... 4

Code of Civil Procedure §§ 422.10, 589 .......... 4

Federal Trade Commission Act, 15 U.S.C. 44 .......... 1

Treatises

3 Witkin, Cal. Proc. (2d ed. 1971) .......... 4

Federal Practice and Procedure (3d ed. 2005) .......... 13

Weil & Brown, Cal. Pro. Before Trial (The Rutter Group 2008) .......... 4, 12

Regulations

16 C.F.R. § 323.2 .......... 1

KAZEROUNI LAW GROUP, APC


102

## I. INTRODUCTION

Plaintiff Daniel Rossi ("Plaintiff") hereby submits the following opposition to Defendant's Demurrer (the "Demurrer") to Plaintiff's First Amended Complaint ("FAC") filed by Defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Defendant").

California has not only enacted a statute to protect the "Made in U.S.A." label in California through California Business & Professions Code § 17533.7, [1] but the California Supreme Court has confirmed the importance of the California "Made in U.S.A." standard.[2] *See Kwikset Corp. v. Superior Court*, 71 Cal. 4th 310, at 328-29 (2011). "On its face, the statute [Section 17533.7] makes it unlawful to sell or offer for sale in California any merchandise using the words 'Made in U.S.A.' or similar words if 'the merchandise or any ... part thereof [ ] has been entirely or substantially made, manufactured, or produced outside of the United States.'" Cal. Bus. & Prof. Code § 17533.7." *Paz v. AG Goldschmeid, Inc*., 2014 U.S. Dist. LEXIS 156413, *14 (S.D. Cal. Oct. 27, 2014). "[I]n California, a product is only deemed 'Made in U.S.A.' if it contains *no* 'article, unit, or part' that 'has been entirely or substantially made, manufactured, or produced outside of the United States.'" *O'Brien v. Camisasca Automotive Manufacturing, Inc*., 161 Cal. App. 4th 388, 403 (Cal. App. 2d Dist. 2008) (citation omitted). Additionally, federal rules clearly defining the use of "Made in USA" or any synonymous phrase require companies to clearly and adequately qualify the term "Made in USA" when a product is not made with "all or substantially" all ingredients that are produced in the United States.[3] Defendant's products contain foreign-made ingredients, and thus,

---

[1] "Section 17533.7 of the Business and Professions Code of the California Code prohibits the sale of a good in California that has been claimed to be made in the United States when in fact the good was not domestically produced. States also take actions to prevent deception of consumers. For example, the State of Missouri concluded a voluntary compliance agreement with Farberware in 1993, requiring that company to conspicuously reveal foreign components of products it claimed were made in the United States." 1996 ITC LEXIS 533, *109

[2] "Simply stated: labels matter. The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities that may come to associate with a particular source…In particular, **to some consumers**, the "Made in U.S.A." label matters. A range of motivations may fuel this preference, from the desire to support domestic jobs to beliefs about quality, to concerns about overseas environmental or labor conditions, to simple patriotism. *See Kwikset Corp. v. Superior Court*, 71 Cal. 4th 310, at 328-29 (2011) (emphasis added).

[3] *See* 16 C.F.R. § 323.2 Prohibited Acts: In connection with promoting or offering for sale any good or service, in or affecting commerce as "commerce" is defined in section 4 of the Federal Trade Commission Act, 15 U.S.C. 44, it is an unfair or deceptive act or practice within the meaning of



KAZEROUNI LAW GROUP, APC

Defendant is not permitted to make an unqualified "Made in USA" representation.

Based upon Defendant's false and misleading advertising and unfair business practices, Plaintiff brought the instant action on behalf of himself and others similarly situated. Despite the detailed allegations in Plaintiff's FAC, Defendant moves to demur Plaintiff's claims in their entirety. Plaintiff respectfully requests that the Court overrule Defendant's Demurrer in its entirety. Alternatively, in the event that this Court is inclined to sustain Defendant's Demurrer, in whole or in any part, Plaintiff respectfully requests leave to amend in order to cure Plaintiff's operative pleading of any perceived deficiency.

## II. STATEMENT OF FACTS

This class action arises out of Defendant's false and misleading advertising as well as its unfair business practices related to the advertising of Defendant's dietary supplement products. *See Complaint.* Plaintiff brought this action on behalf of himself, and others similarly situated, alleging violations of (1) California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq; (2) California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq. ("FAL"); (3) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.; (4) Negligent Misrepresentation; and (5) Intentional Misrepresentation.

On or about January 24, 2023, Plaintiff searched online for a pre-workout supplement when he discovered Defendant's Nitrosurge Pre-workout dietary supplement (the "Product") which represented it was "Manufactured in the USA." (FAC ¶¶ 2, 61). The Product was described and advertised as "Manufactured in the USA." At the time of Plaintiff's purchase, Plaintiff reasonably relied on the offending Product's false label and/or packaging claiming that the Product was "Made in the U.S.A." (FAC ¶¶ 64, 67, 72, 154, 164). Being that the Product was advertised and represented as "Manufactured in the USA," Plaintiff relied on that representation and went forward and purchased the Product. (FAC ¶¶ 61-64). Based on Defendant's "Manufactured in the USA"

---

section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), to label any product as Made in the United States unless the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, ***and all or virtually all ingredients or components of the product are made and sourced in the United States***. (emphasis added).



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


104

KAZEROUNI LAW GROUP, APC

representations, Plaintiff believed that the Product was in fact made with or contained ingredients and/or components that were manufactured in the USA. (FAC ¶¶ 63-64). Plaintiff relied on Defendant's advertisements and representation that they were selling "Manufactured in the USA" products, but had Plaintiff known the Product was not actually derived from components and/or ingredients manufactured in the USA, he would not have purchased the Product, or Plaintiff would have paid less for it. (FAC ¶¶ 67-70). The Product was made with and/or contained components or ingredients that are foreign. (FAC ¶¶ 13, 17, 25, 29, 31, 33, 36, 37, 44, 45*; see* Plaintiff's Request for Judicial Notice ("RJN"), Exhibit 1). Plaintiff believed he was purchasing a superior quality product, supporting U.S. jobs, economy, and ethical working conditions. (FAC ¶¶ 52, 58, 67, 72). Defendant also sells substantially similar products ("Class Products") that were marketed with false "Manufactured in the USA" designations. (FAC, ¶¶ 3, 13, 14, 18, 23, 24, 30, 38, 40, 41, 52, ; Exhibit A).

Prior to filing this action, Plaintiff served a CLRA Notice letter pursuant to Cal. Civ. Code 1782(a) on Defendant.[4] Specifically, on or around March 8, 2023, Plaintiff served a CLRA Notice in writing by certified mail of the particular violations of section 1770 and demanded that Defendant rectify the problem. (FAC ¶ 98). Defendant failed to rectify or agree to rectify the problems associated with the actions detailed in the CLRA Notice and give notice to all affected consumers within thirty days of the date of written notice pursuant to section 1782. Cal. Civ. Code 1782(a). *Id.*

Defendant formulates, markets, and sells various dietary supplement products that have been represented and advertised as "Manufactured in the USA," but the products are made with ingredients and/or components originating outside of the United States. (FAC ¶ 73). On Defendant's website and other third-party vendors, such as Amazon.com, Defendant advertised, and advertises, its products as "Manufactured in the USA, throughout the United States. (FAC ¶¶ 20, 45, 61). Contrary to their representations, Defendant's Class Products are not made with ingredients and/or components that are "Manufactured in the USA." (FAC ¶¶ 52, 63, Exhibit A).

[4] The CLRA Notice is incorporated by reference in Plaintiff's Complaint and the FAC.


105

KAZEROUNI LAW GROUP, APC

## III. LEGAL STANDARD

### A. Demurrer Standard

A demurrer is a pleading that tests the legal sufficiency of the allegations in a complaint and raises questions of law. *Code of Civil Procedure* §§ 422.10, 589; *Buford v. State of Cal*., 104 Cal. App. 3d 811, 818 (1980) (citing 3 Witkin, Cal. Proc. (2d ed. 1971) Pleading 796). The pleading requirements in California are liberal and approximate the notice pleading standards of federal court. *Perkins v. Superior Court*, 117 Cal. App. 3d 1, 6 (1981) (Complaint adequate where, as a whole, it contained sufficient facts to apprise the defendant of the basis upon which the plaintiff was seeking relief). It is not the function of a demurrer to test the truthfulness of a complaint, regardless of how improbable the facts may appear. *Blank v. Kirwan*, 39 Cal. 3d 311, 318 (1985). It is well established that a demurrer admits the truth of all material factual allegations of the complaint, and that Plaintiff's ability to prove the allegations, or the difficulty in making such proof, does not concern the reviewing court. *Aragon-Haas v. Family Security Ins. Services, Inc.*, 231 Cal. App. 3d 232, 239 (1991).

In ruling upon a demurrer, the courts are required to read a complaint as a whole, liberally construing its allegations in favor of the non-moving party. *Myer v. Graphic Arts International Union*, 88 Cal. App. 3d 176 (1979); *Landeros v. Flood*, 50 Cal. App. 3d 115 (1975), vacated on other grounds, 17 Cal. 3d 399; See *Code of Civil Procedure* § 452. In determining the sufficiency of a pleading against a demurrer, the court must look *exclusively* to facts alleged in the pleadings. *Blank v. Kirwan,* 39 Cal. 3d 311, 318 (1995). "No other extrinsic evidence can be considered (i.e., no 'speaking demurrers')." *Weil & Brown*, Cal. Pro. Before Trial (The Rutter Group 2008) § 7:8; *Ion Equip. Corp. v. Nelson*, 110 Cal. App. 3d 868, 881 (1980) (error for court to consider facts asserted in memorandum supporting demurrer). A demurrer merely tests the sufficiency of a pleading's factual allegations. *Gervase v. Superior Court*, 31 Cal. App. 4th 1218, 1224 (1993). Unlike a Motion for Summary Judgment or trial, a demurrer does not ask whether evidence supports an allegation, how to resolve competing interpretations of evidence, or which party should prevail. *Id*. "Instead, a demurrer admits, provisionally for purposes of testing the pleadings, all material facts properly pleaded, however, improbable they may be." *Id*. Accordingly, a court must

KAZEROUNI LAW GROUP, APC


106

overrule a demurrer where a party states a cause of action "under any possible legal theory." *Aubry v. Tri-City Hospital Dist.,* 2 Cal. 4th 962, 967 (1992). "In reviewing the propriety of the sustaining of a demurrer, the court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded." *Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1373, 1379 (2010). "[I]t is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory." *Id.* "[I]f upon a consideration of all the facts stated it appears that the plaintiff is entitled to any relief at the hands of the court against the defendants, the complaint will be held good, although the facts may not be clearly stated, or may be intermingled with a statement of other facts irrelevant to the cause of action shown, or although the plaintiff may demand relief to which he is not entitled under the facts alleged." *Matteson v. Wagoner*, (1905) 147 Cal. 739, 742; *Selby Realty Co. v. City of San Buenaventura*, 10 Cal. 3d 110, 123 (1973) (citing *Scott v. Indian Wells*, 6 Cal. 3d 541, 549 (1972).

Further, a demurrer should not be sustained without leave to amend if the complaint, liberally construed, can state a cause of action under any theory or if there is a reasonable possibility the defect can be cured by amendment. *Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1373, 1379 (2010) (citing *Aubry v. Tri-City Hospital Dist.,* 2 Cal. 4th at 967). It is an abuse of discretion for the court to deny leave to amend where there is any *reasonable possibility* that the defect can be cured by amendment. *Goodman v. Kennedy*, (1976) 18 Cal.3d 335, 349. Thus, in the event that the Court is inclined to sustain Defendant's demurrer, in the interest of justice, Plaintiff respectfully requests leave to amend Plaintiff's operative pleading.

**B. Defendant's Submitted Declarations are Inadmissible and Cannot Be Incorporated by Reference**

Defendant's Declarations for Melanie Ayerh and John Williams, constitute outside evidence which may not be considered in the present motion because Plaintiff did not necessarily rely on or refer to the information listed in them, except for Exhibit 1 attached to Melanie Ayerh's Declaration (Plaintiff's CLRA Notice) which was attached as Exhibit A to Plaintiff's Complaint. The Declaration of John Williams contradicts Plaintiff's allegations in the FAC. Defendant's Declaration constitute extrinsic evidence and hearsay, which should be stricken from the record,


107

held inadmissible, and should not be considered by the Court.

## IV. ARGUMENT

### A. Summary of Argument

Plaintiff's FAC adequately pleads causes of action for Defendant's alleged violations of (1) California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq; (2) California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq. ("FAL"); (3) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.; (4) Negligent Misrepresentation; and (5) Intentional Misrepresentation. Many of Defendant's arguments in the Demurrer regarding Plaintiff's standing and request for injunctive relief are premature and are better suited for the class certification stage. However, should the Court find the allegations to the FAC are insufficient, the Court should grant leave to amend to add greater specificity.

### B. Plaintiff's Fourth and Fifth Causes of Action for Negligent and Intentional Misrepresentation Satisfy the Heightened Pleading Requirements.

The elements to establish an intentional misrepresentation includes; "(1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage." *Chapman v. Skype, Inc.,* 220 Cal. App. 4th 217, 230-1 (2013). Similarly, a claim for negligent misrepresentation requires a misrepresentation, reliance and damages but does not require knowledge of falsity. *National Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc.,* 171 Cal.App.4th 35, 50 (2009). A claim for negligent misrepresentation requires lack of "reasonable grounds for believing it to be true." *Id.*

Here, Defendant represented to the public, including Plaintiff, by advertising and marketing, that Defendant's Class Products are "Manufactured in the USA" without clear and adequate qualification when Defendant's products in fact contain ingredients and components that are not manufactured in the USA. (FAC ¶ 29). In other words, Defendant made a false representation that its products' ingredients and/or components are "Manufactured in the USA," that Defendant knew was false at the time Defendant made it. (FAC ¶ 65, 114, 165). By falsely stating the ingredients in the Class Products were "Manufactured in the USA" Defendant intended to deceive Plaintiff and the Class Members into buying a product of lesser quality. (FAC ¶ 66).

Defendant as the creator of the products was aware of the ingredients in its products and what it was representing to the public. (FAC ¶ 66). Defendant is not an American company, but rather a Canadian one, making its "Manufactured in the USA" misrepresentation unrelated to any sense of patriotism or national pride. (FAC ¶ 51). Instead, Defendant's sole motive was to deliberately market to American consumers who prefer and are willing to pay a premium for, or choose over other options, products that are represented as being made in the United States, including their ingredients and components. (FAC ¶ 51). Defendant's actions of removing the "Manufactured in the USA" representation, but only after litigation was commenced, sheds light into its knowledge and thus intent to make these representations even though they were in fact incorrect. (FAC ¶ 66). (Demurrer, 17). Plaintiff and Class Members relied upon Defendant's unquailed and false representations when purchasing the Class Products causing Plaintiff and Class Members injury. (FAC ¶ 56, 73). This resulted in injury to the Plaintiff and Class Members as they would not have purchased the Product had Plaintiff and the Class known of the true nature of the Product. (FAC ¶ 70).

Plaintiff's allegations stated stem from the false representation by Defendant that the Class Products are "Manufactured in the USA" when in fact those products contained ingredients and components that were foreign (FAC ¶¶ 24, 29-45, 73). Consumers who purchased the Class Products on Defendant's website or through third-party vendor websites were exposed to Defendant's misrepresentations that the Class Products were "Manufactured in the USA." (FAC ¶¶ 20, 45). Each consumer, including Plaintiff, had been exposed to substantially similar or virtually the same misrepresentations and advertisements placed on all of Defendant's websites and the websites of third-party vendors. (FAC ¶ 56). Plaintiff's allegations clearly state that the Class Products were not in fact "Manufactured in the USA" time after time, including the CLRA Notice Letter. (FAC ¶¶ 2, 3, 14, 18, 24, 29-45, 54, 57, 62, 65, 66, 69, 73, 85, 96, 97, 110, 111, 114, 115, 117, 126, 127, 131-133, 135, 136, 138-141, 150-153, 158-160, 163, 167, 168, 170).

The FAC expressly pleads that Defendant marketed, advertised and sold its Class Products as "Manufactured in the USA" without the clear and adequate qualification that the Class Products in fact contained foreign ingredients and/or components, as required by Federal and other laws.

KAZEROUNI LAW GROUP, APC

(FAC ¶ 59). Each consumer, including Plaintiff, had been exposed to substantially similar or virtually the same misrepresentations and advertisements placed on all of Defendant's websites and the websites of third-party vendors. (FAC ¶ 56). Furthermore, Plaintiff specifically alleges that Defendant utilizes identical or comparable ingredients and components throughout its product line, providing several instances of ingredients that are sourced from outside the United States. (FAC ¶ 39). As a result, Plaintiff contends that it is virtually impossible for Defendant's products to be manufactured with ingredients or components that are substantially sourced from within the United States. (FAC ¶ 39). Plaintiff has met the specificity requirements outlined in Defendant's Demurrer, including the identification of the who, what, where, when, to whom, and the means by which the actions in question occurred.

Defendant attempts to discount Plaintiff's "how, when, where, to whom, and by what means" specification in the FAC is a red herring as shown above. (Demurrer, 11). Defendant points to Plaintiff's statement that ingredients such as *Astraglus membrancaseus, Panax notoginseng, theobromine* and *caffeine* are not sourced in the United States and ***only imported*** from outside the USA. *Id.* Plaintiff presented multiple ingredients and components in the Class Products that contain or are made with ingredients that are not "Manufactured in the USA." (FAC ¶¶ 31-37). It is not Plaintiff's job to list out every ingredient for which Defendant should be aware of is not made in the United States, but rather Plaintiff must place Defendant on notice the particular violations of section 1770, as demonstrated from the list of ingredients stated above and the product list attached to the March 8, 2023, CLRA Notice. Cal. Civ. Code 1782(a); (FAC ¶ 98, Exhibit A). As such, the Court should overrule Defendant's Demurrer as to Plaintiff's fourth and fifth causes of action for negligent and misrepresentation.

**C. Plaintiff Adequately Pled a Cause of Action Under the UCL, FAL and CRA.**

Plaintiff's claims are particularly pled as required under the standards of the UCL, FAL and CLRA. The UCL prohibits "'unfair competition,' which is defined as 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the FAL].'" *Hansen v. Newegg.com Americas, Inc.* ,25 Cal. App.5th 714, 722 (2018). "The state's false advertising law is equally comprehensive within the narrower field of


110

false and misleading advertising." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (2011). "[A]ny violation of the false advertising law. . . necessarily violates the [UCL]." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002). The CLRA prohibits various "unfair methods of competition and unfair or deceptive acts or practices." *Hansen,* 25 Cal. App.5th 714, 723.

Plaintiff's allegations stated under the UCL, FAL, and CLRA stem from the false representation that can be found throughout Defendant's Class Product lines as "Manufactured in the USA." (FAC ¶¶ 24, 73). Consumers who purchased the Class Products on Defendant's website or through third-party vendor websites were exposed to Defendant's unqualified and false "Manufactured in the USA" representations. (FAC ¶¶ 20, 45). Plaintiff's allegations, time after time, make it clear that the Class Products were not in fact "Manufactured in the USA," including the CLRA Notice Letter which incorporated via the initial Complaint and the FAC. (FAC ¶¶ 2, 3, 14, 18, 24, 29-45, 54, 57, 62, 65, 66, 69, 73, 85, 96, 97, 110, 111, 114, 115, 117, 126, 127, 131-133, 135, 136, 138-141, 150-153, 158-160, 163, 167, 168, 170; Exhibit A). Defendant attempts to justify Plaintiff's claims as lacking reasonable particularity, as Plaintiff's claims supposedly fail to "allege *why* or *how* the representation is false or deceptive." (Demurrer, 13).

The FAC expressly pleads that Defendant marketed, advertised and sold its Class Products as "Manufactured in the USA" without the clear and adequate qualification that the Class Products in fact contained foreign ingredients and/or components, as required by Federal and other laws. (FAC ¶ 59). Each consumer, including Plaintiff, had been exposed to substantially similar or virtually the same misrepresentations and advertisements placed on all of Defendant's websites and the websites of third-party vendors. (FAC ¶ 56). Additionally, Plaintiff particularly pled Defendant uses the same or similar ingredients and components across Defendant's product line and provided multiple examples of ingredients that are completely sourced from outside of the United States, making it near impossible for Defendant's products to be made with ingredients or components substantially produced within the United States. (FAC ¶ 39). Plaintiff thus suffices the who, what, where, when, to whom, and through what means, specificity requirements Defendant argues in its Demurrer.

Defendant's "Manufactured in the USA" representation is false, unfair, and deceptive,


111

because the Class Products contain ingredients that are foreign. (FAC ¶¶ 14, 17, 25, 29, 30-45). Plaintiff's FAC states "[c]ontrary to the representation, Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not 'Manufactured in the USA.'" (FAC ¶ 30). The Class Products are made with "numerous ingredients and components that are foreign sourced due to significant differences in costs of raw material/component production in the United States versus foreign production such as in China." (FAC ¶ 31). Plaintiff's FAC lists the names of multiple ingredients which are foreign and explains why they are false and deceptive misrepresentations, *i.e.*, those ingredients are not made in the USA and/or cannot be grown in the USA. (FAC ¶¶ 14, 17, 25, 29, 30-45). Furthermore, also by incorporation in the Complaint and FAC as Exhibit A, the CLRA Notice also puts Defendant on notice of additional ingredients which are foreign. (FAC, Exhibit A). If and when discovery is concluded in this matter, the list of foreign ingredients will be much higher. (FAC ¶ 37).

Defendant goes so far as to cherry pick the ingredients Plaintiff provided as ***examples***, which actually supports Plaintiff's factual basis behind his claims that Defendant's products are made with ingredients outside of the United States. (FAC ¶¶ 31-37). Defendant, for example, asserts Plaintiff has not pleaded that *Astragalus membranaceus* and *Panax notoginseng* used in Defendant's products are sourced from outside the USA. (Demurrer, 7, 15). The specific ingredients *Astragalus membranaceus* and *Panax notoginseng* are combined to create AstraGin®, a branded ingredient included in the Product and numerous Class Products. AstraGin®, which is produced by NuLiv Science U.S.A., Inc. ("NuLiv"), an ingredient supplier, is known to be sourced from foreign origins.[5] Even before discovery is conducted here, as shown in Exhibit 1 attached to Plaintiff's Request for Judicial Notice, there is evidence that the Class Products do contain foreign ingredients. The Product and the Class Products contain AstraGin®. To sell AstraGin® in the European Union, NuLiv had to apply for Novel Food status to the European Food Safety Authority ("EFSA"). The application process requires comprehensive documentation, including sourcing and processing

---

[5] *See*, https://efsa.onlinelibrary.wiley.com/doi/epdf/10.2903/j.efsa.2020.6099 ("The *A. membranaceus* roots are purchased from growers in Gansu and Inner Mongolia provinces in the north-western region of China while the *P. notoginseng* roots are acquired from growers in Yunnan and Sichuan provinces in the southern region of China.").


112

KAZEROUNI LAW GROUP, APC

details. The published scientific opinion of EFSA on NuLiv's application for AstraGin® (*see* Plaintiff's RJN, Exhibit 1), clearly states that AstraGin's *Astragalus membranaceus* roots are sourced from Gansu and Inner Mongolia provinces in China, while the *Panax notoginseng* roots are sourced from Yunnan and Sichuan provinces in China (*See* Plaintiff's RJN, Exhibit 1, Section 3.3 Production Process). A prominent ingredient in the Class Products has been publicly documented as being produced outside the United States. Notably, Defendant makes no claim in its demurrer that the ingredients in question are sourced domestically—likely because such a claim would be blatantly false and potentially amount to perjury. Plaintiff has pled with reasonable particularity the how and why Defendant's "Manufactured in the USA" representation is false, unfair, and deceptive. (FAC ¶¶ 14, 17, 25, 29, 30-45).

Plaintiff and Class Members relied upon the advertising and marketing materials prepared and published by Defendant and its agents when purchasing Defendant's Class Products. (FAC ¶ 56, 64). Defendant's false representations are deceitful and have led Plaintiff and Class Members to pay more for the Class Products which they believed to be composed of ingredients and components "Manufactured in the United States." (FAC ¶ 56, 59). In the FAC, Plaintiff additionally describes ***some*** of the ingredients that can be found in the Class Products, which are foreign sourced due to the two significant differences in cost efficiency or particular components not being commercially grown in the United States. (FAC ¶¶ 31-37). Plaintiff alleges these examples are not exclusive, and it is likely that "the remaining ingredients and even the packaging components used to produce the Product are foreign." (FAC ¶ 37).

Additionally, given the nature of the rules and laws governing the unqualified use of "Manufactured in the USA," it is not the Plaintiff's burden at the pleading stage to specify the exact sourcing of each ingredient by Defendant. Instead, the Plaintiff need only present a plausible claim that certain ingredients or components are ***not*** produced in the United States. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, demurrer in this case, we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife,* supra, 504 U.S. at 561; *see also Troyk v. Farmers Group, Inc.*, supra, 171 Cal.App.4th at p. 1345; *Kwikset*


KAZEROUNI LAW GROUP, APC
LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

*Corp. v. Superior Court*, 51 Cal. 4th 310, 327, 120 Cal. Rptr. 3d 741, 755, 246 P.3d 877, 888-89 (2011). At this stage, Plaintiff need only allege economic injury arising from reliance on defendant's misrepresentations. *Id.* at 889. Defendant, as the formulator, creator, and distributor of the Class Products, has never provided an explanation of the Product or Class Products' ingredients' origins, despite having full access to this information. Plaintiff has in fact provided very plausible claims on the face of the operative complaint. Lastly, and notably, Plaintiff's claims are plausible when considering that Defendant removed the "Manufactured in the USA" representations from its products and website, after this matter was filed and during the litigation of this matter, due to the active litigation of this case. Plaintiff's case against Defendant has prompted Defendant to take action regarding the false and deceptive misrepresentations Plaintiff has based his claims on.

As shown above and in the FAC, Plaintiff has pled the facts with reasonable particularity how and why Defendant's "Manufactured in the USA" representations are false, unfair, and deceptive, as to the causes of actions for the UCL, CLRA, and FAL. Therefore, Plaintiff has particularly plead his claims under the UCL, FAL and CLRA and Defendant's Demurrer as to Plaintiff's first, second and third causes of action should be overruled.

**D. Defendant Cannot Strike Plaintiff's Request for Injunctive Relief**

Defendant requests that this Court strike Plaintiff's request for injunctive relief in the Demurrer, but a demur only looks *exclusively* to facts alleged in the pleadings, and any outside evidence by Defendant is not admissible here for the purposes of the demurrer. *Blank v. Kirwan,* 39 Cal. 3d 311, 318 (1995). "No other extrinsic evidence can be considered (*i.e.*, no 'speaking demurrers')." *Weil & Brown*, Cal. Pro. Before Trial (The Rutter Group 2008) § 7:8; *Ion Equip. Corp. v. Nelson*, 110 Cal. App. 3d 868, 881 (1980) (error for court to consider facts asserted in memorandum supporting demurrer). A demurrer merely tests the sufficiency of a pleading's factual allegations. *Gervase v. Superior Court*, 31 Cal. App. 4th 1218, 1224 (1993). Here, Defendant's declarations and argument that Defendant has allegedly removed all the "Manufactured in the USA" representations from its website are not admissible and improper under the legal standard of a demurrer. Furthermore, Plaintiff has sufficiently pled that Defendant's actions present a continuing threat to consumers. (FAC ¶¶ 25, 52, 88, 118, 137, 142-146).

KAZEROUNI LAW GROUP, APC


114

Even accepting *arguendo* Defendant's outside contentions that it has allegedly removed all "Manufactured in the USA" representations from its website, this cannot be confirmed with certainty in the absence of discovery. Furthermore, the extent of Defendant's representations and what has been removed can only be properly explored until after discovery on the subject is explored. Defendant's request to strike injunctive relief is also improper because as of the filing of Plaintiff's complaint on July 6, 2023, Defendant had not removed any of the "Manufactured in the USA" representations from its website. Defendant made the decision to purportedly remove the "Manufactured in the USA" representations from its website after Plaintiff's Complaint was filed and as a result of this litigation. Defendant cannot simply avoid Plaintiff's request for specific remedies by claiming in its demurrer that it has fixed the issues after a lawsuit is filed, especially when it was put on notice beforehand.

Defendant's request to strike Plaintiff's request for injunctive relief is not proper, premature, and should be overruled.

**E. Plaintiff Has Standing to Sue for Products That Are Substantially Similar to The Product Plaintiff Purchased**

Defendant contends that Plaintiff lacks standing to bring suit for products not actually purchased by Plaintiff. (Demurrer, 15). However, Defendant's argument is premature and is better suited for a motion for decertification or an opposition to a motion for class certification. "Representative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation." (7AA Wright et al., Federal Practice and Procedure (3d ed. 2005) § 1785.1, pp. 388–389.) *In re Tobacco II Cases*, 46 Cal. 4th 298, 319, 93 Cal. Rptr. 3d 559, 575, 207 P.3d 20, 34 (2009). This is demonstrated by federal law, to which we look when seeking guidance on issues of class action procedure. *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 656, fn. 7 [22 Cal. Rptr. 2d 419]; *In re Tobacco II Cases*, 46 Cal. 4th 298, 318, 93 Cal. Rptr. 3d 559, 574, 207 P.3d 20, 33 (2009).

The lack of California state court cases on point requires us to rely on federal cases which

KAZEROUNI LAW GROUP, APC

address UCL, FAL, and CLRA standing requirements. Some federal courts, such as those cited by Defendant, have held that a plaintiff lacks standing to assert such claims for products not purchased. However, others "have held that the standing inquiry is more appropriately resolved on a motion for class certification." *Miller v. Ghirardelli Chocolate Co*. (N.D. Cal. 2012) 912 F.Supp.2d 861, 869. *Winkelbauer v. Orgain Mgmt*., 2021 Cal. Super. LEXIS 7158, *22. "The prevailing view in the Ninth Circuit is that class action plaintiffs can bring claims for products they did not purchase as long as the products and alleged misrepresentations are substantially similar." *Battle v. Taylor James, LLC* (C.D. Cal. 2022) 607 F.Supp.3d 1025, 1043 (internal quotations omitted); *see also Brown v. Hain Celestial Group, Inc.* (N.D. Cal. 2012) 913 F.Supp.2d 881, 890 ("The majority of the courts that have carefully analyzed the question hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially [*17] similar."); *Sinatro v. Barilla America, Inc.* (N.D. Cal., Oct. 17, 2022) 2022 WL 10128276 at *11 (same). *White v. De La Calle Co.*, 2023 Cal. Super. LEXIS 24017, *16-17. Plaintiff's claims, like those of the plaintiff in *Winkelbauer*, involve a factual inquiry to determine whether the misrepresentations on Defendant's packaging and ingredients are "not unique" to the product Plaintiff purchased. Here, Plaintiff's allegations concern the representation that Defendant's products contain foreign ingredients such as L-Citrulline, Betaine Anhydrous, Beta Alanine, L-Theanine, acetyl-L-Carnitine HCl, Green Tea Leaf Extract, Black Pepper Fruit Extract, Arginine, Glutathione, caffeine, theobromine, KSM-66 Ashwagandha (as KSM-66®) and *Astragalus membranaceus* and *Panax notoginseng* (together as AstraGin®), (FAC ¶¶ 32, 33, 35, 36, 43, 44, Exhibit A), as stated on the products' labels, and Plaintiff seeks to represent purchasers of all substantially similar goods, which contain foreign ingredients and Defendant represented were "Manufactured in the USA" without clear and adequate qualification.

Additionally, Defendant's claim that Plaintiff does not allege facts sufficient to establish that the Class Products are substantially similar to the product purchased by Plaintiff is also premature. In "substantially similar" products cases, "[c]ourts often postpone the inquiry about the similarity of the products until the class certification stage." *Cordes v. Boulder Brands USA, Inc.* (C.D. Cal., Jan.


116

30, 2019) 2019 WL 1002513, at *2. *White v. De La Calle Co*., 2023 Cal. Super. LEXIS 24017, *19. Deciding at the pleading stage that a plaintiff cannot represent a class who purchased any different products than the plaintiff seems unwarranted…. Whether products are "sufficiently similar" is an appropriate inquiry, but it does not relate to standing: a plaintiff has no more standing to assert claims relating to a "similar" product he did not buy than he does to assert claims relating to a "dissimilar" product he did not buy. Seen this way, analyzing the "sufficient similarity" of the products is not a standing inquiry, but rather an early analysis of the typicality, adequacy, and commonality. *White v. De La Calle Co*., 2023 Cal. Super. LEXIS 24017, *20 (citing *Clancy v. The Bromley Tea Company* (N.D. Cal. 2013) 308 F.R.D. 564, 571).

Also, from a policy perspective, it also makes sense to find standing to sue for substantially similar products not actually purchased because this would facilitate the cessation of Defendant's widespread practice of false and deceptive advertising in violation of Cal. Civ. Code § 17533.7 (as well as Cal. Bus & Prof. Code §§ 17200 and 1770), thus furthering judicial economy by permitting resolution of such claims in one action as opposed to several actions that may be brought by other plaintiffs, and encourage other non-compliant manufacturers to change their ways.

Therefore, Plaintiff has standing to sue for the Class Products that are substantially similar to the Product he purchased from Defendant.

**F. Plaintiff Provided Defendant With Sufficient Notice as Required Under the CLRA.**

Defendant additionally seeks to strike Plaintiff's request for damages under his CLRA claim on the grounds that Plaintiff purportedly failed to comply with the statute's notice requirements prior to bringing suit. Under the CLRA, Cal. Civ. Code § 1782(a)(1) provides the notice, "[n]otify the person alleged to have . . . committed methods, acts, or practices declared unlawful by Section 1770 of the particular alleged violations of Section 1770." Here, by letter, on or about March 8, 2023, Plaintiff provided Defendant notice in writing by certified mail, return receipt requested, of the particular violations of section 1770 and demanded that Defendant rectify the problems associated with this action and give notice to all affected consumers of Defendant's intent to so act (the "CLRA Notice"). (FAC ¶ 98). Further, Plaintiff gave Defendant ample notice that the Class Products contained foreign ingredients, all while Defendant was advertising and selling them as

KAZEROUNI LAW GROUP, APC


117

"Manufactured in the USA." Defendant, as the creator, formulator, and seller of the Class Products, has personal knowledge of their ingredients and is fully aware that they are made with components sourced and produced outside the United States, contrary to its representations. After receiving the CLRA Notice, Defendant needed only to review the certificates of analysis for the Class Products' ingredients to confirm that the Class Products did, in fact, contain foreign ingredients—a step it may have already taken. Defendant failed to rectify or agree to rectify the problems as per the written notice within 30 thirty days of the CLRA Notice pursuant to section 1782. (FAC ¶ 98). Even taking Defendant's extrinsic argument regarding the removal of the representation from its website, via additional extrinsic evidence based off what Defendant represented to Plaintiff, it took Defendant 11-12 months from the date of the CLRA Notice to remove the "Manufactured in the USA" representation from its website—much more than 30 days after the receipt of the CLRA Notice and the filing of the Complaint. Defendant attempts to assert that Plaintiff did not provide "*sufficient notice*" of the alleged defects and incorrectly states the purportedly "foreign" ingredients are not at issue in this lawsuit. (Demurrer, 16) That is not so.

Upon the receipt of a credible claim that suggests deceptive practices or pertinent misrepresentation, the duty to investigate arises through the statutory requirement to provide Defendant with a thirty-day period to cure. Cal. Civ. Code § 1782. The duty is on Defendant to investigate the violations it has been put on notice of, not on Plaintiff; especially given the fact that Defendant is in the best position as the creator of the Class Products. Furthermore, Defendant has access to Certificates of Analysis for each ingredient and component used in the Class Products, which provide detailed information, including the country of origin for each ingredient. Within the CLRA Notice, Plaintiff provided a non-exhaustive list of examples of known ingredients and components that are known to be sourced outside of the United States, including; L-Citrulline, Betaine Anhydrous, Beta Alanine, L-Theanine, acetyl-L-Carnitine HCl, Green Tea Leaf Extract, Black Pepper Fruit Extract, Arginine, Glutathione, caffeine, theobromine, KSM-66 Ashwagandha (as KSM-66®) and *Astragalus membranaceus* and *Panax notoginseng* (together as AstraGin®). (Complaint and FAC, Exhibit A). Additionally, Plaintiff attached Exhibit A to the CLRA Notice, notifying Defendant of the products on which his and Class Member's claims are based. (Complaint


118

KAZEROUNI LAW GROUP, APC

and FAC, Exhibit A). Upon receipt of such notice, Defendant should have undertaken the duty to investigate the claims made by Plaintiff to determine whether in fact any "Manufactured in the USA" misrepresentations had occurred and provide remedy within thirty-days after receipt of notice. Cal. Civ. Code § 1782(b). Ultimately, Defendant was put on sufficient notice as pled in the FAC and the CLRA Notice, by incorporation.

Plaintiff provided more than enough information regarding the particular violations of law in his CLRA Notice to instigate Defendant's duty to investigate the claims of Plaintiff and Class Members. To require Plaintiff to divulge material facts only known by Defendant would be bewildering and a direct contrast to the public policy created by the CLRA to "protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." Civ. Code 1760; *Wang v. Massey Chevrolet*, 97 Cal.App.4th 856, 869 (2002). Therefore, Plaintiff has properly complied with the CLRA's notice requirement and Defendant had sufficient notice before Plaintiff sought damages against it in the operative complaint.

**G. The Appropriate Correction was Not Made to the Fullest Extent Under CLRA.**

Cal. Civ. Code § 1782 is titled "Prerequisites to commencement of action." Cal. Civ. Code § 1782 (Deering, Lexis Advance through the 2024 Regular Session Ch 164) (emphasis added). Cal. Civ. Code § 1782(c) places extensive affirmative obligations on Defendant to identify and make whole the entire class of similarly situated consumers at the onset, before litigation. Cal. Civ. Code § 1782 sets out the notice to be given and remedy by Defendant to avoid liability, specifically in a class action. *See Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1023 (9th Cir. 2011). "[T]he notice provision exists to give an erring defendant an opportunity to avoid liability for damages, and that, therefore, the notice provisions must be literally complied with." *Id.*; see *Kagan v. Gibraltar Sav. & Loan Ass'n*, 35 Cal. 3d 582, 594-95, 676 P.2d 1060, 1066, 200 Cal. Rptr. 38, 44 (1984), *disapproved on other grounds by Meyer v. Sprint Spectrum* L.P., 45 Cal. 4th 634, 200 P.3d 295, 88 Cal. Rptr. 3d 859 (2009). Specifically, and importantly, Cal. Civ. Code § 1782(c) "provides that if a defendant seeks to avoid facing a class action, it must take certain steps regarding "[a]ll consumers similarly situated" to the person giving notice. *Stearn v. Ticketmaster Corp.,* 655 F.3d


119

1013, 1023 (9th Cir. 2011). In essence to avoid the expansive litigation if Defendant wants to resolve a class action it must meet the Cal. Civ. Code § 1782(c) requirements early and not vastly later.

Cal. Civ. Code § 1782(c) states that "[n]o action for damages may be maintained under" the CLRA if the notified defendant shows that "all of the following exist (1) [a]l1 consumers similarly situated [to the consumer making the demand] *have been identified, or a reasonable effort to identify such other consumers has been made*, (2) *[a]ll consumers so identified have been notified* that upon their request the [defendant] shall make the appropriate correction, repair, replacement, or other remedy of the goods or services, (3) [t]he correction, repair, replacement, or other remedy requested by the consumers has been, or, in a reasonable time, shall be, given, [and] (4) "[t]he [defendant] has ceased from engaging, or if immediate cessation is impossible or unreasonably expensive under the circumstances, the [defendant] will, within a reasonable time, cease to engage, in the" acts or practices that allegedly violate section 1770 of the Civil Code. Cal. Civ. Code §§ 1782(c)(1)-(4). (emphasis added). However, Defendant has not adequately met each of these requirements under section 1782. The CLRA Notice was received by Defendant on March 13, 2023,[6] but Defendant failed to timely respond or cure the violations at issue. To this day, 22 months after the CLRA Notice, Defendant has not identified any consumers similarly situated as to Plaintiff or even made a reasonable effort to identify them. No consumers have been identified nor notified by Defendant, therefore, there have been no corrections, repairs, or replacements. Defendant alleges it had eliminated the "Manufactured in the USA" representation on its website, but that occurred 11-12 months after Defendant's receipt of Plaintiff's CLRA Notice and fails to meet the requirements under Cal. Civ. Code §§ 1782(c)(1)-(4). Furthermore, Defendant's actions to allegedly eliminate the "Manufactured in the USA" representation on its website occurred only ***after*** Plaintiff was forced to file the present lawsuit against Defendant—not before.

In *Bruce v. Harley-Davidson,* No. CV 09-6588 CAS (RZx), 2010 U.S. Dist. LEXIS 98180,

---

[6] Plaintiff sent the CLRA Notice to two addresses in Canada (delivered March 13, 2023), one address in New York (delivered March 14, 2023), and on address in Delaware (delivered March 15, 2023), per the secretary of state.


120

KAZEROUNI LAW GROUP, APC

at *4 (C.D. Cal. Jan. 15, 2010), plaintiff there sent defendant a notice under the CLRA regarding a class action where defendant actually responded within the 30 day period, but did not address any of the Cal. Civ. Code § 1782(c) inquiries. The United States District Court for the Central District of California held that "because plaintiffs' demand letters were made on behalf of a class of similarly situated consumers, that section 1782(c) controls the analysis" *Id.* at 23. Defendant argued that it met the Cal. Civ. Code § 1782(c) requirements in a timely manner, but the District Court for the Central District disagreed holding that defendant "did not comply with [Cal. Civ. Code § 1782(c)] requirements." *Id.* Further, the court concluded that defendant's "attempt to remedy the demands of the individual named plaintiff are inadequate to preclude a class action." *Id*. Further in *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1016 (9th Cir. 2011) the Ninth Circuit found that that the "notice section [under Cal. Civ. Code § 1782(c)] expressly recognizes that a class action might ensue . . . [and] . . . it provides that if a defendant seeks to avoid facing a class action, it must take certain steps regarding '[a]ll consumers similarly situated' to the person giving notice." The court acknowledged that there was a requirement under Cal. Civ. Code § 1782(c) to be met before litigating class action CLRA cases. Defendant went on a full-on litigation attack here with multiple motions before ever bringing Cal. Civ. Code § 1782(c) up, which shows that Defendant did not care about resolving this matter prelitigation or before extensive litigation occurred, contrary to the crux of Cal. Civ. Code § 1782.

The CLRA has specific requirements that go beyond a mere correction of the misrepresentation, Defendant's lack of evidence justifying its reasonable means to meet its duty under section 1782(c)(4) does not dismiss Plaintiff and Class Member's claims. The statutory language of Cal. Civ. Code §§ 1782(c)(1)-(4) was created to remedy a class action, but Defendant uses it as an argument and then an excuse as to why it cannot meet the requirements of the CLRA. Cal. Civ. Code §§ 1782(c)(1)-(4) is straight forward and either a defendant meets the requirements or not. Here, Defendant does not. Therefore, Defendant cannot succeed in an argument that Defendant has sufficiently complied with the requirements under section 1782(c)(4) that Plaintiff is precluded from CLRA damages.

KAZEROUNI LAW GROUP, APC

**H. Leave to Amend is Liberally Provided and Should Be Granted**

Defendant's Demurrer fails to articulate any reasoning why Plaintiff should not be given leave to amend. As stated above, a demurrer should not be sustained without leave to amend if the complaint, liberally construed, can state a cause of action under any theory or if there is a reasonable possibility the defect can be cured by amendment. *Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1373, 1379 (2010) (citing *Aubry v. Tri-City Hospital Dist.,* 2 Cal. 4th at 967). Here, given the facts, and Defendant's corrective actions of its representations due to the current litigation, Plaintiff's claims against Defendant are plausible—that the Class Products contain foreign ingredients despite Defendant representing that they are "Manufactured in the USA." Even if a complaint fails to state a cause of action, if there is a reasonable possibility the complaint can be amended to cure the deficiencies, then leave to amend must be granted. *Quelimane v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 39. As discussed above, Defendant's Demurrer should be overruled, but in the event any portion is sustained, Plaintiff should be given leave to amend as there is reasonable possibility that any defect in the FAC can be cured and Plaintiff's class allegations can be cured by amendment. Therefore, Defendant's Demurrer should not be sustained without leave to amend. Instead, in the event the Court sustains Defendant's Demurrer, in whole or in part, Plaintiff should be given leave to amend to allow Plaintiff's operative pleading to cure any perceived deficiencies.

**V. CONCLUSION**

In light of the foregoing points and authorities, and Plaintiff's Request for Judicial Notice, Plaintiff respectfully requests that Defendant's Demurrer be overruled in its entirety. Alternatively, if for any reason the Court is inclined to sustain Defendant's Demurrer in whole, or in part, or otherwise finds Plaintiff's operative complaint is deficient, Plaintiff respectfully requests that the Court grant leave for Plaintiff to file an amended pleading to cure any perceived deficiency.

Dated: January 24, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: ______________________________

GUSTAVO PONCE, ESQ.
*Attorneys for Plaintiff*


122

KAZEROUNI LAW GROUP, APC

KAZEROUNI
LAW GROUP, APC

**PROOF OF SERVICE**

I am over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On January 24, 2025, I served the foregoing document and accompanying attachments by the means indicated below:

- **PLAINTIFF'S OPPOSITION TO DEFENDANT'S DEMURRER TO THE FIRST AMENDED COMPLAINT**

☒ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

☒ ELECTRONIC SERVICE - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m. The electronic filing system sends an e-mail notification of the filing to the parties and counsel of record.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Angela M. Sousa
Anthony Hopp
Melanie A. Ayerh
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
jsingh@steptoe.com
asousa@steptoe.com
ahopp@steptoe.com
mayerh@steptoe.com
*Attorneys for Defendant*
*Nutra Holdings, Inc. d/b/a Jacked Factory*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on January 24, 2025, at Las Vegas, Nevada.

GUSTAVO PONCE


123

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp<br><br>**FILED**<br>Superior Court of California<br>County of Los Angeles<br>10/18/2024<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | |
| PLAINTIFF/PETITIONER:<br>Daniel Rossi | |
| DEFENDANT/RESPONDENT:<br>Nutra Holdings, Inc. | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>23STCV15674 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Court Order Continuing Further Status Conference) of 10/18/2024 upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Melanie Ayerh
Steptoe & Johnson LLP
633 W 5th St
Ste 1900
Los Angeles, CA 90071

Abbas Kazerounian
Kazerouni Law Group, APC
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626

David W. Slayton, Executive Officer / Clerk of Court

Dated: 10/18/2024

By: A. He
Deputy Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674** October 18, 2024
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.** 3:41 PM

Judge: Honorable Stuart M. Rice CSR: None
Judicial Assistant: A. He ERM: None
Courtroom Assistant: None Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Court Order Continuing Further Status Conference

Defendant Nutra Holdings, Inc.'s Demurrer, or in the Alternative, Motion to Strike First Amended Complaint is noticed for hearing on 02/10/2025 at 10:30 AM in Department 1. On the Court's own motion, the Further Status Conference scheduled for 12/10/2024 is continued to 02/10/2025 at 10:30 AM in Department 1 at Spring Street Courthouse.

The parties were ordered in the Initial Status Conference Order to sign up with an e-service provider and are again ordered to do so forthwith if not yet accomplished.

Certificate of Mailing is attached.


125

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 10/17/2024 4:51 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**DECLARATION OF JOHN WILLIAMS**<br><br>Hearing Date: February 10, 2025<br>Time: 10:30 a.m.<br>Dept: 1<br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024 |


126

**DECLARATION OF JOHN WILLIAMS**

I, John Williams, declare and state as follows:

1. I have personal knowledge of the facts stated in this declaration and they are true and correct to the best of my knowledge. If called upon as a witness, I could and would testify to them based on my personal knowledge. I am authorized to make this declaration on behalf of Nutra Holdings, Inc. ("Nutra Holdings").

2. I am the founder and Chief Executive Officer of Nutra Holdings. I am familiar with Nutra Holdings' portfolio of products and brands, and the disclosures and label claims related to each made on Nutra Holdings' website, and those retailer websites over which Nutra Holdings has control.

3. As of no later than January 2024, the "Manufactured in the USA" language no longer appears on the Nutra Holdings website, amazon.com and all other third-party retailer websites over which Nutra Holdings maintains control.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 16, 2024.

John Williams


127

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On October 17, 2024, I served true copies of the following document(s) described as **DECLARATION OF JOHN WILLIAMS**

on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address mabner@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 17, 2024, at Los Angeles, California.

/s/ Grace Calderon

Grace Calderon


128

## SERVICE LIST

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


129

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 10/17/2024 4:51 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**DECLARATION OF MELANIE A. AYERH**<br><br>Hearing Date: February 10, 2025<br>Time:10:30 a.m.<br>Dept: 1<br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024 |


130

**DECLARATION OF MELANIE A. AYERH**

I, Melanie Ayerh, declare and state as follows:

1. I am an attorney duly licensed to practice law in this Court and in all the courts of the State of California. I am an associate with the law firm of Steptoe, LLP, which is counsel of record for Defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Nutra Holdings"). I have personal knowledge of the facts stated in this declaration and could competently testify as to their truth if called upon to do so.

2. On October 8, 2024, I sent counsel for plaintiff Daniel Rossi ("Plaintiff") an email outlining the arguments Nutra Holdings intended to pursue in its demur and motion to strike. Then on October 10, 2024, I attended a telephonic meet and confer call with counsel for Plaintiff, Gustavo Ponce, to further discuss the issues to be raised in Nutra Holdings' demur and motion to strike. We were unable to reach an informal resolution.

3. Attached as **Exhibit 1** is a true and correct copy of Plaintiff's March 8, 2023 demand letter pursuant to Cal. Civ. Code § 1750, *et seq.*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: October 17, 2024

/s/ *Melanie A. Ayerh*
Melanie A. Ayerh


131

# EXHIBIT 1


132

KAZEROUNI
LAW GROUP, APC

245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523
www.kazlg.com

March 8, 2023

**VIA FEDEX**
Nutra Holdings, Inc d/b/a Jacked Factory
c/o John Williams
Chief Executive Officer
145 Aberdeen Avenue, Unit 1
St. John's, NL A1A 5P6
Canada

Nutra Holdings, Inc. d/b/a Jacked Factory
c/o Stewart McKelvey
Cabot Place
100 New Gower Street, Suite 1100
St. John's, NL A1C 6K3
Canada

**AGENT FOR SERVICE; VIA CERTIFIED US MAIL, WITH RETURN RECEIPT REQUESTED**
Nutra Holdings, Inc. d/b/a Jacked Factory's
c/o The Corporation
311 Crossways Park Drive
Woodbury, NY 11797

Nutra Holdings, Inc. d/b/a Jacked Factory's
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

**VIA EMAIL**
support@jackedfactory.com

**RE: Demand Letter Pursuant to California Civil Code § 1750 *Et Seq.***

Dear Sir or Madam:

This letter serves as notice and demand for corrective action by our client, Daniel Rossi, ("Mr. Rossi"),[1] on behalf of himself an all others similarly situated within the State of California pursuant to the Consumers Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*), ("CLRA"). This letter is sent on behalf of Mr. Rossi, a consumer and purchaser of Nutra Holdings, Inc. d/b/a Jacked

[1] This firm represents Daniel Rossi. Please refrain from contacting Mr. Rossi directly. Please direct any and all communications to this office.


133

Factory's ("Jacked Factory") Nitrosurge Pre-workout[2] dietary supplement (the "Product"). We hereby demand that you take immediate corrective action within thirty (30) days as further described below.

On January 24, 2023, Mr. Rossi, a resident of California, searched online for a pre-workout supplement. During his online search, Mr. Rossi discovered the Product on Amazon.com. After reviewing the Product, Mr. Rossi decided to purchase a 30 serving container of the Product from Amazon.com.

Jacked Factory markets and advertises various products, including the Product purchased by our client, as "Manufactured in the USA." This representation, which is displayed prominently on the advertising of Jacked Factory products, including the company's website at www.jackedfactory.com and in the company's Amazon.com product pages, conveys important representations to consumers regarding the quality and characteristics of Jacked Factory's products. Specifically, the term "Manufactured in the USA" conveys to a reasonable consumer that Jacked Factory's products, including the Product, are made entirely in the United States, made of ingredients from the United States, made pursuant to United States labor standards, and are therefore of superior quality (i.e., contain better grown ingredients than non-US made products or raw materials). Mr. Rossi relied on these representations by Jacked Factory when making the decision to purchase the Product for its advertised price of $29.99 plus shipping & handling as well as applicable tax.

Contrary to its "Manufactured in the USA" representation, many, if not all, products produced and sold by Jacked Factory contain or are made with ingredients that are not "Manufactured in the USA." For example, the Product contains L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine, which in this instance, among other ingredients in the product, are not from the United States, yet its advertising states "Manufactured in the USA." Similarly, Jacked Factory's Burn-XT contains acetyl-L-Carnitine HCl, Green Tea Leaf Extract and Black Pepper Fruit Extract, which in this instance, among other ingredients in the product, are not from the United States, yet the advertising on its webpage, at https://www.jackedfactory.com/products/burn-xt, also states "Manufactured in the USA." Jacked Factory's N.O. XT contains Arginine, Glutathione and Citrulline, which in this instance, among other ingredients in the product, are not from the United States, yet its advertising states "Manufactured in the USA" (See https://www.jackedfactory.com/products/no-xt). Additionally, on Jacked Factory's website, it even lists an "FAQ" of "Where is [Product] Manufactured" on each of its product's website pages to which the response by Jacked Factory is "All Jacked Factory products are ***proudly manufactured in the USA*** in a cGMP certified facility using the highest quality control guidelines for maximum potency, quality, & safety." (emphasis added).

The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here. However, it is abundantly clear that Jacked Factory pays no attention to applicable laws regarding the labeling of its products with "Manufactured in the USA", or any

[2] As titled on Amazon.com when our client bought the Product: "*NITROSURGE Pre Workout Supplement - Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps - Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White.*"






134

derivative thereof. **Therefore, each and every one of Jacked Factory products[3] regardless of brand, type, configuration or size, including but not limited to the aforementioned brands and products, containing foreign ingredients, components or raw materials and any reference to "Manufactured in the USA" or any derivative thereof, is subject to the demand/s made in this letter. Please note that should this firm file suit on behalf of our client, we will seek to represent the purchasers of any and all of Jacked Factory misrepresented products.**

Section 1770(a) of the CLRA prohibits, among other things, the following unfair methods of competition and unfair or deceptive acts or practices when attempting to sell or selling goods and services to consumers: (2) Misrepresenting the source, sponsorship, approval, or certification of goods or services; (3) Misrepresenting the affiliation, connection, or association with, or certification by, another; (4) Using deceptive representations or designations of geographic origin in connection with goods or services; (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have; (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (9) Advertising goods or services with intent not to sell them as advertised. (*See* Cal. Civil Code sections 1770(a) (2), (3), (4), (5), (7), and (9).)

The above-described representations and/or omissions are false and misleading and constitute unlawful, unfair, or fraudulent acts, or practices and unfair methods of competition in violation of the CLRA, including but not limited to §§ 1770(a)(2), (3), (4), (5), (7), and (9). The representations also violate California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq*; and California's False Advertising Law, California Business & Professions Code §§ 17500, *et seq.* Jacked Factory has and continues to mislead consumers into believing that its products containing the aforementioned ingredients, among others, are "Manufactured in the USA," when in fact that is not true. These misrepresentations allow Jacked Factory to increase its sales and capture market share from its competitors.

If our client had known the true nature of Jacked Factory's products, he would not have purchased the Product. Our client is a citizen of the State of California and is a consumer as defined in California Civil Code § 1761(d) because he purchased the Product for personal, family, or household purposes. Our client saw and read Jacked Factory's advertising representations and relied on such false and deceptive marketing in deciding to purchase the Product. As a result, our client was injured and suffered loss of money.

We hereby demand on behalf of our client and all other similarly situated that Jacked Factory immediately:

> (1) cease and desist from the continued sale of all its misrepresented products with the "Manufactured in the USA" representation, including the Product as well as those in Exhibit A;

---

[3] For a list that includes, but is not limited to, Jacked Factory products subject to this letter see Exhibit A.


135

(2) initiate a corrective advertising campaign to inform consumers about the true nature of its products, including the Product as well as those in Exhibit A;
(3) initiate a full recall with an offer to refund the purchase price of all misrepresented Jacked Factory products, including the Product purchased by our client, as well as those in Exhibit A, plus reimbursement for interest; and
(4) pay reasonable attorneys' fees and costs.

Please comply with this demand within thirty (30) days from receipt of this letter. Please be advised that your failure to comply with this request within thirty (30) calendar days may subject you to the following remedies under the CLRA:

(1) The actual damages suffered;
(2) An order enjoining you for such methods, acts or practices;
(3) For restitution of property if applicable;
(4) Punitive damages;
(5) Court costs and reasonable attorneys' fees; and
(6) Any other relief which the court deems proper.

**NOTICE OF DUTY TO PRESERVE EVIDENCE**

**Since litigation may be filed in this matter, this letter also serves as notice to Jacked Factory, its suppliers, contract manufacturers, web development firms, Amazon firms, marketing agencies and anyone involved in the sourcing, manufacturing, production/creation of packaging, distribution, sales, advertising and marketing of Jacked Factory's products of their duty to preserve and retain all documents, tangible items, and electronically stored information and communications that are potentially relevant to this matter, including, but not limited to, documents detailing revisions of marketing, advertising, packaging and quantities of each product produced and/or sold.**

If Jacked Factory wishes to enter into discussions to resolve the demands asserted in this letter, please contact me immediately. Your cooperation in this matter would be greatly appreciated.

Yours truly,

***/s/ Abbas Kazerounian***

Abbas Kazerounian, Esq.
Direct Line: 800-400-6808 Ext: 2
ak@kazlg.com






136

**Exhibit A**

1. Nitrosurge Pre-Workout
2. Nitrosurge Shred
3. Authentic Whey
4. Burn XT
5. Creatine Monohydrate
6. Pump Surge
7. Authentic Protein Cereal
8. Lean PM
9. N.O. XT
10. EAA Surge
11. Andro Surge
12. Build XT
13. Authentic Iso
14. Prima Surge
15. Hydra Surge
16. Intra Surge
17. Green Surge Powder
18. Green Surge Capsules
19. Burn XT Black
20. Lean XT
21. Dry XT
22. Carb Surge
23. Altius Pre
24. Build PM
25. BCAA
26. Vita XT
27. Test PM
28. Defend XT
29. L-Glutamine
30. L-Arginine (Nitrosigine)
31. Burn XT Powder
32. GDA XT
33. Red Surge
34. Green Tea Extract
35. Pro Series Test
36. Authentic Casein
37. Burn XT Stick Packs
38. Authentic Vegan
39. Form XT
40. Caffeine
41. Flex XT
42. Crea Surge
43. Nitro Surge Build


137

44. Nitro Surge Natural
45. Nitro Surge Max
46. Any and all other products that contain "Manufactured in the USA" or any derivative thereof in any of their advertising or marketing.

Products with multiple flavors, packaging or other variations not specifically listed here are all subject to this letter.


138

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On October 17, 2024, I served true copies of the following document(s) described as **DECLARATION OF MELANIE A. AYERH** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 17, 2024, at Los Angeles, California.

/s/Grace Calderon
Grace Calderon


139

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


140

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 10/17/2024 4:51 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**NOTICE OF DEMURRER, OR IN THE ALTERNATIVE, MOTION TO STRIKE; DEMURRER, OR IN THE ALTERNATIVE, MOTION TO STRIKE FIRST AMENDED COMPLAINT**<br><br>Hearing Date: February 10, 2025<br>Time:10:30 a.m.<br>Dept: 1<br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024 |


141

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on February 10, 2025 at 10:30 a.m. or soon thereafter as the matter may be heard, in Department 1 of the Superior Court of the State of California, County of Los Angeles, located at 312 North Spring Street, Los Angeles, CA 90012 the Honorable Stuart M. Rice presiding, Defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Nutra Holdings") will and hereby does demur to, and will and does hereby move to strike portions of Plaintiff Daniel Rossi's ("Plaintiff" or "Rossi") First Amended Complaint ("FAC").

Meet and Confer. The parties met and conferred by telephone on October 10, 2024 regarding the substance of Nutra Holdings' motion. The parties were unable to reach a resolution. (*See*, Declaration of Melanie Ayerh, ¶2.)

Nutra Holdings demurs pursuant to Code of Civil Procedure section 430.10(e) on grounds that all claims as pled in the FAC fail to state facts sufficient to constitute a cause of action against Nutra Holdings. A motion to strike is also made on grounds that pursuant to California Code of Civil Procedure §§ 435 and 436, Plaintiff cannot pursue a claim for injunctive relief and damages under the Consumers Legal Remedies Act (Cal. Civ. Code § 1750, et seq.). Accordingly, all such relief should be stricken. Nutra Holdings also moves to strike Plaintiff's allegations in footnote 1 and 3 of the FAC, and Exhibit A in its entirety on grounds that Plaintiff lacks standing to pursue claims against products he did not purchase and products that are not substantially similar to the Product that he allegedly purchased.

The demurrer and motion to strike are based upon this Notice, the Demurrer and Memorandum of Points and Authorities filed concurrently herewith, the Declaration of Melanie A. Ayerh, the Declaration of John Williams, the Request for Judicial Notice and the pleadings and records in this action, and any other such matters and argument as the Court may consider at the hearing.

///

///

///

///


142

Dated: October 17, 2024

**STEPTOE LLP**

By: */s/ Melanie A. Ayerh*

Carol R. Brophy
Jennifer K. Singh
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh

*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*


143

**<u>DEMURRER OR, IN THE ALTERNATIVE, MOTION TO STRIKE</u>**

Nutra Holdings hereby demurs to, and moves to strike portions of, Plaintiff's First Amended Complaint ("FAC") on each of the following grounds:

**DEMURRER TO THE FIRST CAUSE OF ACTION**

1. The first cause of action fails to include sufficient facts to state a cause of action for violation of the California Consumers Legal Remedies Act, Cal. Civ. Code section 1750, et seq. (Code of Civ. Proc. § 430.10(e).)

**DEMURRER TO THE SECOND CAUSE OF ACTION**

2. The second cause of action fails to include sufficient facts to state a cause of action for violation of California's False Advertising Law. Bus. & Prof. Code § 17500, et seq ("CLRA"). (Code of Civ. Proc. § 430.10(e).)

**DEMURRER TO THE THIRD CAUSE OF ACTION**

3. The third cause of action fails to include sufficient facts to state a cause of action for violation of the Unfair Competition Law, Bus. & Prof. Code, § 17200, et seq. (Code of Civ. Proc. § 430.10(e).)

**DEMURRER TO THE FOURTH CAUSE OF ACTION**

4. The fourth cause of action fails to include sufficient facts to state a cause of action for negligent misrepresentation. (Code of Civ. Proc. § 430.10(e).)

**DEMURRER TO THE FIFTH CAUSE OF ACTION**

5. The fifth cause of action fails to include sufficient facts to state a cause of action for intentional misrepresentation. (Code of Civ. Proc. § 430.10(e).)

**MOTIONS TO STRIKE PORTIONS OF THE COMPLAINT**

6. Nutra Holdings moves to strike Plaintiff's prayer for injunctive relief and damages under the CLRA pursuant to California Code of Civil Procedure §§ 435 and 436 on grounds that there is no future conduct to enjoin, Plaintiff's notice under Cal. Civ. Code § 1782 was insufficient, and in any case, Nutra Holdings cured the alleged "wrongs" within a reasonable time. Nutra Holdings also moves to strike Plaintiff's allegations in footnote 1 and 3 of the FAC, and Exhibit A in its entirety on grounds that Plaintiff lacks standing to pursue claims against products he did


144

not purchase and products that are not substantially similar to the Nitrosurge Pre-workout dietary supplement Product that he allegedly purchased.

Dated: October 17, 2024

**STEPTOE LLP**

By: */s/ Melanie A. Ayerh*

Carol R. Brophy
Jennifer K. Singh
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh

*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*


145

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On October 17, 2024, I served true copies of the following document(s) described as **NOTICE OF DEMURRER, OR IN THE ALTERNATIVE, MOTION TO STRIKE; DEMURRER, OR IN THE ALTERNATIVE, MOTION TO STRIKE FIRST AMENDED COMPLAINT**

on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 17, 2024, at Los Angeles, California.

*/s/ Grace Calderon*

Grace Calderon


146

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


147

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 10/17/2024 4:51 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER, OR IN THE ALTERNATIVE, MOTION TO STRIKE**<br><br>Hearing Date: February 10, 2025<br>Time:10:30 a.m.<br>Dept: 1<br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024 |


148

**TABLE OF CONTENTS**


I. INTRODUCTION .......... 6

II. STATEMENT OF RELEVANT FACTS .......... 7

III. PLAINTIFF FAILS TO STATE A CAUSE OF ACTION FOR FRAUD .......... 9

A. Plaintiff's Misrepresentation Claims Are Not Pled With The Requisite Specificity .......... 9

1. Intentional and Negligent Misrepresentation Claims Must be Pled With Specificity .......... 9

2. Plaintiff's Allegations Regarding Ingredient Sourcing Are Sheer Guesswork and do not Establish Foreign Origin .......... 10

IV. PLAINTIFF FAILS TO ALLEGE A CAUSE OF ACTION UNDER THE UCL, FAL AND CLRA .......... 12

V. THE COURT SHOULD STRIKE PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF .......... 13

VI. PLAINTIFF CANNOT EXTEND CLAIMS BEYOND THE PRODUCTS HE PURCHASED .......... 15

VII. PLAINTIFF CANNOT MAINTAIN A CLAIM FOR DAMAGES UNDER THE CLRA .......... 16

A. Plaintiff Did Not Comply With The CLRA's Strict Notice Requirements .......... 16

B. The Appropriate Correction was Made Precluding CLRA Damages .......... 17

VIII. CONCLUSION .......... 18



149

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaei v. Kraft Heinz Food Co*.,
No. 15CV2961-MMA (DHB), 2016 WL 11621800 (S.D. Cal. Apr. 22, 2016) ...................... 11

*Ang v. Bimbo Bakeries USA, Inc*.,
No. 13-CV-01196-WHO, 2013 WL 5407039 (N.D. Cal. Sept. 25, 2013) ............................. 16

*Bennett v. Suncloud*,
56 Cal. App. 4th 91 (1997) ........................................................................................ 11

*Benson v. Kwikset Corp*.,
152 Cal. App. 4th 1254 (2007) .................................................................................. 11

*Bruton v. Gerber Prods. Co.*,
2014 WL 172111 (N.D. Cal. Jan. 15, 2014) ................................................................. 15

*Cadlo v. Owens-Illinois, Inc*.,
125 Cal. App. 4th 513 (2004) ...................................................................................... 9

*California Serv. Station etc. Assn. v. Union Oil Co*.,
232 Cal. App. 3d 44 (Ct. App. 1991) ........................................................................... 14

*Carney v. Simmonds*,
49 Cal. 2d 84 (1957) ................................................................................................. 10

*Colgan v. Leatherman Tool Grp., Inc.*,
135 Cal. App. 4th 663 (2006) ............................................................................... 11, 13

*Committee On Children's Television, Inc. v. General Foods Corp*.
35 Cal.3d 197 (1983) ................................................................................................. 12

*Emery v. Visa Int'l Serv. Ass'n*,
95 Cal. App. 4th 952 (2002) ....................................................................................... 14

*Feitelberg v. Credit Suisse First Boston, LLC*,
134 Cal. App. 4th 997 (2005) ................................................................................ 6, 13

*In re Firearm Cases*,
126 Cal. App. 4th 959 (2005) ...................................................................................... 14

*Foster v. Sexton*,
61 Cal. App. 5th 998 (2021) ........................................................................................ 9


150

*Gomes v. Countrywide Home Loans, Inc.*,
192 Cal. App. 4th 1149 (2011) ....................10, 12

*Gutierrez v. Carmax Auto Superstores California*,
19 Cal. App. 5th 1234 (2018) ....................12

*J.J. Dowling v. Spring Valley Water Co.*,
174 Cal. 218 (1917) ....................10

*In re Jamster Mktg. Litig.*,
No. 05CV0819 JM (CAB), 2009 WL 1456632 (S.D. Cal. May 22, 2009) ....................14

*Johns v. Bayer Corp.*,
No. 09-CV-1935-DMS-JMA, 2010 WL 476688 (S.D. Cal. Feb. 9, 2010)....................14

*Kasky v. Nike, Inc.*,
27 Cal. 4th 939 (2002) ....................12

*Kwikset Corp. v. Superior Court*,
51 Cal.4th 310 (2011) ....................11

*Lazar v. Superior Court*,
12 Cal. 4th 631 (1996) ....................9, 10, 11

*Madrid v. Perot Systems Corp.*
130 Cal. App. 4th 440 (2005) ....................13

*Martin v. Gladstone*,
96 Cal. App. 5th 681 (2023), review denied (Jan. 17, 2024)....................13

*Morgan v. AT & T Wireless Servs., Inc.*,
177 Cal.App.4th 1235,1259–60 (2d Dist. 2009)....................16

*Outboard Marine Corp. v. Superior Ct.*,
52 Cal. App. 3d 30 (Ct. App. 1975)....................16

*People v. Johnson & Johnson*,
77 Cal. App. 5th 295 (2022) ....................12

*Poseidon Dev., Inc. v. Woodland Lane Ests., LLC*,
152 Cal. App. 4th 1106 (2007) ....................6

*Reed v. NBTY, Inc.*,
No. EDCV 13-0142 ....................14

*Stansfield v. Starkey*,
220 Cal. App. 3d 59 (1990) ....................10


151

*Waller v. Hewlett-Packard Co.*,
No. 11CV0454-LAB RBB, 2011 WL 6325972 (S.D. Cal. Dec. 16, 2011)....................16

*West v. JPMorgan Chase Bank, N.A.*,
214 Cal. App. 4th 780 (2013) ....................10

*Yordy v. Plimus, Inc.*,
No. 12-CV-00229-TEH, 2014 WL 1466608 (N.D. Cal. Apr. 15, 2014)....................14

*Yvanova v. New Century Mortgage Corp*.,
62 Cal. 4th 919 (2016) ....................13

**Statutes**

Cal. Bus. & Prof. Code § 17200 ....................9, 12, 13, 14, 15

Cal. Bus. & Prof. Code § 17500 ....................9, 12, 14

Cal. Civ. Code § 1782....................6, 16

Cal. Civ.Code § 1782(a)(2)....................16

Cal. Civ. Code §§ 1782(c)(1)-(4)....................17

Civil Code section 1770....................17

Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, et. seq.................... *passim*

16 C.F.R. § 323....................10

**Other Authorities**

https://draxe.com/nutrition/theobromine-benefits/ ....................8


152

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff Daniel Rossi ("Plaintiff") brings this putative class action against Nutra Holdings d/b/a Jacked Factory ("Nutra Holdings") alleging that the "Manufactured in the USA" language that previously appeared on some Nutra Holdings' Nitrosurge Pre-workout dietary supplement (the "Product") ***websites only*** is false and misleading because the Product allegedly contains certain "ingredients" Plaintiff speculates are foreign. Plaintiff's First Amended Complaint ("FAC") relies on guesswork about foreign ingredient sourcing, which is fatal to his case and grounds for demur. *Poseidon Dev., Inc. v. Woodland Lane Ests., LLC*, 152 Cal. App. 4th 1106, 1111 (2007) (it is a long-settled rule that "[courts] must treat the demurrer as admitting all material *facts* properly pleaded, *but not* contentions, deductions or conclusions of fact or law.") The Court should sustain Nutra Holdings' demurrer to the FAC without leave to amend, or in the alternative, strike portions of the FAC, as set forth below.

*First*, Plaintiff's intentional and negligent misrepresentation claims fail as a matter of law because they do not satisfy the heightened pleading requirements for fraud. *Second***,** Plaintiff's causes of action brought under California's consumer protection statutes are defective because they are pled without particularity. *Third*, the websites at issue no longer carry the "Manufactured in the USA" language and therefore there is no basis for injunctive relief. *Fourth*, Plaintiff lacks standing to pursue any claims related to the 44 other products identified in Exhibit A[1] because he cannot be injured by what he did not purchase and, in any case, he does not plausibly allege that those 44 products are "substantially similar" to the Product he purchased such that he may pursue claims related to those products on behalf of a California class. *Fifth*, Plaintiff is not entitled to CLRA damages because he did not comply with Cal. Civ. Code § 1782 and, in any case, an appropriate correction was made.

---

[1] Plaintiff filed an amended complaint on August 16, 2024 which references an "Exhibit A" but does not in fact attach any exhibit. For purposes of this demur, Nutra Holdings will assume that the "Exhibit A" is identical to the "Exhibit A" attached to the original complaint.


153

## II. STATEMENT OF RELEVANT FACTS

Plaintiff alleges that the "Manufactured in the USA" language that previously appeared[2] on the Product's website and the websites of certain third-party vendors is allegedly false and misleading because, the Product "[is] actually made with or contain[s] ingredients that are not 'Manufactured in the USA'". FAC ¶¶ 3, 23, 24. Plaintiff alleges that on or about January 24, 2023, he searched "online" for a pre-workout supplement when "he discovered the Product and its misrepresented 'Manufactured in the USA' claim." *Id.* ¶ 62. Plaintiff allegedly purchased the Product on Amazon.com. *Id*. He claims that he relied on the "Manufactured in the USA" language and "believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA." *Id.* ¶ 67. He claims that had he been made aware that the Product was not actually "Manufactured in the USA" he would not have purchased the Product. *Id.* ¶ 70.

The Product is, in fact, manufactured in the USA and the FAC fails to plausibly allege facts to the contrary. Instead, the FAC claims that the Product contains *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine, which allegedly are not grown in the US. *Id.* ¶¶ 32-35. However, Plaintiff's allegations regarding ingredient sourcing is sheer guesswork. He does not allege what percentage or portion of the Product these purported ingredients makeup and the websites cited in the FAC do not support a claim that the Product's ingredients are manufactured or sourced outside the USA.

- ***Astragalus membranaceus* and *Panax notoginseng***. Plaintiff speculates, based on two studies, that the *A. membranaceus* and *P. notoginseng* in the Product are not sourced in the US. *Id.*, fn 10. As Plaintiff concedes, however, the cited studies only suggest that *A. membranaceus* and *P. notoginseng* are "mainly" derived from China. Zhao et al., states in a single sentence, that at least in 2017, *P. notoginseng* "[grew] primarily in the Wenshan mountain area of Yunnan province and [was] cultivated commercially in the Southwest regions of China." FAC ¶32, n.10.[3]

---

[2] As of no later than January, 2024, the "Manufactured in the USA" language no longer appears on the Product's website, amazon.com and all other third-party retailer websites over which Nutra Holdings maintains control. Declaration of John Williams ("Williams Decl.") ¶ 3.

[3] China. Zhao et al., https://pmc.ncbi.nlm.nih.gov/articles/PMC10180874/; Ji, et al. https://pmc.ncbi.nlm.nih.gov/articles/PMC5758348/


154

Similarly, Ji, et al. suggests only that *A. membranaceus* is "mainly" derived from "wild and cultivated resources in China." *Id*. These studies do not claim that *A. membranaceus* and *P. notoginseng* are ***exclusively*** sourced from China and they certainly do not demonstrate that the *A. membranaceus* and *P. notoginseng* in the Products are sourced from outside the USA.

- ***Theobromine***. Plaintiff also alleges that the Product contains theobromine "which is not grown commercially in the United States". FAC ¶ 33. In support, Plaintiff cites to a website that discusses the origins and spread of "Theobroma". But there is no plausible allegation in the FAC that the Theobromine in the Product is actually derived from Theobroma – the cacao plant. There are several other sources of theobromine, none of which are foreclosed by the allegations in the FAC.[4]

- ***Caffeine***. Plaintiff alleges that the fourth ingredient that renders the Product false and misleading is "caffeine". Plaintiff alleges that caffeine is "generally derived" from decaffeination of coffee or tea" neither of which is grown "commercially or cost effectively in the United States. FAC ¶ 34. Plaintiff relies, solely, on an unverified Wikipedia page to support her claims. But nothing in the Wikipedia post suggests that the caffeine in the Product is sourced from outside the USA. Moreover, the quote Plaintiff attributes to the post— "Commercial supplies of caffeine are not usually manufactured synthetically because the chemical is readily available as a byproduct of decaffeination"— does not actually appear anywhere on the Wikipedia page.

Plaintiff further alleges, without any factual support, "[u]pon information and belief" that "it is likely that the remaining ingredients and even the packaging components used to produce the Product are foreign." FAC ¶ 37.

To further magnify this confusion, Plaintiff seeks to include in this litigation an additional ***44 different*** Nutra Holding's products allegedly advertised as "Manufactured in the USA" that he did not purchase merely on grounds that "[t]he ingredients in the Product and the Class Products are the same or substantially similar ingredients." FAC ¶¶ 3, n.3, 40.[5] But those 44 products contain

---

[4] *See, e.g.* https://draxe.com/nutrition/theobromine-benefits/ ("Chocolate may be the most popular source of theobromine, ***but it isn't the only source***.")

[5] Footnote 3 claims that "[a] non-comprehensive list of the Class Products is attached hereto as Exhibit A". However, no "Exhibit A" is actually attached to the FAC. For purposes of this demurrer, Nutra Holdings will refer to the "Exhibit A" attached to Plaintiff's original complaint.


155

different and unique ingredients and formulations, may be manufactured at potentially different facilities, and conceivably encompass hundreds of different types of articles, units, or parts all bearing different physical labels and website configurations than the protein powder purchased by Plaintiff. Indeed, a cursory review of the Nutra Holdings website shows that at least 21 of the 44 products listed in Exhibit A do not include ***any*** of the purportedly "foreign" ingredients identified above.[6] The FAC does not include ***any*** allegations as to how those products are "substantially similar" to the Product Plaintiff purchased, or why the "manufactured in USA" language is misleading as to those products. Plaintiff simply alleges that "Defendant uses numerous other 'indisputably foreign ingredients' in numerous of its products, including but not limited to KSM-66 ashwagandha and green tea extract." FAC ¶ 44. But nothing in the FAC suggests that any of the ingredients in the actual products are "indisputably foreign."

Based on these threadbare allegations, Plaintiff seeks to hold Nutra Holdings liable on behalf of a class of California Consumers for intentional and negligent misrepresentation and violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, et. seq ("CLRA"), California's False Advertising Law, Bus. & Prof. Code §§ 17500, et seq., ("FAL") and the Unfair Competition Law, Bus. & Prof. Code §§ 17200, et seq. ("UCL"). Plaintiff seeks damages, restitution and injunctive relief.

## III. PLAINTIFF FAILS TO STATE A CAUSE OF ACTION FOR FRAUD

### A. Plaintiff's Misrepresentation Claims Are Not Pled With The Requisite Specificity

#### 1. <u>Intentional and Negligent Misrepresentation Claims Must be Pled With Specificity</u>

The requirements for pleading fraud in California are strict. Fraud "must be pled specifically; general and conclusory allegations do not suffice." *Lazar v. Superior Court*, 12 Cal. 4th 631, 645 (1996). The same requirement applies to negligent misrepresentation: "Each element

---

[6] See, Request for Judicial Notice. This number is inclusive of products listed on Exhibit A that do not appear on jackedfactory.com or amazon.com


156

in a cause of action for fraud or negligent misrepresentation must be factually and specifically alleged." *Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513, 519 (2004); *accord Foster v. Sexton*, 61 Cal. App. 5th 998, 1028 (2021). To satisfy the specificity requirement, a plaintiff must allege facts which show "how, when, where, to whom, and by what means the representations were tendered." *Lazar*, 12 Cal. 4th at 645.

Because "allegations of fraud involve a serious attack on character... fairness to the defendant demands that he should receive the fullest possible details of the charge in order to prepare his defense." *Stansfield v. Starkey*, 220 Cal. App. 3d 59, 73 (1990). It is "not sufficient to allege fraud or its elements upon information and belief, unless the facts upon which the belief is founded are stated in the pleading." *Carney v. Simmonds*, 49 Cal. 2d 84, 100 (1957); *J.J. Dowling v. Spring Valley Water Co.*, 174 Cal. 218, 221 (1917). "[A] pleading made on information and belief is insufficient if it merely asserts the facts so alleged without alleging such information that leads the plaintiff to believe that the allegations are true." *Gomes v. Countrywide Home Loans, Inc.*, 192 Cal. App. 4th 1149, 1158–59 (2011). Plaintiff's causes of action for intentional and negligent misrepresentation do not come close to satisfying these heightened pleading standards.

2. Plaintiff's Allegations Regarding Ingredient Sourcing Are Sheer Guesswork and do not Establish Foreign Origin

Plaintiff has failed to plausibly allege with particularity that ingredients in his protein powder Product are not from the United States such that there is a violation of 16 C.F.R. § 323[7]. Instead, his FAC demonstrates that Plaintiff is simply guessing at this juncture and hoping that discovery will turn up a violation. To plead a cognizable claim of intentional misrepresentation, a plaintiff must allege facts showing (1) the defendant made a false representation as to a material fact; (2) the defendant knew the representation was false at the time the defendant made it; (3) the defendant intended to deceive the plaintiff with that false representation; (4) the plaintiff justifiably

---

[7] Section 323 prohibits the labeling of "any product as Made in the United States unless the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States." 16 C.F.R. § 323.2.


157

relied on that representation; and (5) the plaintiff suffered resulting damages. *West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 792 (2013). The elements of negligent misrepresentation are the same except that the defendant need not have known the representation was false at the time, the defendant only need lack a reasonable ground for believing it to be true. *Id*.

Plaintiff's allegations do not pass muster under the heightened pleading standard for fraud. Plaintiff fails to specify the "how, when, where, to whom, and by what means" each alleged misrepresentation was made. *Lazar*, 12 Cal. 4th at 645; *Bennett v. Suncloud*, 56 Cal. App. 4th 91, 98 n.2 (1997). Although Plaintiff alleges in the FAC that the Product contains some foreign ingredients, she does not allege any *facts* to support this contention. Plaintiff's allegations that *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are not sourced in the United States (FAC ¶¶35-37), do not save her claims. The authority Plaintiff relies on do not state that these ingredients are ***only*** imported from outside the USA. As the Court in *Alaei v. Kraft Heinz* noted in its dismissal order, "[s]imply put, Plaintiff claims to have bought" a product labeled as "Made in the USA" that "may have contained foreign ingredients, or may have been made somewhere besides the United *States*." *Alaei v. Kraft Heinz Food Co*., No. 15CV2961-MMA (DHB), 2016 WL 11621800, at *3 (S.D. Cal. Apr. 22, 2016). Just like the plaintiff in *Heinz*, Plaintiff fails to "allege the ingredients' country of origin"—if Plaintiff has knowledge and information sufficient to allege these ingredients do not originate within the United States, then he should know exactly where they come from. If Plaintiff is only guessing, California's fraud pleading standards are in place precisely to prevent these sorts of allegations.

An analysis of other cases involving alleged misuse of the "Made in USA" claim, also support a finding that Plaintiff fails to plead adequate facts to survive this demurrer. For example, in *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 692 (2006), *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 318 (2011), and *Benson v. Kwikset Corp*., 152 Cal. App. 4th 1254 (2007), each of the plaintiffs extensively detailed the aspects of foreign manufacturing at issue. See *Colgan*, 135 Cal. App. 4th at 691(detailing each part's manufacturing process, such as "a clip plate that was fineblanked, deburred, formed, hardened, and polished in Switzerland"); *Kwikset*, 51 Cal.4th at 318 (identifying a "latch subassembly performed in Mexico"); *Benson*, 152 Cal. App.








158

4th at 1264 (identifying screws and pins made in Taiwan and a latch assembly sub-assembled in Mexico).

Finally, Plaintiff's claims run afoul of the requirement that allegations pled on information and belief be accompanied by alleged facts providing the basis for that belief. *Gomes*, 192 Cal. App. 4th at 1158-59. Stated differently, Plaintiff fails to state (i) what foreign ingredients are at issue, (ii) where these alleged ingredients are from, and (iii) how they make the "Manufactured in the USA" statement false. Nothing in the FAC suggests Plaintiff's vague claims about ingredient sourcing are anything other than guesswork. "The pleading of fraud…is…the last remaining habitat of the common law notion that a complaint should be sufficiently specific that the court can weed out nonmeritorious actions on the basis of the pleadings." *Committee On Children's Television, Inc. v. General Foods Corp*. 35 Cal.3d 197, 216-217 (1983). It also provides "notice to the defendant, to 'furnish the defendant with certain definite charges which can be intelligently met.'" *Id*. The Court should sustain Nutra Holdings' demurrer as to Plaintiff's fourth and fifth causes of action for negligent and intentional misrepresentation.

**IV. PLAINTIFF FAILS TO ALLEGE A CAUSE OF ACTION UNDER THE UCL, FAL AND CLRA**

Plaintiff's claims also lack the reasonable particularity required to plead claims under the UCL, FAL and CLRA. The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The FAL, "broadly prohibit[s] false or misleading advertising, declaring that it is unlawful for any person or business to make or distribute any statement to induce the public to enter into a transaction 'which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.'" *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 317 (2022); Cal. Bus. & Prof. Code § 17500. "[A]ny violation of the false advertising law ... necessarily violates the [UCL]." *Kasky v. Nike, Inc*., 27 Cal. 4th 939, 950 (2002). Similarly, "California's Consumer Legal Remedies Act ('CLRA') prohibits 'unfair methods of competition and unfair or deceptive acts or practices.'" *Gutierrez v. Carmax Auto Superstores California*, 19 Cal. App. 5th 1234, 1249 (2018).


159

Claims under the UCL, FAL and the CLRA "must be stated with reasonable particularity". *Id.* at 1261.

Plaintiff fails to allege facts sufficient to establish that Nutra Holdings engaged in deceptive practices. Plaintiff predicates his allegations under the UCL, FAL and CLRA on the same baseless allegations that Nutra Holdings misrepresented its Product as "Manufactured in the USA". However, as outlined above, Plaintiff does not plausibly allege ***why*** or ***how*** the representation is false or deceptive. Plaintiff fails to state facts that would support finding that Nutra Holdings misrepresented anything to consumers concerning its Products and the Court is not required to accept the truth of "contentions, deductions, or conclusions of fact or law." *Yvanova v. New Century Mortgage Corp*., 62 Cal. 4th 919, 924 (2016); *Martin v. Gladstone*, 96 Cal. App. 5th 681 (2023), review denied (Jan. 17, 2024). This Court should sustain Nutra's demurrer as to the first, second and third causes of action for Plaintiff's failure to plead his claims with reasonable particularity. *Amiodarone Cases*, 84 Cal. App. 5th 1091, 1115 (2022), review denied (Jan. 25, 2023) (finding Plaintiffs' claims lacked the reasonable particularity required to plead claims under the UCL and CLRA.)

## V. THE COURT SHOULD STRIKE PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF

The record does not support an award of injunctive relief, and it should be stricken. Plaintiff seeks an order "requiring [Nutra Holdings] to discontinue its false and/or misleading statements" (FAC, "Prayer for Relief"). However, the "Manufactured in the USA" language no longer appears on the at-issue websites. Williams Decl. ¶ 3. In order to grant injunctive relief under the UCL, "there must be a threat that the wrongful conduct will continue. 'Injunctive relief will be denied if, at the time of the order of judgment, there is no reasonable probability that the past acts complained of will recur....'" *Colgan*, 135 Cal. App. 4th at 702; *accord Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 997, 1012 (2005) ("'[A]n injunction must seek to prevent harm, not to punish the wrongdoer.'"); *Madrid v. Perot Systems Corp.* 130 Cal. App. 4th 440, 464–465 (2005) ("'[Injunctive relief] ... is not a remedy designed to right completed wrongs.")Generally, an injunction may not issue unless the alleged misconduct is ongoing or likely to recur. *Id.*


160

Here, without admitting guilt of any wrongful conduct, the "Manufactured in USA" language no longer appears on the Product's website and those third-party websites over which Nutra Holdings maintains control, including amazon.com. Williams Decl. ¶ 3. Accordingly, there is no threat that any allegedly wrongful act will continue and Plaintiff's prayer for injunctive relief is moot. *California Serv. Station etc. Assn. v. Union Oil Co*., 232 Cal. App. 3d 44, 57 (Ct. App. 1991).

To the extent Plaintiff contends that the "manufactured in USA" language remains on certain third-party websites, Plaintiff does not allege that Nutra Holdings has unbridled control over the representations made on those third-party sites such that imposition of an injunction is appropriate. *See* FAC ¶ 29, n.8. "A defendant's liability [under the UCL] must be based on [its] personal 'participation in the unlawful practices' and 'unbridled control' over the practices." *Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952, 960 (2002) (quoting *People v. Toomey*, 157 Cal. App. 3d 1, 15 (1984)); see also *Reed v. NBTY, Inc*., No. EDCV 13-0142 JGB (OPx), 2014 WL 12284044, at *11 (C.D. Cal. Nov. 18, 2014) (summary judgment in favor of manufacturer and distributor when plaintiffs bought product from third-party website and there was no evidence that defendants participated in or controlled third-party website's representations); *In re Firearm Cases*, 126 Cal. App. 4th 959, 985 (2005) (rejecting UCL claim where defendants "did not control the wrongful acts [in question] or encourage others to engage in questionable acts," even though defendants did "have a relationship with the wrongdoers"). Likewise, for an FAL claim, "mere knowledge of the falsity of a third-party's statements is insufficient to support direct liability...." *Yordy v. Plimus, Inc*., No. 12-CV-00229-TEH, 2014 WL 1466608, at *3 (N.D. Cal. Apr. 15, 2014). And under the CLRA, a defendant's liability must be based upon "participation or control in the alleged unlawful advertising scheme." *In re Jamster Mktg. Litig*., No. 05CV0819 JM (CAB), 2009 WL 1456632, at *9 (S.D. Cal. May 22, 2009). Accordingly, Nutra Holdings is not liable for statements on third party websites it does not control.


161

## VI. PLAINTIFF CANNOT EXTEND CLAIMS BEYOND THE PRODUCTS HE PURCHASED

Plaintiff cannot extend his claims beyond the Product he allegedly purchased – Nutra Holdings' Nitrosurge Pre-workout dietary supplement. (FAC ¶ 2.) Plaintiff "has standing under the UCL and CLRA to pursue his claim regarding [the] product [he saw] and the representations contained on that product; but he lacks standing to pursue any other alleged claim under the UCL or CLRA." *Johns v. Bayer Corp.,* No. 09-CV-1935-DMS-JMA, 2010 WL 476688, *5 (S.D. Cal. Feb. 9, 2010). The "statutory standing requirements of UCL and CLRA are narrowly prescribed and do not permit… generalized allegations" regarding a product the plaintiff did not purchase or advertisements relating to a product that he did not rely upon. *Id*.

Plaintiff targets 44 of Nutra Holdings' products—all of which contain different formulations and ingredients, are manufactured at potentially various facilities, and conceivably encompass hundreds of different types of articles, units, or parts, and bearing different physical labels and website configurations than the protein powder purchased by Plaintiff. Plaintiff has not alleged any facts to suggest that any of the 44 products are substantially similar to the Product he purchased. They are not. Even if any credit is given Plaintiff's claims that ingredients such as *Astragalus membranaceus*, *Panax notoginseng*, KSM-66 ashwagandha, green tea extract, theobromine and caffeine are from some foreign source, at least 21 of the products on the list do not contain any of the allegedly foreign ingredients identified in the amended complaint. Without any factual detail as to which parts, articles, or units of the products are not made or manufactured in the United States, the Court cannot make a finding that the unpurchased products bear any similarity to the Product purchased by Plaintiff in determining whether a "Manufactured in USA" label claim was or was not appropriate for the specific product. In n other words, the composition of each individual product listed in the FAC is critical to the determination of which products, if any, are substantially similar to the one Plaintiff allegedly purchased. Plaintiff has not made that showing. As such, Plaintiff lacks standing to bring claims as to all other products he did not purchase. *See, e.g. Bruton v. Gerber Prods. Co.*, 2014 WL 172111, at *8 (N.D. Cal. Jan. 15, 2014)


162

(dismissing claims based on non-purchased products where complaint failed to explain how certain non-purchased products were similar to purchased products).

In the unlikely event that Plaintiff's claims survive this demurrer, Nutra Holdings respectfully requests that the Court preclude Plaintiff from challenging any product other than the one he allegedly purchased and therefore strike the allegations in footnote 1 and 3 of the FAC, and Exhibit A in its entirety.

## VII. PLAINTIFF CANNOT MAINTAIN A CLAIM FOR DAMAGES UNDER THE CLRA

Nutra Holdings moves to strike Plaintiff's request for damages under the CLRA because Plaintiff has failed to comply with the requirements for maintaining a CLRA damages claim and Nutra Holdings has taken the appropriate action to avoid having to defend a CLRA damages claim.

### A. Plaintiff Did Not Comply With The CLRA's Strict Notice Requirements

A plaintiff intending to bring a CLRA cause of action seeking damages must notify defendants at least 30 days in advance. Cal. Civ.Code § 1782; *Morgan v. AT & T Wireless Servs., Inc.*, 177 Cal.App.4th 1235,1259–60 (2d Dist. 2009). The notice provision requires a consumer to identify "the particular alleged violations of Section 1770." Cal. Civ. Code§ 1782(a). "The purpose of the notice requirement of section 1782 is to give the manufacturer or vendor ***sufficient notice*** of alleged defects to permit appropriate corrections or replacements." *Outboard Marine Corp. v. Superior Ct.*, 52 Cal. App. 3d 30, 40 (Ct. App. 1975) (emphasis added). Rossi's "notice" letter dated March 8, 2023 does not identify the allegedly foreign "ingredients" in the Products at issue. Ayerh Decl. ¶ 3; Ex. 1. In fact, the letter makes no mention of the allegedly "foreign" ingredients in the Product – *Astragalus membranaceus*, *Panax notoginseng*, theobromine, Caffeine or KSM-66 ashwagandha. *Id*. Instead, the letter focuses on purportedly "foreign" ingredients not at issue in this litigation. *Id*. (identifying L-Citrulline, Betaine Anhydrous, Beta Alanine, L Theanine, acetyl-L-Carnitine HCl, Green Tea Leaf Extract, Black Pepper Fruit Extract, Arginine, Glutathione and Citrulline as the purportedly "foreign" ingredients in the products.) Plaintiff filed a complaint based on entirely different allegations. Accordingly, he did not provide "sufficient notice of alleged defects to permit appropriate corrections or replacements." Cal. Civ.Code § 1782(a)(2). This


163

deficiency is sufficient to warrant dismissal of Plaintiff's damages claims under the CLRA. *See, e.g., Ang v. Bimbo Bakeries USA, Inc.*, No. 13-CV-01196-WHO, 2013 WL 5407039, at *12 (N.D. Cal. Sept. 25, 2013) (dismissing CLRA claim to the extent premised on products not identified in the notice); *Waller v. Hewlett-Packard Co.*, No. 11CV0454-LAB RBB, 2011 WL 6325972, at *6 (S.D. Cal. Dec. 16, 2011) (dismissal with prejudice appropriate when a plaintiff seeks damages under the CLRA first, "then provide the notice required by § 1782, and then amend[s] his complaint so that the defendant will have had 30 days to address the alleged wrong").

**B. The Appropriate Correction was Made Precluding CLRA Damages**

"No action for damages may be maintained under" the CLRA if the notified defendant shows that (1) "[a]l1 consumers similarly situated [to the consumer making the demand] have been identified, or a reasonable effort to identify such other consumers has been made," (2) "[a]ll consumers so identified have been notified that upon their request the [defendant] shall make the appropriate correction, repair, replacement, or other remedy of the goods or services," (3) "[t]he correction, repair, replacement, or other remedy requested by the consumers has been, or, in a reasonable time, shall be, given," and (4) "[t]he [defendant] has ceased from engaging, or if immediate cessation is impossible or unreasonably expensive under the circumstances, the [defendant] will, within a reasonable time, cease to engage, in the" acts or practices that allegedly violate section 1770 of the Civil Code. Cal. Civ. Code §§ 1782(c)(1)-(4). Necessarily implied in the provisions of the CLRA referred to above is a requirement that the "correction, repair, replacement or other remedy" be "appropriate," and reasonable. A plaintiff consumer may not defeat the purpose of the CLRA provisions and ensure himself or herself standing to assert a CLRA damages claim by making remedy demands that are inherently inappropriate, unreasonable, and unsatisfiable.

Here, no action for damages may be maintained by Plaintiff because Nutra Holdings has substantially complied with section 1782(c) of the Civil Code to the extent possible. Specifically, Nutra Holdings has complied with section 1782(c)(4) because it has removed the "Manufactured in USA" website statements. With respect to section 1782(c)(1)-(3) of the Civil Code, it is inappropriate and inherently unreasonable for Nutra Holdings to be required to give notice and


164

make refunds to an unascertainable group of consumers who purchased the Product at issue on Nutra Holdings or amazon websites and not in person (the Product labels do not and have not in the past included the "Manufactured in USA" language), and who purportedly relied on that label language prior to his or her purchase, when Plaintiff's CLRA demand did not even give sufficient notice of the purported "violations" at issue.

For the foregoing reasons, Plaintiff's request for damages under his CLRA cause of action should be stricken.

## VIII. CONCLUSION

For the reasons set forth above, the Court should sustain the demurrer and dismiss the action with prejudice. In the alternative, the Court should strike any claim for injunctive relief and damages under the CLRA.

Dated: October 17, 2024

**STEPTOE LLP**

By: *_/s/ Melanie A. Ayerh_*

Carol R. Brophy
Jennifer K. Singh
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh

*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*


165

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On October 17, 2024, I served true copies of the following document(s) described as **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER AND MOTION TO STRIKE** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 17, 2024, at Los Angeles, California.

*/s/ Grace Calderon*
Grace Calderon


166

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


167

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 10/17/2024 4:51 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**REQUEST FOR JUDICIAL NOTICE**<br><br>Hearing Date: February 10, 2025<br>Time:10:30 a.m.<br>Dept: 1<br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024 |


168

**REQUEST FOR JUDICIAL NOTICE**

A party may test the legal sufficiency of facts alleged in a complaint by demurrer or a motion to strike where defects appear on the face of the pleading and facts and documents subject to judicial notice. *See* Cal. Civ. Proc. Code § § 430.30, 430.70, 435-437; *Thaler v. Household Fin. Corp.* 80 Cal. App. 4th 1093, 1098 (2000) as modified (May 18, 2000). Matters subject to judicial notice are governed by Evidence Code § § 450-452, *et seq*. Relevant here, California courts may take judicial notice of documents incorporated by reference in a complaint. *See, e.g., Pomona Coll. v. Superior Court*, 45 Cal. App. 4th 1716. 1727-28 (1996) (taking judicial notice of employment handbook referred to in plaintiff's complaint). This is particularly so where the allegations in the pleading regarding those documents are patently at odds with the documents themselves. *See, e.g. Pac. States Enters., Inc. v. City of Coachella*, 13 Cal. App. 4th 1414, 1426, n.8 (1993) (taking judicial notice of the exhibits incorporated by reference into plaintiff's complaint that contradicted allegations in the complaint).

Nutra Holdings, Inc. respectfully requests that the Court take notice of the jackedfactory.com and amazon.com websites below identifying the ingredient list for each such product listed on Plaintiff's "Exhibit A" that does not contain any of the allegedly "foreign" ingredients identified in the First Amended Complaint.

| Product Name: | Jackedfactory.com | Amazon.com |
|---|---|---|
| Jacked Factory Authentic Whey | https://www.jackedfactory.com/products/authentic-whey?srsltid=AfmBOorkCShpIfouDqLNtmWu1gGEj6f8TUwgBR042NuKEpxABYTM-p2V | https://www.amazon.com/Jacked-Factory-Authentic-Building-Protein/dp/B08LQZF6PM/ref=asc_df_B08LQZF6PM/?tag=hyprod-20&linkCode=df0&hvadid=693308329636&hvpos=&hvnetw=g&hvrand=13126969764773578753&hvpone=&hvptwo=&hvqmt=&hvdev=c&hvdvcmdl=&hvlocint=&hvlocphy=9197829&hvtargid=pla-2253611129037&mcid=7c3dc52926d931f1933fb9840d25fb6f&th=1 |


169

| | | |
|---|---|---|
| Jacked Factory Creatine Monohydrate | https://www.jackedfactory.com/products/creatine-monohydrate?srsltid=AfmBOop81vcARpTdJFnHktVrwQPhpZE66z9wQ1OuJQZ6AoInlBXDGqHc | https://www.amazon.com/Creatine-Monohydrate-Powder-Post-Workout-Recovery-Muscle-Builder/dp/B08DH161T6 |
| Jacked Factory Authentic Protein Cereal | https://www.jackedfactory.com/pages/cereal?srsltid=AfmBOoqpQrat23vHzcK6cvIg-5xMEAtZY_At37zSDCqgYVPT6sJKI8ip | https://www.amazon.com/High-Protein-Cereal-Low-Carb-Low-Sugar/dp/B0B7L2Q2WN |
| Jacked Factory N.O.XT | https://www.jackedfactory.com/products/no-xt?srsltid=AfmBOor5KwXLpUDE4dPS3mAllerZ5XY6FO260DfAFr8PYa5cvsLG0oNr | https://www.amazon.com/Nitrosigine-L-Arginine-Nitric-Oxide-Booster-Pre-Workout/dp/B076CRGF8H |
| Jacked Factory EAA Surge | https://www.jackedfactory.com/products/eaa-surge?srsltid=AfmBOoqDADOpi_fqQo-X78tJjSIkg8XvbahrhmndZMClqRzAEHu1KT0U | https://www.amazon.com/EAA-BCAA-Powder-Muscle-Builder-Intra-Workout-Powder/dp/B08156T4V3 |
| Jacked Factory Andro Surge | https://www.jackedfactory.com/products/androsurge?srsltid=AfmBOoq2Rit3ktBXgzj2a3GgzdcpuJVcLfJ14JLezIY80RY-HcB-RXLI | https://www.amazon.com/DIM-Longjack-Estrogen-Blocker-Testosterone-Supplement-For-Men/dp/B01IDRJ02A |
| Jacked Factory Authentic Iso | https://www.jackedfactory.com/products/authentic-iso?srsltid=AfmBOoqmc0xBCN30d2NmMUeNjOUVul1LSe1l3kD8AD2CkC0PBQj3Cs4a | https://www.amazon.com/BCAA-Amino-Acids-Grass-Fed-Whey-Protein-Isolate/dp/B0C9MWY6GT |
| Jacked Factory Prima Surge | https://www.jackedfactory.com/products/primasurge | https://www.amazon.com/Ashwagandha-Shilajit-Weight-Loss-Testosterone-Supplement-For-Men/dp/B014Q1SJ10 |

| | | |
|---|---|---|
| Jacked Factory Hydra Surge | https://www.jackedfactory.com/products/hydrasurge-natural-electrolyte-powder?srsltid=AfmBOoqhFavtbqeX-PU7NctL0ZSQqGX1BFMTUsIiquo30NHf7YPsacKB | https://www.amazon.com/Electrolytes-Hydration-Powder-Coconut-Water-Potassium-Magnesium-Supplement/dp/B07MDSB78X |
| Jacked Factory Carb Surge | https://www.jackedfactory.com/products/carb-surge?srsltid=AfmBOooaby619oxtOpu31_b7mVj-SRmf6qAO453swmZfwuNyf7DrVMZV | https://www.amazon.com/CARB-Surge-Carbohydrate-Powder-Performance/dp/B0816YHGFZ |
| Jacked Factory Build PM | https://www.jackedfactory.com/products/build-pm?srsltid=AfmBOopOQ2g8XbB9TsiNj3kaQYJDpZx76y-jgQyNAkMxkRefX0rZBVbo | https://www.amazon.com/Melatonin-Magnesium-Sleep-Aid-Post-Workout-Muscle-Recovery/dp/B07NSHGJK1 |
| Jacked Factory BCAA | https://www.jackedfactory.com/products/bcaa-fermented?srsltid=AfmBOorFytX2xZCpftBTGzqXLraudjiosyGauhxzUbHxuuXprZFw6NPW | https://www.amazon.com/Jacked-Factory-BCAA-Powder-Leucine-Amino-Acids-Supplement/dp/B08DG7DDRR |
| Jacked Factory Test PM | https://www.jackedfactory.com/products/test-pm?srsltid=AfmBOopB-vZ214KKzcbW7TTK7BUb-jWyv-lG9u98hF70gvJi8Hhsg58H | https://www.amazon.com/Sleep-Aid-Testosterone-Supplement-For-Men-Cortisol-Reducer/dp/B0719T3FPD |
| Jacked Factory Defend XT | N/A | https://www.amazon.com/Milk-Thistle-Supplement-Glutathione-Cycle-Support-Liver-Supplement/dp/B093QKZ25V |


171

| | | |
|---|---|---|
| Jacked Factory L-Glutamine | https://www.jackedfactory.com/products/l-glutamine-fermented?srsltid=AfmBOoo_dOuhUilqpnESubaeaUgxt48aGCykZ4muqSSeZzxE9sSSFrhh | https://www.amazon.com/Amino-Acids-Gut-Health-L-Glutamine-Powder/dp/B0929KZBY7 |
| Jacked Factory L-Arginine (Nitrosigine) | https://www.jackedfactory.com/products/l-arginine-nitrosigine%C2%AE?srsltid=AfmBOorrDvhvg2AjUZeZxLaChDQN0QECq9HEVhFbMeLHgYzyyDF-wVKs | https://www.amazon.com/L-Arginine-Capsules-Amino-Acids-Nitric-Oxide-Supplement/dp/B07PWKZ8TH |
| Jacked Factory Authentic Casein | N/A | https://www.amazon.com/Authentic-Casein-Building-Micellar-Protein/dp/B08DP648P8 |
| Jacked Factory Authentic Vegan | N/A | https://www.amazon.com/Authentic-Vegan-Plant-Protein-Powder/dp/B09NDWPK2X |
| Jacked Factory Form XT | N/A | https://www.amazon.com/Muscle-Builder-Ashwagandha-Capsules-Phosphatidic-Acid-Testosterone-Booster/dp/B09NP9SK9R |
| Jacked Factory Crea Surge | | https://www.amazon.com/CREASURGE-Creatine-Powder-ElevATP-Performance/dp/B07NLHDRBC/ref=cm_cr_arp_d_product_top?ie=UTF8 |

Dated: October 17, 2024

**STEPTOE LLP**

By: */s/ Melanie A. Ayerh*

Carol R. Brophy
Jennifer K. Singh
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh


172

*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*








173

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On October 17, 2024, I served true copies of the following document(s) described as **REQUEST FOR JUDICIAL NOTICE; EXHIBIT 1**

on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 17, 2024, at Los Angeles, California.

*/s/ Grace Calderon*

Grace Calderon


174

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


175

Electronically Received 09/13/2024 08:14 AM

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

FILED
Superior Court of California
County of Los Angeles
09/30/2024
David W. Slayton, Executive Officer / Clerk of Court
By: A. Lim Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**STIPULATION TO EXTEND TIME TO RESPOND TO PLAINTIFF'S FIRST AMENDED COMPLAINT; ~~PROPOSED~~ ORDER**<br><br>Complaint Filed: July 6, 2023<br>FAC Filed: August 16, 2024<br>Current Response Date: September 17, 2024<br>Proposed Response Date: **October 17, 2024** |


176

Plaintiff Daniel Rossi ("Plaintiff") and defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Nutra Holdings" and, together with Plaintiff, the "Parties"), through their respective undersigned counsel, hereby stipulate as follows:

WHEREAS, on July 6, 2023, Plaintiff filed his original complaint against Nutra Holdings in this Court;

WHEREAS, on July 19, 2023, the Court issued a "Court Order Re: Newly Filed Class Action" which "stay[ed] the case, except for service of the Summons and Complaint" at least until the Initial Status Conference;

WHEREAS, Nutra Holdings was served with the original complaint on November 9, 2023;

WHEREAS, on April 17, 2024, following the Parties' Initial Status Conference, the Court issued a "Case Management Order for Civil Class Action" lifting the pleading stay previously imposed and ordered Nutra Holdings to file a response to the complaint within 30 days;

WHEREAS, on May 21, 2024, Nutra Holdings timely filed a demurrer and motion to strike the original complaint;

WHEREAS, on August 16, 2024, in lieu of filing an opposition to the demurrer and motion to strike, Plaintiff filed his First Amended Complaint ("FAC"), making Nutra Holding's response due on September 17, 2024;

WHEREAS, Nutra Holdings intends to file a demurrer and motion to strike the FAC and the Parties require additional time to meet and confer to potentially narrow the issues to be raised in Nutra Holdings' forthcoming pleading challenges;

WHEREAS, in order to allow the Parties additional time to further confer before Nutra Holdings' response to the FAC is due, the Parties agree to extend Nutra Holding's deadline to respond to the FAC by 30 days;

WHEREAS, this Court has not yet set a trial date and related deadlines in this case;

WHEREAS, California Rule of Court 3.110(e) permits this Court to extend the time period prescribed for Nutra Holdings to respond to the FAC;

WHEREAS, this stipulation is entered into in good faith and not for purposes of delay; and


177

WHEREAS, this Stipulation is made without prejudice to, or waiver of, any rights or defenses otherwise available to the Parties in this action.

IT IS HEREBY AGREED, STIPULATED AND REQUESTED THAT the time for Nutra Holdings to respond to the FAC, shall be extended to and including October 17, 2024.

Dated: September 12, 2024

**KAZEROUNI LAW GROUP, APC**

By: _/s/ Gustavo Ponce_
Gustavo Ponce
*Attorney for Plaintiff DANIEL ROSSI*

Dated: September 12, 2024

**STEPTOE LLP**

By: _/s/ Melanie A. Ayerh_
Carol R. Brophy
Jennifer K. Singh
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh
*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*


178

**~~[PROPOSED]~~ ORDER**

On September 13, 2024, the Parties jointly submitted a Stipulation to Extend Time to Respond to Plaintiff's First Amended Complaint.

There being good cause for the request, IT IS HEREBY ORDERED that defendant Nutra Holdings, Inc. d/b/a Jacked Factory's deadline to respond to Plaintiff's First Amended Complaint shall be extended to and including October 17, 2024.

DATED: 09/30/24

Stuart M. Rice / Judge

Honorable Stuart M. Rice
Judge of the Los Angeles Superior Court


179

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On September 13, 2024, I served true copies of the following document(s) described as **STIPULATION TO EXTEND TIME TO RESPOND TO PLAINTIFF'S FIRST AMENDED COMPLAINT; PROPOSED ORDER** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on September 13, 2024, at Los Angeles, California.

/s/ Grace Calderon
Grace Calderon


180

## SERVICE LIST

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


181

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp<br><br>FILED<br>Superior Court of California<br>County of Los Angeles<br>08/26/2024<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | |
| PLAINTIFF/PETITIONER:<br>Daniel Rossi | |
| DEFENDANT/RESPONDENT:<br>Nutra Holdings, Inc. | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>23STCV15674 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Court Order Continuing Status Conference) of 08/26/2024 upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Carol Brophy
Steptoe LLP
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, CA 94105

Abbas Kazerounian
Kazerouni Law Group, APC
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626

Melanie Ayerh
Steptoe & Johnson LLP
633 W 5th St
Ste 1900
Los Angeles, CA 90071

David W. Slayton, Executive Officer / Clerk of Court

Dated: 08/26/2024

By: A. He
Deputy Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

August 26, 2024
4:59 PM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: None

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Court Order Continuing Status Conference

Defendant Nutra Holdings, Inc. d/b/a Jacked Factory filed a Demurrer to Complaint and Motion to Strike on 5/17/2024. Plaintiff filed a First Amended Class Action Complaint on 8/16/2024. Pursuant to the request of Defendant, the Demurrer to Complaint and Motion to Strike scheduled for 8/29/2024 is taken off calendar.

On the Court's own motion, the Further Status Conference scheduled for 08/29/2024 is continued to 12/10/2024 at 09:00 AM in Department 1 at Spring Street Courthouse. A joint report is due three (3) to five (5) court days in advance of the status conference.

The parties were ordered in the Initial Status Conference Order to sign up with an e-service provider and are again ordered to do so forthwith if not yet accomplished.

Certificate of Mailing is attached.


183

Electronically Received 08/16/2024 11:50 AM

KAZEROUNI LAW GROUP, APC

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**FILED**
Superior Court of California
County of Los Angeles
08/16/2024
David W. Slayton, Executive Officer / Clerk of Court
By: F. Sims Deputy

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No.: 23STCV15674

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

1) **CONSUMERS LEGAL REMEDIES ACT, CAL. CIVIL CODE §§ 1750, ET SEQ.;**
2) **CALIFORNIA'S FALSE ADVERTISING LAW, BUS. & PROF. CODE §§ 17500 ET SEQ.;**
3) **CALIFORNIA'S UNFAIR COMPETITION LAW, BUS. & PROF. CODE §§ 17200 ET SEQ.;**
4) **NEGLIGENT MISREPRESENTATION; AND**
5) **INTENTIONAL MISREPRESENTATION**

**JURY TRIAL DEMANDED**


184
LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

KAZEROUNI LAW GROUP, APC

## INTRODUCTION

1. Plaintiff DANIEL ROSSI ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY ("Defendant") in unlawfully representing and advertising Defendant's consumable consumer dietary supplement products with the false designation and representation that the products are/were made and/or manufactured in the USA. The unlawfully represented products are sold online on Defendant's website and other third-party vendors, such as Amazon.com, throughout the United States, and advertised on Defendant's website.[1] Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

2. Specifically, Plaintiff purchased Defendant's Nitrosurge Pre-workout[2] dietary supplement (hereinafter the "Product"), which, as advertised on Defendant's website and other third-party vendors, Defendant represented to Plaintiff and other similarly situated consumers that the Product is/was made and/or manufactured in the USA. However, Defendant's Product contains or is made with ingredients that are not "Manufactured in the USA," as discussed further herein.

3. The "Manufactured in the USA" claim (or some derivative thereof) is prominently printed on Defendant's website and advertisements, as well as the websites of third-party vendors, including the product purchased by Plaintiff. Contrary to Defendant's representation and in violation of Federal and California laws, Defendant's Class Products[3], including the specific product purchased by Plaintiff, are actually made with or contain ingredients that are not "Manufactured in the USA" as discussed herein.

---

[1] Plaintiff seeks class wide relief on behalf of all purchasers of any of Defendant's products that are substantially similar to the consumable consumer packaged product purchased by Plaintiff that are advertised as being "Manufactured in the USA" in violation of California law(s).

[2] As titled on Amazon.com when Plaintiff purchased the Product; "NITROSURGE Pre Workout Supplement – Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps – Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White."

[3] A non-comprehensive list of the Class Products is attached hereto as Exhibit A.


185

4. This nationwide sale and advertising of deceptively advertised products constitutes violations of: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (2) California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17533.7; (3) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 et seq.; (4) negligent misrepresentation and (5) intentional misrepresentation. This conduct caused Plaintiff, and others similarly situated, damages, and requires restitution and injunctive relief to remedy and prevent further harm.

5. Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of Defendant.

**JURISDICTION AND VENUE**

6. Jurisdiction is proper pursuant to this Court's general jurisdiction.

7. The Court has jurisdiction over Plaintiff's claims for damages, restitution, injunctive relief, and declaratory relief arising from Defendant's unlawful business practices under California's CLRA, FAL, and UCL; as well as negligent and intentional misrepresentation.

8. This Court has personal jurisdiction over Defendant because Defendant conducts substantial business in the State of California and County of Los Angeles, has sufficient minimum contacts with this State and County, and otherwise purposefully avails itself of the markets in this State and County through the promotion, sale, and marketing of its services in this State, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this Court pursuant to California Code of Civil Procedure § 395(a) because Plaintiff resides within this county and many of the acts and transactions giving rise to this action occurred in this county because Defendant:

a. is authorized to conduct business in this county and has intentionally availed itself of the laws and markets within this county;

b. does substantial business within this county; and is subject to personal jurisdiction in this county;


186

c. and is subject to personal jurisdiction in this county.

**PARTIES**

10. Plaintiff is an individual residing in the City of Northridge, County of Los Angeles, State of California.

11. Defendant is a corporation with its principal place of business in St. Johnson, Canada, which is regularly doing business in the State of California and within this county.

12. Defendant is a manufacturer and seller of dietary supplements that conducts business through its website and the websites of third-party vendors. One of the products sold by Defendant is Nitrosurge Pre-workout, the Product and Class Products, which was purchased by Plaintiff.

**NATURE OF THE CASE**

13. At all times relevant, Defendant made, and continues to make, affirmative misrepresentations regarding the Class Products, including the Product purchased by Plaintiff, it manufactures, markets and sells. Specifically, Defendant marketed, advertised, and sold its Class Products as "Manufactured in the USA" without clear and adequate qualification that the Class Products contained foreign ingredients and/or components as required by Federal and other laws.

14. However, although Defendant represents that its Class Products are "Manufactured in the USA" without clear and adequate qualification, Defendant's Class Products contain or are made with ingredients and/or components that are not "Manufactured in the USA."

15. Federal law regarding the use of "Made in the United States" claims with respect to products and services are well established and well defined.

16. Specifically, the Made in USA Labeling rule, 16 C.F.R. § 323, (the "MUSA Rule") clearly defines the meaning of "Made in the United States", including synonymous phrases[4], as well as when it can be used without clear and adequate qualification notifying consumers that the good or service in question contains or is made with ingredients or components that are not made or sourced

---

[4] *See* 16 C.F.R. § 323.1(a) ("The term Made in the United States means any unqualified representation, express or implied, that a product or service, or a specified component thereof, is of U.S. origin, including, but not limited to, a representation that such product or service is "made," "***manufactured***," "built," "produced," "created," or "crafted" in the United States or in America, or any other unqualified U.S.-origin claim.") (emphasis added)






187

KAZEROUNI LAW GROUP, APC

in the United States.[5]

17. Despite the clearly established and well-defined Federal law regarding "Made in the United States" claims, Defendant falsely, unfairly and deceptively advertised, marketed and sold its products, including the Product purchased by Plaintiff, as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and/or components as further herein.

18. Defendant's "Manufactured in the United States" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

19. Each consumer, including Plaintiff, was exposed to virtually the same material misrepresentations, as similar advertisements and misrepresentations were prominently placed on all of Defendant's website and the websites of third-party vendors, and are currently being sold, throughout the United States and within the State of California.

20. As of July 2023, when the first complaint in this matter was filed, Defendant's website contained a clear and conspicuous "Manufactured in the USA" claim under iconography of a waiving United States flag encircled by the words "Manufactured in the USA" making it clear that Defendant meant this claim to be applied to <u>*all*</u> its products. This claim, including iconography, appeared on each and every product page of Defendant's website as well as Defendant's Amazon.com product pages.

21. Even after the filing of this matter, according to publicly archived webpages[6], as of January 2024 or even later, the main home page of Defendant's website still contained a clear and conspicuous "Manufactured in the USA" claim under same iconography of a waiving United States

---

[5] *See* 16 C.F.R. § 323.2 Prohibited Acts ("In connection with promoting or offering for sale any good or service, in or affecting commerce as "commerce" is defined in section 4 of the Federal Trade Commission Act, 15 U.S.C. 44, ***it is an unfair or deceptive act or practice*** within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), ***to label any product as Made in the United States unless*** the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and ***all or virtually all ingredients or components of the product are made and sourced in the United States***. (emphasis added)

[6] *See* https://web.archive.org/web/20240121011132/https://www.jackedfactory.com/ (archived January 21, 2024)


188

KAZEROUNI LAW GROUP, APC

flag encircled by the words “Manufactured in the USA” thus making it more evident that Defendant meant this claim to be applied to *__all__* its products—even after the Complaint was filed in this matter.




22. According to publicly archived webpages, as of November 2023 or even later, the “Frequently Asked Questions” page of Defendant’s website contained the following answer in response to the question: “Where are your products manufactured?” “Answer: **Our products are manufactured in the USA** in a cGMP, FDA Registered manufacturing facility adhering to the strictest quality control.” (emphasis added)[7]

23. As a consequence of Defendant’s unfair and deceptive practices, Plaintiff and other similarly situated consumers have purchased Defendant’s Class Products under the false impression that the products were actually manufactured and/or made in the USA with U.S. made ingredients and components.

24. As a result of Defendant’s misrepresentations, Plaintiff and other consumers similarly situated overpaid for Defendant’s Class Products, and/or purchased the Class Products under the false belief that the product they purchased was made and/or manufactured in the USA with U.S. made ingredients and components. Had Plaintiff and other consumers similarly situated been made aware that Defendant’s Class Products were not actually made with all or virtually all ingredients and components being made in the United States, they would not have purchased the products.

---

[7] *See* https://web.archive.org/web/20231101090125/https://www.jackedfactory.com/pages/common-faqs (archived November 1, 2023)

KAZEROUNI LAW GROUP, APC


189

25. As a result of Defendant's false and misleading statements and failure to clearly and adequately disclose the presence of foreign ingredients and components, as well as Defendant's other conduct described herein, Plaintiff and other similarly situated consumers purchased thousands, if not millions, of Defendant's Class Products and have suffered, and continue to suffer, injury in fact, including the loss of money and/or property.

26. Defendant's conduct as alleged herein violates Federal law as well as several California laws, as more fully set forth herein.

27. This action seeks, among other things, equitable and injunctive relief; restitution of all amounts illegally retained by Defendant; and disgorgement of all ill-gotten profits from Defendant's wrongdoing alleged herein.

**FACTUAL ALLEGATIONS**

28. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

29. Defendant manufactures, markets and/or sells various dietary supplements that have been and are currently still represented and advertised as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and components. Defendant made these representations on its website which resulted in these representations being made and still being made on the websites of its third-party vendors.[8]

30. Contrary to the representation, Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

31. Dietary supplements, such those sold by Defendant, are often made with numerous ingredients and components that are foreign sourced due to significant differences in costs of raw material/component production in the United States versus foreign production such as in China.[9] In

---

[8] *See* https://www.walmart.com/ip/Nitrosurge-Pre-Workout-Powder-Endless-Energy-Instant-Strength-Gains-Clear-Focus-Intense-Pumps-30-Servings-Blue-Raspberry/383327735 (Under Product Details "Each bottle of Nitrosurge pre-workout is manufactured in a state-of-the-art cGMP manufacturing facility in the USA adhering to the most stringent manufacturing standards."; "Manufactured in the USA in a cGMP-Certified Facility.") (last accessed August 1, 2024)

[9] *See* U.S.-China Economic and Security Review Commission. *Potential Health & Safety Impacts from Pharmaceuticals and Supplements Containing Chinese-Sourced Raw Ingredients*. (2010). https://www.uscc.gov/sites/default/files/Research/NSD_BIO_Pharma_Report--


190

many cases, certain botanical ingredients cannot grow in the United States due to climate reasons or are not grown commercially due to significant differences in costs of domestic versus foreign agricultural production.

32. The offending Product purchased by Plaintiff contains or is made with ingredients and/or components that are not "Manufactured in the USA." For example, the Product contains two herbal ingredients that are native to China and not commercially grown in the United States; *Astragalus membranaceus* and *Panax notoginseng*. These ingredients are sourced from China or other Asian countries.[10] Irrespective of exactly where these two ingredients are sourced, one thing is certain – they are not grown, made or sourced from the United States.

33. In addition to foreign *Astragalus membranaceus* and *Panax notoginseng*, the Product contains theobromine, a component of cacao which is not grown commercially in the United States.[11]

34. The Product also contains caffeine, which is generally derived from decaffeination of coffee or tea[12], neither of which is grown commercially or cost effectively in the United States.

---

Revised_FINAL_for_PDF--14_%20April_2010.pdf ("This report attempts to shed light and insight on particular issues addressing potential implications of a critical component of a complex supply chain, which contributes to U.S. national health security as China continues to strengthen its position as the world's largest supply source of raw materials for pharmaceuticals and supplements. As first reported in 1998 by the U.S. Government Accounting Office, the U.S. imports an estimated 80% of the raw ingredients contained in both products manufactured, sold and consumed in this country.")

[10] *See* Ji B, Xuan L, Zhang Y, Zhang G, Meng J, Mu W, Liu J, Paek K-Y, Park S-Y, Wang J, et al. Advances in Biotechnological Production and Metabolic Regulation of *Astragalus membranaceus*. Plants. 2023; 12(9):1858. ("As one of the most popular herbal medicines in the world, *A. membranaceus* is mainly derived from wild and cultivated resources in China. Wild plants of *A. membranaceus* are mainly produced in Inner Mongolia, Gansu, Shanxi, and Ningxia. Wild resources have been over-exploited, seriously damaging the ecological environment. Cultivated plants are mainly derived from Shanxi Hunyuan, Gansu Longxi, Inner Mongolia Niuyingzi, and Shaanxi Zizhou."); Zhao H, Han Z, Li G, Zhang S, Luo Y. Therapeutic Potential and Cellular Mechanisms of *Panax Notoginseng* on Prevention of Aging and Cell Senescence-Associated Diseases. Aging Dis. 2017 Dec 1;8(6):721-739. ("*Panax notoginseng*, distributed in the Southwest of China, Japan, Burma, and Nepal, is both cultivated and gathered from wild forests. *Panax notoginseng* is sensitive to sunlight. It grows primarily in the Wenshan mountain area of Yunnan province and is cultivated commercially in the Southwest regions of China.")

[11] *See* https://www.icco.org/growing-cocoa/

[12] *See* https://en.wikipedia.org/wiki/Caffeine ("Commercial supplies of caffeine are not usually manufactured synthetically because the chemical is readily available as a byproduct of decaffeination.").



KAZEROUNI LAW GROUP, APC

*35.* *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are material to the Product's formulation and marketing claims.

*36.* Because *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are indisputably foreign, "all or virtually all" ingredients in the Product cannot be made in the United States as required by the MUSA Rule for Defendant to lawfully make an unqualified "Manufactured in the USA" claim.

*37.* Upon information and belief, it is likely that the remaining ingredients and even the packaging components used to produce the Product are foreign.

38. The offending Product purchased by Plaintiff and all of Defendant's Class Products are substantially similar in that Defendant produces and sells dietary supplement products focused on a specific market and consumer, namely the sports nutrition market and consume.[13]

39. Defendant uses the same or similar ingredients and packaging across its product line, making it near impossible for any of its products to be produced with "all or virtually all" ingredients and components.

40. The ingredients in the Product and the Class Products are the are the same or substantially similar ingredients.

41. The ingredients in the Product and the Class Products are the same or substantially similar, therefore, the Class Products and Defendant's misrepresentations of them are substantially similar to the Product and the misrepresentation of the Product.

42. For example, caffeine is included in numerous of Defendant's products other than the Product, including, but not limited to, NitroSurge Shred (also contains theobromine), NitroSurge Build, Burn-XT, Build-XT Black (also contains theobromine), Burn-XT Powder, Wick Mode Pre Workout and NitroSurge Shred Max.

43. *Astragalus membranaceus* and *Panax notoginseng* are included in numerous products

---

[13] *See Miller v. Ghirardelli Chocolate Co.*, 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012) (citing cases); ("hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar."); *see also, e.g., Colucci v. ZonePerfect Nutrition Co.*, No. 12-2907, 2012 WL 6737800, at *4 (N.D. Cal. Dec. 28, 2012); *Astiana v. Dreyer's Grand Ice Cream, Inc.*, No. 11-2910, 2012 WL 2990766, at *11-13 (N.D. Cal. July 20, 2012).


192

KAZEROUNI LAW GROUP, APC

other than the Product, including but not limited to, NitroSurge Build, Pump Surge, Build-XT, GDA-XT, Wick Mode Pre Workout, NitroSurge Shred Max and Build XT Max – Elite Muscle Builder.

44. Defendant uses numerous other indisputably foreign ingredients in numerous of its products, including but not limited to KSM-66 ashwagandha[14] and green tea extract[15].

45. Despite the presence of numerous indisputable foreign ingredients in the Class Products, Defendant made unqualified "Manufactured in the USA" representations on the main page of its website, on each product page, on each Amazon.com product page and even in the "Frequently Asked Questions" section of its website.

46. Adequately and properly qualified "Manufactured in the USA" representations are common and ubiquitous in the dietary supplement industry.

47. Numerous competitors of Defendant including, but not limited to, Optimum Nutrition, Zhou Nutrition, MuscleTech and BSN, clearly, adequately and properly qualify "Manufactured in the USA" and "Made in the USA" representations on their products.[16]

48. Some dietary supplement products make no "Manufactured in the USA" or "Made in the USA" representations at all.

49. When consumers like Plaintiff see unqualified "Manufactured in the USA" claims, such as those made by Defendant, in an industry where qualified claims are so common, they reasonable believe that the products in question are made entirely in the United States, including ingredients and components.

50. Defendant is not a U.S. based company, but rather a company founded in, operated in and from Newfoundland and Labrador, Canada.

51. The purpose of its unqualified "Manufactured in the USA" was not from a sense of

---

[14] *See* https://ksm66ashwagandhaa.com/traceability/quality-control/ ("The state of Rajasthan in India is one of the most suited terrains known to grow the best quality ashwagandha in the world and that is where, our ashwagandha farms are located.")

[15] *See* https://en.wikipedia.org/wiki/Tea ("Tea is mainly grown in Asia and Africa, with smaller areas in South America and around the Black and Caspian Seas. The four biggest tea-producing countries are China, India, Kenya and Sri Lanka, together representing 81% of world tea production.")

[16] *See* Exhibit C.


193
LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use
KAZEROUNI LAW GROUP, APC

patriotism or national pride. Instead, Defendant's motive was solely for the intentional purpose of marketing to American consumers seeking and will pay more for[17] products that are made, including ingredients and components, in the United States.

52. Defendant markets, and continues to sell, and represent to the general public via its website, the website of its third-party vendors, and other forms of advertising and marketing that the Class Products are "Manufactured in the USA," without clear, adequate and proper qualification. As such, Defendant has inaccurately represented that its Class Products are "Manufactured in the USA," which conveys to a reasonable consumer like Plaintiff that the Class Products, including the Product, are made entirely in the United States, made with ingredients and components from the United States, made pursuant to United States labor standards, and are therefore superior quality (*i.e.,* contain better grown ingredients that non-US made products or raw materials). Defendant possesses superior knowledge of the true facts that were not disclosed regarding the Class Products, thereby tolling the running of any applicable statute of limitations.

53. The types of misrepresentations and/or omissions made by Defendant, as described herein, were considered by Plaintiff, a reasonable consumer, when deciding to purchase the Product.

54. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendant's representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the products were "Manufactured in the USA," when Defendant's Class Products are in fact wholly and/or substantially made with ingredients and/or components that are <u>not</u> "Manufactured in the USA."

55. Reasonable consumers, including Plaintiff, attached importance to the "Manufactured in the USA" representations made by Defendant on its Product and the Class Products and whether Defendant's representation was accurate and/or reliable.

56. Consumers who purchased the Class Products on Defendant's website or through third-party vendor websites were not the only consumers who were exposed to and relied upon the

[17] *See* https://reshoringinstitute.org/wp-content/uploads/2020/09/made-in-usa-survey.pdf ("Slightly more than 83% [of consumers polled] said they would pay up to 20% more for products made domestically.")


194

KAZEROUNI LAW GROUP, APC

unqualified and false "Manufactured in the USA" representations made by Defendant. Defendant's website contains a "Find A Store" link[18] making it highly likely that hundreds of thousands of consumers saw the unqualified and false "Manufactured in the USA" representations and proceeded to purchase Class Products in brick-and-mortar stores like The Vitamin Shoppe.

57. Most consumers possess limited knowledge of the likelihood that products are made with or contain ingredients and components that are not "Manufactured in the USA" when they are advertised and represented to be "Manufactured in the USA." This is a material factor in many individuals' purchasing decisions which they rely upon as they believe they are purchasing a product that is "Manufactured in the USA" with ingredients and components from the United States.

58. Consumers generally believe that products that are "Manufactured in the USA" are made entirely in the United States, made of ingredients and components from the United States, made pursuant to United States labor standards, and are therefore of superior quality (*i.e.,* contain better grown ingredients that non-US made products or raw materials).

59. On information and belief, Defendant's misrepresented Class Products were purchased by consumers over Defendant's competitors' properly and legally marketed products, during the entirety of the relevant four-year statutory time period, based on the unqualified, false and deceptive "Manufactured in the USA" representations (or some derivative thereof) made with respect to Defendant's products. Federal and California laws are designed to protect consumers from such false representations and predatory conduct.

60. Defendant's "Manufactured in the USA" representation was misleading to a reasonable consumer.

61. On or about January 24, 2023, Plaintiff searched online for a pre-workout supplement when he discovered the Product and its unqualified and misrepresented "Manufactured in the USA" claim. Plaintiff subsequently purchased the product on Amazon.com.

62. At the time of Plaintiff's purchase, the description of the offending product described the product as "Manufactured in the USA," without any qualification, when the Product was actually

---

[18] *See* https://www.jackedfactory.com/pages/storelocator


195

KAZEROUNI LAW GROUP, APC

made with or contained ingredients and/or components that were not "Manufactured in the USA." Accordingly, Defendant is not entitled to lawfully make representations that the Product was "Manufactured in the USA" as per the MUSA Rule.

63. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendant as follows:

i. The "who" is Defendant;

ii. The "what" is representation that Defendant's Class Products are "Manufactured in the USA" when in fact the Products are made with or contain ingredients and components that are not manufactured in the USA;

iii. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

iv. The "where" is in Defendant's advertisements and marketing of the Class Products;

v. The "to whom" is Plaintiff and the putative Class who bought the Class Products;

vi. The "by what means" is by Defendant representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA. Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

vii. The "how" is the allegation that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

64. It is widely and generally known that consumers prefer products that are "Manufactured in the USA" due to quality, support for local businesses, national economic, environmental and other reasons. The preference is increased when the products are health related


196

and ingestible due to the potential for inferior ingredients and components being manufactured overseas. In making the decision to purchase Defendant's Product, Plaintiff relied upon the advertising, marketing and/or other promotional materials prepared, approved and distributed and/or published by Defendant and its agents and disseminated through its Class Products' advertising containing the misrepresentations alleged herein.

65. Defendant's false representation is that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA, while Defendant knew that fact.

66. Defendant intended to deceive Plaintiff and the Class members into buying the Class Products knowing that consumers would prefer, purchase, and likely pay more for products "Manufactured in the USA" versus other products not "Manufactured in the USA."

67. Plaintiff justifiably relied on Defendant's "Manufactured in the USA" representation. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

68. Plaintiff paid and purchased the Product which was of less or little value than what he paid for.

69. Defendant's "Manufactured in the USA" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

70. Had Plaintiff been made aware that the Product, including its ingredients and components, was not actually "Manufactured in the USA," he would not have purchased the Product. In other words, Plaintiff would not have purchased Defendant's Product, but for the unqualified "Manufactured in the USA" representations on Defendant's website and advertising on the websites of its third-party vendors.

71. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's unqualified and false "Manufactured in the USA" designation set forth on Defendant's website and advertising on the websites of its third-party vendors.


197

72. In each case when Plaintiff and putative Class members purchased a Class Product, they relied upon Defendant's unqualified "Manufactured in the USA" representation in their purchasing decision, which is typical of most U.S. consumers. Consequently, they were deceived as a result of Defendant's actions. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

73. Defendant's products are made with or contain ingredients and components that are not manufactured in the USA, including the Product purchased by Plaintiff. Plaintiff and putative Class members purchased Defendant's misrepresented Class Products over Defendant's competitors' properly and legally marketed products that clearly and adequately qualify "Manufactured in the USA" claims or do not make the "Manufactured in the USA" claims at all. The precise amount of damages will be proven at the time of trial, in large part, by expert testimony.

74. Plaintiff and Class members were undoubtedly injured as a result of Defendant's unqualified and false "Manufactured in the USA" representations that are at issue in this matter.

## CLASS ACTION ALLEGATIONS

75. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

76. Plaintiff brings this action individually and on behalf of all others similarly situated against Defendant, pursuant to California Code of Civil Procedure Section 378.

77. Plaintiff represents, and is a member of the class, ("the Class") consisting of:

> All persons similarly situated within the state of California, who purchased one or more of Defendant's Class Products, which were represented and/or advertised as "Manufactured in the USA" (or similar words), that were made with or contained ingredients or components that were not manufactured in the USA, within the four years prior to the filing of the Complaint."

78. Excluded from the Class are Defendant and any of its officers, directors, and employees.

79. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.


198

KAZEROUNI LAW GROUP, APC

80. The "Class Period" means four years prior to the filing of the Complaint in this action.

81. This action has been brought and may properly be maintained as a class action under the provisions of § 382 of the California Code of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

82. **Ascertainability**. Plaintiff does not know the number of members in the Class, but Plaintiff currently believes that there are hundreds of thousands, if not more, members of the Class within the State of California. Because of the nature of Defendant's products and applicable regulations, Defendant must keep detailed and accurate records of production, manufacturing, sale and distribution. Therefore, the members of the Class are ascertainable through Defendant's records and/or Defendant's agents' records regarding retail and sales, as well as through public notice. This matter should therefore be certified as a Class action to assist in the expeditious litigation of this matter.

83. **Numerosity**. The members of the Class are so numerous and geographically disbursed that joinder of all Class members is impractical, and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court.

84. **Existence and Predominance of Common Questions of Law and Fact**. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. Common questions of fact and law exist in this matter that predominate over questions that may affect individual Class members, including, but not limited to, the following:

a. Whether Defendant committed the wrongful conduct alleged herein;

b. Whether Defendant's claims and representations, as alleged herein, are untrue, misleading, and/or reasonably likely to deceive the average consumer;

c. Whether Defendant's acts, transactions, or course of conduct constitute the violations of law alleged herein;

d. Whether Defendant's conduct violates 16 C.F.R. §§ 323, *et seq.*;

e. Whether Defendant's conduct violates California Civil Code §§ 1750, *et seq.*;

f. Whether Defendant's advertising is false, untrue, or misleading within the meaning of California Business & Professions Code §§ 17500, *et seq.*;

KAZEROUNI LAW GROUP, APC

g. Whether Defendant's conduct is an unfair, fraudulent, or unlawful act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

h. Whether Defendant's advertising is unfair, deceptive, untrue or misleading within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

i. Whether Defendant acted negligently or intentionally in making the misrepresentations contained regarding the Products thought its website and the websites of its third-party vendors;

j. Whether Defendant, through its conduct, received money that, in equity and good conscience, belongs to Plaintiff and members of the Class;

k. Whether the members of the Class sustained and/or continue to sustain damages attributable to Defendant's conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages; and

l. Whether the members of the Class are entitled to injunctive and/or any other equitable relief, including but not limited to restitution and/or disgorgement of ill-gotten gains.

85. **Typicality**. As a person who purchased one or more of Defendant's products, that were advertised as "Manufactured in the USA" but are made with or contain ingredients and/or components that are not manufactured in the USA, Plaintiff is asserting claims that are typical of the Class. Plaintiff's claims involve the same violations of law by Defendant as other Class Members' claims. Plaintiff and members of the Class also sustained damages arising out of Defendant's common course of conduct complained herein. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent members of the Class. Defendant has no defenses unique to the Plaintiff.

86. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of other members of the Class in that Plaintiff has no interests antagonistic to any member of the Class. Further, Plaintiff has retained counsel experienced in handling class action claims and claims involving violations of the consumer laws like violations of the California Business and Professions Code, and, specifically, false and deceptive advertising. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and proposed Class.


200

87. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent and/or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendant. The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them. Even if the members of the proposed Class could afford such litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable pursuant to Cal. Code of Civil Procedure § 382.

88. Unless the Class is certified, Defendant will retain monies received as a result of Defendant's unlawful and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendant will also likely continue to, or allow its agents to, advertise, market, promote and package Defendant's Class Products in an unlawful and misleading manner, and members of the Class will continue to be misled, harmed, and denied their rights under California law.

89. Further, Defendant has acted or refused to act on grounds that are generally applicable to the class so that declaratory and injunctive relief is appropriate to the Class as a whole, making class certification appropriate.

//

//

//

//

KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

## FIRST CAUSE OF ACTION

## VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

## CAL. CIV. CODE SECTION 1750, ET SEQ.

90. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

91. California Civil Code §§ 1750 et seq., entitled the Consumers Legal Remedies Act (hereinafter "CLRA"), provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer." The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, *inter alia*, that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.

92. Defendant's Product and the Class Products constitute "goods" as defined pursuant to Civil Code Section 1761(a).

93. Plaintiff, and the Class members, are each a "consumer" as defined pursuant to Civil Code Section 1761(d).

94. Each of Plaintiff's and the Class members' purchases of Defendant's products constituted a "Transaction" as defined pursuant to Civil Code Section 1761(e).

95. Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) provides that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> (2) [m]isrepresenting the source, sponsorship, approval, or certification of goods or services;
> (3) [m]isrepresenting the affiliation, connection, or association with, or certification by, another;
> (4) [u]sing deceptive representations or designations of geographic origin in connection with goods and services;
> (5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a








202

> sponsorship, approval, status, affiliation, or connection which he or she does not have;
> (7) [r]epresenting that goods or services are of a particular standard, quality, or grade…; [and]
> (9) [a]dvertising goods or services with intent not to sell them as advertised."

96. Defendant violated Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) by marketing and representing that its Class Products are "Manufactured in the USA," or some derivative thereof, when they are made with or contain ingredients and components that are not manufactured in the United States.

97. Defendant's "Manufactured in the USA" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

98. Pursuant to section 1782(d), by letter dated March 8, 2023, Plaintiff provide Defendant notice in writing by certified mail of the particular violations of section 1770 and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. Defendant failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within thirty days of the date of written notice pursuant to section 1782. Therefore, Plaintiff and the Class further seek actual, punitive, and statutory damages, as deemed appropriate.

99. Attached hereto as Exhibit B is a sworn affidavit from Plaintiff pursuant to Cal. Civ. Code § 17801(d).

100. On information and belief, Defendant's violations of the CLRA set forth herein were done with awareness of the fact that the conduct alleged was wrongful and was motivated solely for Defendant's self-interest, monetary gain and increased profit. Plaintiff further alleges that Defendant committed these acts knowing the harm that would result to Plaintiff and Defendant engaged in such unfair and deceptive conduct notwithstanding such knowledge.

101. Plaintiff further alleges that Defendant committed these acts knowing the harm that would result to Plaintiff and Defendant engaged in such unfair and deceptive conduct notwithstanding such knowledge.


203

102. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's unqualified and false "Manufactured in the USA" representations set forth in Defendant's website and the websites of its third-party vendors regarding the Product and the Class Products.

103. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiff and members of the Class are entitled to a declaration that Defendant violated the Consumer Legal Remedies Act.

104. Plaintiff, on behalf of himself and the Class demands judgment against Defendant for damages, restitution, punitive damages, statutory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

105. Pursuant to section 1780(e) of the California Civil Code, Plaintiff and the Class make claims for damages and attorneys' fees and costs.

106. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

**SECOND CAUSE OF ACTION**

**VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")**

**BUS. & PROF. CODE §§ 17500, *ET SEQ.***

107. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

108. Plaintiff and Defendant are both "person[s]" as defined by Cal. Bus. & Prof. Code § 17506.

109. Cal. Bus. & Prof. Code § 17535 authorizes a private right of action on both an individual and representative basis.

110. Defendant misrepresents its products as "Manufactured in the USA" without clear and adequate qualification when in fact Defendant's Class Products are made with or contain ingredients and components that are not manufactured in the USA.

KAZEROUNI LAW GROUP, APC


204

111. Defendant's class products are made with ingredients/components that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

112. These misrepresentations, acts, and non-disclosures by Defendant constitute false and misleading advertising in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

113. At all times relevant, Defendant's representations and advertising of its products was, and is, untrue, misleading, and likely to deceive the reasonable consumer and the public.

114. Defendant engaged in the false and/or misleading advertising and marketing of its Product, as alleged herein, with the intent to directly or indirectly induce consumers to purchase its products, which Defendant knew, or had reason to know, that the Class products were made with or contained ingredients and components that were not manufactured in the USA.

115. Defendant's "Manufactured in the USA" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

116. Because Defendant knew or should have known that the representations and/or omissions alleged herein regarding the Class Products were untrue or misleading, Defendant acted in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

117. Had Defendant clearly, adequately and truthfully qualified and advertised that its products were made with or contained ingredients and components that were not manufactured in the USA, Plaintiff and the putative Class members would not have purchased the Class Products or would have purchased a different product from another company.

118. This false and misleading advertising of the products by Defendant presents a continuing threat to consumers, as Defendant's conduct is ongoing to this day.

119. As a direct and proximate result of the aforementioned acts and omissions by Defendant, Defendant received and continues to hold monies rightfully belonging to Plaintiff and the putative Class members, who were led to purchase Defendant's Class Products during the Class Period.

//

//

KAZEROUNI LAW GROUP, APC


205

KAZEROUNI LAW GROUP, APC

**THIRD CAUSE OF ACTION**

**VIOLATION OF BUSINESS & PROFESSIONS CODE**

**BUS. & PROF. CODE, SECTION 17200, ET SEQ.**

120. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

121. Plaintiff and Defendant are each "person[s]" as defined by California Business & Professions Code § 17201. California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

122. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

123. By and through Defendant's conduct alleged in further detail above and herein, Defendant engaged in conduct which constitutes unlawful, unfair, and/or fraudulent business practices prohibited by Bus. & Prof. Code § 17200 et seq.

***A. "Unlawful" Prong***

124. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

125. The violation of any law constitutes as "unlawful" business practice under the UCL.

126. Beginning at a date currently unknown through the time of this Complaint, Defendant has committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code § 17200 et seq. by manufacturing, distributing, and/or marketing Defendant's Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq., and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq., by falsely representing that the products referenced herein are "Manufactured in the USA" without clear and adequate qualification when


206

Defendant's products are in fact made with or contain ingredients and components that are not manufactured in the USA.

127. Defendant violated the MUSA Rule**,** 16 C.F.R. § 323, by making its representations on the products without clear and adequate qualification that Defendant's products are "Manufactured in the USA" or made with or contain ingredients and components that are not manufactured in the USA.

128. Defendant's acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of the MUSA Rule, FAL, and the CLRA, as described above.

129. These alleged acts and practices by Defendant were intentional in violation of the MUSA Rule, FAL, and the CLRA.

130. Pursuant to the UCL, Plaintiff is entitled to preliminary and permanent injunctive relief and order Defendant to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff of all the revenues associated with this unfair and unlawful competition, or such proton of said revenues as the Court may find applicable.

***B. "Unfair" Prong***

131. Beginning at a date currently unknown and continuing up through the time of this Complaint, Defendant has committed acts of unfair competition that are prohibited by Bus. & Prof. Code section 17200 et seq. Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes by engaging conduct and practices that threaten an incipient violation of law/s or violate the policy or spirit of law/s by manufacturing, distributing, and/or marketing Defendant's products with a false ingredient origin information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's products are in fact made with or contain ingredients and components that are not manufactured in the USA.

132. Clearly said, Defendant's products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

KAZEROUNI LAW GROUP, APC


207

133. Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices that are immoral, unethical, oppressive or unscrupulous, the utility of such conduct, if any, being far outweighed by the harm done to consumers and against public policy by manufacturing, distributing, and/or marketing Defendant's Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's products are in fact made with or contain ingredients and components that are not manufactured in the USA.

134. Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices, including manufacturing, distributing, marketing, and/or advertising Defendant's products with false ingredient information, wherein: (1) the injury to the consumer was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was not of the kind that consumers themselves could not have reasonably avoided.

***C. "Fraudulent" Prong***

135. Beginning at a date currently unknown and continuing up through the time of this Complaint, Defendant engaged in acts of unfair competition, including those described above and herein, prohibited and in violation of Bus. & Prof. Code § 17200 et seq., by engaging in a pattern of "fraudulent" business practices within the meaning of Bus. & Prof. Code § 17200 et seq, by manufacturing, distributing, and/or marketing Defendant's Class Products in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's products are in fact made with or contain ingredients and components that are not manufactured in the USA.

136. Defendant's products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.


208
KAZEROUNI LAW GROUP, APC

137. Plaintiff reserves the right to allege further conduct that constitutes other fraudulent business acts or practices. Such conduct is ongoing and continues to this date.

***D. "Unfair, Deceptive, Untrue or Misleading Advertising" Prong***

138. Defendant's advertising is unfair, deceptive, untrue and/or misleading in that consumers are led to believe that Defendant's Class Products are "Manufactured in the USA" when Defendant's products are in fact made with or contain ingredients and components that are not manufactured in the USA.

139. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendant's representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the products are actually manufactured in the USA with ingredients and components from the USA given the absence of clear and adequate qualification of Defendant's "Manufactured in the USA" representations.

140. Contrary to the representation, Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

141. Defendant's "Manufactured in the United States" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

142. Defendant's unlawful, unfair, and fraudulent business practices and unfair, deceptive, untrue or misleading advertising presents a continuing threat to the public in that Defendant continues to engage in unlawful conduct resulting in harm to consumers.

143. Defendant engaged in these unlawful, unfair, and fraudulent business practices motivated solely by Defendant's self-interest with the primary purpose of collecting unlawful and unauthorized monies from Plaintiff and all others similarly situated; thereby unjustly enriching Defendant.

144. Such acts and omissions by Defendant are unlawful and/or unfair and/or fraudulent and constitute a violation of Business & Professions Code §§ 17200, et seq. Plaintiff reserves the right to identify additional violations by Defendant as may be established through discovery.

KAZEROUNI LAW GROUP, APC


209

145. As a direct and proximate result of the aforementioned acts and representations described above and herein, Defendant received and continues to receive unearned commercial benefits at the expense of their competitors and the public.

146. As a direct and proximate result of Defendant's unlawful, unfair and fraudulent conduct described herein, Defendant has been and will continue to be unjustly enriched by the receipt of ill-gotten gains from customers, including Plaintiff, who unwittingly provided money to Defendant based on Defendant's representations.

147. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's false representations set forth on the Defendant's Products.

148. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

**FOURTH CAUSE OF ACTION FOR**

**NEGLIGENT MISREPRESENTATION**

149. Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully stated herein.

150. At a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendant represented to the public, including Plaintiff, by packaging, advertising, marketing and other means, that Defendant's Class Products are "Manufactured in the USA" without clear and adequate qualification when Defendant's products are in fact made with or contain ingredients and components that are not manufactured in the USA.

151. Defendant's products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

152. Defendant made the representations herein alleged with the intention of inducing the public, including Plaintiff and putative class members, to purchase Defendant's Class Products over similar products from competitors which clearly and adequately qualified their "Manufactured in the USA" representations or made no "Manufactured in the USA" representations at all.


210

153. Defendant's "Manufactured in the United States" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

154. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendant's advertising representations and, in reliance on them, purchased the Class Products, as described herein.

155. At all times relevant, Defendant made the misrepresentations herein alleged when Defendant should have known these representations to be untrue, and Defendant had no reasonable basis for believing the representations to be true.

156. As a proximate result of Defendant's negligent misrepresentations, Plaintiff and other consumers similarly situated were induced to purchase, purchase more of, purchase instead of, or pay more for Defendant's Class Products, due to the unlawful acts of Defendant, in an amount to be determined at trial, during the Class Period.

**FIFTH CAUSE OF ACTION FOR**

**INTENTIONAL MISREPRESENTATION**

157. Plaintiff repeats, re-alleges and incorporates herein by reference the above allegations as if fully stated herein.

158. At a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendant intentionally represented to the public, including Plaintiff, by promoting and other means, that Defendant's Class Products were "Manufactured in the USA" without clear and adequate qualification when Defendant's products are in fact made with or contain ingredients and components that are not manufactured in the USA.

159. Defendant's products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

160. Defendant's "Manufactured in the USA" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

KAZEROUNI LAW GROUP, APC


211

161. Defendant made the representations herein alleged with the intention of inducing the public, including Plaintiff, to purchase Defendant's Class Products for Defendant's own financial gain.

162. Defendant intentionally made such misrepresentations by printing and advertising its misrepresentations its website and the websites of its third-party vendors.

163. Defendant's misrepresentations of the Class Products as "Manufactured in the USA" without clear and adequate qualification was misleading because Defendant's products are in fact made with or contain ingredients and components that are not manufactured in the USA.

164. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendant's advertising representations and, in reliance on such representations, purchased the Class Products, as described above.

165. At all times relevant, Defendant intentionally made the misrepresentations herein alleged, allowed the misrepresentations to continue to be made by its resellers and Defendant knew the representations to be false.

166. As a proximate result of Defendant's intentional misrepresentations, Plaintiff and other consumers similarly situated were induced to spend an amount of money to be determined at trial on Defendant's misrepresented Products.

167. Defendant knew that its Class Products were in fact not "Manufactured in the USA" without clear and adequate qualification but instead made with or contain ingredients and components that are not manufactured in the USA**,** but nevertheless made the representations described herein with the intention that consumers rely on Defendant's representations.

168. Defendant also knew that its website, as well as the websites of its third-party vendors, were advertising its Class Products as "Manufactured in the USA" without clear and adequate qualification, when Defendant clearly knew that its Class Products were in fact made with or contained ingredients and components that were not manufactured in the USA.

169. Plaintiff and other consumers similarly situated, in purchasing and using the Class Products as herein alleged, did rely on Defendant's representations, including the representations on Defendant's advertisements and website, all to their damage and/or detriment as herein alleged.


212

KAZEROUNI LAW GROUP, APC

170. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendant as follows:

viii. The "who" is Defendant;

ix. The "what" is representation that Defendant's Class Products are "Manufactured in the USA" when in fact the Products are made with or contain ingredients and components that are not manufactured in the USA;

x. The "when" is the date Plaintiff purchased the product and the Class Period of four years prior to the filing of the Complaint;

xi. The "where" is in Defendant's product advertisements and marketing;

xii. The "to whom" is Plaintiff and the putative class who bought the Class Products;

xiii. The "by what means" by Defendant representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA;

xiv. The "how" is the allegation that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

171. By engaging in the acts described above, Defendant is guilty of malice, oppression, and fraud, and Plaintiff and the Class members are therefore entitled to recover exemplary or punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the Court grant Plaintiff and the putative Class the following relief:

- That this action be certified as a Class Action;
- That Plaintiff be appointed as the Class Representative;
- That Plaintiff's attorneys be appointed as Class Counsel;


213
KAZEROUNI LAW GROUP, APC

- That Defendant's wrongful conduct be adjudged and decreed to violate the consumer protection statutes raised herein;
- That Plaintiff and each of the other members of the Class recover the amounts by which Defendant and Does have been unjustly enriched;
- An order requiring imposition of a constructive trust and and/or disgorgement of Defendant's and Does' ill-gotten gains and to pay restitution to Plaintiff and all members of the Class and to restore to the Plaintiff and members of the class all funds acquired by means of any act or practice declared by this court to be an unlawful, fraudulent or unfair business act or practice, in violation of laws, statutes or regulations, or constituting unfair competition;
- Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery were necessary and as applicable, to prevent Defendant or Does from retaining the benefits of their wrongful conduct;
- That Defendant and Does be enjoined from continuing the wrongful conduct alleged herein and be required to comply with all applicable laws;
- A temporary, preliminary and/or permanent order for injunctive relief requiring Defendant and Does to: (i) discontinue its false and/or misleading statement/s; and (ii) undertake an immediate public information campaign to inform members of the proposed class as to their prior practices;
- Pre-judgment interests from the date of filing of this suit;
- that Plaintiff and each member of the putative Class recover their costs of suit.

**FIRST CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT CAL. BUS. & PROF. CODE §§ 1750, *ET SEQ.***

- Actual damages, injunctive relief, restitution, and punitive damages pursuant to Cal. Civ. Code § 1780(a); and
- an award of costs and attorney's fees pursuant to Cal. Civ. Code § 1780(d).

**SECOND CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.***


214

KAZEROUNI LAW GROUP, APC

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17535; and
- Recovery of reasonably attorney's fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**THIRD CAUSE OF ACTION FOR**
**VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17203; and
- Recovery of reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**FOURTH CAUSE OF ACTION FOR**
**NEGLIGENT MISREPRESENTATION**

- A judgment against Defendant and Does for general and compensatory damages in an amount to be determined at trial; and

**FIFTH CAUSE OF ACTION FOR**

**INTENTIONAL MISREPRESENTATION**

- A judgment against Defendant and Does for general and compensatory damages in an amount to be determined at trial;
- Punitive damages pursuant to Cal. Civ. Code § 3294; and
- That Plaintiff and the members of the Class be granted any other relief the Court may deem just and proper.

**TRIAL BY JURY**

172. Plaintiff is entitled, and demands, a trial by jury on all issues so triable.

Dated: August 16, 2024

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: ______________________________
Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*

KAZEROUNI LAW GROUP, APC


215

**PROOF OF SERVICE**

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On August 16, 2024, I served the foregoing document and accompanying attachments by the means indicated below:

☒ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

☒ ELECTRONIC SERVICE - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m. The electronic filing system sends an e-mail notification of the filing to the parties and counsel of record.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K/ Singh
Angela M. Sousa
Anthony Hopp
Melanie A. Ayerh
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
jsingh@steptoe.com
asousa@steptoe.com
ahopp@steptoe.com
mayerh@steptoe.com
*Attorneys for Defendant*
*Nutra Holdings, Inc. d/b/a Jacked Factory*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on August 16, 2024, at Las Vegas, Nevada.

[signature]

GUSTAVO PONCE

KAZEROUNI LAW GROUP, APC


216
LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp<br><br>FILED<br>Superior Court of California<br>County of Los Angeles<br>05/31/2024<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | |
| PLAINTIFF/PETITIONER:<br>Daniel Rossi | |
| DEFENDANT/RESPONDENT:<br>Nutra Holdings, Inc. | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>23STCV15674 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Court Order Continuing Status Conference) of 05/31/2024 upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Carol Brophy
Steptoe LLP
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, CA 94105

Abbas Kazerounian
Kazerouni Law Group, APC
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626

David W. Slayton, Executive Officer / Clerk of Court

Dated: 05/31/2024

By: A. He
Deputy Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

May 31, 2024
1:46 PM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: None

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Court Order Continuing Status Conference

Defendant Nutra Holdings, Inc. d/b/a Jacked Factory has noticed a Demurrer and Motion to Strike as to Plaintiff Daniel Rossi's Complaint for August 29, 2024, 10:30 AM. On the Court's own motion, the Further Status Conference scheduled for 07/29/2024 is continued to 08/29/2024 at 10:30 AM in Department 1 at Spring Street Courthouse.

Certificate of Mailing is attached.


218

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 5/17/2024 5:19 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**DECLARATION OF MELANIE A. AYERH**<br><br>Hearing Date: August 29, 2024<br>Time:10:30 a.m.<br>Dept: 1<br>Complaint Filed: July 6, 2023 |


219

**DECLARATION OF MELANIE A. AYERH**

I, Melanie Ayerh, declare and state as follows:

1. I am an attorney duly licensed to practice law in this Court and in all the courts of the State of California. I am an associate with the law firm of Steptoe, LLP, which is counsel of record for Defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Nutra Holdings"). I have personal knowledge of the facts stated in this declaration and could competently testify as to their truth if called upon to do so.

2. On May 9, 2024, I sent counsel for plaintiff Daniel Rossi ("Plaintiff") an email outlining the arguments Nutra Holdings intended to pursue in its demur and motion to strike. Then on May 13, 2024, I attended a telephonic meet and confer call with counsel for Plaintiff, Gustavo Ponce, to further discuss the issues to be raised in Nutra Holdings' demur and motion to strike. We were unable to reach an informal resolution and we agreed that any future meet and confer efforts would be futile.

3. As of no later than March 2023, the "Manufactured in the USA" language no longer appears on the Product's website, amazon.com and all other third-party retailers that Nutra Holdings is aware of.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: May 17, 2024

/s/ *Melanie A. Ayerh*
Melanie A. Ayerh



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


220

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On May 17, 2024, I served true copies of the following document(s) described as **DECLARATION OF MELANIE A. AYERH** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address mabner@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 17, 2024, at Los Angeles, California.

/s/Megan A. Abner
MEGAN A. ABNER


221

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


222

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 5/17/2024 5:19 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

Defendants.

Case No.: 23STCV15674
*[Assigned for all purposes to the Honorable Stuart M. Rice]*

**NOTICE OF DEMURRER AND MOTION TO STRIKE; DEMURRER BY NUTRA HOLDINGS, INC. TO COMPLAINT**

Hearing Date: August 29, 2024
Time:10:30 a.m.
Dept: 1
Complaint Filed: July 6, 2023


223

**NOTICE**

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 29, 2024 at 10:30 a.m. or soon thereafter as the matter may be heard, in Department 1 of the Superior Court of the State of California, County of Los Angeles, located at 312 North Spring Street, Los Angeles, CA 90012 the Honorable Stuart M. Rice presiding, Defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Nutra Holdings") will and hereby does demur to, and will and does hereby move to strike portions of Plaintiff Daniel Rossi's ("Plaintiff" or "Rossi") Complaint.

Meet and Confer. The parties met and conferred by telephone on May 13, 2024 regarding the substance of Nutra Holdings' motion. The parties were unable to reach a resolution, and agreed that any future meet and confer efforts would be futile. (*See*, Declaration of Melanie Ayerh, ¶2.)

Nutra Holdings demurs pursuant to Code of Civil Procedure section 430.10(e) on grounds that all claims as pled in the complaint fail to state facts sufficient to constitute a cause of action against Nutra Holdings. A motion to strike is also made on grounds that pursuant to California Code of Civil Procedure §§ 435 and 436, Plaintiff cannot pursue a claim for injunctive relief and lacks standing to prosecute a claim against products he did not purchase.

The demurrer and motion to strike are based upon this Notice, the Demurrer and Memorandum of Points and Authorities filed concurrently herewith, the Declaration of Melanie A. Ayerh, the Request for Judicial Notice and the pleadings and records in this action, and any other such matters and argument as the Court may consider at the hearing.


224

## DEMURRER AND MOTION TO STRIKE

Nutra Holdings hereby demurs to, and moves to strike portions of, Plaintiff's complaint on each of the following grounds:

**DEMURRER TO THE FIRST CAUSE OF ACTION**

1. The first cause of action fails to include sufficient facts to state a cause of action for violation of California Consumers Legal Remedies Act, Cal. Civ. Code section 1750, et seq. (Code of Civ. Proc. § 430.10(e).)

**DEMURRER TO THE SECOND CAUSE OF ACTION**

2. The second cause of action fails to include sufficient facts to state a cause of action for violation of California's False Advertising Law. Bus. & Prof. Code § 17500, et seq. (Code of Civ. Proc. § 430.10(e).)

**DEMURRER TO THE THIRD CAUSE OF ACTION**

3. The third cause of action fails to include sufficient facts to state a cause of action for violation of the Unfair Competition Law, Bus. & Prof. Code, § 17200, et seq. (Code of Civ. Proc. § 430.10(e).)

**DEMURRER TO THE FOURTH CAUSE OF ACTION**

4. The fourth cause of action fails to include sufficient facts to state a cause of action for negligent misrepresentation. (Code of Civ. Proc. § 430.10(e).)

**DEMURRER TO THE FIFTH CAUSE OF ACTION**

5. The fifth cause of action fails to include sufficient facts to state a cause of action for intentional misrepresentation. (Code of Civ. Proc. § 430.10(e).)

**MOTION TO STRIKE PORTIONS OF THE COMPLAINT**

6. Nutra Holdings moves to strike Plaintiff's cause of action for injunctive relief pursuant to California Code of Civil Procedure §§ 435 and 436 on grounds that there is no future conduct to enjoin. Nutra Holdings also moves to strike Plaintiff's allegations in footnote 1 and 3, and Exhibit A to the complaint in its entirety on grounds that Plaintiff lacks standing to pursue claims against products he


225

did not purchase and products that are not substantially similar to the Nitrosurge Pre-workout dietary supplement product that he allegedly purchased.

Dated: May 17, 2024

**STEPTOE LLP**

By: */s/ Melanie A. Averh*

Carol R. Brophy
Jennifer K. Singh
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh

*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*


226

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On May 17, 2024, I served true copies of the following document(s) described as **NOTICE OF DEMURRER AND MOTION TO STRIKE; DEMURRER BY NUTRA HOLDINGS, INC. TO COMPLAINT** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address mabner@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 17, 2024, at Los Angeles, California.

/s/Megan A. Abner
MEGAN A. ABNER


227

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


228

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 5/17/2024 5:19 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER AND MOTION TO STRIKE**<br><br>Hearing Date: August 29, 2024<br>Time:10:30 a.m.<br>Dept: 1<br>Complaint Filed: July 6, 2023 |



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


229

**TABLE OF CONTENTS**


I. INTRODUCTION ........ 6

II. STATEMENT OF RELEVANT FACTS ........ 7

III. PLAINTIFF FAILS TO STATE A CAUSE OF ACTION FOR INTENTIONAL AND NEGLIGENT MISREPRESENTATION ........ 8

A. Plaintiff's Misrepresentation Claims Are Not Pled With The Requisite Specificity ..... 8

1. Both Intentional and Negligent Misrepresentation Claims Must be Pled With Specificity ........ 8

2. Plaintiff Fails to Allege The Elements of Misrepresentation With Specificity ...... 9

IV. PLAINTIFF FAILS TO ALLEGE A CAUSE OF ACTION UNDER THE UCL, FAL AND CLRA ........ 11

A. Plaintiff's Consumer Protection Statutes are Not Pled With Reasonable Particularity 11

B. Plaintiff's Consumer Fraud Claims Fail Because Plaintiff Fails To Allege That The "Manufactured in the USA" Representation Is Misleading To A Reasonable Consumer: ........ 12

V. PLAINTIFF CANNOT SEEK INJUNCTIVE RELIEF AND ALL SUCH RELIEF SHOULD BE STRICKEN ........ 14

VI. PLAINTIFF CANNOT EXTEND CLAIMS BEYOND THE PRODUCTS HE PURCHASED ........ 15

VII. CONCLUSION ........ 16



230

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaei v. Kraft Heinz Food Co.*,
No. 15CV2961-MMA (DHB), 2016 WL 11621800 (S.D. Cal. Apr. 22, 2016)......................10

*Bennett v. Suncloud*,
56 Cal. App. 4th 91 (1997) ......................10

*Benson v. Kwikset Corp.*,
152 Cal. App. 4th 1254 (2007) ......................13

*Bruton v. Gerber Prods. Co.*,
2014 WL 172111 (N.D. Cal. Jan. 15, 2014)......................15

*Cadlo v. Owens-Illinois, Inc.*,
125 Cal. App. 4th 513 (2004) ......................8

*California Service Station etc. Assn. v. Union Oil Co.*,
*supra*, 232 Cal. App. 3d at 57 ......................14

*Carney v. Simmonds*,
49 Cal. 2d 84 (1957) ......................8

*Chapman v. Skype, Inc.*,
220 Cal. App. 4th 217 (2013) ......................12

*Colgan v. Leatherman Tool Group, Inc.*,
135 Cal. App. 4th 663 (2006) ......................14

*Committee On Children's Television, Inc. v. General Foods Corp.*
35 Cal.3d 197 (1983) ......................11

*Feitelberg v. Credit Suisse First Boston, LLC*,
134 Cal. App. 4th 997 (2005) ......................6, 14

*Foster v. Sexton*,
61 Cal. App. 5th 998 (2021) ......................8

*Gomes v. Countrywide Home Loans, Inc.*,
192 Cal. App. 4th 1149 (2011) ......................9, 10

*Granfield v. NVIDIA Corp.*,
No. C 11–05403 JW, 2012 WL 2847575 (N.D. Cal. July 11, 2012)......................15


231

*Gutierrez v. Carmax Auto Superstores California*,
19 Cal. App. 5th 1234 (2018) ....................................................................................11

*Hill v. Roll Int'l Corp.*,
195 Cal. App. 4th 1295 (2011) ....................................................................................12

*J.J. Dowling v. Spring Valley Water Co.*,
174 Cal. 218 (1917) ....................................................................................8

*Kasky v. Nike, Inc.*,
27 Cal. 4th 939 (2002) ....................................................................................11

*Kwikset Corp. v. Superior Ct.*,
51 Cal. 4th 310 (2011) ....................................................................................15

*Lavie v. Proctor & Gamble Co.*,
105 Cal. App. 4th 496 (2013) ....................................................................................12

*Lazar v. Superior Court*,
12 Cal. 4th 631 (1996) ....................................................................................8, 10

*Madrid v. Perot Systems Corp.*
130 Cal. App. 4th 440 (2005) ....................................................................................14

*Martin v. Gladstone*,
96 Cal. App. 5th 681 (2023), review denied (Jan. 17, 2024)....................................................................................12

*People v. Johnson & Johnson*,
77 Cal. App. 5th 295 (2022) ....................................................................................11

*Poseidon Dev., Inc. v. Woodland Lane Ests., LLC*,
152 Cal. App. 4th 1106 (2007) ....................................................................................6

*Simpson v. Kroger Corp.*,
219 Cal. App. 4th 1352 (2013) ....................................................................................12

*Skinner v. Ken's Foods, Inc.*,
53 Cal. App. 5th 938 (2020) ....................................................................................12

*Stansfield v. Starkey*,
220 Cal. App. 3d 59 (1990) ....................................................................................8

*In re Vioxx Class Cases*,
180 Cal. App. 4th 116 (2009) ....................................................................................12

*West v. JPMorgan Chase Bank, N.A.*,
214 Cal. App. 4th 780 (2013) ....................................................................................9


232

*Yvanova v. New Century Mortgage Corp.*, 62 Cal. 4th 919 (2016) ..........12

**Statutes**

Cal. Bus. & Prof. Code § 17533.7 ..........6, 13

Cal. Code of Civ. Proc §§ 435 and 436 ..........14, 15

California's Consumer Legal Remedies Act ..........8, 11, 12, 15

California's False Advertising Law, Bus. & Prof. Code §§ 17500, et seq. ..........8, 11, 12

Unfair Competition Law, Bus. & Prof. Code §§ 17200, et seq. ..........8, 11, 12, 14, 15


233

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Plaintiff Daniel Rossi ("Plaintiff") brings this putative class action against Nutra Holdings d/b/a Jacked Factory ("Nutra Holdings") alleging that the "Manufactured in the USA" language that previously appeared on some Nutra Holdings' Nitrosurge Pre-workout dietary supplement (the "Product") websites is false and misleading because the Product contains some unspecified foreign "ingredients". The Product is manufactured in the USA and beyond mere guess work, Plaintiff does not plead any facts to support his contentions. This is fatal to his case and grounds for demur. *Poseidon Dev., Inc. v. Woodland Lane Ests., LLC*, 152 Cal. App. 4th 1106, 1111 (2007) (it is a long-settled rule that "[courts] must treat the demurrer as admitting all material *facts* properly pleaded, *but not* contentions, deductions or conclusions of fact or law.") For this reason and others set forth below, Plaintiff's causes of action are defective and the Court should sustain Nutra Holdings' demurrer and grant its motion to strike without leave to amend.

*First*, Plaintiff's misrepresentation causes of action fail as a matter of law because they do not satisfy the heightened pleading requirements for fraud. *Second***,** Plaintiff's causes of action brought under three California consumer protection statutes, including Cal. Bus. & Prof. Code § 17533.7, are defective because they are pled without particularity and Plaintiff does not plausibly allege that the "Manufactured in the USA" language is misleading to a reasonable consumer. Third, the websites at issue no longer carry the "Manufactured in the USA" language and therefore there is no grounds for injunctive relief. Lastly, Plaintiff cannot be injured by what he did not buy. Unless he actually bought all of the 46 products alleged in the complaint, and facts that establish that all said products are falsely advertised—which he fails to do—he cannot prove that he suffered an injury with respect to those products and lacks standing to pursue those claims.

///

///

///

///

///


234

## II. STATEMENT OF RELEVANT FACTS

The alleged facts are straightforward. Plaintiff claims that the "Manufactured in the USA" language that previously appeared[1] on the Product's website and "websites of its third-party vendors" is, allegedly false and misleading because, "on information and belief", the Product "[is] actually made with or contain[s] ingredients that are not 'Manufactured in the USA'". Compl. ¶¶ 3, 23, 24. Plaintiff alleges that on or about January 24, 2023, he searched online for a pre-workout supplement when "he discovered the Product and its misrepresented 'Manufactured in the USA' claim." *Id*. ¶ 30. Plaintiff allegedly purchased the product on Amazon.com. *Id*. He claims that he relied on the "Manufactured in the USA" language and "believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA." *Id*. ¶ 35. He claims that had he been made aware that the Product was not actually "Manufactured in the USA" he would not have purchased the Product. *Id*. ¶ 33.

The Product is, in fact, manufactured in the USA and the complaint fails to allege facts to the contrary. Plaintiff does not specify how the "Manufactured in the USA" language is false. He fails to identify what ingredients are in the Product—much less the supposed foreign "ingredients". Are there multiple ingredients or is it a single ingredient that is not manufactured in the USA? Where were those ingredients manufactured if not in the USA? Do those supposed ingredients constitute more than a de minimis portion of the final product? And even if there is an ingredient that is not manufactured in the USA, Plaintiff fails to allege how that fact renders the "Manufactured in the USA" claim false and misleading. To multiply this confusion, Plaintiff seeks to include in this litigation ***45 different*** Nutra Holding's products advertised as "Manufactured in the USA" that he did not purchase. Compl. ¶ 3, n.3. As to those 45 additional products, he again fails to identify a single ingredient that was not manufactured in the USA, or any facts to support his baseless claims that the products themselves were not manufactured in the USA.

---

[1] As of no later than March 2023, the "Manufactured in the USA" language no longer appears on the Product's website, amazon.com and all other third-party retailers that Nutra Holdings is aware of. (Declaration of Melanie A. Ayerh, ¶ 3.) The removal of this language was due to reasons unrelated to this action and can in no way be construed as an admission of guilt.


235

Relying on these threadbare allegations, and a strained and highly implausible view of both California law and consumers' understanding of the "Manufactured in the USA" language, Plaintiff seeks to hold Nutra Holdings liable on behalf of a class of California Consumers for intentional and negligent misrepresentation and violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, et. seq ("CLRA"), California's False Advertising Law, Bus. & Prof. Code §§ 17500, et seq., ("FAL") and the Unfair Competition Law, Bus. & Prof. Code §§ 17200, et seq. ("UCL"). Plaintiff seeks damages and injunctive relief.

## III. PLAINTIFF FAILS TO STATE A CAUSE OF ACTION FOR INTENTIONAL AND NEGLIGENT MISREPRESENTATION

### A. Plaintiff's Misrepresentation Claims Are Not Pled With The Requisite Specificity

Nutra Holdings' demur to Plaintiff's causes of action for intentional and negligent misrepresentation should be sustained because the complaint lacks the necessary specificity.

1. Both Intentional and Negligent Misrepresentation Claims Must be Pled With Specificity

The requirements for pleading fraud in California are strict. Fraud "must be pled specifically; general and conclusory allegations do not suffice." *Lazar v. Superior Court*, 12 Cal. 4th 631, 645 (1996). The same requirement applies to negligent misrepresentation: "Each element in a cause of action for fraud or negligent misrepresentation must be factually and specifically alleged." *Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513, 519 (2004); *accord Foster v. Sexton*, 61 Cal. App. 5th 998, 1028 (2021). To satisfy the specificity requirement, a plaintiff must allege facts which show "how, when, where, to whom, and by what means the representations were tendered." *Lazar*, 12 Cal. 4th at 645.

Indeed, because "allegations of fraud involve a serious attack on character... fairness to the defendant demands that he should receive the fullest possible details of the charge in order to prepare his defense." *Stansfield v. Starkey*, 220 Cal. App. 3d 59, 73 (1990). It is "not sufficient to allege fraud or its elements upon information and belief, unless the facts upon which the belief is founded are stated in the pleading." *Carney v. Simmonds*, 49 Cal. 2d 84, 100 (1957); *J.J. Dowling*


236

*v. Spring Valley Water Co*., 174 Cal. 218, 221 (1917). "[A] pleading made on information and belief is insufficient if it merely asserts the facts so alleged without alleging such information that leads the plaintiff to believe that the allegations are true." *Gomes v. Countrywide Home Loans, Inc*., 192 Cal. App. 4th 1149, 1158–59 (2011). Plaintiff's causes of action for intentional and negligent misrepresentation do not come close to satisfying these pleading standards.

2. Plaintiff Fails to Allege The Elements of Misrepresentation With Specificity

To plead a cognizable claim of intentional misrepresentation, a plaintiff must allege facts showing (1) the defendant made a false representation as to a material fact; (2) the defendant knew the representation was false at the time the defendant made it; (3) the defendant intended to deceive the plaintiff with that false representation; (4) the plaintiff justifiably relied on that representation; and (5) the plaintiff suffered resulting damages. *West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 792 (2013). The elements of negligent misrepresentation are the same except that the defendant need not have known the representation was false at the time, the defendant only need lack a reasonable ground for believing it to be true. *Id*. Plaintiff fails to plead these elements with specificity.

Plaintiff relies on extraordinarily vague allegations to support his misrepresentation claims. He merely alleges that the "Manufactured in the USA" statement that previously appeared on the Product's website and the website of third-party vendors is false and misleading because, "*based on information and belief*", "Defendant's products are in fact made with or contain ingredients that are not manufactured in the USA". *See, e.g.* Compl. ¶¶ 1, 36, 24 ("Based upon information and belief, the offending Product purchased by Plaintiff contains or is made with ingredients that are not 'Manufactured in the USA.'") The complaint does not include facts establishing ***how*** the representation is false. Plaintiff does not attempt to plead the specific ingredients in the Product—let alone the specific ingredients or components that are allegedly not manufactured in the USA, where those foreign ingredients or components are manufactured, or what proportion of the ingredients and components of the Product are not manufactured in the USA. And nowhere does Plaintiff plausibly allege that any part of the production process occurred outside of the United


237

States. *See, e.g.*, *Alaei v. Kraft Heinz Food Co.*, No. 15CV2961-MMA (DHB), 2016 WL 11621800, at *3 (S.D. Cal. Apr. 22, 2016) (dismissing complaint for lack of specificity reasoning that "[plaintiff] appears to take issue with the origin of the product's ingredients, rather than the location where the product is made. But Plaintiff does not specify which "components" of the product were purportedly 'made outside of the United States.'")

*Alaei* is instructive. There, like here, Plaintiff brought a putative class action against Kraft Heinz under Cal. Bus. & Prof. Code sections 17533.7 and 17200 on grounds that Kraft Heinz falsely labeled its products as being manufactured in the United States when "[a]ccording to Plaintiff, the products include ingredients of foreign origin." 2016 WL 11621800, at *1. In granting Kraft Heinz's motion to dismiss under Rule 9(b)[2], the Court found such allegations insufficient:

> Even assuming that this [allegation] satisfies the "who", "what", "where", and "when" requirements, ***it does not adequately explain the "how."*** Although Plaintiff's allegation is unclear, she appears to take issue with the origin of the product's ingredients, rather than the location where the product is made. But Plaintiff does not specify which "components" of the product were purportedly "made outside of the United States." As its name suggests, Heinz 57 Sauce may contain dozens of ingredients. ***Yet, Plaintiff does not allege a single specific ingredient in the sauce to be of foreign origin***. ***In fact, Plaintiff does not allege any of the ingredients of Heinz 57 Sauce.*** [] Simply put, Plaintiff claims to have bought a bottle of sauce labeled as "MFD. In USA" that may have contained foreign ingredients, or may have been made somewhere besides the United States. This is not sufficient to state a fraud-based claim under Rule 9(b)'s standard.

*Id*. at *3.

Here too, the complaint allegations fall short of the requirement that a plaintiff specify the "how, when, where, to whom, and by what means" each alleged misrepresentation was made. *Lazar*, 12 Cal. 4th at 645; *Bennett v. Suncloud*, 56 Cal. App. 4th 91, 98 n.2 (1997). And it also runs afoul of the requirement that allegations pled on information and belief be accompanied by alleged facts providing the basis for that belief. *Gomes*, 192 Cal. App. 4th at 1158-59. Stated differently, Plaintiff fails to state (i) what foreign ingredients are at issue, (ii) where these alleged ingredients are from, and (iii) how they make the "Manufactured in the USA" statement false. Nothing in the

---

[2] Applying Fed. Rules Civ. Proc., Rule 9(b), which similarly requires fraud to be pled with particularity.


238

complaint suggests Plaintiff's vague claims about ingredient sourcing are anything other than guesswork. "The pleading of fraud…is…the last remaining habitat of the common law notion that a complaint should be sufficiently specific that the court can weed out nonmeritorious actions on the basis of the pleadings." *Committee On Children's Television, Inc. v. General Foods Corp*. 35 Cal.3d 197, 216-217 (1983). It also provides "notice to the defendant, to 'furnish the defendant with certain definite charges which can be intelligently met.'" *Id*. The Court should sustain Nutra Holdings' demurrer as to Plaintiff's fourth and fifth causes of action for negligent and intentional misrepresentation.

## IV. PLAINTIFF FAILS TO ALLEGE A CAUSE OF ACTION UNDER THE UCL, FAL AND CLRA

### A. Plaintiff's Consumer Protection Statutes are Not Pled With Reasonable Particularity

Plaintiff's claims also lack the reasonable particularity required to plead claims under the UCL, FAL and CLRA. The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The FAL, "broadly prohibit[s] false or misleading advertising, declaring that it is unlawful for any person or business to make or distribute any statement to induce the public to enter into a transaction 'which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.'" *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 317 (2022); Cal. Bus. & Prof. Code § 17500. "[A]ny violation of the false advertising law ... necessarily violates the [UCL]." *Kasky v. Nike, Inc*., 27 Cal. 4th 939, 950 (2002). Similarly, "California's Consumer Legal Remedies Act ('CLRA') prohibits 'unfair methods of competition and unfair or deceptive acts or practices.'" *Gutierrez v. Carmax Auto Superstores California*, 19 Cal. App. 5th 1234, 1249 (2018). Claims under the UCL, FAL and the CLRA "must be stated with reasonable particularity". *Id.* at 1261.

Plaintiff fails to allege facts sufficient to establish that Nutra Holdings engaged in deceptive practices. Plaintiff predicates his allegations under the UCL, FAL and CLRA on the same baseless allegations that Nutra Holdings misrepresented its Product as "Manufactured in the USA".





LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


239

However, as outlined above, Plaintiff alleges no facts whatsoever to establish ***why*** or ***how*** the representation is deceptive. Plaintiff fails to state facts that would support finding that Nutra Holdings misrepresented anything to consumers concerning its Products and the Court is not required to accept the truth of "contentions, deductions, or conclusions of fact or law." *Yvanova v. New Century Mortgage Corp*., 62 Cal. 4th 919, 924 (2016); *Martin v. Gladstone*, 96 Cal. App. 5th 681 (2023), review denied (Jan. 17, 2024). This Court should sustain Nutra's demurrer as to the first, second and third causes of action for Plaintiff's failure to plead his allegations with reasonable particularity. *Amiodarone Cases*, 84 Cal. App. 5th 1091, 1115 (2022), review denied (Jan. 25, 2023) (finding Plaintiffs' claims lacked the reasonable particularity required to plead claims under the UCL and CLRA.)

**B. Plaintiff's Consumer Fraud Claims Fail Because Plaintiff Fails To Allege That The "Manufactured in the USA" Representation Is Misleading To A Reasonable Consumer:**

The reasonable consumer test applies to false advertising claims brought under the UCL, FAL, and CLRA. *Skinner v. Ken's Foods, Inc*., 53 Cal. App. 5th 938, 948 (2020); *Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2013). This standard requires plaintiffs to establish that the advertising is such that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably under the circumstances, could be misled. *Chapman v. Skype, Inc*., 220 Cal. App. 4th 217, 226 (2013); *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 130 (2009). While the question of whether advertising is likely to deceive is typically a question of fact, courts sustain demurrers where the advertising could not plausibly deceive a reasonable consumer. *See e.g., Simpson v. Kroger Corp*., 219 Cal. App. 4th 1352, 1371-72 (2013); *Hill v. Roll Int'l Corp*., 195 Cal. App. 4th 1295, 1300-01 (2011).

Here, Plaintiff's vague theory of liability appears to be that reasonable consumers understand the phrase "Manufactured in the USA" to mean that each and every single ingredient or component of the product regardless of how *de minimis* it is, must be: (i) sourced, (ii) processed and (iii) "manufactured" in the United States. This interpretation is absurd, unreasonable and runs afoul of applicable California law. The term "manufacturing" or "manufactured" as defined by


240

Merriam-Webster means to "make into a product suitable for use".[3] *Benson v. Kwikset Corp.*, 152 Cal. App. 4th 1254, 1272 (2007), as modified on denial of reh'g (July 26, 2007) (Manufacturing has been defined "as the production of articles for use from raw or prepared materials by giving such materials new forms, qualities, properties, or combinations, whether by hand labor or by machinery....") Consumers understand that "manufacturing" involves the down-line production of a product. As such, Plaintiff's purist theory is simply unreasonable and implausible.

Moreover, Plaintiff's theory runs afoul of California law. Cal. Bus. & Prof. Code § 17533.7 provides that:

> (a) It is unlawful for any person, firm, corporation, or association to sell or offer for sale in this state any merchandise on which merchandise or on its container there appears the words "Made in U.S.A.," "Made in America," "U.S.A.," or similar words if the merchandise or any article, unit, or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States.
>
> (b) This section shall not apply to merchandise made, manufactured, or produced in the United States that has one or more articles, units, or parts from outside of the United States, if all of the articles, units, or parts of the merchandise obtained from outside the United States constitute not more than 5 percent of the final wholesale value of the manufactured product.

Cal. Bus. & Prof. Code § 17533.7(a) & (b). The California Court of Appeal has interpreted the statutory language "made, manufactured, or produced" in Section 17533.7(a) and has concluded that "one would not violate the statute by making, manufacturing, or producing merchandise solely in the United States ***even though using raw materials acquired from a foreign source***." *Benson v. Kwikset Corp.*, 152 Cal. App. 4th 1254, 1272, modified on other grounds, 153 Cal. App. 4th 444 (2007) (emphasis added). In other words, California law is focused on manufacturing and production activity, not on raw materials. As a result, if the raw materials or ingredients in a product come from overseas, but then are manufactured into a product in the United States, the finished product meets the California standard. *See id*. Plaintiff's claim that some unknown raw material(s) (ingredients or components) in the products they purchased are sourced from outside

---

[3] https://www.merriam-webster.com/dictionary/manufacturing, Request for Judicial Notice, Exhibit 1.


241

of the U.S. would not establish a violation, even if Plaintiff had a factual basis for that naked assertion. The notion that reasonable consumers would have a contrary understanding is simply absurd.

Here, Nutra Holdings truthfully states that the manufacturing of its Product occurs in the United States. This is accurate and not misleading. And Plaintiff does not allege how or why reasonable consumers would be misled.

**V. PLAINTIFF CANNOT SEEK INJUNCTIVE RELIEF AND ALL SUCH RELIEF SHOULD BE STRICKEN**

The record does not support an award of injunctive relief. Plaintiff seeks an order "requiring [Nutra Holdings] to discontinue its false and/or misleading statements" (Compl., "Prayer for Relief"). However, the "Manufactured in the USA" language no longer appears on the at-issue websites. In order to grant injunctive relief under the UCL, "there must be a threat that the wrongful conduct will continue. 'Injunctive relief will be denied if, at the time of the order of judgment, there is no reasonable probability that the past acts complained of will recur....'" *Colgan v. Leatherman Tool Group, Inc*., 135 Cal. App. 4th 663, 702 (2006); *accord Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 997, 1012 (2005) ("'[A]n injunction must seek to prevent harm, not to punish the wrongdoer.'"); *Madrid v. Perot Systems Corp.* 130 Cal. App. 4th 440, 464–465 (2005) ("'[Injunctive relief] ... is not a remedy designed to right completed wrongs.")

Here, without admitting guilt of any wrongful conduct and for reasons unrelated to the complaint, the "manufactured in USA" language no longer appears on the Product's website and third party websites, including amazon.com. Accordingly, there is no threat that any allegedly wrongful act will continue and Plaintiff's prayer for injunctive relief is moot. *California Service Station etc. Assn. v. Union Oil Co., supra*, 232 Cal. App. 3d at 57. Accordingly, Nutra Holdings, Inc. respectfully requests that the Court strike Plaintiff's prayer for injunctive relief. Cal. Code of Civ. Proc §§ 435 and 436.


242

## VI. PLAINTIFF CANNOT EXTEND CLAIMS BEYOND THE PRODUCTS HE PURCHASED

Finally, Plaintiff cannot extend his claims beyond challenging the products he allegedly purchased – Nutra Holdings' Nitrosurge Pre-workout dietary supplement. The complaint identifies an additional 45 products attached as Exhibit A and purportedly at issue in this litigation. However, Plaintiff does not allege that he purchased any of those products, and he does not provide any detail regarding those other 45 Products that would suggest that they are substantially similar to the Product he purchased and are falsely or misleadingly advertised as "Manufactured in the USA". Indeed, the products listed in Exhibit A are all highly varied and together may contain dozens of separate ingredients sourced from multiple vendors. The complaint fails to set forth any facts to establish that each product was not "Manufactured in the USA". *See, e.g. Bruton v. Gerber Prods. Co.*, 2014 WL 172111, at *8 (N.D. Cal. Jan. 15, 2014) (dismissing claims based on non-purchased products where complaint failed to explain how certain non-purchased products were similar to purchased products). Moreover, Plaintiff lacks statutory standing to pursue claims based on those products he did not purchase. *See Granfield v. NVIDIA Corp.*, No. C 11–05403 JW, 2012 WL 2847575, at *6 (N.D. Cal. July 11, 2012); *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 323 (2011). As such, only the listed Product should be part of Plaintiff's' claims. Indeed, Plaintiff lacks standing to assert claims based on unpurchased products and cannot expand the scope of his case to include unpurchased products because "statutory standing requirements of UCL and CLRA are narrowly prescribed and do not permit… generalized allegations."

In the unlikely event that Plaintiff's claims survive this demurrer, Nutra Holdings respectfully requests that the Court preclude Plaintiff from challenging any product other than the one he allegedly purchased and allegedly was "injured" by. Accordingly, pursuant to Cal. Code of Civ. Proc §§ 435 and 436, the Court should strike footnotes 1 and 3, and Exhibit A of the complaint.

/ / /

/ / /

/ / /


243

**VII. CONCLUSION**

For the reasons set forth above, the Court should sustain the demurrer and dismiss the action with prejudice.

Dated: May 17, 2024

**STEPTOE LLP**

By:

*/s/ Melanie A. Ayerh*

Carol R. Brophy
Jennifer K. Singh
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh

*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*


244

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On May 17, 2024, I served true copies of the following document(s) described as **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER AND MOTION TO STRIKE**
on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address mabner@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 17, 2024, at Los Angeles, California.

/s/Megan A. Abner
MEGAN A. ABNER


245

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


246

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 5/17/2024 5:19 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**REQUEST FOR JUDICIAL NOTICE; EXHIBIT 1**<br><br>Hearing Date: August 29, 2024<br>Time:10:30 a.m.<br>Dept: 1<br>Complaint Filed: July 6, 2023 |

# REQUEST FOR JUDICIAL NOTICE

Pursuant to California Evidence Code sections 451(e), 452(h) and 453, Defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Nutra Holdings"), hereby requests that the Court take judicial notice of the Merriam-Webster online dictionary definition of "manufactured" available at https://www.merriam-webster.com/dictionary/manufacturing and attached hereto as **Exhibit 1.**

Evidence code section 451(e) provides that the Court shall take judicial notice of "[t]he true signification of all English words and phrases and of all legal expressions". And pursuant to Evidence Code Section 452(h), the Court may take judicial notice of "facts ... not reasonably subject to dispute and ... capable of immediate and accurate determination." (Evid. Code, § 452, subd. (h).) Courts routinely take judicial notice of dictionary definitions. *See, e.g. Surfrider Found. v. California Reg'l Water Quality Control Bd*., 211 Cal. App. 4th 557, 569, n.7 (2012) (Taking judicial notice of the word "mortality" as defined in Webster's Third New International Dictionary.); *Falkowski v. Imation Corp*., 132 Cal. App. 4th 499, 508, n. 8 (2005) (granting judicial notice of various dictionary definitions).

Accordingly, Nutra Holdings respectfully requests that the Court take judicial notice of Exhibit 1.

Dated: May 17, 2024

**STEPTOE LLP**

By: */s/ Melanie A. Ayerh*

Carol R. Brophy
Jennifer K. Singh
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh

*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


248

# EXHIBIT 1


249

Merriam-Webster manufacturing

noun 2 Synonyms Example Sentences Word History Phrases Containing Ent

Ad removed.
Show details

# manufacture 1 of 2 noun

man·u·fac·ture ˌman-yə-ˈfak-chər ˌma-nə-

Synonyms of *manufacture* >

1 : something made from raw materials by hand or by machinery
imports most *manufactures* used by consumers
— D. L. Cohn

2 a : the process of making wares by hand or by machinery especially when carried on systematically with division of labor
the *manufacture* of automobiles

b : a productive industry using mechanical power and machinery

3 : the act or process of producing something
the *manufacture* of blood goes on constantly in the human body
— Morris Fishbein

# manufacture 2 of 2 verb

**manufactured; manufacturing** ˌman-yə-ˈfak-chə-riŋ -ˈfak-shriŋ, ˌma-nə-

*transitive verb*

1 : to make into a product suitable for use

Merriam-Webster

noun 2 Synonyms Example Sentences Word History Phrases Containing Ent

4 : to produce as if by manufacturing : **CREATE**

writers who *manufacture* stories for television

*intransitive verb*

: to engage in manufacture

ˌman-yə-ˌfak-chə-rə-ˈbi-lə-tē -ˌfak-shrə-ˈbi-ˌma-nə- **noun**

ˌman-yə-ˈfak-chə-rə-bəl -ˈfak-shrə-bəlˌma-nə- **adjective**

**noun**

**Verb**

fabricate

fashion


251

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On May 17, 2024, I served true copies of the following document(s) described as **REQUEST FOR JUDICIAL NOTICE; EXHIBIT 1**

on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address mabner@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 17, 2024, at Los Angeles, California.

/s/Megan A. Abner

MEGAN A. ABNER


252

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


253

Electronically FILED by Superior Court of California, County of Los Angeles 5/06/2024 4:52 PM David W. Slayton, Executive Officer/Clerk of Court, By L. Smith, Deputy Clerk

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp (pro hac vice forthcoming)
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Attorneys for

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice, Department One (1)]*<br><br>**NOTICE OF COURT RULING FOLLOWING INITIAL STATUS CONFERENCE HELD ON APRIL 17, 2024**<br><br>Complaint Filed: July 6, 2023 |

**TO THE CLERK OF THE COURT, ALL PARTIES AND THEIR COUNSEL:**

NOTICE IS HEREBY PROVIDED by Defendant NUTRA HOLDINGS INC. D/B/A JACKED FACTORY ("Defendant" or Nutra Holdings") of the Court's Minute Order and Case


254

Management Order ("CMO") following the Initial Status Conference held at 9 a.m. on April 17, 2024 in Department One (1) of the Los Angeles Superior Court, Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA 90012. The Honorable Stuart M. Rice, Superior Court Judge, presided over the Initial Status Conference. Plaintiff DANIEL ROSSI ("Plaintiff" or "Rossi") was represented by Gustavo Ponce, Esq. of the Kazerouni Law Group, APC, and Defendant Nutra Holdings was represented by Angela M. Sousa, Esq. of Steptoe LLP. The Court ruled as follows:

1. The Court issues its CMO, and lifts the pleading stay pursuant to CMO.

2. If Defendant decides to file a pleadings challenge, Defendant is to reserve a hearing date with Department One before filing the pleadings challenge.

3. A further Status Conference is scheduled for July 29, 2024 at 10:30 a.m. in Department One. A Joint Report is to be filed three (3) to five (5) days in advance of the July 29, 2024 Status Conference.

4. Defendant's counsel was ordered to give Notice.

True and correct copies of the Court's Minute Order dated April 17, 2024 and Case Management Order dated April 17, 2024 are attached hereto as Exhibit A.

Dated: May 6, 2024

**STEPTOE LLP**

By: *<u>/s/ Carol R. Brophy</u>*
Carol R. Brophy
Jennifer K. Singh
Anthony Hopp
Angela M. Sousa

*Attorneys for Defendant NUTRA HOLDINGS, INC.*


255

# EXHIBIT A


256

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

April 17, 2024
9:00 AM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: R. Sims

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Gustavo Ponce via LACC

For Defendant(s): Angela Maria Sousa

**NATURE OF PROCEEDINGS:** Initial Status Conference

The case is called for hearing.

Defendant intends to file a pleadings challenge. The Court issues its Case Management Order ("CMO"). Defendant to contact the courtroom to reserve a hearing date before the filing of any pleadings challenge. The pleading stay is lifted pursuant to the CMO. Further Status Conference is scheduled for 07/29/2024 at 10:30 AM in Department 1 at Spring Street Courthouse. A joint report is due three (3) to five (5) court days in advance of the status conference.

Defendant to give notice. Certificate of Mailing is attached.


257

FILED
Superior Court of California
County of Los Angeles
04/17/2024
David W. Slayton, Executive Officer / Clerk of Court
By: A. He Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No. 23STCV15674

The Honorable Stuart M. Rice, Dept. 1

**CASE MANAGEMENT ORDER FOR CIVIL CLASS ACTION**

This action has been designated as complex pursuant to CRC 3.400(a), and thus requires exceptional judicial management to carry out the purposes of Rule 3.400(a) and to promote effective decision-making by the Court. The Court has read the Joint Initial Status Conference Report previously filed and issues the following Case Management Order:

The Court lifts the pleading stay previously imposed and orders defendants to file a response to the complaint within 30 days.

1. Phased Discovery. Discovery will be phased with the stay lifted once the answer is filed or, if applicable, after the Court rules on the pleading challenge. The Court will permit class certification discovery only. Merits-based discovery will be allowed after a successful class certification motion. If there is a dispute concerning whether a given request is certification or merits-based, the parties are to set up a telephonic conference with the court.


258

2. Class List Discovery. The decision in *In Re Insurance Installment Fee cases* (2012) 211 Cal.App.4th 1395, 1426-1429, held that the notice procedure prescribed by the trial court and followed by the defendant was necessary to protect privacy rights under the California Constitution. The parties therefore shall use the procedure described in *Belaire-West Landscape v Superior Court* (2008) 149 Cal.App.4th 554 to notify putative class members (as described in the applicable paragraph of the currently operative complaint), giving them the opportunity to opt out. The parties are to share the cost of the procedure equally.
    a. Plaintiff is to take the lead and prepare a proposed letter to be sent out by the agreed-upon third party administrator. The parties will discuss and settle upon a final version.
    b. The letter will be written using the administrator's letterhead, not that of any party.
    c. The defense is to turn over the contact information consisting of name, address, phone number, and email address (if available) to the third-party administrator.
    d. In the event the putative class list is greater than 400 people, the administrator must randomly select a sample of no more than 400. The contact information for those persons who did not opt out must be turned over to the plaintiff. This sample size is without prejudice to the plaintiff seeking contact information for additional putative class members at a later date upon a good cause showing.
3. Protective Order. Parties must be aware of the model protective order to be found at Los Angeles Superior Court website at http://www.lacourt.org under "Tools for Litigators." A redlined courtesy copy is to be posted on the e-service bulletin board and lodged with the court at the time of filing. The parties are to use the redlined version to identify any changes the parties propose to the model order.
4. E-service. The parties were ordered in the Initial Status Conference Order to sign up with an e-service provider and are again ordered to do so forthwith if not yet accomplished. The parties shall use the e-service bulletin board in lieu of ex parte motions whenever possible. Argument shall not be posted on the bulletin board.




259

5. Class Certification Motion. The deadline to file the class certification motion will be set at a later conference. Plaintiff is reminded that plaintiff must provide a trial plan. Counsel are to call the Court for a hearing date and briefing schedule prior to posting and filing the motion. The Court will schedule a non-appearance hearing to confirm that the motion is filed. If the motion is not filed, the Court will schedule an OSC re Dismissal.

6. Informal Conferences. The Court requires informal pleading and discovery conferences before motions are filed. The conferences are informal and must be via LACourtConnect with the utilization of the video function. Five court days before the conference, parties are to post and file a joint brief, which CANNOT exceed five pages. Meet and confer and then contact the courtroom staff to schedule the conference. Since these conferences are informal, no court reporter or audio recording is permitted. Based on the issues presented in the joint statement, the Court may dispense with an informal pleading conference and instead direct the parties to proceed with filing the motion.

7. Potential Related Cases. Counsel are ordered to file a Notice of Related Case for any potentially related cases pursuant California Rules of Court, Rule 3.300. This is a continuing obligation on both plaintiffs and defendants while this case is pending.

DATED: April 17, 2024

Stuart M. Rice / Judge

THE HONORABLE STUART M. RICE
JUDGE OF THE SUPERIOR COURT


260

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS: Spring Street Courthouse 312 North Spring Street, Los Angeles, CA 90012 | FILED Superior Court of California County of Los Angeles 04/17/2024 David W. Slayton, Executive Officer / Clerk of Court By: A. He Deputy |
| PLAINTIFF/PETITIONER: Daniel Rossi | |
| DEFENDANT/RESPONDENT: Nutra Holdings, Inc. | |
| **CERTIFICATE OF MAILING** | CASE NUMBER: 23STCV15674 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Initial Status Conference) of 04/17/2024, Case Management Order upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Gustavo Ponce
Kazerouni Law Group APC
245 Fischer Ave
Unit D1
Costa Mesa, CA 92626

Angela Maria Sousa
Steptoe LLP
633 West Fifth Street
19FL
Los Angeles, CA 90071

David W. Slayton, Executive Officer / Clerk of Court

Dated: 04/17/2024

By: A. He
Deputy Clerk

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On May 6, 2024, I served true copies of the following document(s) described as **"NOTICE OF COURT RULING FOLLOWING INITIAL STATUS CONFERENCE HELD ON APRIL 17, 2024"** on the interested parties in this action as follows:

☒ **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of Steptoe & Johnson LLP for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope was placed in the mail at Los Angeles, California.

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address mabner@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 6, 2024, at Los Angeles, California.

/s/Megan A. Abner

MEGAN A. ABNER


262

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


263

FILED
Superior Court of California
County of Los Angeles
04/17/2024
David W. Slayton, Executive Officer / Clerk of Court
By: A. He Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No. 23STCV15674

The Honorable Stuart M. Rice, Dept. 1

**CASE MANAGEMENT ORDER FOR CIVIL CLASS ACTION**

This action has been designated as complex pursuant to CRC 3.400(a), and thus requires exceptional judicial management to carry out the purposes of Rule 3.400(a) and to promote effective decision-making by the Court. The Court has read the Joint Initial Status Conference Report previously filed and issues the following Case Management Order:

The Court lifts the pleading stay previously imposed and orders defendants to file a response to the complaint within 30 days.

1. Phased Discovery. Discovery will be phased with the stay lifted once the answer is filed or, if applicable, after the Court rules on the pleading challenge. The Court will permit class certification discovery only. Merits-based discovery will be allowed after a successful class certification motion. If there is a dispute concerning whether a given request is certification or merits-based, the parties are to set up a telephonic conference with the court.






264

2. Class List Discovery. The decision in *In Re Insurance Installment Fee cases* (2012) 211 Cal.App.4th 1395, 1426-1429, held that the notice procedure prescribed by the trial court and followed by the defendant was necessary to protect privacy rights under the California Constitution. The parties therefore shall use the procedure described in *Belaire-West Landscape v Superior Court* (2008) 149 Cal.App.4th 554 to notify putative class members (as described in the applicable paragraph of the currently operative complaint), giving them the opportunity to opt out. The parties are to share the cost of the procedure equally.
    a. Plaintiff is to take the lead and prepare a proposed letter to be sent out by the agreed-upon third party administrator. The parties will discuss and settle upon a final version.
    b. The letter will be written using the administrator's letterhead, not that of any party.
    c. The defense is to turn over the contact information consisting of name, address, phone number, and email address (if available) to the third-party administrator.
    d. In the event the putative class list is greater than 400 people, the administrator must randomly select a sample of no more than 400. The contact information for those persons who did not opt out must be turned over to the plaintiff. This sample size is without prejudice to the plaintiff seeking contact information for additional putative class members at a later date upon a good cause showing.
3. Protective Order. Parties must be aware of the model protective order to be found at Los Angeles Superior Court website at http://www.lacourt.org under "Tools for Litigators." A redlined courtesy copy is to be posted on the e-service bulletin board and lodged with the court at the time of filing. The parties are to use the redlined version to identify any changes the parties propose to the model order.
4. E-service. The parties were ordered in the Initial Status Conference Order to sign up with an e-service provider and are again ordered to do so forthwith if not yet accomplished. The parties shall use the e-service bulletin board in lieu of ex parte motions whenever possible. Argument shall not be posted on the bulletin board.


265

5. Class Certification Motion. The deadline to file the class certification motion will be set at a later conference. Plaintiff is reminded that plaintiff must provide a trial plan. Counsel are to call the Court for a hearing date and briefing schedule prior to posting and filing the motion. The Court will schedule a non-appearance hearing to confirm that the motion is filed. If the motion is not filed, the Court will schedule an OSC re Dismissal.

6. Informal Conferences. The Court requires informal pleading and discovery conferences before motions are filed. The conferences are informal and must be via LACourtConnect with the utilization of the video function. Five court days before the conference, parties are to post and file a joint brief, which CANNOT exceed five pages. Meet and confer and then contact the courtroom staff to schedule the conference. Since these conferences are informal, no court reporter or audio recording is permitted. Based on the issues presented in the joint statement, the Court may dispense with an informal pleading conference and instead direct the parties to proceed with filing the motion.

7. Potential Related Cases. Counsel are ordered to file a Notice of Related Case for any potentially related cases pursuant California Rules of Court, Rule 3.300. This is a continuing obligation on both plaintiffs and defendants while this case is pending.

DATED: April 17, 2024

Stuart M. Rice / Judge

THE HONORABLE STUART M. RICE

JUDGE OF THE SUPERIOR COURT






266

Electronically Received 09/09/2025 03:49 PM

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for JACKED FACTORY INC.

**FILED**
Superior Court of California
County of Los Angeles
09/11/2025
David W. Slayton, Executive Officer / Clerk of Court
By: A. He Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Theresa M. Traber]*<br><br>**STIPULATION AND ~~[PROPOSED]~~ ORDER RE BRIEFING SCHEDULE ON PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Dept: 1<br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024<br>Second Amended Complaint: March 27, 2025 |


267

Plaintiff Daniel Rossi ("Plaintiff") and defendant Jacked Factory Inc. ("Defendant", collectively the "Parties"), through their respective undersigned counsel, hereby stipulate as follows:

WHEREAS, on August 26, 2025 at the Further Status Conference, the Court ordered the Parties to meet and confer regarding the setting of a class certification deadline, motion hearing date, and briefing schedule;

WHEREAS, the Court further ordered that a stipulation and proposed order setting forth an agreed upon schedule is to be submitted by September 9, 2025;

WHEREAS, the Parties met and conferred as ordered by the Court and have agreed to the below schedule on Plaintiff's motion for class certification.

**THEREFORE, THE PARTIES STIPULATE AND RESPECTFULLY REQUEST THAT THE COURT ENTER THE FOLLOWING SCHEDULE:**

| EVENT | DEADLINE |
|---|---|
| Deadline for Plaintiff to disclose all class certification expert witnesses, if any | July 1, 2026 |
| Deadline for Defendant to disclose all class certification expert witnesses, if any | August 3, 2026 |
| Deadline to file Class Certification Motion | October 1, 2026 |
| Deadline to file Opposition to Class Certification | November 16, 2026 |
| Deadline to file Reply in Support of Class Certification | December 15, 2026 |
| Hearing on Class Certification Motion | January 11, 2027 at 10:30 a.m. |

Dated: September 9, 2025

**KAZEROUNI LAW GROUP, APC**

By:

*/s/ Gustavo Ponce*

Gustavo Ponce

*Attorney for Plaintiff DANIEL ROSSI*


268

Dated: September 9, 2025

**STEPTOE LLP**

By: */s/ Melanie A. Ayerh*
Carol R. Brophy
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh
*Attorneys for Defendant JACKED FACTORY INC.*


269

# [~~PROPOSED~~] ORDER

PURSUANT TO STIPULATION OF THE PARTIES AND GOOD CAUSE APPEARING THEREFOR, the schedule on Plaintiff's class certification motion shall proceed as follows:

| EVENT | DEADLINE |
|---|---|
| Deadline for Plaintiff to disclose all class certification expert witnesses, if any | July 1, 2026 |
| Deadline for Defendant to disclose all class certification expert witnesses, if any | August 3, 2026 |
| Deadline to file Class Certification Motion | October 1, 2026 |
| Deadline to file Opposition to Class Certification | November 16, 2026 |
| Deadline to file Reply in Support of Class Certification | December 15, 2026 |
| Hearing on Class Certification Motion | January 11, 2027 at 10:30 a.m. |

IT IS SO ORDERED.

DATED: 09/11/2025

Hon. Theresa M. Traber
Superior Court Judge


270

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On September 9, 2025, I served true copies of the following document(s) described as **STIPULATION AND [PROPOSED] ORDER RE BRIEFING SCHEDULE ON PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on September 9, 2025, at Los Angeles, California.

*/s/ Inez Brown*
Inez Brown


271

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


272

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

August 26, 2025
10:30 AM

Judge: Honorable Theresa M. Traber
Judicial Assistant: A. He
Courtroom Assistant: F. Sims

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Gustavo Ponce via LACC

For Defendant(s): Melanie Ayerh

**NATURE OF PROCEEDINGS:** Hearing on Defendant Nutra Holdings, Inc. d/b/a Jacked Factory's Motion to Strike Second Amended Class Action Complaint; Further Status Conference

The case is called for hearing.

The Court adopts its tentative ruling as its final ruling.

The Motion to Strike Second Amended Complaint filed by Nutra Holdings, Inc. on 05/01/2025 is Granted.

This is a putative consumer class action. Plaintiff Daniel Rossi (Plaintiff) contends that defendant Jacked Factory, Inc., formerly known as Nutra Holdings, Inc. (Defendant) represents to consumers that its dietary supplements are "manufactured in the USA" when they are wholly or substantially made with ingredients manufactured outside the United States of America. Plaintiff sues under the Consumer Legal Remedies Act (CLRA, Civ. Code § 1750 et seq.), False Advertising Law (FAL, Bus. & Prof. Code § 17500 et seq.), and Unfair Competition Law (UCL, Bus. & Prof. Code § 17200 et seq.), and for negligent and intentional misrepresentation.

On February 10, 2025, the Court overruled Defendant's demurrer to Plaintiff's First Amended Complaint (the FAC) in its entirety but granted Defendant's motion to strike Plaintiff's damages claim under the CLRA with leave to amend, because Plaintiff had not given proper statutory notice of the violations alleged in his complaint. Plaintiff filed a Second Amended Complaint (SAC) on March 27, 2025. Defendant now moves again to strike portions of Plaintiff's SAC.

## LEGAL STANDARDS

"Any party, within the time allowed to respond to a pleading may serve and file a notice of motion to strike the whole or any part thereof[.]" (Code Civ. Proc. § 435(b)(1).) "The court may, upon a motion made pursuant to Section 435, or at any time in its discretion, and upon terms it

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

August 26, 2025
10:30 AM

Judge: Honorable Theresa M. Traber
Judicial Assistant: A. He
Courtroom Assistant: F. Sims

CSR: None
ERM: None
Deputy Sheriff: None

deems proper: (a) Strike out any irrelevant, false, or improper matter inserted in any pleading. (b) Strike out all or any part of any pleading not drawn or filed in conformity with the laws of this state, a court rule, or an order of the court." (Code Civ. Proc. § 436.) "The grounds for a motion to strike shall appear on the face of the challenged pleading or from any matter of which the court is required to take judicial notice." (Code Civ. Proc. § 437(a).)

**DISCUSSION**

If a plaintiff seeks damages in a CLRA action, the statute requires pre-suit notice to the defendant:

> (a) Thirty days or more prior to the commencement of an action for damages pursuant to this title, the consumer shall do the following:
>
> (1) Notify the person alleged to have employed or committed methods, acts, or practices declared unlawful by Section 1770 of the particular alleged violations of Section 1770.
>
> (2) Demand that the person correct, repair, replace, or otherwise rectify the goods or services alleged to be in violation of Section 1770.
>
> The notice shall be in writing and shall be sent by certified or registered mail, return receipt requested, to the place where the transaction occurred or to the person's principal place of business within California.

(Civ. Code § 1782(a).)

The Court previously granted Defendant's motion to strike Plaintiff's claim for damages under the CLRA cause of action, because Plaintiff's notice letter to Defendant did not contain all the ingredients on which Plaintiff's CLRA claim was based. (See *DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 380 [purpose of pre-suit notice requirement is to "provide efficient and economical procedures" to secure protection to consumers]; *Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30, 41 [purpose of the statute can "only be accomplished by a literal application of the notice provisions."]) The Court granted Plaintiff leave to amend, giving Plaintiff the option of either serving an amended notice or proceeding under the CLRA only on the ingredients of which he gave notice.

Plaintiff has opted to proceed under the CLRA only as to the ingredients of which he gave notice, which he labels the "CLRA Ingredients." The CLRA cause of action itself makes no






274

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

August 26, 2025
10:30 AM

Judge: Honorable Theresa M. Traber
Judicial Assistant: A. He
Courtroom Assistant: F. Sims

CSR: None
ERM: None
Deputy Sheriff: None

reference to the CLRA Ingredients, but as before, simply references the "Class Products" on which the suit is based. Although a list of the precise Class Products at issue was referenced in prior complaints but not attached, such list is actually attached this time. (See SAC, Ex. A.) Plaintiff has also attached a chart showing which CLRA Ingredients are allegedly contained in each Class Product. (SAC, Ex. F.) A brief examination of these two exhibits reveals that some Class Products contain no CLRA Ingredients, such as Build XT (containing only AstraGin and Ashwagandha, non-CLRA Ingredients) or GDA XT (only AstraGin). (See SAC, Ex. F.)

By referencing the Class Products in the CLRA cause of action but not the CLRA Ingredients, the CLRA cause of action seeks damages beyond the scope of Plaintiff's CLRA notice and therefore contains irrelevant or improper matter. The Court will therefore strike it again without prejudice. Plaintiff's CLRA cause of action must be clearly bounded by the CLRA Ingredients of which Plaintiff gave notice.

For the parties' guidance, the Court finds it appropriate that the SAC references non-CLRA Ingredients, as Plaintiff's case is not based solely on the CLRA. Rather, Plaintiff alleges causes of action under the False Advertising Law (Bus. & Prof. Code § 17500 et seq.), Unfair Competition Law (Bus. & Prof. Code § 17200 et seq.), and for negligent and intentional misrepresentation. (See SAC, p. 1.) To the extent that Plaintiff contends that the inclusion of non-CLRA Ingredients supports these other causes of action, those ingredients are properly mentioned. However, Plaintiff must appropriately limit the CLRA cause of action to the CLRA Ingredients. He has not yet done so.

**CONCLUSION**

For the foregoing reasons, the motion is GRANTED with 30 days leave to amend.

Further Status Conference is held. The stay is lifted as to all discovery. The parties are to meet and confer regarding the setting of a class certification deadline, motion hearing date, and briefing schedule. A stipulation and proposed order setting forth an agreed upon schedule is to be submitted by 09/09/2025. Non-Appearance Case Review for Receipt of Stipulation and Proposed Order Re: Class Certification Schedule is scheduled for 09/12/2025 at 04:00 PM in Department 1 at Spring Street Courthouse.

Further Status Conference is scheduled for 12/11/2025 at 09:00 AM in Department 1 at Spring Street Courthouse. A joint report is due five (5) court days in advance of the status conference.




275

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

August 26, 2025
10:30 AM

Judge: Honorable Theresa M. Traber
Judicial Assistant: A. He
Courtroom Assistant: F. Sims

CSR: None
ERM: None
Deputy Sheriff: None

Notice is waived.






276

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for JACKED FACTORY INC.[1]

**Electronically FILED by Superior Court of California, County of Los Angeles 8/22/2025 2:49 PM David W. Slayton, Executive Officer/Clerk of Court, By R. Lozano, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**JOINT FURTHER STATUS CONFERENCE STATEMENT**<br><br>Conference Date: August 26, 2025<br>Time: 10:30 am<br>Dept: 1<br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024<br>Second Amended Complaint: March 27, 2025 |

[1] Defendant "NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY" recently changed its name to JACKED FACTORY, INC. *See* Notice of Name Change filed on August 19, 2025.


277

## I. STATUS OF PLEADINGS

On February 10, 2025, the Court overruled Defendant's Demurrer as to all causes of action and granted Defendant's Motion to Strike only as to the damages request in the CLRA cause of action with 45 days leave to amend. The Court found that Plaintiff could not maintain a claim for damages under the CLRA as to purportedly foreign ingredients that Plaintiff did not identify in his CLRA notice. The Court ordered the parties to meet and confer in good faith before any further amended complaint is filed. On March 18, 2025, the parties held a zoom conference to meet and confer regarding Plaintiff's proposed Second Amended Complaint ("SAC"). Counsel for Jacked Factory explained that the proposed SAC did not comply with the Court's February 10 order because it jumbled together the ingredients Plaintiff identified in his CLRA notice with the various new ingredients for which he did not give any notice, and therefore it did not adequately plead the basis for CLRA damages. Plaintiff disagreed and filed the SAC on March 27, 2025. Defendant filed a Motion to Strike the SAC on April 29, 2025.

On August 14, 2025, at 6:08 pm (pacific), after receipt of Plaintiff's August 13 Opposition to the Motion to Strike, and based on the representations made by Plaintiff in the Opposition, counsel for Defendant reached out to Plaintiff's counsel of record Gustavo Ponce, David McGlothlin, Mona Amini, and Abbas Kazerounian in an attempt to obviate the need to further litigate the Motion to Strike. Counsel for Defendant offered to stipulate to allowing Plaintiff to further amend the SAC to conform to the representations made in the Opposition without prejudice to Defendant's ability to answer or further challenge the amended pleadings. Defendant asked that Plaintiff respond by close of business on August 15, 2025, in light of its reply deadline. Plaintiff's counsel, Gustavo Ponce, was out of the office due to personal matters and thus Defendant received an away message at 6:08 pm (pacific) on August 14, 2025. Defendant did not make any other attempt to contact Plaintiff despite receiving Mr. Ponce's away message. To date, Plaintiff has not responded to the August 14 email.

It is Plaintiff's stance that Defendant's August 14, 2025, email is confusing, misrepresents facts, and Plaintiff's positions overall, making it difficult to respond and unnecessary to do so. Further the same positions in Plaintiff's Opposition to the Motion to Strike the SAC have been


278

explained to Defendant on numerous occasions but they still believe the Motion to Strike the SAC was necessary. The Motion to Strike the SAC was brought by Defendant and has been fully briefed at this point so there is no need for a response.

The Motion to Strike is fully briefed and set for hearing on August 26, 2025.

## II. DISCOVERY

### A. PROTECTIVE ORDERS

Plaintiff's Position:

Plaintiff recognizes that Defendant may require a protective order for confidential information, and Plaintiff is agreeable to a stipulated confidentiality protective order, including the model form found on the Court's website. Plaintiff requests that a stipulated confidentiality protective order be filed no later than September 26, 2025, to avoid any delay in exchange of discovery.

Defendant's Position:

Defendant believes that a protective order will be necessary. Defendant proposes submitting a stipulated protective order two weeks following the Court's ruling on Defendant's Motion to Strike the SAC.

### B. STATUS OF DISCOVERY

Plaintiff's Position:

This Court stated at the February 10, 2025, hearing that discovery is open but Defendant has argued that it has to be limited based on its additional motion. Defendant misrepresents that discovery is stayed.

To the extent that further argument is required, Plaintiff does not believe that discovery should be bifurcated or limited between merits discovery and class discovery or conducted in stages in this California putative class action, but Plaintiff is willing to focus initial efforts on discovery relevant to moving for class certification.

To that end, Plaintiff intends to propound written discovery (Requests for Admissions, Requests for Production, Form Interrogatories, and Special Interrogatories), requesting categories of information such as: (a) information relating to the number of California consumers who

purchased class products within the last four years; (b) Defendant's advertising and marketing in any form in California of the relevant to substantially similar class products; (c) the average price of the class products sold during the class period; (d) Defendant's sales figures as it concerns the relevant class products and the number of units of the products sold in California; (e) information pertaining to contact information retained by Defendant for class members, including e-mail address and phone numbers; (f) information relating to the putative class members maintained by Defendant or its agent/vendors; (g) information relating the ingredients in the class products; and (h) defenses and documentation that Defendants will rely upon to oppose a motion for class certification.

Plaintiff also intends to depose the Person Most Knowledgeable for Defendant after receipt of sufficient written discovery from Defendant, and potentially other individuals with knowledge, such as employees of Defendant and third parties involved in Defendant's advertising campaigns. Plaintiff anticipates needing seven to eight months for discovery to prepare a motion for class certification. Following a motion for class certification, Plaintiff intends to conduct further fact discovery relating to any certified class and also conduct expert discovery. Plaintiff anticipates requiring at least four months after the ruling on a motion for class certification to complete fact discovery, including as to class members in any certified action.

Defendant's Position:

Defendant believes that a continued stay of discovery until after determination of the merits or adequacy of Plaintiff's SAC is a more efficient and cost-effective procedure. The determination of whether the SAC states one or more valid causes of action, and whether Plaintiff may pursue claims related to all products listed in the SAC would unquestionably affect the definition of a putative class or sub-classes. It makes no sense and would be inefficient and unnecessarily burdensome to undertake voluminous and expensive discovery of information related to purported putative class members as to causes of action and products that would or might be dismissed.


280

## III. ALTERNATIVE DISPUTE RESOLUTION

While the Parties both prefer private mediation as an alternative dispute resolution mechanism, no mediation has been scheduled at this time.

Moreover, Defendant does not believe that any settlement discussions will be productive unless and until the Court rules on Defendant's pending Motion to Strike and/or Plaintiff amends his complaint to plead a more definite statement as to the causes of action and relief he seeks to pursue in this litigation.

Plaintiff believes the Court mandating mediation or an alternative dispute resolution mechanism, given the time passage when this case has filed, and all the motion practice will be beneficial to move along this matter.

Dated: August 22, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP APC**

*/s/ Gustavo Ponce*
Gustavo Ponce, Esq.
Attorneys for Plaintiff

**STEPTOE LLP**

*/s/ Melanie A. Ayerh*
Carol R. Brophy
Anthony Hopp (*Pro Hac Vice* forthcoming)
Melanie A. Ayerh
Attorneys for Defendant


281

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On August 22, 2025, I served true copies of the following document(s) described as **JOINT FURTHER STATUS CONFERENCE STATEMENT** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on August 22, 2025, at Los Angeles, California.

*/s/ Grace Calderon*
Grace Calderon


282

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


283

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

**Electronically FILED by Superior Court of California, County of Los Angeles 8/19/2025 1:34 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Covarrubias, Deputy Clerk**

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for JACKED FACTORY INC.

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**NOTICE OF NAME CHANGE OF DEFENDANT** |


284

**TO THE HONORABLE COURT AND TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD**:

PLEASE TAKE NOTICE that Defendant, NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY, has changed its name to JACKED FACTORY INC.

A true and correct copy of the Certificate of Amendment and Articles of Amendment file d with the Registrar of Companies for the Province of Newfoundland and Labrador on February 4, 2025, which documents the name change, is attached hereto as **Exhibit A**.

Dated: August 19, 2025

**STEPTOE LLP**

By: *Ⅰs/ Melanie A. Ayerh*

Carol R. Brophy
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh
*Attorneys for Defendant JACKED FACTORY INC.*








285

# EXHIBIT A


286

Newfoundland Labrador

GOVERNMENT OF NEWFOUNDLAND AND LABRADOR

*THE CORPORATIONS ACT*
*FORM 5*

# CERTIFICATE OF AMENDMENT

(Sections 279, 286)

Corporation Name: **Jacked Factory Inc.**

Corporation Number: **85159**
Date of Amendment: **FEBRUARY 4, 2025**

I certify, as per the attached Articles of Amendment, that the Articles of Incorporation for this Corporation have been amended under the *Corporations Act* of Newfoundland and Labrador.

**REGISTRAR OF COMPANIES**
For Province of Newfoundland and Labrador
FEBRUARY 6, 2025


287

**REGISTRY OF COMPANIES**

Company No. 85159

Filed Feb 4, 2025

Receipt No. 80014652

Registrar of Companies

GOVERNMENT OF NEWFOUNDLAND AND LABRADOR

**Department of Government Services and Lands**

The Corporations Act (Form 4)

**ARTICLES OF AMENDMENT (Sections 54, 285)**

| 1 – Name of Corporation | 2 – Corporation No. |
|---|---|
| Nutra Holdings Inc. | 85159 |

| 3 – The Articles of the above-named corporation are amended as follows: |
|---|
| The name of the Corporation as contained within its Articles be changed from "Nutra Holdings Inc." to: Jacked Factory Inc. |

| Date | Signature | Description of Office |
|---|---|---|
| February 3 1, 2025 | Stephen H. Winter | Solicitor for the Corporation |

*Registry of Companies, PO Box 8700, Confederation Building, St. John's, NL A1B 4J6*

SA

RECEIVED
FEB 04 2025
REGISTRY OF COMPANIES


288

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On August 19, 2025, I served true copies of the following document(s) described as **NOTICE OF NAME CHANGE OF DEFENDANT** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on August 19, 2025, at Los Angeles, California.

*/s/ Grace Calderon*
Grace Calderon


289

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


290

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for JACKED FACTORY INC.

**Electronically FILED by Superior Court of California, County of Los Angeles 8/19/2025 1:33 PM David W. Slayton, Executive Officer/Clerk of Court, By E. Davis, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**REPLY IN SUPPORT OF MOTION TO STRIKE THE SECOND AMENDED COMPLAINT**<br><br>Hearing Date: August 26, 2025<br>Time: 10:30am<br>Dept: 1<br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024<br>Second Amended Complaint: March 27, 2025 |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. PLAINTIFF DOES NOT DISPUTE THAT CLRA DAMAGES ARE LIMITED TO THOSE INGREDIENTS FOR WHICH PLAINTIFF PROVIDED § 1782 NOTICE**

In its ruling on Jacked Factory Inc's[1] ("Jacked Factory") Motion to Dismiss, this Court held, in relevant part:

> … Plaintiff must give notice of the violations actually sued upon so that Defendant may cure or take appropriate action (which may, in the end, be no action at all). Alternatively, Plaintiff may amend his complaint to allege the violations of which he gave notice, if he can do so in good faith. The Court has no way of determining at this stage whether the product Plaintiff purchased contains the L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine of which he gave notice. Finally, Plaintiff may simply abandon his claim for damages under the CLRA and proceed solely on injunctive relief, which has no notice requirement.

February 10, 2025 Order. The Court struck Plaintiff's CLRA damages claim but gave him 45 days to file a Second Amended Complaint ("SAC") specifically identifying the allegedly foreign ingredients contained in the product he allegedly purchased, and on which his CLRA damages claim is allegedly based.

Plaintiff subsequently filed an SAC which in no way complied with this Court's order, and Jacked Factory therefore moved to strike Plaintiff's request for damages under the CLRA as to those ingredients for which Plaintiff failed to give notice consistent with Civil Code § 1782 and this Court's February 10, 2025 Order. (Mot. at 5-6). The Motion explained that the SAC jumbles together the ingredients Plaintiff identified in his CLRA notice (the "CLRA Ingredients") with the various new ingredients for which he did not give notice (the "Non-CLRA Ingredients"). (*Id*. at 6). Jacked Factory's Motion also sought an order striking any claim for CLRA damages as to specific products—Caffeine, BuildXT and GDA XT—that do not contain any CLRA Ingredients. (*Id*.)

---

[1] Defendant "NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY" recently changed its name to JACKED FACTORY INC. *See* Notice of Name Change filed on August 19, 2025.


292

Inexplicably, the Opposition agrees that Plaintiff's "CLRA damages claim is expressly limited to the nine ingredients identified in his March 8, 2023 CLRA notice..." (Opp. at 1) but does not explain how the SAC complies with this express limitation. Plaintiff also concedes that he cannot seek CLRA damages as to the three products: Caffeine, BuildXT and GDA XT.

Rather than defending the SAC as complying with this Court's February 10 order (it does not) the Opposition claims that Plaintiff's counsel instead attempted to describe the limited nature of the CLRA claims in the SAC during "multiple meet-and-confer" discussions. (*Id.*) But even if using "meet and confer" sessions to fix a deficient complaint was somehow allowed under the Code of Civil Procedure, that's not what actually happened here.

The Parties never resolved Jacked Factory's objections to the SAC's description of CLRA Ingredients and Non-CLRA Ingredients during their pre-motion meet and confer efforts. Notably, Plaintiff does not submit any attorney declaration attesting to the "multiple meet-and-confer" discussions because there were none. As outlined in the declaration of Melanie A. Ayerh, the parties attended a single meet and confer conference on March 18, 2025 during which counsel for Defendant raised the issues addressed in the Motion. (Ayerh Decl. ¶¶ 6-7.) Plaintiff's counsel agreed to consider Jacked Factory's arguments and to review the SAC to determine whether Plaintiff would be willing to consider further amendments. (*Id.*) Plaintiff's counsel ultimately refused via email on March 20:

> We have discussed internally what you and I spoke about and we believe that the complaint has plead the facts sufficiently as to the causes of actions. As discussed Defendant was put on notice of the CLRA ingredients on the CLRA letter and while the other ingredients in the complaint point out that there is a multitude of foreign ingredients in Defendant's products which apply further to Plaintiff's other cases of actions. Further there is a table that summarizes the ingredients.

(*Id.* ¶ 8; Ex. B.) Plaintiff's response fell short of resolving the dispute and his express refusal to amend the complaint suggested that any further meet and confer efforts would be futile. Regardless, the SAC does not contain the necessary clarifications outlined in this Court's February 10 order, and Plaintiff's suggestion that counsel somehow described how the SAC modified the FAC in "meet and confer" discussions cannot serve as a substitute for an amended


LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

293

pleading. *Hutton v. Fid. Nat'l Title Co.*, 213 Cal. App. 4th 486, 499 (2013), as modified on denial of reh'g (Feb. 22, 2013).

## II. THE SAC DOES NOT CONFORM TO THE FEBRUARY 10 ORDER AND IS INCONSISTENT WITH THE VARIOUS REPRESENTATIONS MADE IN THE OPPOSITION

The SAC does not adequately separate Plaintiff's allegations regarding the CLRA Ingredients from the Non-CLRA Ingredients. Instead, it seeks relief under the CLRA as to all "Class Products" without limitation. (SAC ¶ 127.) Paragraphs 113 through 129 plead Plaintiff's relief sought under his CLRA cause of action. Plaintiff seeks "damages, restitution, punitive damages, statutory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief" as to all of the "Class Products" without any limitation. (*Id.*) Nowhere in those 17 paragraphs, or elsewhere in the SAC, does Plaintiff explicitly identify which ingredients are relevant (or not relevant) to the various forms of relief he seeks under the CLRA. Worse, Plaintiff's representations in his Opposition that the "other (Non-CLRA ingredients) only apply to Plaintiff's UCL and FAL claims" (Opp. at 1) directly conflict with the allegations in paragraph 127 of the SAC. This Court's February 10 order stated that Defendant should not be left to guess what ingredients are relevant to Plaintiff's CLRA, UCL and FAL claims generally, but that is precisely what Defendant is forced to do. Jacked Factory is forced to guess whether Plaintiff seeks injunctive and declaratory relief under the CLRA as to the non-CLRA ingredients; whether the CLRA cause of action is for damages only so that Plaintiff no longer seeks injunctive and declaratory relief under that cause of action; whether Plaintiff seeks injunctive relief under the CLRA as to the non-CLRA ingredients, etc. The SAC fails to provide the clarification this Court's order mandated.

The Opposition also suggests that "Exhibit F" to the SAC clarifies the limitations on Plaintiff's CLRA claim. (Opp. at 4.) But Exhibit F provides no such clarification, and only further confuses the issues. Exhibit F is a table that purports to identify all "Class Products"[2], their various

---

[2] Defendant disputes that Plaintiff may seek relief as to all products identified in Exhibit F and reserves the right to challenge Plaintiff's standing related to the same at the appropriate time.


LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

294

ingredients and whether or not those ingredients were identified in Plaintiff's CLRA notice. Nowhere in the table does Plaintiff clarify which products and ingredients relate to his CLRA damages claims. Moreover, Exhibit F identifies Caffeine, BuildXT and GDA XT as "Class Products" and states that all ingredients at issue in those three products are Non-CLRA Ingredients. Yet, Plaintiff's CLRA cause of action embraces these three products without limitation. (SAC ¶ 127; *see also* Mot. at fn. 1.) The SAC does not conform to the representations in Plaintiff's opposition to the Motion. The Court should strike any claim for damages under the CLRA as to any ingredient that Plaintiff did not address in his CLRA notice and any product that is alleged to contain those ingredients, including Caffeine, BuildXT and GDA XT.

## III. IN THE ALTERNATIVE, DEFENDANT REQUESTS THAT PLAINTIFF BE REQUIRED TO AMEND HIS COMPLAINT GIVING DEFENDANT A MORE DEFINITE STATEMENT UPON WHICH TO RESPOND

Code of Civil Procedure Section 430.10(f) provides that if a pleading is so vague and ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. Although it did not specifically cite Section 430.10(f), this Court's February 10th order essentially required Plaintiff to provide a more definite statement regarding his CLRA claims. As outlined above and evidenced by the representations made in Plaintiff's Opposition to the Motion, the SAC did not comply with this Court's February 10th order and is otherwise so disjointed that plaintiff's claims under the CLRA remain unclear, vague and ambiguous. Accordingly, as an alternative to striking Plaintiff's allegations, Defendant now moves, pursuant to Section 430.10(f) to have plaintiff file a more definite statement.

On August 14, 2025, after receipt of Plaintiff's Opposition, and based on the representations made in the Opposition, counsel for Defendant reached out to Plaintiff's counsel in an attempt to obviate the need to further litigate the Motion. Counsel for Defendant offered to stipulate to allowing Plaintiff to further amend the SAC to conform to the representations made in the Opposition without prejudice to Defendant's ability to answer or further challenge the amended pleadings. (Supplemental Declaration of Melanie A. Ayerh ¶ 2; Ex. C.) Plaintiff did not respond to Defendant's August 14 email.


295

**IV. <u>CONCLUSION</u>**

If not clarified, Plaintiff's jumbled CLRA claims will have knock on effects, causing ambiguity for the parties' discovery efforts, difficulty for the Court in ruling on discovery matters, and ultimately confusion for the jury. Plaintiff concedes the substance of the Jacked Factory's Motion and the limitations on his CLRA damages. But Plaintiff's SAC intentionally ignores those limits. Accordingly, Defendant respectfully requests that the Court issue an order striking with prejudice: (1) any claim for damages under the CLRA as to any ingredient that Plaintiff did not address in his CLRA notice; and (2) any product that is alleged to contain those ingredients, including Caffeine, BuildXT and GDA XT. Alternatively, Defendant respectfully requests that the Court order the Plaintiff to plead a more definite statement of his CLRA cause of action.

Dated: August 19, 2025

**STEPTOE LLP**

By: */s/ Melanie A. Ayerh*

Carol R. Brophy
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh
*Attorneys for Defendant JACKED FACTORY INC.*




296

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On August 19, 2025, I served true copies of the following document(s) described as **REPLY IN SUPPORT OF MOTION TO STRIKE THE SECOND AMENDED COMPLAINT** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on August 19, 2025, at Los Angeles, California.

*/s/ Grace Calderon*
Grace Calderon


297

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


298

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 8/19/2025 1:33 PM David W. Slayton, Executive Officer/Clerk of Court, By E. Davis, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**SUPPLEMENTAL DECLARATION OF MELANIE A. AYERH**<br><br>Hearing Date: August 26, 2025<br>Time: 10:30 a.m.<br>Dept: 1<br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024<br>Second Amended Complaint: March 27, 2025 |


299

**SUPPLEMENTAL DECLARATION OF MELANIE A. AYERH**

I, Melanie Ayerh, declare and state as follows:

1. I am an attorney duly licensed to practice law in this Court and in all the courts of the State of California. I am an attorney with the law firm of Steptoe, LLP, which is counsel of record for Defendant Jacked Factory Inc. I have personal knowledge of the facts stated in this declaration and could competently testify as to their truth if called upon to do so.

2. On August 14, 2025, after receipt of Plaintiff's Opposition, and based on the representations made in the Opposition, I sent an email to Plaintiff's counsel in an attempt to obviate the need to further litigate the Motion to Strike. The email offered to stipulate to allowing Plaintiff to further amend the SAC to conform to the representations made in the Opposition without prejudice to Defendant's ability to answer or further challenge the amended pleadings.

3. Attached hereto as "**Exhibit C**" is a true and correct copy of the August 14, 2025 correspondence.

4. Plaintiff's counsel did not respond to the August 14, 2025 correspondence.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: August 19, 2025

/s/ *Melanie A. Ayerh*
Melanie A. Ayerh




300

# EXHIBIT C


301

## Ayerh, Melanie

| | |
|---|---|
| **From:** | Ayerh, Melanie |
| **Sent:** | Thursday, August 14, 2025 6:08 PM |
| **To:** | 'Gustavo Ponce'; Hopp, Tony; Sousa, Angela [Contractor - Lexolution]; Brophy, Carol; Calderon, Grace |
| **Cc:** | Abbas Kazerounian; David McGlothlin; Mona Amini |
| **Subject:** | RE: [EXTERNAL] Daniel Rossi v. Nutra Holdings, Inc. d/b/a Jacked Factory |

Gustavo—

We are in receipt of Plaintiff's opposition to the Motion to Strike ("MTS"). Substantively, it appears that Plaintiff does not oppose the contentions in Defendant's MTS which it characterizes as relating to "resolved issues". Opp. at 1. Plaintiff claims that "*Defendant's motion fails because Plaintiff's CLRA damages claim is expressly limited to the nine ingredients identified in his March 8, 2023, CLRA notice, the CLRA Letter Ingredients, while other ingredients only apply to Plaintiff's UCL and FAL claims*." *Id*. It appears that Plaintiff recognizes the limitations on his CLRA damages claims, however, nowhere in the Second Amended Complaint ("SAC") does he expressly plead these limitations and his Opposition to the MTS only confuses the issues. For example, paragraphs 113 – 129 of the SAC related to Plaintiff's causes of action under the CLRA generally seek "damages, restitution, punitive damages, statutory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief" as to all of the "Class Products" without limitation. SAC ¶ 127. Is it plaintiff's contention now, based on the italicized language quoted above from his opposition to the MTS, that he is no longer seeking injunctive and declaratory relief under the CLRA? Moreover, nowhere in those 17 paragraphs, or elsewhere in the SAC, does Plaintiff explicitly identify which ingredients are relevant (or not relevant) to the various relief sought under the CLRA. The table in Exhibit F does not clarify this issue and is equally confusing. For example, "Caffeine" is identified in Exhibit F as a "Class Product" with a single ingredient (caffeine) that is classified as "other foreign ingredients in Product" – therefore Plaintiff concedes that caffeine was not identified in his CLRA notice. Yet, Plaintiff appears to seek all relief under the CLRA as to this single ingredient product. SAC ¶ 127; *see also* MTS at FN 1. The SAC does not conform to the representations in Plaintiff's opposition to the MTS.

It is Defendant's position that Plaintiff must further amend the SAC so that it is consistent with the representations Plaintiff has now made in its opposition to the MTS. Defendant will agree to enter a stipulation to that effect, allowing Plaintiff the opportunity to file a third amended complaint without prejudice to Defendant's right to respond appropriately to any such amended complaint, whether by answer or further pleading challenges. If Plaintiff will agree to such a stipulation and upon execution of the same, Defendant will withdraw the MTS so that only the status conference will proceed on August 26.

Given that Defendant's reply is due in 4 business days, we ask that you please let us know Plaintiff's position regarding the above by no later than COB tomorrow, 8/15.

Thanks,
Melanie

---

**From:** Gustavo Ponce <gustavo@kazlg.com>
**Sent:** Wednesday, August 13, 2025 6:45 PM
**To:** Ayerh, Melanie <mayerh@steptoe.com>; Hopp, Tony <ahopp@steptoe.com>; Sousa, Angela [Contractor - Lexolution] <asousa@steptoe.com>; Brophy, Carol <cbrophy@steptoe.com>; Calderon, Grace <gcalderon@steptoe.com>
**Cc:** Abbas Kazerounian <ak@kazlg.com>; David McGlothlin <david@kazlg.com>; Mona Amini <mona@kazlg.com>;

Singh, Jennifer <jsingh@steptoe.com>
**Subject:** [EXTERNAL] Daniel Rossi v. Nutra Holdings, Inc. d/b/a Jacked Factory

Counsel, attached you will find Plaintiff's Opposition to Defendant's motion to strike the Second Amended Complaint.

Thank you,

Gustavo Ponce, Esq.
*Licensed in California and Nevada*

KAZEROUNI LAW GROUP, APC

6940 S. Cimarron Rd., Suite 210
Las Vegas, Nevada 89113
Direct: (702) 625-9392
Toll free: (800) 400-6808 ext. 20
Fax: (800) 520-5523
www.kazlg.com
www.vegasdebtdefense.com

**Los Angeles - Orange County - San Diego - Riverside**
**San Luis Obispo - Phoenix - Las Vegas - Austin**

**CONFIDENTIALITY NOTICE AND WARNING:**
The information contained in this message (including all attachments) is attorney privileged and confidentialinformation intended only for the use of the individual/s and/or entity named above. If the reader of the message is not the intended recipient or an authorized representative of theintended recipient, I do not intend to waive and do not waive any privileges or the confidentiality of the message/s and/or attachment/s, and you are hereby notified that any dissemination of this communication is strictly prohibited. If you receive this communication in error, please notify me immediately at gustavo@kazlg.com or at (800) 400-6808 ext. 20 and delete the message and attachments from your records. Thank you for your cooperation.


303

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On August 19, 2025, I served true copies of the following document(s) described as **SUPPLEMENTAL DECLARATION OF MELANIE A. AYERH** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on August 19, 2025, at Los Angeles, California.

/s/*Grace Calderon*

Grace Calderon


304

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


305

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**Electronically FILED by Superior Court of California, County of Los Angeles 8/13/2025 6:42 PM David W. Slayton, Executive Officer/Clerk of Court, By C. Perez, Deputy Clerk**

KAZEROUNI LAW GROUP, APC

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No.: 23STCV15674
[Assigned to the Honorable Stuart M. Rice]

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE THE SECOND AMENDED COMPLAINT**

Hearing Date: August 26, 2025
Time: 10:30am
Dept: 1

Complaint Filed: July 6, 2023
First Amended Complaint: August 16, 2024
Second Amended Complaint: March 27, 2025

///

///

///


306

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. FACTS ..... 1

III. LEGAL STANDARD ..... 2

IV. ARGUMENT ..... 3

A. DEFENDANT'S MOTION TO STRIKE THE AMENDED COMPLAINT SHOULD BE DENIED ..... 3

B. THE SAC FULLY COMPLIES WITH THE COURT'S ORDER AND LIMITS PLAINTIFF'S CLRA DAMAGES CLAIM TO THE CLRA LETTER INGREDIENTS ..... 4

C. PLAINTIFF PROVIDED DEFENDANT WITH SUFFICIENT NOTICE UNDER THE CLRA ..... 5

V. CONCLUSION ..... 6


KAZEROUNI LAW GROUP, APC


307

# TABLE OF AUTHORITIES

CASES

*Accord Camanyah v. Am. Honda Motor Co.*,
2023 Cal. Super. LEXIS 5918 (San Diego Cnty. Sup. Ct. Jan. 13, 2023) ..... 6

*Dawes v. Sup. Ct.*,
111 Cal. App. 3d 82 (1980) ..... 5

*Ferraro v. Carmalinghi*,
161 Cal. App. 4th 509, 529 (2008). ..... 6

*Tourfanpour v. Schlosberg*,
No. 30-2023-0136727-CU-BC-WJC,
2024 Cal. Super. LEXIS 32760 (Orange Cnty. Supt. Ct. Aug. 7, 2024) ..... 5

STATUTES

Cal. Bus. & Prof. Code §§ 17200, et seq. ..... 4, 5, 6, 7, 8, 9

Cal. Civ. Code §§ 1750, et seq ..... 4, 5, 6, 7, 8, 9

Cal. Civ. Proc. Code § 436 ..... 5

OTHER AUTHORITIES

Weil & Brown, Cal. Prac. Guide: Civ. Proc. Before Trial (Rutter Group 2023) ..... 5

KAZEROUNI LAW GROUP, APC


308

## I. INTRODUCTION

Plaintiff Daniel Rossi ("Plaintiff"), individually and on behalf of all others similarly situated, submits this response in opposition to the Motion to Strike ("Motion") filed by Defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Defendant") on April 29, 2025.

Plaintiff Daniel Rossi ("Plaintiff") opposes Defendant Nutra Holdings, Inc. d/b/a Jacked Factory's ("Defendant") Motion to Strike the Second Amended Complaint ("Motion"). Defendant's Motion is premised on the incorrect assertion that Plaintiff seeks CLRA damages for ingredients not included in his pre-suit CLRA Notice.[1] As the Second Amended Complaint ("SAC") and multiple meet-and-confer discussions make clear, Plaintiff's CLRA damages claim is limited solely to the ingredients identified in the March 8, 2023 CLRA notice ("CLRA Letter Ingredients"), while claims involving other ingredients ("Non-CLRA Ingredients") are brought only under the UCL and FAL, which do not require pre-suit notice.

Defendant's motion fails because Plaintiff's CLRA damages claim is expressly limited to the nine ingredients identified in his March 8, 2023, CLRA notice, the CLRA Letter Ingredients, while other ingredients only apply to Plaintiff's UCL and FAL claims, which require no pre-suit notice. Defendant misstates the SAC and misrepresents the Court's February 10, 2025, order in an attempt to relitigate resolved issues.

## II. FACTS

On March 8, 2023, Plaintiff served Defendant with a detailed CLRA notice by certified mail, return receipt requested, identifying the CLRA Letter Ingredients—L-Citrulline, Betaine Anhydrous, Beta Alanine, L-Theanine, acetyl-L-Carnitine HCl, Green Tea Leaf Extract, Black Pepper Fruit Extract, Arginine, and Glutathione (together the CLRA Letter Ingredients)—as foreign-sourced and therefore inconsistent with Defendant's "Manufactured in the USA" claims. Defendant received the notice on March 13–15, 2023,[2] and ultimately took no action to cure within 30 days.

---

[1] On or about March 8, 2023, Plaintiff provided Defendant notice in writing by certified mail, return receipt requested, of Defendant's violations of section 1770, provided notice of the CLRA Letter Ingredients, and demanded that Defendant rectify the problems associated with this action and give notice to all affected consumers of Defendant's intent to so act (the "CLRA Notice").

[2] The CLRA Notice was sent to four addresses for Defendant and were received on March 13, 14, and 15, 2023.





LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


309

Plaintiff filed his initial complaint on July 6, 2023—114 days after the CLRA Notice was received by Defendant—and later amended it following the Court's February 10, 2025 order regarding Defendant's Demurrer and Motion to strike the First Amended Complaint. That order gave Plaintiff three options regarding CLRA damages: (1) amend to allege only violations for which notice was given, (2) give new notice as to additional ingredients, or (3) abandon CLRA damages. Plaintiff chose option (2) and made clear in the SAC that the CLRA cause of action seeks damages only for the CLRA Letter Ingredients. The UCL and FAL claims include both CLRA Letter Ingredients and Non-CLRA Ingredients, consistent with those statutes' lack of a notice requirement.

During a March 18, 2025, meet-and-confer, Plaintiff's counsel again explained this distinction, CLRA cause of action seeks damages only for the CLRA Letter Ingredients and not the Non-CLRA Ingredients. Nevertheless, Defendant now moves to strike as if Plaintiff's CLRA damages claim still encompassed Non-CLRA Ingredients—an assertion unsupported by any citation to the SAC.

## III. LEGAL STANDARD

As an initial matter, motions for the strike are highly discouraged. *See Tourfanpour v. Schlosberg*, No. 30-2023-0136727-CU-BC-WJC, 2024 Cal. Super. LEXIS 32760 (Orange Cnty. Supt. Ct. Aug. 7, 2024) (citing Weil & Brown, Cal. Prac. Guide: Civ. Proc. Before Trial (Rutter Group 2023) § 7:180). "The grounds for a motion to strike shall appear on the face of the challenged pleading or from any matter of which the court is required to take judicial notice." Cal. Civ. Proc. Code § 437(a). The Court may then "[s]trike out any irrelevant, false, or improper matter inserted in any pleading" and "[s]trike out all or any part of any pleading not drawn or filed in conformity with the laws of this state, a court rule, or an order of the court." Cal. Civ. Proc. Code § 436.

In ruling on a motion to strike, courts must assume the truth of the complaint's allegations and liberally construe the allegations with a view to substantial justice. *Dawes v. Sup. Ct.*, 111 Cal. App. 3d 82, 91 (1980). Arguments that a complaint fails to state facts sufficient to constitute a cause of action are not grounds for a motion to strike, but for a general demurrer. *Ferraro v. Carmalinghi*, 161 Cal. App. 4th 509, 529 (2008). *Accord Camanyah v. Am. Honda Motor Co.*, No. 37-2022-00019859-CU-BC-CTL, 2023 Cal. Super. LEXIS 5918 (San Diego Cnty. Sup. Ct. Jan. 13, 2023).


310
KAZEROUNI LAW GROUP, APC

**IV. ARGUMENT**

**A. Defendant's Motion to Strike the Amended Complaint Should be Denied**

Plaintiff's SAC contains detailed factual allegations about Defendant's unlawful misrepresentation and false advertising of its dietary supplement products with the false designation and representation that the products were made and/or manufactured in the USA. *See* SAC at ¶¶ 2-3; 14-22; 29-75. Those allegations include details about the specific foreign ingredients that made Defendant's "Manufactured in the USA" claim false and misleading. SAC at ¶¶ 34-35; 37; 41-48; 50-51; 54-56. Specifically, the foreign ingredients in Defendants products include the CLRA Letter Ingredients as well as other foreign ingredients, Non-CLRA Ingredients (caffeine, theobromine, AstraGin[3], and KSM-66 ashwangandha). SAC at ¶ 37; Exhibit F of the SAC. Plaintiff also attached the CLRA letter that he had sent to Defendant, prior to the initiation of litigation, pursuant to Section 1782(d) of the Consumer Legal Remedies Act with the CLRA Letter Ingredients. See Exhibit B to the SAC.

Notably, and as discussed with Defendant and its counsel on numerous occasions, Plaintiff's claims for damages under the CLRA are for the nine (9) ingredients in the CLRA Letter (the "CLRA Letter Ingredients"). See Exhibit B to the SAC. Plaintiff's claims under the UCL and FAL include the CLRA Letter Ingredients and the remaining ingredients in the SAC (the "Non-CLRA Ingredients") which do not require notice contrary to what Defendant attempts to confuse.

Defendant moves to strike Plaintiff's request for damages under to the CLRA as to any ingredient that Plaintiff did not address in his CLRA notice and any product that is alleged to contain those ingredients: Caffeine, BuildXT and GDA XT. See Defendant's Motion, p. 3. Defendant bases its argument on the flawed contention that Plaintiff is claiming damages under the CLRA for the Non-CLRA Ingredients which is patently false. As has been explained on numerous occasions Plaintiff's is claiming CLRA damages for the CLRA Letter Ingredients only and nowhere in the SAC does Plaintiff claim CLRA damages for the Non-CLRA Ingredients. Defendant is unnecessarily muddying the waters and confusing the SAC despite it being on notice the damages under the FAL and UCL

[3] AstraGin® is created from the combination of *Astragalus membranaceus* and *Panax notoginseng.*





KAZEROUNI LAW GROUP, APC

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


311

deal with Non-CLRA Ingredients and the CLRA Ingredients but the CLRA damages only deal with the CLRA Letter Ingredients.

Further Defendant makes grossly misstates the Court's February 10, 2025, order leaving out important information. The Court overruled the demurrer as to all causes of action, granted the motion to strike in part as to the request for damages in the First Cause of Action for violation of the CLRA with 45 days' leave to amend, and otherwise denied the motion to strike in its entirety. The Court ruled that if Plaintiff was to include the Non-CLRA Ingredients then Plaintiff would either need to give new notice or abandon his damages under the CLRA for those ingredients. Most importantly the Court stated "Plaintiff may amend his complaint to allege the violations of which he gave notice"—which Plaintiff did in the SAC.

**B. The SAC Fully Complies with the Court's Order and Limits Plaintiff's CLRA Damages Claim to the CLRA Letter Ingredients**

The Court's February 10, 2025, order gave Plaintiff three options with respect to the CLRA cause of action: (1) amend the complaint to allege only the violations identified in the CLRA notice; (2) provide new notice for any additional ingredients; or (3) abandon CLRA damages and proceed solely on injunctive relief. The Court also directed the parties to meet and confer regarding any amendment.

On March 18, 2025, the parties met and conferred, during which Plaintiff's counsel explicitly confirmed that the CLRA cause of action seeks damages only for the CLRA Letter Ingredients and does not include any Non-CLRA Ingredients. Counsel further explained that while the UCL and FAL causes of action include both the CLRA Letter Ingredients and Non-CLRA Ingredients, those statutes do not require pre-suit notice for damages. Despite this clear and repeated clarification, Defendant filed the present motion, unnecessarily prolonging the case and wasting resources for both the parties and the Court.

The SAC faithfully implements the Court's directive. Plaintiff amended the First Amended Complaint to make clear which ingredients comprise the CLRA Letter Ingredients—ingredients that apply only to the CLRA cause of action. Plaintiff also filed Exhibit F with the SAC, which identifies the CLRA Letter Ingredients and the products containing them; this exhibit was provided to


312

KAZEROUNI LAW GROUP, APC

Defendant before the SAC was filed.

Plaintiff has fully complied with the CLRA's notice requirements. As demonstrated repeatedly, Plaintiff served Defendant with a detailed CLRA notice identifying the CLRA Letter Ingredients, Defendant received that notice, the parties discussed it, more than 30 days elapsed, and Defendant took no corrective action. Defendant now tries to conflate the CLRA claim with the UCL and FAL claims, suggesting that Non-CLRA Ingredients cannot be pursued—an argument irrelevant here because those claims do not require pre-suit notice. More importantly, Defendant cannot cite a single paragraph in the SAC alleging CLRA damages for Non-CLRA Ingredients.

In short, there is nothing to strike. The SAC and Plaintiff's conduct have been consistent from the start: (1) the CLRA cause of action seeks damages only for the CLRA Letter Ingredients, and (2) Non-CLRA Ingredients are not relied upon to support any claim for CLRA damages.

**C. Plaintiff Provided Defendant with Sufficient Notice Under the CLRA**

Defendant's contention that Plaintiff failed to comply with the CLRA's notice requirement is flatly wrong. The CLRA, Cal. Civ. Code § 1782(a)(1), requires that a consumer "[n]otify the person alleged to have…committed methods, acts, or practices declared unlawful by Section 1770 of the particular alleged violations of Section 1770" at least 30 days before filing suit for damages. Plaintiff fully complied. On March 8, 2023, Plaintiff served Defendant with a detailed written notice, sent by certified mail with return receipt requested, identifying the CLRA Letter Ingredients and explaining why their inclusion rendered Defendant's "Manufactured in the USA" claims unlawful. SAC ¶ 121. The notice demanded that Defendant correct the violations and inform affected consumers. Defendant received this notice at four separate addresses between March 13 and March 15, 2023. More than 30 days elapsed—114 days from the latest receipt—before Plaintiff filed suit on July 6, 2023. During that time, Defendant failed to correct or even agree to correct the violations. Indeed, by Defendant's own admission, it did not begin removing the challenged representations from certain products until 2024.

Defendant had ample notice and opportunity to cure, yet chose not to act. The CLRA Notice was clear, specific, and targeted solely to the CLRA Letter Ingredients. Those are the only ingredients for which Plaintiff seeks CLRA damages. The Non-CLRA Ingredients—AstraGin®, theobromine,

KAZEROUNI LAW GROUP, APC


313

caffeine, and KSM-66 ashwagandha—are pled exclusively under the UCL and FAL, which do not require pre-suit notice. Defendant's attempt to conflate the CLRA claims with the UCL and FAL claims is legally irrelevant and factually unsupported. It has not identified any paragraph in the SAC that alleges CLRA damages for Non-CLRA Ingredients because no such allegation exists.

In short, Defendant was given the notice required by statute, had well over the statutory period to remedy the violations, and chose not to do so. Plaintiff is therefore entitled to pursue CLRA damages for the CLRA Letter Ingredients, and no new notice was required. Defendant's argument rests on a misreading of the SAC and an attempt to relitigate issues already resolved by the Court.

## V. CONCLUSION

In conclusion, the Court should deny Defendant's Motion to Strike because there is nothing to strike based on what Defendant argues. Plaintiff's CLRA cause of action for damages relies only on the CLRA Letter Ingredients and Defendant had ample notice of the CLRA Notice and CLRA Letter Ingredients. Plaintiff's claims as to the Non-CLRA Ingredients fall under the UCL and FAL and not the CLRA.

Dated: August 13, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: *_/s/ Gustavo Ponce_*
Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*


314

**PROOF OF SERVICE**

I am over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On August 13, 2025, I served the foregoing document and accompanying attachments by the means indicated below:

☒ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

☒ ELECTRONIC SERVICE - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m. The electronic filing system sends an e-mail notification of the filing to the parties and counsel of record.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Angela M. Sousa
Anthony Hopp
Melanie A. Ayerh
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
jsingh@steptoe.com
asousa@steptoe.com
ahopp@steptoe.com
mayerh@steptoe.com
*Attorneys for Defendant*
*Nutra Holdings, Inc. d/b/a Jacked Factory*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on August 13, 2025, at Las Vegas, Nevada.

*/s/ Gustavo Ponce*
GUSTAVO PONCE

KAZEROUNI LAW GROUP, APC


315

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp<br><br>FILED<br>Superior Court of California<br>County of Los Angeles<br>05/09/2025<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | |
| PLAINTIFF/PETITIONER:<br>Daniel Rossi | |
| DEFENDANT/RESPONDENT:<br>Nutra Holdings, Inc. | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>23STCV15674 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Order upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Abbas Kazerounian
Kazerouni Law Group, APC
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626

Angela M. Sousa
Steptoe LLP
One Market Plaza
Steuart Tower Ste 1070
San Francisco, CA 94105

Melanie Ayerh
Steptoe & Johnson LLP
633 W 5th St
Ste 1900
Los Angeles, CA 90071

Anthony Hopp
STEPTOE LLP
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606

David W. Slayton, Executive Officer / Clerk of Court

Dated: 05/9/2025

By: A. He
Deputy Clerk

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**FILED**
Superior Court of California
County of Los Angeles
05/08/2025
David W. Slayton, Executive Officer / Clerk of Court
By: A. He Deputy

Electronically Received 05/06/2025 02:50 PM

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**~~[PROPOSED]~~ ORDER**<br><br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024<br>Second Amended Complaint: March 27, 2025 |

**~~[PROPOSED]~~ ORDER**

PURSUANT TO STIPULATION OF THE PARTIES AND GOOD CAUSE APPEARING THEREFOR, IT IS ORDERED that the Further Status Conference currently scheduled for May 15, 2025 at 9:00 a.m. is continued to August 26, 2025 at ~~9:00 a.m~~. 10:30 AM.

IT IS SO ORDERED.

DATE: May 8, 2025

Stuart M. Rice / Judge

Honorable Stuart Rice
Superior Court Judge

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On May 6, 2025, I served true copies of the following document(s) described as **[PROPOSED] ORDER** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 6, 2025, at Los Angeles, California.

/s/ Grace Calderon

Grace Calderon


319

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


320

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 5/06/2025 2:50 PM David W. Slayton, Executive Officer/Clerk of Court, By E. Davis, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**STIPULATION TO CONTINUE FURTHER STATUS CONFERENCE FROM MAY 15, 2025 TO AUGUST 26, 2025**<br><br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024<br>Second Amended Complaint: March 27, 2025 |


321

Plaintiff Daniel Rossi ("Plaintiff") and defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Nutra Holdings" and, together with Plaintiff, the "Parties"), through their respective undersigned counsel, hereby stipulate as follows:

WHEREAS, a status conference is currently set in the above captioned matter for May 15, 2025 at 9:00 a.m. in Department 1 of the above titled Court;

WHEREAS, on March 27, 2025, Plaintiff filed a Second Amended Complaint;

WHEREAS, on April 29, 2025 Nutra Holdings filed a Motion to Strike portions of the Second Amended Complaint;

WHEREAS, the hearing on the Motion to Strike is set for August 26, 2025 at 10:30 a.m.;

WHEREAS the Parties have met and conferred and have determined that in the interest of justice and party and judicial economy, the May 15, 2025 Further Status Conference date should be continued to August 26, 2025 so that it may be heard on the same day as the Motion to Strike.

**THEREFORE, THE PARTIES STIPULATE AND RESPECTFULLY REQUEST THAT THE COURT ORDER AS FOLLOWS:**

1. That the Further Status Conference, currently scheduled for May 15, 2025 at 9:00 a.m. be continued to August 26, 2025, or a date thereafter to be determined by the Court.

Dated: May 6, 2025

**KAZEROUNI LAW GROUP, APC**

By: */s/ Gustavo Ponce*
Gustavo Ponce
*Attorney for Plaintiff DANIEL ROSSI*

Dated: May 6, 2025

**STEPTOE LLP**

By: */s/ Melanie A. Ayerh*
Carol R. Brophy
Jennifer K. Singh
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh
*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*


322

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On May 6, 2025, I served true copies of the following document(s) described as **STIPULATION TO CONTINUE FURTHER STATUS CONFERENCE FROM MAY 15, 2025 TO AUGUST 26, 2025** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 6, 2025, at Los Angeles, California.

/s/ Grace Calderon
Grace Calderon


323

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


324

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 5/01/2025 8:46 PM David W. Slayton, Executive Officer/Clerk of Court, By S. Drew, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**DECLARATION OF MELANIE A. AYERH**<br><br>Hearing Date: August 26, 2025<br>Time: 10:30 a.m.<br>Dept: 1<br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024<br>Second Amended Complaint: March 27, 2025 |


325

**DECLARATION OF MELANIE A. AYERH**

I, Melanie Ayerh, declare and state as follows:

1. I am an attorney duly licensed to practice law in this Court and in all the courts of the State of California. I am an attorney with the law firm of Steptoe, LLP, which is counsel of record for Defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Nutra Holdings"). I have personal knowledge of the facts stated in this declaration and could competently testify as to their truth if called upon to do so.

2. On July 6, 2023, Plaintiff filed his initial complaint. The complaint failed to identify any ingredient in the product at issue that was purportedly of foreign origin. Nutra Holdings demurred and moved to strike the initial complaint on May 17, 2024.

3. On August 16, 2024, Plaintiff filed his First Amended Complaint ("FAC") in lieu of an opposition to the demurrer.

4. Nutra Holdings filed a demurrer and motion to strike the FAC, and on February 10, 2025 the Court issued an order granting the demurrer in part with leave to amend. Attached hereto as **Exhibit A** is a true and correct copy of the Court's February 10 Order.

5. On March 14, 2025, counsel for Plaintiff served a copy of Plaintiff's proposed Second Amended Complaint ("SAC") via e-mail.

6. On March 18, 2025, the parties held a zoom conference to meet and confer regarding Plaintiff's proposed SAC. Gustavo Ponce attended on behalf of Plaintiff and my colleague, Anthony Hopp, and I attended on behalf of Nutra Holdings.

7. I informed Plaintiff's counsel that the SAC did not conform with the Court's February 10 Order in that Plaintiff continued to seek CLRA damages for allegedly "foreign" ingredients that were never disclosed in his CLRA notice. I informed counsel that Nutra Holdings intended to challenge the SAC on those grounds. Plaintiff's counsel agreed to consider Nutra Holdings' arguments and to review the SAC to determine whether Plaintiff was willing to consider further amendments to the proposed SAC.



326

8. On October 20, 2025, Plaintiff's counsel sent an email refusing to further amend the SAC and stated that "the complaint has plead the facts sufficiently as to the causes of actions". Attached hereto as **Exhibit B** is a true and correct copy of Plaintiff's October 20 correspondence.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: April 29, 2025

/s/ *Melanie A. Ayerh*
Melanie A. Ayerh


327

# EXHIBIT A


328

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

KAZEROUNI LAW GROUP, APC

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,<br><br>Defendant. | Case No.: 23STCV15674<br>Assigned to the Hon. Stuart M. Rice<br><br>**NOTICE OF RULING** |


329

KAZEROUNI LAW GROUP, APC

1. TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

2. **PLEASE TAKE NOTICE** that on February 10, 2025, the Court issued its tentative ruling and held a hearing on Defendant's Demurer and Motion to Strike Plaintiff's First Amended Complaint. On February 10, 2025, the Court issued its Minute Order regarding the hearing, a copy of which is attached hereto as Exhibit 1, which orders as follows:

3. The Court adopted its tentative Ruling re Defendant's Demurer and Motion to Strike Plaintiff's First Amended Complaint, copies of which are attached hereto as Exhibit 2, respectively;

4. Defendant's Demurrer is **OVERRULED** as to all causes of action;

5. Defendant's motion to strike is **GRANTED IN PART** as to the request for damages in the First Cause of Action for violation of the CLRA with 45 days' leave to amend and is otherwise **DENIED.**

6. Plaintiff has 45 days from February 10, 2025, (March 27, 2025) to amend the Complaint;

7. Plaintiff must meet and confer with Defendant regarding Plaintiff's amendment to the Complaint pursuant to CCP 430.14 within 45 days of February 10, 2025.

8. A Status Conference is scheduled for May 15, 2025, at 9:00 am (pst) in Department 1;

9. Plaintiff and Defendant to file a joint report 3-5 days prior to the May 15, 2025, Status Conference;

10. Plaintiff and Defendant will meet and confer regarding potential resolution prior to the May 15, 2025, Status Conference;

11. Plaintiff to give notice.

Dated: February 10, 2025

**KAZEROUNI LAW GROUP, APC**

By: ______________________

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*


330

KAZEROUNI LAW GROUP, APC

# PROOF OF SERVICE

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On February 10, 2025, I served the foregoing document and accompanying attachments by the means indicated below:

**NOTICE OF RULING**

☒ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K/ Singh
Angela M. Sousa
Anthony Hopp
Melanie A. Ayerh
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
jsingh@steptoe.com
asousa@steptoe.com
ahopp@steptoe.com
mayerh@steptoe.com
*Attorneys for Defendant*
*Nutra Holdings, Inc. d/b/a Jacked Factory*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on February 10, 2025, at Las Vegas, Nevada.

GUSTAVO PONCE


331

KAZEROUNI LAW GROUP, APC

# EXHIBIT 1


332

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

February 10, 2025
10:30 AM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: R. Sims

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Gustavo Ponce via LACC

For Defendant(s): Melanie Ayerh

**NATURE OF PROCEEDINGS:** Hearing on Defendant Nutra Holdings, Inc.'s Demurrer, or in the Alternative, Motion to Strike First Amended Complaint; Further Status Conference

The matter is called for hearing.

Oral argument is heard. The Court adopts its tentative ruling as its final ruling as follows:

**Demurrer overruled as to all causes of action. Motion to strike granted as to damages request in the CLRA cause of action with 45 days leave to amend and otherwise denied.**

This is a consumer proposed class action. Plaintiff Daniel Rossi (Plaintiff) contends that defendant Nutra Holdings, Inc., doing business as Jacked Factory (Defendant) represents to consumers that its dietary supplements are "manufactured in the USA" when they are wholly or substantially made with ingredients manufactured outside the United States of America. Plaintiff brings suit under the Consumer Legal Remedies Act (CLRA, Civ. Code § 1750 et seq.), False Advertising Law (FAL, Bus. & Prof. Code § 17500 et seq.), and Unfair Competition Law (UCL, Bus. & Prof. Code § 17200 et seq.), and for negligent and intentional misrepresentation. Defendant demurs to Plaintiff's First Amended Complaint (FAC) and, in the alternative, moves to strike portions of it.

**Legal Standards**

**1. Demurrer**

A demurrer for sufficiency tests whether the complaint states a cause of action. (*Hahn v. Mirda* (2007) 147 Cal. App. 4th 740, 747.) When considering demurrers, courts read the allegations liberally and in context. (*Taylor v. City of Los Angeles Dept. of Water and Power* (2006) 144 Cal. App. 4th 1216, 1228.) In a demurrer proceeding, the defects must be apparent on the face of the pleading or by proper judicial notice. (CCP § 430.30(a).) A demurrer tests the pleadings alone and not the evidence or other extrinsic matters. (*SKF Farms v. Superior Court* (1984) 153 Cal. App. 3d 902, 905.) Therefore, it lies only where the defects appear on the face of






333

the pleading or are judicially noticed. (*Id*.) The only issue involved in a demurrer hearing is whether the complaint, as it stands, unconnected with extraneous matters, states a cause of action. (*Hahn v. Mirda, supra,* 147 Cal.App.4th at 747.)
"On demurrer the allegations of the complaint are assumed to be true. A demurrer is simply not the appropriate procedure for determining the truth of disputed facts." (*Ramsden v. Western Union* (1977) 71 Cal.App.3d 873, 879.) "Less particularity is required when it appears that defendant has superior knowledge of the facts, so long as the pleading gives notice of the issues sufficient to enable preparation of a defense." (*Okun v. Superior Court* (1981) 29 Cal.3d 442, 458.) "If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38.) "[A] plaintiff is required only to set forth the essential facts of his case with reasonable precision and with particularity sufficient to acquaint a defendant with the nature, source and extent of his cause of action." (*Youngman v. Nevada Irrigation District* (1969) 70 Cal.2d 240, 245; see also *Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins. Exchange* (2005) 132 Cal.App.4th 1076, 1099.)

**2. Motion to Strike**

"Any party, within the time allowed to respond to a pleading may serve and file a notice of motion to strike the whole or any part thereof[.]" (Code Civ. Proc. § 435(b)(1).) "The court may, upon a motion made pursuant to Section 435, or at any time in its discretion, and upon terms it deems proper: (a) Strike out any irrelevant, false, or improper matter inserted in any pleading. (b) Strike out all or any part of any pleading not drawn or filed in conformity with the laws of this state, a court rule, or an order of the court." (Code Civ. Proc. § 436.) "The grounds for a motion to strike shall appear on the face of the challenged pleading or from any matter of which the court is required to take judicial notice." (Code Civ. Proc. § 437(a).)

**Request for Judicial Notice**

Defendant requests that the Court take judicial notice of a number of web pages from its own website (jackedfactory.com) and Amazon.com "identifying the ingredient list for each such product listed on Plaintiff's 'Exhibit A' that does not contain any of the allegedly 'foreign' ingredients identified in the First Amended Complaint." Although the contents of public websites are ostensibly matters that would be subject to judicial notice, a review of the papers indicates that Defendant seeks to use the websites to establish what the contents of the products themselves are. (See Defendant's Memorandum, p. 9.) This is not a proper use of judicial notice. (See *Malek Media Group LLC v. AXQG Corp.* (2020) 58 Cal.App.5th 817, 826 [offering

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

February 10, 2025
10:30 AM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: R. Sims

CSR: None
ERM: None
Deputy Sheriff: None

material for judicial notice "for the truth of their contents" is "not a proper use of judicial notice. At most, we could judicially notice the existence of the press releases, but not the truth of their contents [citation], which are 'plainly subject to interpretation and for that reason not subject to judicial notice[.]'"]) Defendant offers no theory on which the contents of the products themselves could be judicially noticed at this stage, and that is the ultimate fact which Defendant seeks to use here. Defendant's request for judicial notice is **denied.**

Plaintiff requests that the Court take judicial notice of a "Scientific Opinion" from EFSA Journal purporting to establish that "Panax notoginseng and Astragalus membranaceus, which create AtraGin, are not from the USA and are sourced from Gansu and Inner Mongolia provinces in China, and from Yunnan and Sichuan provinces in China." This presents the identical issue as Defendant's request, namely that the Court cannot so determine without accepting the contents of the article for its truth, and the truth of those contents does not appear to be indisputable. Plaintiff's request is **denied.**

Defendant has not requested judicial notice of Plaintiff's CLRA demand letter, which is attached to the declaration of Melanie Ayerh as Exhibit 1. However, Plaintiff does not dispute the authenticity of the letter, and contends in fact that the letter is "incorporated by reference in Plaintiff's Complaint and the FAC." (See Plaintiff's Opposition Memorandum, p. 3, fn. 4.) The Court therefore notifies the parties that it intends to take judicial notice of the CLRA demand letter, on its own motion pursuant to Evid. Code § 455 and subject to the parties' right to meet the information.

## Discussion

### I. Specificity of Fraud Allegations

As held in *Lazar v. Superior Court* (1996) 12 Cal.4th 631 (*Lazar*):

> In California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] "Thus '"the policy of liberal construction of the pleadings ... will not ordinarily be invoked to sustain a pleading defective in any material respect.' " [Citation.] [¶] This particularity requirement necessitates pleading facts which show how, when, where, to whom, and by what means the representations were tendered." [Citation.] (*Id.* at 645.)

Defendant contends that Plaintiff's claims lack the required specificity. Plaintiff's FAC alleges, in pertinent part:


335

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674** February 10, 2025
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.** 10:30 AM

Judge: Honorable Stuart M. Rice CSR: None
Judicial Assistant: A. He ERM: None
Courtroom Assistant: R. Sims Deputy Sheriff: None

18. Defendant's "Manufactured in the United States" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."
[¶]
20. As of July 2023, when the first complaint in this matter was filed, Defendant's website contained a clear and conspicuous "Manufactured in the USA" claim under iconography of a waiving United States flag encircled by the words "Manufactured in the USA" making it clear that Defendant meant this claim to be applied to *all* its products. This claim, including iconography, appeared on each and every product page of Defendant's website as well as Defendant's Amazon.com product pages.

21. Even after the filing of this matter, according to publicly archived webpages, as of January 2024 or even later, the main home page of Defendant's website still contained a clear and conspicuous "Manufactured in the USA" claim under same iconography of a waiving United States flag encircled by the words "Manufactured in the USA" thus making it more evident that Defendant meant this claim to be applied to *all* its products—even after the Complaint was filed in this matter.
[Image]

22. According to publicly archived webpages, as of November 2023 or even later, the "Frequently Asked Questions" page of Defendant's website contained the following answer in response to the question: "Where are your products manufactured?"
"Answer: **Our products are manufactured in the USA** in a cGMP, FDA Registered manufacturing facility adhering to the strictest quality control." (emphasis added)
[¶…¶]
32. The offending Product purchased by Plaintiff contains or is made with ingredients and/or components that are not "Manufactured in the USA." For example, the Product contains two herbal ingredients that are native to China and not commercially grown in the United States; *Astragalus membranaceus* and *Panax notoginseng*. These ingredients are sourced from China or other Asian countries. Irrespective of exactly where these two ingredients are sourced, one thing is certain – they are not grown, made or sourced from the United States.
[¶…¶]
41. The ingredients in the Product and the Class Products are the same or substantially similar, therefore, the Class Products and Defendant's misrepresentations of them are substantially similar to the Product and the misrepresentation of the Product.




336

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

February 10, 2025
10:30 AM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: R. Sims

CSR: None
ERM: None
Deputy Sheriff: None

> 42. For example, caffeine is included in numerous of Defendant's products other than the Product, including, but not limited to, NitroSurge Shred (also contains theobromine), NitroSurge Build, Burn-XT, Build-XT Black (also contains theobromine), Burn-XT Powder, Wick Mode Pre Workout and NitroSurge Shred Max.
>
> 43. *Astragalus membranaceus* and *Panax notoginseng* are included in numerous products other than the Product, including but not limited to, NitroSurge Build, Pump Surge, Build-XT, GDAXT, Wick Mode Pre Workout, NitroSurge Shred Max and Build XT Max – Elite Muscle Builder.
>
> 44. Defendant uses numerous other indisputably foreign ingredients in numerous of its products, including but not limited to KSM-66 ashwagandha and green tea extract
>
> 45. Despite the presence of numerous indisputable foreign ingredients in the Class Products, Defendant made unqualified "Manufactured in the USA" representations on the main page of its website, on each product page, on each Amazon.com product page and even in the "Frequently Asked Questions" section of its website.
> (FAC, footnotes omitted.)

These allegations are sufficient to put Defendant on notice of the nature of Plaintiff's claims under the heightened pleading standard for misrepresentation claims. Plaintiff alleges that before the filing of the Complaint and until at least January 2024, Defendant made misrepresentations to the general public over the internet about its products being manufactured in the USA, when they contained ingredients which were not, including caffeine, theobromine, astragalus membranaceus, panax notoginseng, KSM-66 ashwagandha, and green tea extract. This fulfills *Lazar'*s requirement to allege "how, when, where, to whom, and by what means the representations were tendered." (See *Lazar, supra,* 12 Cal.4th at 645.)

Defendant argues that Plaintiff does not allege adequate facts supporting the falsity of the representation, such as alleging the countries of origin of the ingredients. Nothing Defendant presents imposes such a requirement on Plaintiff at the pleading stage. *Colgan v. Leatherman Tool Group, Inc.* and *Benson v. Kwikset Corp.* did not involve pleadings motions and say nothing about whether the complaints at issue met the requisite pleading standard. (See *Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 672 [appeal was from grant of summary judgment]; *Benson v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254, 1262 [appeal was of judgment entered after trial.]) In *Kwikset Corp. v. Superior Court,* the question at bar was the allegations of injury in fact in light of the recently enacted Proposition 64, not the sufficiency of the falsity allegations or the "how, when, where, to whom, and by what means" questions

of *Lazar*. (See *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 319-320.) That these cases may have had more robust falsity allegations is irrelevant and unhelpful to Defendant's arguments on demurrer.

*Alaei v. Kraft Heinz Food Co.* (S.D. Cal. Apr. 22, 2016, No. 15cv2961-MMA) 2016 WL 11621800 (nonpub. opn.), aside from being an unpublished district court decision, is distinct. The whole of the plaintiff's allegations there was:

> In November of 2015, Plaintiff purchased Defendant's Heinz 57 Sauce (the "Product") from an Albertsons grocery store located on 1133 Mission Road in Fallbrook, California. At the time of Plaintiff's purchase, the offending Product was described as manufactured in the U.S.A., when the Product actually was made and/or contained components made outside of the United States. As such, Defendant is not entitled to lawfully make representations that the Product was "MFD. In U.S.A."
> (*Id.* at p. 2.)

The only ingredients the plaintiff identified did not correspond to the Heinz 57 Sauce the plaintiff purchased. (*Id.* at p. 3.) The District Court found that these allegations fell short of the "who, what, where, when, and how" requirements of the pleading standard. (*Ibid.*) Plaintiff's allegations here are much more robust and correspond to the product he purchased.

Because the allegations noted above are not stated on information and belief, it is unnecessary to address whether Plaintiff has asserted sufficient facts to justify any information and belief allegations. (See *Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1159.)

For the foregoing reasons, the Court will overrule the demurrer to the fourth and fifth causes of action for negligent and intentional misrepresentation on this ground.

### II. Sufficiency of Allegations Concerning UCL, FAL, and CLRA Claims

Defendant argues that for the same reasons, Plaintiff's allegations fail under the Unfair Competition Law (UCL, Bus. & Prof. Code § 17200 et seq.), False Advertising Law (FAL, Bus. & Prof. Code § 17500 et seq.), and Consumers Legal Remedies Act (CLRA, Civ. Code § 1750 et seq.). For the reasons discussed above, Plaintiff's allegations are sufficient to allege that Defendant made false statements to consumers concerning the product Plaintiff bought, at a minimum, and are not simply "contentions, deductions, or conclusions of fact or law" as would support a demurrer. (See *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924.) The Court will overrule the demurrer to the first, second, and third causes of action on this


338

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

February 10, 2025
10:30 AM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: R. Sims

CSR: None
ERM: None
Deputy Sheriff: None

ground.

**III. Request for Injunctive Relief**

Defendant contends that it has removed the "Manufactured in the USA" language from its website, Amazon.com, and all other websites over which it maintains control, based on a declaration from its founder and CEO (see Williams Decl., ¶ 3) and that the Court should therefore strike Plaintiff's request for an injunction. It is axiomatic that motions to strike may be based only on the face of the pleading or matters of which the Court may properly take judicial notice. (Code Civ. Proc. § 437(a).) To the extent that Defendant's motion depends on Mr. Williams's declaration, it cannot be granted.

Defendant also contends that Plaintiff does not establish Defendant has unbridled control of the representations made by certain third parties. This argument is somewhat in conflict with Mr. Williams' declaration, which purports to establish that Defendant has control of certain third party websites and not others. Defendant identifies no part of Plaintiff's complaint subject to being stricken due to a purported lack of control. The Court will therefore not grant the motion to strike this portion of the FAC.

**IV. Allegations Concerning Products Plaintiff Did Not Buy**

Defendant argues that Plaintiff lacks standing as a matter of law to bring claims pertaining to any products other than the one he purchased (i.e. Jacked Factory Nitrosurge Pre-workout dietary supplement).

This argument does not appear to be based on any California law. *Johns v. Bayer Corp.,* an unreported case from the U.S. District Court for the Southern District of California, does not cite any California law in support of the language Defendant relies on, nor does *Bruton v. Gerber Products Company.* (See *Johns v. Bayer Corp.* (S.D. Cal. Feb. 9, 2010, No. 09CV1935 DMS (JMA)) 2010 WL 476688 (nonpub. opn.), p. 5; *Bruton v. Gerber Products Company* (N.D. Cal. Jan. 15, 2014, No. 12-CV-02412-LHK) 2014 WL 172111 (nonpub. opn.), p. 8.)

Plaintiff is not alleging that he was harmed by any representations connected with a product he did not purchase. Rather, he seeks to represent a class of people who he claims purchased products subject to similar misrepresentations. (See FAC, ¶¶ 3, 77.) Whether people who purchased other products are similarly situated to Plaintiff is a paradigmatic class certification inquiry. As Defendant presents nothing permitting the Court to determine this question as a matter of law at this stage in the litigation, the Court will not strike these allegations, but






339

recognizes this issue may come before the Court again in a different context.

**V. Insufficiency of CLRA Notice**

If a plaintiff seeks damages in a CLRA action, the statute requires pre-suit notice to the defendant:

> (a) Thirty days or more prior to the commencement of an action for damages pursuant to this title, the consumer shall do the following:
> (1) Notify the person alleged to have employed or committed methods, acts, or practices declared unlawful by Section 1770 of the particular alleged violations of Section 1770.
>
> (2) Demand that the person correct, repair, replace, or otherwise rectify the goods or services alleged to be in violation of Section 1770.
>
> The notice shall be in writing and shall be sent by certified or registered mail, return receipt requested, to the place where the transaction occurred or to the person's principal place of business within California.
> (Civ. Code § 1782(a).)

"That requirement exists in order to allow a defendant to avoid liability for damages if the defendant corrects the alleged wrongs within 30 days after notice, or indicates within that 30–day period that it will correct those wrongs within a reasonable time." (*Morgan v. AT&T Wireless Services, Inc.* (2009) 177 Cal.App.4th 1235, 1261 (*Morgan*).)

Defendant contends that Plaintiff's CLRA notice letter was insufficient because it does not identify the purportedly foreign ingredients in the product at issue (i.e. *Astragalus membranaceus, Panax notoginseng*, theobromine, Caffeine or KSM-66 ashwagandha) but other ingredients which are not in the product, and Plaintiff's FAC contains no mention of the substances which are mentioned in the CLRA notice letter.

The letter reads, in pertinent part:

> Contrary to its "Manufactured in the USA" representation, many, if not all, products produced and sold by Jacked Factory contain or are made with ingredients that are not "Manufactured in the USA." For example, the Product contains L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine, which in this instance,
> among other ingredients in the product, are not from the United States, yet its advertising

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

February 10, 2025
10:30 AM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: R. Sims

CSR: None
ERM: None
Deputy Sheriff: None

states "Manufactured in the USA." Similarly, Jacked Factory's Burn-XT contains acetyl-L-Carnitine HCl, Green Tea Leaf Extract and Black Pepper Fruit Extract, which in this instance, among other ingredients in the product, are not from the United States, yet the advertising on its webpage, at https://www.jackedfactory.com/products/burn-xt, also states "Manufactured in the USA." Jacked Factory' s N.O. XT contains Arginine, Glutathione and Citrulline, which in this instance, among other ingredients in the product, are not from the United States, yet its advertising states "Manufactured in the USA" (See https://www.jackedfactory.com/products/no-xt). Additionally, on Jacked Factory's website, it even lists an "FAQ" of "Where is [Product] Manufactured" on each of its product's website pages to which the response by Jacked Factory is "All Jacked Factory products are ***proudly manufactured in the USA*** in a cGMP certified facility using the highest quality control guidelines for maximum potency, quality, & safety." (emphasis added).

The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here. However, it is abundantly clear that Jacked Factory pays no attention to applicable laws regarding the labeling of its products with "Manufactured in the USA", or any derivative thereof. **Therefore, each and every one of Jacked Factory products regardless of brand, type, configuration or size, including but not limited to the aforementioned brands and products, containing foreign ingredients, components or raw materials and any reference to "Manufactured** in **the USA" or any derivative thereof, is subject to the demand/s made in this letter. Please note that should this firm file suit on behalf of our client, we will seek to represent the purchasers of any and all of Jacked Factory misrepresented products.**

Section 1770(a) of the CLRA prohibits, among other things, the following unfair methods of competition and unfair or deceptive acts or practices when attempting to sell or selling goods and services to consumers: (2) Misrepresenting the source, sponsorship, approval, or certification of goods or services; (3) Misrepresenting the affiliation, connection, or association with, or certification by, another; ( 4) Using deceptive representations or designations of geographic origin in connection with goods or services; (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have; (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (9) Advertising goods






341

> or services with intent not to sell them as advertised. *(See* Cal. Civil Code sections 1770(a) (2), (3), (4), (5), (7), and (9).)
>
> The above-described representations and/or omissions are false and misleading and constitute unlawful, unfair, or fraudulent acts, or practices and unfair methods of competition in violation of the CLRA, including but not limited to§§ 1770(a)(2), (3), (4), (5), (7), and (9). The representations also violate California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq;* and California's False Advertising Law, California Business & Professions Code §§ 17500, *et seq.* Jacked Factory has and continues to mislead consumers into believing that its products containing the aforementioned ingredients, among others, are "Manufactured in the USA," when in fact that is not true. These misrepresentations allow Jacked Factory to increase its sales and capture market share from its competitors.
> (Ayerh Decl., Ex. 1, pp. 2-3, emphasis in original.)

Defendant contends that Plaintiff's failure to identify in the CLRA notice the specific ingredients that Plaintiff argues are foreign-procured dooms the CLRA claim for lack of notice.

> The CLRA was enacted not just to "protect consumers against unfair and deceptive business practices" but also "to provide efficient and economical procedures to secure such protection." ([Civ. Code] § 1760.) Avoiding litigation when appropriate corrective action has been proffered by the merchant, regardless of whether the relief is requested in the form of monetary damages or restitution of property, achieves this latter goal. (*Ibid.*) (*DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 380.)

"This clear purpose may only be accomplished by a literal application of the notice provisions." (*Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30, 41.) That purpose cannot be served by a CLRA notice unless the notice describes with sufficient particularity what acts need to be corrected. In this context, that means identifying the ingredients in the product Plaintiff purchased which Plaintiff contended were manufactured or procured from outside the United States, so that Defendant could determine whether that contention required any corrective action. If the notice describes certain acts (including L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine in a product held out as "Manufactured in USA"), and the manufacturer believes that those allegations are not meritorious and do not expose it to any liability, the appropriate action is to do nothing. If a plaintiff then brings suit based on different acts (including Theobromine, Caffeine, *Astragalus membranaceus, Panax notoginseng,* and KSM-66 Ashwagandha in the product), the defendant has had no opportunity to correct those acts and the purpose of avoiding litigation is entirely




342

frustrated.

As recognized in *Morgan,* it is inappropriate to foreclose the CLRA claim with prejudice based on lack of notice. (See *Morgan, supra,* 177 Cal.App.4th at 1261.) Instead, the claim should be "dismissed until 30 days or more after the plaintiff complies with the notice requirements. If, before that 30–day period expires the defendant corrects the alleged wrongs or indicates it will correct the wrongs, the defendant cannot be held liable for damages." (*Ibid.*) Again, in this context, that means that Plaintiff must give notice of the violations actually sued upon so that Defendant may cure or take appropriate action (which may, in the end, be no action at all). Alternatively, Plaintiff may amend his complaint to allege the violations of which he gave notice, if he can do so in good faith. The Court has no way of determining at this stage whether the product Plaintiff purchased contains the L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine of which he gave notice. Finally, Plaintiff may simply abandon his claim for damages under the CLRA and proceed solely on injunctive relief, which has no notice requirement. (See *Kagan v. Gibraltar Savings & Loan Association* (1984) 35 Cal.3d 582, 590, disapproved on other grounds in *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 643 fn. 3.)

For the foregoing reasons, the Court will grant the motion to strike the request for damages in the CLRA claim with 45 days leave to amend. Because the Court's intention is to grant with leave, the Court will address Defendant's argument based on the making of an appropriate correction, as that question may recur.

### VI. Appropriate Correction

The CLRA provides:

> (b) Except as provided in subdivision (c), no action for damages may be maintained under Section 1780 if an appropriate correction, repair, replacement, or other remedy is given, or agreed to be given within a reasonable time, to the consumer within 30 days after receipt of the notice.
> (c) No action for damages may be maintained under Section 1781 upon a showing by a person alleged to have employed or committed methods, acts, or practices declared unlawful by Section 1770 that all of the following exist:
>
> > (1) All consumers similarly situated have been identified, or a reasonable effort to identify such other consumers has been made.
> >
> > (2) All consumers so identified have been notified that upon their request the

person shall make the appropriate correction, repair, replacement, or other remedy of the goods and services.

(3) The correction, repair, replacement, or other remedy requested by the consumers has been, or, in a reasonable time, shall be, given.

(4) The person has ceased from engaging, or if immediate cessation is impossible or unreasonably expensive under the circumstances, the person will, within a reasonable time, cease to engage, in the methods, act, or practices.

(Civ. Code § 1782.)

Defendant contends that it has substantially complied with the steps under Civ. Code § 1782(c), such that Plaintiff's action for damages ought to be foreclosed. Specifically, Defendant contends that it has removed the "Manufactured in USA" statements from its website as required by subdivision (c)(4), and that the first three subdivisions have been satisfied because it is inappropriate and unreasonable to require Defendant to take those steps.

As discussed above, Defendant's extrinsic evidence cannot be considered on demurrer. Moreover, the appropriateness of corrections under this section is a matter of judicial discretion, requiring evidence. (*Benson v. Southern California Auto Sales, Inc.* (2015) 239 Cal.App.4th 1198, 1207 ["[T]he trial court should use its discretion, basing it on substantial evidence, to determine whether a correction was appropriate[.]") This makes it an inappropriate issue for demurrer. If the correction were a discrete matter whose resolution could be judicially noticed, that would be one thing, but the Court cannot determine without evidence that as a matter of law, it is unreasonable for Defendant to identify consumers similarly situated to Plaintiff and make an appropriate correction as to those consumers. The Court has no evidence (and can consider none at this stage) of what Defendant's ability is to identify its customers or extend refunds or corrections to them. The Court will not sustain the demurrer or grant the motion to strike on this ground.

**Conclusion**

For the foregoing reasons, the demurrer is **overruled** as to all causes of action. The motion to strike is **granted in part** as to the request for damages in the First Cause of Action for violation of the CLRA with 45 days' leave to amend and is otherwise **denied.** Plaintiff to give notice.


344

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

February 10, 2025
10:30 AM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: R. Sims

CSR: None
ERM: None
Deputy Sheriff: None

Further Status Conference is scheduled for 05/15/2025 at 09:00 AM in Department 1 at Spring Street Courthouse. A joint report is due three (3) to five (5) court days in advance of the status conference. If another motion is filed and scheduled, the Court will continue the Further Status Conference to follow the motion hearing date.

Plaintiff to give notice.


345

# EXHIBIT 2


346

**DEPARTMENT 1 LAW AND MOTION RULINGS**

---

**Case Number:** 23STCV15674 **Hearing Date:** February 10, 2025 **Dept:** 1

Moving Party: Defendant Nutra Holdings, Inc. d/b/a Jacked Factory
Responding Party: Plaintiff Daniel Rossi
Ruling: **Demurrer overruled as to all causes of action. Motion to strike granted as to damages request in the CLRA cause of action with 45 days leave to amend and otherwise denied.**

This is a consumer proposed class action. Plaintiff Daniel Rossi (Plaintiff) contends that defendant Nutra Holdings, Inc., doing business as Jacked Factory (Defendant) represents to consumers that its dietary supplements are "manufactured in the USA" when they are wholly or substantially made with ingredients manufactured outside the United States of America. Plaintiff brings suit under the Consumer Legal Remedies Act (CLRA, Civ. Code § 1750 et seq.), False Advertising Law (FAL, Bus. & Prof. Code § 17500 et seq.), and Unfair Competition Law (UCL, Bus. & Prof. Code § 17200 et seq.), and for negligent and intentional misrepresentation. Defendant demurs to Plaintiff's First Amended Complaint (FAC) and, in the alternative, moves to strike portions of it.

## Legal Standards

### Demurrer

A demurrer for sufficiency tests whether the complaint states a cause of action.¿ (*Hahn v. Mirda* (2007) 147 Cal. App. 4th 740, 747.) ¿When considering demurrers, courts read the allegations liberally and in context.¿ (*Taylor v. City of Los Angeles Dept. of Water and Power*¿(2006) 144 Cal. App. 4th 1216, 1228.)¿ In a demurrer proceeding, the defects must be apparent on the face of the pleading or by proper judicial notice. (CCP § 430.30(a).)¿ A demurrer tests the pleadings alone and not the evidence or other extrinsic matters. (*SKF Farms v. Superior Court* (1984) 153 Cal. App. 3d 902, 905.)¿ Therefore, it lies only where the defects appear on the face of the pleading or are judicially noticed. (*Id.*)¿ The only issue involved in a demurrer hearing is whether the complaint, as it stands, unconnected with extraneous matters, states a cause of action.¿ (*Hahn v. Mirda, supra,* 147 Cal.App.4th at 747.)

"On demurrer the allegations of the complaint are assumed to be true. A demurrer is simply not the appropriate procedure for determining the truth of disputed facts." (*Ramsden v. Western Union* (1977) 71 Cal.App.3d 873, 879.) "Less particularity is required when it appears that defendant has superior knowledge of the facts, so long as the pleading gives notice of the issues sufficient to enable preparation of a defense." (*Okun v. Superior Court* (1981) 29 Cal.3d 442, 458.) "If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38.) "[A] plaintiff is required only to set forth the essential facts of his case with reasonable precision and with particularity sufficient to acquaint a defendant with the nature, source and extent of his cause of action." (*Youngman v. Nevada Irrigation District* (1969) 70 Cal.2d 240, 245; see also *Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins. Exchange* (2005) 132 Cal.App.4th 1076, 1099.)

### Motion to Strike


347

"Any party, within the time allowed to respond to a pleading may serve and file a notice of motion to strike the whole or any part thereof[.]" (Code Civ. Proc. § 435(b)(1).) "The court may, upon a motion made pursuant to Section 435, or at any time in its discretion, and upon terms it deems proper: (a) Strike out any irrelevant, false, or improper matter inserted in any pleading. (b) Strike out all or any part of any pleading not drawn or filed in conformity with the laws of this state, a court rule, or an order of the court." (Code Civ. Proc. § 436.) "The grounds for a motion to strike shall appear on the face of the challenged pleading or from any matter of which the court is required to take judicial notice." (Code Civ. Proc. § 437(a).)

**Request for Judicial Notice**

Defendant requests that the Court take judicial notice of a number of web pages from its own website (jackedfactory.com) and Amazon.com "identifying the ingredient list for each such product listed on Plaintiff's 'Exhibit A' that does not contain any of the allegedly 'foreign' ingredients identified in the First Amended Complaint." Although the contents of public websites are ostensibly matters that would be subject to judicial notice, a review of the papers indicates that Defendant seeks to use the websites to establish what the contents of the products themselves are. (See Defendant's Memorandum, p. 9.) This is not a proper use of judicial notice. (See *Malek Media Group LLC v. AXQG Corp*. (2020) 58 Cal.App.5th 817, 826 [offering material for judicial notice "for the truth of their contents" is "not a proper use of judicial notice. At most, we could judicially notice the existence of the press releases, but not the truth of their contents [citation], which are 'plainly subject to interpretation and for that reason not subject to judicial notice[.]'"]) Defendant offers no theory on which the contents of the products themselves could be judicially noticed at this stage, and that is the ultimate fact which Defendant seeks to use here. Defendant's request for judicial notice is **denied.**

Plaintiff requests that the Court take judicial notice of a "Scientific Opinion" from EFSA Journal purporting to establish that "Panax notoginseng and Astragalus membranaceus, which create AtraGin, are not from the USA and are sourced from Gansu and Inner Mongolia provinces in China, and from Yunnan and Sichuan provinces in China." This presents the identical issue as Defendant's request, namely that the Court cannot so determine without accepting the contents of the article for its truth, and the truth of those contents does not appear to be indisputable. Plaintiff's request is **denied.**

Defendant has not requested judicial notice of Plaintiff's CLRA demand letter, which is attached to the declaration of Melanie Ayerh as Exhibit 1. However, Plaintiff does not dispute the authenticity of the letter, and contends in fact that the letter is "incorporated by reference in Plaintiff's Complaint and the FAC." (See Plaintiff's Opposition Memorandum, p. 3, fn. 4.) The Court therefore notifies the parties that it intends to take judicial notice of the CLRA demand letter, on its own motion pursuant to Evid. Code § 455 and subject to the parties' right to meet the information.

**Discussion**

**I. Specificity of Fraud Allegations**

As held in *Lazar v. Superior Court* (1996) 12 Cal.4th 631 (*Lazar*):

> In California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] "Thus '"the policy of liberal construction of the pleadings ... will not ordinarily be invoked to sustain a pleading defective in any material respect.' " [Citation.] [¶] This particularity requirement


348

> necessitates pleading facts which show how, when, where, to whom, and by what means the representations were tendered." [Citation.]
>
> (*Id*. at 645.)

Defendant contends that Plaintiff's claims lack the required specificity. Plaintiff's FAC alleges, in pertinent part:

> 18. Defendant's "Manufactured in the United States" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."
>
> [¶]
>
> 20. As of July 2023, when the first complaint in this matter was filed, Defendant's website contained a clear and conspicuous "Manufactured in the USA" claim under iconography of a waiving United States flag encircled by the words "Manufactured in the USA" making it clear that Defendant meant this claim to be applied to *all* its products. This claim, including iconography, appeared on each and every product page of Defendant's website as well as Defendant's Amazon.com product pages.
>
> 21. Even after the filing of this matter, according to publicly archived webpages, as of January 2024 or even later, the main home page of Defendant's website still contained a clear and conspicuous "Manufactured in the USA" claim under same iconography of a waiving United States flag encircled by the words "Manufactured in the USA" thus making it more evident that Defendant meant this claim to be applied to *all* its products—even after the Complaint was filed in this matter.
>
> [Image]
>
> 22. According to publicly archived webpages, as of November 2023 or even later, the "Frequently Asked Questions" page of Defendant's website contained the following answer in response to the question: "Where are your products manufactured?" "Answer: **Our products are manufactured in the USA** in a cGMP, FDA Registered manufacturing facility adhering to the strictest quality control." (emphasis added)
>
> [¶…¶]
>
> 32. The offending Product purchased by Plaintiff contains or is made with ingredients and/or components that are not "Manufactured in the USA." For example, the Product contains two herbal ingredients that are native to China and not commercially grown in the United States; *Astragalus membranaceus* and *Panax notoginseng*. These ingredients are sourced from China or other Asian countries. Irrespective of exactly where these two ingredients are sourced, one thing is certain – they are not grown, made or sourced from the United States.
>
> [¶…¶]
>
> 41. The ingredients in the Product and the Class Products are the same or substantially similar, therefore, the Class Products and Defendant's misrepresentations of them are substantially similar to the Product and the misrepresentation of the Product.


349

> 42. For example, caffeine is included in numerous of Defendant's products other than the
>
> Product, including, but not limited to, NitroSurge Shred (also contains theobromine), NitroSurge Build, Burn-XT, Build-XT Black (also contains theobromine), Burn-XT Powder, Wick Mode Pre Workout and NitroSurge Shred Max.
>
> 43. *Astragalus membranaceus* and *Panax notoginseng* are included in numerous products other than the Product, including but not limited to, NitroSurge Build, Pump Surge, Build-XT, GDAXT, Wick Mode Pre Workout, NitroSurge Shred Max and Build XT Max – Elite Muscle Builder.
>
> 44. Defendant uses numerous other indisputably foreign ingredients in numerous of its
>
> products, including but not limited to KSM-66 ashwagandha and green tea extract
>
> 45. Despite the presence of numerous indisputable foreign ingredients in the Class Products, Defendant made unqualified "Manufactured in the USA" representations on the main page of its website, on each product page, on each Amazon.com product page and even in the "Frequently Asked Questions" section of its website.
>
> (FAC, footnotes omitted.)

These allegations are sufficient to put Defendant on notice of the nature of Plaintiff's claims under the heightened pleading standard for misrepresentation claims. Plaintiff alleges that before the filing of the Complaint and until at least January 2024, Defendant made misrepresentations to the general public over the internet about its products being manufactured in the USA, when they contained ingredients which were not, including caffeine, theobromine, astragalus membranaceus, panax notoginseng, KSM-66 ashwagandha, and green tea extract. This fulfills *Lazar*'s requirement to allege "how, when, where, to whom, and by what means the representations were tendered." (See *Lazar, supra,* 12 Cal.4th at 645.)

Defendant argues that Plaintiff does not allege adequate facts supporting the falsity of the representation, such as alleging the countries of origin of the ingredients. Nothing Defendant presents imposes such a requirement on Plaintiff at the pleading stage. *Colgan v. Leatherman Tool Group, Inc*. and *Benson v. Kwikset Corp*. did not involve pleadings motions and say nothing about whether the complaints at issue met the requisite pleading standard. (See *Colgan v. Leatherman Tool Group, Inc*. (2006) 135 Cal.App.4th 663, 672 [appeal was from grant of summary judgment]; *Benson v. Kwikset Corp*. (2007) 152 Cal.App.4th 1254, 1262 [appeal was of judgment entered after trial.]) In *Kwikset Corp. v. Superior Court,* the question at bar was the allegations of injury in fact in light of the recently enacted Proposition 64, not the sufficiency of the falsity allegations or the "how, when, where, to whom, and by what means" questions of *Lazar.* (See *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 319-320.) That these cases may have had more robust falsity allegations is irrelevant and unhelpful to Defendant's arguments on demurrer.


350

*Alaei v. Kraft Heinz Food Co*. (S.D. Cal. Apr. 22, 2016, No. 15cv2961-MMA) 2016 WL 11621800 (nonpub. opn.), aside from being an unpublished district court decision, is distinct. The whole of the plaintiff's allegations there was:

> In November of 2015, Plaintiff purchased Defendant's Heinz 57 Sauce (the "Product") from an Albertsons grocery store located on 1133 Mission Road in Fallbrook, California. At the time of Plaintiff's purchase, the offending Product was described as manufactured in the U.S.A., when the Product actually was made and/or contained components made outside of the United States. As such, Defendant is not entitled to lawfully make representations that the Product was "MFD. In U.S.A."
>
> (*Id*. at p. 2.)

The only ingredients the plaintiff identified did not correspond to the Heinz 57 Sauce the plaintiff purchased. (*Id*. at p. 3.) The District Court found that these allegations fell short of the "who, what, where, when, and how" requirements of the pleading standard. (*Ibid*.) Plaintiff's allegations here are much more robust and correspond to the product he purchased.

Because the allegations noted above are not stated on information and belief, it is unnecessary to address whether Plaintiff has asserted sufficient facts to justify any information and belief allegations. (See *Gomes v. Countrywide Home Loans, Inc*. (2011) 192 Cal.App.4th 1149, 1159.)

For the foregoing reasons, the Court will overrule the demurrer to the fourth and fifth causes of action for negligent and intentional misrepresentation on this ground.

## II. Sufficiency of Allegations Concerning UCL, FAL, and CLRA Claims

Defendant argues that for the same reasons, Plaintiff's allegations fail under the Unfair Competition Law (UCL, Bus. & Prof. Code § 17200 et seq.), False Advertising Law (FAL, Bus. & Prof. Code § 17500 et seq.), and Consumers Legal Remedies Act (CLRA, Civ. Code § 1750 et seq.). For the reasons discussed above, Plaintiff's allegations are sufficient to allege that Defendant made false statements to consumers concerning the product Plaintiff bought, at a minimum, and are not simply "contentions, deductions, or conclusions of fact or law" as would support a demurrer. (See *Yvanova v. New Century Mortgage Corp*. (2016) 62 Cal.4th 919, 924.) The Court will overrule the demurrer to the first, second, and third causes of action on this ground.

## III. Request for Injunctive Relief

Defendant contends that it has removed the "Manufactured in the USA" language from its website, Amazon.com, and all other websites over which it maintains control, based on a declaration from its founder and CEO (see Williams Decl., ¶ 3) and that the Court should therefore strike Plaintiff's request for an


351

injunction. It is axiomatic that motions to strike may be based only on the face of the pleading or matters of which the Court may properly take judicial notice. (Code Civ. Proc. § 437(a).) To the extent that Defendant's motion depends on Mr. Williams's declaration, it cannot be granted.

Defendant also contends that Plaintiff does not establish Defendant has unbridled control of the representations made by certain third parties. This argument is somewhat in conflict with Mr. Williams' declaration, which purports to establish that Defendant has control of certain third party websites and not others. Defendant identifies no part of Plaintiff's complaint subject to being stricken due to a purported lack of control. The Court will therefore not grant the motion to strike this portion of the FAC.

**IV. Allegations Concerning Products Plaintiff Did Not Buy**

Defendant argues that Plaintiff lacks standing as a matter of law to bring claims pertaining to any products other than the one he purchased (i.e. Jacked Factory Nitrosurge Pre-workout dietary supplement).

This argument does not appear to be based on any California law. *Johns v. Bayer Corp.,* an unreported case from the U.S. District Court for the Southern District of California, does not cite any California law in support of the language Defendant relies on, nor does *Bruton v. Gerber Products Company*. (See *Johns v. Bayer Corp*. (S.D. Cal. Feb. 9, 2010, No. 09CV1935 DMS (JMA)) 2010 WL 476688 (nonpub. opn.), p. 5; *Bruton v. Gerber Products Company* (N.D. Cal. Jan. 15, 2014, No. 12-CV-02412-LHK) 2014 WL 172111 (nonpub. opn.), p. 8.)

Plaintiff is not alleging that he was harmed by any representations connected with a product he did not purchase. Rather, he seeks to represent a class of people who he claims purchased products subject to similar misrepresentations. (See FAC, ¶¶ 3, 77.) Whether people who purchased other products are similarly situated to Plaintiff is a paradigmatic class certification inquiry. As Defendant presents nothing permitting the Court to determine this question as a matter of law at this stage in the litigation, the Court will not strike these allegations, but recognizes this issue may come before the Court again in a different context.

**V. Insufficiency of CLRA Notice**

If a plaintiff seeks damages in a CLRA action, the statute requires pre-suit notice to the defendant:

> (a) Thirty days or more prior to the commencement of an action for damages pursuant to this title, the consumer shall do the following:
>
> (1) Notify the person alleged to have employed or committed methods, acts, or practices declared unlawful by Section 1770 of the particular alleged violations of Section 1770.


352

(2) Demand that the person correct, repair, replace, or otherwise rectify the goods or services alleged to be in violation of Section 1770.

The notice shall be in writing and shall be sent by certified or registered mail, return receipt requested, to the place where the transaction occurred or to the person's principal place of business within California.

(Civ. Code § 1782(a).)

"That requirement exists in order to allow a defendant to avoid liability for damages if the defendant corrects the alleged wrongs within 30 days after notice, or indicates within that 30–day period that it will correct those wrongs within a reasonable time." (*Morgan v. AT&T Wireless Services, Inc*. (2009) 177 Cal.App.4th 1235, 1261 (*Morgan*).)

Defendant contends that Plaintiff's CLRA notice letter was insufficient because it does not identify the purportedly foreign ingredients in the product at issue (i.e. *Astragalus membranaceus, Panax notoginseng*, theobromine, Caffeine or KSM-66 ashwagandha) but other ingredients which are not in the product, and Plaintiff's FAC contains no mention of the substances which are mentioned in the CLRA notice letter.

The letter reads, in pertinent part:

> Contrary to its "Manufactured in the USA" representation, many, if not all, products produced and sold by Jacked Factory contain or are made with ingredients that are not "Manufactured in the USA." For example, the Product contains L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine, which in this instance, among other ingredients in the product, are not from the United States, yet its advertising states "Manufactured in the USA." Similarly, Jacked Factory's Burn-XT contains acetyl-L-Carnitine HCl, Green Tea Leaf Extract and Black Pepper Fruit Extract, which in this instance, among other ingredients in the product, are not from the United States, yet the
>
> advertising on its webpage, at https://www.jackedfactory.com/products/burn-xt, also states "Manufactured in the USA." Jacked Factory' s N.O. XT contains Arginine, Glutathione and Citrulline, which in this instance, among other ingredients in the product, are not from the United States, yet its advertising states "Manufactured in the USA" (See
>
> https://www.jackedfactory.com/products/no-xt). Additionally, on Jacked Factory's website, it even lists an "FAQ" of "Where is [Product] Manufactured" on each of its product's website pages to which the response by Jacked Factory is "All Jacked Factory products are ***proudly manufactured in the USA*** in a cGMP certified facility using the highest quality control guidelines for maximum potency, quality, & safety." (emphasis added).
>
> The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here. However, it is abundantly clear that Jacked Factory pays no attention to applicable laws regarding the labeling of its products with "Manufactured in the USA", or any derivative thereof.


353

**Therefore, each and every one of Jacked Factory products regardless of brand, type, configuration or size, including but not limited to the aforementioned brands and products, containing foreign ingredients, components or raw materials and any reference to "Manufactured** in **the USA" or any derivative thereof, is subject to the demand/s**

**made in this letter. Please note that should this firm file suit on behalf of our client, we will seek to represent the purchasers of any and all of Jacked Factory misrepresented products.**

Section 1770(a) of the CLRA prohibits, among other things, the following unfair methods of competition and unfair or deceptive acts or practices when attempting to sell or selling goods and services to consumers: (2) Misrepresenting the source, sponsorship, approval, or certification of goods or services; (3) Misrepresenting the affiliation, connection, or association with, or certification by, another; ( 4) Using deceptive representations or designations of geographic origin in connection with goods or services; (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have; (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (9) Advertising goods or services with intent not to sell them as advertised. *(See* Cal. Civil Code sections 1770(a) (2), (3), (4), (5), (7), and (9).)

The above-described representations and/or omissions are false and misleading and constitute unlawful, unfair, or fraudulent acts, or practices and unfair methods of competition in violation of the CLRA, including but not limited to§§ 1770(a)(2), (3), (4), (5), (7), and (9). The representations also violate California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq;* and California's False Advertising Law, California Business & Professions Code §§ 17500, *et seq*. Jacked Factory has and continues to mislead consumers into believing that its products containing the aforementioned ingredients, among others, are "Manufactured in the

USA," when in fact that is not true. These misrepresentations allow Jacked Factory to increase its sales and capture market share from its competitors.

(Ayerh Decl., Ex. 1, pp. 2-3, emphasis in original.)

Defendant contends that Plaintiff's failure to identify in the CLRA notice the specific ingredients that Plaintiff argues are foreign-procured dooms the CLRA claim for lack of notice.

The CLRA was enacted not just to "protect consumers against unfair and deceptive business practices" but also "to provide efficient and economical procedures to secure such protection." ([Civ. Code] § 1760.) Avoiding litigation when appropriate corrective action has been proffered by the merchant, regardless of whether the relief is requested in the form of monetary damages or restitution of property, achieves this latter goal. (*Ibid*.)

(*DeNike v. Mathew Enterprise, Inc*. (2022) 76 Cal.App.5th 371, 380.)


354

"This clear purpose may only be accomplished by a literal application of the notice provisions." (*Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30, 41.) That purpose cannot be served by a CLRA notice unless the notice describes with sufficient particularity what acts need to be corrected. In this context, that means identifying the ingredients in the product Plaintiff purchased which Plaintiff contended were manufactured or procured from outside the United States, so that Defendant could determine whether that contention required any corrective action. If the notice describes certain acts (including L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine in a product held out as "Manufactured in USA"), and the manufacturer believes that those allegations are not meritorious and do not expose it to any liability, the appropriate action is to do nothing. If a plaintiff then brings suit based on different acts (including Theobromine, Caffeine, *Astragalus membranaceus, Panax notoginseng, and KSM-66 Ashwagandha in the product), the defendant has had no opportunity to correct those acts and the purpose of avoiding litigation is entirely frustrated.*

*As recognized in Morgan,* it is inappropriate to foreclose the CLRA claim with prejudice based on lack of notice. (See *Morgan, supra,* 177 Cal.App.4th at 1261.) Instead, the claim should be "dismissed until 30 days or more after the plaintiff complies with the notice requirements. If, before that 30–day period expires the defendant corrects the alleged wrongs or indicates it will correct the wrongs, the defendant cannot be held liable for damages." (*Ibid*.) Again, in this context, that means that Plaintiff must give notice of the violations actually sued upon so that Defendant may cure or take appropriate action (which may, in the end, be no action at all). Alternatively, Plaintiff may amend his complaint to allege the violations of which he gave notice, if he can do so in good faith. The Court has no way of determining at this stage whether the product Plaintiff purchased contains the L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine of which he gave notice. Finally, Plaintiff may simply abandon his claim for damages under the CLRA and proceed solely on injunctive relief, which has no notice requirement. (See *Kagan v. Gibraltar Savings & Loan Association* (1984) 35 Cal.3d 582, 590, disapproved on other grounds in *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 643 fn. 3.)

For the foregoing reasons, the Court will grant the motion to strike the request for damages in the CLRA claim with 45 days leave to amend. Because the Court's intention is to grant with leave, the Court will address Defendant's argument based on the making of an appropriate correction, as that question may recur.

## VI. Appropriate Correction

The CLRA provides:

> (b) Except as provided in subdivision (c), no action for damages may be maintained under Section 1780 if an appropriate correction, repair, replacement, or other remedy is given, or agreed to be given within a reasonable time, to the consumer within 30 days after receipt of the notice.
>
> (c) No action for damages may be maintained under Section 1781 upon a showing by a person alleged to have employed or committed methods, acts, or practices declared unlawful by Section 1770 that all of the following exist:


355

> (1) All consumers similarly situated have been identified, or a reasonable effort to identify such other consumers has been made.
>
> (2) All consumers so identified have been notified that upon their request the person shall make the appropriate correction, repair, replacement, or other remedy of the goods and services.
>
> (3) The correction, repair, replacement, or other remedy requested by the consumers has been, or, in a reasonable time, shall be, given.
>
> (4) The person has ceased from engaging, or if immediate cessation is impossible or unreasonably expensive under the circumstances, the person will, within a reasonable time, cease to engage, in the methods, act, or practices.

(Civ. Code § 1782.)

Defendant contends that it has substantially complied with the steps under Civ. Code § 1782(c), such that Plaintiff's action for damages ought to be foreclosed. Specifically, Defendant contends that it has removed the "Manufactured in USA" statements from its website as required by subdivision (c)(4), and that the first three subdivisions have been satisfied because it is inappropriate and unreasonable to require Defendant to take those steps.

As discussed above, Defendant's extrinsic evidence cannot be considered on demurrer. Moreover, the appropriateness of corrections under this section is a matter of judicial discretion, requiring evidence. (*Benson v. Southern California Auto Sales, Inc*. (2015) 239 Cal.App.4th 1198, 1207 ["[T]he trial court should use its discretion, basing it on substantial evidence, to determine whether a correction was appropriate[.]") This makes it an inappropriate issue for demurrer. If the correction were a discrete matter whose resolution could be judicially noticed, that would be one thing, but the Court cannot determine without evidence that as a matter of law, it is unreasonable for Defendant to identify consumers similarly situated to Plaintiff and make an appropriate correction as to those consumers. The Court has no evidence (and can consider none at this stage) of what Defendant's ability is to identify its customers or extend refunds or corrections to them. The Court will not sustain the demurrer or grant the motion to strike on this ground.

**Conclusion**

For the foregoing reasons, the demurrer is **overruled** as to all causes of action. The motion to strike is **granted in part** as to the request for damages in the First Cause of Action for violation of the CLRA with 45 days' leave to amend and is otherwise **denied.** Plaintiff to give notice.


356

# EXHIBIT B


357

**Ayerh, Melanie**

---

| | |
|---|---|
| **From:** | Gustavo Ponce <gustavo@kazlg.com> |
| **Sent:** | Thursday, March 20, 2025 12:01 PM |
| **To:** | Ayerh, Melanie; Hopp, Tony |
| **Cc:** | Brophy, Carol; Sousa, Angela [Contractor - Lexolution]; Singh, Jennifer; Mona Amini |
| **Subject:** | [EXTERNAL] Daniel Rossi v. Nutra Holdings, Inc. d/b/a Jacked Factory |

Melanie and Tony,

Thank you for meeting and conferring with me regarding the amended complaint. We have discussed internally what you and I spoke about and we believe that the complaint has plead the facts sufficiently as to the causes of actions. As discussed Defendant was put on notice of the CLRA ingredients on the CLRA letter and while the other ingredients in the complaint point out that there is a multitude of foreign ingredients in Defendant's products which apply further to Plaintiff's other cases of actions. Further there is a table that summarizes the ingredients.

Please let us know if you'd like to discuss further.

Thank you,

Gustavo Ponce, Esq.
*Licensed in California and Nevada*
KAZEROUNI LAW GROUP, APC
6940 S. Cimarron Rd., Suite 210
Las Vegas, Nevada 89113
Direct: (702) 625-9392
Toll free: (800) 400-6808 ext. 20
Fax: (800) 520-5523
www.kazlg.com
www.vegasdebtdefense.com

**Los Angeles - Orange County - San Diego - Riverside**
**San Luis Obispo - Phoenix - Las Vegas - Austin**

**CONFIDENTIALITY NOTICE AND WARNING:**
The information contained in this message (including all attachments) is attorney privileged and confidentialinformation intended only for the use of the individual/s and/or entity named above. If the reader of the message is not the intended recipient or an authorized representative of theintended recipient, I do not intend to waive and do not waive any privileges or the confidentiality of the message/s and/or attachment/s, and you are hereby notified that any dissemination of this communication is strictly prohibited. If you receive this communication in error, please notify me immediately at gustavo@kazlg.com or at (800) 400-6808 ext. 20 and delete the message and attachments from your records. Thank you for your cooperation.


358

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On April 29, 2025, I served true copies of the following document(s) described as **DECLARATION OF MELANIE A. AYERH** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 29, 2025, at Los Angeles, California.

/s/*Grace Calderon*

Grace Calderon


359

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


360

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 5/01/2025 8:46 PM David W. Slayton, Executive Officer/Clerk of Court, By S. Drew, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STRIKE THE SECOND AMENDED COMPLAINT**<br><br>Hearing Date: August 26, 2025<br>Time: 10:30am<br>Dept: 1<br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024<br>Second Amended Complaint: March 27, 2025 |

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Nutra Holdings, Inc. d/b/a Jacked Factory ("Nutra Holdings") moves to strike Plaintiff Daniel Rossi's ("Plaintiff") request for damages under the CLRA because Plaintiff's Second Amended Complaint ("SAC") ignores this Court's order of February 10, 2025 and pleads CLRA damages for ingredients that he never included in a CLRA notice. The Court may strike from a pleading any "irrelevant, false or improper matter" and "all or any part of any pleading not drawn...in conformity with the laws of this state..." Code Civ. Proc. §§ 435, 436. The Court has specific authority to strike damages from a complaint if such damages are not recoverable. *Grieves v. Superior Court*, 157 Cal.App.3d 159, 164 (1984).

Plaintiff brings this putative class action against Nutra Holdings alleging that the "Manufactured in the USA" language that previously appeared on Nutra Holdings' Nitrosurge Pre-workout dietary supplement (the "Product") website, and other third party retailer websites, is false and misleading because the Product allegedly contains certain "ingredients" Plaintiff speculates are foreign. This Court previously dismissed Plaintiff's claims for damages under the CLRA because his presuit notice failed to "describe[] with sufficient particularity what acts need to be corrected." The Court explained that:

> If the [CLRA] notice describes certain acts (including L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine in a product held out as "Manufactured in USA"), and the manufacturer believes that those allegations are not meritorious and do not expose it to any liability, the appropriate action is to do nothing. If a plaintiff then brings suit based on different acts (including Theobromine, Caffeine, Astragalus membranaceus, Panax notoginseng, and KSM-66 Ashwagandha in the product), the defendant has had no opportunity to correct those acts and the purpose of avoiding litigation is entirely frustrated.

The Court allowed Plaintiff leave to amend his complaint with instructions to either (1) "give notice of the violations actually sued upon", (2) "amend [the] complaint to allege the violations of which he gave notice, if he can do so in good faith", or (3) "simply abandon his claim for damages under the CLRA." Plaintiff ignored this directive and did none of these things. Instead, like the


362

First Amended Complaint ("FAC"), the SAC seeks CLRA damages for ingredients that were not addressed in Plaintiff's presuit CLRA notice.

Nutra Holdings respectfully moves the Court to strike, with prejudice, Plaintiff's request for damages under the CLRA as to any ingredient that Plaintiff did not address in his CLRA notice and any product that is alleged to contain those ingredients: Caffeine, BuildXT and GDA XT.

## II. PROCEDURAL HISTORY

On March 8, 2023, Plaintiff served a letter pursuant to Civ. Code § 1782(a) ("CLRA notice"). SAC ¶ 32; Ex. A. The CLRA notice stated that the ingredients—L-Citrulline, Betaine Anhydrous, Beta Alanine, L-Theanine, acetyl-L-Carnitine HCl, Green Tea Leaf Extract, Black Pepper Fruit Extract, Arginine and Glutathione—are foreign sourced and therefore Nutra Holdings' products containing the same are allegedly not "Manufactured in the USA". *Id.* The CLRA notice made no mention of and otherwise took no issue with the following ingredients: *Astragalus membranaceus*, *Panax notoginseng*, *AstraGin®*, theobromine, caffeine and KSM-66 ashwangandha. *Id.*

On July 6, 2023, Plaintiff filed his initial complaint. The complaint failed to identify any ingredient in the Product that was purportedly of foreign origin. Nutra Holdings demurred and moved to strike the initial complaint on May 17, 2024. Declaration of Melanie A. Ayerh ("Ayerh Decl.") ¶ 2. On August 16, 2024, Plaintiff filed an FAC in response. *Id.* ¶ 3. Nutra Holdings filed another demurrer and motion to strike the FAC, and on February 10, 2025 the Court issued an order granting the demurrer in part with leave to amend. *Id.* ¶ 4; Ex. A. Relevant to this motion, the Court found that Plaintiff could not maintain a claim for damages under the CLRA as to those purportedly foreign ingredients that Plaintiff did not identify in his CLRA notice. *Id.* The Court allowed Plaintiff 45 days to amend providing clear guidance on how Plaintiff may plausibly amend his complaint:

> [T]he claim should be "dismissed until 30 days or more after the plaintiff complies with the notice requirements. If, before that 30–day period expires the defendant corrects the alleged wrongs or indicates it will correct the wrongs, the defendant cannot be held liable for damages." (Ibid.) Again, in this context, that means that Plaintiff must give notice of the violations actually sued upon so that Defendant may cure or take appropriate action (which may, in the end, be no action at all). Alternatively, Plaintiff may amend his complaint to allege the violations of which




363

> he gave notice, if he can do so in good faith. [] Finally, Plaintiff may simply abandon his claim for damages under the CLRA and proceed solely on injunctive relief, which has no notice requirement.

*Id*. The Court ordered the parties to meet and confer in good faith before any amended complaint is filed. *Id*.

On March 18, 2025, the parties held a zoom conference to meet and confer regarding Plaintiff's proposed SAC. *Id*. ¶ 6. Counsel for Nutra Holdings informed Plaintiff's counsel that the SAC did not conform with the Court's order for the reasons set forth in this motion. *Id*. ¶ 7. Plaintiff disagreed arguing that "the complaint has plead the facts sufficiently as to the causes of actions". Plaintiff filed his FAC a week later. *Id*.; Ex. B.

**III. STATEMENT OF RELEVANT FACTS**

Similar to the FAC, Plaintiff's SAC alleges that the "Manufactured in the USA" language that previously appeared on the Product's website and the websites of certain third-party vendors is allegedly false and misleading because, the Product "[is] actually made with or contain[s] ingredients that are not 'Manufactured in the USA'". SAC ¶¶ 3, 24. On or about January 24, 2023, Plaintiff allegedly searched online for a pre-workout supplement when "he discovered the Product and its misrepresented 'Manufactured in the USA' claim." *Id*. ¶ 84. Plaintiff allegedly purchased the Product on Amazon. *Id*. He claims that he relied on the "Manufactured in the USA" language and "believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA." *Id*. ¶ 90. He claims that had he been made aware that the Product was not actually "Manufactured in the USA" he would not have purchased the Product "or would not have purchased the Product for the price he paid". *Id*. ¶ 93.

After this Court granted him leave to amend to address the deficiencies in his CLRA notice, Plaintiff did not serve a new notice. Instead, his SAC again alleges that the Products are misleadingly advertised because the ingredients *Astragalus membranaceus*, *Panax notoginseng*, *AstraGin®*, theobromine, caffeine and KSM-66 ashwangandha are allegedly sourced from foreign








364

locations. SAC ¶¶ 41-47.[1] According to Plaintiff, "[b]ecause *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are indisputably foreign, 'all or virtually all' ingredients in the Product cannot be made in the United States as required by the MUSA Rule for Defendant to lawfully make an unqualified 'Manufactured in the USA' claim.'" *Id.* ¶ 51. These ingredients were not identified in the March 2023 CLRA notice.

In addition to his defective CLRA claims, Plaintiff seeks to hold Nutra Holdings liable on behalf of a class of California Consumers for intentional and negligent misrepresentation and violations of California's False Advertising Law, Bus. & Prof. Code §§ 17500, et seq., ("FAL") and the Unfair Competition Law, Bus. & Prof. Code §§ 17200, et seq. ("UCL"). Plaintiff seeks damages, restitution and injunctive relief.

## IV. THE COURT SHOULD STRIKE PLAINTIFF'S DAMAGES UNDER THE CLRA AS TO THOSE INGREDIENTS AND PRODUCTS OMITTED FROM ITS CLRA NOTICE

As this Court recognized, "[t]he purpose of the notice requirement of section 1782 is to give the manufacturer or vendor ***sufficient notice*** of alleged defects to permit appropriate corrections or replacements." *Outboard Marine Corp. v. Superior Ct.*, 52 Cal. App. 3d 30, 40 (Ct. App. 1975) (emphasis added). Failure to strictly comply is fatal to a damages claim under the CLRA. *Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d 1181, 1195-96 (S.D. Cal. 2005) (dismissing CLRA claim for damages with prejudice due to failure to comply with notice requirements); *Roybal v. Equifax*, No. 2:05-cv-01207-MCE-KJM, 2008 WL 4532447, *11 (E.D. Cal. Oct. 9, 2008) (granting defendants' motion for summary adjudication on CLRA claim because plaintiff's letter failed to provide notice of "particular alleged violations"). "That purpose cannot be served by a CLRA notice unless the notice describes with sufficient particularity what acts need to be corrected. ***In this context, that means identifying the ingredients in the product Plaintiff purchased which Plaintiff contended were manufactured or procured from outside the United***

---

[1] Plaintiff's "Exhibit A" to the SAC purports to list the "Class Products". Included in that list are several products, including "caffeine", that are not even manufactured, distributed or sold by Nutra Holdings. The three purported products "Caffeine", "BuildXT" and "GDA XT" do not contain any of the ingredients identified in the CLRA notice. *See* SAC, Ex. F.


365

***States, so that Defendant could determine whether that contention required any corrective action***." Ayerh Decl. ¶4; Ex. A (emphasis added). The Court dismissed Plaintiff's CLRA damages because the FAC was improperly based on ingredients that Plaintiff did not identify in his CLRA notice. The same result is warranted here.

**A. The SAC Does Not Remedy Plaintiff's Noncompliance With The CLRA's Strict Notice Requirements**

Plaintiff did not serve a new CLRA notice to remedy his deficient CLRA damage claims. Instead, he filed a SAC relying on the same deficient claims. As the Court previously recognized, Plaintiff's March 8, 2023 notice focused on purportedly "foreign" ingredients not at issue in his CLRA notice. *Id*. While the SAC now identifies the ingredients listed in Plaintiff's CLRA notice in passing, the SAC continues to focus on the ingredients that were not listed in the CLRA notice: *Astragalus membranaceus*, *Panax notoginseng, AstraGin®*, theobromine, caffeine and KSM-66 ashwangandha. These allegations are in violation of this Court's February 10th order and cannot support a CLRA damages claim. *Outboard Marine Corp*., 52 Cal.App.3d at 41; *Ang v. Bimbo Bakeries USA, Inc*., No. 13-CV-01196-WHO, 2013 WL 5407039, at *12 (N.D. Cal. Sept. 25, 2013) (dismissing CLRA claim to the extent premised on products not identified in the notice); *Waller v. Hewlett-Packard Co.*, No. 11CV0454-LAB RBB, 2011 WL 6325972, at *6 (S.D. Cal. Dec. 16, 2011). Consistent with its prior order, the Court should strike any claim for CLRA damages based on the ingredients *Astragalus membranaceus, Panax notoginseng, AstraGin®*, theobromine, caffeine and KSM-66 ashwangandha. The Court should also strike any CLRA damages as to Caffeine, BuildXT and GDA XT – the purported products that are alleged to only contain the above ingredients. *See* SAC, Ex. F.

**B. Nutra Holdings Was Deprived The Opportunity to Adequately Evaluate Plaintiff's Claims and a Possible Cure**

The entire purpose of the CLRA notice provision is to foster resolution and avoid spurious claims. *Outboard Marine Corp.*, 52 Cal. App. 3d at 40. Plaintiff's CLRA notice does neither of these. As this Court recognized, without strict compliance with section 1782, "the defendant has [] no opportunity to correct those acts and the purpose of avoiding litigation is entirely frustrated."








366

Ayerh Decl.¶ 5; Ex. A; *DeNike v. Mathew Enterprise, Inc.*, 76 Cal.App.5th 371, 380 (2022); *see also Roybal*, 2008 WL 4532447, *10 (notice insufficient where it failed to outline specific violations, making it impossible for defendants to implement appropriate corrections.) Here, Nutra Holdings received no notice that Plaintiff's theory of liability will center around the ingredients *Astragalus membranaceus*, *Panax notoginseng*, *AstraGin®,* theobromine, caffeine and KSM-66 ashwangandha. In fact, Plaintiff disclosed those ingredients for the first time ***a year after*** he served the CLRA Notice when he filed his FAC. Nutra Holdings has not been afforded the notice to which it is due under the code and remains uncertain about the scope of Plaintiff's claims. Plaintiff failed to do what was required to perfect a CLRA damages claim as to the ingredients *Astragalus membranaceus*, *Panax notoginseng*, *AstraGin®,* theobromine, caffeine and KSM-66 ashwangandha.

## V. CONCLUSION

For the reasons set forth above and in its Order dismissing the FAC, the Court should strike with prejudice any claim for damages under the CLRA as to any ingredient that Plaintiff did not address in his CLRA notice and any product that is alleged to contain those ingredients, including Caffeine, BuildXT and GDA XT.

Dated: April 29, 2025

**STEPTOE LLP**

By:

*/s/ Melanie A. Ayerh*

Carol R. Brophy
Jennifer K. Singh
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh
*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*


367

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On April 29, 2025, I served true copies of the following document(s) described as **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STRIKE** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 29, 2025, at Los Angeles, California.

*/s/ Grace Calderon*
Grace Calderon


368

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


369

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 5/01/2025 8:46 PM David W. Slayton, Executive Officer/Clerk of Court, By S. Drew, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**NOTICE OF MOTION AND MOTION TO STRIKE SECOND AMENDED COMPLAINT**<br><br>Hearing Date: August 26, 2025<br>Time: 10:30 a.m.<br>Dept: 1<br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024 |

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 26, 2025 at 10:30 a.m. or soon thereafter as the matter may be heard, in Department 1 of the Superior Court of the State of California, County of Los Angeles, located at 312 North Spring Street, Los Angeles, CA 90012 the Honorable Stuart M. Rice presiding, Defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Nutra Holdings") will and hereby does move to strike portions of Plaintiff Daniel Rossi's ("Plaintiff" or "Rossi") Second Amended Complaint ("SAC").

Nutra Holdings moves to strike, pursuant to California Code of Civil Procedure §§ 435 and 436, Plaintiff's request for damages under the CLRA as to any ingredient that Plaintiff did not address in his CLRA notice—specifically, *Astragalus membranaceus*, *Panax notoginseng*, *AstraGin®*, theobromine, caffeine and KSM-66 ashwangandha. Nutra Holding also moves to strike any product listed in Exhibit F to the SAC that is alleged to contain the above ingredients only—specifically, Caffeine, BuildXT and GDA XT.

<u>Meet and Confer</u>. The parties met and conferred by telephone on March 18, 2025 regarding the substance of Nutra Holdings' motion. The parties were unable to reach a resolution. (*See*, Declaration of Melanie Ayerh, ¶¶6,7.)

The motion to strike is based upon this Notice, the Memorandum of Points and Authorities filed concurrently herewith, the Declaration of Melanie A. Ayerh, the Declaration and the pleadings and records in this action, and any other such matters and argument as the Court may consider at the hearing.

Dated: April 29, 2025

**STEPTOE LLP**

By: *<u>/s/ Melanie A. Ayerh</u>*

Carol R. Brophy
Jennifer K. Singh
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh

*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*


371

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On April 29, 2025, I served true copies of the following document(s) described as **NOTICE OF MOTION TO STRIKE SECOND AMENDED COMPLAINT** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 29, 2025, at Los Angeles, California.

*/s/ Grace Calderon*
Grace Calderon


372

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


373

FILED
Superior Court of California
County of Los Angeles
03/27/2025
David W. Slayton, Executive Officer / Clerk of Court
By: F. Sims Deputy

Electronically Received 03/27/2025 03:37 PM

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No.: 23STCV15674

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

1) **CONSUMERS LEGAL REMEDIES ACT, CAL. CIVIL CODE §§ 1750, ET SEQ.;**
2) **CALIFORNIA'S FALSE ADVERTISING LAW, BUS. & PROF. CODE §§ 17500 ET SEQ.;**
3) **CALIFORNIA'S UNFAIR COMPETITION LAW, BUS. & PROF. CODE §§ 17200 ET SEQ.;**
4) **NEGLIGENT MISREPRESENTATION; AND**
5) **INTENTIONAL MISREPRESENTATION**

**JURY TRIAL DEMANDED**


374

## INTRODUCTION

1. Plaintiff DANIEL ROSSI ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY ("Defendant") in unlawfully representing and advertising Defendant's dietary supplement products with the false designation and representation that the products were made and/or manufactured in the USA. The unlawfully represented products were sold online on Defendant's website and other third-party vendors, such as Amazon.com ("Amazon"), throughout the United States, and advertised on Defendant's website.[1] Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

2. Specifically, Plaintiff purchased Defendant's Nitrosurge Pre Workout[2] Supplement (hereinafter the "Product"), which, as advertised on Defendant's website and other third-party vendors, was represented by Defendant to Plaintiff and other similarly situated consumers as a product made and/or manufactured in the USA. However, Defendant's Product contains or is made with ingredients that are not "Manufactured in the USA," as discussed further herein.

3. The "Manufactured in the USA" claim (or some derivative thereof) was prominently printed on Defendant's website and advertisements, as well as the websites of third-party vendors, including Amazon, where the Product was purchased by Plaintiff. Contrary to Defendant's representation and in violation of federal rules and California laws, Defendant's Class Products,[3] including the Product purchased by Plaintiff, are actually made with or contain ingredients that are not "Manufactured in the USA," as discussed in further detail herein.

---

[1] Plaintiff seeks class wide relief on behalf of all purchasers of any of Defendant's products that are substantially similar to the dietary supplement product purchased by Plaintiff that were advertised as being "Manufactured in the USA" in violation of California law(s).

[2] As titled on Amazon.com when Plaintiff purchased the Product; "NITROSURGE Pre Workout Supplement – Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps – Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White."

[3] A list of the Class Products is attached hereto as Exhibit A.

KAZEROUNI LAW GROUP, APC


375

4. Defendant's nationwide sale and advertising of deceptively advertised Class Products constitutes violations of: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (2) California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17533.7; (3) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 et seq.; (4) negligent misrepresentation and (5) intentional misrepresentation. This conduct caused Plaintiff, and others similarly situated, damages, and requires restitution and injunctive relief to remedy and prevent further harm.

5. Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of Defendant.

**JURISDICTION AND VENUE**

6. Jurisdiction is proper pursuant to this Court's general jurisdiction.

7. The Court has jurisdiction over Plaintiff's claims for damages, restitution, injunctive relief, and declaratory relief arising from Defendant's unlawful business practices under California's CLRA, FAL, and UCL; as well as negligent and intentional misrepresentation.

8. This Court has personal jurisdiction over Defendant because Defendant conducts substantial business in the State of California and County of Los Angeles, has sufficient minimum contacts with this State and County, and otherwise purposefully avails itself of the markets in this State and County through the promotion, sale, and marketing of its services in this State, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this Court pursuant to California Code of Civil Procedure § 395(a) because Plaintiff resides within this county and many of the acts and transactions giving rise to this action occurred in this county because Defendant:

a. is authorized to conduct business in this county and has intentionally availed itself of the laws and markets within this county;

b. does substantial business within this county; and is subject to personal jurisdiction in this county;

KAZEROUNI LAW GROUP, APC








376

c. and is subject to personal jurisdiction in this county.

**PARTIES**

10. Plaintiff is an individual residing in the City of Northridge, County of Los Angeles, State of California.

11. Defendant is a corporation with its principal place of business in St. John's, Newfoundland and Labrador, Canada, which is regularly doing business in the State of California and within this county.

12. Defendant is a manufacturer and seller of dietary supplements that conducts business through its website and the websites of third-party vendors. One of the products sold by Defendant is Nitrosurge Pre Workout, the Product, which was purchased by Plaintiff.

**NATURE OF THE CASE**

13. At all times relevant, Defendant made affirmative misrepresentations regarding the Class Products, including the Product purchased by Plaintiff, it manufactures, markets and sells. Specifically, Defendant marketed, advertised, and sold its Class Products as "Manufactured in the USA" without clear and adequate qualification that the Class Products contained foreign ingredients and/or components as required by federal rules and state laws.

14. However, although Defendant represents that its Class Products are "Manufactured in the USA" without clear and adequate qualification, Defendant's Class Products contain or are made with ingredients and/or components that are not "Manufactured in the USA."

15. Federal rules regarding the use of "Made in the United States" claims with respect to products and services are well established and well defined.

16. Specifically, the Made in USA Labeling rule, 16 C.F.R. § 323, (the "MUSA Rule") clearly defines the meaning of "Made in the United States", including synonymous phrases[4], as well as when it can be used without clear and adequate qualification notifying consumers that the good or

[4] *See* 16 C.F.R. § 323.1(a) ("The term Made in the United States means any unqualified representation, express or implied, that a product or service, or a specified component thereof, is of U.S. origin, including, but not limited to, a representation that such product or service is "made," "***manufactured***," "built," "produced," "created," or "crafted" in the United States or in America, or any other unqualified U.S.-origin claim.") (emphasis added)



KAZEROUNI LAW GROUP, APC

service in question contains or is made with ingredients or components that are not made or sourced in the United States.[5]

17. Despite the clearly established and well-defined federal rules regarding "Made in the United States" claims, Defendant falsely, unfairly and deceptively advertised, marketed and sold its Class Products, including the Product purchased by Plaintiff, as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and/or components as further herein.

18. Defendant's "Manufactured in the United States" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

19. Each consumer, including Plaintiff, was exposed to virtually the same material misrepresentations, as similar advertisements and misrepresentations were prominently placed on all of Defendant's website and the websites of third-party vendors.

20. As of July 2023, when the first complaint in this matter was filed, Defendant's website contained a clear and conspicuous "Manufactured in the USA" claim under iconography of a waiving United States flag encircled by the words "Manufactured in the USA" making it clear that Defendant meant this claim to be applied to _all_ of its products, including the Class Products. This claim, including iconography, appeared on each and every product page of Defendant's website as well as Defendant's Amazon product pages.

21. Even after the filing of this matter, according to publicly archived webpages[6], as of January 2024 or even later, the main home page of Defendant's website still contained a clear and

[5] *See* 16 C.F.R. § 323.2 Prohibited Acts ("In connection with promoting or offering for sale any good or service, in or affecting commerce as "commerce" is defined in section 4 of the Federal Trade Commission Act, 15 U.S.C. 44, ***it is an unfair or deceptive act or practice*** within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), ***to label any product as Made in the United States unless*** the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and ***all or virtually all ingredients or components of the product are made and sourced in the United States***. (emphasis added)

[6] *See* https://web.archive.org/web/20240121011132/https://www.jackedfactory.com/ (archived January 21, 2024)




378

KAZEROUNI LAW GROUP, APC

conspicuous "Manufactured in the USA" claim under same iconography of a waiving United States flag encircled by the words "Manufactured in the USA" thus making it more evident that Defendant meant this claim to be applied to *all* its products—even after the Complaint was filed in this matter.




22. According to publicly archived webpages, as of November 2023 or even later, the "Frequently Asked Questions" page of Defendant's website contained the following answer in response to the question: "Where are your products manufactured?" "Answer: **Our products are manufactured in the USA** in a cGMP, FDA Registered manufacturing facility adhering to the strictest quality control." (emphasis added)[7]

23. As a consequence of Defendant's unfair and deceptive practices, Plaintiff and other similarly situated consumers purchased Defendant's Class Products under the false impression that the products were actually manufactured and/or made in the USA with U.S. made ingredients and components.

24. As a result of Defendant's misrepresentations, Plaintiff and other consumers similarly situated overpaid for Defendant's Class Products, and/or purchased the Class Products under the false belief that the product they purchased was made and/or manufactured in the USA with U.S. made ingredients and components. Had Plaintiff and other consumers similarly situated been made aware

[7] *See* https://web.archive.org/web/20231101090125/https://www.jackedfactory.com/pages/common-faqs (archived November 1, 2023)


379

that Defendant's Class Products were not actually made with all or virtually all ingredients and components being made in the United States, they would not have purchased the products.

25. As a result of Defendant's false and misleading statements and failure to clearly and adequately disclose the presence of foreign ingredients and components, as well as Defendant's other conduct described herein, Plaintiff and other similarly situated consumers purchased thousands, if not millions, of Defendant's Class Products and have suffered injury in fact, including the loss of money and/or property.

26. Defendant's conduct as alleged herein violates federal rules as well as several California laws, as more fully set forth herein.

27. This action seeks, among other things, equitable and injunctive relief; restitution of all amounts illegally retained by Defendant; and disgorgement of all ill-gotten profits from Defendant's wrongdoing alleged herein.

**FACTUAL ALLEGATIONS**

28. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

29. Defendant marketed and sold various dietary supplements that were represented and advertised as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and components. Defendant made these representations on its website which resulted in these representations being made on the websites of its third-party vendors, including Walmart.com.[8] These representations were made until, at least, sometime in January 2024 on Defendant's website and even later on third party vendors' websites.

30. Contrary to the representation, Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

31. Dietary supplements, such those sold by Defendant, are often made with numerous

---

[8] *See* https://www.walmart.com/ip/Nitrosurge-Pre-Workout-Powder-Endless-Energy-Instant-Strength-Gains-Clear-Focus-Intense-Pumps-30-Servings-Blue-Raspberry/383327735 (Under Product Details "Each bottle of Nitrosurge pre-workout is manufactured in a state-of-the-art cGMP manufacturing facility in the USA adhering to the most stringent manufacturing standards."; "Manufactured in the USA in a cGMP-Certified Facility.") (last accessed August 1, 2024)


380

KAZEROUNI LAW GROUP, APC

ingredients and components that are foreign sourced due to significant differences in costs of raw material/component production in the United States versus foreign production such as in China.[9] In many cases, certain botanical ingredients cannot grow in the United States due to climate reasons or are not grown commercially due to significant differences in costs of domestic versus foreign agricultural production.

32. Pursuant to Section 1782(d) of the CLRA, Plaintiff provided Defendant with written notice by certified mail on March 8, 2023, outlining the specific violations of Section 1770 and demanding that Defendant rectify the issues (the "CLRA Letter").[10]

33. Specifically, the CLRA Letter provided non-exhaustive examples of Defendant's violations of the rules and laws governing unqualified "Manufactured in the USA" claims, using three products as illustrative examples: the Product, Burn-XT, and N.O. XT (the "CLRA Products").

34. The CLRA Letter informed Defendant that the following ingredients, along with potentially other ingredients in the CLRA Products, were not sourced from the United States, contrary to Defendant's unqualified "Manufactured in the USA" representations: L-citrulline, betaine anhydrous, beta alanine, L-theanine, acetyl-L-carnitine HCl, green tea leaf extract, black pepper extract, arginine, and glutathione (the "CLRA Ingredients").[11]

35. Furthermore, the CLRA Letter specifically stated that "The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here."

---

[9] *See* U.S.-China Economic and Security Review Commission. *Potential Health & Safety Impacts from Pharmaceuticals and Supplements Containing Chinese-Sourced Raw Ingredients*. (2010). https://www.uscc.gov/sites/default/files/Research/NSD_BIO_Pharma_Report--Revised_FINAL_for_PDF--14_%20April_2010.pdf ("This report attempts to shed light and insight on particular issues addressing potential implications of a critical component of a complex supply chain, which contributes to U.S. national health security as China continues to strengthen its position as the world's largest supply source of raw materials for pharmaceuticals and supplements. As first reported in 1998 by the U.S. Government Accounting Office, the U.S. imports an estimated 80% of the raw ingredients contained in both products manufactured, sold and consumed in this country.")

[10] A true and correct copy of Plaintiff's CLRA Letter dated March 8, 2023, is attached hereto as Exhibit B.

[11] For convenience, certain ingredients may be referred to by their common name or abbreviation when referenced individually. For example: citrulline, theanine, ALCAR (for acetyl-L-carnitine HCl), green tea and black pepper.


381

KAZEROUNI LAW GROUP, APC

36. Upon receiving such a letter, a reasonable company would have, at the very least, investigated whether the CLRA Ingredients were, in fact, grown, sourced, or produced outside the United States. In reality, a reasonable company would have conducted an investigation into *all* of its products to determine whether they contained foreign ingredients or components.

37. Some of the CLRA Ingredients appear in the Product, namely citrulline, beta alanine, betaine anhydrous, and theanine. The Product also contains other foreign ingredients, specifically caffeine, theobromine, and AstraGin®.

38. Had Defendant investigated and found that the CLRA Ingredients, and other ingredients in the Product and the Class Products, were, in fact, grown, sourced, or produced within the United States, Defendant would have responded to Plaintiff by correcting Plaintiff's allegations regarding the Product, the CLRA Products and the Class Products and providing evidence of the ingredients' U.S. sourcing.

39. Instead, the Defendant continued to market and sell the Product and Class Products as "Manufactured in the USA"—without qualification—on its website for more than nine months after receiving the CLRA Letter, despite being aware of the foreign ingredients (and potentially components) used in its products. The Class Products continued to be sold with the same unqualified U.S. origin claim on third-party vendor websites for well over nine months after the Defendant received the CLRA Letter.

40. Furthermore, Defendant has yet to provide any evidence that Plaintiff's assertions regarding the origin of the CLRA Ingredients, or other ingredients and components, are incorrect.

41. The Product purchased by Plaintiff contains or is made with ingredients and/or components that are not "Manufactured in the USA." For example, the Product contains AstraGin®, a branded ingredient which is created from the combination of *Astragalus membranaceus* and *Panax notoginseng*.

42. AstraGin® is produced by NuLiv Science U.S.A., Inc. ("NuLiv"), an ingredient supplier. To sell AstraGin® in the European Union, NuLiv had to apply for Novel Food status to the European Food Safety Authority ("EFSA"). The application process requires comprehensive documentation, including sourcing and processing details.




382

KAZEROUNI LAW GROUP, APC

43. The published scientific opinion of the EFSA on NuLiv's application for AstraGin® (*see* Exhibit E)[12] states that AstraGin's *Astragalus membranaceus* roots are sourced from Gansu and Inner Mongolia provinces in China, while the *Panax notoginseng* roots are sourced from Yunnan and Sichuan provinces in China (*see* Exhibit E, Section 3.3 Production Process).

44. *Astragalus membranaceus* and *Panax notoginseng,* are native to China and not commercially grown in the United States.[13] *See* Exhibit E, Section 3.3 Production Process.

45. Irrespective of exactly where *Astragalus membranaceus* and *Panax notoginseng* are sourced, one thing is certain – they are not grown, made, or sourced from within the United States.

46. In addition to foreign *Astragalus membranaceus* and *Panax notoginseng*, the Product contains theobromine, a component of cacao which is not grown commercially in the United States.[14]

47. The Product also contains caffeine, which is generally derived from decaffeination of coffee or tea[15], neither of which is grown commercially or cost effectively in the United States. When not from natural sources, synthetic caffeine is generally produced overseas.[16]

---

[12] *See*, https://efsa.onlinelibrary.wiley.com/doi/epdf/10.2903/j.efsa.2020.6099 ("The *A. membranaceus* roots are purchased from growers in Gansu and Inner Mongolia provinces in the north-western region of China while the *P. notoginseng* roots are acquired from growers in Yunnan and Sichuan provinces in the southern region of China.").

[13] *See* Ji B, Xuan L, Zhang Y, Zhang G, Meng J, Mu W, Liu J, Paek K-Y, Park S-Y, Wang J, et al. Advances in Biotechnological Production and Metabolic Regulation of *Astragalus membranaceus*. Plants. 2023; 12(9):1858. ("As one of the most popular herbal medicines in the world, *A. membranaceus* is mainly derived from wild and cultivated resources in China. Wild plants of *A. membranaceus* are mainly produced in Inner Mongolia, Gansu, Shanxi, and Ningxia. Wild resources have been over-exploited, seriously damaging the ecological environment. Cultivated plants are mainly derived from Shanxi Hunyuan, Gansu Longxi, Inner Mongolia Niuyingzi, and Shaanxi Zizhou."); Zhao H, Han Z, Li G, Zhang S, Luo Y. Therapeutic Potential and Cellular Mechanisms of *Panax Notoginseng* on Prevention of Aging and Cell Senescence-Associated Diseases. Aging Dis. 2017 Dec 1;8(6):721-739. ("*Panax notoginseng*, distributed in the Southwest of China, Japan, Burma, and Nepal, is both cultivated and gathered from wild forests. *Panax notoginseng* is sensitive to sunlight. It grows primarily in the Wenshan mountain area of Yunnan province and is cultivated commercially in the Southwest regions of China.")

[14] *See* https://www.icco.org/growing-cocoa/

[15] *See* https://web.archive.org/web/20240807011447/https://en.wikipedia.org/wiki/Caffeine ("Commercial supplies of caffeine are not usually manufactured synthetically because the chemical is readily available as a byproduct of decaffeination.").

[16] *See* https://whyy.org/segments/where-you-will-get-your-caffeine-buzz-in-the-future/ ("…synthetic caffeine production (and its pollution) mostly moved overseas, especially to China.")


383

KAZEROUNI LAW GROUP, APC

48. One of the CLRA Products, Burn-XT, specifically contains caffeine from coffee bean extract, which cannot be from the United States.[17] Caffeine from coffee appears in other Class Products as well.

49. Thus, upon information and belief, the forms of caffeine contained in the Product and the Class Products are not made or sourced from within the United States.

50. *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are material to the Product's formulation and marketing claims.

51. Because *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are indisputably foreign, "all or virtually all" ingredients in the Product cannot be made in the United States as required by the MUSA Rule for Defendant to lawfully make an unqualified "Manufactured in the USA" claim.

52. Upon information and belief, it is likely that the remaining ingredients and even the packaging components used to produce the Product are foreign.

53. Similarly, the Class Products contain many of the same foreign ingredients as those found in the Product.

54. For example, caffeine is included in numerous of Defendant's products other than the Product, including, but not limited to, Altius Pre, Caffeine, Nitrosurge Shred (also contains theobromine), Nitrosurge Build, Burn-XT, Build-XT Black (also contains theobromine), Burn-XT Powder, Burn XT Stick Pack, Nitrosurge Natural and Nitrosurge Shred Max.

55. *Astragalus membranaceus* and *Panax notoginseng* (as AstraGin®) are included in numerous Class Products other than the Product, including but not limited to, Nitrosurge Build, Nitrosurge Max Pump Surge, Build-XT, GDA-XT, Intrasurge, Green Tea Extract, Nitrosurge Build, and Nitrosurge Shred Max.

56. Defendant uses numerous other indisputably foreign ingredients in numerous of its

[17] *See* https://en.wikipedia.org/wiki/Coffee (See "Map showing areas of coffee cultivation" under "Cultivation and Production" – the United States is not a commercial producer of coffee.)


384

KAZEROUNI LAW GROUP, APC

numerous products, including but not limited to KSM-66 ashwagandha[18] and green tea extract[19].

57. Some of the ingredients, components, and even packaging used by Defendant can be sourced either domestically or internationally — and since this information is exclusively known to Defendant at this time — Plaintiff cannot fully allege the extent of Defendant's unqualified "Manufactured in the USA" violations without further discovery. Nevertheless, Defendant's blatant and willful disregard for the laws discussed herein is well established by the aforementioned, non-exhaustive examples.

58. Despite the presence of numerous indisputable foreign ingredients in the Class Products, Defendant made unqualified "Manufactured in the USA" representations on the main page of its website, on each product page for the Class Products, on each Amazon product page for the Class Products, and even in the "Frequently Asked Questions" section of its website.

59. Adequately and properly qualified "Manufactured in the USA" representations are common and ubiquitous in the dietary supplement industry.

60. Numerous competitors of Defendant including, but not limited to, Optimum Nutrition, Zhou Nutrition, MuscleTech, and BSN, clearly, adequately, and properly qualify "Manufactured in the USA" and "Made in the USA" representations on their products.[20]

61. Some dietary supplement products make no "Manufactured in the USA" or "Made in the USA" representations at all.

62. When consumers like Plaintiff see unqualified "Manufactured in the USA" claims, such as those made by Defendant regarding the Class Products, in an industry where qualified claims are so common, they reasonably believe that the products in question are made entirely in the United States, including ingredients and components.

---

[18] *See* https://ksm66ashwagandhaa.com/traceability/quality-control/ ("The state of Rajasthan in India is one of the most suited terrains known to grow the best quality ashwagandha in the world and that is where, our ashwagandha farms are located.")

[19] *See* https://en.wikipedia.org/wiki/Tea ("Tea is mainly grown in Asia and Africa, with smaller areas in South America and around the Black and Caspian Seas. The four biggest tea-producing countries are China, India, Kenya and Sri Lanka, together representing 81% of world tea production.")

[20] *See* Exhibit D.


385

63. Defendant is not a U.S. based company, but rather a company founded in, operated in and from Newfoundland and Labrador, Canada.

64. Given that Defendant is a Canadian company, the purpose of its unqualified "Manufactured in the USA" was clearly not from Defendant's sense of American patriotism or national pride. Instead, Defendant's motive behind representing the Class Products as "Manufactured in the USA" was solely for the intentional purpose of marketing to American consumers seeking and will pay more for products that are made, including ingredients and components, in the United States. [21]

65. Unlike general wellness dietary supplement companies that offer a wide variety of products for various applications, such as cognitive, cardiovascular, immune, digestive, and anti-aging health, as well as basic vitamins (e.g., Vitamins C, B, D, E, etc.) and minerals, Defendant's marketing focus and product line are much more specific.

66. Specifically, Defendant's exclusive marketing focus, as reflected in its product line, is on sports and athletic performance dietary supplements.

67. Defendant knew that its unqualified "Manufactured in the USA" representations would resonate with sports- and athletic-minded consumers in the United States, particularly given the strong sense of patriotism and national pride prevalent in this community.

68. Defendant's exclusive focus results in Defendant using a much more limited range of ingredients, both in terms of ingredient categories and specific ingredients, compared to a general wellness dietary supplement company.

69. For example, nearly all of the ingredients in Defendant's products, including the Class Products, fall into one of three categories: **Amino Acid/Amino Acid Derivative**, **Stimulant**, or **Herbal Performance**.

70. Examples of ingredients in these categories include, but are not limited to: (1) **Amino Acid/Amino Acid Derivatives**: citrulline, beta alanine, betaine anhydrous, theanine, ALCAR,

[21] *See* https://reshoringinstitute.org/wp-content/uploads/2020/09/made-in-usa-survey.pdf ("Slightly more than 83% [of consumers polled] said they would pay up to 20% more for products made domestically.")


386

KAZEROUNI LAW GROUP, APC

arginine, glutathione, creatine, glutamine, and valine; (2) **Stimulants**: caffeine and theobromine; and (3) **Herbal Performance**: green tea, black pepper, AstraGin®, and ashwagandha.

71. As a result of the narrow range of ingredients and ingredient categories, there is significant overlap and shared use of ingredients between the Class Products, the CLRA Products, and the Product.

72. This relationship is partially illustrated[22] in Exhibit F, which depicts the connection between the CLRA Ingredients, other foreign ingredients in the Product, Ashwagandha, and those in the Class Products.

73. Given Defendant's exclusive focus on sports/athletic performance products (and their consumers), its narrow range of ingredients and ingredient categories, as well as the commonality between the ingredients used in the Product, the CLRA Ingredients, and the Class Products, Plaintiff asserts that the Product and the Class Products are substantially similar. [23]

74. Certain of Defendant's products, including but not limited to its protein and cereal bar products, have been excluded from the definition of Class Products. Plaintiff reserves the right to further allege substantial similarity between the excluded products and the Product should, for example, discovery confirm that the same or similar foreign packaging or other components were used across Defendant's product line.

75. Defendant represented, marketed and sold to the general public via its website, the website of its third-party vendors, and other forms of advertising and marketing that the Class Products are "Manufactured in the USA," without clear, adequate ,and proper qualification. As such, Defendant inaccurately represented that its Class Products are "Manufactured in the USA," which conveys to a reasonable consumer like Plaintiff that the Class Products, including the Product, are made entirely in the United States, made with ingredients and components from the United States,

---

[22] Not all ingredients in the Class Products are represented on the X-axis of the chart. The Class Products contain numerous other foreign ingredients.

[23] *See Miller v. Ghirardelli Chocolate Co.*, 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012) (citing cases); ("hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar."); *see also, e.g., Colucci v. ZonePerfect Nutrition Co.*, No. 12-2907, 2012 WL 6737800, at *4 (N.D. Cal. Dec. 28, 2012); *Astiana v. Dreyer's Grand Ice Cream, Inc.*, No. 11-2910, 2012 WL 2990766, at *11-13 (N.D. Cal. July 20, 2012).


387

KAZEROUNI LAW GROUP, APC

made pursuant to United States labor standards, and are therefore superior quality (*i.e.,* contain better grown ingredients that non-US made products or raw materials). Defendant possesses superior knowledge of the true facts that were not disclosed regarding the Class Products, thereby tolling the running of any applicable statute of limitations.

76. The types of misrepresentations and/or omissions made by Defendant, as described herein, were considered by Plaintiff, a reasonable consumer, when deciding to purchase the Product.

77. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendant's representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the products were "Manufactured in the USA," when Defendant's Class Products are in fact wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

78. Reasonable consumers, including Plaintiff, attached importance to the "Manufactured in the USA" representations made by Defendant on its Product and the Class Products.

79. Consumers who purchased the Class Products on Defendant's website or through third-party vendor websites were not the only consumers who were exposed to and relied upon the unqualified and false "Manufactured in the USA" representations made by Defendant. Defendant's website contains a "Find A Store" link[24] making it highly likely that hundreds of thousands of consumers saw the unqualified and false "Manufactured in the USA" representations and proceeded to purchase Class Products in brick-and-mortar stores like The Vitamin Shoppe.

80. Most consumers possess limited knowledge of the likelihood that products are made with or contain ingredients and components that are not "Manufactured in the USA" when they are advertised and represented to be "Manufactured in the USA." This is a material factor in many individuals' purchasing decisions which they rely upon as they believe they are purchasing a product that is "Manufactured in the USA" with ingredients and components from the United States.

81. Consumers generally believe that products that are "Manufactured in the USA" are made entirely in the United States, made of ingredients and components from the United States, made

[24] *See* https://www.jackedfactory.com/pages/storelocator



KAZEROUNI LAW GROUP, APC

pursuant to United States labor standards, and are therefore of superior quality (*i.e.,* contain better grown ingredients that non-US made products or raw materials).

82. On information and belief, Defendant's misrepresented Class Products were purchased by consumers over Defendant's competitors' properly and legally marketed products, during the entirety of the relevant four-year statutory time period, based on the unqualified, false and deceptive "Manufactured in the USA" representations (or some derivative thereof) made with respect to Defendant's products. Federal rules and California laws are designed to protect consumers from such false representations and predatory conduct.

83. Defendant's "Manufactured in the USA" representation was misleading to a reasonable consumer.

84. On or about January 24, 2023, Plaintiff searched online for a pre-workout supplement when he discovered the Product and its unqualified and misrepresented "Manufactured in the USA" claim. Plaintiff subsequently purchased the Product on Amazon.

85. At the time of Plaintiff's purchase, the description of the Product described the Product as "Manufactured in the USA," without any qualification, when the Product was actually made with or contained ingredients and/or components that were not "Manufactured in the USA." Accordingly, Defendant was not entitled to lawfully make representations that the Product was "Manufactured in the USA" without qualification as per the MUSA Rule.

86. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendant as follows:

i. The "who" is Defendant;

ii. The "what" is representation that Defendant's Class Products are "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

iii. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

iv. The "where" is in Defendant's advertisements and marketing of the Class Products;

KAZEROUNI LAW GROUP, APC


389

v. The "to whom" is Plaintiff and the putative Class who bought the Class Products;

vi. The "by what means" is by Defendant representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA. Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

vii. The "how" is the allegation that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

87. It is widely and generally known that consumers prefer products that are "Manufactured in the USA" due to quality, support for local businesses, national economic, environmental and other reasons. The preference is increased when the products are health related and ingestible due to the potential for inferior ingredients and components being manufactured overseas. In making the decision to purchase Defendant's Product, Plaintiff relied upon the advertising, marketing and/or other promotional materials prepared, approved and distributed and/or published by Defendant and its agents and disseminated through its Class Products' advertising containing the misrepresentations alleged herein.

88. Defendant's false representation is that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA, while Defendant knew that fact.

89. Defendant intended to deceive Plaintiff and the Class members into buying the Class Products knowing that consumers would prefer, purchase, and likely pay more for products "Manufactured in the USA" versus other products not "Manufactured in the USA."

90. Plaintiff justifiably relied on Defendant's "Manufactured in the USA" representation.

KAZEROUNI LAW GROUP, APC


390

Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

91. Plaintiff paid and purchased the Product which was of less or little value than what he paid for.

92. Defendant's "Manufactured in the USA" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

93. Had Plaintiff been made aware that the Product, including its ingredients and components, was not actually "Manufactured in the USA," he would not have purchased the Product, or would not have purchased the Product for the price he paid. In other words, Plaintiff would not have purchased Defendant's Product, or paid the amount he did for the purchase of the Product, but for the unqualified "Manufactured in the USA" representations on Defendant's website and advertising on the websites of its third-party vendors which Plaintiff reasonably relied on.

94. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's unqualified and false "Manufactured in the USA" designation set forth on Defendant's website and advertising on the websites of its third-party vendors.

95. In each case when Plaintiff and putative Class members purchased a Class Product, they relied upon Defendant's unqualified "Manufactured in the USA" representation in their purchasing decision, which is typical of most U.S. consumers. Consequently, they were deceived as a result of Defendant's actions. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

96. Defendant's Class Products are made with or contain ingredients and components that are not manufactured in the USA, similar to the Product purchased by Plaintiff. Plaintiff and putative Class members purchased Defendant's misrepresented Class Products over Defendant's competitors' properly and legally marketed products that clearly and adequately qualify "Manufactured in the USA" claims or do not make the "Manufactured in the USA" claims at all. The precise amount of


391

KAZEROUNI LAW GROUP, APC

Plaintiff and the Class members' damages will be proven at the time of trial, in large part, by expert testimony.

97. Plaintiff and Class members were undoubtedly injured as a result of Defendant's unqualified and false "Manufactured in the USA" representations that are at issue in this matter.

**CLASS ACTION ALLEGATIONS**

98. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

99. Plaintiff brings this action individually and on behalf of all others similarly situated against Defendant, pursuant to California Code of Civil Procedure Section 378.

100. Plaintiff represents, and is a member of the class, ("the Class") consisting of:

> All persons similarly situated within the state of California, who purchased one or more of Defendant's Class Products, which were represented and/or advertised as "Manufactured in the USA" (or similar words), that were made with or contained ingredients or components that were not manufactured in the USA, within the four years prior to the filing of the Complaint."

101. Excluded from the Class are Defendant and any of its officers, directors, and employees.

102. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

103. The "Class Period" means four years prior to the filing of the Complaint in this action.

104. This action has been brought and may properly be maintained as a class action under the provisions of § 382 of the California Code of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

105. **Ascertainability**. Plaintiff does not know the number of members in the Class, but Plaintiff currently believes that there are hundreds of thousands, if not more, members of the Class within the State of California. Because of the nature of Defendant's products and applicable regulations, Defendant must keep detailed and accurate records of production, manufacturing, sale and distribution. Therefore, the members of the Class are ascertainable through Defendant's records and/or Defendant's agents' records regarding retail and sales, as well as through public notice. This matter should therefore be certified as a Class action to assist in the expeditious litigation of this


392

KAZEROUNI LAW GROUP, APC

matter.

106. **Numerosity**. The members of the Class are so numerous and geographically disbursed that joinder of all Class members is impractical, and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court.

107. **Existence and Predominance of Common Questions of Law and Fact**. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. Common questions of fact and law exist in this matter that predominate over questions that may affect individual Class members, including, but not limited to, the following:

a. Whether Defendant committed the wrongful conduct alleged herein;

b. Whether Defendant's claims and representations, as alleged herein, are untrue, misleading, and/or reasonably likely to deceive the average consumer;

c. Whether Defendant's acts, transactions, or course of conduct constitute the violations of law alleged herein;

d. Whether Defendant's conduct violates 16 C.F.R. §§ 323, *et seq*.;

e. Whether Defendant's conduct violates California Civil Code §§ 1750, *et seq*.;

f. Whether Defendant's advertising is false, untrue, or misleading within the meaning of California Business & Professions Code §§ 17500, *et seq*.;

g. Whether Defendant's conduct is an unfair, fraudulent, or unlawful act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

h. Whether Defendant's advertising is unfair, deceptive, untrue or misleading within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

i. Whether Defendant acted negligently or intentionally in making the misrepresentations contained regarding the Class Products thought its website and the websites of its third-party vendors;

j. Whether Defendant, through its conduct, received money that, in equity and good conscience, belongs to Plaintiff and members of the Class;

k. Whether the members of the Class sustained and/or continue to sustain damages attributable to Defendant's conduct, and, if so, the proper measure and appropriate




393

KAZEROUNI LAW GROUP, APC

formula to be applied in determining such damages; and

l. Whether the members of the Class are entitled to injunctive and/or any other equitable relief, including but not limited to restitution and/or disgorgement of ill-gotten gains.

108. **Typicality**. As a person who purchased one or more of Defendant's products, that were advertised as "Manufactured in the USA" but are made with or contain ingredients and/or components that are not manufactured in the USA, Plaintiff is asserting claims that are typical of the Class. Plaintiff's claims involve the same violations of law by Defendant as other Class Members' claims. Plaintiff and members of the Class also sustained damages arising out of Defendant's common course of conduct complained herein. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent members of the Class. Defendant has no defenses unique to the Plaintiff.

109. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of other members of the Class in that Plaintiff has no interests antagonistic to any member of the Class. Further, Plaintiff has retained counsel experienced in handling class action claims and claims involving violations of the consumer laws like violations of the California Business and Professions Code, and, specifically, false and deceptive advertising. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and proposed Class.

110. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent and/or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendant. The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them. Even if the members of the proposed Class could afford such litigation, the court system could not.


394

KAZEROUNI LAW GROUP, APC

Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable pursuant to Cal. Code of Civil Procedure § 382.

111. Unless the Class is certified, Defendant will retain monies received as a result of Defendant's unlawful and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendant will also likely continue to, or allow its agents to, advertise, market, promote and package Defendant's Class Products in an unlawful and misleading manner, and members of the Class will continue to be misled, harmed, and denied their rights under California law.

112. Further, Defendant has acted or refused to act on grounds that are generally applicable to the class so that declaratory and injunctive relief is appropriate to the Class as a whole, making class certification appropriate.

**FIRST CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**

**CAL. CIV. CODE SECTION 1750, ET SEQ.**

113. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

114. California Civil Code §§ 1750 et seq., entitled the Consumers Legal Remedies Act (hereinafter "CLRA"), provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer." The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, *inter alia*, that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.

115. Defendant's Product and the Class Products constitute "goods" as defined pursuant to Civil Code Section 1761(a).








395

KAZEROUNI LAW GROUP, APC

116. Plaintiff, and the Class members, are each a "consumer" as defined pursuant to Civil Code Section 1761(d).

117. Each of Plaintiff's and the Class members' purchases of Defendant's Class Products constituted a "Transaction" as defined pursuant to Civil Code Section 1761(e).

118. Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) provides that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> (2) [m]isrepresenting the source, sponsorship, approval, or certification of goods or services;
> (3) [m]isrepresenting the affiliation, connection, or association with, or certification by, another;
> (4) [u]sing deceptive representations or designations of geographic origin in connection with goods and services;
> (5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;
> (7) [r]epresenting that goods or services are of a particular standard, quality, or grade…; [and]
> (9) [a]dvertising goods or services with intent not to sell them as advertised."

119. Defendant violated Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) by marketing and representing that its Class Products are "Manufactured in the USA," or some derivative thereof, when they are made with or contain ingredients and components that are not manufactured in the United States.

120. Defendant's "Manufactured in the USA" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

121. Pursuant to section 1782(d), by letter dated March 8, 2023, Plaintiff provide Defendant notice in writing by certified mail of the particular violations of section 1770 and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. Defendant failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers


396

within thirty days of the date of written notice pursuant to section 1782. Therefore, Plaintiff and the Class further seek actual, punitive, and statutory damages, as deemed appropriate.

122. Attached hereto as Exhibit C is a sworn affidavit from Plaintiff pursuant to Cal. Civ. Code § 17801(d).

123. On information and belief, Defendant's violations of the CLRA set forth herein were done with awareness of the fact that the conduct alleged was wrongful and was motivated solely for Defendant's self-interest, monetary gain and increased profit. Plaintiff further alleges that Defendant committed these acts knowing the harm that would result to Plaintiff and Defendant engaged in such unfair and deceptive conduct notwithstanding such knowledge.

124. Plaintiff further alleges that Defendant committed these acts knowing the harm that would result to Plaintiff and Defendant engaged in such unfair and deceptive conduct notwithstanding such knowledge.

125. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's unqualified and false "Manufactured in the USA" representations set forth in Defendant's website and the websites of its third-party vendors regarding the Product and the Class Products.

126. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiff and members of the Class are entitled to a declaration that Defendant violated the Consumer Legal Remedies Act.

127. Plaintiff, on behalf of himself and the Class demands judgment against Defendant for damages, restitution, punitive damages, statutory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

128. Pursuant to section 1780(e) of the California Civil Code, Plaintiff and the Class make claims for damages and attorneys' fees and costs.

129. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

KAZEROUNI LAW GROUP, APC


397

**SECOND CAUSE OF ACTION**

**VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")**

**BUS. & PROF. CODE §§ 17500, *ET SEQ*.**

130. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

131. Plaintiff and Defendant are both "person[s]" as defined by Cal. Bus. & Prof. Code § 17506.

132. Cal. Bus. & Prof. Code § 17535 authorizes a private right of action on both an individual and representative basis.

133. Defendant misrepresented its Class Products as "Manufactured in the USA" without clear and adequate qualification when in fact Defendant's Class Products are made with or contain ingredients and components that are not manufactured in the USA.

134. Defendant's Class Products are made with ingredients/components that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

135. These misrepresentations, acts, and non-disclosures by Defendant constitute false and misleading advertising in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

136. At all times relevant, Defendant's representations and advertising of its Class Products was untrue, misleading, and likely to, and did, deceive the reasonable consumer and the public.

137. Defendant engaged in the false and/or misleading advertising and marketing of its Product, as alleged herein, with the intent to directly or indirectly induce consumers to purchase its products, which Defendant knew, or had reason to know, that the Class Products were made with or contained ingredients and components that were not manufactured in the USA.

138. Defendant's "Manufactured in the USA" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

139. Because Defendant knew or should have known that the representations and/or omissions alleged herein regarding the Class Products were untrue or misleading, Defendant acted in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.


398

140. Had Defendant clearly, adequately and truthfully qualified and advertised that its Class Products were made with or contained ingredients and components that were not manufactured in the USA, Plaintiff and the putative Class members would not have purchased the Class Products, would have paid a different price, or would have purchased a different product from another company.

141. As a direct and proximate result of the aforementioned acts and omissions by Defendant, Defendant received and continues to hold monies rightfully belonging to Plaintiff and the putative Class members, who were led to purchase Defendant's Class Products during the Class Period.

**THIRD CAUSE OF ACTION**

**VIOLATION OF BUSINESS & PROFESSIONS CODE**

**BUS. & PROF. CODE, SECTION 17200, ET SEQ.**

142. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

143. Plaintiff and Defendant are each "person[s]" as defined by California Business & Professions Code § 17201. California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

144. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

145. By and through Defendant's conduct alleged in further detail above and herein, Defendant engaged in conduct which constitutes unlawful, unfair, and/or fraudulent business practices prohibited by Bus. & Prof. Code §§ 17200, et seq.

***A. "Unlawful" Prong***

146. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.


399

KAZEROUNI LAW GROUP, APC

147. The violation of any law constitutes as "unlawful" business practice under the UCL.

148. Beginning at a date currently unknown, Defendant committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code §§ 17200, et seq. by manufacturing, distributing, and/or marketing Defendant's Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq., and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq., by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

149. Defendant violated the MUSA Rule**,** 16 C.F.R. § 323, by making its representations on the Class Products without clear and adequate qualification that Defendant's Class Products are "Manufactured in the USA" or made with or contain ingredients and components that are not manufactured in the USA.

150. Defendant's acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of the MUSA Rule, FAL, and the CLRA, as described above.

151. These alleged acts and practices by Defendant were intentional in violation of the MUSA Rule, FAL, and the CLRA.

152. Pursuant to the UCL, Plaintiff and the Class are entitled to preliminary and permanent injunctive relief and order Defendant to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the Class of all the revenues associated with this unfair and unlawful competition, or such proton of said revenues as the Court may find applicable.

***B. "Unfair" Prong***

153. Beginning at a date currently unknown, Defendant committed acts of unfair competition that are prohibited by Bus. & Prof. Code section 17200 et seq. Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes by engaging in conduct and practices that threaten an incipient violation of law/s or violate the policy or spirit of


KAZEROUNI LAW GROUP, APC
LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

400

law/s by manufacturing, distributing, and/or marketing Defendant's Class Products with a false ingredient origin information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein were "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

154. Clearly said, Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

155. Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices that are immoral, unethical, oppressive or unscrupulous, the utility of such conduct, if any, being far outweighed by the harm done to consumers and against public policy by manufacturing, distributing, and/or marketing Defendant's Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

156. Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices, including manufacturing, distributing, marketing, and/or advertising Defendant's Class Products with false ingredient information, wherein: (1) the injury to the consumer was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was not of the kind that consumers themselves could not have reasonably avoided.

***C. "Fraudulent" Prong***

157. Beginning at a date currently unknown, Defendant engaged in acts of unfair competition, including those described above and herein, prohibited and in violation of Bus. & Prof. Code § 17200 et seq., by engaging in a pattern of "fraudulent" business practices within the meaning








401

KAZEROUNI LAW GROUP, APC

of Bus. & Prof. Code § 17200 et seq, by manufacturing, distributing, and/or marketing Defendant's Class Products in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

158. Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

159. Plaintiff reserves the right to allege further conduct that constitutes other fraudulent business acts or practices. Such conduct is ongoing and continues to this date.

***D. "Unfair, Deceptive, Untrue or Misleading Advertising" Prong***

160. Defendant's advertising was unfair, deceptive, untrue and/or misleading in that consumers were led to believe that Defendant's Class Products are "Manufactured in the USA" when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

161. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendant's representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the Class Products are actually manufactured in the USA with ingredients and components from the USA given the absence of clear and adequate qualification of Defendant's "Manufactured in the USA" representations.

162. Contrary to the representation, Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

163. Defendant's "Manufactured in the United States" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

164. Defendant's unfair, deceptive, untrue, or misleading advertising presented a threat to the public by engaging in unlawful conduct that resulted in harm to consumers.

165. Defendant engaged in these unlawful, unfair, and fraudulent business practices


402

KAZEROUNI LAW GROUP, APC

motivated solely by Defendant's self-interest with the primary purpose of collecting unlawful and unauthorized monies from Plaintiff and all others similarly situated; thereby unjustly enriching Defendant.

166. Such acts and omissions by Defendant were unlawful and/or unfair and/or fraudulent and constitute a violation of Business & Professions Code §§ 17200, et seq. Plaintiff reserves the right to identify additional violations by Defendant as may be established through discovery.

167. As a direct and proximate result of the aforementioned acts and representations described above and herein, Defendant received unearned commercial benefits at the expense of its competitors and the public.

168. As a direct and proximate result of Defendant's unlawful, unfair and fraudulent conduct described herein, Defendant has been unjustly enriched by the receipt of ill-gotten gains from customers, including Plaintiff, who unwittingly provided money to Defendant based on Defendant's representations.

169. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's false representations set forth on the Defendant's Class Products.

170. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

## FOURTH CAUSE OF ACTION FOR
## NEGLIGENT MISREPRESENTATION

171. Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully stated herein.

172. At a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendant represented to the public, including Plaintiff, by packaging, advertising, marketing and other means, that Defendant's Class Products are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.


403

KAZEROUNI LAW GROUP, APC

173. Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

174. Defendant made the representations herein alleged with the intention of inducing the public, including Plaintiff and putative class members, to purchase Defendant's Class Products over similar products from competitors which clearly and adequately qualified their "Manufactured in the USA" representations or made no "Manufactured in the USA" representations at all.

175. Defendant's "Manufactured in the United States" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

176. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendant's advertising representations and, in reliance on them, purchased the Class Products, as described herein.

177. At all times relevant, Defendant made the misrepresentations herein alleged when Defendant should have known these representations to be untrue, and Defendant had no reasonable basis for believing the representations to be true.

178. As a proximate result of Defendant's negligent misrepresentations, Plaintiff and other consumers similarly situated were induced to purchase, purchase more of, purchase instead of, or pay more for Defendant's Class Products, due to the unlawful acts of Defendant, in an amount to be determined at trial, during the Class Period.

**FIFTH CAUSE OF ACTION FOR**

**INTENTIONAL MISREPRESENTATION**

179. Plaintiff repeats, re-alleges and incorporates herein by reference the above allegations as if fully stated herein.

180. At a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendant intentionally represented to the public, including Plaintiff, by promoting and other means, that Defendant's Class Products were "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.


404

181. Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

182. Defendant's "Manufactured in the USA" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

183. Defendant made the representations herein alleged with the intention of inducing the public, including Plaintiff, to purchase Defendant's Class Products for Defendant's own financial gain.

184. Defendant intentionally made such misrepresentations by printing and advertising its misrepresentations its website and the websites of its third-party vendors.

185. Defendant's misrepresentations of the Class Products as "Manufactured in the USA" without clear and adequate qualification was misleading because Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

186. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendant's advertising representations and, in reliance on such representations, purchased the Class Products, as described above.

187. At all times relevant, Defendant intentionally made the misrepresentations herein alleged and allowed the misrepresentations to continue to be made by its resellers when Defendant knew the representations to be false.

188. As a proximate result of Defendant's intentional misrepresentations, Plaintiff and other consumers similarly situated were induced to spend an amount of money to be determined at trial on Defendant's misrepresented Products.

189. Defendant knew that its Class Products were in fact not "Manufactured in the USA" without clear and adequate qualification but instead made with or contain ingredients and components that are not manufactured in the USA, but nevertheless made the representations described herein with the intention that consumers rely on Defendant's representations.

190. Defendant also knew that its website, as well as the websites of its third-party vendors, were advertising its Class Products as "Manufactured in the USA" without clear and adequate


405
KAZEROUNI LAW GROUP, APC

qualification, when Defendant clearly knew that its Class Products were in fact made with or contained ingredients and components that were not manufactured in the USA.

191. Plaintiff and other consumers similarly situated, in purchasing and using the Class Products as herein alleged, did rely on Defendant's representations, including the representations on Defendant's advertisements and website, all to their damage and/or detriment as herein alleged.

192. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendant as follows:

viii. The "who" is Defendant;

ix. The "what" is representation that Defendant's Class Products were "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

x. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

xi. The "where" is in Defendant's product advertisements and marketing;

xii. The "to whom" is Plaintiff and the putative class who bought the Class Products;

xiii. The "by what means" by Defendant representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA;

xiv. The "how" is the allegation that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

193. By engaging in the acts described above, Defendant is guilty of malice, oppression, and fraud, and Plaintiff and the Class members are therefore entitled to recover exemplary or punitive damages.








406

KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the Court grant Plaintiff and the putative Class the following relief:

- That this action be certified as a Class Action;
- That Plaintiff be appointed as the Class Representative;
- That Plaintiff's attorneys be appointed as Class Counsel;
- That Defendant's wrongful conduct be adjudged and decreed to violate the consumer protection statutes raised herein;
- That Plaintiff and each of the other members of the Class recover the amounts by which Defendant and Does have been unjustly enriched;
- An order requiring imposition of a constructive trust and and/or disgorgement of Defendant's and Does' ill-gotten gains and to pay restitution to Plaintiff and all members of the Class and to restore to the Plaintiff and members of the class all funds acquired by means of any act or practice declared by this court to be an unlawful, fraudulent or unfair business act or practice, in violation of laws, statutes or regulations, or constituting unfair competition;
- Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery were necessary and as applicable, to prevent Defendant or Does from retaining the benefits of their wrongful conduct;
- That Defendant and Does be enjoined from continuing the wrongful conduct alleged herein and be required to comply with all applicable laws;
- A temporary, preliminary and/or permanent order for injunctive relief requiring Defendant and Does to: (i) discontinue its false and/or misleading statement/s; and (ii) undertake an immediate public information campaign to inform members of the proposed class as to their prior practices;
- Pre-judgment interests from the date of filing of this suit;
- that Plaintiff and each member of the putative Class recover their costs of suit.


407

**CAL. BUS. & PROF. CODE §§ 1750, *ET SEQ.***

- Actual damages, injunctive relief, restitution, and punitive damages pursuant to Cal. Civ. Code § 1780(a); and
- an award of costs and attorney's fees pursuant to Cal. Civ. Code § 1780(d).

**SECOND CAUSE OF ACTION FOR**
**VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW**
**CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17535; and
- Recovery of reasonably attorney's fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**THIRD CAUSE OF ACTION FOR**
**VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17203; and
- Recovery of reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**FOURTH CAUSE OF ACTION FOR**

**NEGLIGENT MISREPRESENTATION**

- A judgment against Defendant and Does for general and compensatory damages in an amount to be determined at trial; and

**FIFTH CAUSE OF ACTION FOR**

**INTENTIONAL MISREPRESENTATION**

- A judgment against Defendant and Does for general and compensatory damages in an amount to be determined at trial;
- Punitive damages pursuant to Cal. Civ. Code § 3294; and
- That Plaintiff and the members of the Class be granted any other relief the Court may deem just and proper.

///

///

///





KAZEROUNI LAW GROUP, APC


408

**TRIAL BY JURY**

194. Plaintiff is entitled, and demands, a trial by jury on all issues so triable.

Dated: March 27, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: */s/ Gustavo Ponce*
Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*

KAZEROUNI LAW GROUP, APC


409

KAZEROUNI LAW GROUP, APC

**PROOF OF SERVICE**

I am over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On March 27, 2025, I served the foregoing document and accompanying attachments by the means indicated below:

☒ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

☒ ELECTRONIC SERVICE - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m. The electronic filing system sends an e-mail notification of the filing to the parties and counsel of record.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Angela M. Sousa
Anthony Hopp
Melanie A. Ayerh
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
jsingh@steptoe.com
asousa@steptoe.com
ahopp@steptoe.com
mayerh@steptoe.com
*Attorneys for Defendant*
*Nutra Holdings, Inc. d/b/a Jacked Factory*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on March 27, 2025, at Las Vegas, Nevada.

*/s/ Gustavo Ponce*
GUSTAVO PONCE


410

# EXHIBIT A

KAZEROUNI LAW GROUP, APC


411

# CLASS PRODUCTS

1. Altius Pre
2. Androsurge
3. Build PM
4. Build XT
5. Burn XT
6. Burn XT Black
7. Burn XT Powder
8. Burn XT Stick Packs
9. Caffeine
10. Defend XT
11. Dry XT
12. EAA Surge
13. Flex XT
14. GDA XT
15. Green Surge (Capsules)
16. Green Surge (Powder)
17. Green Tea
18. Intra Surge
19. L-Arginine
20. Lean PM
21. Lean XT
22. N.O. XT
23. Nitrosurge Build
24. Nitrosurge Max
25. Nitrosurge Natural
26. Nitrosurge Pre-Workout (the Product)
27. Nitrosurge Shred
28. Primasurge
29. Pro Series Test
30. Pump Surge
31. Red Surge
32. Test PM

Class Products with multiple flavors, packaging sizes or other variations not specifically listed here are all subject to this letter.

KAZEROUNI LAW GROUP, APC


412

KAZEROUNI LAW GROUP, APC

# EXHIBIT B


413

KAZEROUNI LAW GROUP, APC

245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523
www.kazlg.com

March 8, 2023

**VIA FEDEX**
Nutra Holdings, Inc d/b/a Jacked Factory
c/o John Williams
Chief Executive Officer
145 Aberdeen Avenue, Unit 1
St. John's, NL A1A 5P6
Canada

Nutra Holdings, Inc. d/b/a Jacked Factory
c/o Stewart McKelvey
Cabot Place
100 New Gower Street, Suite 1100
St. John's, NL A1C 6K3
Canada

**AGENT FOR SERVICE; VIA CERTIFIED US MAIL, WITH RETURN RECEIPT REQUESTED**
Nutra Holdings, Inc. d/b/a Jacked Factory's
c/o The Corporation
311 Crossways Park Drive
Woodbury, NY 11797

Nutra Holdings, Inc. d/b/a Jacked Factory's
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

**VIA EMAIL**
support@jackedfactory.com

**RE: Demand Letter Pursuant to California Civil Code § 1750 *Et Seq*.**

Dear Sir or Madam:

This letter serves as notice and demand for corrective action by our client, Daniel Rossi, ("Mr. Rossi"),[1] on behalf of himself an all others similarly situated within the State of California pursuant to the Consumers Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*), ("CLRA"). This letter is sent on behalf of Mr. Rossi, a consumer and purchaser of Nutra Holdings, Inc. d/b/a Jacked

[1] This firm represents Daniel Rossi. Please refrain from contacting Mr. Rossi directly. Please direct any and all communications to this office.


414

Factory's ("Jacked Factory") Nitrosurge Pre-workout[2] dietary supplement (the "Product"). We hereby demand that you take immediate corrective action within thirty (30) days as further described below.

On January 24, 2023, Mr. Rossi, a resident of California, searched online for a pre-workout supplement. During his online search, Mr. Rossi discovered the Product on Amazon.com. After reviewing the Product, Mr. Rossi decided to purchase a 30 serving container of the Product from Amazon.com.

Jacked Factory markets and advertises various products, including the Product purchased by our client, as "Manufactured in the USA." This representation, which is displayed prominently on the advertising of Jacked Factory products, including the company's website at www.jackedfactory.com and in the company's Amazon.com product pages, conveys important representations to consumers regarding the quality and characteristics of Jacked Factory's products. Specifically, the term "Manufactured in the USA" conveys to a reasonable consumer that Jacked Factory's products, including the Product, are made entirely in the United States, made of ingredients from the United States, made pursuant to United States labor standards, and are therefore of superior quality (i.e., contain better grown ingredients than non-US made products or raw materials). Mr. Rossi relied on these representations by Jacked Factory when making the decision to purchase the Product for its advertised price of $29.99 plus shipping & handling as well as applicable tax.

Contrary to its "Manufactured in the USA" representation, many, if not all, products produced and sold by Jacked Factory contain or are made with ingredients that are not "Manufactured in the USA." For example, the Product contains L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine, which in this instance, among other ingredients in the product, are not from the United States, yet its advertising states "Manufactured in the USA." Similarly, Jacked Factory's Burn-XT contains acetyl-L-Carnitine HCl, Green Tea Leaf Extract and Black Pepper Fruit Extract, which in this instance, among other ingredients in the product, are not from the United States, yet the advertising on its webpage, at https://www.jackedfactory.com/products/burn-xt, also states "Manufactured in the USA." Jacked Factory's N.O. XT contains Arginine, Glutathione and Citrulline, which in this instance, among other ingredients in the product, are not from the United States, yet its advertising states "Manufactured in the USA" (See https://www.jackedfactory.com/products/no-xt). Additionally, on Jacked Factory's website, it even lists an "FAQ" of "Where is [Product] Manufactured" on each of its product's website pages to which the response by Jacked Factory is "All Jacked Factory products are ***proudly manufactured in the USA*** in a cGMP certified facility using the highest quality control guidelines for maximum potency, quality, & safety." (emphasis added).

The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here. However, it is abundantly clear that Jacked Factory pays no attention to applicable laws regarding the labeling of its products with "Manufactured in the USA", or any

---

[2] As titled on Amazon.com when our client bought the Product: "*NITROSURGE Pre Workout Supplement - Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps - Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White.*"


415

derivative thereof. **Therefore, each and every one of Jacked Factory products[3] regardless of brand, type, configuration or size, including but not limited to the aforementioned brands and products, containing foreign ingredients, components or raw materials and any reference to "Manufactured in the USA" or any derivative thereof, is subject to the demand/s made in this letter. Please note that should this firm file suit on behalf of our client, we will seek to represent the purchasers of any and all of Jacked Factory misrepresented products.**

Section 1770(a) of the CLRA prohibits, among other things, the following unfair methods of competition and unfair or deceptive acts or practices when attempting to sell or selling goods and services to consumers: (2) Misrepresenting the source, sponsorship, approval, or certification of goods or services; (3) Misrepresenting the affiliation, connection, or association with, or certification by, another; (4) Using deceptive representations or designations of geographic origin in connection with goods or services; (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have; (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (9) Advertising goods or services with intent not to sell them as advertised. (*See* Cal. Civil Code sections 1770(a) (2), (3), (4), (5), (7), and (9).)

The above-described representations and/or omissions are false and misleading and constitute unlawful, unfair, or fraudulent acts, or practices and unfair methods of competition in violation of the CLRA, including but not limited to §§ 1770(a)(2), (3), (4), (5), (7), and (9). The representations also violate California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq*; and California's False Advertising Law, California Business & Professions Code §§ 17500, *et seq.* Jacked Factory has and continues to mislead consumers into believing that its products containing the aforementioned ingredients, among others, are "Manufactured in the USA," when in fact that is not true. These misrepresentations allow Jacked Factory to increase its sales and capture market share from its competitors.

If our client had known the true nature of Jacked Factory's products, he would not have purchased the Product. Our client is a citizen of the State of California and is a consumer as defined in California Civil Code § 1761(d) because he purchased the Product for personal, family, or household purposes. Our client saw and read Jacked Factory's advertising representations and relied on such false and deceptive marketing in deciding to purchase the Product. As a result, our client was injured and suffered loss of money.

We hereby demand on behalf of our client and all other similarly situated that Jacked Factory immediately:

> (1) cease and desist from the continued sale of all its misrepresented products with the "Manufactured in the USA" representation, including the Product as well as those in Exhibit A;

---

[3] For a list that includes, but is not limited to, Jacked Factory products subject to this letter see Exhibit A.


416

(2) initiate a corrective advertising campaign to inform consumers about the true nature of its products, including the Product as well as those in Exhibit A;
(3) initiate a full recall with an offer to refund the purchase price of all misrepresented Jacked Factory products, including the Product purchased by our client, as well as those in Exhibit A, plus reimbursement for interest; and
(4) pay reasonable attorneys' fees and costs.

Please comply with this demand within thirty (30) days from receipt of this letter. Please be advised that your failure to comply with this request within thirty (30) calendar days may subject you to the following remedies under the CLRA:

(1) The actual damages suffered;
(2) An order enjoining you for such methods, acts or practices;
(3) For restitution of property if applicable;
(4) Punitive damages;
(5) Court costs and reasonable attorneys' fees; and
(6) Any other relief which the court deems proper.

**NOTICE OF DUTY TO PRESERVE EVIDENCE**

**Since litigation may be filed in this matter, this letter also serves as notice to Jacked Factory, its suppliers, contract manufacturers, web development firms, Amazon firms, marketing agencies and anyone involved in the sourcing, manufacturing, production/creation of packaging, distribution, sales, advertising and marketing of Jacked Factory's products of their duty to preserve and retain all documents, tangible items, and electronically stored information and communications that are potentially relevant to this matter, including, but not limited to, documents detailing revisions of marketing, advertising, packaging and quantities of each product produced and/or sold.**

If Jacked Factory wishes to enter into discussions to resolve the demands asserted in this letter, please contact me immediately. Your cooperation in this matter would be greatly appreciated.

Yours truly,

***/s/ Abbas Kazerounian***

Abbas Kazerounian, Esq.
Direct Line: 800-400-6808 Ext: 2
ak@kazlg.com






417

# Exhibit A

1. Nitrosurge Pre-Workout
2. Nitrosurge Shred
3. Authentic Whey
4. Burn XT
5. Creatine Monohydrate
6. Pump Surge
7. Authentic Protein Cereal
8. Lean PM
9. N.O. XT
10. EAA Surge
11. Andro Surge
12. Build XT
13. Authentic Iso
14. Prima Surge
15. Hydra Surge
16. Intra Surge
17. Green Surge Powder
18. Green Surge Capsules
19. Burn XT Black
20. Lean XT
21. Dry XT
22. Carb Surge
23. Altius Pre
24. Build PM
25. BCAA
26. Vita XT
27. Test PM
28. Defend XT
29. L-Glutamine
30. L-Arginine (Nitrosigine)
31. Burn XT Powder
32. GDA XT
33. Red Surge
34. Green Tea Extract
35. Pro Series Test
36. Authentic Casein
37. Burn XT Stick Packs
38. Authentic Vegan
39. Form XT
40. Caffeine
41. Flex XT
42. Crea Surge
43. Nitro Surge Build


418

44. Nitro Surge Natural
45. Nitro Surge Max
46. Any and all other products that contain "Manufactured in the USA" or any derivative thereof in any of their advertising or marketing.

Products with multiple flavors, packaging or other variations not specifically listed here are all subject to this letter.


419

KAZEROUNI LAW GROUP, APC

# EXHIBIT C


420

KAZEROUNI LAW GROUP, APC

**AFFIDAVIT OF JENNIFER HYATT**

I, DANIEL ROSSI, DECLARE:

1. On or about January 25, 2023, I visited Amazon.com and purchased Defendant's Nitrosurge Pre-workout[1] dietary supplement (the "Product").
2. At the time of my purchase and review of the Product, I was in the County of Los Angeles, California, where I also reside.
3. It is my understanding that Defendant Nutra Holdings, Inc. d/b/a Jacked Factory conducts business in the County of Los Angeles, State of California.

I declare under the penalty of perjury under the laws of the state of California that the foregoing is true and correct, executed on August 5___, 2024.

By: Daniel Rossi

Daniel Rossi

[1] As titled on Amazon.com when Plaintiff purchased the Product; "NITROSURGE Pre Workout Supplement – Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps – Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White."


421

citrix | RightSignature

# SIGNATURE CERTIFICATE

**REFERENCE NUMBER**
EFA4F1D1-98FB-457B-9030-0343BD7A643D

| TRANSACTION DETAILS | DOCUMENT DETAILS |
|---|---|
| **Reference Number**<br>EFA4F1D1-98FB-457B-9030-0343BD7A643D | **Document Name**<br>B Exhibit B Daniel Rossi Complaint Affidavit |
| **Transaction Type**<br>Signature Request | **Filename**<br>B_Exhibit_B_Daniel_Rossi_Complaint_Affidavit.pdf |
| **Sent At**<br>08/05/2024 18:01 EDT | **Pages**<br>2 pages |
| **Executed At**<br>08/05/2024 18:20 EDT | **Content Type**<br>application/pdf |
| **Identity Method**<br>email | **File Size**<br>185 KB |
| **Distribution Method**<br>email | **Original Checksum**<br>e3f80ad1b8a211be093e16f69a568acb9be1dc32e53c8df4624b76eb1aaa7d8e |
| **Signed Checksum**<br>bba890c0dc1371abd85b79a4695d1b6cb61ea3116e0d5f2b693406999fd01b39 | |
| **Signer Sequencing**<br>Disabled | |
| **Document Passcode**<br>Disabled | |

## SIGNERS

| SIGNER | E-SIGNATURE | EVENTS |
|---|---|---|
| **Name**<br>Daniel Rossi<br>**Email**<br>dcrossi888@gmail.com<br>**Components**<br>2 | **Status**<br>signed<br>**Multi-factor Digital Fingerprint Checksum**<br>cc1f02c24bbad06c275630f1adf177ec64b339c52a2f166d6bebc9327f46c217<br>**IP Address**<br>172.251.234.249<br>**Device**<br>Chrome via Mac<br>**Typed Signature**<br>Daniel Rossi<br>**Signature Reference ID**<br>65C48872 | **Viewed At**<br>08/05/2024 18:20 EDT<br>**Identity Authenticated At**<br>08/05/2024 18:20 EDT<br>**Signed At**<br>08/05/2024 18:20 EDT |

## AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 08/05/2024 18:01 EDT | Ali Sadrarhami (ali@kazlg.com) created document 'B_Exhibit_B_Daniel_Rossi_Complaint_Affidavit.pdf' on Chrome via Mac from 174.79.245.20. |
| 08/05/2024 18:01 EDT | Daniel Rossi (dcrossi888@gmail.com) was emailed a link to sign. |
| 08/05/2024 18:20 EDT | Daniel Rossi (dcrossi888@gmail.com) viewed the document on Chrome via Mac from 172.251.234.249. |
| 08/05/2024 18:20 EDT | Daniel Rossi (dcrossi888@gmail.com) authenticated via email on Chrome via Mac from 172.251.234.249. |
| 08/05/2024 18:20 EDT | Daniel Rossi (dcrossi888@gmail.com) signed the document on Chrome via Mac from 172.251.234.249. |


422

KAZEROUNI LAW GROUP, APC

# EXHIBIT D


423


Supplement Facts
Serving Size 9.5 g (About 2 Scoops)
Servings Per Container 30
Amount Per Serving
% Daily Value
Calories 5
Total Carbohydrate 1 g <1%*
Total Sugars 0 g **
Magnesium 60 mg 14%
Chloride 190 mg 8%
Sodium 110 mg 5%
Potassium 45 mg 1%
Amino Blend 5 g **
Electrolyte Blend 440 mg **
Sodium Chloride, Magnesium Oxide, Potassium Chloride
Caffeine† 100 mg **
Green Tea Leaf Extract 50 mg **
Green Coffee Bean Extract 10 mg **
*Percent Daily Values are based on a 2,000 calorie diet.
**Daily Value not established.
CONTAINS: SOY.
PHENYLKETONURICS: CONTAINS PHENYLALANINE.
NO ASPARTAME.
SERVING SCOOP INCLUDED
Shake gently before first use.
INFORMED CHOICE
REGULARLY TESTED FOR BANNED SUBSTANCES
ON
MANUFACTURED BY
OPTIMUM NUTRITION, INC.
MANUFACTURED IN THE USA
THIS PRODUCT CONTAINS INGREDIENTS OF INTERNATIONAL AND DOMESTIC ORIGIN.
AT TIME OF FILL
AFTER SETTLING
CONTENTS SOLD BY WEIGHT NOT VOLUME. SOME SETTLING WILL OCCUR.
AND DRUG ADMINISTRATION.
TREAT, CURE OR PREVENT ANY DISEASE.


GREATNESS BY NATURE™
YOUR ELECTROLYTE BOOST™
FUELING UP HAS NEVER TASTED SO GOOD.
SUPPLEMENT FACTS
Serving Size: 3 Gummies
Servings per Container: 20
Amount Per Serving % DV
Calories 50
Total Carbohydrates 10 g 4%†
Total Sugars 7 g **
Includes 7 g Added Sugars 14%†
Vitamin B6 (as Pyridoxine HCl) 1.7 mg 100%
Vitamin B12 (as Methylcobalamin) 2.4 mcg 100%
Magnesium (as Magnesium Citrate) 10 mg 2%
Sodium 60 mg 3%
Potassium (as Potassium Gluconate) 10 mg <1%
Caffeine (from Green Coffee bean) 75 mg **
†Percent Daily Values (DV) are based on a 2,000 Calorie Diet.
**Daily Value (DV) not established.
Other Ingredients: Electrolyte Blend (Tapioca Syrup, Cane Sugar, Purified Water, Pectin, Natural Flavors, Citric Acid, Sodium Citrate, Coconut Oil, Natural Colors).
Contains: Tree nuts (Coconut).
Carefully crafted for Zhou Nutrition® | Zhou, Inc. | Salt Lake City, UT 84101 USA | 1-855-700-ZHOU | ZhouNutrition.com
DIRECTIONS FOR USE:
GREAT TASTING HYDRATION SUPPORT
#howizhou
GMP
GOOD MANUFACTURING PRACTICE
CONSISTENT QUALITY
LAB VERIFIED
PRODUCT BACKED WITH
60-DAY MONEY BACK GUARANTEE
VEGAN
MADE WITH NON-GMO INGREDIENTS
MADE IN THE USA WITH GLOBAL INGREDIENTS


425


ECH™
Supplement Facts
Serving Size: 1 Scoop (9g)
Servings Per Container: Approx 30
Amount Per | 1 Scoop | % DV | 2 Scoops | % DV
Total Carbohydrate <1g 0%* 1g 0%*
Niacin (as nicotinic acid) 15mg 94% 30mg 188%
Choline (as choline bitratrate) 40mg 7% 80mg 15%
Iron 0.2mg 1% 0.5mg 3%
Sodium 5mg <1% 10mg <1%
Potassium 45mg 1% 90mg 2%
Musclebuilding Matrix
Creatine monohydrate 1,500mg † 3,000mg †
Betaine anhydrous 1,250mg † 2,500mg †
Performance & Endurance Compound
Beta-alanine 1,600mg † 3,200mg †
Taurine 500mg † 1,000mg †
Pump Matrix
Nitrosigine® arginine inositol silicate 750mg † 1,500mg †
Hawthorn extract (as Crataegus pinnatifida) (berry) 200mg † 400mg †
Energy+ Matrix
Caffeine anhydrous 190mg † 380mg †
Choline bitartrate 100mg † 200mg †
Neuro-Sensory Blend
L-theanine 62.5mg † 125mg †
Galangal extract (as Alpinia officinarum) (stem & root) 25mg † 50mg †
Yohimbe extract (as Pausinystalia yohimbe) (bark) 20mg † 40mg †
Standardized for 6% yohimbine
* Percent Daily Values (DV) are based on a 2,000 calorie diet.
† Daily Value not established.
Other Ingredients: Citric Acid, Silicon Dioxide, Natural and Artificial Flavors, Malic Acid, Resistant Maltodextrin, Sucralose, Acesulfame-Potassium, Gum Blend (Cellulose Gum, Xanthan Gum, Carrageenan), FD&C Blue No. 1. Processed in a facility that processes milk, egg, wheat, soy, sesame, peanut, tree nut, fish and shellfish ingredients.
WARNING: Not intended for use by persons under 18. Do not use if pregnant or nursing. Do not use if you have had a myocardial infarction (heart attack). Inhalation may amplify the inflammatory airway response in people with asthma. One serving of this product contains up to as much caffeine as 2 cups of coffee. Caffeine-sensitive individuals may experience symptoms including (but not limited to) restlessness, nervousness, tremors, anxiety, increased heart rate, or difficulty sleeping. Do not combine with other sources of caffeine or stimulants. Some individuals may experience a harmless tingling sensation from the concentrated performance dose of beta-alanine. Consult a medical doctor if you have a medical condition or before starting any diet or exercise program.
KEEP OUT OF REACH OF CHILDREN.
CONTAINS BIOENGINEERED FOOD INGREDIENTS.
Do not use if packaging has been tampered with. Store in a cool, dry place (60°F to 80°F).
▲ These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.
Nitrosigine®
6 31656 71092 2
Made in the U.S.A. from international ingredients. © 2021 Nitrosigine® and the Nitrosigine® logo are registered
1105 North Market Street, Suite 1330, Wilmington, DE 19801
nt protected. For lot no. and expiry date: see bottle.
1858ZUS


426


Supplement Facts
Serving Size 18.5 g (About 1 Scoop)
Servings Per Container 60
Amount Per Serving % Daily Value
Calories 20
Total Carbohydrate 5 g 2%‡
Vitamin D 12.5 mcg 63%
Thiamin 2 mg 167%
Niacin 20 mg 125%
Vitamin B6 2 mg 118%
Folate 330 mcg DFE 83%
Vitamin B12 6 mcg 250%
Pantothenic Acid 10 mg 200%
Calcium 40 mg 3%
Magnesium 125 mg 30%
Sodium 140 mg 6%
Potassium 270 mg 6%
N.O.-XPLODE® MASTER PERFORMANCE BLEND*
Myogenic Matrix* 5.1 g **
Creatine Blend (Creatine Monohydrate, Creatine Anhydrous), Taurine, Di-Calcium Phosphate, Di-Sodium Phosphate, AstraGin® Proprietary Blend [Astragalus membranaceus Extract (root), Panax notoginseng Extract (root)]
Endura Shot* 2.9 g **
Beta-Alanine, Potassium Bicarbonate, Sodium Bicarbonate, Magnesium Oxide, Cholecalciferol
Thermic Energy* 1.3 g **
N-Acetyl-L-Tyrosine, L-Tyrosine, Caffeine Anhydrous, Grapefruit Bioflavonoid Complex
N.O. Alpha Fusion* 1 g **
L-Citrulline Malate, Danshen Extract (Salvia miltiorrhiza)(root), Grape Skin Extract, Phyllanthus emblica Extract (fruit) (CAPROS®), Hawthorn Extract (aerial parts), Folic Acid
Shock Composite* 290 mg **
DMAE Bitartrate (2-Dimethylaminoethanol), L-Phenylalanine, Nicotinic Acid, Calcium D-Pantothenate, Toothed Clubmoss Extract (aerial parts), Thiamin Hydrochloride, Pyridoxine Hydrochloride, Cyanocobalamin
†Percent Daily Values are based on a 2,000 calorie diet.
**Daily Value Not Established.
OTHER INGREDIENTS: Natural and Artificial Flavor, Citric Acid, Malic Acid, Calcium Silicate, Silicon Dioxide, Sucralose, Beet Juice Powder (Color), Salt.
MANUFACTURED BY:
Bio-Engineered Supplements & Nutrition, Inc., 3500 Lacey Road, Suite 1200, Downers Grove, IL 60515 USA
877.673.3727 www.goBSN.com
MANUFACTURED IN THE USA
This product contains ingredients of international and domestic origin.


427

KAZEROUNI LAW GROUP, APC

# EXHIBIT E


428

Check for updates

EFSA Journal

SCIENTIFIC OPINION

ADOPTED: 24 March 2020

doi: 10.2903/j.efsa.2020.6099

# Safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food pursuant to Regulation (EU) 2015/2283

EFSA Panel on Nutrition, Novel Foods and Food Allergens (NDA),
Dominique Turck, Jacqueline Castenmiller, Stefaan De Henauw, Karen Ildico Hirsch-Ernst, John Kearney, Alexandre Maciuk, Inge Mangelsdorf, Harry J McArdle, Androniki Naska, Carmen Pelaez, Kristina Pentieva, Alfonso Siani, Frank Thies, Sophia Tsabouri, Marco Vinceti, Francesco Cubadda, Karl Heinz Engel, Thomas Frenzel, Marina Heinonen, Rosangela Marchelli, Monika Neuhäuser-Berthold, Morten Poulsen, Josef Rudolf Schlatter, Henk van Loveren, Reinhard Ackerl and Helle Katrine Knutsen

## Abstract

Following a request from the European Commission, the EFSA Panel on Nutrition, Novel Foods and Food Allergens (NDA) was asked to deliver a scientific opinion on a botanical extract derived from both *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food (NF) pursuant to Regulation (EU) 2015/2283. The NF is a combination of an ethanol extract of the roots of *A. membranaceus* and a hot water extract of the roots of *P. notoginseng*. The NF contains 1.5–5% total saponins, 0.1–0.5% ginsenoside Rb1 and 0.01–0.1% astragaloside I. Both plants that are used to produce the NF have a long history of use, especially in traditional Chinese medicine. Information on the production process and the composition of the NF is sufficient and does not raise safety concerns. The applicant proposed to use the NF as a food supplement for the general adult population, excluding pregnant women, at a maximum daily amount of 350 mg. Taking into account these conditions of use, the Panel considers that the consumption of the NF is not nutritionally disadvantageous. The provided genotoxicity studies do not raise concerns for genotoxicity of the NF. Based on the findings of a subchronic toxicity study, supported by a subacute toxicity study, the Panel identified the overall no observed adverse effect level (NOAEL) of the NF at 100 mg/kg body weight (bw) per day. By applying an uncertainty factor of 200, the Panel concludes that the NF is safe at an intake level of 0.5 mg/kg bw per day, corresponding to a maximum daily intake of 35 mg of the NF for the target population, i.e. adults excluding pregnant women.

© 2020 European Food Safety Authority. *EFSA Journal* published by John Wiley and Sons Ltd on behalf of European Food Safety Authority.

**Keywords:** *Panax notoginseng*, *Astragalus membranaceus*, *Astragalus propinquus*, extract, novel food, safety

**Requestor:** European Commission following an application by NuLiv Science

**Question number:** EFSA-Q-2018-00557

**Correspondence:** nda@efsa.europa.eu



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


429

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Panel members:** Dominique Turck, Jacqueline Castenmiller, Stefaan De Henauw, Karen Ildico Hirsch-Ernst, John Kearney, Helle Katrine Knutsen, Alexandre Maciuk, Inge Mangelsdorf, Harry J McArdle, Androniki Naska, Carmen Pelaez, Kristina Pentieva, Alfonso Siani, Frank Thies, Sophia Tsabouri and Marco Vinceti.

**Suggested citation:** EFSA NDA Panel (EFSA Panel on Nutrition, Novel Foods and Food Allergens), Turck D, Castenmiller J, De Henauw S, Hirsch-Ernst KI, Kearney J, Maciuk A, Mangelsdorf I, McArdle HJ, Naska A, Pelaez C, Pentieva K, Siani A, Thies F, Tsabouri S, Vinceti M, Cubadda F, Engel KH, Frenzel T, Heinonen M, Marchelli R, Neuhäuser-Berthold M, Poulsen M, Schlatter JR, van Loveren H, Ackerl R and Knutsen HK, 2020. Scientific Opinion on the safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food pursuant to Regulation (EU) 2015/2283. EFSA Journal 2020;18(5):6099, 16 pp. https://doi.org/10.2903/j.efsa.2020.6099

**ISSN:** 1831-4732

© 2020 European Food Safety Authority. *EFSA Journal* published by John Wiley and Sons Ltd on behalf of European Food Safety Authority.

This is an open access article under the terms of the Creative Commons Attribution-NoDerivs License, which permits use and distribution in any medium, provided the original work is properly cited and no modifications or adaptations are made.

The EFSA Journal is a publication of the European Food Safety Authority, an agency of the European Union.




430

# Table of contents


Abstract .... 1
1. Introduction .... 4
1.1. Background and Terms of Reference as provided by the European Commission .... 4
2. Data and methodologies .... 4
2.1. Data .... 4
2.2. Methodologies .... 4
3. Assessment .... 4
3.1. Introduction .... 4
3.2. Identity of the NF .... 5
3.2.1. Panax notoginseng (Burkill) F.H. Chen .... 5
3.2.2. *Astragalus membranaceus* (Fisch.) Bunge .... 5
3.3. Production process .... 5
3.4. Compositional data .... 6
3.4.1. Stability .... 7
3.5. Specifications .... 8
3.6. History of use of the NF and/or of its source .... 9
3.6.1. History of use of the source of the NF .... 9
3.6.2. History of use of the NF .... 9
3.7. Proposed uses and use levels .... 9
3.7.1. Target population .... 9
3.7.2. Proposed uses and use levels .... 9
3.8. Absorption, distribution, metabolism and excretion (ADME) .... 9
3.9. Nutritional information .... 9
3.10. Toxicological information .... 10
3.10.1. Genotoxicity .... 10
3.10.2. Subacute and subchronic toxicity .... 11
3.10.3. Human data .... 13
3.11. Allergenicity .... 13
4. Discussion .... 13
5. Conclusions .... 13
Steps taken by EFSA .... 13
References .... 14
Abbreviations .... 15




18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

# 1. Introduction

## 1.1. Background and Terms of Reference as provided by the European Commission

On 8 June 2018, the company NuLiv Science submitted a request to the European Commission in accordance with Article 10 of Regulation (EU) 2015/2283[1] to place a botanical extract derived from both *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) on the Union market as a novel food (NF).

The NF is intended for use in food supplements and the suggested daily intake for adults is 50 mg.

The target population is the general population, excluding children and pregnant women.

On 22 October 2018, and in accordance with Article 10(3) of Regulation (EU) 2015/2283, the European Commission asked EFSA to provide a scientific opinion on the extract derived from *Panax notoginseng* and *Astragalus membranaceus*.

# 2. Data and methodologies

## 2.1. Data

The safety assessment of this NF is based on data supplied in the application, information provided by the EFSA Working Group on Compendium of Botanicals and information submitted by the applicant following two EFSA requests for supplementary information.

The information in support of this application has been made available through the Commission e-submission portal (NF 2018/0284).

Administrative and scientific requirements for NF applications referred to in Article 10 of Regulation (EU) 2015/2283 are listed in the Commission Implementing Regulation (EU) 2017/2469[2].

A common and structured format on the presentation of NF applications is described in the EFSA guidance on the preparation and presentation of a NF application (EFSA NDA Panel, 2016). As indicated in this guidance, it is the duty of the applicant to provide all of the available (proprietary, confidential and published) scientific data, including both data in favour and not in favour of supporting the safety of the proposed NF.

This NF application includes a request for protection of proprietary data in accordance with Article 26 of Regulation (EU) 2015/2283. Data claimed to be proprietary by the applicant include all the submitted analytical information, the manufacturing process and the toxicity studies provided.

## 2.2. Methodologies

The assessment follows the methodology set out in the EFSA guidance on NF applications (EFSA NDA Panel, 2016) and the principles described in the relevant existing guidance documents from the EFSA Scientific Committee. The legal provisions for the assessment are laid down in Article 11 of Regulation (EU) 2015/2283 and in Article 7 of the Commission Implementing Regulation (EU) 2017/2469.

The information provided by the EFSA Working Group on Compendium of Botanicals is based on extensive literature searches on *P. notoginseng* and *A. membranaceus*, following a search strategy and standard operating procedure as described by Dibusz and Vejvodova (2020).

This assessment concerns only risks that might be associated with consumption of the NF under the proposed conditions of use, and is not an assessment of the efficacy of AstraGin™ with regard to any (claimed) benefit.

# 3. Assessment

## 3.1. Introduction

The NF which is the subject of the application is a combination of root extracts from *P. notoginseng* and *A. membranaceus*, denominated as AstraGin™.

---

[1] Regulation (EU) 2015/2283 of the European Parliament and of the Council on novel foods, amending Regulation (EU) No 1169/2011 of the European Parliament and of the Council and repealing Regulation (EC) No 258/97 of the European Parliament and of the Council and Commission Regulation (EC) No 1852/2001 (2013/0435 (COD). OJ L 327, 11.12.2015, p. 1–22.

[2] Commission Implementing Regulation (EU) 2017/2469 of 20 December 2017 laying down administrative and scientific requirements for applications referred to in Article 10 of Regulation (EU) 2015/2283 of the European Parliament and of the Council on novel foods. OJ L 351, 30.12.2017, pp. 64–71.




432

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

The NF falls under Regulation 2015/2283, Article 3(2)(a)(iv): food consisting of, isolated from or produced from plants or their parts of.

The NF is proposed by the applicant to be used as a food supplement for the general adult population, except pregnant women.

## 3.2. Identity of the NF

The NF is a combination of an ethanol extract of the roots of *A. membranaceus* (Fisch.) Bunge and a hot water extract of the roots of *P. notoginseng* (Burkill) F.H. Chen.

### 3.2.1. Panax notoginseng (Burkill) F.H. Chen

The full taxonomy of *P. notoginseng* is the following. Kingdom: Plantae, Division: Magnoliophyta, Class: Magnoliopsida, Order: Apiales, Family: Araliaceae, Genus: *Panax*, Species: *Panax notoginseng*.

The plant is also known as *Panax pseudoginseng* var. *notoginseng* (Burkill) G. Hoo & C.L. Tseng and by a number of traditional Chinese names, e.g. Sanqi, San Qi, Shan Qi, Tu San Qi, Tianqi and Tien-chi.

The plant belongs to the genus *Panax*, which includes about 15 species from both Asia and America. Analyses of the 5S-rRNA spacer domains from seven Panax species showed a high degree of genetic similarity with ~ 75% of the spacer domains conserved throughout the genus (Cui et al., 2003).

The root of *P. notoginseng* contains ~ 8–13% saponins by weight (Dong et al., 2003; Wang et al., 2006). More than 150 saponins, mostly of dammarane type with 20(S)-protopanaxadiol or 20(*S*)-protopanaxatriol aglycon moieties have been identified in this species, some of them being present in other *Panax* species, some being specific of *P. notoginseng*. Many other compounds of various chemical classes are found including flavonoids, cyclopeptides, sterols, polyacetylenes, a volatile oil, saccharides and amino acids (Wang et al., 2016). Based on an earlier review, the applicant stated that 56 saponins of *P. notoginseng* have been identified with major ones being ginsenosides Rb1, Rd, Re and Rg1. Five polyacetylenes have been identified, i.e. panaxytriol, panaxydol, notoginsenic acid, β-sophoroside and 10-hydroxydeca-4,6-diynoic acid. The extract also contained the flavonoids quercetin and quercetin-3-*O*-sophoroside, a number of phytosterols and amino acids, the most prevalent ones being arginine, aspartic acid and glutamic acid. The non-proteinogenic amino acid L-dencichin (oxalyldiaminopropionic acid) has also been identified (Wang et al., 2006).

### 3.2.2. *Astragalus membranaceus* (Fisch.) Bunge

The name *A. membranaceus* (Fisch.) Bunge is a synonym of the accepted name *Astragalus propinquus* Schischkin.[3]

The full taxonomy of *A. membranaceus/A. propinquus* is the following. Kingdom: Plantae, Division: Magnoliophyta, Class: Magnoliopsida, Order: Fabales, Family: Fabaceae, Genus: *Astragalus*, Species: *A. membranaceus*/*A. propinquus*.

The plant is also known as milkvetch root (English), ogi (Japanese), hwanggi (Korean) and huang qi (in Traditional Chinese Medicine).

This species is defined as Radix Astragali in the Pharmacopoeia of China (Fu et al., 2014).

The root of *A. membranaceus*/*A. propinquus* contains a number of saponins, in particular cycloartane triterpene glycosides (astragalosides I–VII) as well as flavonoids (calycosin and formononetin genins and glycosides, ononin, among others). Other constituents include γ- and α-aminobutyric acids, L-canavanine, choline, betaine, gluconic acid, linoleic acid, asparagine, β-sitosterol (Thorne Research Inc, 2003; Fu et al., 2014).

## 3.3. Production process

According to the information provided, the NF is produced under adherence to good manufacturing practice (GMP) at GMP-certified manufacturing facilities in China. Information was provided on the Hazard Analysis and Critical Control Points (HACCP) scheme applied.

The *A. membranaceus* roots are purchased from growers in Gansu and Inner Mongolia provinces in the north-western region of China while the *P. notoginseng* roots are acquired from growers in Yunnan and Sichuan provinces in the southern region of China.

[3] http://www.theplantlist.org/tpl1.1/record/ild-32156



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


433

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

The roots of both plants are washed with water, dried and pulverised.

The pulverised roots of *A. membranaceus* are then passed through a 10-mesh size sieve and extracted with eightfold volume of 40% ethanol. The extract is centrifuged, filtered, concentrated/dried, smashed and screened through an 80-mesh size sieve. The extract is analysed for the content of total saponins (by ultraviolet (UV) spectrophotometry) and for astragaloside I (by high-performance liquid chromatography-evaporative light scattering detection (HPLC-ELSD)).

The pulverised roots of *P. notoginseng* are passed through a 20-mesh size sieve and extracted with 10-fold volume of water. The extract is centrifuged, filtered and concentrated. The concentrated solution is subsequently absorbed on a resin, which is washed with water, and eluted with 60% ethanol. The eluent is concentrated/dried, smashed and screened through an 80-mesh size sieve. The extract is analysed for the content of total saponins (by UV spectrophotometry) and for ginsenoside Rb1 (by HPLC-UV).

The plant to extract ratios were indicated by the applicant to be 10:1 for the *Astragalus* extract and 50:1 for the *Panax* extract.

At the end of the manufacturing process the extracts are mixed (45–47.5% of each extract) with maltodextrin (5–10%). The blend, i.e. the NF, is analysed for the marker compounds (total saponins, ginsenoside Rb1 and astragaloside I; see the following Section), physicochemical characteristics, heavy metals, pesticides, organic solvent residue and microbial counts before packaging into plastic bags for storage.

The Panel considers that the production process is sufficiently described and does not raise safety concerns.

## 3.4. Compositional data

As described in the previous section, the NF is a blend of an ethanol extract of the roots of *A. membranaceus* and a hot water extract of the roots of *P. notoginseng* (plus maltodextrin as an excipient). The NF contains 1.5–5% total saponins, 0.1–0.5% ginsenoside Rb1 and 0.01–0.1% astragaloside I.

In order to provide information on the variability of the composition of the NF, the applicant submitted batch to batch analyses for total saponins, ginsenoside Rb1, astragaloside I, proximates, a number of organoleptic and physicochemical parameters, contaminants and microbiological quality of the NF (Table 1).

**Table 1:** Batch-to-batch analyses of the NF

| Parameter | Batch number | | | | |
|---|---|---|---|---|---|
| | **C20151209** | **C20160606[(1)]** | **C20170106** | **C20170515** | **C20171009** |
| Total saponins | 4.10% | 3.79% | 3.12% | 3.56% | 3.09% |
| Ginsenoside Rb1 | 0.10% | 0.17% | 0.14% | 0.11% | 0.10% |
| Astragaloside I | 0.034% | 0.028% | 0.028% | 0.024% | 0.048% |
| Colour | Light yellow | Light yellow | Light yellow | Light yellow | Light yellow |
| Odour | 'Characteristic' | 'Characteristic' | 'Characteristic' | 'Characteristic' | 'Characteristic' |
| Appearance | Fine powder | Fine powder | Fine powder | Fine powder | Fine powder |
| Sieve analysis | 100% through 80 mesh | 99% through 80 mesh | 100% through 80 mesh | 100% through 80 mesh | 100% through 80 mesh |
| Total carbohydrates | 91.8% | 92.2% | 92.1% | 92.4% | 89.6% |
| Protein | 2.1% | 2.5% | 2.4% | 2.5% | 4.3% |
| Fat | 1.4% | 0.8% | 0.7% | 0.7% | 1.1% |
| Moisture | 4.3% | 4.1% | 4.5% | 4.2% | 4.6% |
| Ash | 0.4% | 0.4% | 0.3% | 0.3% | 0.4% |
| Bulk density | 0.59 g/mL | 0.54 g/mL | 0.56 g/mL | 0.55 g/mL | 0.53 g/mL |
| Solubility in water (1 g in 30 mL) | Soluble | Soluble | Soluble | Soluble | Soluble |
| **Contaminants** | | | | | |
| Lead (Pb) | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg |
| Arsenic (As) | 0.19 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg |




434

| Parameter | Batch number | | | | |
|---|---|---|---|---|---|
| | C20151209 | C20160606(1) | C20170106 | C20170515 | C20171009 |
| Cadmium (Cd) | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg |
| Mercury (Hg) | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg | 0.02 mg/kg | 0.02 mg/kg |
| Ethanol | < 0.5% | < 0.5% | < 0.5% | < 0.5% | < 0.5% |
| **Microbiological** | | | | | |
| Total plate count | 370 CFU/g | 35 CFU/g | 410 CFU/g | 900 CFU/g | < 10 CFU/g |
| Yeast and mould | 210 CFU/g | 20 CFU/g | 60 CFU/g | < 20 CFU/g | < 20 CFU/g |
| Enterobacteriaceae | – | < 10 CFU/g | < 10 CFU/g | < 10 CFU/g | < 10 CFU/g |
| *E. coli* (in 25 g) | Negative | Negative | Negative | Negative | Negative |
| *Salmonella* (in 375 g) | Negative | Negative | Negative | Negative | Negative |
| *Staphylococcus aureus* (in 25 g) | Negative | Negative | Negative | Negative | Negative |

NF: novel food; CFU: colony forming units.
(1): Batch of the NF that was used in the 90-day toxicity study (see Section 3.10.2).

For four additional batches (Table 2) information on the content of total saponins was provided, plus for three of the four batches also the concentrations of astragaloside I and ginsenoside Rb1.

**Table 2:** Total saponins, astragaloside I and ginsenoside Rb1 in the NF

| Parameter | Batch number | | | |
|---|---|---|---|---|
| | 20100621(1) | C20150120(2) | 20100824 | C20140921 |
| Total saponins | 2.35% | 2.68% | 2.92% | 2.0% |
| Ginsenoside Rb1 | 0.17% | 0.10% | 0.10% | Not provided |
| Astragaloside I | 0.054% | 0.033% | 0.039% | Not provided |

NF: novel food.
(1): Batch of the NF that was used in the 28-day toxicity study.
(2): Batch of the NF that was used in the bacterial reverse mutation test and in the *in vitro* mammalian cell gene mutation assay (see Section 3.10.1).

In order to achieve a certain concentration of total saponins and ginsenoside Rb1 and astragaloside I in the NF, the applicant established internal specifications for the two extracts, with total saponins ≥ 0.6% and ginsenoside Rb1 ≥ 0.2% for the *P. notoginseng* extract, and total saponins ≥ 3% and astragaloside I ≥ 0.02% for the *A. membranaceus* extract.

Considering that the genus *Astragalus* is known to accumulate trace elements, the applicant provided a certificate of analysis for one batch of the NF, in which selenium, thallium and uranium were below detection limits (i.e. < 0.1 mg/kg for selenium and thallium and < 0.01 mg/kg for uranium).

Additionally, the applicant provided the analytical results for the concentrations of pesticides and mycotoxins in the NF, which were all below their limits of detection (LODs).

The Panel considers that the information provided on the composition of the NF including the batch to batch variability is sufficient and does not raise safety concerns.

### 3.4.1. Stability

The applicant proposes a shelf-life of 3 years from the time of manufacturing of the NF.

The applicant provided data of a 6 months accelerated (i.e. at 40°C and 75% relative humidity) stability testing performed with three batches of the NF. The batches were analysed for the content of total saponins in the NF, which remained stable throughout the testing period (Table 3). Further parameters were appearance (i.e. light yellow powder), moisture, ash, heavy metals and microbial counts, which all remained within specifications during the testing period.



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


435

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Table 3:** Total saponin content of the NF during the stability testing

| Date of analysis | Batch number | | |
|---|---|---|---|
| | **20100621** | **20100720** | **20100825** |
| 22/10/2010 | 2.35% | 2.65% | 2.92% |
| 22/11/2010 | 2.39% | 2.68% | 2.84% |
| 22/12/2010 | 2.37% | 2.59% | 2.88% |
| 22/1/2011 | 2.41% | 2.61% | 2.86% |
| 22/4/2011 | 2.43% | 2.61% | 2.93% |

NF: novel food.

The Panel considers that, given the low moisture content of the NF, eventual degradation products or microbial activity are unlikely to be of safety concern. Since the product parameters were unchanged for six months under accelerated conditions the product can be expected to be stable for up to 2 years.

## 3.5. Specifications

The specifications of the NF are indicated in Table 4.

The applicant informed that each batch of the NF will be subjected to a series of analytical quality controls to ensure that all product specifications are met, including physicochemical parameters, organoleptic characteristics, microbial counts, heavy metals and pesticide residues.

**Table 4:** Specifications of the NF

**Description:** The NF is a combination of an ethanol extract of the roots of *Astragalus membranaceus* (Fisch.) Bunge and a hot water extract of the roots of *Panax notoginseng* (Burkill) F.H. Chen
Appearance: beige to light brown yellow powder

| Parameter | Specification | Method of analysis |
|---|---|---|
| Total saponins | 1.5–5.0% | UV absorption (at 560 ± 5 nm) |
| Ginsenoside Rb1 | 0.10–0.50% | HPLC-UV |
| Astragaloside I | 0.01–0.10% | HPLC-ELSD |
| Carbohydrates | ≥ 90% | By calculation |
| Protein | ≤ 4.5% | Kjeldahl |
| Moisture | ≤ 5.0% | GB/T 14769 -1993 |
| Ash | ≤ 1.0% | AOAC 942.05, 18th |
| **Contaminants** | | |
| Arsenic (As) | ≤ 0.3 mg/kg | ChP 2015, App. IXB (ICP-MS) |
| **Microbiological** | | |
| Total plate count | ≤ 5,000 CFU/g | ISO 4833-1 |
| Total yeast and mould count | ≤ 500 CFU/g | FDA (BAM) Chapter 18, 8th Ed. |
| Enterobacteriaceae | < 10 CFU/g | ISO 21528-2:2004 |
| *E. coli* | Negative in 25 g | ISO 7251:2005 |
| *Salmonella* | Negative in 375 g | FDA (BAM) Chapter 5, 8th Ed. |
| *Staphylococcus aureus* | Negative in 25 g | GB 5009.22-2016 |

CFU: colony forming units; FDA-BAM: Food and Drug Administration's Bacteriological Analytical Manual; GC–MS: gas chromatography–mass spectrometry; HPLC: high-performance liquid chromatography; ICP-MS:inductively coupled plasma mass spectrometry; UV: ultraviolet; ELSD: evaporative light scattering detector.

The Panel considers that the information provided on the specifications of the NF is sufficient and does not raise safety concerns.




436

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## 3.6. History of use of the NF and/or of its source

### 3.6.1. History of use of the source of the NF

Both plants *A. membranaceus* and *P. notoginseng* have a long history of use in humans, especially in China.

According to the information provided, *A. membranaceus* has a recorded history of use of over 2,000 years (Khan and Abourashed, 2009). Traditionally, it has mainly been used as raw dried root, honey-cured root or as aqueous decoction, although steeping in ethanol has also been described (Reid, 1995; Khan and Abourashed, 2009). Daily doses of the root are reported to range from 9 to 30 g, with more than 60 g in some cases (Duke and Ayensu, 1985; Leung, 1995; Leung and Foster, 1996; Zhu, 1998b; Yu et al., 2007).

Documented use of *P. notoginseng* dates back to the 16th century and its cultivation in certain areas has been reported to exceed 1,000 years, with current production in China of approximately 2,000 tonnes per year (Dong et al., 2003). Typical total daily doses range from approximately 3 to 15 g of roots for a decoction or 1–5 g of root as a ground powder. The use of ethanolic extracts was also reported (Bensky and Gamble, 1986; Zhu, 1998a; Dharmananda, 2004; Wang et al., 2006; Reid, 1987).

The Panel notes that extensive literature searches performed by UCT Prague retrieved 13,581 and 8,116 scientific articles for *A. membranaceus* and *P. notoginseng*, respectively, demonstrating that these species have been extensively studied.

### 3.6.2. History of use of the NF

According to the information provided by the applicant, the NF is already marketed as a food supplement in a number of countries worldwide (e.g. Australia, Brazil, Canada, India).

Sales data have been provided for individual countries for the years 2011, 2012 and 2013 (confidential information).

## 3.7. Proposed uses and use levels

### 3.7.1. Target population

The target population proposed by the applicant is the general adult population, except pregnant women.

### 3.7.2. Proposed uses and use levels

The applicant proposed to use the NF as a food supplement.

Following a request for clarification, the applicant proposed an amount of 50 mg per portion and a maximum daily amount of 350 mg of the NF.

## 3.8. Absorption, distribution, metabolism and excretion (ADME)

The applicant has not provided any toxicokinetic studies that were performed with the NF.

A number of animal studies were submitted, which investigated the absorption, distribution, metabolism and excretion of various saponins. The Panel considers that the studies provided are of limited relevance for the safety assessment of the NF.

## 3.9. Nutritional information

The applicant provided a nutritional analysis of the NF, which indicates that the NF mainly consists of carbohydrates (about 90%), moisture (about 5%), protein (2–5%), fat (about 1%) and ash. The applicant pointed out that some variation can be expected concerning the nutrients in the NF, given the nature of the starting material and its susceptibility to varying weather conditions.

Taking into account the proposed conditions of use (i.e. max. 350 mg/day), the Panel considers that the consumption of the NF is not nutritionally disadvantageous.




437

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## 3.10. Toxicological information

The roots of *A. membranaceus* have been reported to contain the non-proteinogenic amino acid L-canavanine (Thorne Research Inc, 2003; Khan and Abourashed, 2009). L-Canavanine is an antinutrient that is structurally related to L-arginine. Owing to this similarity, in organisms that consume L-canavanine, it is mistakenly incorporated into their own proteins in place of L-arginine, leading to the production of structurally aberrant proteins. L-Canavanine has been suspected of being associated with systemic lupus erythematosus (SLE) activation (Alcocer-Varela et al., 1985; Morimoto et al., 1990). L-Canavanine is found in many legumes where it acts as a nitrogen-storing metabolite and is part of the plant's chemical defence. For example, L-canavanine accounts for up to 5% of the dry weight in the jack bean seed (*Canavalia ensiformis*), 2.4% in the alfalfa plant (*Medicago sativa*) and up to 2.5% in sword bean (*Canavalia gladiate*) (Rosenthal, 2001; Bence and Crooks, 2003). Following an EFSA request to provide information on the content of L-canavanine in the NF, the applicant submitted a certificate of analysis for one batch of the NF in which L-canavanine was detected at a concentration of 0.67 mg/g. The Panel notes that the amount of L-canavanine at the proposed conditions of use for the NF (i.e. 350 mg per day) would be 0.23 mg/day. The Panel considers L-canavanine in the NF unlikely to be of safety concern at the proposed conditions of use.

*P. notoginseng* has been reported to contain the non-proteinogenic amino acid L-dencichin (oxalyldiaminopropionic acid (ODAP)) (Wang et al., 2006), which is a structural analogue of the neurotransmitter glutamate. L-Dencichin is a neurotoxin responsible for lathyrism, a motor neuron degeneration syndrome. Lathyrism may be induced by consumption of the seeds (if consumed at high enough amounts) of the legume *Lathyrus sativus* (grass pea), which is a staple food in some areas of the world and which has been reported to contain L-dencichin at concentrations up to 0.7% (Xu et al., 2017). Following an EFSA request to provide information on the content of L-dencichin in the NF, the applicant submitted a certificate of analysis for one batch of the NF in which L-dencichin was not detected. No LOD was provided. However, information was provided on the method that was used for the analysis (Dezhuang et al., 1998). From the information provided, the limit of quantification (LOQ) for L-dencichin is at a level of about 0.17% for the method used. Taking into consideration the maximum proposed use level of 350 mg NF/day, and assuming an L-dencichin concentration at the LOQ (i.e. 0.17%) in the *P. notoginseng* fraction (i.e. < 50% in the NF), this would correspond to about 0.3 mg L-dencichin/day. The Panel considers L-dencichin in the NF unlikely to be of safety concern at the proposed conditions of use.

### 3.10.1. Genotoxicity

The applicant provided a bacterial reverse mutation assay (Zin, 2016, unpublished study report) and an *in vitro* mammalian cell gene mutation assay (Ruslan et al., 2016, unpublished study report), which were both performed with batch #C20150120 of the NF. This batch contains 2.68% total saponins, 0.033% astragaloside I and 0.10% ginsenoside Rb1 (see also Table 2).

The bacterial reverse mutation test (Zin, 2016, unpublished study report) was performed in compliance with good laboratory practice (GLP) and following OECD Test Guideline (TG) 471. The test was carried out with *Salmonella* Typhimurium strains TA98, TA100, TA1535, TA1537 and *Escherichia coli* strain WP2 *uvrA*, using the pre-incubation method in the presence and in the absence of an exogenous metabolic activation system (i.e. S9-mix). In order to evaluate the cytotoxicity of the test item a dose-finding test was performed with the five strains mentioned above, with and without metabolic activation, using the following five concentrations of the NF dissolved in water: 313, 625, 1,250, 2,500 and 5,000 μg/plate. There was no sign of cytotoxicity and no precipitation of the test material was observed at any concentration. Thus, the main test was performed using the same concentrations. Positive and negative controls were included. The NF induced no biologically relevant increase in the number of revertant colonies compared with the negative controls for all strains, in the presence and absence of S9-mix, in the dose finding test and the main test.

The *in vitro* mammalian cell gene mutation test using the hypoxanthine-guanine phosphoribosyl transferase (*Hprt*) gene (Ruslan et al., 2016, unpublished study report) was performed in compliance with GLP. According to the applicant, the test was conducted in accordance with OECD TG 476. However, the Panel notes that the NF was only tested in the absence and not in the presence of an exogenous metabolic activation system (S9-mix) in the main experiment, which is considered a relevant deviation. No rationale could be provided by the applicant for this deviation. In the absence of activation, the NF did not induce an increase in the number of gene mutations in mammalian cells.



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


438

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Following an EFSA request, and in accordance with the EFSA recommendations for genotoxicity testing (EFSA Scientific Committee, 2011), the applicant submitted two *in vitro* mammalian cell micronucleus tests following OECD TG 487. As per the EFSA request, one micronucleus test per plant extract was carried out.

The micronucleus test (Vedic Lifesciences, 2019a, Study Nr. 190503/NL/PC, unpublished study report), submitted for the *P. notoginseng* extract, was performed with a batch (i.e. #20170702) that contained 1.08% total saponins and 0.31% ginsenoside Rb1. The test, which followed OECD TG 487, was carried out in cultured mammalian CHO-K1 cells. In order to evaluate the cytotoxicity of the test item, the cells were exposed to the extract (dissolved in water and diluted with culture medium) at concentrations of 310 μg/mL, 620 μg/mL, 1,250 μg/ml, 2,500 μg/mL and 5,000 μg/mL either for 30 h in the absence of an exogenous metabolic system (S9-mix) or for 3 h in the presence or absence of S9-mix. As the cytotoxicity even at the highest concentration of 5,000 μg/mL was less than 40%, the study coordinators decided to use the following four concentrations of the extract in the main experiment: 620, 1,250, 2,500 and 5,000 μg/mL. In the main test, the cytotoxicity at the highest concentration of 5,000 μg/mL for 30 h without S9-mix was 35.9%. After short-term exposure to this concentration in the presence of metabolic activation, the cytotoxicity was 38.5%, while without metabolic activation it was 27.8%. Appropriate positive controls were used as per OECD TG 487 and an adequate response was seen. Micronuclei were manually scored for at least 2,000 cells per concentration. Compared to the vehicle control, there were no statistically significant differences in the number of micronuclei at any tested concentration with and without metabolic activation.

Another micronucleus test was submitted (Vedic Lifesciences, 2019b; Study Nr. 190502/NL/PC, unpublished study report), which assessed the clastogenic/aneugenic potential of the *A. membranaceus* extract. The tested batch (i.e. #20180225) contained 3.1% total saponins and 0.12% astragaloside I. Also this test, which followed OECD TG 487, was carried out in cultured mammalian CHO-K1 cells. In order to evaluate the cytotoxicity of the test item, the cells were exposed to the extract (dissolved in water and diluted with culture medium) at concentrations of 310 μg/mL, 620 μg/mL, 1,250 μg/mL, 2,500 μg/mL and 5,000 μg/mL for 30 h in the absence or for 3 h in the presence and absence of an exogenous metabolic system (S9-mix). The observed toxicity was up to 29% after exposure for 30 h without S9-mix. After exposure for 3 h with and without metabolic activation, the cytotoxicity amounted to 24% and 18.1%, respectively. As the observed toxicity was less than 35% at any concentration with or without S9-mix, the study coordinators decided to use the following three concentrations of the extract in the main experiment: 500, 1,500 and 5,000 μg/mL. In the main test, the cytotoxicity at the highest concentration of 5,000 μg/mL for 30 h without S9-mix was 28.5%. After short-term exposure to this concentration in the presence of metabolic activation the cytotoxicity was 30.5%, while without metabolic activation it was 29.4%. Appropriate positive controls were used as per OECD TG 487 and an adequate response was seen. Micronuclei were manually scored for at least 2,000 cells per concentration. Compared to the vehicle control there were no statistically significant differences in the number of micronuclei at any tested concentration with and without metabolic activation.

The Panel concludes that the studies provided do not raise concerns for genotoxicity of the NF.

### 3.10.2. Subacute and subchronic toxicity

The applicant provided a 28-day oral toxicity study (Pasics Szakonyiné, 2011, unpublished study report) conducted in compliance with GLP and in accordance with OECD TG 407. Twenty Wistar rats (n = 10 per sex) per group were administered by gavage 0, 100, 300 or 1,000 mg/kg body weight (bw) per day of the NF for 28 days. The batch (#20100621) that was used in this study contained 2.35% total saponins, 0.17% ginsenoside Rb1 and 0.054% astragaloside I (see also Table 2). The test item was prepared daily by suspending the NF in 1%-aqueous methylcellulose vehicle.

There was no mortality during the study period. No clinical signs or abnormalities in behaviour, motor activity or general health were observed in control or treated animals. No relevant differences in body weight or body weight gain or feed consumption were observed among the groups.

A number of statistically significant differences in haematology and clinical chemistry between controls and animals administered the NF were observed (available in a file annexed to the scientific opinion under 'Supporting information'). The number of neutrophils significantly increased in all groups receiving the NF. In male rats, the number of basophils was reduced in the mid-dose group. In females, white blood cells (WBC) and lymphocytes were reduced in the low- and mid-dose groups and in the mid- and high-dose groups, respectively. Furthermore, in female rats, mean corpuscular volume

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

(MCV) was reduced in the low-dose group, mean corpuscular haemoglobin concentration (MCHC) was decreased in the mid-dose group and platelets were increased in the low-dose group. Activated partial thromboplastin time (APTT) was increased in the high-dose group compared to the control group. The serum concentration of phosphorus increased with dose in both sexes, being statistically significant in the high-dose group of males and in the mid- and high-dose groups for females.

Absolute and relative organ weights were not different between the groups, except for a higher testes to brain weight ratio in the low-dose males and a lower absolute and relative to body weight kidney weight in the high-dose males. However, the differences were small and considered biologically not relevant. No relevant dose-related histopathological findings were observed.

The applicant provided a repeated dose 90-day oral toxicity study (Upadhyaya and Wang, 2017, unpublished study report) which was conducted in accordance with OECD TG 408 and in compliance with GLP.

Wistar rats (n = 10/group and sex) of 6–8 weeks of age were randomly allocated to one of six groups, which were administered the NF daily by gavage for 90 consecutive days at dosages of 0 mg/kg bw per day (control group), 100 mg/kg bw per day, 300 mg/kg bw per day or 1,000 mg/kg bw per day. The study included two additional groups (i.e. recovery groups) that received 0 mg/kg bw per day (controls) or 1,000 mg/kg bw per day, respectively, for 90 days, and thereafter 0 mg/kg bw per day for an additional 2-week period (i.e. recovery period). The batch (#C20160606) that was used in this study contained 3.79% total saponins, 0.17% ginsenoside Rb1 and 0.028% astragaloside I (see also Table 1). The test item was prepared (with water as vehicle) every day before administration.

None of the animals died in the course of the study. No treatment-related clinical signs were observed in any of the animals throughout the study. Ophthalmological and neurobehavioural examinations of the animals did not reveal any differences between the groups. No treatment-related changes in body weight or body weight gain were observed. However, compared to the controls, feed consumption was lower in males in the low-dose group until day 78 and it was higher in females in the mid- and high-dose groups for most of the study duration. On day 91 (day 105 for the recovery groups), animals were subjected to necropsy and a gross pathological examination was performed. No changes were found in gross pathology.

A number of statistically significant differences in clinical chemistry between controls and animals exposed to the NF were observed (A summary of the results can be found in the online version of this output under the 'Supporting information' section: https://doi.org/10.2903/j.efsa.2020.6099). Serum cholesterol and triglyceride concentrations were increased in males and females. Cholesterol was increased in the high-dose group in the males and in females in all the groups that were administered the NF. Triglycerides were increased in the mid- and high-dose groups for both sexes. Increases were also observed for alanine amino transferase (ALT) (in males of the high-dose group and in females in all the treatment groups) and alkaline phosphatase (ALP) (in males of the high-dose group and in females in the low-dose group). Aspartate amino transferase (AST) was increased in females only, i.e. in the low- and mid-dose groups. Furthermore, lactate dehydrogenase (LDH) was increased in both sexes, in males in all treatment groups and in females in the high-dose group. In males, phosphorous was increased in the mid- and high-dose groups and remained higher (statistically significant) also after the recovery period. In females, succinate dehydrogenase (SDH) and total protein were increased (SDH in the mid- and high dose groups, total protein in all groups receiving the NF).

A number of statistically significant findings were observed for absolute and relative organ weights, but the observed changes were small, often not dose-related and in many cases a result of rather low values in the control groups (with respect to historical controls). No differences were seen in urinalysis.

The Panel notes that a considerable number of changes were observed in clinical chemistry, including markers of liver and kidney toxicity. Even though the size of individual changes was rather small and within historical ranges, the effects were seen consistently in both sexes, were often dose-related and, in the case of phosphorus, also observed after the recovery period. The Panel considers that taken together, the findings imply a potentially adverse effect of the NF. The Panel also considers that taking into account the magnitude of the effects seen, the overall lowest observed adverse effect level (LOAEL) is to be set at 300 mg/kg bw per day. Consequently, the Panel considers the lowest dose tested in the study, i.e. 100 mg/kg bw per day, as the overall no observed adverse effect level (NOAEL).




440

### 3.10.3. Human data

The applicant did not provide any human studies performed with the NF nor were there any human studies with the NF retrieved by extensive literature searches.

## 3.11. Allergenicity

The Panel notes the protein content (2–5%) of the NF and, thus, the potential of the NF to elicit allergic reactions.

The literature searches carried out by the applicant and by the EFSA contractor (UCT Prague) did not retrieve any studies reporting incidents of allergenicity to the NF or to *A. membranaceus*, one of the two plants that is used to produce the NF.

With respect to *P. notoginseng*, the applicant submitted one review (Dharmananda, 2004), which described 19 case reports of allergic reactions to Sanqi (i.e. dried tuber of *P. notoginseng*). No further information on the allergenicity of *P. notoginseng* was provided.

The Panel notes the limited epidemiological data reported on one of the two plants that is used to produce the NF.

Overall, taking into account the long history of use of both plants (i.e. *A. membranaceus* and *P. notoginseng*) that are used to produce the NF, the Panel considers that the risk of allergic reactions to the NF for the general population is unknown but expected to be low.

# 4. Discussion

The NF is a mixture of the root extracts of *A. membranaceus* and *P. notoginseng*, and contains marker compounds within a specified range (i.e. 1.5–5% total saponins, 0.1–0.5% ginsenoside Rb1 and 0.01–0.1% astragaloside I). The Panel considers that the information provided on the composition of the NF and the production process is sufficient and does not raise safety concerns.

The applicant proposed to use the NF as a food supplement for the general adult population (with the exception of pregnant women) at a maximum daily amount of 350 mg. The Panel considers that, taking into account the proposed conditions of use, the consumption of the NF is not nutritionally disadvantageous.

The provided genotoxicity studies do not raise concerns for genotoxicity of the NF. In view of the maximum daily amount proposed for the NF, contribution of pesticides or contaminants is not of toxicological relevance.

Based on the findings of a subchronic toxicity study, supported by a subacute toxicity study, the Panel identified the overall NOAEL of the NF at 100 mg/kg bw per day.

The Panel considers an uncertainty factor (UF) of 200 appropriate, in order to account for inter- and intra-species variability (UF 10 $\times$ 10) and for the lack of chronic toxicity data (additional UF of 2). The application of this UF to the NOAEL results in a safe intake level for the NF of 0.5 mg/kg bw per day. Considering a standard bodyweight of 70 kg for adults (EFSA Scientific Committee, 2012), this level corresponds to a maximum daily intake of 35 mg NF for the target population, i.e. adults excluding pregnant women.

# 5. Conclusions

The Panel concludes that the NF, i.e. a botanical extract derived from both *P. notoginseng* and *A. membranaceus* roots (AstraGin™), is safe at an intake level of 0.5 mg/kg bw per day. This level corresponds to a maximum intake of 35 mg/day for the target population, i.e. adults excluding pregnant women.

The Panel could not have reached the conclusion on the safety of the NF under the proposed conditions of use without the toxicological data for which protection of proprietary data was requested by the applicant (Pasics Szakonyiné, 2011; Zin, 2016; Upadhyaya and Wang, 2017; Vedic Lifesciences, 2019a,b).

## Steps taken by EFSA

1) Letter from the European Commission to the European Food Safety Authority with the request for a scientific opinion on the safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus*. Ref. Ares(2018)5414664, dated 22 October 2018.





18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

2) On 22 October 2018, EFSA received a valid application from the European Commission on a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food, which was submitted by NuLiv Science (US), and the scientific evaluation procedure started.
3) On 6 March 2019, EFSA requested the applicant to provide additional information to accompany the application and the scientific evaluation was suspended.
4) On 30 August 2019, additional information was provided by the applicant and the scientific evaluation was restarted.
5) On 11 November 2019, EFSA requested the applicant to provide additional information to accompany the application and the scientific evaluation was suspended.
6) On 23 January 2020, additional information was provided by the applicant and the scientific evaluation was restarted.
7) During its meeting on 24 March 2020, the NDA Panel, having evaluated the data, adopted a scientific opinion on the safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* as a NF pursuant to Regulation (EU) 2015/2283.

## References


Alcocer-Varela J, Inglesias A, Llorente L and Alarcon-Segovia D, 1985. Effects of L-canavanine on T cells may explain the induction of systemic lupus erythematosus by alfalfa. Arthritis Rheumatism, 28, 52–57.

Bence AK and Crooks PA, 2003. The mechanism of L-canavanine cytotoxicity: arginyl tRNA synthetase as a novel target for anticancer drug discovery. Journal of Enzyme Inhibition and Medicinal Chemistry, 18, 383–394.

Bensky D and Gamble A, 1986. Radix pseudoginseng. Chinese herbal medicine: materia medica. Eastland Press, Seattle. pp. 359–360.

Cui XM, Lo CK, Yip KL, Dong TT and Tsim KW, 2003. Authentication of *Panax notoginseng* by 5S-rRNA spacer domain and random amplified polymorphic DNA (RAPD) analysis. Planta Medica, 69, 584–586.

Dezhuang J, Cong Z and Zhihua W, 1998. Determination of L-Dencichin in Chinese Red Ginseng and Korean Red Ginseng. Chinese Traditional Patent Medicine, 11, 48.

Dharmananda S, 2004. Rare reactions to a safe herb. Institute for Traditional Medicine, Sanqi (Panax notoginseng). Available online: http://www.itmonline.org/arts/sanqi.htm

Dibusz K and Vejvodova P, 2020. Systematic literature search to assist EFSA in the preparatory work for the safety assessment of novel food applications and traditional food notifications. EFSA supporting publication 2020;EN-1774, 72 pp. Available online https://doi.org/10.2903/sp.efsa.2019.EN-1774

Dong TT, Cui XM, Song ZH, Zhao KJ, Ji ZN, Lo CK and Tsim KW, 2003. Chemical assessment of roots of *Panax notoginseng* in China: regional and seasonal variations in its active constituents. Journal of Agriculture and Food Chemistry, 51, 4617–4623.

Duke J and Ayensu E, 1985. Medicinal plants of China. Vol I. Reference Publications, Inc, Algonac, MI.

EFSA NDA Panel (EFSA Panel on Dietetic Products, Nutrition and Allergies), 2016. Guidance on the preparation and presentation of an application for authorisation of a novel food in the context of Regulation (EU) 2015/2283. EFSA Journal 2016;14(11):4594, 24 pp. https://doi.org/10.2903/j.efsa.2016.4594

EFSA Scientific Committee, 2011. Scientific Opinion on genotoxicity testing strategies applicable to food and feed safety assessment. EFSA Journal 2011;9(9):2379. https://doi.org/10.2903/j.efsa.2011.2379

EFSA Scientific Committee, 2012. Guidance on selected default values to be used by the EFSA Scientific Committee, Scientific Panels and Units in the absence of actual measured data. EFSA Journal 2012;10(3):2579, 32 pp. https://doi.org/10.2903/j.efsa.2012.2579

Fu J, Wang Z, Huang L, Zheng S, Wang D, Chen S, Zhang H and Yang S, 2014. Review of the Botanical Characteristics, Phytochemistry, and Pharmacology of *Astragalus membranaceus* (Huangqi). Phytotherapy Research, 28, 1275–1283.

Khan IA and Abourashed EA, 2009. Leung's Encyclopedia of Common Natural Ingredients: Used in Food, Drugs and Cosmetics, 3rd Edition. Wiley. ISBN 978-0-471-46743-4.

Leung A, 1995. Astragalus. In: Glen Rock NJ (ed.). Better health with (mostly) Chinese herbs and foods. AYSL Corp. pp. 5–6.

Leung A and Foster S, 1996. Astragalus. Encyclopedia of common natural ingredients used in food, drugs, and cosmetics. John Wiley & Sons, New York. pp. 50–53.

Morimoto I, Shiozawa S, Tanaka Y and Fujita T, 1990. L-canavanine acts on suppressorinducer T cells to regulate antibody synthesis: lymphocytes of systemic lupus erythematosus patients are specifically unresponsive to L-canavanine. Clinical Immunology and Immunopathology, 55, 97–108.

Pasics Szakonyiné I, 2011 (unpublished study report, claimed as proprietary by the applicant). Repeated dose 28-day oral gavage toxicity study with AstraGin™ in rats. Study No: 413.407.3084. Toxi-Coop Zrt., Hungary.

Reid D, 1987. Panax notoginseng (Araliacea), notoginseng. Chinese herbal medicine. Shambhala Publications Inc., Boston.

Reid D, 1995. Astragalus. A handbook of Chinese healing herbs. Boston, Shambhala. pp. 63–65.





442

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Rosenthal GA, 2001. L-Canavanine: a higher plant insecticidal allelochemical. Amino Acids, 21, 319–330.

Ruslan NF, Noam SRA, Azhar MS, Dahlan HM, Wang R, Suhailah N and Ping TS, 2016 (unpublished study report, claimed as proprietary by the applicant). AstraGin: *in vitro* mammalian cell gene mutation test (HPRT gene mutation) on V79B cells. Study ID: TL/G/476/15/012. Melaka Biotechnology Corporation. Ayer Keroh, Melaka, Malaysia.

Thorne Research Inc, 2003. A. Astragalus membranaceus. Monograph. Alternative Medicine Review, 8, 72–77.

Upadhyaya S and Wang R, 2017 (unpublished study report, claimed as proprietary by the applicant). 90-days repeated dose oral toxicity study of Astragin® in Wistar rats. 161101/NVS/PC. July 2017. 319pp. Vedic Life Sciences Pvt, Ltd. Mumbai, India.

Vedic Lifesciences, 2019a (unpublished study report, claimed as proprietary by the applicant). *Panax notoginseng* proprietary extract: *in vitro* micronucleus test in CHO-K1 cells. Study Nr. 190503/NL/PC. Mumbai, India.

Vedic Lifesciences, 2019b (unpublished study report, claimed as proprietary by the applicant). *Astragalus membranaceus* extract: *in vitro* micronucleus test in CHO-K1 cells. Study Nr. 190502/NL/PC. Mumbai, India.

Wang CZ, McEntee E, Wicks S, Wu JA and Yuan CS, 2006. Phytochemical and analytical studies of Panax notoginseng (Burk.) FH Chen. Journal of Natural Medicines, 60, 97–106.

Wang T, Guo R, Zhou G, Zhou X, Kou Z, Sui F, Li C, Tang L and Wang Z, 2016. Traditional uses, botany, phytochemistry, pharmacology and toxicology of *Panax notoginseng* (Burk.) F.H. Chen: a review. Journal of Ethnopharmacology, 188, 234–258.

Xu Q, Liu F, Chen P, Jez JM and Krishnan HB, 2017. Β-N-Oxalyl-l-α, β-diaminopropionic Acid (β-ODAP) Content in Lathyrus sativus: the Integration of Nitrogen and Sulfur Metabolism through β-Cyanoalanine Synthase. International Journal of Molecular Sciences, 18, 526.

Yu SY, Ouyang HT, Yang JY, Huang XL, Yang T, Duan JP, Cheng JP, Chen YX, Yang YJ and Qiong P, 2007. Subchronic toxicity studies of Radix Astragali extract in rats and dogs. Journal of Ethnopharmacology, 110, 352–355.

Zhu Y, 1998a. San qi (Radix notoginseng – sanchi). Harwood Academic Publishers, Chinese Materia Medica. pp. 423–427.

Zhu Y, 1998b. Huang qi (Radix astragali – milkvetch root). Harwood Academic Publishers, Chinese Materia Medica. pp. 560–564.

Zin HM, 2016 (unpublished study report, claimed as proprietary by the applicant). Bacterial reverse mutation test (Ames test) for AstraGin™. Study code: GLP/J165/2016/48). Environmental Technology Research Centre (ETRC). Shah Alam, Selangor, Malaysia.

## Abbreviations

| | |
|---|---|
| ADME | absorption, distribution, metabolism and excretion |
| ALP | alkaline phosphatase |
| ALT | alanine amino transferase |
| APTT | activated partial thromboplastin time |
| AST | aspartate amino transferase |
| bw | body weight |
| CFU | colony forming units |
| ELSD | evaporative light scattering detector |
| FDA-BAM | Food and Drug Administration's Bacteriological Analytical Manual |
| GC-MS | gas chromatography–mass spectrometry |
| GLP | good laboratory practice |
| GMP | good manufacturing practice |
| HACCP | hazard analysis and critical control points |
| HPLC | high-performance liquid chromatography |
| HPRT | hypoxanthine-guanine phosphoribosyl transferase gene |
| ICP-MS | inductively coupled plasma mass spectrometry |
| LDH | lactate dehydrogenase |
| LOAEL | lowest observed adverse effect level |
| LOD | limit of detection |
| LOQ | limit of quantification |
| MCHC | mean corpuscular haemoglobin concentration |
| MCV | mean corpuscular volume |
| MF | mutation frequency |
| NDA | EFSA Panel on Dietetic Products, Nutrition and Allergies |
| NF | novel food |
| NOAEL | no observed adverse effect level |
| ODAP | oxalyldiaminopropionic acid |




443

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

| | |
|---|---|
| OECD | Organisation for Co-operation and Development |
| RNA | ribonucleic acid |
| SDH | succinate dehydrogenase |
| SLE | systemic lupus erythematosus |
| TG | test guidelines |
| UF | uncertainty factor |
| UV | ultraviolet |
| WBC | white blood cells |



18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License


444

# EXHIBIT F

KAZEROUNI LAW GROUP, APC


445

| | In CLRA Letter | | | | | | | | | Other foreign ingredients in Product | | | In Complaint |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Citrulline | Beta Alanine | Betaine Anhydrous | Theanine | ALCAR | Green Tea | Black Pepper | Arginine | Glutathione | Caffeine | Theobromine | AstraGin® | Ashwagandha |
| Altius Pre | X | X | X | | | | | | | X | | | |
| Andro Surge | | | | | | | X | | | | | | |
| Build PM | | | | X | | | X | | | | | | X |
| Build XT | | | | | | | | | | | | X | X |
| Burn XT | | | | | X | X | X | | | X | | | |
| Burn XT Black | | | | | X | X | X | | | X | X | | |
| Burn XT Powder | | | | | X | X | X | | | X | | | |
| Burn XT Stick Packs | | | | | X | X | X | | | X | | | |
| Caffeine | | | | | | | | | | X | | | |
| Defend XT | | | | | | | X | | X | | | | |
| Dry XT | | | | | | X | | | | | | | |
| EAA Surge | X | | | | | | | | | | | | |
| Flex XT | | | | | | | X | | | | | | |
| GDA XT | | | | | | | | | | | | X | |
| Green Surge (all forms) | | | | | | X | | | | | | | |
| Green Tea | | | | | | X | | | | | | X | |
| Intra Surge | X | | | | | | | | | | | X | |
| L-Arginine | | | | | | | | X | | | | | |
| Lean PM | | | | X | | | X | | | | | | |
| Lean XT | | | | | X | X | X | | | | | | |
| N.O. XT | X | | | | | | | X | X | | | | |
| Nitro Surge Build | X | X | X | X | | | | | | X | | X | |
| Nitro Surge Max | X | X | X | X | | | | | | | X | X | |
| Nitro Surge Natural | X | X | X | X | | X | | | | X | | | |
| Nitro Surge Pre-Workout (Product) | X | X | X | X | | | | | | X | X | X | |
| Nitro Surge Shred | X | X | | X | X | | X | | | X | X | | |
| Prima Surge | | | | | | | X | | | | | | X |
| Pro Series Test | | | | | | | X | | | | | | X |
| Pump Surge | X | | X | | | | | | | | | X | |
| Red Surge | | | | | | X | | | | | | | |
| Test PM | | | | X | | | X | | | | | | |


446

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

February 10, 2025
10:30 AM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: R. Sims

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Gustavo Ponce via LACC

For Defendant(s): Melanie Ayerh

**NATURE OF PROCEEDINGS:** Hearing on Defendant Nutra Holdings, Inc.'s Demurrer, or in the Alternative, Motion to Strike First Amended Complaint; Further Status Conference

The matter is called for hearing.

Oral argument is heard. The Court adopts its tentative ruling as its final ruling as follows:

**Demurrer overruled as to all causes of action. Motion to strike granted as to damages request in the CLRA cause of action with 45 days leave to amend and otherwise denied.**

This is a consumer proposed class action. Plaintiff Daniel Rossi (Plaintiff) contends that defendant Nutra Holdings, Inc., doing business as Jacked Factory (Defendant) represents to consumers that its dietary supplements are "manufactured in the USA" when they are wholly or substantially made with ingredients manufactured outside the United States of America. Plaintiff brings suit under the Consumer Legal Remedies Act (CLRA, Civ. Code § 1750 et seq.), False Advertising Law (FAL, Bus. & Prof. Code § 17500 et seq.), and Unfair Competition Law (UCL, Bus. & Prof. Code § 17200 et seq.), and for negligent and intentional misrepresentation. Defendant demurs to Plaintiff's First Amended Complaint (FAC) and, in the alternative, moves to strike portions of it.

**Legal Standards**

**1. Demurrer**

A demurrer for sufficiency tests whether the complaint states a cause of action. (*Hahn v. Mirda* (2007) 147 Cal. App. 4th 740, 747.) When considering demurrers, courts read the allegations liberally and in context. (*Taylor v. City of Los Angeles Dept. of Water and Power* (2006) 144 Cal. App. 4th 1216, 1228.) In a demurrer proceeding, the defects must be apparent on the face of the pleading or by proper judicial notice. (CCP § 430.30(a).) A demurrer tests the pleadings alone and not the evidence or other extrinsic matters. (*SKF Farms v. Superior Court* (1984) 153 Cal. App. 3d 902, 905.) Therefore, it lies only where the defects appear on the face of

the pleading or are judicially noticed. (*Id*.) The only issue involved in a demurrer hearing is whether the complaint, as it stands, unconnected with extraneous matters, states a cause of action. (*Hahn v. Mirda, supra,* 147 Cal.App.4th at 747.)
"On demurrer the allegations of the complaint are assumed to be true. A demurrer is simply not the appropriate procedure for determining the truth of disputed facts." (*Ramsden v. Western Union* (1977) 71 Cal.App.3d 873, 879.) "Less particularity is required when it appears that defendant has superior knowledge of the facts, so long as the pleading gives notice of the issues sufficient to enable preparation of a defense." (*Okun v. Superior Court* (1981) 29 Cal.3d 442, 458.) "If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38.) "[A] plaintiff is required only to set forth the essential facts of his case with reasonable precision and with particularity sufficient to acquaint a defendant with the nature, source and extent of his cause of action." (*Youngman v. Nevada Irrigation District* (1969) 70 Cal.2d 240, 245; see also *Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins. Exchange* (2005) 132 Cal.App.4th 1076, 1099.)

**2. Motion to Strike**

"Any party, within the time allowed to respond to a pleading may serve and file a notice of motion to strike the whole or any part thereof[.]" (Code Civ. Proc. § 435(b)(1).) "The court may, upon a motion made pursuant to Section 435, or at any time in its discretion, and upon terms it deems proper: (a) Strike out any irrelevant, false, or improper matter inserted in any pleading. (b) Strike out all or any part of any pleading not drawn or filed in conformity with the laws of this state, a court rule, or an order of the court." (Code Civ. Proc. § 436.) "The grounds for a motion to strike shall appear on the face of the challenged pleading or from any matter of which the court is required to take judicial notice." (Code Civ. Proc. § 437(a).)

**Request for Judicial Notice**

Defendant requests that the Court take judicial notice of a number of web pages from its own website (jackedfactory.com) and Amazon.com "identifying the ingredient list for each such product listed on Plaintiff's 'Exhibit A' that does not contain any of the allegedly 'foreign' ingredients identified in the First Amended Complaint." Although the contents of public websites are ostensibly matters that would be subject to judicial notice, a review of the papers indicates that Defendant seeks to use the websites to establish what the contents of the products themselves are. (See Defendant's Memorandum, p. 9.) This is not a proper use of judicial notice. (See *Malek Media Group LLC v. AXQG Corp.* (2020) 58 Cal.App.5th 817, 826 [offering






448

material for judicial notice "for the truth of their contents" is "not a proper use of judicial notice. At most, we could judicially notice the existence of the press releases, but not the truth of their contents [citation], which are 'plainly subject to interpretation and for that reason not subject to judicial notice[.]'"]) Defendant offers no theory on which the contents of the products themselves could be judicially noticed at this stage, and that is the ultimate fact which Defendant seeks to use here. Defendant's request for judicial notice is **denied.**

Plaintiff requests that the Court take judicial notice of a "Scientific Opinion" from EFSA Journal purporting to establish that "Panax notoginseng and Astragalus membranaceus, which create AtraGin, are not from the USA and are sourced from Gansu and Inner Mongolia provinces in China, and from Yunnan and Sichuan provinces in China." This presents the identical issue as Defendant's request, namely that the Court cannot so determine without accepting the contents of the article for its truth, and the truth of those contents does not appear to be indisputable. Plaintiff's request is **denied.**

Defendant has not requested judicial notice of Plaintiff's CLRA demand letter, which is attached to the declaration of Melanie Ayerh as Exhibit 1. However, Plaintiff does not dispute the authenticity of the letter, and contends in fact that the letter is "incorporated by reference in Plaintiff's Complaint and the FAC." (See Plaintiff's Opposition Memorandum, p. 3, fn. 4.) The Court therefore notifies the parties that it intends to take judicial notice of the CLRA demand letter, on its own motion pursuant to Evid. Code § 455 and subject to the parties' right to meet the information.

## Discussion

### I. Specificity of Fraud Allegations

As held in *Lazar v. Superior Court* (1996) 12 Cal.4th 631 (*Lazar*):

> In California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] "Thus '"the policy of liberal construction of the pleadings ... will not ordinarily be invoked to sustain a pleading defective in any material respect.' " [Citation.] [¶] This particularity requirement necessitates pleading facts which show how, when, where, to whom, and by what means the representations were tendered." [Citation.] (*Id.* at 645.)

Defendant contends that Plaintiff's claims lack the required specificity. Plaintiff's FAC alleges, in pertinent part:


449

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674** February 10, 2025
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.** 10:30 AM

Judge: Honorable Stuart M. Rice CSR: None
Judicial Assistant: A. He ERM: None
Courtroom Assistant: R. Sims Deputy Sheriff: None

---

18. Defendant's "Manufactured in the United States" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."
[¶]
20. As of July 2023, when the first complaint in this matter was filed, Defendant's website contained a clear and conspicuous "Manufactured in the USA" claim under iconography of a waiving United States flag encircled by the words "Manufactured in the USA" making it clear that Defendant meant this claim to be applied to *all* its products. This claim, including iconography, appeared on each and every product page of Defendant's website as well as Defendant's Amazon.com product pages.

21. Even after the filing of this matter, according to publicly archived webpages, as of January 2024 or even later, the main home page of Defendant's website still contained a clear and conspicuous "Manufactured in the USA" claim under same iconography of a waiving United States flag encircled by the words "Manufactured in the USA" thus making it more evident that Defendant meant this claim to be applied to *all* its products—even after the Complaint was filed in this matter.
[Image]

22. According to publicly archived webpages, as of November 2023 or even later, the "Frequently Asked Questions" page of Defendant's website contained the following answer in response to the question: "Where are your products manufactured?"
"Answer: **Our products are manufactured in the USA** in a cGMP, FDA Registered manufacturing facility adhering to the strictest quality control." (emphasis added)
[¶…¶]
32. The offending Product purchased by Plaintiff contains or is made with ingredients and/or components that are not "Manufactured in the USA." For example, the Product contains two herbal ingredients that are native to China and not commercially grown in the United States; *Astragalus membranaceus* and *Panax notoginseng*. These ingredients are sourced from China or other Asian countries. Irrespective of exactly where these two ingredients are sourced, one thing is certain – they are not grown, made or sourced from the United States.
[¶…¶]
41. The ingredients in the Product and the Class Products are the same or substantially similar, therefore, the Class Products and Defendant's misrepresentations of them are substantially similar to the Product and the misrepresentation of the Product.


450

> 42. For example, caffeine is included in numerous of Defendant's products other than the Product, including, but not limited to, NitroSurge Shred (also contains theobromine), NitroSurge Build, Burn-XT, Build-XT Black (also contains theobromine), Burn-XT Powder, Wick Mode Pre Workout and NitroSurge Shred Max.
>
> 43. *Astragalus membranaceus* and *Panax notoginseng* are included in numerous products other than the Product, including but not limited to, NitroSurge Build, Pump Surge, Build-XT, GDAXT, Wick Mode Pre Workout, NitroSurge Shred Max and Build XT Max – Elite Muscle Builder.
>
> 44. Defendant uses numerous other indisputably foreign ingredients in numerous of its products, including but not limited to KSM-66 ashwagandha and green tea extract
>
> 45. Despite the presence of numerous indisputable foreign ingredients in the Class Products, Defendant made unqualified "Manufactured in the USA" representations on the main page of its website, on each product page, on each Amazon.com product page and even in the "Frequently Asked Questions" section of its website.
> (FAC, footnotes omitted.)

These allegations are sufficient to put Defendant on notice of the nature of Plaintiff's claims under the heightened pleading standard for misrepresentation claims. Plaintiff alleges that before the filing of the Complaint and until at least January 2024, Defendant made misrepresentations to the general public over the internet about its products being manufactured in the USA, when they contained ingredients which were not, including caffeine, theobromine, astragalus membranaceus, panax notoginseng, KSM-66 ashwagandha, and green tea extract. This fulfills *Lazar'*s requirement to allege "how, when, where, to whom, and by what means the representations were tendered." (See *Lazar, supra,* 12 Cal.4th at 645.)

Defendant argues that Plaintiff does not allege adequate facts supporting the falsity of the representation, such as alleging the countries of origin of the ingredients. Nothing Defendant presents imposes such a requirement on Plaintiff at the pleading stage. *Colgan v. Leatherman Tool Group, Inc.* and *Benson v. Kwikset Corp.* did not involve pleadings motions and say nothing about whether the complaints at issue met the requisite pleading standard. (See *Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 672 [appeal was from grant of summary judgment]; *Benson v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254, 1262 [appeal was of judgment entered after trial.]) In *Kwikset Corp. v. Superior Court,* the question at bar was the allegations of injury in fact in light of the recently enacted Proposition 64, not the sufficiency of the falsity allegations or the "how, when, where, to whom, and by what means" questions






451

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674** February 10, 2025
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.** 10:30 AM

Judge: Honorable Stuart M. Rice CSR: None
Judicial Assistant: A. He ERM: None
Courtroom Assistant: R. Sims Deputy Sheriff: None

of *Lazar*. (See *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 319-320.) That these cases may have had more robust falsity allegations is irrelevant and unhelpful to Defendant's arguments on demurrer.

*Alaei v. Kraft Heinz Food Co.* (S.D. Cal. Apr. 22, 2016, No. 15cv2961-MMA) 2016 WL 11621800 (nonpub. opn.), aside from being an unpublished district court decision, is distinct. The whole of the plaintiff's allegations there was:

> In November of 2015, Plaintiff purchased Defendant's Heinz 57 Sauce (the "Product") from an Albertsons grocery store located on 1133 Mission Road in Fallbrook, California. At the time of Plaintiff's purchase, the offending Product was described as manufactured in the U.S.A., when the Product actually was made and/or contained components made outside of the United States. As such, Defendant is not entitled to lawfully make representations that the Product was "MFD. In U.S.A."
> (*Id.* at p. 2.)

The only ingredients the plaintiff identified did not correspond to the Heinz 57 Sauce the plaintiff purchased. (*Id.* at p. 3.) The District Court found that these allegations fell short of the "who, what, where, when, and how" requirements of the pleading standard. (*Ibid.*) Plaintiff's allegations here are much more robust and correspond to the product he purchased.

Because the allegations noted above are not stated on information and belief, it is unnecessary to address whether Plaintiff has asserted sufficient facts to justify any information and belief allegations. (See *Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1159.)

For the foregoing reasons, the Court will overrule the demurrer to the fourth and fifth causes of action for negligent and intentional misrepresentation on this ground.

### II. Sufficiency of Allegations Concerning UCL, FAL, and CLRA Claims

Defendant argues that for the same reasons, Plaintiff's allegations fail under the Unfair Competition Law (UCL, Bus. & Prof. Code § 17200 et seq.), False Advertising Law (FAL, Bus. & Prof. Code § 17500 et seq.), and Consumers Legal Remedies Act (CLRA, Civ. Code § 1750 et seq.). For the reasons discussed above, Plaintiff's allegations are sufficient to allege that Defendant made false statements to consumers concerning the product Plaintiff bought, at a minimum, and are not simply "contentions, deductions, or conclusions of fact or law" as would support a demurrer. (See *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924.) The Court will overrule the demurrer to the first, second, and third causes of action on this






452

ground.

### III. Request for Injunctive Relief

Defendant contends that it has removed the "Manufactured in the USA" language from its website, Amazon.com, and all other websites over which it maintains control, based on a declaration from its founder and CEO (see Williams Decl., ¶ 3) and that the Court should therefore strike Plaintiff's request for an injunction. It is axiomatic that motions to strike may be based only on the face of the pleading or matters of which the Court may properly take judicial notice. (Code Civ. Proc. § 437(a).) To the extent that Defendant's motion depends on Mr. Williams's declaration, it cannot be granted.

Defendant also contends that Plaintiff does not establish Defendant has unbridled control of the representations made by certain third parties. This argument is somewhat in conflict with Mr. Williams' declaration, which purports to establish that Defendant has control of certain third party websites and not others. Defendant identifies no part of Plaintiff's complaint subject to being stricken due to a purported lack of control. The Court will therefore not grant the motion to strike this portion of the FAC.

### IV. Allegations Concerning Products Plaintiff Did Not Buy

Defendant argues that Plaintiff lacks standing as a matter of law to bring claims pertaining to any products other than the one he purchased (i.e. Jacked Factory Nitrosurge Pre-workout dietary supplement).

This argument does not appear to be based on any California law. *Johns v. Bayer Corp.,* an unreported case from the U.S. District Court for the Southern District of California, does not cite any California law in support of the language Defendant relies on, nor does *Bruton v. Gerber Products Company.* (See *Johns v. Bayer Corp.* (S.D. Cal. Feb. 9, 2010, No. 09CV1935 DMS (JMA)) 2010 WL 476688 (nonpub. opn.), p. 5; *Bruton v. Gerber Products Company* (N.D. Cal. Jan. 15, 2014, No. 12-CV-02412-LHK) 2014 WL 172111 (nonpub. opn.), p. 8.)

Plaintiff is not alleging that he was harmed by any representations connected with a product he did not purchase. Rather, he seeks to represent a class of people who he claims purchased products subject to similar misrepresentations. (See FAC, ¶¶ 3, 77.) Whether people who purchased other products are similarly situated to Plaintiff is a paradigmatic class certification inquiry. As Defendant presents nothing permitting the Court to determine this question as a matter of law at this stage in the litigation, the Court will not strike these allegations, but


453

recognizes this issue may come before the Court again in a different context.

**V. Insufficiency of CLRA Notice**

If a plaintiff seeks damages in a CLRA action, the statute requires pre-suit notice to the defendant:

> (a) Thirty days or more prior to the commencement of an action for damages pursuant to this title, the consumer shall do the following:
> (1) Notify the person alleged to have employed or committed methods, acts, or practices declared unlawful by Section 1770 of the particular alleged violations of Section 1770.
>
> (2) Demand that the person correct, repair, replace, or otherwise rectify the goods or services alleged to be in violation of Section 1770.
>
> The notice shall be in writing and shall be sent by certified or registered mail, return receipt requested, to the place where the transaction occurred or to the person's principal place of business within California.
> (Civ. Code § 1782(a).)

"That requirement exists in order to allow a defendant to avoid liability for damages if the defendant corrects the alleged wrongs within 30 days after notice, or indicates within that 30–day period that it will correct those wrongs within a reasonable time." (*Morgan v. AT&T Wireless Services, Inc.* (2009) 177 Cal.App.4th 1235, 1261 (*Morgan*).)

Defendant contends that Plaintiff's CLRA notice letter was insufficient because it does not identify the purportedly foreign ingredients in the product at issue (i.e. *Astragalus membranaceus, Panax notoginseng*, theobromine, Caffeine or KSM-66 ashwagandha) but other ingredients which are not in the product, and Plaintiff's FAC contains no mention of the substances which are mentioned in the CLRA notice letter.

The letter reads, in pertinent part:

> Contrary to its "Manufactured in the USA" representation, many, if not all, products produced and sold by Jacked Factory contain or are made with ingredients that are not "Manufactured in the USA." For example, the Product contains L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine, which in this instance,
> among other ingredients in the product, are not from the United States, yet its advertising




454

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674** February 10, 2025
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.** 10:30 AM

Judge: Honorable Stuart M. Rice CSR: None
Judicial Assistant: A. He ERM: None
Courtroom Assistant: R. Sims Deputy Sheriff: None

states "Manufactured in the USA." Similarly, Jacked Factory's Burn-XT contains acetyl-L-Carnitine HCl, Green Tea Leaf Extract and Black Pepper Fruit Extract, which in this instance, among other ingredients in the product, are not from the United States, yet the advertising on its webpage, at https://www.jackedfactory.com/products/burn-xt, also states "Manufactured in the USA." Jacked Factory' s N.O. XT contains Arginine, Glutathione and Citrulline, which in this instance, among other ingredients in the product, are not from the United States, yet its advertising states "Manufactured in the USA" (See https://www.jackedfactory.com/products/no-xt). Additionally, on Jacked Factory's website, it even lists an "FAQ" of "Where is [Product] Manufactured" on each of its product's website pages to which the response by Jacked Factory is "All Jacked Factory products are ***proudly manufactured in the USA*** in a cGMP certified facility using the highest quality control guidelines for maximum potency, quality, & safety." (emphasis added).

The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here. However, it is abundantly clear that Jacked Factory pays no attention to applicable laws regarding the labeling of its products with "Manufactured in the USA", or any derivative thereof. **Therefore, each and every one of Jacked Factory products regardless of brand, type, configuration or size, including but not limited to the aforementioned brands and products, containing foreign ingredients, components or raw materials and any reference to "Manufactured** in **the USA" or any derivative thereof, is subject to the demand/s made in this letter. Please note that should this firm file suit on behalf of our client, we will seek to represent the purchasers of any and all of Jacked Factory misrepresented products.**

Section 1770(a) of the CLRA prohibits, among other things, the following unfair methods of competition and unfair or deceptive acts or practices when attempting to sell or selling goods and services to consumers: (2) Misrepresenting the source, sponsorship, approval, or certification of goods or services; (3) Misrepresenting the affiliation, connection, or association with, or certification by, another; ( 4) Using deceptive representations or designations of geographic origin in connection with goods or services; (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have; (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (9) Advertising goods


455

> or services with intent not to sell them as advertised. *(See* Cal. Civil Code sections 1770(a) (2), (3), (4), (5), (7), and (9).)
>
> The above-described representations and/or omissions are false and misleading and constitute unlawful, unfair, or fraudulent acts, or practices and unfair methods of competition in violation of the CLRA, including but not limited to§§ 1770(a)(2), (3), (4), (5), (7), and (9). The representations also violate California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq;* and California's False Advertising Law, California Business & Professions Code §§ 17500, *et seq.* Jacked Factory has and continues to mislead consumers into believing that its products containing the aforementioned ingredients, among others, are "Manufactured in the USA," when in fact that is not true. These misrepresentations allow Jacked Factory to increase its sales and capture market share from its competitors.
> (Ayerh Decl., Ex. 1, pp. 2-3, emphasis in original.)

Defendant contends that Plaintiff's failure to identify in the CLRA notice the specific ingredients that Plaintiff argues are foreign-procured dooms the CLRA claim for lack of notice.

> The CLRA was enacted not just to "protect consumers against unfair and deceptive business practices" but also "to provide efficient and economical procedures to secure such protection." ([Civ. Code] § 1760.) Avoiding litigation when appropriate corrective action has been proffered by the merchant, regardless of whether the relief is requested in the form of monetary damages or restitution of property, achieves this latter goal. (*Ibid.*)
> (*DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 380.)

"This clear purpose may only be accomplished by a literal application of the notice provisions." (*Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30, 41.) That purpose cannot be served by a CLRA notice unless the notice describes with sufficient particularity what acts need to be corrected. In this context, that means identifying the ingredients in the product Plaintiff purchased which Plaintiff contended were manufactured or procured from outside the United States, so that Defendant could determine whether that contention required any corrective action. If the notice describes certain acts (including L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine in a product held out as "Manufactured in USA"), and the manufacturer believes that those allegations are not meritorious and do not expose it to any liability, the appropriate action is to do nothing. If a plaintiff then brings suit based on different acts (including Theobromine, Caffeine, *Astragalus membranaceus, Panax notoginseng,* and KSM-66 Ashwagandha in the product), the defendant has had no opportunity to correct those acts and the purpose of avoiding litigation is entirely


456

frustrated.

As recognized in *Morgan,* it is inappropriate to foreclose the CLRA claim with prejudice based on lack of notice. (See *Morgan, supra,* 177 Cal.App.4th at 1261.) Instead, the claim should be "dismissed until 30 days or more after the plaintiff complies with the notice requirements. If, before that 30–day period expires the defendant corrects the alleged wrongs or indicates it will correct the wrongs, the defendant cannot be held liable for damages." (*Ibid.*) Again, in this context, that means that Plaintiff must give notice of the violations actually sued upon so that Defendant may cure or take appropriate action (which may, in the end, be no action at all). Alternatively, Plaintiff may amend his complaint to allege the violations of which he gave notice, if he can do so in good faith. The Court has no way of determining at this stage whether the product Plaintiff purchased contains the L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine of which he gave notice. Finally, Plaintiff may simply abandon his claim for damages under the CLRA and proceed solely on injunctive relief, which has no notice requirement. (See *Kagan v. Gibraltar Savings & Loan Association* (1984) 35 Cal.3d 582, 590, disapproved on other grounds in *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 643 fn. 3.)

For the foregoing reasons, the Court will grant the motion to strike the request for damages in the CLRA claim with 45 days leave to amend. Because the Court's intention is to grant with leave, the Court will address Defendant's argument based on the making of an appropriate correction, as that question may recur.

## VI. Appropriate Correction

The CLRA provides:

> (b) Except as provided in subdivision (c), no action for damages may be maintained under Section 1780 if an appropriate correction, repair, replacement, or other remedy is given, or agreed to be given within a reasonable time, to the consumer within 30 days after receipt of the notice.
> (c) No action for damages may be maintained under Section 1781 upon a showing by a person alleged to have employed or committed methods, acts, or practices declared unlawful by Section 1770 that all of the following exist:
>
> > (1) All consumers similarly situated have been identified, or a reasonable effort to identify such other consumers has been made.
> >
> > (2) All consumers so identified have been notified that upon their request the

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

February 10, 2025
10:30 AM

Judge: Honorable Stuart M. Rice
Judicial Assistant: A. He
Courtroom Assistant: R. Sims

CSR: None
ERM: None
Deputy Sheriff: None

person shall make the appropriate correction, repair, replacement, or other remedy of the goods and services.

(3) The correction, repair, replacement, or other remedy requested by the consumers has been, or, in a reasonable time, shall be, given.

(4) The person has ceased from engaging, or if immediate cessation is impossible or unreasonably expensive under the circumstances, the person will, within a reasonable time, cease to engage, in the methods, act, or practices.

(Civ. Code § 1782.)

Defendant contends that it has substantially complied with the steps under Civ. Code § 1782(c), such that Plaintiff's action for damages ought to be foreclosed. Specifically, Defendant contends that it has removed the "Manufactured in USA" statements from its website as required by subdivision (c)(4), and that the first three subdivisions have been satisfied because it is inappropriate and unreasonable to require Defendant to take those steps.

As discussed above, Defendant's extrinsic evidence cannot be considered on demurrer. Moreover, the appropriateness of corrections under this section is a matter of judicial discretion, requiring evidence. (*Benson v. Southern California Auto Sales, Inc.* (2015) 239 Cal.App.4th 1198, 1207 ["[T]he trial court should use its discretion, basing it on substantial evidence, to determine whether a correction was appropriate[.]") This makes it an inappropriate issue for demurrer. If the correction were a discrete matter whose resolution could be judicially noticed, that would be one thing, but the Court cannot determine without evidence that as a matter of law, it is unreasonable for Defendant to identify consumers similarly situated to Plaintiff and make an appropriate correction as to those consumers. The Court has no evidence (and can consider none at this stage) of what Defendant's ability is to identify its customers or extend refunds or corrections to them. The Court will not sustain the demurrer or grant the motion to strike on this ground.

**Conclusion**

For the foregoing reasons, the demurrer is **overruled** as to all causes of action. The motion to strike is **granted in part** as to the request for damages in the First Cause of Action for violation of the CLRA with 45 days' leave to amend and is otherwise **denied.** Plaintiff to give notice.


458

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Spring Street Courthouse, Department 1

**23STCV15674** February 10, 2025
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.** 10:30 AM

Judge: Honorable Stuart M. Rice CSR: None
Judicial Assistant: A. He ERM: None
Courtroom Assistant: R. Sims Deputy Sheriff: None

Further Status Conference is scheduled for 05/15/2025 at 09:00 AM in Department 1 at Spring Street Courthouse. A joint report is due three (3) to five (5) court days in advance of the status conference. If another motion is filed and scheduled, the Court will continue the Further Status Conference to follow the motion hearing date.

Plaintiff to give notice.


459

Electronically FILED by Superior Court of California, County of Los Angeles 2/03/2025 3:56 PM David W. Slayton, Executive Officer/Clerk of Court, By L. Smith, Deputy Clerk

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,<br><br>Defendant. | Case No.: 23STCV15674<br><br>**JOINT INITIAL STATUS CONFERENCE STATEMENT**<br><br>Assigned for all purposes to: Judge Stuart M. Rice<br><br>Date: February 10, 2024<br>Time: 10:30a.m.<br>Department: Dept1<br><br>Action Filed: July 6, 2023<br>Trial Date: None |

Plaintiff DANIEL ROSSI ("Plaintiff") and Defendant NUTRA HOLDINGS, INC. d/b/a JACKED FACTORY ("Defendant") (collectively, the "Parties") jointly submit this Status Conference Statement in accordance with this Court's Order at the February 27, 2024, hearing.

///

///

///

**1. PARTIES AND COUNSEL:**

a. Plaintiff is represented by the following counsel:

KAZEROUNI LAW GROUP, APC
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

b. Defendant is represented by the following counsel:

Carol R. Brophy (SBN 155767)
cbrophy@steptoe.com
Anthony Hopp (*pro hac vice* application pending)
ahopp@steptoe.com
Melanie A. Ayerh (SBN 303211)
Jennifer K. Singh (SBN 285000)
jsingh@steptoe.com
Angela M. Sousa (SBN 96726)
asousa@steptoe.com
STEPTOE LLP
One Market Plaza, Steuart Tower, Ste 1070
San Francisco, California 94105
Telephone: (415) 365-6700
Facsimile: (415) 365-6699

**2. STATUS OF PLEADINGS:**

Defendant filed a demurrer and motion to strike ("Demurrer") the Complaint on May 17, 2024. The Demurrer was set for hearing on August 29, 2024. Plaintiff filed a First Amended Complaint ("FAC") in lieu of an opposition to the Demurrer on August 16, 2024. Defendant file a demurrer and motion to strike the FAC ("FAC Demurrer") on October 17, 2024. The FAC Demurrer is fully briefed and set for hearing on February 10, 2024. .


461

**3. POTENTIAL ADDITIONAL PARTIES:**

Plaintiff's Position:

Plaintiff does not presently anticipate adding additional plaintiffs/class representatives nor naming additional parties but reserves the right to do so following further discovery.

Likewise, Plaintiff does not intend to name additional defendants but reserves the right to do so following further discovery.

Defendant's Position:

Defendant does not presently anticipate adding any third-party defendants.

**4. IMPROPERLY NAMED DEFENDANTS:**

Plaintiff's Position:

It is Plaintiff's understanding that there are no improperly named defendants.

Defendant's Position:

Defendant does not believe that there are any improperly named defendants.

**5. ADEQUACY OF PROPSED CLASS REPRESENTATIVE:**

Plaintiff's Position:

Plaintiff believes the proposed class representative is adequate.

Defendant's Position:

Defendant reserves the right to challenge the adequacy of the proposed class representative.

**6. CLASS ACTION ESTIMATED SIZE:**

Plaintiff's Position:

Plaintiff believes the class size to be in the thousands, if not millions.

Defendant's Position:

Defendant does not believe that a class should be certified.

**7. OTHER ACTIONS WITH OVERLAPPING CLASS DEFINITIONS:**

The parties are not aware of any other overlapping class actions.

///

///


462

**8. POTENTIALLY RELEVANT ARBITRATION AND/OR CLASS ACTION WAIVER CLAUSES:**

Plaintiff's Position

Plaintiff does not believe that there are any arbitration provisions and/or class action waivers that govern the claims in this action.

Defendant's Position

Defendant is not currently aware of any arbitration provisions and/or class action waivers that govern the claims in this action, but Defendant's investigation continues.

**9. POTENTIAL EARLY MOTIONS:**

Plaintiff's Position:

Plaintiff anticipates bringing a motion for class certification.

Defendant's Position:

Defendant has filed a demurer and motion to strike, and will oppose any motion for class certification.

**10. CLASS CONTACT INFORMATION:**

Plaintiff's Position:

Plaintiff believes Defendant has the means of obtaining the class contact information through their records or the records of third-party companies associated with Defendant. However, Plaintiff does not believe obtaining class contact information from Defendant is necessary as class notice may be achieved through internet publication.

Defendant's Position:

Defendant does not believe that class notice will be necessary as it disputes that any class can or should be certified. Should notice be deemed necessary, Defendant does not believe obtaining class contact information from Defendant will be necessary as class notice may be achieved through internet publication.

///

///


463

**11. PROTECTIVE ORDERS:**

Plaintiff's Position:

Plaintiff recognizes that Defendant may require a protective order for confidential information, and Plaintiff is agreeable to a stipulated confidentiality protective order, including the model form found on the Court's website. Plaintiff requests that a stipulated confidentiality protective order be filed no later than April 26, 2024, to avoid any delay in exchange of discovery.

Defendant's Position:

Defendant believes that a protective order will be necessary. Defendant proposes submitting a stipulated protective order two weeks following the Court's ruling on Defendant's FAC Demurrer.

**12. DISCOVERY:**

Plaintiff's Position:

Plaintiff believes that the discovery should be permitted to commence immediately. Plaintiff does not believe that discovery should be bifurcated between merits discovery and class discovery or conducted in stages in this California putative class action, but Plaintiff is willing to focus initial efforts on discovery relevant to moving for class certification.

To that end, Plaintiff intends to propound written discovery (Requests for Admissions, Requests for Production, Form Interrogatories, and Special Interrogatories), requesting categories of information such as: (a) information relating to the number of California consumers who purchased class products within the last four years; (b) Defendant's advertising and marketing in any form in California of the relevant to substantially similar class products; (c) the average price of the class products sold during the class period; (d) Defendant's sales figures as it concerns the relevant class products and the number of units of the products sold in California; (e) information pertaining to contact information retained by Defendant for class members, including e-mail address and phone numbers; (f) information relating to the putative class members maintained by Defendant or its agent/vendors; (g) information relating the ingredients in the class products; and (h) defenses and documentation that Defendants will rely upon to oppose a motion for class certification.


464

Plaintiff also intends to depose the Person Most Knowledgeable for Defendant after receipt of sufficient written discovery from Defendant, and potentially other individuals with knowledge, such as employees of Defendant and third parties involved in Defendant's advertising campaigns. Plaintiff anticipates needing seven to eight months for discovery to prepare a motion for class certification. Following a motion for class certification, Plaintiff intends to conduct further fact discovery relating to any certified class and also conduct expert discovery. Plaintiff anticipates requiring at least four months after the ruling on a motion for class certification to complete fact discovery, including as to class members in any certified action.

Lastly, if Defendant intends to bring a motion to dismiss, Plaintiff believes discovery should commence and proceed and not be stayed pending resolution of the motion.

Defendant's Position:

Defendant believes that a stay of discovery until after determination of the merits or adequacy of Plaintiff's FAC is a more efficient and cost-effective procedure. If there is a valid demurrer to the FAC, some of Plaintiff's causes of action would either be dismissed or at best, amended. The determination of whether the FAC states one or more valid causes of action would unquestionably affect the definition of a putative class or sub-classes. It makes no sense to undertake voluminous and expensive discovery of information related to purported putative class members as to causes of action that would or might be dismissed. Moreover, since the FAC purports that approximately 44 or more products could be involved in Plaintiff's claims, undertaking class discovery first could be unnecessary or irrelevant if these potential class members' claims are barred by statutes of limitation or if some Products were withdrawn or labeling modified or different. Additionally, although Paragraph 77 of the FAC seems to limit the putative class to California purchasers, footnote 1 of the Complaint implies the possibility of a nationwide or multistate class. Again, it would be inefficient and unnecessarily burdensome to undertake discovery of possible multistate consumers for whom no valid causes of action are viable.

///

///


465

**13. INSURANCE COVERAGE:**

The Parties do not believe there is any insurance coverage that would apply to this matter.

**14. ALTERNATIVE DISPUTE RESOLUTION:**

The Parties have met and conferred regarding ADR. The Parties both prefer private mediation as the alternative dispute resolution mechanism.

Dated: February 3, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP APC**

*/s/ Gustavo Ponce*
Gustavo Ponce, Esq.
Attorneys for Plaintiff

**STEPTOE LLP**

*/s/ Melanie Ayerh*
Carol R. Brophy
Anthony Hopp (*Pro Hac Vice* forthcoming)
Melanie A. Ayerh
Attorneys for Defendant


466

**PROOF OF SERVICE**

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On February 3, 2025, I served the foregoing document and accompanying attachments by the means indicated below:

☒ E-MAIL - by transmitting via e-mail the document(s) listed above to the e-mail address(es) set forth below on this date before 11:59 p.m.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Anthony Hopp
Melanie A. ayerh
Angela M. Sousa
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
*jsingh@steptoe.com*
*ahopp@steptoe.com*
*Attorneys for Defendant*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on February 3, 2025, at Las Vegas, Nevada.

*/s/ Gustavo Ponce*
GUSTAVO PONCE

Electronically FILED by Superior Court of California, County of Los Angeles 2/03/2025 4:49 PM David W. Slayton, Executive Officer/Clerk of Court, By E. Davis, Deputy Clerk

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Jennifer K. Singh (SBN 285000)
*jsingh@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**REPLY IN SUPPORT OF DEMURRER, OR IN THE ALTERNATIVE, MOTION TO STRIKE**<br><br>Hearing Date: February 10, 2025<br>Time: 10:30 a.m.<br>Dept: 1<br>Complaint Filed: July 6, 2023<br>First Amended Complaint: August 16, 2024 |


468

**TABLE OF CONTENTS**


I. INTRODUCTION ........................................................................................................ 1

II. PLAINTIFF SUFFERED NO HARM AND LACKS STATUTORY STANDING TO PURSUE CLAIMS RELATED TO THE *46* PRODUCTS HE DID NOT PURCHASE .. 1

A. Plaintiff Lacks Statutory Standing to Assert Claims Based on the 46 Products He Never Purchased ........................................................................................ 1

B. Plaintiff Does Not Plausibly Allege That The 46 Products Are "Substantially Similar" ........................................................................................................ 2

III. PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF IS MOOT ................................ 5

IV. PLAINTIFF'S SECTION 1782 NOTICE IS DEFICIENT AND HE CANNOT MAINTAIN A CLAIM FOR DAMAGES UNDER THE CLRA ...................................... 6

V. PLAINTIFF'S CLAIMS FOR FRAUD AND THOSE UNDER CALIFORNIA'S CONSUMER STATUTES ARE NOT ADEQUATELY PLED ....................................... 8

VI. CONCLUSION ........................................................................................................ 9



469

# TABLE OF AUTHORITIES


Page(s)

**Cases**

*Alaei v. Kraft Heinz Food Co.*, No. 15CV2961-MMA (DHB), 2016 WL 11621800 (SD Cal. Apr 22, 2016) ....................... 4, 8

*Ang v. Bimbo Bakeries USA, Inc.*, No. 13-CV-01196-WHO, 2013 WL 5407039 (N.D. Cal. Sept. 25, 2013) ............................... 7

*Ang v. Bimbo Bakeries USA, Inc.*, No. 13-CV-01196-WHO, 2014 WL 1024182 (N.D. Cal. Mar. 13, 2014) ............................... 4

*Brown v. Hain Celestial Group, Inc.*, 913 F.Supp.2d 881 (N.D. Cal. 2012) ............................... 4

*Cadlo v. Owens-Illinois*, 125 Cal.App.4th 513 (2004) ............................... 8

*California Serv. Station etc. Assn. v. Union Oil Co.*, 232 Cal. App. 3d 44 (Ct. App. 1991) ............................... 5

*Cordes v. Boulder Brands USA, Inc.*, No. CV 18-6534 PSG (JCX), 2019 WL 1002513 (C.D. Cal. Jan. 30, 2019) ............................... 5

*Cruz v. County of Los Angeles*, 173 Cal.App.3d 1131 (1985) ............................... 5

*Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952 (2002) ............................... 6

*In re Firearm Cases*, 126 Cal. App. 4th 959 (2005) ............................... 6

*Herron v. Best Buy Stores, L.P.*, No. 12–cv–02103, 2014 WL 2462969 (E.D. Cal. May 29, 2014) ............................... 7

*In re Jamster Mktg. Litig.*, No. 05CV0819 JM (CAB), 2009 WL 1456632 (S.D. Cal. May 22, 2009) ............................... 6

*Kwikset Corp v. Superior Court*, 51 Cal.4th 310 (2011) ............................... 1

*Larsen v. Trader Joe's Co.*, No. 11–cv–5188–SI, 2012 WL 5458396 (N.D. Cal. filed June 14, 2012) ............................... 4



470

*Madrid v. Perot Systems Corp.*
130 Cal. App. 4th 440 (2005) .......... 5

*Miller v. Ghirardelli Chocolate Co.*,
912 F.Supp.2d 861 (N.D. Cal. 2012) .......... 4

*Outboard Marine Corp. v. Superior Court*,
52 Cal. App. 3d 30 (1975) .......... 6

*People v. Williams*,
176 Cal.App.4th 1521 (2009) .......... 3

*PH II, Inc. v. Superior Ct.*,
33 Cal. App. 4th 1680 (1995) .......... 2

*Roybal v. Equifax*,
No. 2:05-cv-01207-MCE-KJM, 2008 WL 4532447 (E.D. Cal. Oct. 9, 2008) .......... 7

*San Diego County Employees Retirement Assn. v. County of San Diego*,
151 Cal.App.4th 1163 (2007) .......... 3

*Shaeffer v. Califia Farms, LLC*,
44 Cal.App.5th 1125 .......... 2

*Veera v. Banana Republic, LLC*,
6 Cal.App.5th 907 (2016) .......... 2

*West v. JPMorgan Chase Bank, NA*,
214 Cal.App.4th 780 (2013) .......... 8

*White v. De La Calle Co.*,
2023 Cal. Super. LEXIS 24017 .......... 3

*Winkelbauer v. Orgain Mgmt.*,
2021 Cal. Super. LEXIS 7158 .......... 3

*Yordy v. Plimus, Inc.*,
No. 12-CV-00229-TEH, 2014 WL 1466608 (N.D. Cal. Apr. 15, 2014) .......... 6

**Statutes**

Bus. & Prof. Code § 17535 .......... 1

Cal. Evid. Code § 452 .......... 5

Civil Code section 1782 .......... 6, 8


471

**Other Authorities**

16 C.F.R. § 323 .......... 1, 8

Cal. Rules of Ct., rule 8.1115 .......... 3


472

## I. INTRODUCTION

The issues raised by Nutra Holdings, Inc. d/b/a Jacked Factory's ("Nutra Holdings") demurrer and motion to strike are straightforward. First, although Plaintiff purchased only one type of Nutra Holdings' dietary supplements, he attempts to bring causes of action as to *46* dissimilar products that he never purchased. He cannot do so. He does not, and cannot, allege any statutory standing to bring claims under California's Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), or Consumers Legal Remedies Act ("CLRA") based on marketing related to products he never purchased, and he has not and cannot plausibly allege that the 46 products are "substantially similar" to the product he allegedly purchased. This Court must disregard Plaintiff's reliance on unpublished, uncitable California trial court decisions. Allegations concerning those 46 unpurchased products should be dismissed with prejudice.

Second, Plaintiff's prayer for injunctive relief requiring Nutra Holdings to "discontinue its false and/or misleading statements" is moot because there is no question that the websites that Nutra Holdings controls no longer carry the "Manufactured in the USA" language. Nutra Holdings should not be forced into discovery on such a straightforward, readily verifiable fact. Nutra Holdings' removal of the "Manufactured in the USA" language also remedies any purported "defects" and precludes recovery of CLRA damages.

Finally, the First Amended Complaint ("FAC") fails to plausibly allege with particularity that the ingredients in any of Nutra Holdings' dietary supplement is sourced outside of the United States such that there is a violation of 16 C.F.R. § 323. Sheer guesswork, in hopes that discovery will turn up a violation, is insufficient to maintain a claim for fraud.

## II. PLAINTIFF SUFFERED NO HARM AND LACKS STATUTORY STANDING TO PURSUE CLAIMS RELATED TO THE *46* PRODUCTS HE DID NOT PURCHASE

### A. Plaintiff Lacks Statutory Standing to Assert Claims Based on the 46 Products He Never Purchased

The UCL and the FAL both impose a strict statutory standing requirement: a plaintiff must plead and prove that he or she has personally suffered a loss of money or property as a result of the alleged violation. *Kwikset Corp v. Superior Court*, 51 Cal.4th 310, 323 (2011); Bus. & Prof. Code § 17535. The CLRA's standing requirements "are essentially identical to those of the UCL


473

and the FAL." *Veera v. Banana Republic, LLC*, 6 Cal.App.5th 907, 916 & n.3 (2016). Under all three statutes, "the plaintiff must show that he 'actual[ly] reli[ed]' on the 'allegedly deceptive or misleading statement' and that it 'was an immediate cause' of [his] injury." *Shaeffer v. Califia Farms, LLC*, 44 Cal.App.5th 1125, 1137.

Here, Plaintiff alleges that he purchased only *one type* of Nutra Holdings' products: Nutra Holdings' Nitrosurge Pre-workout dietary supplement. FAC ¶ 2. That fact notwithstanding, he attempts to assert claims based on marketing related to 46 different, unrelated dietary supplements that he never purchased or consumed. *Id.* ¶ 3, fn. 3. Plaintiff simply lacks statutory standing to do so. Because he never purchased any of those 46 products, he has not alleged that any marketing related to those products was the "immediate cause" of any injury to him. *Shaeffer*, 44 Cal.App. at 1137. Nor did he "actually rely" on any advertisement related to any of those 46 products because he did not purchase them. *Id.* Plaintiff's failure to plead facts establishing any statutory standing to prosecute claims based on unpurchased products is a substantive defect appearing "on the face of the complaint." *PH II, Inc. v. Superior Ct.*, 33 Cal. App. 4th 1680, 1682 (1995). Nutra Holdings "should not have to suffer discovery and navigate the often-dense thicket of proceedings in summary adjudication" over a raft of unpurchased products. *Id.* Accordingly, the Court should sustain the demurrer as to the 46 unrelated products Plaintiff never purchased.[1]

**B. Plaintiff Does Not Plausibly Allege That The 46 Products Are "Substantially Similar"**

Even if this Court were to follow those federal district courts applying a "substantially similar" theory of Article III standing, this Court should still sustain the demurrer and motion to strike because Plaintiff simply has not plausibly alleged that the 46 different Nutra Holdings products are "substantially similar" to the Product he purchased. They are not. *See* Mot. at 15. Merely identifying and labeling various products as "class products" without more is not enough. The Opposition does not address the fact that each product contains different formulations and

---

[1] Plaintiff also lacks standing to bring his misrepresentation claims based on the 46 products that he never actually purchased. Plaintiff suffered no injury, damage, loss, or harm as a result of the alleged marketing statements on those 46 dietary supplements.


474

ingredients, is manufactured at potentially various facilities, and conceivably encompasses hundreds of different types of articles, units, or parts, bearing different physical labels and website configurations than the product purchased by Plaintiff.[2] Notably, the Opposition fails to address the fact that at least <u>*21*</u> of the 46 products do not even contain <u>*any*</u> of the allegedly foreign ingredients identified in the FAC. *See* Mot. at 15. Instead, the Opposition argues that Plaintiff should be allowed discovery on this issue, or that any ruling should be deferred to the class certification stage. Opp. at 14-15. Plaintiff offers no authority for these propositions. He improperly relies on two <u>*unpublished*</u> California trial court decisions, "*White v. De La Calle Co.*, 2023 Cal. Super. LEXIS 24017" and "*Winkelbauer v. Orgain Mgmt*., 2021 Cal. Super. LEXIS 7158".[3] *See* Cal. Rules of Ct., rule 8.1115; *People v. Williams*, 176 Cal.App.4th 1521, 1529 (2009) (citations to unpublished decisions "absolutely prohibited," absent exceptions not applicable here); *San Diego County Employees Retirement Assn. v. County of San Diego*,151 Cal.App.4th 1163, 1184 (2007) ("A trial court judgment cannot properly be cited in support of a legal argument, absent exceptions not applicable here".) And the federal cases he cites are readily distinguishable.

For example, in *Sinatro v. Barilla America, Inc*., the Court found that some 52 pasta products were "substantially similar" based on plaintiffs' detailed allegations that "all of the products at issue [were] sold under the same brand name, Barilla, and [were] dry pastas that [were] made from largely the same ingredients or types of ingredients, milled in the same or similar manner, and manufactured into the finished Products in the same or similar manner." 2022 WL 10128276 at *877 (N.D. Cal., Oct. 17, 2022). The *Sinatro* court acknowledged that the plaintiffs sufficiently pled that the challenged representations appeared prominently and conspicuously "on

---

[2] Incredibly, without alleging <u>*any*</u> facts or reasonable basis in support, Plaintiff seeks to pursue claims against "[a]ny and all other products that contain 'Manufactured in the USA' or any derivative thereof in any of their advertising or marketing."

[3] It is black letter law that this Court may not consider such unpublished opinions as legal authority or precedent, and parties are expressly prohibited from citing them as authority. Even if the Court is to give these unpublished decisions any credence, they are both factually distinguishable. Neither involves a complaint completely devoid of *any* facts establishing how unpurchased products are "substantially similar" to the purportedly purchased products at issue.


475

the primary display panel of the front label and/or packaging" on each product along with the colors of Italy's national flag." *Id*. Here, the FAC does not plead *any* facts to show that the 46 products are "substantially similar" to the product Plaintiff allegedly purchased.[4] And a cursory review of the publicly available ingredient list for each of the 46 Nutra Holdings products show that each product contains different formulations and ingredients. *See* Mot. at 15. An order striking any reference to the 46 products identified in paragraph 3 of the FAC is appropriate. *Ang v. Bimbo Bakeries USA, Inc*., No. 13-CV-01196-WHO, 2014 WL 1024182, at *1 (N.D. Cal. Mar. 13, 2014) (products are not substantially similar where misleading labels requires a context-specific analysis.); *see also*, *Larsen v. Trader Joe's Co*., No. 11–cv–5188–SI, 2012 WL 5458396 (N.D. Cal. filed June 14, 2012) (plaintiffs lacked standing to bring claims based on products they did not purchase where they challenged "a wide range of Trader Joe's products which bear little similarity"); *Brown v. Hain Celestial Group, Inc*., 913 F.Supp.2d 881, 892 (N.D. Cal. 2012) (product line to be found "substantially similar", in part because plaintiffs *disclaimed any intent to challenge whether specific ingredients actually are organic*. Therefore, the dissimilarity of the accused products [was] relatively unimportant.)

Plaintiff also relies on *Miller v. Ghirardelli Chocolate Co*., 912 F.Supp.2d 861, 869 (N.D. Cal. 2012), but *Miller* supports Nutra Holdings' position. In *Miller* the court found that plaintiff did not have standing to pursue claims over other white chocolate products because those products' composition was different, the labeling on the products was "very different" and the purported misrepresentations "var[ied] widely." *Id*. at 870–71. Because of those differences, the plaintiff lacked standing to pursue claims based on the unpurchased products. The *Miller* court noted that even if it did not take judicial notice of the different product labels, the result remained the same because plaintiff did not allege any facts to establish substantial similarity between the products

[4] Paragraph 3 of the FAC claims that "Defendant's Class Products…are actually made with or contain ingredients that are not "Manufactured in the USA" as discussed herein." Yet, nowhere in the FAC does Plaintiff actually address the *46 different* products and the purportedly "foreign" ingredients present in each. *Alaei v. Kraft Heinz Food Co*., No. 15CV2961-MMA (DHB), 2016 WL 11621800, at *3 (SD Cal. Apr 22, 2016) (dismissing complaint where plaintiff failed to specify which "components of the product were purportedly 'made outside of the United States".)


476

he purchased and those that he did not purchase. *Id*. at 871. Here too, because the FAC is devoid of facts plausibly alleging any substantial similarity between the unpurchased products and the Product, Plaintiff lacks standing to pursue those 46 additional products. Without plausibly alleging that the products are substantially similar, there is simply no basis to defer the question of standing to later stages of litigation. *Cordes v. Boulder Brands USA, Inc*., No. CV 18-6534 PSG (JCX), 2019 WL 1002513, at *2 (C.D. Cal. Jan. 30, 2019) (because the complaint contained no allegations about other varieties of Defendant's products, the Court found that Plaintiff had failed to plausibly allege that the non-purchased products were substantially similar to the product he purchased.)

## III. PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF IS MOOT

Injunctive relief is not a remedy designed to right completed "wrongs". *Madrid v. Perot Systems Corp.* 130 Cal. App. 4th 440, 464–465 (2005). The fact that the Nutra Holdings website and its amazon.com storefront no longer make a "Manufactured in the USA" claim cannot be seriously disputed. This issue does not require drawn out discovery, a simple google search would suffice. Tellingly, the Opposition does not dispute this fact, and the FAC relies solely on _*archived*_ versions of the Nutra Holdings website dating back to 2023 and "January 2024". *See*, FAC ¶¶ 21, 22. But archived websites do not establish a present or ongoing threat of harm. Neither the Nutra Holdings website nor the products' amazon.com page makes a "Manufactured in the USA" claim, therefore, there is no threat that any allegedly wrongful act will continue.[5] Plaintiff's prayer for injunctive relief is moot. *California Serv. Station etc. Assn. v. Union Oil Co*., 232 Cal. App. 3d 44, 57 (Ct. App. 1991).

The Opposition also fails to address, and effectively concedes, that as to third party websites, imposition of an injunction is inappropriate where the FAC does not plausibly allege that Nutra Holdings has control over the representations made on such websites. *See* FAC ¶ 29, n.8.

---

[5] Even if the Court disregards the declaration of John Williams at this stage, which it need not, the representations are judicially noticeable. The claims present (or missing) on jackedfactory.com and amazon.com websites are publicly available and cannot reasonably be the subject of dispute. Cal. Evid. Code § 452. Judicially noticeable matters upon demurrer will be dispositive in those instances where there is not or cannot be a factual dispute concerning that which is sought to be judicially noticed. *Cruz v. County of Los Angeles*, 173 Cal.App.3d 1131, 1134 (1985).


477

As outlined in the moving papers, "[a] defendant's liability [under the UCL] must be based on [its] personal 'participation in the unlawful practices' and 'unbridled control' over the practices." *Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952, 960 (2002) (quoting *People v. Toomey*, 157 Cal. App. 3d 1, 15 (1984)); *In re Firearm Cases*, 126 Cal. App. 4th 959, 985 (2005) (rejecting UCL claim where defendants "did not control the wrongful acts [in question] or encourage others to engage in questionable acts," even though defendants did "have a relationship with the wrongdoers"). Likewise, for an FAL claim, "mere knowledge of the falsity of a third-party's statements is insufficient to support direct liability...." *Yordy v. Plimus, Inc*., No. 12-CV-00229-TEH, 2014 WL 1466608, at *3 (N.D. Cal. Apr. 15, 2014). And under the CLRA, a defendant's liability must be based upon "participation or control in the alleged unlawful advertising scheme." *In re Jamster Mktg. Litig*., No. 05CV0819 JM (CAB), 2009 WL 1456632, at *9 (S.D. Cal. May 22, 2009). Accordingly, to the extent that there may be third party websites presently carrying the "Manufactured in the USA" language, the FAC alleges no facts to suggest that Nutra Holdings has control over those sites such that an injunction as to Nutra Holdings is appropriate.

## IV. PLAINTIFF'S SECTION 1782 NOTICE IS DEFICIENT AND HE CANNOT MAINTAIN A CLAIM FOR DAMAGES UNDER THE CLRA

Plaintiff's tired argument of form over substance, (Opp. at 15-16), ignores substantial case law requiring strict compliance with the CLRA notice provisions. "The clear intent of the [CLRA notice requirement] is to provide and facilitate pre-complaint settlements of consumer actions wherever possible .... This clear purpose may only be accomplished by a ***literal application*** of the notice provisions." *Outboard Marine Corp. v. Superior Court*, 52 Cal. App. 3d 30, 40 (1975) (emphasis added). Applying Civil Code section 1782 literally here, as the Court must, Plaintiff's CLRA notice is legally deficient. To be clear, nowhere in Plaintiff's March 8, 2023 CLRA letter does he identify the purportedly "foreign" ingredients that are at issue in this litigation. [6] *See* FAC, Ex. A; Ayerh Decl. ¶ 3; Ex. 1. Instead, Plaintiff's letter focused on ingredients such as "L-

[6] Plaintiff's opposition misleadingly conflates the ingredients identified in the FAC and the March 8 letter. In fact, Plaintiff's original complaint did not identify any ingredients. Plaintiff, for the first time, identified the actual ingredients at issue in his FAC.


478

Citrulline", "Betaine Anhydrous", "Beta Alanine", and "Theanine", ingredients that Plaintiff now concedes are inconsequential and are not at issue in this litigation. *Ang v. Bimbo Bakeries USA, Inc*., No. 13-CV-01196-WHO, 2013 WL 5407039, at *12 (N.D. Cal. Sept. 25, 2013) (dismissing CLRA claim to the extent premised on products not identified in the notice); *Herron v. Best Buy Stores, L.P.*, No. 12–cv–02103, 2014 WL 2462969, at *2–3 (E.D. Cal. May 29, 2014) (dismissing plaintiff's CLRA damages claims arising from unpurchased laptops where "plaintiff's CLRA notice failed to notify defendant of the particular alleged violations of the CLRA concerning laptops other than the [one] plaintiff purchased")(internal modifications omitted); *Roybal v. Equifax*, No. 2:05-cv-01207-MCE-KJM, 2008 WL 4532447, *10 (E.D. Cal. Oct. 9, 2008) (granting summary adjudication on CLRA claim because plaintiff's letter failed to provide notice of "particular alleged violations"). In *Roybal*, the court found Plaintiff's 1782 notice insufficient where it "wholly failed to point to any particular violations [ ] capable of putting the defendants on notice of Plaintiffs' claims." *Id.* at *10. The letter merely claimed that the defendants were responsible for false derogatory credit entries on plaintiffs' credit reports, but failed to identify any *specific entries*, making it impossible for the defendants to make "appropriate corrections." *Id*. at *11. Like in *Roybal*, the insufficiency of Plaintiff's notice is fatal to his claim for damages under the CLRA.

Plaintiff's position that it is Defendant's duty to guess the potential scope of Plaintiff's CLRA claims (Opp. at 16) lacks any legal support and entirely misses the mark. The entire purpose of the CLRA notice provision is to foster resolution and avoid spurious claims. Plaintiff's CLRA notice does neither of these. His letter identified a list of ingredients that he now concedes do not create any liability, and his FAC vaguely identifies a new list of ingredients that Plaintiff only guesses may be of foreign origin. Plaintiff clearly intends to use discovery to determine what, if any ingredients, in the products may be foreign. There is nothing "bewildering" about requiring a Plaintiff to specifically disclose purported violations prior to filing a putative class action seeking damages. Nutra Holdings has not been afforded the notice to which it is due under the statute and remains uncertain about the scope of Plaintiff's claims. Plaintiff has failed to do what was required to perfect a CLRA damages claim against Nutra Holdings.


LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

479

Notwithstanding Plaintiff's defective notice, Nutra Holdings has substantially complied with section 1782(c)(4) of the Civil Code because it has removed the "Manufactured in USA" website statements. With respect to section 1782(c)(1)-(3) of the Civil Code, it is inappropriate and inherently unreasonable for Nutra Holdings to be required to give notice and make refunds to an unascertainable group of consumers who may have purchased the products on Nutra Holdings or some third party websites and not in person[7], and who purportedly relied on the "Manufactured in the USA" language prior to his or her purchase, when Plaintiff's CLRA demand did not even give sufficient notice of the purported "violations" at issue.

For the foregoing reasons, Plaintiff's request for damages under his CLRA cause of action should be stricken.

## V. PLAINTIFF'S CLAIMS FOR FRAUD AND THOSE UNDER CALIFORNIA'S CONSUMER STATUTES ARE NOT ADEQUATELY PLED

Each element in a cause of action for fraud or negligent misrepresentation must be *factually* and *specifically*, alleged. *See, e.g.*, *Cadlo v. Owens-Illinois*, 125 Cal.App.4th 513, 519 (2004) (emphasis added). Specificity is required to give "notice to the defendant with sufficiently definite charges that the defendant can meet them" and to "permit a court to weed out meritless fraud claims on the basis of the pleadings." *West v. JPMorgan Chase Bank, NA*, 214 Cal.App.4th 780, 793 (2013). The Opposition does nothing to remedy Plaintiff's failure to plausibly allege with particularity that the ingredients in his protein powder Product are sourced outside of the United States such that there is a violation of 16 C.F.R. § 323.[8] (Mot. at 9-13.) Mere allegations, without factual support, that *Astragalus membranaceus, Panax notoginseng,* theobromine and caffeine are *likely* not sourced in the United States because there may be "cheaper" varieties sourced from China (FAC ¶31), do not save his claims. *Alaei v. Kraft Heinz Food Co.,* No. 15CV2961-MMA

---

[7] The Product labels do not and have not in the past included the "Manufactured in USA" language and the FAC does not allege any facts to the contrary.

[8] Section 323 prohibits the labeling of "any product as Made in the United States unless the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States." 16 C.F.R. § 323.2.


480

(DHB), 2016 WL 11621800, at *3 (S.D. Cal. Apr. 22, 2016) (granting motion to dismiss and finding insufficient where "[s]imply put, plaintiff claims to have bought" a product labeled as "Made in the USA" that "*may* have contained foreign ingredients, or *may* have been made somewhere besides the United States.") [9]

For the reasons set forth above and in Nutra Holding's demurrer (*see* Mot. at 12-13), Plaintiff's first, second and third causes of action for violation of the UCL, FAL and CLRA, which rely on the same facts as his misrepresentation claims, are insufficiently pled and should be dismissed. *Amiodarone Cases*, 84 Cal. App. 5th 1091, 1115 (2022), review denied (Jan. 25, 2023) (finding Plaintiffs' claims lacked the reasonable particularity required to plead claims under the UCL and CLRA.)

## VI. CONCLUSION

Plaintiff's complaint is inadequately pled, and he has needlessly complicated this case by attempting to assert claims as to products he never purchased (and as to which he suffered no injury) and by requesting remedies not available as a matter of law. For the reasons set forth above, and in Nutra Holdings' moving papers, the Court should sustain the demurrer and dismiss the case with prejudice.

Dated: February 3, 2025

**STEPTOE LLP**

By:
*/s/ Melanie A. Ayerh*
Carol R. Brophy
Jennifer K. Singh
Anthony Hopp *(pro hac vice forthcoming)*
Angela M. Sousa
Melanie A. Ayerh
*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*

---

[9] In his Opposition, Plaintiff for the first time makes allegations about the purported ingredient "AstraGin", the manufacturer of AstraGin and alleged sourcing of AstraGin. Opp. at 13-14. But nowhere in the FAC does he mention "AstraGin", and he cannot now rely on new facts raised in Opposition in an attempt to defeat Nutra Holdings' demurrer.


481

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On February 3, 2025, I served true copies of the following document(s) described as **REPLY IN SUPPORT OF DEMURRER AND MOTION TO STRIKE** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 3, 2025, at Los Angeles, California.

*/s/ Grace Calderon*
Grace Calderon


482

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


483

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | FILED<br>Superior Court of California<br>County of Los Angeles<br>01/28/2025<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
| PLAINTIFF/PETITIONER:<br>Daniel Rossi | |
| DEFENDANT/RESPONDENT:<br>Nutra Holdings, Inc. | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>23STCV15674 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Stipulation and Order to Exceed Page Limit Re Plaintiffs Opposition to Defendants Demurrer to First Amended Complaint and Defendants Reply in Support of the Same upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Abbas Kazerounian
Kazerouni Law Group, APC
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626

Carol Brophy
Steptoe LLP
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, CA 94105

David W. Slayton, Executive Officer / Clerk of Court

Dated: 01/28/2025

By: A. He
Deputy Clerk

Electronically Received 01/24/2025 10:23 AM

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

FILED
Superior Court of California
County of Los Angeles
01/28/2025
David W. Slayton, Executive Officer / Clerk of Court
By: A. He Deputy

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No.: 23STCV15674

**STIPULATION AND ~~[PROPOSED]~~ ORDER TO EXCEED PAGE LIMIT RE PLAINTIFF'S OPPOSITION TO DEFENDANT'S DEMURRER TO FIRST AMENDED COMPLAINT AND DEFENDANT'S REPLY IN SUPPORT OF THE SAME**

Date: February 10, 2025
Time: 10:30 a.m.
Dept.: 1

///

///

///


485

Plaintiff Daniel Rossi ("Plaintiff") and Defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Defendant") (collectively, the "Parties"), by and through their respective counsel, hereby stipulate as follows:

WHEREAS, on October 17, 2024, Defendant's filed a Memorandum of Points and Authorities in Support of Demurrer, or in the Alternative, Motion to Strike (the "Demurrer");

WHEREAS, Rule 3.1113(d) of the California Rules of Court limits opening and responding memorandums (except for summary judgment) to fifteen (15) pages;

WHEREAS, Rule 3.1113(d) of the California Rules of Court limits reply memorandums to ten (10) pages;

WHEREAS, the Parties respectfully request the Court permit Plaintiff to file his Opposition to Defendant's Demurrer to the First Amended Complaint (the "Opposition") to exceed the page limit of fifteen (15) pages to twenty (20) pages;

WHEREAS, the Parties respectfully request the Court permit Defendant to file its Reply in Support of the Demurrer to exceed the page limit of ten (10) pages to fifteen (15) pages;

WHEREAS, good cause exists for an extension of the page limit as it is necessary so Plaintiff may adequately and efficiently address Defendant's Demurrer, and Defendant may adequately respond to Plaintiff's enlarged Opposition.

///

///

///

KAZEROUNI
LAW GROUP, APC


486

NOW, THEREFORE, the Parties stipulate to and respectfully request that the Court enter the attached Proposed Order granting Plaintiff five (5) additional pages for Plaintiff's Opposition and granting Defendant five (5) additional pages for Defendant's Reply in Support of the Demurrer.

**IT IS SO STIPULATED.**

Dated: January 24, 2025 **KAZEROUNI LAW GROUP, APC**

By: ______________________
Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*

Dated: January 24, 2025 **STEPTOE LLP**

By: */s/ Melanie Ayerh*
Carol R. Brophy
Jennifer K. Singh
Angela M. Sousa
Melanie A. Ayerh
*Attorneys for Defendant*

**ATTORNEY ATTESTATION**

Pursuant to California Rule of Court 2.257(c), the filing attorney attests that he has obtained concurrence regarding the filing of this document from the signatories to this document.

Dated: January 24, 2025 **KAZEROUNI LAW GROUP, APC**

By: ______________________
Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*

KAZEROUNI LAW GROUP, APC


487

**~~[PROPOSED]~~ ORDER**

The Court, having read and considered the stipulation by the Parties, and good cause appearing, hereby ORDERS as follows:

1. Plaintiff shall have five (5) additional pages, a total of no more than twenty (20) pages, for Plaintiff's Opposition to Defendant's Demurrer to the First Amended Complaint, and
2. Defendant shall have five (5) additional pages, a total of no more than fifteen (15) pages, for Defendant's Reply in Support of the Demurrer.

IT IS SO ORDERED.

Dated: January 28, 2025

By: Stuart M. Rice / Judge
Hon. Stuart M. Rice
Judge of the Superior Court

KAZEROUNI LAW GROUP, APC


488

**PROOF OF SERVICE**

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On January 24, 2025, I served the foregoing document and accompanying attachments by the means indicated below:

- **STIPULATION AND [PROPOSED] ORDER TO EXCEED PAGE LIMIT RE PLAINTIFF'S OPPOSITION TO DEFENDANT'S DEMURRER TO FIRST AMENDED COMPLAINT AND DEFENDANT'S REPLY**

☒ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

☒ ELECTRONIC SERVICE - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m. The electronic filing system sends an e-mail notification of the filing to the parties and counsel of record.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Angela M. Sousa
Anthony Hopp
Melanie A. Ayerh
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
jsingh@steptoe.com
asousa@steptoe.com
ahopp@steptoe.com
mayerh@steptoe.com
*Attorneys for Defendant*
*Nutra Holdings, Inc. d/b/a Jacked Factory*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on January 24, 2025, at Las Vegas, Nevada.

GUSTAVO PONCE

KAZEROUNI LAW GROUP, APC


489

Electronically FILED by Superior Court of California, County of Los Angeles 1/24/2025 2:08 PM David W. Slayton, Executive Officer/Clerk of Court, By L. Smith, Deputy Clerk

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

KAZEROUNI LAW GROUP, APC

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No.: 23STCV15674

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S DEMURRER TO FIRST AMENDED COMPLAINT**

Date: February 10, 2025
Time: 10:30 a.m.
Dept.: 1

[Concurrently filed with Plaintiff's Opposition To Defendant's Demurrer To The First Amended Complaint]

Matters subject to judicial notice are governed by Evidence Code §§ 450-452, *et seq*. Relevant here, California courts may take judicial notice of documents incorporated by reference in a complaint. *See, e.g., Pomona Coll. v. Superior Court*, 45 Cal. App. 4th 1716. 1727-28 (1996). Pursuant to California Evidence Code sections 452 and 453, Plaintiff DANIEL ROSSI, respectfully request that this Court take judicial notice of the following:

///

///

///


490

KAZEROUNI LAW GROUP, APC

**<u>Request for Judicial Notice:</u>**

- **Exhibit 1 - EFSA Journal's Scientific Opinion; *Safety of a botanical extract derived from Panax notoginseng and Astragalus membranaceus (AstraGinTM) as a novel food pursuant to Regulation (EU) 2015/2283***
    - Plaintiff request that this Court take judicial notice of the EFSA Journal's Scientific Opinion, *Safety of a botanical extract derived from Panax notoginseng and Astragalus membranaceus (AstraGinTM) as a novel food pursuant to Regulation (EU) 2015/2283*, regarding AstraGin (*Panax notoginseng* and *Astragalus membranaceus*) which is found in the product Plaintiff bought from Defendant as well as the Class Products referenced in the Complaint and First Amended Complaint. This Opinion demonstrates facts and propositions that show that *Panax notoginseng and Astragalus membranaceu, which create AtraGin*, are not from the USA and are sourced from Gansu and Inner Mongolia provinces in China, and from Yunnan and Sichuan provinces in China. The Court may take judicial notice under section 452(h).

Pursuant to section 453 of the Evidence Code, Plaintiff requests that this Court take compulsory judicial notice of the above-referenced document because Plaintiff have given Defendant sufficient notice of the request, which would enable Defendant to prepare to meet the request, and because Plaintiff furnished the Court with sufficient information to enable it to take judicial notice.

Dated: January 24, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: ______________________

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*


491

KAZEROUNI LAW GROUP, APC

## PROOF OF SERVICE

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On August 16, 2024, I served the foregoing document and accompanying attachments by the means indicated below:

- **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S DEMURRER TO FIRST AMENDED COMPLAINT and EXHIBIT A**

☒ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

☒ ELECTRONIC SERVICE - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m. The electronic filing system sends an e-mail notification of the filing to the parties and counsel of record.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Angela M. Sousa
Anthony Hopp
Melanie A. Ayerh
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
jsingh@steptoe.com
asousa@steptoe.com
ahopp@steptoe.com
mayerh@steptoe.com
*Attorneys for Defendant*
*Nutra Holdings, Inc. d/b/a Jacked Factory*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on January 24, 2025, at Las Vegas, Nevada.

GUSTAVO PONCE


492

KAZEROUNI LAW GROUP, APC

# EXHIBIT 1


493

Check for updates

EFSA Journal

SCIENTIFIC OPINION

ADOPTED: 24 March 2020

doi: 10.2903/j.efsa.2020.6099

# Safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food pursuant to Regulation (EU) 2015/2283

EFSA Panel on Nutrition, Novel Foods and Food Allergens (NDA),
Dominique Turck, Jacqueline Castenmiller, Stefaan De Henauw, Karen Ildico Hirsch-Ernst, John Kearney, Alexandre Maciuk, Inge Mangelsdorf, Harry J McArdle, Androniki Naska, Carmen Pelaez, Kristina Pentieva, Alfonso Siani, Frank Thies, Sophia Tsabouri, Marco Vinceti, Francesco Cubadda, Karl Heinz Engel, Thomas Frenzel, Marina Heinonen, Rosangela Marchelli, Monika Neuhäuser-Berthold, Morten Poulsen, Josef Rudolf Schlatter, Henk van Loveren, Reinhard Ackerl and Helle Katrine Knutsen

## Abstract

Following a request from the European Commission, the EFSA Panel on Nutrition, Novel Foods and Food Allergens (NDA) was asked to deliver a scientific opinion on a botanical extract derived from both *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food (NF) pursuant to Regulation (EU) 2015/2283. The NF is a combination of an ethanol extract of the roots of *A. membranaceus* and a hot water extract of the roots of *P. notoginseng*. The NF contains 1.5–5% total saponins, 0.1–0.5% ginsenoside Rb1 and 0.01–0.1% astragaloside I. Both plants that are used to produce the NF have a long history of use, especially in traditional Chinese medicine. Information on the production process and the composition of the NF is sufficient and does not raise safety concerns. The applicant proposed to use the NF as a food supplement for the general adult population, excluding pregnant women, at a maximum daily amount of 350 mg. Taking into account these conditions of use, the Panel considers that the consumption of the NF is not nutritionally disadvantageous. The provided genotoxicity studies do not raise concerns for genotoxicity of the NF. Based on the findings of a subchronic toxicity study, supported by a subacute toxicity study, the Panel identified the overall no observed adverse effect level (NOAEL) of the NF at 100 mg/kg body weight (bw) per day. By applying an uncertainty factor of 200, the Panel concludes that the NF is safe at an intake level of 0.5 mg/kg bw per day, corresponding to a maximum daily intake of 35 mg of the NF for the target population, i.e. adults excluding pregnant women.

© 2020 European Food Safety Authority. *EFSA Journal* published by John Wiley and Sons Ltd on behalf of European Food Safety Authority.

**Keywords:** *Panax notoginseng*, *Astragalus membranaceus*, *Astragalus propinquus*, extract, novel food, safety

**Requestor:** European Commission following an application by NuLiv Science

**Question number:** EFSA-Q-2018-00557

**Correspondence:** nda@efsa.europa.eu




494

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Panel members:** Dominique Turck, Jacqueline Castenmiller, Stefaan De Henauw, Karen Ildico Hirsch-Ernst, John Kearney, Helle Katrine Knutsen, Alexandre Maciuk, Inge Mangelsdorf, Harry J McArdle, Androniki Naska, Carmen Pelaez, Kristina Pentieva, Alfonso Siani, Frank Thies, Sophia Tsabouri and Marco Vinceti.

**Suggested citation:** EFSA NDA Panel (EFSA Panel on Nutrition, Novel Foods and Food Allergens), Turck D, Castenmiller J, De Henauw S, Hirsch-Ernst KI, Kearney J, Maciuk A, Mangelsdorf I, McArdle HJ, Naska A, Pelaez C, Pentieva K, Siani A, Thies F, Tsabouri S, Vinceti M, Cubadda F, Engel KH, Frenzel T, Heinonen M, Marchelli R, Neuhäuser-Berthold M, Poulsen M, Schlatter JR, van Loveren H, Ackerl R and Knutsen HK, 2020. Scientific Opinion on the safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food pursuant to Regulation (EU) 2015/2283. EFSA Journal 2020;18(5):6099, 16 pp. https://doi.org/10.2903/j.efsa.2020.6099

**ISSN:** 1831-4732

© 2020 European Food Safety Authority. *EFSA Journal* published by John Wiley and Sons Ltd on behalf of European Food Safety Authority.

This is an open access article under the terms of the Creative Commons Attribution-NoDerivs License, which permits use and distribution in any medium, provided the original work is properly cited and no modifications or adaptations are made.

The EFSA Journal is a publication of the European Food Safety Authority, an agency of the European Union.



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


495

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## Table of contents

Abstract ..... 1
1. Introduction ..... 4
1.1. Background and Terms of Reference as provided by the European Commission ..... 4
2. Data and methodologies ..... 4
2.1. Data ..... 4
2.2. Methodologies ..... 4
3. Assessment ..... 4
3.1. Introduction ..... 4
3.2. Identity of the NF ..... 5
3.2.1. Panax notoginseng (Burkill) F.H. Chen ..... 5
3.2.2. *Astragalus membranaceus* (Fisch.) Bunge ..... 5
3.3. Production process ..... 5
3.4. Compositional data ..... 6
3.4.1. Stability ..... 7
3.5. Specifications ..... 8
3.6. History of use of the NF and/or of its source ..... 9
3.6.1. History of use of the source of the NF ..... 9
3.6.2. History of use of the NF ..... 9
3.7. Proposed uses and use levels ..... 9
3.7.1. Target population ..... 9
3.7.2. Proposed uses and use levels ..... 9
3.8. Absorption, distribution, metabolism and excretion (ADME) ..... 9
3.9. Nutritional information ..... 9
3.10. Toxicological information ..... 10
3.10.1. Genotoxicity ..... 10
3.10.2. Subacute and subchronic toxicity ..... 11
3.10.3. Human data ..... 13
3.11. Allergenicity ..... 13
4. Discussion ..... 13
5. Conclusions ..... 13
Steps taken by EFSA ..... 13
References ..... 14
Abbreviations ..... 15



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


496

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

# 1. Introduction

## 1.1. Background and Terms of Reference as provided by the European Commission

On 8 June 2018, the company NuLiv Science submitted a request to the European Commission in accordance with Article 10 of Regulation (EU) 2015/2283[1] to place a botanical extract derived from both *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) on the Union market as a novel food (NF).

The NF is intended for use in food supplements and the suggested daily intake for adults is 50 mg.

The target population is the general population, excluding children and pregnant women.

On 22 October 2018, and in accordance with Article 10(3) of Regulation (EU) 2015/2283, the European Commission asked EFSA to provide a scientific opinion on the extract derived from *Panax notoginseng* and *Astragalus membranaceus*.

# 2. Data and methodologies

## 2.1. Data

The safety assessment of this NF is based on data supplied in the application, information provided by the EFSA Working Group on Compendium of Botanicals and information submitted by the applicant following two EFSA requests for supplementary information.

The information in support of this application has been made available through the Commission e-submission portal (NF 2018/0284).

Administrative and scientific requirements for NF applications referred to in Article 10 of Regulation (EU) 2015/2283 are listed in the Commission Implementing Regulation (EU) 2017/2469[2].

A common and structured format on the presentation of NF applications is described in the EFSA guidance on the preparation and presentation of a NF application (EFSA NDA Panel, 2016). As indicated in this guidance, it is the duty of the applicant to provide all of the available (proprietary, confidential and published) scientific data, including both data in favour and not in favour of supporting the safety of the proposed NF.

This NF application includes a request for protection of proprietary data in accordance with Article 26 of Regulation (EU) 2015/2283. Data claimed to be proprietary by the applicant include all the submitted analytical information, the manufacturing process and the toxicity studies provided.

## 2.2. Methodologies

The assessment follows the methodology set out in the EFSA guidance on NF applications (EFSA NDA Panel, 2016) and the principles described in the relevant existing guidance documents from the EFSA Scientific Committee. The legal provisions for the assessment are laid down in Article 11 of Regulation (EU) 2015/2283 and in Article 7 of the Commission Implementing Regulation (EU) 2017/2469.

The information provided by the EFSA Working Group on Compendium of Botanicals is based on extensive literature searches on *P. notoginseng* and *A. membranaceus*, following a search strategy and standard operating procedure as described by Dibusz and Vejvodova (2020).

This assessment concerns only risks that might be associated with consumption of the NF under the proposed conditions of use, and is not an assessment of the efficacy of AstraGin™ with regard to any (claimed) benefit.

# 3. Assessment

## 3.1. Introduction

The NF which is the subject of the application is a combination of root extracts from *P. notoginseng* and *A. membranaceus*, denominated as AstraGin™.

---

[1] Regulation (EU) 2015/2283 of the European Parliament and of the Council on novel foods, amending Regulation (EU) No 1169/2011 of the European Parliament and of the Council and repealing Regulation (EC) No 258/97 of the European Parliament and of the Council and Commission Regulation (EC) No 1852/2001 (2013/0435 (COD). OJ L 327, 11.12.2015, p. 1–22.

[2] Commission Implementing Regulation (EU) 2017/2469 of 20 December 2017 laying down administrative and scientific requirements for applications referred to in Article 10 of Regulation (EU) 2015/2283 of the European Parliament and of the Council on novel foods. OJ L 351, 30.12.2017, pp. 64–71.




497

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

The NF falls under Regulation 2015/2283, Article 3(2)(a)(iv): food consisting of, isolated from or produced from plants or their parts of.

The NF is proposed by the applicant to be used as a food supplement for the general adult population, except pregnant women.

## 3.2. Identity of the NF

The NF is a combination of an ethanol extract of the roots of *A. membranaceus* (Fisch.) Bunge and a hot water extract of the roots of *P. notoginseng* (Burkill) F.H. Chen.

### 3.2.1. Panax notoginseng (Burkill) F.H. Chen

The full taxonomy of *P. notoginseng* is the following. Kingdom: Plantae, Division: Magnoliophyta, Class: Magnoliopsida, Order: Apiales, Family: Araliaceae, Genus: *Panax*, Species: *Panax notoginseng*.

The plant is also known as *Panax pseudoginseng* var. *notoginseng* (Burkill) G. Hoo & C.L. Tseng and by a number of traditional Chinese names, e.g. Sanqi, San Qi, Shan Qi, Tu San Qi, Tianqi and Tien-chi.

The plant belongs to the genus *Panax*, which includes about 15 species from both Asia and America. Analyses of the 5S-rRNA spacer domains from seven Panax species showed a high degree of genetic similarity with ~ 75% of the spacer domains conserved throughout the genus (Cui et al., 2003).

The root of *P. notoginseng* contains ~ 8–13% saponins by weight (Dong et al., 2003; Wang et al., 2006). More than 150 saponins, mostly of dammarane type with 20(S)-protopanaxadiol or 20(*S*)-protopanaxatriol aglycon moieties have been identified in this species, some of them being present in other *Panax* species, some being specific of *P. notoginseng*. Many other compounds of various chemical classes are found including flavonoids, cyclopeptides, sterols, polyacetylenes, a volatile oil, saccharides and amino acids (Wang et al., 2016). Based on an earlier review, the applicant stated that 56 saponins of *P. notoginseng* have been identified with major ones being ginsenosides Rb1, Rd, Re and Rg1. Five polyacetylenes have been identified, i.e. panaxytriol, panaxydol, notoginsenic acid, β-sophoroside and 10-hydroxydeca-4,6-diynoic acid. The extract also contained the flavonoids quercetin and quercetin-3-*O*-sophoroside, a number of phytosterols and amino acids, the most prevalent ones being arginine, aspartic acid and glutamic acid. The non-proteinogenic amino acid L-dencichin (oxalyldiaminopropionic acid) has also been identified (Wang et al., 2006).

### 3.2.2. *Astragalus membranaceus* (Fisch.) Bunge

The name *A. membranaceus* (Fisch.) Bunge is a synonym of the accepted name *Astragalus propinquus* Schischkin.[3]

The full taxonomy of *A. membranaceus/A. propinquus* is the following. Kingdom: Plantae, Division: Magnoliophyta, Class: Magnoliopsida, Order: Fabales, Family: Fabaceae, Genus: *Astragalus*, Species: *A. membranaceus/A. propinquus*.

The plant is also known as milkvetch root (English), ogi (Japanese), hwanggi (Korean) and huang qi (in Traditional Chinese Medicine).

This species is defined as Radix Astragali in the Pharmacopoeia of China (Fu et al., 2014).

The root of *A. membranaceus/A. propinquus* contains a number of saponins, in particular cycloartane triterpene glycosides (astragalosides I–VII) as well as flavonoids (calycosin and formononetin genins and glycosides, ononin, among others). Other constituents include γ- and α-aminobutyric acids, L-canavanine, choline, betaine, gluconic acid, linoleic acid, asparagine, β-sitosterol (Thorne Research Inc, 2003; Fu et al., 2014).

## 3.3. Production process

According to the information provided, the NF is produced under adherence to good manufacturing practice (GMP) at GMP-certified manufacturing facilities in China. Information was provided on the Hazard Analysis and Critical Control Points (HACCP) scheme applied.

The *A. membranaceus* roots are purchased from growers in Gansu and Inner Mongolia provinces in the north-western region of China while the *P. notoginseng* roots are acquired from growers in Yunnan and Sichuan provinces in the southern region of China.

---

3 http://www.theplantlist.org/tpl1.1/record/ild-32156




498

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

The roots of both plants are washed with water, dried and pulverised.

The pulverised roots of *A. membranaceus* are then passed through a 10-mesh size sieve and extracted with eightfold volume of 40% ethanol. The extract is centrifuged, filtered, concentrated/dried, smashed and screened through an 80-mesh size sieve. The extract is analysed for the content of total saponins (by ultraviolet (UV) spectrophotometry) and for astragaloside I (by high-performance liquid chromatography-evaporative light scattering detection (HPLC-ELSD)).

The pulverised roots of *P. notoginseng* are passed through a 20-mesh size sieve and extracted with 10-fold volume of water. The extract is centrifuged, filtered and concentrated. The concentrated solution is subsequently absorbed on a resin, which is washed with water, and eluted with 60% ethanol. The eluent is concentrated/dried, smashed and screened through an 80-mesh size sieve. The extract is analysed for the content of total saponins (by UV spectrophotometry) and for ginsenoside Rb1 (by HPLC-UV).

The plant to extract ratios were indicated by the applicant to be 10:1 for the *Astragalus* extract and 50:1 for the *Panax* extract.

At the end of the manufacturing process the extracts are mixed (45–47.5% of each extract) with maltodextrin (5–10%). The blend, i.e. the NF, is analysed for the marker compounds (total saponins, ginsenoside Rb1 and astragaloside I; see the following Section), physicochemical characteristics, heavy metals, pesticides, organic solvent residue and microbial counts before packaging into plastic bags for storage.

The Panel considers that the production process is sufficiently described and does not raise safety concerns.

## 3.4. Compositional data

As described in the previous section, the NF is a blend of an ethanol extract of the roots of *A. membranaceus* and a hot water extract of the roots of *P. notoginseng* (plus maltodextrin as an excipient). The NF contains 1.5–5% total saponins, 0.1–0.5% ginsenoside Rb1 and 0.01–0.1% astragaloside I.

In order to provide information on the variability of the composition of the NF, the applicant submitted batch to batch analyses for total saponins, ginsenoside Rb1, astragaloside I, proximates, a number of organoleptic and physicochemical parameters, contaminants and microbiological quality of the NF (Table 1).

**Table 1:** Batch-to-batch analyses of the NF

| Parameter | Batch number | | | | |
|---|---|---|---|---|---|
| | **C20151209** | **C20160606(1)** | **C20170106** | **C20170515** | **C20171009** |
| Total saponins | 4.10% | 3.79% | 3.12% | 3.56% | 3.09% |
| Ginsenoside Rb1 | 0.10% | 0.17% | 0.14% | 0.11% | 0.10% |
| Astragaloside I | 0.034% | 0.028% | 0.028% | 0.024% | 0.048% |
| Colour | Light yellow | Light yellow | Light yellow | Light yellow | Light yellow |
| Odour | 'Characteristic' | 'Characteristic' | 'Characteristic' | 'Characteristic' | 'Characteristic' |
| Appearance | Fine powder | Fine powder | Fine powder | Fine powder | Fine powder |
| Sieve analysis | 100% through 80 mesh | 99% through 80 mesh | 100% through 80 mesh | 100% through 80 mesh | 100% through 80 mesh |
| Total carbohydrates | 91.8% | 92.2% | 92.1% | 92.4% | 89.6% |
| Protein | 2.1% | 2.5% | 2.4% | 2.5% | 4.3% |
| Fat | 1.4% | 0.8% | 0.7% | 0.7% | 1.1% |
| Moisture | 4.3% | 4.1% | 4.5% | 4.2% | 4.6% |
| Ash | 0.4% | 0.4% | 0.3% | 0.3% | 0.4% |
| Bulk density | 0.59 g/mL | 0.54 g/mL | 0.56 g/mL | 0.55 g/mL | 0.53 g/mL |
| Solubility in water (1 g in 30 mL) | Soluble | Soluble | Soluble | Soluble | Soluble |
| **Contaminants** | | | | | |
| Lead (Pb) | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg |
| Arsenic (As) | 0.19 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg |




499

| Parameter | Batch number | | | | |
|---|---|---|---|---|---|
| | C20151209 | C20160606(1) | C20170106 | C20170515 | C20171009 |
| Cadmium (Cd) | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg |
| Mercury (Hg) | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg | 0.02 mg/kg | 0.02 mg/kg |
| Ethanol | < 0.5% | < 0.5% | < 0.5% | < 0.5% | < 0.5% |
| **Microbiological** | | | | | |
| Total plate count | 370 CFU/g | 35 CFU/g | 410 CFU/g | 900 CFU/g | < 10 CFU/g |
| Yeast and mould | 210 CFU/g | 20 CFU/g | 60 CFU/g | < 20 CFU/g | < 20 CFU/g |
| Enterobacteriaceae | – | < 10 CFU/g | < 10 CFU/g | < 10 CFU/g | < 10 CFU/g |
| *E. coli* (in 25 g) | Negative | Negative | Negative | Negative | Negative |
| *Salmonella* (in 375 g) | Negative | Negative | Negative | Negative | Negative |
| *Staphylococcus aureus* (in 25 g) | Negative | Negative | Negative | Negative | Negative |

NF: novel food; CFU: colony forming units.
(1): Batch of the NF that was used in the 90-day toxicity study (see Section 3.10.2).

For four additional batches (Table 2) information on the content of total saponins was provided, plus for three of the four batches also the concentrations of astragaloside I and ginsenoside Rb1.

**Table 2:** Total saponins, astragaloside I and ginsenoside Rb1 in the NF

| Parameter | Batch number | | | |
|---|---|---|---|---|
| | 20100621(1) | C20150120(2) | 20100824 | C20140921 |
| Total saponins | 2.35% | 2.68% | 2.92% | 2.0% |
| Ginsenoside Rb1 | 0.17% | 0.10% | 0.10% | Not provided |
| Astragaloside I | 0.054% | 0.033% | 0.039% | Not provided |

NF: novel food.
(1): Batch of the NF that was used in the 28-day toxicity study.
(2): Batch of the NF that was used in the bacterial reverse mutation test and in the *in vitro* mammalian cell gene mutation assay (see Section 3.10.1).

In order to achieve a certain concentration of total saponins and ginsenoside Rb1 and astragaloside I in the NF, the applicant established internal specifications for the two extracts, with total saponins ≥ 0.6% and ginsenoside Rb1 ≥ 0.2% for the *P. notoginseng* extract, and total saponins ≥ 3% and astragaloside I ≥ 0.02% for the *A. membranaceus* extract.

Considering that the genus *Astragalus* is known to accumulate trace elements, the applicant provided a certificate of analysis for one batch of the NF, in which selenium, thallium and uranium were below detection limits (i.e. < 0.1 mg/kg for selenium and thallium and < 0.01 mg/kg for uranium).

Additionally, the applicant provided the analytical results for the concentrations of pesticides and mycotoxins in the NF, which were all below their limits of detection (LODs).

The Panel considers that the information provided on the composition of the NF including the batch to batch variability is sufficient and does not raise safety concerns.

### 3.4.1. Stability

The applicant proposes a shelf-life of 3 years from the time of manufacturing of the NF.

The applicant provided data of a 6 months accelerated (i.e. at 40°C and 75% relative humidity) stability testing performed with three batches of the NF. The batches were analysed for the content of total saponins in the NF, which remained stable throughout the testing period (Table 3). Further parameters were appearance (i.e. light yellow powder), moisture, ash, heavy metals and microbial counts, which all remained within specifications during the testing period.



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


500

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Table 3:** Total saponin content of the NF during the stability testing

| Date of analysis | Batch number | | |
|---|---|---|---|
| | 20100621 | 20100720 | 20100825 |
| 22/10/2010 | 2.35% | 2.65% | 2.92% |
| 22/11/2010 | 2.39% | 2.68% | 2.84% |
| 22/12/2010 | 2.37% | 2.59% | 2.88% |
| 22/1/2011 | 2.41% | 2.61% | 2.86% |
| 22/4/2011 | 2.43% | 2.61% | 2.93% |

NF: novel food.

The Panel considers that, given the low moisture content of the NF, eventual degradation products or microbial activity are unlikely to be of safety concern. Since the product parameters were unchanged for six months under accelerated conditions the product can be expected to be stable for up to 2 years.

## 3.5. Specifications

The specifications of the NF are indicated in Table 4.

The applicant informed that each batch of the NF will be subjected to a series of analytical quality controls to ensure that all product specifications are met, including physicochemical parameters, organoleptic characteristics, microbial counts, heavy metals and pesticide residues.

**Table 4:** Specifications of the NF

**Description:** The NF is a combination of an ethanol extract of the roots of *Astragalus membranaceus* (Fisch.) Bunge and a hot water extract of the roots of *Panax notoginseng* (Burkill) F.H. Chen
Appearance: beige to light brown yellow powder

| Parameter | Specification | Method of analysis |
|---|---|---|
| Total saponins | 1.5–5.0% | UV absorption (at 560 ± 5 nm) |
| Ginsenoside Rb1 | 0.10–0.50% | HPLC-UV |
| Astragaloside I | 0.01–0.10% | HPLC-ELSD |
| Carbohydrates | ≥ 90% | By calculation |
| Protein | ≤ 4.5% | Kjeldahl |
| Moisture | ≤ 5.0% | GB/T 14769 -1993 |
| Ash | ≤ 1.0% | AOAC 942.05, 18th |
| **Contaminants** | | |
| Arsenic (As) | ≤ 0.3 mg/kg | ChP 2015, App. IXB (ICP-MS) |
| **Microbiological** | | |
| Total plate count | ≤ 5,000 CFU/g | ISO 4833-1 |
| Total yeast and mould count | ≤ 500 CFU/g | FDA (BAM) Chapter 18, 8th Ed. |
| Enterobacteriaceae | < 10 CFU/g | ISO 21528-2:2004 |
| *E. coli* | Negative in 25 g | ISO 7251:2005 |
| *Salmonella* | Negative in 375 g | FDA (BAM) Chapter 5, 8th Ed. |
| *Staphylococcus aureus* | Negative in 25 g | GB 5009.22-2016 |

CFU: colony forming units; FDA-BAM: Food and Drug Administration's Bacteriological Analytical Manual; GC–MS: gas chromatography–mass spectrometry; HPLC: high-performance liquid chromatography; ICP-MS:inductively coupled plasma mass spectrometry; UV: ultraviolet; ELSD: evaporative light scattering detector.

The Panel considers that the information provided on the specifications of the NF is sufficient and does not raise safety concerns.





18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## 3.6. History of use of the NF and/or of its source

### 3.6.1. History of use of the source of the NF

Both plants *A. membranaceus* and *P. notoginseng* have a long history of use in humans, especially in China.

According to the information provided, *A. membranaceus* has a recorded history of use of over 2,000 years (Khan and Abourashed, 2009). Traditionally, it has mainly been used as raw dried root, honey-cured root or as aqueous decoction, although steeping in ethanol has also been described (Reid, 1995; Khan and Abourashed, 2009). Daily doses of the root are reported to range from 9 to 30 g, with more than 60 g in some cases (Duke and Ayensu, 1985; Leung, 1995; Leung and Foster, 1996; Zhu, 1998b; Yu et al., 2007).

Documented use of *P. notoginseng* dates back to the 16th century and its cultivation in certain areas has been reported to exceed 1,000 years, with current production in China of approximately 2,000 tonnes per year (Dong et al., 2003). Typical total daily doses range from approximately 3 to 15 g of roots for a decoction or 1–5 g of root as a ground powder. The use of ethanolic extracts was also reported (Bensky and Gamble, 1986; Zhu, 1998a; Dharmananda, 2004; Wang et al., 2006; Reid, 1987).

The Panel notes that extensive literature searches performed by UCT Prague retrieved 13,581 and 8,116 scientific articles for *A. membranaceus* and *P. notoginseng*, respectively, demonstrating that these species have been extensively studied.

### 3.6.2. History of use of the NF

According to the information provided by the applicant, the NF is already marketed as a food supplement in a number of countries worldwide (e.g. Australia, Brazil, Canada, India).

Sales data have been provided for individual countries for the years 2011, 2012 and 2013 (confidential information).

## 3.7. Proposed uses and use levels

### 3.7.1. Target population

The target population proposed by the applicant is the general adult population, except pregnant women.

### 3.7.2. Proposed uses and use levels

The applicant proposed to use the NF as a food supplement.

Following a request for clarification, the applicant proposed an amount of 50 mg per portion and a maximum daily amount of 350 mg of the NF.

## 3.8. Absorption, distribution, metabolism and excretion (ADME)

The applicant has not provided any toxicokinetic studies that were performed with the NF.

A number of animal studies were submitted, which investigated the absorption, distribution, metabolism and excretion of various saponins. The Panel considers that the studies provided are of limited relevance for the safety assessment of the NF.

## 3.9. Nutritional information

The applicant provided a nutritional analysis of the NF, which indicates that the NF mainly consists of carbohydrates (about 90%), moisture (about 5%), protein (2–5%), fat (about 1%) and ash. The applicant pointed out that some variation can be expected concerning the nutrients in the NF, given the nature of the starting material and its susceptibility to varying weather conditions.

Taking into account the proposed conditions of use (i.e. max. 350 mg/day), the Panel considers that the consumption of the NF is not nutritionally disadvantageous.




502

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## 3.10. Toxicological information

The roots of *A. membranaceus* have been reported to contain the non-proteinogenic amino acid L-canavanine (Thorne Research Inc, 2003; Khan and Abourashed, 2009). L-Canavanine is an antinutrient that is structurally related to L-arginine. Owing to this similarity, in organisms that consume L-canavanine, it is mistakenly incorporated into their own proteins in place of L-arginine, leading to the production of structurally aberrant proteins. L-Canavanine has been suspected of being associated with systemic lupus erythematosus (SLE) activation (Alcocer-Varela et al., 1985; Morimoto et al., 1990). L-Canavanine is found in many legumes where it acts as a nitrogen-storing metabolite and is part of the plant's chemical defence. For example, L-canavanine accounts for up to 5% of the dry weight in the jack bean seed (*Canavalia ensiformis*), 2.4% in the alfalfa plant (*Medicago sativa*) and up to 2.5% in sword bean (*Canavalia gladiate*) (Rosenthal, 2001; Bence and Crooks, 2003). Following an EFSA request to provide information on the content of L-canavanine in the NF, the applicant submitted a certificate of analysis for one batch of the NF in which L-canavanine was detected at a concentration of 0.67 mg/g. The Panel notes that the amount of L-canavanine at the proposed conditions of use for the NF (i.e. 350 mg per day) would be 0.23 mg/day. The Panel considers L-canavanine in the NF unlikely to be of safety concern at the proposed conditions of use.

*P. notoginseng* has been reported to contain the non-proteinogenic amino acid L-dencichin (oxalyldiaminopropionic acid (ODAP)) (Wang et al., 2006), which is a structural analogue of the neurotransmitter glutamate. L-Dencichin is a neurotoxin responsible for lathyrism, a motor neuron degeneration syndrome. Lathyrism may be induced by consumption of the seeds (if consumed at high enough amounts) of the legume *Lathyrus sativus* (grass pea), which is a staple food in some areas of the world and which has been reported to contain L-dencichin at concentrations up to 0.7% (Xu et al., 2017). Following an EFSA request to provide information on the content of L-dencichin in the NF, the applicant submitted a certificate of analysis for one batch of the NF in which L-dencichin was not detected. No LOD was provided. However, information was provided on the method that was used for the analysis (Dezhuang et al., 1998). From the information provided, the limit of quantification (LOQ) for L-dencichin is at a level of about 0.17% for the method used. Taking into consideration the maximum proposed use level of 350 mg NF/day, and assuming an L-dencichin concentration at the LOQ (i.e. 0.17%) in the *P. notoginseng* fraction (i.e. < 50% in the NF), this would correspond to about 0.3 mg L-dencichin/day. The Panel considers L-dencichin in the NF unlikely to be of safety concern at the proposed conditions of use.

### 3.10.1. Genotoxicity

The applicant provided a bacterial reverse mutation assay (Zin, 2016, unpublished study report) and an *in vitro* mammalian cell gene mutation assay (Ruslan et al., 2016, unpublished study report), which were both performed with batch #C20150120 of the NF. This batch contains 2.68% total saponins, 0.033% astragaloside I and 0.10% ginsenoside Rb1 (see also Table 2).

The bacterial reverse mutation test (Zin, 2016, unpublished study report) was performed in compliance with good laboratory practice (GLP) and following OECD Test Guideline (TG) 471. The test was carried out with *Salmonella* Typhimurium strains TA98, TA100, TA1535, TA1537 and *Escherichia coli* strain WP2 *uvrA*, using the pre-incubation method in the presence and in the absence of an exogenous metabolic activation system (i.e. S9-mix). In order to evaluate the cytotoxicity of the test item a dose-finding test was performed with the five strains mentioned above, with and without metabolic activation, using the following five concentrations of the NF dissolved in water: 313, 625, 1,250, 2,500 and 5,000 μg/plate. There was no sign of cytotoxicity and no precipitation of the test material was observed at any concentration. Thus, the main test was performed using the same concentrations. Positive and negative controls were included. The NF induced no biologically relevant increase in the number of revertant colonies compared with the negative controls for all strains, in the presence and absence of S9-mix, in the dose finding test and the main test.

The *in vitro* mammalian cell gene mutation test using the hypoxanthine-guanine phosphoribosyl transferase (*Hprt*) gene (Ruslan et al., 2016, unpublished study report) was performed in compliance with GLP. According to the applicant, the test was conducted in accordance with OECD TG 476. However, the Panel notes that the NF was only tested in the absence and not in the presence of an exogenous metabolic activation system (S9-mix) in the main experiment, which is considered a relevant deviation. No rationale could be provided by the applicant for this deviation. In the absence of activation, the NF did not induce an increase in the number of gene mutations in mammalian cells.




503

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Following an EFSA request, and in accordance with the EFSA recommendations for genotoxicity testing (EFSA Scientific Committee, 2011), the applicant submitted two *in vitro* mammalian cell micronucleus tests following OECD TG 487. As per the EFSA request, one micronucleus test per plant extract was carried out.

The micronucleus test (Vedic Lifesciences, 2019a, Study Nr. 190503/NL/PC, unpublished study report), submitted for the *P. notoginseng* extract, was performed with a batch (i.e. #20170702) that contained 1.08% total saponins and 0.31% ginsenoside Rb1. The test, which followed OECD TG 487, was carried out in cultured mammalian CHO-K1 cells. In order to evaluate the cytotoxicity of the test item, the cells were exposed to the extract (dissolved in water and diluted with culture medium) at concentrations of 310 μg/mL, 620 μg/mL, 1,250 μg/ml, 2,500 μg/mL and 5,000 μg/mL either for 30 h in the absence of an exogenous metabolic system (S9-mix) or for 3 h in the presence or absence of S9-mix. As the cytotoxicity even at the highest concentration of 5,000 μg/mL was less than 40%, the study coordinators decided to use the following four concentrations of the extract in the main experiment: 620, 1,250, 2,500 and 5,000 μg/mL. In the main test, the cytotoxicity at the highest concentration of 5,000 μg/mL for 30 h without S9-mix was 35.9%. After short-term exposure to this concentration in the presence of metabolic activation, the cytotoxicity was 38.5%, while without metabolic activation it was 27.8%. Appropriate positive controls were used as per OECD TG 487 and an adequate response was seen. Micronuclei were manually scored for at least 2,000 cells per concentration. Compared to the vehicle control, there were no statistically significant differences in the number of micronuclei at any tested concentration with and without metabolic activation.

Another micronucleus test was submitted (Vedic Lifesciences, 2019b; Study Nr. 190502/NL/PC, unpublished study report), which assessed the clastogenic/aneugenic potential of the *A. membranaceus* extract. The tested batch (i.e. #20180225) contained 3.1% total saponins and 0.12% astragaloside I. Also this test, which followed OECD TG 487, was carried out in cultured mammalian CHO-K1 cells. In order to evaluate the cytotoxicity of the test item, the cells were exposed to the extract (dissolved in water and diluted with culture medium) at concentrations of 310 μg/mL, 620 μg/mL, 1,250 μg/mL, 2,500 μg/mL and 5,000 μg/mL for 30 h in the absence or for 3 h in the presence and absence of an exogenous metabolic system (S9-mix). The observed toxicity was up to 29% after exposure for 30 h without S9-mix. After exposure for 3 h with and without metabolic activation, the cytotoxicity amounted to 24% and 18.1%, respectively. As the observed toxicity was less than 35% at any concentration with or without S9-mix, the study coordinators decided to use the following three concentrations of the extract in the main experiment: 500, 1,500 and 5,000 μg/mL. In the main test, the cytotoxicity at the highest concentration of 5,000 μg/mL for 30 h without S9-mix was 28.5%. After short-term exposure to this concentration in the presence of metabolic activation the cytotoxicity was 30.5%, while without metabolic activation it was 29.4%. Appropriate positive controls were used as per OECD TG 487 and an adequate response was seen. Micronuclei were manually scored for at least 2,000 cells per concentration. Compared to the vehicle control there were no statistically significant differences in the number of micronuclei at any tested concentration with and without metabolic activation.

The Panel concludes that the studies provided do not raise concerns for genotoxicity of the NF.

### 3.10.2. Subacute and subchronic toxicity

The applicant provided a 28-day oral toxicity study (Pasics Szakonyiné, 2011, unpublished study report) conducted in compliance with GLP and in accordance with OECD TG 407. Twenty Wistar rats (n = 10 per sex) per group were administered by gavage 0, 100, 300 or 1,000 mg/kg body weight (bw) per day of the NF for 28 days. The batch (#20100621) that was used in this study contained 2.35% total saponins, 0.17% ginsenoside Rb1 and 0.054% astragaloside I (see also Table 2). The test item was prepared daily by suspending the NF in 1%-aqueous methylcellulose vehicle.

There was no mortality during the study period. No clinical signs or abnormalities in behaviour, motor activity or general health were observed in control or treated animals. No relevant differences in body weight or body weight gain or feed consumption were observed among the groups.

A number of statistically significant differences in haematology and clinical chemistry between controls and animals administered the NF were observed (available in a file annexed to the scientific opinion under 'Supporting information'). The number of neutrophils significantly increased in all groups receiving the NF. In male rats, the number of basophils was reduced in the mid-dose group. In females, white blood cells (WBC) and lymphocytes were reduced in the low- and mid-dose groups and in the mid- and high-dose groups, respectively. Furthermore, in female rats, mean corpuscular volume




504

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

(MCV) was reduced in the low-dose group, mean corpuscular haemoglobin concentration (MCHC) was decreased in the mid-dose group and platelets were increased in the low-dose group. Activated partial thromboplastin time (APTT) was increased in the high-dose group compared to the control group. The serum concentration of phosphorus increased with dose in both sexes, being statistically significant in the high-dose group of males and in the mid- and high-dose groups for females.

Absolute and relative organ weights were not different between the groups, except for a higher testes to brain weight ratio in the low-dose males and a lower absolute and relative to body weight kidney weight in the high-dose males. However, the differences were small and considered biologically not relevant. No relevant dose-related histopathological findings were observed.

The applicant provided a repeated dose 90-day oral toxicity study (Upadhyaya and Wang, 2017, unpublished study report) which was conducted in accordance with OECD TG 408 and in compliance with GLP.

Wistar rats (n = 10/group and sex) of 6–8 weeks of age were randomly allocated to one of six groups, which were administered the NF daily by gavage for 90 consecutive days at dosages of 0 mg/kg bw per day (control group), 100 mg/kg bw per day, 300 mg/kg bw per day or 1,000 mg/kg bw per day. The study included two additional groups (i.e. recovery groups) that received 0 mg/kg bw per day (controls) or 1,000 mg/kg bw per day, respectively, for 90 days, and thereafter 0 mg/kg bw per day for an additional 2-week period (i.e. recovery period). The batch (#C20160606) that was used in this study contained 3.79% total saponins, 0.17% ginsenoside Rb1 and 0.028% astragaloside I (see also Table 1). The test item was prepared (with water as vehicle) every day before administration.

None of the animals died in the course of the study. No treatment-related clinical signs were observed in any of the animals throughout the study. Ophthalmological and neurobehavioural examinations of the animals did not reveal any differences between the groups. No treatment-related changes in body weight or body weight gain were observed. However, compared to the controls, feed consumption was lower in males in the low-dose group until day 78 and it was higher in females in the mid- and high-dose groups for most of the study duration. On day 91 (day 105 for the recovery groups), animals were subjected to necropsy and a gross pathological examination was performed. No changes were found in gross pathology.

A number of statistically significant differences in clinical chemistry between controls and animals exposed to the NF were observed (A summary of the results can be found in the online version of this output under the 'Supporting information' section: https://doi.org/10.2903/j.efsa.2020.6099). Serum cholesterol and triglyceride concentrations were increased in males and females. Cholesterol was increased in the high-dose group in the males and in females in all the groups that were administered the NF. Triglycerides were increased in the mid- and high-dose groups for both sexes. Increases were also observed for alanine amino transferase (ALT) (in males of the high-dose group and in females in all the treatment groups) and alkaline phosphatase (ALP) (in males of the high-dose group and in females in the low-dose group). Aspartate amino transferase (AST) was increased in females only, i.e. in the low- and mid-dose groups. Furthermore, lactate dehydrogenase (LDH) was increased in both sexes, in males in all treatment groups and in females in the high-dose group. In males, phosphorous was increased in the mid- and high-dose groups and remained higher (statistically significant) also after the recovery period. In females, succinate dehydrogenase (SDH) and total protein were increased (SDH in the mid- and high dose groups, total protein in all groups receiving the NF).

A number of statistically significant findings were observed for absolute and relative organ weights, but the observed changes were small, often not dose-related and in many cases a result of rather low values in the control groups (with respect to historical controls). No differences were seen in urinalysis.

The Panel notes that a considerable number of changes were observed in clinical chemistry, including markers of liver and kidney toxicity. Even though the size of individual changes was rather small and within historical ranges, the effects were seen consistently in both sexes, were often dose-related and, in the case of phosphorus, also observed after the recovery period. The Panel considers that taken together, the findings imply a potentially adverse effect of the NF. The Panel also considers that taking into account the magnitude of the effects seen, the overall lowest observed adverse effect level (LOAEL) is to be set at 300 mg/kg bw per day. Consequently, the Panel considers the lowest dose tested in the study, i.e. 100 mg/kg bw per day, as the overall no observed adverse effect level (NOAEL).




505

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

### 3.10.3. Human data

The applicant did not provide any human studies performed with the NF nor were there any human studies with the NF retrieved by extensive literature searches.

## 3.11. Allergenicity

The Panel notes the protein content (2–5%) of the NF and, thus, the potential of the NF to elicit allergic reactions.

The literature searches carried out by the applicant and by the EFSA contractor (UCT Prague) did not retrieve any studies reporting incidents of allergenicity to the NF or to *A. membranaceus*, one of the two plants that is used to produce the NF.

With respect to *P. notoginseng*, the applicant submitted one review (Dharmananda, 2004), which described 19 case reports of allergic reactions to Sanqi (i.e. dried tuber of *P. notoginseng*). No further information on the allergenicity of *P. notoginseng* was provided.

The Panel notes the limited epidemiological data reported on one of the two plants that is used to produce the NF.

Overall, taking into account the long history of use of both plants (i.e. *A. membranaceus* and *P. notoginseng*) that are used to produce the NF, the Panel considers that the risk of allergic reactions to the NF for the general population is unknown but expected to be low.

# 4. Discussion

The NF is a mixture of the root extracts of *A. membranaceus* and *P. notoginseng*, and contains marker compounds within a specified range (i.e. 1.5–5% total saponins, 0.1–0.5% ginsenoside Rb1 and 0.01–0.1% astragaloside I). The Panel considers that the information provided on the composition of the NF and the production process is sufficient and does not raise safety concerns.

The applicant proposed to use the NF as a food supplement for the general adult population (with the exception of pregnant women) at a maximum daily amount of 350 mg. The Panel considers that, taking into account the proposed conditions of use, the consumption of the NF is not nutritionally disadvantageous.

The provided genotoxicity studies do not raise concerns for genotoxicity of the NF. In view of the maximum daily amount proposed for the NF, contribution of pesticides or contaminants is not of toxicological relevance.

Based on the findings of a subchronic toxicity study, supported by a subacute toxicity study, the Panel identified the overall NOAEL of the NF at 100 mg/kg bw per day.

The Panel considers an uncertainty factor (UF) of 200 appropriate, in order to account for inter- and intra-species variability (UF 10 $\times$ 10) and for the lack of chronic toxicity data (additional UF of 2). The application of this UF to the NOAEL results in a safe intake level for the NF of 0.5 mg/kg bw per day. Considering a standard bodyweight of 70 kg for adults (EFSA Scientific Committee, 2012), this level corresponds to a maximum daily intake of 35 mg NF for the target population, i.e. adults excluding pregnant women.

# 5. Conclusions

The Panel concludes that the NF, i.e. a botanical extract derived from both *P. notoginseng* and *A. membranaceus* roots (AstraGin™), is safe at an intake level of 0.5 mg/kg bw per day. This level corresponds to a maximum intake of 35 mg/day for the target population, i.e. adults excluding pregnant women.

The Panel could not have reached the conclusion on the safety of the NF under the proposed conditions of use without the toxicological data for which protection of proprietary data was requested by the applicant (Pasics Szakonyiné, 2011; Zin, 2016; Upadhyaya and Wang, 2017; Vedic Lifesciences, 2019a,b).

# Steps taken by EFSA

1) Letter from the European Commission to the European Food Safety Authority with the request for a scientific opinion on the safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus*. Ref. Ares(2018)5414664, dated 22 October 2018.




506

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

2) On 22 October 2018, EFSA received a valid application from the European Commission on a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food, which was submitted by NuLiv Science (US), and the scientific evaluation procedure started.
3) On 6 March 2019, EFSA requested the applicant to provide additional information to accompany the application and the scientific evaluation was suspended.
4) On 30 August 2019, additional information was provided by the applicant and the scientific evaluation was restarted.
5) On 11 November 2019, EFSA requested the applicant to provide additional information to accompany the application and the scientific evaluation was suspended.
6) On 23 January 2020, additional information was provided by the applicant and the scientific evaluation was restarted.
7) During its meeting on 24 March 2020, the NDA Panel, having evaluated the data, adopted a scientific opinion on the safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* as a NF pursuant to Regulation (EU) 2015/2283.

## References

Alcocer-Varela J, Inglesias A, Llorente L and Alarcon-Segovia D, 1985. Effects of L-canavanine on T cells may explain the induction of systemic lupus erythematosus by alfalfa. Arthritis Rheumatism, 28, 52–57.
Bence AK and Crooks PA, 2003. The mechanism of L-canavanine cytotoxicity: arginyl tRNA synthetase as a novel target for anticancer drug discovery. Journal of Enzyme Inhibition and Medicinal Chemistry, 18, 383–394.
Bensky D and Gamble A, 1986. Radix pseudoginseng. Chinese herbal medicine: materia medica. Eastland Press, Seattle. pp. 359–360.
Cui XM, Lo CK, Yip KL, Dong TT and Tsim KW, 2003. Authentication of *Panax notoginseng* by 5S-rRNA spacer domain and random amplified polymorphic DNA (RAPD) analysis. Planta Medica, 69, 584–586.
Dezhuang J, Cong Z and Zhihua W, 1998. Determination of L-Dencichin in Chinese Red Ginseng and Korean Red Ginseng. Chinese Traditional Patent Medicine, 11, 48.
Dharmananda S, 2004. Rare reactions to a safe herb. Institute for Traditional Medicine, Sanqi (Panax notoginseng). Available online: http://www.itmonline.org/arts/sanqi.htm
Dibusz K and Vejvodova P, 2020. Systematic literature search to assist EFSA in the preparatory work for the safety assessment of novel food applications and traditional food notifications. EFSA supporting publication 2020;EN-1774, 72 pp. Available online https://doi.org/10.2903/sp.efsa.2019.EN-1774
Dong TT, Cui XM, Song ZH, Zhao KJ, Ji ZN, Lo CK and Tsim KW, 2003. Chemical assessment of roots of *Panax notoginseng* in China: regional and seasonal variations in its active constituents. Journal of Agriculture and Food Chemistry, 51, 4617–4623.
Duke J and Ayensu E, 1985. Medicinal plants of China. Vol I. Reference Publications, Inc, Algonac, MI.
EFSA NDA Panel (EFSA Panel on Dietetic Products, Nutrition and Allergies), 2016. Guidance on the preparation and presentation of an application for authorisation of a novel food in the context of Regulation (EU) 2015/2283. EFSA Journal 2016;14(11):4594, 24 pp. https://doi.org/10.2903/j.efsa.2016.4594
EFSA Scientific Committee, 2011. Scientific Opinion on genotoxicity testing strategies applicable to food and feed safety assessment. EFSA Journal 2011;9(9):2379. https://doi.org/10.2903/j.efsa.2011.2379
EFSA Scientific Committee, 2012. Guidance on selected default values to be used by the EFSA Scientific Committee, Scientific Panels and Units in the absence of actual measured data. EFSA Journal 2012;10(3):2579, 32 pp. https://doi.org/10.2903/j.efsa.2012.2579
Fu J, Wang Z, Huang L, Zheng S, Wang D, Chen S, Zhang H and Yang S, 2014. Review of the Botanical Characteristics, Phytochemistry, and Pharmacology of *Astragalus membranaceus* (Huangqi). Phytotherapy Research, 28, 1275–1283.
Khan IA and Abourashed EA, 2009. Leung's Encyclopedia of Common Natural Ingredients: Used in Food, Drugs and Cosmetics, 3rd Edition. Wiley. ISBN 978-0-471-46743-4.
Leung A, 1995. Astragalus. In: Glen Rock NJ (ed.). Better health with (mostly) Chinese herbs and foods. AYSL Corp. pp. 5–6.
Leung A and Foster S, 1996. Astragalus. Encyclopedia of common natural ingredients used in food, drugs, and cosmetics. John Wiley & Sons, New York. pp. 50–53.
Morimoto I, Shiozawa S, Tanaka Y and Fujita T, 1990. L-canavanine acts on suppressorinducer T cells to regulate antibody synthesis: lymphocytes of systemic lupus erythematosus patients are specifically unresponsive to L-canavanine. Clinical Immunology and Immunopathology, 55, 97–108.
Pasics Szakonyiné I, 2011 (unpublished study report, claimed as proprietary by the applicant). Repeated dose 28-day oral gavage toxicity study with AstraGin™ in rats. Study No: 413.407.3084. Toxi-Coop Zrt., Hungary.
Reid D, 1987. Panax notoginseng (Araliacea), notoginseng. Chinese herbal medicine. Shambhala Publications Inc., Boston.
Reid D, 1995. Astragalus. A handbook of Chinese healing herbs. Boston, Shambhala. pp. 63–65.




507

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Rosenthal GA, 2001. L-Canavanine: a higher plant insecticidal allelochemical. Amino Acids, 21, 319–330.

Ruslan NF, Noam SRA, Azhar MS, Dahlan HM, Wang R, Suhailah N and Ping TS, 2016 (unpublished study report, claimed as proprietary by the applicant). AstraGin: *in vitro* mammalian cell gene mutation test (HPRT gene mutation) on V79B cells. Study ID: TL/G/476/15/012. Melaka Biotechnology Corporation. Ayer Keroh, Melaka, Malaysia.

Thorne Research Inc, 2003. A. Astragalus membranaceus. Monograph. Alternative Medicine Review, 8, 72–77.

Upadhyaya S and Wang R, 2017 (unpublished study report, claimed as proprietary by the applicant). 90-days repeated dose oral toxicity study of Astragin® in Wistar rats. 161101/NVS/PC. July 2017. 319pp. Vedic Life Sciences Pvt, Ltd. Mumbai, India.

Vedic Lifesciences, 2019a (unpublished study report, claimed as proprietary by the applicant). *Panax notoginseng* proprietary extract: *in vitro* micronucleus test in CHO-K1 cells. Study Nr. 190503/NL/PC. Mumbai, India.

Vedic Lifesciences, 2019b (unpublished study report, claimed as proprietary by the applicant). *Astragalus membranaceus* extract: *in vitro* micronucleus test in CHO-K1 cells. Study Nr. 190502/NL/PC. Mumbai, India.

Wang CZ, McEntee E, Wicks S, Wu JA and Yuan CS, 2006. Phytochemical and analytical studies of Panax notoginseng (Burk.) FH Chen. Journal of Natural Medicines, 60, 97–106.

Wang T, Guo R, Zhou G, Zhou X, Kou Z, Sui F, Li C, Tang L and Wang Z, 2016. Traditional uses, botany, phytochemistry, pharmacology and toxicology of *Panax notoginseng* (Burk.) F.H. Chen: a review. Journal of Ethnopharmacology, 188, 234–258.

Xu Q, Liu F, Chen P, Jez JM and Krishnan HB, 2017. B-N-Oxalyl-l-α, β-diaminopropionic Acid (β-ODAP) Content in Lathyrus sativus: the Integration of Nitrogen and Sulfur Metabolism through β-Cyanoalanine Synthase. International Journal of Molecular Sciences, 18, 526.

Yu SY, Ouyang HT, Yang JY, Huang XL, Yang T, Duan JP, Cheng JP, Chen YX, Yang YJ and Qiong P, 2007. Subchronic toxicity studies of Radix Astragali extract in rats and dogs. Journal of Ethnopharmacology, 110, 352–355.

Zhu Y, 1998a. San qi (Radix notoginseng – sanchi). Harwood Academic Publishers, Chinese Materia Medica. pp. 423–427.

Zhu Y, 1998b. Huang qi (Radix astragali – milkvetch root). Harwood Academic Publishers, Chinese Materia Medica. pp. 560–564.

Zin HM, 2016 (unpublished study report, claimed as proprietary by the applicant). Bacterial reverse mutation test (Ames test) for AstraGin™. Study code: GLP/J165/2016/48). Environmental Technology Research Centre (ETRC). Shah Alam, Selangor, Malaysia.

# Abbreviations

| | |
|---|---|
| ADME | absorption, distribution, metabolism and excretion |
| ALP | alkaline phosphatase |
| ALT | alanine amino transferase |
| APTT | activated partial thromboplastin time |
| AST | aspartate amino transferase |
| bw | body weight |
| CFU | colony forming units |
| ELSD | evaporative light scattering detector |
| FDA-BAM | Food and Drug Administration's Bacteriological Analytical Manual |
| GC-MS | gas chromatography–mass spectrometry |
| GLP | good laboratory practice |
| GMP | good manufacturing practice |
| HACCP | hazard analysis and critical control points |
| HPLC | high-performance liquid chromatography |
| HPRT | hypoxanthine-guanine phosphoribosyl transferase gene |
| ICP-MS | inductively coupled plasma mass spectrometry |
| LDH | lactate dehydrogenase |
| LOAEL | lowest observed adverse effect level |
| LOD | limit of detection |
| LOQ | limit of quantification |
| MCHC | mean corpuscular haemoglobin concentration |
| MCV | mean corpuscular volume |
| MF | mutation frequency |
| NDA | EFSA Panel on Dietetic Products, Nutrition and Allergies |
| NF | novel food |
| NOAEL | no observed adverse effect level |
| ODAP | oxalyldiaminopropionic acid |




508

| | |
|---|---|
| OECD | Organisation for Co-operation and Development |
| RNA | ribonucleic acid |
| SDH | succinate dehydrogenase |
| SLE | systemic lupus erythematosus |
| TG | test guidelines |
| UF | uncertainty factor |
| UV | ultraviolet |
| WBC | white blood cells |




509

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
**STEPTOE LLP**
One Market Plaza, Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
John P. Wallan (SBN 353689)
*jwallan@steptoe.com*
**STEPTOE LLP**
633 West Fifth Street, Suite 1900
Los Angeles, California 90071-3500
Telephone: (213) 439-9400 /Facsimile: (213) 439-9599

Anthony G. Hopp (*pro hac vice* pending)
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Attorneys for Defendant JACKED FACTORY, INC. erroneously sued as NUTRA HOLDINGS INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 7/30/2026 3:26 PM David W. Slayton, Executive Officer/Clerk of Court, By A. Radillo, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

Defendant.

Case No.: 23STCV15674
[*Assigned to the Hon. Theresa M. Traber*]

**NOTICE OF MOTION AND MOTION; MEMORANUDM OF POINTS AND AUTHORITIES IN SUPPORT OF VERIFIED APPLICATION OF ANTHONY G. HOPP TO APPEAR AS COUNSEL *PRO HAC VICE* FOR DEFENDANT JACKED FACTORY**

Dept. 1
TAC Filed: September 25, 2025


510

**TO THE COURT, THE STATE BAR OF CALIFORNIA, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

NOTICE IS HEREBY PROVIDED pursuant to Rule 9.40 of the California Rules of Court ("CRC") that Defendant Jacked Factory, Inc. ("Jacked Factory" or "Defendant") hereby applies to this Court for an Order permitting Anthony G. Hopp, Esq. to appear in this matter on Defendant's behalf as counsel pro hac vice.

This Notice and Motion is brought on the grounds that Mr. Hopp, who has been retained as counsel for Defendant, meets the requirements for admission *pro hac vice* to this Court, as indicated in the concurrently-filed Verified Application/Declaration of Anthony G. Hopp.

This Motion and Verified Application is made upon this Notice, and the attached Memorandum of Points and Authorities, and the concurrently-filed Verified Application/Declaration of Anthony G. Hopp, any oral presentation to the Court at any hearing on the Motion, the pleadings and other matters of record in this action, and other documents filed in connection with the Verified Application.

Dated: July 30, 2026

**STEPTOE LLP**

By: */s/ Carol R. Brophy*
Carol R. Brophy
Melanie A. Ayerh
John P. Wallan

*Attorneys for Defendant JACKED FACTORY, INC. erroneously sued as NUTRA HOLDINGS, INC. d/b/a Jacked Factory*


511

## MEMORANDUM OF POINTS AND AUTHORITIES

**I. INTRODUCTION**

Defendant Jacked Factory, Inc. ("Jacked Factory" or "Defendant") hereby applies to this Court for an Order that Anthony G. Hopp, Esq. of Steptoe LLP, located at 227 West Monroe Street, Suite 4700, Chicago, IL 60606, and reachable via telephone number (312) 577-1249 and facsimile (312) 577-1370, shall be admitted *pro hac vice* in California to represent Defendant in the above-captioned matter. As evidenced below, and in the accompanying Verified Application/Declaration of Anthony G. Hopp filed concurrently herewith, Mr. Hopp meets the requirements for *pro hac vice* admission as set forth in Rule 9.40 of the California Rules of Court ("CRC") and by the State Bar of California.

**II. LEGAL ARGUMENT**

CRC Rule 9.40 specifically provides for the admission of out-of-state counsel to appear before this Court upon written application to appear as counsel pro hac vice. Subsection (a) of Rule 9.40 provides:

> A person who is not a licensee of the State Bar of California but who is an attorney in good standing of and eligible to practice before the bar of any United States court or the highest court in any state, territory, or insular possession of the United States, and who has been retained to appear in a particular cause pending in a court of this state, may in the discretion of such court be permitted upon written application to appear as counsel *pro hac vice*, provided that an active licensee of the State Bar of California is associated as attorney of record. No person is eligible to appear as counsel *pro hac vice* under this rule if the person is:
>
> (1) A resident of the State of California;
>
> (2) Regularly employed in the State of California; or
>
> (3) Regularly engaged in substantial business, professional, or other activities in the State of California.

Given the importance of a party's right to be represented by counsel of its choice, a request to allow the association of counsel *pro hac vice* should be granted in most cases. *See Magee v. Superior Court* (1973) 8 Cal. 3d 949, 952 (noting that it is an abuse of discretion to








512

deny the request unless the association would result in an unreasonable disruption of the orderly process of justice).

As set forth here and the concurrently filed Verified Application, Mr. Hopp:

1. meets the qualifications set forth in Rule 9.40(a) of the California Rules of Court;
2. is a partner in the law firm of Steptoe LLP, which has been retained to appear in the above-captioned matter as counsel for Defendant;
3. resides at 1530 Abbotsford Drive, Naperville, Illinois 60563;
4. has an office address in the Chicago office of Steptoe LLP, located at 227 West Monroe Street, Suite 4700, Chicago, IL 60606, and reachable via telephone number (312) 577-1249 and facsimile (312) 577-1370;
5. is a member in good standing of, and admitted to practice before, the highest court of the state of Illinois since November 10, 1988 (Bar No. 6199290);
6. is also a member in good standing of, and admitted to practice before the following additional courts:

a. United States District Court for the Northern District of Illinois (admitted January 15, 1989; admitted as a Member of the Trial Bar on January 16, 1997);

b. United States District Court for the Central District of Illinois (admitted August 5, 1991);

c. United States Court of Appeals for the First Circuit (Bar No. 1212147, admitted April 18, 2024);

d. United States Court of Appeals for the Second Circuit (admitted May 2, 2024);

e. United States Court of Appeals for the Fourth Circuit (admitted October 11, 2022);

f. United States Court of Appeals for the Seventh Circuit (admitted August 22, 2014);

g. United States Court of Appeals for the Ninth Circuit (admitted October 3, 1997);


513

h. United States Court of Appeals for the Eleventh Circuit (admitted August 16, 2023).

7. has not been suspended or disbarred from any court, nor has any such proceeding pending;

8. is not regularly employed, or regularly engaged in substantial business, professional or other activities within the state of California;

9. has not made repeated *pro hac vice* appearances in California state courts;

10. on July 28, 2025, Mr. Hopp applied to the United States District Court for the Southern District of California to be admitted pro hac vice in the case entitled "*Leah Testone, on behalf of herself, all others similarly situated, and the general public, Plaintiff, v. Go Macro, LLC, Defendant*", No. 3:25-cv-01743-RSH-KSC, assigned to Judge Robert S. Huie, United States District Court Judge, and his pro hac vice application for that case was granted;

11. on August 12, 2025, Mr. Hopp applied to the United States District Court for the Southern District of California to be admitted pro hac vice in the case entitled "*George Pratt, individually and on behalf of all others similarly situated, Plaintiff, v. Bonafide Provisions, LLC, Defendant*", No. 3:25-cv-01982-AJB-KSC, then assigned to Judge Anthony J. Battaglia, United States District Court Judge, and his pro hac vice application for that case was granted;

12. on December 11, 2025, Mr. Hopp applied to the United States District Court for the Central District of California to be admitted pro hac vice in the case entitled "*Jessica Argueta, individually and on behalf of all others similarly situated, Plaintiff, v. Terrasoul Superfoods, LLC, a Texas limited liability company, Defendant*", No. 2:25-cv-11648-RGK-RAO, assigned to Judge R. Gary Klausner, United States District Court Judge, and his pro hac vice application for that case was denied pursuant to L.R. 83-21.3.4 as Local Counsel did not maintain an office in the District;


514

13. on January 6, 2026, Mr. Hopp applied to the United States District Court for the Northern District of California to be admitted pro hac vice in the case entitled "*Sergio Perez, on behalf of himself and others similarly situated, Plaintiff, v. Go Macro, LLC, and Does 1-10, inclusive, Defendants*", No. 5:25-cv-09890-PCP, assigned to Judge P. Casey Pitts, United States District Court Judge, and his pro hac vice application for that case was granted;
14. on May 12, 2026, Mr. Hopp applied to the United States District Court for the Central District of California to be admitted pro hac vice in the case entitled "*Lawrence Schallert, an individual, Plaintiff, v. Laird Superfood, Inc., LLC, Defendant*", No. 2:25-cv-12407-SPG-PVC, assigned to Judge Sherilyn Peace Garnett, United States District Court Judge, and his pro hac vice application was granted;
15. on July 24, 2026, Mr. Hopp applied to the Superior Court of California, County of Los Angeles, Complex Division, to be admitted pro hac vice in the case entitled "*Salvadore Caldera, on behalf of himself and others similarly situated, Plaintiff, v. Laird Superfood, Inc and Does 1 through 10, inclusive, Defendants*", No. 26STCV02688, assigned to Judge Samantha Jessner, Dept. 7, and his pro hac vice application is pending;
16. on July 30, 2026, Mr. Hopp applied to the Superior Court of California, County of Monterey, to be admitted pro hac vice in the case entitled "*Sergio Perez, on behalf of himself and others similarly situated, Plaintiff, v. Go Macro, LLC, and Does 1 to 10, inclusive, Defendant*", No. 25CV004722, assigned to Judge Thomas W. Wills, Dept. 15, and his pro hac vice application is pending;
17. is associated with Carol R. Brophy, who is an active member in good standing of the State Bar of California (State Bar No. 155767) and an attorney of record for Defendant Jacked Factory in this case;
18. is also associated with the following additional Steptoe attorneys who are active members in good standing of the State Bar of California, and who are also


515

representing Defendant Jacked Factory in this case: Melanie A. Ayerh (SBN 303211), and John P. Wallan (SBN 353689); and

19. has submitted a copy of the concurrently-filed Verified Application/Declaration of Anthony G. Hopp with the required payment to the State Bar of California in compliance with Rules 9.40(c) and 9.40(e) of the California Rules of Court.

## III. CONCLUSION

Accordingly, Defendant Jacked Factory, Ms. Brophy and Mr. Hopp respectfully request that this Court grant the attached Verified Application and allow Mr. Hopp to appear as counsel *pro hac vice* on behalf of Defendant Jacked Factory.

Dated: July 30, 2026

**STEPTOE LLP**

By: */s/ Carol R. Brophy*
Carol R. Brophy
Melanie A. Ayerh
John P. Wallan

*Attorneys for Defendant Jacked Factory, Inc.*


516

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On July 30, 2026, I served true copies of the following document(s) described as **NOTICE OF MOTION AND MEMORANUDM OF POINTS AND AUTHORITIES IN SUPPORT OF VERIFIED APPLICATION OF ANTHONY G. HOPP TO APPEAR AS COUNSEL *PRO HAC VICE* FOR DEFENDANT JACKED FACTORY** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 30, 2026, at Los Angeles, California.

/s/ Grace Calderon

Grace Calderon




517

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*

Office of Admissions
The State Bar of California
180 Howard Street
San Franscico, CA 94105
**(VIA APPLICANT PORTAL)**


518

Thank you for submitting your payment. It is currently being processed. Please allow 7 days for the bank to verify and process the payment. If there are any issues with your payment, you will be notified directly. A detailed breakdown of your transaction is below:

| | |
|---|---|
| Amount : | $615.00 |
| Payment Date : | 07/30/2026 03:02 PM |
| Payment Method : | Credit Card |
| Reference : | Payment from Calderon Administrative Account |

PAID


519

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
**STEPTOE LLP**
One Market Plaza, Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
John P. Wallan (SBN 353689)
*jwallan@steptoe.com*
**STEPTOE LLP**
633 West Fifth Street, Suite 1900
Los Angeles, California 90071-3500
Telephone: (213) 439-9400 /Facsimile: (213) 439-9599

Anthony Hopp (*pro hac vice* pending)
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Attorneys for Defendant JACKED FACTORY, INC. erroneously sued as NUTRA HOLDINGS INC. D/B/A JACKED FACTORY

**Electronically FILED by Superior Court of California, County of Los Angeles 7/30/2026 3:26 PM David W. Slayton, Executive Officer/Clerk of Court, By A. Radillo, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

Defendant.

Case No.: 23STCV15674
[*Assigned to the Hon. Theresa M. Traber*]

**VERIFIED APPLICATION/ DECLARATION OF ANTHONY G. HOPP TO APPEAR AS COUNSEL *PRO HAC VICE* FOR DEFENDANT JACKED FACTORY**

Dept. 1
TAC Filed: September 25, 2025

I, **ANTHONY G. HOPP**, declare and state as follows:

1. I make this Verified Application/Declaration to appear *pro hac vice* as counsel for Jacked Factory, Inc. ("Jacked Factory" or "Defendant") in the above-captioned action, pursuant to, and in accordance with, Rule 9.40 of the California Rules of Court ("CRC"). I make this Verified Application/Declaration based upon my personal knowledge, and if called to testify, I could and would competently testify to and verify the information stated herein.

2. I am a partner in the law firm of Steptoe LLP, which has been retained to appear in the above-captioned matter as counsel for Defendant.

3. My residential address is 1530 Abbotsford Drive, Naperville, Illinois 60563.

4. My office address is the Chicago office of Steptoe LLP, located at 227 West Monroe Street, Suite 4700, Chicago, IL 60606, telephone number (312) 577-1249, and facsimile (312) 577-1370.

5. I am an attorney admitted and licensed to practice law in the state of Illinois since November 10, 1988. My Illinois bar number is 6199290, and I am in good standing.

6. I also have been admitted to practice before and am in good standing with the following courts:

a. United States District Court for the Northern District of Illinois (admitted January 15, 1989; admitted as a Member of the Trial Bar on January 16, 1997);

b. United States District Court for the Central District of Illinois (admitted August 5, 1991);

c. United States Court of Appeals for the First Circuit (Bar No. 1212147, admitted April 18, 2024);

d. United States Court of Appeals for the Second Circuit (admitted May 2, 2024);

e. United States Court of Appeals for the Fourth Circuit (admitted October 11, 2022);

f. United States Court of Appeals for the Seventh Circuit (admitted August 22, 2014);

g. United States Court of Appeals for the Ninth Circuit (admitted October 3, 1997);


521

h. United States Court of Appeals for the Eleventh Circuit (admitted August 16, 2023).

7. I have not been suspended or disbarred from any court, nor do I have any such proceeding pending.

8. I am not regularly employed, or regularly engaged in substantial business, professional or other activities within the state of California.

9. I have not made repeated pro hac vice appearances in California state courts.

10. On July 28, 2025, I applied to the United States District Court for the Southern District of California to be admitted pro hac vice in the case entitled *"Leah Testone, on behalf of herself, all others similarly situated, and the general public, Plaintiff, v. Go Macro, LLC, Defendant*", No. 3:25-cv-01743-RSH-KSC, assigned to Judge Robert S. Huie, United States District Court Judge, and my pro hac vice application for that case was granted.

11. On August 12, 2025, I applied to the United States District Court for the Southern District of California to be admitted pro hac vice in the case entitled "*George Pratt, individually and on behalf of all others similarly situated, Plaintiff, v. Bonafide Provisions, LLC, Defendant*", No. 3:25-cv-01982-AJB-KSC, then assigned to Judge Anthony J. Battaglia, United States District Court Judge, and my pro hac vice application for that case was granted.

12. On December 11, 2025, I applied to the United States District Court for the Central District of California to be admitted pro hac vice in the case entitled "*Jessica Argueta, individually and on behalf of all others similarly situated, Plaintiff, v. Terrasoul Superfoods, LLC, a Texas limited liability company, Defendant*", No. 2:25-cv-11648-RGK-RAO, assigned to Judge R. Gary Klausner, United States District Court Judge, and my pro hac vice application for that case was denied pursuant to L.R. 83-21.3.4 as Local Counsel did not maintain an office in the District.

13. On January 6, 2026, I applied to the United States District Court for the Northern District of California to be admitted pro hac vice in the case entitled "*Sergio Perez, on behalf of himself and others similarly situated, Plaintiff, v. Go Macro, LLC, and Does 1-10, inclusive,*


522

*Defendants*", No. 5:25-cv-09890-PCP, assigned to Judge P. Casey Pitts, United States District Court Judge, and my pro hac vice application for that case was granted.

14. On May 12, 2026, I applied to the United States District Court for the Central District of California to be admitted pro hac vice in the case entitled "*Lawrence Schallert, an individual, Plaintiff, v. Laird Superfood, Inc., LLC, Defendant*", No. 2:25-cv-12407-SPG-PVC, assigned to Judge Sherilyn Peace Garnett, United States District Court Judge, and my pro hac vice application was granted.

15. On July 24, 2026, I applied to the Superior Court of California, County of Los Angeles, Complex Division, to be admitted pro hac vice in the case entitled "*Salvador Caldera, on behalf of himself and others similarly situated, Plaintiff, v. Laird Superfood, Inc and Does 1 through 10, inclusive, Defendants*", No. 26STCV02688, assigned to Judge Samantha Jessner, Dept. 7, and my pro hac vice application is pending;

16. On July 30, 2026, I applied to the Superior Court of California, County of Monterey, to be admitted pro hac vice in the case entitled "*Sergio Perez, on behalf of himself and others similarly situated, Plaintiff, v. Go Macro, LLC and Does 1 to 10, inclusive, Defendant*", No. 25CV004722, assigned to Judge Thomas W. Wills, Dept. 15, and my pro hac vice application is pending;

17. I am associated with Carol R. Brophy, who is an active member in good standing of the State Bar of California (State Bar No. 155767) and an attorney of record for Defendant Jacked Factory in this case. Her office address is One Market Plaza, Steuart Tower, Suite 1070, San Francisco, California 94105, and her telephone number is (415) 365-6700.

18. I am also associated with the following additional Steptoe attorneys who are active members in good standing of the State Bar of California, and who are also representing Defendant Jacked Factory in this case: Melanie A. Ayerh (SBN 303211), and John P. Wallan (SBN 353689). Their office address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071-3500, and their telephone number is (213) 439-9400.


523

19. I have submitted a copy of this "Verified Application/Declaration of Anthony G. Hopp" with the required payment to the State Bar of California in compliance with Rules 9.40(c) and 9.40(e) of the California Rules of Court.

**VERIFICATION**

I am the applicant in this matter, and I have read the foregoing Verified Application and herewith verify that the matters stated in it are true of my own knowledge.

I declare under penalty of perjury under the laws of the State of California, the state of Illinois, and the United States that the foregoing is true and correct.

Executed on this 30th day of July 2026 in Naperville, Illinois.

ANTHONY G. HOPP


524

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On July 30, 2026, I served true copies of the following document(s) described as **VERIFIED APPLICATION/ DECLARATION OF ANTHONY G. HOPP TO APPEAR AS COUNSEL *PRO HAC VICE* FOR DEFENDANT JACKED FACTORY** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 30, 2026, at Los Angeles, California.

/s/ Grace Calderon

Grace Calderon


525

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*

Office of Admissions
The State Bar of California
180 Howard Street
San Franscico, CA 94105
**(VIA APPLICANT PORTAL)**


526

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | FOR COURT USE ONLY<br><br>**FILED**<br>Superior Court of California<br>County of Los Angeles<br>06/26/2026<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | |
| PLAINTIFF(S)/PETITIONER(S):<br>Daniel Rossi | |
| DEFENDANT(S)/RESPONDENT(S):<br>Nutra Holdings, Inc. | |
| **CLERK'S CERTIFICATE OF SERVICE<br>BY ELECTRONIC SERVICE** | CASE NUMBER:<br>23STCV15674 |

I, David W. Slayton, Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein and that on this date I served the

**Stipulation to Continue the Briefing Schedule and Court Deadlines; Order of 06/26/2026**

upon each party or counsel of record in the above entitled action by electronically serving to the party or parties at the electronic address as listed below:

**"Kazerounian, Abbas" <ak@kazlg.com>**
**"Sousa, Angela M." <asousa@steptoe.com>**
**"Brophy, Carol R." <cbrophy@steptoe.com>**
**"Ponce, Gustavo" <gustavo@kazlg.com>**
**"Singh, Jennifer K." <jsingh@steptoe.com>**
**"Ayerh, Melanie A." <mayerh@steptoe.com>**

The electronic transmission originated from the Superior Court of California, County of Los Angeles email address eService-DoNotReply@lacourt.org at the Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA 90012.

Dated: 06/26/2026

David W. Slayton, Executive Officer / Clerk of Court

By: A. He
Deputy Clerk


527

Electronically Received 06/18/2026 01:27 PM

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

FILED
Superior Court of California
County of Los Angeles
06/26/2026
David W. Slayton, Executive Officer / Clerk of Court
By: A. He Deputy

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No.: 23STCV15674

**STIPULATION TO CONTINUE THE BRIEFING SCHEDULE AND COURT DEADLINES; [~~PROPOSED~~] ORDER**

[Assigned for all purposes to the Honorable Theresa M. Traber]

Complaint Filed: July 6, 2023
First Amended Complaint: August 16, 2024
Second Amended Complaint: March 27, 2025
Third Amended Complaint: September 25, 2025


528

KAZEROUNI LAW GROUP, APC

Plaintiff Daniel Rossi ("Plaintiff") and defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Defendant" and, together with Plaintiff, the "Parties"), through their respective undersigned counsel, hereby stipulate as follows:

WHEREAS, the Parties met and conferred and agreed to continue the dates in this matter given the discovery issues and the ongoing communications in an effort to resolve the complex discovery issues and avoid unnecessary expenditure of resources for the parties and the Court;

WHEREAS, both Parties have outstanding discovery issues which they have met and conferred with each other on diligently and in good faith, and are working together through these discovery matters;

WHEREAS, a Further Status Conference is currently set in the above captioned matter for January 11, 2027 at 10:30 a.m. in Department 1 of the above titled Court;

WHEREAS, Plaintiff's Motion for Class Certification is also set to be heard January 11, 2027 at 10:30 a.m. in Department 1 of the above titled;

WHEREAS, Plaintiff's current deadline to file a Motion to Compel Further Discovery Responses is June 22, 2026, pursuant to prior agreement;

WHEREAS, the Parties filed a status report on May 29 informing the above titled Court about their discovery issues and efforts to diligently resolve them in good faith;

WHEREAS, the Parties have been seeking an opportunity to discuss a potential settlement in addition to working through their discovery issues as of June 8, 2026;

WHEREAS, the Parties have met and conferred and have determined that in the interest of justice and party and judicial economy, that all deadlines and hearings should be extended by ninety (90) days in order to grant the Parties additional time to address their discovery issues and explore an informal resolution.

**THEREFORE, THE PARTIES STIPULATE AND RESPECTFULLY REQUEST THAT THE COURT ORDER AS FOLLOWS:**

1. The deadline for Plaintiff to disclose all class certification expert witnesses, if any, currently set for July 1, 2026, to be continued to September 29, 2026

2. The deadline for Defendant to disclose all class certification expert witnesses, if any, currently set for August 3, 2026, to be continued to November 1, 2026.

3. The deadline to file Class Certification Motion currently set for October 3, 2026, to be continued to January 2, 2027.

4. The deadline to file an Opposition to the Class Certification Motion currently set for November 16, 2026, to be continued to February 15, 2027.

5. The deadline to file a Reply in Support of the Class Certification Motion currently set for December 15, 2026, to be continued to March 15, 2027.

6. That the Further Status Conference, currently scheduled for January 11, 2027 at 10:30 a.m. be continued to April 12, 2027, or a date thereafter to be determined by the Court.

7. That the hearing on Plaintiff's Motion for Class Certification, currently scheduled for January 11, 2027 at 10:30 a.m. be continued to April 12, 2027, or a date thereafter to be determined by the Court.

8. That all other deadlines or hearings in this matter pursuant to order, agreement, or calculated by statute shall be extended by ninety (90) days.

Dated: June 18, 2026 **KAZEROUNI LAW GROUP, APC**

By: *_/s/ Gustavo Ponce_*
Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*

Dated: June 18, 2026 **STEPTOE LLP**

By: *_/s/ Melanie Ayerh_*
Carol R. Brophy
Jennifer K. Singh
Anthony Hopp (*pro hac vice* forthcoming)
Angela M. Sousa
Melanie A. Ayerh
*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*

**~~[PROPOSED]~~ ORDER**

PURSUANT TO STIPULATION OF THE PARTIES AND GOOD CAUSE APPEARING THEREFOR, IT IS ORDERED that:

1. The deadline for Plaintiff to disclose all class certification expert witnesses, if any, currently set for July 1, 2026, is continued to September 29, 2026;
2. The deadline for Defendant to disclose all class certification expert witnesses, if any, currently set for August 3, 2026, is continued to November 1, 2026;
3. The deadline to file Class Certification Motion currently set for October 3, 2026, is continued to January 2, 2027;
4. The deadline to file an Opposition to the Class Certification Motion currently set for November 16, 2026, is continued to February 15, 2027;
5. The deadline to file a Reply in Support of the Class Certification Motion currently set for December 15, 2026, is continued to March 15, 2027;
6. That the Further Status Conference, currently scheduled for January 11, 2027 at 10:30 a.m. is continued to April 12, 2027, or a date thereafter to be determined by the Court.
7. That the hearing on Plaintiff's Motion for Class Certification, currently scheduled for January 11, 2027 at 10:30 a.m. is continued to April 12, 2027, or a date thereafter to be determined by the Court;
8. That all other deadlines or hearings in this matter pursuant to order, agreement, or calculated by statute shall be extended by ninety (90) days.

**IT IS SO ORDERED.**

DATE: 06/26/2026

Honorable Theresa M. Traber
Superior Court Judge

KAZEROUNI LAW GROUP, APC


531

**PROOF OF SERVICE**

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, CA 92626. June 18, 2026, I served the herein described document(s):

**STIPULATION TO CONTINUE THE BRIEFING SCHEDULE AND COURT DEADLINES; [PROPOSED] ORDER**

☐ FACSIMILE - by transmitting via facsimile the document(s) listed above to the fax number(s) set forth on the attached Telecommunications Cover Page(s) on this date before 11:59 p.m.

☒ MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Costa Mesa, California addressed as set forth below.

☐ PERSONAL SERVICE - by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

Carol R. Brophy (SBN 155767)
cbrophy@steptoe.com
STEPTOE LLP
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105

Anthony Hopp (*pro hac vice* forthcoming)
ahopp@steptoe.com
STEPTOE LLP
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606

Melanie A. Ayerh (SBN 303211)
mayerh@steptoe.com
John P. Wallan (SBN 353689)
jwallan@steptoe.com
STEPTOE LLP
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on June 18, 2026, at Las Vegas, Nevada.

By: */s/ Gustavo Ponce*
Gustavo Ponce


532

KAZEROUNI LAW GROUP, APC

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | FOR COURT USE ONLY |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA, 90012 | FILED<br>Superior Court of California<br>County of Los Angeles<br>06/02/2026<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
| PLAINTIFF(S)/PETITIONER(S):<br>Daniel Rossi | |
| DEFENDANT(S)/RESPONDENT(S):<br>Nutra Holdings, Inc. | |
| **CLERK'S CERTIFICATE OF SERVICE BY ELECTRONIC SERVICE** | CASE NUMBER:<br>23STCV15674 |

I, David W. Slayton, Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein and that on this date I served the

**Minute Order of 06/02/2026**

upon each party or counsel of record in the above entitled action by electronically serving to the party or parties at the electronic address as listed below:

**"Melanie A. Ayerh" <mayerh@steptoe.com>,**
**"Carol R. Brophy" <cbrophy@steptoe.com>,**
**"Gustavo Ponce" <gustavo@kazlg.com>,**
**"Jennifer K. Singh" <jsingh@steptoe.com>**
**mona@kazlg.com, david@kazlg.com**

The electronic transmission originated from the Superior Court of California, County of Los Angeles email address eService-DoNotReply@lacourt.org at the Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA, 90012.

Dated: 06/2/2026

David W. Slayton, Executive Officer / Clerk of Court

By: A. He
Deputy Clerk


533

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

June 2, 2026
3:00 PM

Judge: Honorable Theresa M. Traber
Judicial Assistant: A. He
Courtroom Assistant: None

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Court Order Continuing Hearing

On the Court's own motion, the Further Status Conference scheduled for 06/04/2026 is continued to 01/11/2027 at 10:30 AM in Department 1 at Spring Street Courthouse. A joint status report is due at least five (5) court days in advance.

Certificate of Service is attached.


534

**KAZEROUNI LAW GROUP, APC**
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**Electronically FILED by Superior Court of California, County of Los Angeles 5/29/2026 10:43 AM David W. Slayton, Executive Officer/Clerk of Court, By M. Arellanes, Deputy Clerk**

KAZEROUNI LAW GROUP, APC

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br><br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**JOINT STATUS REPORT** |


535

KAZEROUNI LAW GROUP, APC

Plaintiff Daniel Rossi ("Plaintiff") and Defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Defendant") (collectively the "Parties"), jointly submit this Status Report per the Court's Order.

The Parties have each served discovery requests on each other, with extensions for the responses. Discovery responses for each side have been served. There have been discovery issues in which the Parties have had good faith meet and confers regarding Defendant and Plaintiff's discovery responses. The Parties are still working out the discovery disputes in good faith. The Parties are working in good faith and diligently in this matter.

Dated: May 29, 2026 Respectfully submitted,

**KAZEROUNI LAW GROUP APC**

*/s/ Gustavo Ponce*
Gustavo Ponce, Esq.
Attorneys for Plaintiff

**STEPTOE LLP**

*/s/ Melanie Ayerh*
Carol R. Brophy
Anthony Hopp (*Pro Hac Vice* forthcoming)
Melanie A. Ayerh
Attorneys for Defendant


536

# PROOF OF SERVICE

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On May 29, 2026, I served the foregoing document and accompanying attachments by the means indicated below:

**JOINT STATUS REPORT**

☒ E-MAIL - by transmitting via e-mail the document(s) listed above to the e-mail address(es) set forth below on this date before 11:59 p.m.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Anthony Hopp
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
*jsingh@steptoe.com*
*ahopp@steptoe.com*
*Attorneys for Defendant*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on May 29, 2026, at Las Vegas, Nevada.

*/s/ Gustavo Ponce*
GUSTAVO PONCE

KAZEROUNI LAW GROUP, APC


537

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | FOR COURT USE ONLY<br><br>FILED<br>Superior Court of California<br>County of Los Angeles<br>03/04/2026<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | |
| PLAINTIFF(S)/PETITIONER(S):<br>Daniel Rossi | |
| DEFENDANT(S)/RESPONDENT(S):<br>Nutra Holdings, Inc. | |
| **CLERK'S CERTIFICATE OF SERVICE<br>BY ELECTRONIC SERVICE** | CASE NUMBER:<br>23STCV15674 |

I, David W. Slayton, Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein and that on this date I served the

**Stipulation and Protective Order – Confidential Designation Only of 03/04/2026**

upon each party or counsel of record in the above entitled action by electronically serving to the party or parties at the electronic address as listed below:

**"Kazerounian, Abbas" <ak@kazlg.com>**
**"Sousa, Angela M." <asousa@steptoe.com>**
**"Brophy, Carol R." <cbrophy@steptoe.com>**
**"Ponce, Gustavo" <gustavo@kazlg.com>**
**"Singh, Jennifer K." <jsingh@steptoe.com>**
**"Ayerh, Melanie A." <mayerh@steptoe.com>**

The electronic transmission originated from the Superior Court of California, County of Los Angeles email address eService-DoNotReply@lacourt.org at the Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA 90012.

Dated: 03/4/2026

David W. Slayton, Executive Officer / Clerk of Court

By: A. He
Deputy Clerk


538

Electronically Received 03/03/2026 01:54 PM

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza, Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for JACKED FACTORY INC. erroneously sued as NUTRA HOLDINGS, INC D/B/A JACKED FACTORY[1]

**FILED**
Superior Court of California
County of Los Angeles
03/04/2026
David W. Slayton, Executive Officer / Clerk of Court
By: A. He Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned to the Honorable Traber, Theresa M.]*<br><br>STIPULATION AND PROTECTIVE ORDER – CONFIDENTIAL DESIGNATION ONLY<br><br>Dept. 1<br>Complaint Filed: July 6, 2023<br>Third Amended Complaint: September 25, 2025 |

[1]The name of the corporation “NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY” changed to JACKED FACTORY, INC. effective February 4, 2025. *See* “Notice of Name Change” filed on August 19, 2025.


539

**IT IS HEREBY STIPULATED** by and between Plaintiff Daniel Rossi ("Rossi") and Defendant Jacked Factory, Inc. ("Jacked Factory") (together, the "Parties"), by and through their respective counsel of record, that in order to facilitate the exchange of information and documents which may be subject to confidentiality limitations on disclosure due to federal laws, state laws, and privacy rights, the Parties stipulate as follows:

**DEFINITIONS**

1. In this Stipulation and Protective Order, the words set forth below shall have the following meanings:

a. "Proceeding" means the above-entitled proceeding, Case No.: 23STCV15674.

b. "Court" means the Hon. Traber, Theresa M., or any other judge to which this Proceeding may be assigned, including Court staff participating in such proceedings.

c. "Confidential" means any information which is in the possession of a Designating Party who believes in good faith that such information is entitled to confidential treatment under applicable law.

d. "Confidential Materials" means any Documents, Testimony or Information as defined below designated as "Confidential" pursuant to the provisions of this Stipulation and Protective Order.

e. "Designating Party" means the Party that designates Materials as "Confidential."

f. "Disclose" or "Disclosed" or "Disclosure" means to reveal, divulge, give, or make available Materials, or any part thereof, or any information contained therein.

g. "Documents" means (i) any "Writing," "Original," and "Duplicate" as those terms are defined by California Evidence Code Sections 250, 255, and 260, which have been produced in discovery in this Proceeding by any person, and (ii) any copies, reproductions, or summaries of all or any part of the foregoing.

h. "Information" means the content of Documents or Testimony.


540

i. "Testimony" means all depositions, declarations or other testimony taken or used in this Proceeding.

**DESIGNATION OF CONFIDENTIAL MATERIAL**

2. The Designating Party shall have the right to designate as "Confidential" any Documents, Testimony or Information that the Designating Party in good faith believes to contain non-public information that is entitled to confidential treatment under applicable law.

3. The entry of this Stipulation and Protective Order does not alter, waive, modify, or

abridge any right, privilege or protection otherwise available to any Party with respect to the discovery of matters, including but not limited to any Party's right to assert the attorney-client privilege, the attorney work product doctrine, or other privileges, or any Party's right to contest any such assertion.

4. Any Documents, Testimony or Information to be designated as "Confidential" must be clearly so designated before the Document, Testimony or Information is Disclosed or produced. The parties may agree that the case name and number are to be part of the "Confidential" designation. The "Confidential" designation should not obscure or interfere with the legibility of the designated Information.

a. For Documents (apart from transcripts of depositions or other pretrial or trial proceedings), the Designating Party must affix the legend "CONFIDENTIAL" on each page of any Document containing such designated Confidential Material.

b. For Testimony given in depositions the Designating Party may either:

i. identify on the record, before the close of the deposition, all "Confidential" Testimony, by specifying all portions of the Testimony that qualify as "Confidential;" or

ii. designate the entirety of the Testimony at the deposition as "Confidential" (before the deposition is concluded) with the right to identify more specific portions of the Testimony as to which protection is sought within 30 days


541

following receipt of the deposition transcript. In circumstances where portions of the deposition Testimony are designated for protection, the transcript pages containing "Confidential" Information may be separately bound by the court reporter, who must affix to the top of each page the legend "Confidential," as instructed by the Designating Party.

c. For Information produced in some form other than Documents, and for any other tangible items, including, without limitation, compact discs or DVDs, the Designating Party must affix in a prominent place on the exterior of the container or containers in which the Information or item is stored the legend "Confidential." If only portions of the Information or item warrant protection, the Designating Party, to the extent practicable, shall identify the "Confidential" portions.

**INADVERTENT PRODUCTION OR FAILURE TO PROPERLY DESIGNATE**

5. The inadvertent production by any of the undersigned Parties or non-Parties to the Proceedings of any Document, Testimony or Information during discovery in this Proceeding without a "Confidential" designation, shall be without prejudice to any claim that such item is "Confidential" and such Party shall not be held to have waived any rights by such inadvertent production. In the event that any Document, Testimony or Information that is subject to a "Confidential" designation is inadvertently produced without such designation, the Party that inadvertently produced the document shall give written notice of such inadvertent production within twenty (20) days of discovery of the inadvertent production, together with a further copy of the subject Document, Testimony or Information designated as "Confidential" (the "Inadvertent Production Notice"). Upon receipt of such Inadvertent Production Notice, the Party that received the inadvertently produced Document, Testimony or Information shall promptly destroy the inadvertently produced Document, Testimony or Information and all copies thereof, or, at the expense of the producing Party, return such together with all copies of such Document, Testimony or Information to counsel for the producing Party and shall retain only the "Confidential" designated Materials. Should the receiving Party choose to destroy such


542

inadvertently produced Document, Testimony or Information, the receiving Party shall notify the producing Party in writing of such destruction within ten (10) days of receipt of written notice of the inadvertent production. This provision is not intended to apply to any inadvertent production of any Information protected by attorney-client or work product privileges. In the event that this provision conflicts with any applicable law regarding waiver of confidentiality through the inadvertent production of Documents, Testimony or Information, such law shall govern.

In the event that counsel for a Party receiving Documents, Testimony or Information in discovery designated as "Confidential" objects to such designation with respect to any or all of such items, said counsel shall advise counsel for the Designating Party, in writing, of such objections, the specific Documents, Testimony or Information to which each objection pertains, and the specific reasons and support for such objections (the "Designation Objections"). Counsel for the Designating Party shall have thirty (30) days from receipt of the written Designation Objections to either (a) agree in writing to de-designate Documents, Testimony or Information pursuant to any or of the Designation Objections and/or (b) make themselves available to meet and confer with counsel for the party serving Designation Objections. In the event the parties cannot reach agreement through their meet and confer, and the Designating Party wishes to safeguard the Confidential designations, the Designating Party must file a motion with the Court seeking to uphold any or all designations on Documents, Testimony or Information addressed by the Designation Objections ("Designation Motion"). The Designation Motion shall be filed within 14 days after the parties meet and confer or 30 days after Designation Objections are raised, whichever is later. Pending a resolution of the Designation Motion by the Court, any and all existing designations on the Documents, Testimony or Information at issue in such Motion shall remain in place. In connection with the resolution of any Designation Motion, the Designating Party shall have the burden on any Designation Motion of establishing the applicability of its "Confidential" designation. In the event that the Designation Objections are neither timely agreed to nor timely addressed in the Designation Motion as set forth above, then such Documents, Testimony or Information shall be de-designated in accordance with the Designation Objection applicable to such material.


543

**ACCESS TO AND DISCLOSURE OF CONFIDENTIAL MATERIAL**

7. Access to and/or Disclosure of Confidential Materials designated as "Confidential" shall be permitted only to the following persons:

a. the Court;

b. (1) Attorneys of record in the Proceedings and their affiliated attorneys, paralegals, clerical and secretarial staff employed by such attorneys who are actively involved in the Proceedings and are not employees of any Party. (2) In-house counsel to the undersigned Parties and the paralegal, clerical and secretarial staff employed by such counsel. Provided, however, that each non-lawyer given access to Confidential Materials shall be advised that such Materials are being Disclosed pursuant to, and are subject to, the terms of this Stipulation and Protective Order and that they may not be Disclosed other than pursuant to its terms;

c. those officers, directors, partners, members, employees and agents of all non-designating Parties that counsel for such Parties deems necessary to aid counsel in the prosecution and defense of this Proceeding; provided, however, that prior to the Disclosure of Confidential Materials to any such officer, director, partner, member, employee or agent, counsel for the Party making the Disclosure shall deliver a copy of this Stipulation and Protective Order to such person, shall explain that such person is bound to follow the terms of such Order, and shall secure the signature of such person on a statement in the form attached hereto as Exhibit A;

d. court reporters in this Proceeding (whether at depositions, hearings, or any other proceeding);

e. any deposition, trial or hearing witness in the Proceeding who previously has had authorized access to the Confidential Materials, or who is currently or was previously an officer, director, partner, member, employee or agent of an entity that has had authorized access to the Confidential Materials;

f. any deposition witness in the Proceeding employed by or formerly employed by the Designating Party who previously did not have access to the Confidential Materials; provided, however, that each such witness given access to Confidential Materials shall be advised that such materials are being disclosed pursuant to, and are subject to, the terms of this


544

Stipulation and Protective Order and that they may not be Disclosed other than pursuant to its terms;

g. mock jury participants, provided, however, that prior to the Disclosure of Confidential Materials to any such mock jury participant, counsel for the Party making the Disclosure shall deliver a copy of this Stipulation and Protective Order to such person, shall explain that such person is bound to follow the terms of such Order, and shall secure the signature of such person on a statement in the form attached hereto as Exhibit A.

h. outside experts or expert consultants consulted by the undersigned Parties or their counsel in connection with the Proceeding, whether or not retained to testify at any oral hearing; provided, however, that prior to the Disclosure of Confidential Materials to any such expert or expert consultant, counsel for the Party making the Disclosure shall deliver a copy of this Stipulation and Protective Order to such person, shall explain its terms to such person, and shall secure the signature of such person on a statement in the form attached hereto as Exhibit A. It shall be the obligation of counsel, upon learning of any breach or threatened breach of this Stipulation and Protective Order by any such expert or expert consultant, to promptly notify counsel for the Designating Party of such breach or threatened breach; and

i. any other person that the Designating Party agrees to in writing.

8. Confidential Materials shall be used by the persons receiving them only for the purposes of preparing for, conducting, participating in the conduct of, and/or prosecuting and/or defending the Proceeding, and not for any business or other purpose whatsoever.

9. Any Party to the Proceeding (or other person subject to the terms of this Stipulation and Protective Order) may ask the Court, after appropriate notice to the other Parties to the Proceeding, to modify or grant relief from any provision of this Stipulation and Protective Order.

10. Entering into, agreeing to, and/or complying with the terms of this Stipulation and Protective Order shall not:

a. operate as an admission by any person that any particular Document, Testimony or Information marked “Confidential” contains or reflects trade secrets, proprietary,


545

confidential or competitively sensitive business, commercial, financial or personal information; or

b. prejudice in any way the right of any Party (or any other person subject to the terms of this Stipulation and Protective Order):

i. to seek a determination by the Court of whether any particular Confidential Material should be subject to protection as "Confidential" under the terms of this Stipulation and Protective Order; or

ii. to seek relief from the Court on appropriate notice to all other Parties to the Proceeding from any provision(s) of this Stipulation and Protective Order, either generally or as to any particular Document, Material or Information.

11. Any Party to the Proceeding who has not executed this Stipulation and Protective Order as of the time it is presented to the Court for signature may thereafter become a Party to this Stipulation and Protective Order by its counsel's signing and dating a copy thereof and filing the same with the Court, and serving copies of such signed and dated copy upon the other Parties to this Stipulation and Protective Order.

**THIRD PARTY DISCOVERY AND SUBPOENAS**

12. Any Information that may be produced by a non-Party witness in discovery in the Proceeding pursuant to subpoena or otherwise may be designated by such non-Party as "Confidential" under the terms of this Stipulation and Protective Order, and any such designation by a non-Party shall have the same force and effect, and create the same duties and obligations, as if made by one of the undersigned Parties hereto. Any such designation shall also function as a consent by such producing Party to the authority of the Court in the Proceeding to resolve and conclusively determine any motion or other application made by any person or Party with respect to such designation, or any other matter otherwise arising under this Stipulation and Protective Order.

13. If any person subject to this Stipulation and Protective Order who has custody of any Confidential Materials receives a subpoena or other process ("Subpoena") from any government or other person or entity demanding production of Confidential Materials, the





546

recipient of the Subpoena shall promptly give notice of the same by electronic mail transmission, followed by either express mail or overnight delivery to counsel of record for the Designating Party, and shall furnish such counsel with a copy of the Subpoena. Upon receipt of this notice, the Designating Party may, in its sole discretion and at its own cost, move to quash or limit the Subpoena, otherwise oppose production of the Confidential Materials, and/or seek to obtain confidential treatment of such Confidential Materials from the subpoenaing person or entity to the fullest extent available under law. The recipient of the Subpoena may not produce any Documents, Testimony or Information pursuant to the Subpoena prior to the date specified for production on the Subpoena.

14. Nothing in this Stipulation and Protective Order shall be construed to preclude either Party from asserting in good faith that certain Confidential Materials require additional protection. The Parties shall meet and confer to agree upon the terms of such additional protection.

15. If, after execution of this Stipulation and Protective Order, any Confidential Materials submitted by a Designating Party under the terms of this Stipulation and Protective Order is Disclosed by a non-Designating Party to any person other than in the manner authorized by this Stipulation and Protective Order, the non-Designating Party responsible for the Disclosure shall bring all pertinent facts relating to the Disclosure of such Confidential Materials to the immediate attention of the Designating Party.

16. This Stipulation and Protective Order is entered into without prejudice to the right of any Party to knowingly waive the applicability of this Stipulation and Protective Order to any Confidential Materials designated by that Party.

17. Where any Confidential Materials, or Information derived from Confidential Materials, is included in any motion or other proceeding governed by California Rules of Court, Rules 2.550 and 2.551, the party shall follow those rules. With respect to discovery motions or other proceedings not governed by California Rules of Court, Rules 2.550 and 2.551, the following shall apply: If Confidential Materials or Information derived from Confidential Materials are submitted to or otherwise disclosed to the Court in connection with discovery motions and proceedings, the same shall be separately filed under seal with the clerk of the Court


547

in an envelope marked: "CONFIDENTIAL – FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER AND WITHOUT ANY FURTHER SEALING ORDER REQUIRED."

18. The Parties shall meet and confer regarding the procedures for use of Confidential Materials at trial and shall move the Court for entry of an appropriate order.

19. Nothing in this Stipulation and Protective Order shall affect the admissibility into evidence of Confidential Materials, or abridge the rights of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Court concerning the issue of the status of Protected Material.

20. This Stipulation and Protective Order shall continue to be binding after the conclusion of this Proceeding and all subsequent proceedings arising from this Proceeding, except that a Party may seek the written permission of the Designating Party or may move the Court for relief from the provisions of this Stipulation and Protective Order. To the extent permitted by law, the Court shall retain jurisdiction to enforce, modify, or reconsider this Stipulation and Protective Order, even after the Proceeding is terminated.

21. Upon written request made within thirty (30) days after the settlement or other termination of the Proceeding, the undersigned Parties shall have thirty (30) days to either (a) promptly return to counsel for each Designating Party all Confidential Materials and all copies thereof (except that counsel for each Party may maintain in its files, in continuing compliance with the terms of this Stipulation and Protective Order, all work product, and one copy of each pleading filed with the Court [and one copy of each deposition together with the exhibits marked at the deposition)]), (b) agree with counsel for the Designating Party upon appropriate methods and certification of destruction or other disposition of such Confidential Materials, or (c) as to any Documents, Testimony or other Information not addressed by sub-paragraphs (a) and (b), file a motion seeking a Court order regarding proper preservation of such Materials. To the extent permitted by law the Court shall retain continuing jurisdiction to review and rule upon the motion referred to in sub-paragraph (c) herein.

22. After this Stipulation and Protective Order has been signed by counsel for all Parties, it shall be presented to the Court for entry. Counsel agree to be bound by the terms set


548

forth herein with regard to any Confidential Materials that have been produced before the Court signs this Stipulation and Protective Order.

23. The Parties and all signatories to the Certification attached hereto as Exhibit A agree to be bound by this Stipulation and Protective Order pending its approval and entry by the Court. In the event that the Court modifies this Stipulation and Protective Order, or in the event that the Court enters a different Protective Order, the Parties agree to be bound by this Stipulation and Protective Order until such time as the Court may enter such a different Order. It is the Parties' intent to be bound by the terms of this Stipulation and Protective Order pending its entry so as to allow for immediate production of Confidential Materials under the terms herein.

This Stipulation and Protective Order may be executed in counterparts.

DATED: March 3, 2026

**STEPTOE LLP**

By: */s/ Melanie A. Ayerh*
Carol Brophy
Anthony Hopp
Melanie A. Ayerh
Counsel for Defendant,

JACKED FACTORY INC. erroneously sued as NUTRA HOLDINGS, INC D/B/A JACKED FACTORY

DATED: March 3, 2026

**KAZEROUNI LAW GROUP APC**

By: /s/ *Gustavo Ponce*
Abbas Kazeriunian, Esq
David McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
Attorneys for Plaintiff


549

ORDER

GOOD CAUSE APPEARING, the Court hereby approves this Stipulation and Protective Order.

**IT IS SO ORDERED.**

DATED: 03/04/2026

*Honorable Theresa M. Traber*
CALIFORNIA SUPERIOR COURT JUDGE


550

**EXHIBIT A**

**CERTIFICATION RE CONFIDENTIAL DISCOVERY MATERIALS**

I hereby acknowledge that I, ______________________________________ [NAME], ____________________________________________ [POSITION AND EMPLOYER], am about to receive Confidential Materials supplied in connection with the Proceeding, *Daniel Rossi v. Nutra Holdings, Inc. d/b/a Jacked Factory*, Case No. 23STCV15674. I certify that I understand that the Confidential Materials are provided to me subject to the terms and restrictions of the Stipulation and Protective Order filed in this Proceeding. I have been given a copy of the Stipulation and Protective Order; I have read it, and I agree to be bound by its terms.

I understand that Confidential Materials, as defined in the Stipulation and Protective Order, including any notes or other records that may be made regarding any such materials, shall not be Disclosed to anyone except as expressly permitted by the Stipulation and Protective Order. I will not copy or use, except solely for the purposes of this Proceeding, any Confidential Materials obtained pursuant to this Protective Order, except as provided therein or otherwise ordered by the Court in the Proceeding.

I further understand that I am to retain all copies of all Confidential Materials provided to me in the Proceeding in a secure manner, and that all copies of such Materials are to remain in my personal custody until termination of my participation in this Proceeding, whereupon the copies of such Materials will be returned to counsel who provided me with such Materials.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. Executed this _____ day of _________, 20, at _______________.

DATED:_______________ BY: ________________________

__Signature

________________________

Title

________________________

Address

________________________

City, State, Zip

________________________

Telephone Number


551

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On March 3, 2026, I served true copies of the following document(s) described as STIPULATION AND PROTECTIVE ORDER – CONFIDENTIAL DESIGNATION ONLY on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 3, 2026, at Los Angeles, California.

*/s/ Grace Calderon*
Grace Calderon


552

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


553

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | FOR COURT USE ONLY |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA, 90012 | FILED<br>Superior Court of California<br>County of Los Angeles<br>02/04/2026<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
| PLAINTIFF(S)/PETITIONER(S):<br>Daniel Rossi | |
| DEFENDANT(S)/RESPONDENT(S):<br>Nutra Holdings, Inc. | |
| **CLERK'S CERTIFICATE OF SERVICE<br>BY ELECTRONIC SERVICE** | CASE NUMBER:<br>23STCV15674 |

I, David W. Slayton, Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein and that on this date I served the

**Minute Order of 02/04/2026**

upon each party or counsel of record in the above entitled action by electronically serving to the party or parties at the electronic address as listed below:

**"Carol R. Brophy" <cbrophy@steptoe.com>,**
**"Melanie A. Ayerh" <mayerh@steptoe.com>,**
**"Abbas Kazerounian" <ak@kazlg.com>,**
**"Gustavo Ponce" <gustavo@kazlg.com>,**
**"Jennifer K. Singh" <jsingh@steptoe.com>,**
**"Angela M. Sousa" <asousa@steptoe.com>**

The electronic transmission originated from the Superior Court of California, County of Los Angeles email address eService-DoNotReply@lacourt.org at the Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA, 90012.

Dated: 02/4/2026

David W. Slayton, Executive Officer / Clerk of Court

By: A. He
Deputy Clerk


554

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

February 4, 2026
2:28 PM

Judge: Honorable Theresa M. Traber
Judicial Assistant: A. He
Courtroom Assistant: None

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Court Order Continuing Hearing

The Court has reviewed the Joint Status Report. On the Court's own motion, the Further Status Conference scheduled for 02/05/2026 is advanced to this date and continued to 06/04/2026 at 08:30 AM in Department 1 at Spring Street Courthouse. A joint status report is due at least five (5) court days in advance of the status conference.

Certificate of Service is attached.


555

**KAZEROUNI LAW GROUP, APC**
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**Electronically FILED by Superior Court of California, County of Los Angeles 1/30/2026 11:23 AM David W. Slayton, Executive Officer/Clerk of Court, By L. Albino, Deputy Clerk**

*Attorneys for Plaintiff,*
Carmen Barajas

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br><br>*[Assigned for all purposes to the Honorable Stuart M. Rice]*<br><br>**JOINT STATUS REPORT** |

KAZEROUNI LAW GROUP, APC


556
LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

Plaintiff Daniel Rossi ("Plaintiff") and Defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Defendant") (collectively the "Parties"), jointly submit this Status Report per the Court's Order.

The Parties have each served discovery requests on each other, with extensions for the responses. Discovery responses for each side are not yet due. The Parties are working in good faith and diligently in this matter.

Dated: January 30, 2026

Respectfully submitted,

**KAZEROUNI LAW GROUP APC**

*/s/ Gustavo Ponce*
Gustavo Ponce, Esq.
Attorneys for Plaintiff

**STEPTOE LLP**

*/s/ Melanie Ayerh*
Carol R. Brophy
Anthony Hopp (*Pro Hac Vice* forthcoming)
Melanie A. Ayerh
Attorneys for Defendant

KAZEROUNI LAW GROUP, APC

<u>**PROOF OF SERVICE**</u>

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On January 30, 2026, I served the foregoing document and accompanying attachments by the means indicated below:

**JOINT STATUS REPORT**

☒ E-MAIL - by transmitting via e-mail the document(s) listed above to the e-mail address(es) set forth below on this date before 11:59 p.m.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Anthony Hopp
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
*jsingh@steptoe.com*
*ahopp@steptoe.com*
*Attorneys for Defendant*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on January 30, 2026, at Las Vegas, Nevada.

*/s/ Gustavo Ponce*
GUSTAVO PONCE


558

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | FOR COURT USE ONLY<br><br>FILED<br>Superior Court of California<br>County of Los Angeles<br>12/11/2025<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA, 90012 | |
| PLAINTIFF(S)/PETITIONER(S):<br>Daniel Rossi | |
| DEFENDANT(S)/RESPONDENT(S):<br>Nutra Holdings, Inc. | |
| **CLERK'S CERTIFICATE OF SERVICE<br>BY ELECTRONIC SERVICE** | CASE NUMBER:<br>23STCV15674 |

I, David W. Slayton, Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein and that on this date I served the

**Minute Order of 12/11/2025**

upon each party or counsel of record in the above entitled action by electronically serving to the party or parties at the electronic address as listed below:

**"Melanie A. Ayerh" <mayerh@steptoe.com>,**
**"Carol R. Brophy" <cbrophy@steptoe.com>,**
**"Abbas Kazerounian" <ak@kazlg.com>,**
**"Gustavo Ponce" <gustavo@kazlg.com>,**
**"Jennifer Karpinski Singh" <jsingh@steptoe.com>,**
**"Angela M. Sousa" <asousa@steptoe.com>**

The electronic transmission originated from the Superior Court of California, County of Los Angeles email address eService-DoNotReply@lacourt.org at the Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA, 90012.

Dated: 12/11/2025

David W. Slayton, Executive Officer / Clerk of Court

By: A. He
Deputy Clerk


559

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

December 11, 2025
9:00 AM

Judge: Honorable Theresa M. Traber
Judicial Assistant: A. He
Courtroom Assistant: F. Sims

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Further Status Conference

Further Status Conference is not held. On the Court's own motion, the Further Status Conference scheduled for 12/11/2025 is continued to 02/05/2026 at 08:30 AM in Department 1 at Spring Street Courthouse. A joint status report is due five (5) court days in advance of the status conference.

Certificate of Service is attached.


560

**KAZEROUNI LAW GROUP, APC**
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Carmen Barajas

**Electronically FILED by Superior Court of California, County of Los Angeles 12/04/2025 12:01 PM David W. Slayton, Executive Officer/Clerk of Court, By R. Lozano, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY

Defendants.

Case No.: 23STCV15674

*[Assigned for all purposes to the Honorable Stuart M. Rice]*

**JOINT STATUS REPORT**


561

Plaintiff Daniel Rossi ("Plaintiff") and Defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Defendant") (collectively the "Parties"), jointly submit this Status Report per the Court's Order.

This Court entered a Scheduling Order on September 11, 2025

On October 28, 2025, Defendant filed its respective Answer to Plaintiff's Third Amended Complaint.

The Parties plan on serving discovery requests shortly.

Dated: December 4, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP APC**

*/s/ Gustavo Ponce*
Gustavo Ponce, Esq.
Attorneys for Plaintiff

**STEPTOE LLP**

*/s/ Melanie Ayerh*
Carol R. Brophy
Anthony Hopp (*Pro Hac Vice* forthcoming)
Melanie A. Ayerh
Attorneys for Defendant

KAZEROUNI LAW GROUP, APC


562

KAZEROUNI LAW GROUP, APC

**PROOF OF SERVICE**

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On December 4, 2025, I served the foregoing document and accompanying attachments by the means indicated below:

**JOINT STATUS REPORT**

☒ E-MAIL - by transmitting via e-mail the document(s) listed above to the e-mail address(es) set forth below on this date before 11:59 p.m.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Anthony Hopp
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
*jsingh@steptoe.com*
*ahopp@steptoe.com*
*Attorneys for Defendant*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on December 4, 2025, at Las Vegas, Nevada.

*/s/ Gustavo Ponce*
GUSTAVO PONCE


563

Electronically FILED by Superior Court of California, County of Los Angeles 10/29/2025 3:07 PM David W. Slayton, Executive Officer/Clerk of Court, By M. Arellanes, Deputy Clerk

Carol R. Brophy (SBN 155767)
*cbrophy@steptoe.com*
Angela M. Sousa (SBN 96726)
*asousa@steptoe.com*
**STEPTOE LLP**
One Market Plaza, Steuart Tower, Suite 1070
San Francisco, California 94105
Telephone: (415) 365-6700 /Facsimile: (415) 365-6699

Anthony Hopp *(pro hac vice forthcoming)*
*ahopp@steptoe.com*
**STEPTOE LLP**
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1300 / Facsimile: (312) 577-1370

Melanie A. Ayerh (SBN 303211)
*mayerh@steptoe.com*
**STEPTOE LLP**
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 439-9400 / Facsimile: (213) 439-9599

Attorneys for JACKED FACTORY INC. erroneously sued as NUTRA HOLDINGS, INC D/B/A JACKED FACTORY[1]

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendants. | Case No.: 23STCV15674<br>*[Assigned to the Honorable Stuart M. Rice]*<br><br>**DEFENDANT JACKED FACTORY INC. ERRONEOUSLY SUED AS NUTRA HOLDINGS, INC D/B/A JACKED FACTORY'S ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT; REQUEST FOR JURY TRIAL**<br><br>Dept: 1<br>Complaint Filed: July 6, 2023<br>Third Amended Complaint: September 25, 2025 |

[1]The name of the corporation "NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY" changed to JACKED FACTORY, INC. effective February 4, 2025. *See* "Notice of Name Change" filed on August 19, 2025.


564

COMES NOW Defendant JACKED FACTORY INC. erroneously sued as NUTRA HOLDINGS, INC D/B/A JACKED FACTORY ("Defendant") answers the unverified Third Amended Complaint ("TAC") of Plaintiff DANIEL ROSSI, ("Plaintiff" or "Rossi") as follows:

**GENERAL DENIAL**

1. Pursuant to California Code of Civil Procedure section 431.30, Defendant generally and specifically denies each and every allegation contained in the TAC. Defendant further denies, generally and specifically, that Plaintiff is entitled to any relief whatsoever as against Defendant. Defendant further denies that Plaintiff has sustained or will sustain any injury, damage or loss, if any, by reason of any act or omission, fault, or negligence on the part of, or attributable to, Defendant.

**AFFIRMATIVE DEFENSES**

2. Defendant asserts the following affirmative defenses and reserves all rights to amend or supplement these defenses when and if amended or additional defenses become appropriate and/or available in this action. The statement of any defense herein does not assume the burden of proof for any issue to which the applicable law places the burden of proof on Plaintiff.

**First Affirmative Defense**

**(Lack of Standing)**

3. Plaintiff and/or the persons that he claims to represent lack standing to pursue Plaintiff's purported claims, and/or seek the relief sought by the TAC, including because (1) they did not purchase the product at issue; (2) they did not purchase the product prior to obtaining knowledge of the allegations regarding Defendant's product that forms the basis of this lawsuit; (3) the terms of the challenged statements were and are not material to them; (4) they did not reasonably rely on the labels for Defendant's product; (5) Plaintiff is not able to demonstrate any likelihood of future harm; and/or (6) Plaintiff is unable to demonstrate that he suffered any cognizable injury, including for the foregoing reasons.

///

///

///


565

**Second Affirmative Defense**

**(Lack of Causation/Preceding and/or Superseding Cause)**

4. Any purported reliance and/or injury alleged in the TAC was the result of, in whole and/or in part, the conduct of non-parties.

**Third Affirmative Defense**

**(Failure to Mitigate)**

5. Plaintiff failed to mitigate any harms alleged in the TAC, including by failing to act reasonably, failing to attempt any return of the Defendant's product, and insofar as Plaintiff continued to purchase Defendant's product after learning additional information about the product.

**Fourth Affirmative Defense**

**(Waiver/Assumption of Risk)**

6. Plaintiff waived any right to complain about Defendant's product when he purchased the product with full knowledge of its contents and/or the potential effects thereof, and/or Plaintiff assumed any alleged risks from using the product.

**Fifth Affirmative Defense**

**(Voluntary Payment Doctrine)**

7. Plaintiff's claims and/or requests for relief are barred, in whole or in part, by the voluntary payment doctrine, because Plaintiff voluntarily paid for Defendant's product with full knowledge of the facts and circumstances pursuant to which such amounts were paid.

**Sixth Affirmative Defense**

**(Accord and Satisfaction)**

8. The TAC, and each and every claim alleged therein, is barred, in whole and/or in part, by the doctrine of accord and satisfaction, to the extent that Plaintiff sought and received any refund of his purchase price.

///

///

///

///


566

**Seventh Affirmative Defense**

**(Laches/Failure to Notify in Reasonable Time)**

9. Plaintiff's claims are barred due to the doctrine of laches, and/or for his failure to timely provide Defendant with notice of any purported issues concerning Defendant's product within a reasonable period of time, including as set forth in the California Commercial Code.

**Eighth Affirmative Defense**

**(Safe Harbor/Compliance with Law)**

10. Plaintiff's claims and/or requests for relief are barred by the safe harbor doctrine, including because Defendant fully complied with all statutes and regulations in effect during the relevant time period.

**Ninth Affirmative Defense**

**(Claims Contrary to/Failure to Comply with California Law)**

11. Some and/or all of Plaintiff's claims and/or the relief requested in the TAC are barred because such claims and relief are contrary to and/or Plaintiff did not comply with California law, including California Business & Professions Code §§17200 and 17500, *et seq.*, California Civil Code § 1750, *et. seq.*, and California Health & Safety Code § 109875, *et seq.*

**Tenth Affirmative Defense**

**(First Amendment/California Constitution)**

12. Some and/or all of Plaintiff's claims and/or the relief requested in the TAC violate the free speech protections in the First Amendment to the United States Constitution and/or the California Constitution.

**Eleventh Affirmative Defense**

**(Exclusion of Warranties)**

13. Plaintiff's claims and/or requests for relief are barred because, before purchasing Defendant's product, Plaintiff had an opportunity to inspect the product as fully as he desired, or he refused to examine the product, and, in this case, any examination would have revealed the characteristics of the product about which Plaintiff now complains.


567

**Twelfth Affirmative Defense**

**(Not a Basis of the Bargain)**

14. Even if Plaintiff suffered any harm, which Defendant denies, the challenged statements could not and/or did not constitute the basis of the bargain, and thus, Plaintiff is not entitled to any relief.

**Thirteenth Affirmative Defense**

**(Offset)**

15. Even if Plaintiff was entitled to any damages, which Defendant denies, Defendant is entitled to offset them by any benefits received by Plaintiff from his and/or others' use of the product and/or any amounts they received from reselling the product.

**Fourteenth Affirmative Defense**

**(No Damages)**

16. Plaintiff and the putative class claims are barred, in whole or in part, because they have suffered no damages as a result of the matters alleged in the TAC.

**Fifteenth Affirmative Defense**

**(Speculative Damages)**

17. Any losses or damages allegedly caused by Defendant and sustained by Plaintiff, if any, are de minimis, remote, speculative, or transient and, hence, not cognizable by law.

**Sixteenth Affirmative Defense**

**(Limitations on Damages)**

18. Plaintiff's and the putative class's recovery, if any, is subject to the applicable state's limitations on awards, caps on recovery, and setoff.

**Seventeenth Affirmative Defense**

**(Failure to Exhaust Administrative Remedies)**

19. Insofar as any applicable consumer fraud or protection law require exhaustion of administrative or other remedies, the claims asserted in the TAC should be stayed or dismissed because, on information and belief, Plaintiff and putative class members have not exhausted those administrative or other remedies.


568

**Eighteenth Affirmative Defense**

**(Statutes of Limitations, Repose)**

20. Plaintiff's claims are barred and/or limited by the applicable statute of limitation, including the statutes of limitation pertaining to claims under Cal. Bus. & Prof. Code Sections 17200, et seq., and 17500, et seq., and Cal. Civil Code_Section 1750, et seq., and including those statutes of limitation found in California Code of Civ. Proc. Sections 338, 339 and 343, California Commercial Code 2725, and Cal. Bus. & Prof. Code Sections 17208, as well as by the applicable statutes of repose.

**Ninteenth Affirmative Defense**

**(Laches/Waiver/Estoppel)**

21. Plaintiff's and the putative class's claims are barred, in whole or in part, by the applicable doctrines of laches, waiver, and/or estoppel.

**Twentieth Affirmative Defense**

**(Failure to State a Claim)**

22. The TAC fails to state a claim upon which relief can be granted.

**Twenty-First Affirmative Defense**

**(Not Likely to Mislead)**

23. Plaintiff's claims are barred because Defendant's actions were true and/or not likely to mislead.

**Twenty-Second Affirmative Defense**

**(No Injunctive Relief)**

24. Plaintiff lacks standing to pursue injunctive relief because the challenged statements are no longer being made by Defendant, and/or because Plaintiff does not face a risk of future injury.

**Twenty-Third Affirmative Defense**

**(Adequate Remedy at Law)**

25. Plaintiff's and the putative class's claims for injunctive or other equitable relief are barred because there is an adequate remedy at law.


569

**Twenty-Fourth Affirmative Defense**

**(No Attorneys' Fees, Costs, Interest or Other Species of Damages)**

26. The TAC fails to state a claim upon which relief can be granted as to costs, attorneys' fees, expert fees, disbursements, pre-judgment interest, post-judgment interest, treble damages, delay damages, refunds, rescission, unjust enrichment, disgorgement, restitution, successor liability, agency, or joint venture liability. Plaintiff's and the putative class's claims for costs, fees and/or interest are barred and/or limited for failure to comply with the requirements of the applicable states' law.

**Twenty-Fifth Affirmative Defense**

**(This suit Cannot be Maintained as a Class Action)**

27. This action cannot be maintained as a class action because the named Plaintiff and the putative class cannot satisfy the procedural requirements of Code of Civil Procedure section 382.

28. This action cannot be maintained as a class action because the questions of fact at issue are not common to the alleged class, but rather, are highly specific and will vary dramatically from person to person. This action cannot be maintained as a class action because class certification would violate Defendant's rights as provided by the Fifth and Seventh Amendments, and Defendant's right to procedural and substantive safeguards, which include traditional defenses to liability.

**Twenty-Sixth Affirmative Defense**

**(No Duty to Disclose)**

29. Plaintiff's claims are barred because Defendant was under no duty to disclose any of the purported information that Plaintiffs allege was not disclosed.

**Twenty-Seventh Affirmative Defense**

30. At all times mentioned in the TAC, Defendant acted lawfully and within its legal rights, with a good faith belief in the exercise of those rights, and in the furtherance of a legitimate business purpose, business necessity, business justification and/or economic justification. Further, Defendant acted in good faith in the honest belief that the acts, conduct and communications, if


570

any, by Defendant was justified under the circumstances based on information reasonably available to Defendant.

**Twenty-Eighth Affirmative Defense**

**(Unclean Hands)**

31. Plaintiff's claims are barred by the doctrine of unclean hands.

**Twenty-Ninth Affirmative Defense**

**(Additional Affirmative Defenses)**

32. Defendant presently has insufficient information or knowledge on which to form a belief as to whether it may have additional, as yet unstated, affirmative defenses available for its benefit. Defendant thereby reserves herein its right to assert additional affirmative defenses in the event discovery indicates that such affirmative defenses would be appropriate. Defendant also reserves herein its right to assert such other and related defenses as may become available in the event of a determination that the action or some part thereof is governed by the substantive law of one or more States whose laws become relevant in the course of this action.

**JURY DEMAND**

Defendant hereby demands a trial by jury on all issues so triable.

WHEREFORE, Defendant prays for relief as follows:

1. That the TAC be dismissed, with prejudice and in its entirety;
2. That Plaintiff take nothing by reason of this TAC and that judgment be entered against Plaintiff and in favor of Defendant;
3. That Defendant be awarded its attorneys' fees and costs incurred in defending this action;
4. That Defendant be granted such other and further relief as the Court may deem just and proper.

///

///

///

///


571

DATED: October 29, 2025

STEPTOE LLP

By: */s/ Carol Brophy*
Carol Brophy
Anthony Hopp
Melanie A. Ayerh
Counsel for Defendant,

JACKED FACTORY INC. erroneously sued as NUTRA HOLDINGS, INC D/B/A JACKED FACTORY


572

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On October 29, 2025, I served true copies of the following document(s) described as **DEFENDANT JACKED FACTORY INC. ERRONEOUSLY SUED AS NUTRA HOLDINGS, INC D/B/A JACKED FACTORY'S ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT; REQUEST FOR JURY TRIAL** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 29, 2025, at Los Angeles, California.

*/s/ Grace Calderon*
Grace Calderon


573

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


574

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**Electronically FILED by Superior Court of California, County of Los Angeles 9/29/2025 12:00 AM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

KAZEROUNI LAW GROUP, APC

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,<br><br>Defendant. | Case No.: 23STCV15674<br><br>**NOTICE OF ERRATA REGARDING THE EXHIBITS ATTACHED TO THIRD AMENDED COMPLAINT** |

///

///

///

///


575

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Plaintiff DANIEL ROSSI ("Plaintiff") hereby respectfully submits this Notice of Errata as to the Exhibits Attached to the Third Amended Complaint filed in the above-captioned matter on September 25, 2025. It came to Plaintiff's attention that inadvertently the Exhibits were not attached the filed Third Amended Complaint. A complete and corrected copy of the Third Amended Complaint with the Exhibits is filed together with this notice.

Dated: September 26, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By:____________________________________
Gustavo Ponce, Esq.
*Attorneys for Plaintiffs*

KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

**PROOF OF SERVICE**

I am over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On September 26, 2025, I served the foregoing document and accompanying attachments by the means indicated below:

**NOTICE OF ERRATA**

☒ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

☒ ELECTRONIC SERVICE - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m. The electronic filing system sends an e-mail notification of the filing to the parties and counsel of record.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Angela M. Sousa
Anthony Hopp
Melanie A. Ayerh
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
jsingh@steptoe.com
asousa@steptoe.com
ahopp@steptoe.com
mayerh@steptoe.com
*Attorneys for Defendant*
*Nutra Holdings, Inc. d/b/a Jacked Factory*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on September 26, 2025, at Las Vegas, Nevada.

GUSTAVO PONCE

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No.: 23STCV15674

**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

1) **CONSUMERS LEGAL REMEDIES ACT, CAL. CIVIL CODE §§ 1750, ET SEQ.;**
2) **CALIFORNIA'S FALSE ADVERTISING LAW, BUS. & PROF. CODE §§ 17500 ET SEQ.;**
3) **CALIFORNIA'S UNFAIR COMPETITION LAW, BUS. & PROF. CODE §§ 17200 ET SEQ.;**
4) **NEGLIGENT MISREPRESENTATION; AND**
5) **INTENTIONAL MISREPRESENTATION**

**JURY TRIAL DEMANDED**

KAZEROUNI LAW GROUP, APC


578

**INTRODUCTION**

1. Plaintiff DANIEL ROSSI ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY ("Defendant") in unlawfully representing and advertising Defendant's dietary supplement products with the false designation and representation that the products were made and/or manufactured in the USA. The unlawfully represented products were sold online on Defendant's website and other third-party vendors, such as Amazon.com ("Amazon"), throughout the United States, and advertised on Defendant's website.[1] Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

2. Specifically, Plaintiff purchased Defendant's Nitrosurge Pre Workout[2] Supplement (hereinafter the "Product"), which, as advertised on Defendant's website and other third-party vendors, was represented by Defendant to Plaintiff and other similarly situated consumers as a product made and/or manufactured in the USA. However, Defendant's Product contains or is made with ingredients that are not "Manufactured in the USA," as discussed further herein.

3. The "Manufactured in the USA" claim (or some derivative thereof) was prominently printed on Defendant's website and advertisements, as well as the websites of third-party vendors, including Amazon, where the Product was purchased by Plaintiff. Contrary to Defendant's representation and in violation of federal rules and California laws, Defendant's Class Products,[3] including the Product purchased by Plaintiff, are actually made with or contain ingredients that are not "Manufactured in the USA," as discussed in further detail herein.

---

[1] Plaintiff seeks class wide relief on behalf of all purchasers of any of Defendant's products that are substantially similar to the dietary supplement product purchased by Plaintiff that were advertised as being "Manufactured in the USA" in violation of California law(s).

[2] As titled on Amazon.com when Plaintiff purchased the Product; "NITROSURGE Pre Workout Supplement – Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps – Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White."

[3] A list of the Class Products is attached hereto as Exhibit A.


579

KAZEROUNI LAW GROUP, APC

4. Defendant's nationwide sale and advertising of deceptively advertised Class Products constitutes violations of: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (2) California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17533.7; (3) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 et seq.; (4) negligent misrepresentation and (5) intentional misrepresentation. This conduct caused Plaintiff, and others similarly situated, damages, and requires restitution and injunctive relief to remedy and prevent further harm.

5. Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of Defendant.

**JURISDICTION AND VENUE**

6. Jurisdiction is proper pursuant to this Court's general jurisdiction.

7. The Court has jurisdiction over Plaintiff's claims for damages, restitution, injunctive relief, and declaratory relief arising from Defendant's unlawful business practices under California's CLRA, FAL, and UCL; as well as negligent and intentional misrepresentation.

8. This Court has personal jurisdiction over Defendant because Defendant conducts substantial business in the State of California and County of Los Angeles, has sufficient minimum contacts with this State and County, and otherwise purposefully avails itself of the markets in this State and County through the promotion, sale, and marketing of its services in this State, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this Court pursuant to California Code of Civil Procedure § 395(a) because Plaintiff resides within this county and many of the acts and transactions giving rise to this action occurred in this county because Defendant:

a. is authorized to conduct business in this county and has intentionally availed itself of the laws and markets within this county;

b. does substantial business within this county; and is subject to personal jurisdiction in this county;

KAZEROUNI LAW GROUP, APC

c. and is subject to personal jurisdiction in this county.

**PARTIES**

10. Plaintiff is an individual residing in the City of Northridge, County of Los Angeles, State of California.

11. Defendant is a corporation with its principal place of business in St. John's, Newfoundland and Labrador, Canada, which is regularly doing business in the State of California and within this county.

12. Defendant is a manufacturer and seller of dietary supplements that conducts business through its website and the websites of third-party vendors. One of the products sold by Defendant is Nitrosurge Pre Workout, the Product, which was purchased by Plaintiff.

**NATURE OF THE CASE**

13. At all times relevant, Defendant made affirmative misrepresentations regarding the Class Products, including the Product purchased by Plaintiff, it manufactures, markets and sells. Specifically, Defendant marketed, advertised, and sold its Class Products as "Manufactured in the USA" without clear and adequate qualification that the Class Products contained foreign ingredients and/or components as required by federal rules and state laws.

14. However, although Defendant represents that its Class Products are "Manufactured in the USA" without clear and adequate qualification, Defendant's Class Products contain or are made with ingredients and/or components that are not "Manufactured in the USA."

15. Federal rules regarding the use of "Made in the United States" claims with respect to products and services are well established and well defined.

16. Specifically, the Made in USA Labeling rule, 16 C.F.R. § 323, (the "MUSA Rule") clearly defines the meaning of "Made in the United States", including synonymous phrases[4], as well as when it can be used without clear and adequate qualification notifying consumers that the good or

[4] *See* 16 C.F.R. § 323.1(a) ("The term Made in the United States means any unqualified representation, express or implied, that a product or service, or a specified component thereof, is of U.S. origin, including, but not limited to, a representation that such product or service is "made," "***manufactured***," "built," "produced," "created," or "crafted" in the United States or in America, or any other unqualified U.S.-origin claim.") (emphasis added)


581

KAZEROUNI LAW GROUP, APC

service in question contains or is made with ingredients or components that are not made or sourced in the United States.[5]

17. Despite the clearly established and well-defined federal rules regarding "Made in the United States" claims, Defendant falsely, unfairly and deceptively advertised, marketed and sold its Class Products, including the Product purchased by Plaintiff, as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and/or components as further herein.

18. Defendant's "Manufactured in the United States" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

19. Each consumer, including Plaintiff, was exposed to virtually the same material misrepresentations, as similar advertisements and misrepresentations were prominently placed on all of Defendant's website and the websites of third-party vendors.

20. As of July 2023, when the first complaint in this matter was filed, Defendant's website contained a clear and conspicuous "Manufactured in the USA" claim under iconography of a waiving United States flag encircled by the words "Manufactured in the USA" making it clear that Defendant meant this claim to be applied to *__all__* of its products, including the Class Products. This claim, including iconography, appeared on each and every product page of Defendant's website as well as Defendant's Amazon product pages.

21. Even after the filing of this matter, according to publicly archived webpages[6], as of January 2024 or even later, the main home page of Defendant's website still contained a clear and

---

[5] *See* 16 C.F.R. § 323.2 Prohibited Acts ("In connection with promoting or offering for sale any good or service, in or affecting commerce as "commerce" is defined in section 4 of the Federal Trade Commission Act, 15 U.S.C. 44, ***it is an unfair or deceptive act or practice*** within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), ***to label any product as Made in the United States unless*** the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and ***all or virtually all ingredients or components of the product are made and sourced in the United States***. (emphasis added)

[6] *See* https://web.archive.org/web/20240121011132/https://www.jackedfactory.com/ (archived January 21, 2024)


582
KAZEROUNI LAW GROUP, APC

conspicuous "Manufactured in the USA" claim under same iconography of a waiving United States flag encircled by the words "Manufactured in the USA" thus making it more evident that Defendant meant this claim to be applied to ***all*** its products—even after the Complaint was filed in this matter.




22. According to publicly archived webpages, as of November 2023 or even later, the "Frequently Asked Questions" page of Defendant's website contained the following answer in response to the question: "Where are your products manufactured?" "Answer: **Our products are manufactured in the USA** in a cGMP, FDA Registered manufacturing facility adhering to the strictest quality control." (emphasis added)[7]

23. As a consequence of Defendant's unfair and deceptive practices, Plaintiff and other similarly situated consumers purchased Defendant's Class Products under the false impression that the products were actually manufactured and/or made in the USA with U.S. made ingredients and components.

24. As a result of Defendant's misrepresentations, Plaintiff and other consumers similarly situated overpaid for Defendant's Class Products, and/or purchased the Class Products under the false belief that the product they purchased was made and/or manufactured in the USA with U.S. made ingredients and components. Had Plaintiff and other consumers similarly situated been made aware

---

[7] *See* https://web.archive.org/web/20231101090125/https://www.jackedfactory.com/pages/common-faqs (archived November 1, 2023)

KAZEROUNI LAW GROUP, APC


583

that Defendant's Class Products were not actually made with all or virtually all ingredients and components being made in the United States, they would not have purchased the products.

25. As a result of Defendant's false and misleading statements and failure to clearly and adequately disclose the presence of foreign ingredients and components, as well as Defendant's other conduct described herein, Plaintiff and other similarly situated consumers purchased thousands, if not millions, of Defendant's Class Products and have suffered injury in fact, including the loss of money and/or property.

26. Defendant's conduct as alleged herein violates federal rules as well as several California laws, as more fully set forth herein.

27. This action seeks, among other things, equitable and injunctive relief; restitution of all amounts illegally retained by Defendant; and disgorgement of all ill-gotten profits from Defendant's wrongdoing alleged herein.

**THE FOREIGN INGREDIENTS IN DEFENDANT'S CLASS PRODUCTS**

28. Pursuant to section 1782(a) of the CLRA, on March 8, 2023, Plaintiff provided Defendant notice in writing sent by certified mail of the particular violations of section 1770, and demanded that Defendant rectify the problems (the "CLRA Letter").[8]

29. Plaintiff's CLRA Letter included a list of products with foreign ingredients, the Class Products, which has since been made reduced. See Exhibit A.

30. Plaintiff's CLRA Letter put Defendant on notice of the following foreign ingredients in its products, including the offending Product (the "CLRA Ingredients"):

a. *L-Citruline,*

b. *Beta Alanine,*

c. *Betaine Anhydrous,*

d. *L-Theanine*

31. The Product purchased by Plaintiff contains the following foreign ingredients:

---

[8] A true and correct copy of Plaintiff's CLRA Letter dated March 8, 2023, is attached hereto as Exhibit B.


584

a. *L-Citrulline*

b. *Beta Alanine*

c. *Betaine Anhydrous*

d. *L-Theanine*

e. *Caffiene Anhydrous*

f. *Theobromine*

g. *AstraGin,* which is the combination of *Astragalus membranaceus* and *Panax notoginseng* (both which are foreign ingredients)

32. Thus, the CLRA Letter provided Defendant with notice of four (4) foreign ingredients in the Product which Plaintiff's CLRA claims are based on: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*.

33. Plaintiff's UCL, FAL, negligent misrepresentation, and intentional misrepresentation, claims are based on the seven (7) foreign ingredients contained in the Product; (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

34. The Class Products are substantially similar to the Product as they all contain the foreign ingredients included in the Product, and Defendant similarly made the "Manufactured in the USA" representation for each of the Class Products.

35. The Product purchased by Plaintiff contains the following foreign ingredients: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin (*Astragalus membranaceus* and *Panax notoginseng*).

a. Like the Product purchased by Plaintiff, the Class Product Altius Pre contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, and (d) *Caffiene Anhydrous*.

b. Like the Product purchased by Plaintiff, the Class Product Build PM contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Theanine*.


585

KAZEROUNI LAW GROUP, APC

c. Like the Product purchased by Plaintiff, the Class Product Build XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

d. Like the Product purchased by Plaintiff, the Class Product Burn XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous*.

e. Like the Product purchased by Plaintiff, the Class Product Burn XT Black contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous* and (b) *Theobromine*.

f. Like the Product purchased by Plaintiff, the Class Product Burn XT Powder contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous*.

g. Like the Product purchased by Plaintiff, the Class Product EAA Surge contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Citruline*.

h. Like the Product purchased by Plaintiff, the Class Product GDA XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

i. Like the Product purchased by Plaintiff, the Class Product Intra Surge Pre contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, and (b) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

j. Like the Product purchased by Plaintiff, the Class Product Lean PM contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Theanine*.

k. Like the Product purchased by Plaintiff, the Class Product N.O. XT contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Citruline*.


586

l. Like the Product purchased by Plaintiff, the Class Product Nitro Surge Build contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffiene Anhydrous*, and (f) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

m. Like the Product purchased by Plaintiff, the Class Product Nitro Surge Max contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine,* (e) *Theobromine*, and (f) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

n. Like the Product purchased by Plaintiff, the Class Product NitroSurge Shred contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *L-Theanine*, (d) *Caffiene Anhydrous*, and (e) *Theobromine.*

o. Like the Product purchased by Plaintiff, the Class Product Pump Surge contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Betaine Anhydrous*, and (c) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

p. Like the Product purchased by Plaintiff, the Class Product Test PM contains: (a) *L-Theanine*, which is also included in the Product purchased by Plaintiff

36. Plaintiff alleges claims and seeks damages and relief available under the CLRA as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, as they contain the CLRA Ingredients referenced in the CLRA Letter. (12 Total)

37. Plaintiff alleges claims and seeks damages and relief under the UCL, FAL, negligent misrepresentation, and intentional misrepresentation as to all of the Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge



KAZEROUNI LAW GROUP, APC

Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT, as they contain foreign ingredients similar to the Product. (17 Total)

**FACTUAL ALLEGATIONS**

38. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

39. Defendant marketed and sold various dietary supplements that were represented and advertised as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and components. Defendant made these representations on its website which resulted in these representations being made on the websites of its third-party vendors, including Walmart.com.[9] These representations were made until, at least, sometime in January 2024 on Defendant's website and even later on third party vendors' websites.

40. Contrary to Defendant's representation, Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

41. Dietary supplements, such those sold by Defendant, are often made with numerous ingredients and components that are foreign sourced due to significant differences in costs of raw material/component production in the United States versus foreign production such as in China.10 In many cases, certain botanical ingredients cannot grow in the United States due to climate reasons or

[9] *See* https://www.walmart.com/ip/Nitrosurge-Pre-Workout-Powder-Endless-Energy-Instant-Strength-Gains-Clear-Focus-Intense-Pumps-30-Servings-Blue-Raspberry/383327735 (Under Product Details "Each bottle of Nitrosurge pre-workout is manufactured in a state-of-the-art cGMP manufacturing facility in the USA adhering to the most stringent manufacturing standards."; "Manufactured in the USA in a cGMP-Certified Facility.") (last accessed August 1, 2024)

[10] *See* U.S.-China Economic and Security Review Commission. *Potential Health & Safety Impacts from Pharmaceuticals and Supplements Containing Chinese-Sourced Raw Ingredients*. (2010). https://www.uscc.gov/sites/default/files/Research/NSD_BIO_Pharma_Report--Revised_FINAL_for_PDF--14_%20April_2010.pdf ("This report attempts to shed light and insight on particular issues addressing potential implications of a critical component of a complex supply chain, which contributes to U.S. national health security as China continues to strengthen its position as the world's largest supply source of raw materials for pharmaceuticals and supplements. As first reported in 1998 by the U.S. Government Accounting Office, the U.S. imports an estimated 80% of the raw ingredients contained in both products manufactured, sold and consumed in this country.")


588

KAZEROUNI LAW GROUP, APC

are not grown commercially due to significant differences in costs of domestic versus foreign agricultural production.

42. Pursuant to Section 1782(d) of the CLRA, Plaintiff provided Defendant with written notice by certified mail on March 8, 2023, outlining the specific violations of Section 1770 and demanding that Defendant rectify the issues (the "CLRA Letter").[11]

43. Specifically, the CLRA Letter provided non-exhaustive examples of Defendant's violations of the rules and laws governing unqualified "Manufactured in the USA" claims, using three products as illustrative examples: the Product, Burn-XT, and N.O. XT (the "CLRA Products").

44. The CLRA Letter informed Defendant that the following ingredients, along with potentially other ingredients in the CLRA Products, were not sourced from the United States, contrary to Defendant's unqualified "Manufactured in the USA" representations: L-citrulline, betaine anhydrous, beta alanine, L-theanine, acetyl-L-carnitine HCl, green tea leaf extract, black pepper extract, arginine, and glutathione (the "CLRA Ingredients").[12]

45. Furthermore, the CLRA Letter specifically stated that "The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here."

46. Upon receiving such a letter, a reasonable company would have, at the very least, investigated whether the CLRA Ingredients were, in fact, grown, sourced, or produced outside the United States. In reality, a reasonable company would have conducted an investigation into all of its products to determine whether they contained foreign ingredients or components.

47. Some of the CLRA Ingredients appear in the Product, namely citrulline, beta alanine, betaine anhydrous, and theanine. The Product also contains other foreign ingredients, specifically caffeine, theobromine, and AstraGin®.

48. Had Defendant investigated and found that the CLRA Ingredients, and other ingredients in the Product and the Class Products, were, in fact, grown, sourced, or produced within

---

[11] A true and correct copy of Plaintiff's CLRA Letter dated March 8, 2023, is attached hereto as Exhibit B.

[12] For convenience, certain ingredients may be referred to by their common name or abbreviation when referenced individually. For example: citrulline, theanine, ALCAR (for acetyl-L-carnitine HCl), green tea and black pepper.








589

KAZEROUNI LAW GROUP, APC

the United States, Defendant would have responded to Plaintiff by correcting Plaintiff's allegations regarding the Product, the CLRA Products and the Class Products and providing evidence of the ingredients' U.S. sourcing.

49. Instead, the Defendant continued to market and sell the Product and Class Products as "Manufactured in the USA"—without qualification—on its website for more than nine months after receiving the CLRA Letter, despite being aware of the foreign ingredients (and potentially components) used in its products. The Class Products continued to be sold with the same unqualified U.S. origin claim on third-party vendor websites for well over nine months after the Defendant received the CLRA Letter.

50. Furthermore, Defendant has yet to provide any evidence that Plaintiff's assertions regarding the origin of the CLRA Ingredients, or other ingredients and components, are incorrect.

51. The Product purchased by Plaintiff contains or is made with ingredients and/or components that are not "Manufactured in the USA." For example, the Product contains AstraGin®, a branded ingredient which is created from the combination of *Astragalus membranaceus* and *Panax notoginseng*.

52. AstraGin® is produced by NuLiv Science U.S.A., Inc. ("NuLiv"), an ingredient supplier. To sell AstraGin® in the European Union, NuLiv had to apply for Novel Food status to the European Food Safety Authority ("EFSA"). The application process requires comprehensive documentation, including sourcing and processing details.

53. The published scientific opinion of the EFSA on NuLiv's application for AstraGin® (*see* Exhibit E)[13] states that AstraGin®'s *Astragalus membranaceus* roots are sourced from Gansu and Inner Mongolia provinces in China, while the *Panax notoginseng* roots are sourced from Yunnan and Sichuan provinces in China (*see* Exhibit E, Section 3.3 Production Process).

54. *Astragalus membranaceus* and *Panax notoginseng,* are native to China and not

[13] *See*, https://efsa.onlinelibrary.wiley.com/doi/epdf/10.2903/j.efsa.2020.6099 ("The *A. membranaceus* roots are purchased from growers in Gansu and Inner Mongolia provinces in the north-western region of China while the *P. notoginseng* roots are acquired from growers in Yunnan and Sichuan provinces in the southern region of China.").


590
KAZEROUNI LAW GROUP, APC

commercially grown in the United States.[14] *See* Exhibit E, Section 3.3 Production Process.

55. Irrespective of exactly where *Astragalus membranaceus* and *Panax notoginseng* are sourced, one thing is certain – they are not grown, made, or sourced from within the United States.

56. In addition to foreign *Astragalus membranaceus* and *Panax notoginseng*, the Product contains theobromine, a component of cacao which is not grown commercially in the United States.[15]

57. The Product also contains caffeine, which is generally derived from decaffeination of coffee or tea[16], neither of which is grown commercially or cost effectively in the United States. When not from natural sources, synthetic caffeine is generally produced overseas.[17]

58. One of the CLRA Products, Burn-XT, specifically contains caffeine from coffee bean extract, which cannot be from the United States.[18] Caffeine from coffee appears in other Class Products as well.

59. Thus, upon information and belief, the forms of caffeine contained in the Product and the Class Products are not made or sourced from within the United States.

60. *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are material to the Product's formulation and marketing claims.

---

[14] *See* Ji B, Xuan L, Zhang Y, Zhang G, Meng J, Mu W, Liu J, Paek K-Y, Park S-Y, Wang J, et al. Advances in Biotechnological Production and Metabolic Regulation of *Astragalus membranaceus*. Plants. 2023; 12(9):1858. ("As one of the most popular herbal medicines in the world, *A. membranaceus* is mainly derived from wild and cultivated resources in China. Wild plants of *A. membranaceus* are mainly produced in Inner Mongolia, Gansu, Shanxi, and Ningxia. Wild resources have been over-exploited, seriously damaging the ecological environment. Cultivated plants are mainly derived from Shanxi Hunyuan, Gansu Longxi, Inner Mongolia Niuyingzi, and Shaanxi Zizhou."); Zhao H, Han Z, Li G, Zhang S, Luo Y. Therapeutic Potential and Cellular Mechanisms of *Panax Notoginseng* on Prevention of Aging and Cell Senescence-Associated Diseases. Aging Dis. 2017 Dec 1;8(6):721-739. ("*Panax notoginseng*, distributed in the Southwest of China, Japan, Burma, and Nepal, is both cultivated and gathered from wild forests. *Panax notoginseng* is sensitive to sunlight. It grows primarily in the Wenshan mountain area of Yunnan province and is cultivated commercially in the Southwest regions of China.")

[15] *See* https://www.icco.org/growing-cocoa/

[16] *See* https://web.archive.org/web/20240807011447/https://en.wikipedia.org/wiki/Caffeine ("Commercial supplies of caffeine are not usually manufactured synthetically because the chemical is readily available as a byproduct of decaffeination.").

[17] *See* https://whyy.org/segments/where-you-will-get-your-caffeine-buzz-in-the-future/ ("…synthetic caffeine production (and its pollution) mostly moved overseas, especially to China.")

[18] *See* https://en.wikipedia.org/wiki/Coffee (See "Map showing areas of coffee cultivation" under "Cultivation and Production" – the United States is not a commercial producer of coffee.)


591

KAZEROUNI LAW GROUP, APC

61. Because *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are indisputably foreign, "all or virtually all" ingredients in the Product cannot be made in the United States as required by the MUSA Rule for Defendant to lawfully make an unqualified "Manufactured in the USA" claim.

62. Upon information and belief, it is likely that the remaining ingredients and even the packaging components used to produce the Product are foreign.

63. Similarly, the Class Products contain the same foreign ingredients as those found in the Product.

64. For example, caffeine is included in numerous of Defendant's products other than the Product, including, but not limited to, Altius Pre, Caffeine, Nitrosurge Shred (also contains theobromine), Nitrosurge Build, Burn-XT, Build-XT Black (also contains theobromine), Burn-XT Powder, Burn XT Stick Pack, Nitrosurge Natural and Nitrosurge Shred Max.

65. *Astragalus membranaceus* and *Panax notoginseng* (as AstraGin®) are included in numerous Class Products other than the Product, including but not limited to, Nitrosurge Build, Nitrosurge Max Pump Surge, Build-XT, GDA-XT, Intrasurge, Green Tea Extract, Nitrosurge Build, and Nitrosurge Shred Max.

66. Defendant uses numerous other indisputably foreign ingredients in numerous of its numerous products, including but not limited to KSM-66 ashwagandha[19] and green tea extract[20].

67. Some of the ingredients, components, and even packaging used by Defendant can be sourced either domestically or internationally — and since this information is exclusively known to Defendant at this time — Plaintiff cannot fully allege the extent of Defendant's unqualified "Manufactured in the USA" violations without further discovery. Nevertheless, Defendant's blatant and willful disregard for the laws discussed herein is well established by the aforementioned, non-

---

[19] *See* https://ksm66ashwagandhaa.com/traceability/quality-control/ ("The state of Rajasthan in India is one of the most suited terrains known to grow the best quality ashwagandha in the world and that is where, our ashwagandha farms are located.")

[20] *See* https://en.wikipedia.org/wiki/Tea ("Tea is mainly grown in Asia and Africa, with smaller areas in South America and around the Black and Caspian Seas. The four biggest tea-producing countries are China, India, Kenya and Sri Lanka, together representing 81% of world tea production.")



KAZEROUNI LAW GROUP, APC

exhaustive examples.

68. Despite the presence of numerous indisputable foreign ingredients in the Class Products, Defendant made unqualified "Manufactured in the USA" representations on the main page of its website, on each product page for the Class Products, on each Amazon product page for the Class Products, and even in the "Frequently Asked Questions" section of its website.

69. Adequately and properly qualified "Manufactured in the USA" representations are common and ubiquitous in the dietary supplement industry.

70. Numerous competitors of Defendant including, but not limited to, Optimum Nutrition, Zhou Nutrition, MuscleTech, and BSN, clearly, adequately, and properly qualify "Manufactured in the USA" and "Made in the USA" representations on their products.[21]

71. Some dietary supplement products make no "Manufactured in the USA" or "Made in the USA" representations at all.

72. When consumers like Plaintiff see unqualified "Manufactured in the USA" claims, such as those made by Defendant regarding the Class Products, in an industry where qualified claims are so common, they reasonably believe that the products in question are made entirely in the United States, including ingredients and components.

73. Defendant is not a U.S. based company, but rather a company founded in, operated in and from Newfoundland and Labrador, Canada.

74. Given that Defendant is a Canadian company, the purpose of its unqualified "Manufactured in the USA" was clearly not from Defendant's sense of American patriotism or national pride. Instead, Defendant's motive behind representing the Class Products as "Manufactured in the USA" was solely for the intentional purpose of marketing to American consumers seeking and will pay more for products that are made, including ingredients and components, in the United States.[22]

---

[21] *See* Exhibit D.

[22] *See* https://reshoringinstitute.org/wp-content/uploads/2020/09/made-in-usa-survey.pdf ("Slightly more than 83% [of consumers polled] said they would pay up to 20% more for products made domestically.")


593

KAZEROUNI LAW GROUP, APC

75. Unlike general wellness dietary supplement companies that offer a wide variety of products for various applications, such as cognitive, cardiovascular, immune, digestive, and anti-aging health, as well as basic vitamins (e.g., Vitamins C, B, D, E, etc.) and minerals, Defendant's marketing focus and product line are much more specific.

76. Specifically, Defendant's exclusive marketing focus, as reflected in its product line, is on sports and athletic performance dietary supplements.

77. Defendant knew that its unqualified "Manufactured in the USA" representations would resonate with sports- and athletic-minded consumers in the United States, particularly given the strong sense of patriotism and national pride prevalent in this community.

78. Defendant's exclusive focus results in Defendant using a much more limited range of ingredients, both in terms of ingredient categories and specific ingredients, compared to a general wellness dietary supplement company.

79. For example, nearly all of the ingredients in Defendant's products, including the Class Products, fall into one of three categories: Amino Acid/Amino Acid Derivative, Stimulant, or Herbal Performance.

80. Examples of ingredients in these categories include, but are not limited to: (1) Amino Acid/Amino Acid Derivatives: citrulline, beta alanine, betaine anhydrous, theanine, ALCAR, arginine, glutathione, creatine, glutamine, and valine; (2) Stimulants: caffeine and theobromine; and (3) Herbal Performance: green tea, black pepper, AstraGin®, and ashwagandha.

81. As a result of the narrow range of ingredients and ingredient categories, there is significant overlap and shared use of ingredients between the Class Products, the CLRA Products, and the Product.

82. This relationship is partially illustrated[23] in Exhibit F, which depicts the connection between the CLRA Ingredients, other foreign ingredients in the Product, Ashwagandha, and those in the Class Products.

---

[23] Not all ingredients in the Class Products are represented on the X-axis of the chart. The Class Products contain numerous other foreign ingredients.




594

KAZEROUNI LAW GROUP, APC

83. Given Defendant's exclusive focus on sports/athletic performance products (and their consumers), its narrow range of ingredients and ingredient categories, as well as the commonality between the ingredients used in the Product, the CLRA Ingredients, and the Class Products, Plaintiff asserts that the Product and the Class Products are substantially similar.[24]

84. Certain of Defendant's products, including but not limited to its protein and cereal bar products, have been excluded from the definition of Class Products. Plaintiff reserves the right to further allege substantial similarity between the excluded products and the Product should, for example, discovery confirm that the same or similar foreign packaging or other components were used across Defendant's product line.

85. Defendant represented, marketed and sold to the general public via its website, the website of its third-party vendors, and other forms of advertising and marketing that the Class Products are "Manufactured in the USA," without clear, adequate, and proper qualification. As such, Defendant inaccurately represented that its Class Products are "Manufactured in the USA," which conveys to a reasonable consumer like Plaintiff that the Class Products, including the Product, are made entirely in the United States, made with ingredients and components from the United States, made pursuant to United States labor standards, and are therefore superior quality (i.e., contain better grown ingredients that non-US made products or raw materials). Defendant possesses superior knowledge of the true facts that were not disclosed regarding the Class Products, thereby tolling the running of any applicable statute of limitations.

86. The types of misrepresentations and/or omissions made by Defendant, as described herein, were considered by Plaintiff, a reasonable consumer, when deciding to purchase the Product.

87. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendant's representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the products were "Manufactured in the

---

[24] *See Miller v. Ghirardelli Chocolate Co.*, 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012) (citing cases); ("hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar."); *see also, e.g., Colucci v. ZonePerfect Nutrition Co.*, No. 12-2907, 2012 WL 6737800, at *4 (N.D. Cal. Dec. 28, 2012); *Astiana v. Dreyer's Grand Ice Cream, Inc.*, No. 11-2910, 2012 WL 2990766, at *11-13 (N.D. Cal. July 20, 2012).


595
KAZEROUNI LAW GROUP, APC

USA," when Defendant's Class Products are in fact wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

88. Reasonable consumers, including Plaintiff, attached importance to the "Manufactured in the USA" representations made by Defendant on its Product and the Class Products.

89. Consumers who purchased the Class Products on Defendant's website or through third-party vendor websites were not the only consumers who were exposed to and relied upon the unqualified and false "Manufactured in the USA" representations made by Defendant. Defendant's website contains a "Find A Store" link25 making it highly likely that hundreds of thousands of consumers saw the unqualified and false "Manufactured in the USA" representations and proceeded to purchase Class Products in brick-and-mortar stores like The Vitamin Shoppe.

90. Most consumers possess limited knowledge of the likelihood that products are made with or contain ingredients and components that are not "Manufactured in the USA" when they are advertised and represented to be "Manufactured in the USA." This is a material factor in many individuals' purchasing decisions which they rely upon as they believe they are purchasing a product that is "Manufactured in the USA" with ingredients and components from the United States.

91. Consumers generally believe that products that are "Manufactured in the USA" are made entirely in the United States, made of ingredients and components from the United States, made pursuant to United States labor standards, and are therefore of superior quality (i.e., contain better grown ingredients that non-US made products or raw materials).

92. On information and belief, Defendant's misrepresented Class Products were purchased by consumers over Defendant's competitors' properly and legally marketed products, during the entirety of the relevant four-year statutory time period, based on the unqualified, false and deceptive "Manufactured in the USA" representations (or some derivative thereof) made with respect to Defendant's products. Federal rules and California laws are designed to protect consumers from such false representations and predatory conduct.

93. Defendant's "Manufactured in the USA" representation was misleading to a

[25] *See* https://www.jackedfactory.com/pages/storelocator








596

KAZEROUNI LAW GROUP, APC

reasonable consumer.

94. On or about January 24, 2023, Plaintiff searched online for a pre-workout supplement when he discovered the Product and its unqualified and misrepresented "Manufactured in the USA" claim. Plaintiff subsequently purchased the Product on Amazon.

95. At the time of Plaintiff's purchase, the description of the Product described the Product as "Manufactured in the USA," without any qualification, when the Product was actually made with or contained ingredients and/or components that were not "Manufactured in the USA." Accordingly, Defendant was not entitled to lawfully make representations that the Product was "Manufactured in the USA" without qualification as per the MUSA Rule.

96. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendant as follows:

a. The "who" is Defendant;

b. The "what" is representation that Defendant's Class Products are "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

c. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

d. The "where" is in Defendant's advertisements and marketing of the Class Products;

e. The "to whom" is Plaintiff and the putative Class who bought the Class Products;

f. The "by what means" is by Defendant representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA. Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

g. The "how" is the allegation that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and



KAZEROUNI LAW GROUP, APC

components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

97. It is widely and generally known that consumers prefer products that are "Manufactured in the USA" due to quality, support for local businesses, national economic, environmental and other reasons. The preference is increased when the products are health related and ingestible due to the potential for inferior ingredients and components being manufactured overseas. In making the decision to purchase Defendant's Product, Plaintiff relied upon the advertising, marketing and/or other promotional materials prepared, approved and distributed and/or published by Defendant and its agents and disseminated through its Class Products' advertising containing the misrepresentations alleged herein.

98. Defendant's false representation is that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA, while Defendant knew that fact.

99. Defendant intended to deceive Plaintiff and the Class members into buying the Class Products knowing that consumers would prefer, purchase, and likely pay more for products "Manufactured in the USA" versus other products not "Manufactured in the USA."

100. Plaintiff justifiably relied on Defendant's "Manufactured in the USA" representation. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

101. Plaintiff paid and purchased the Product which was of less or little value than what he paid for.

102. Defendant's "Manufactured in the USA" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

103. Had Plaintiff been made aware that the Product, including its ingredients and components, was not actually "Manufactured in the USA," he would not have purchased the Product, or would not have purchased the Product for the price he paid. In other words, Plaintiff would not





598
KAZEROUNI LAW GROUP, APC

have purchased Defendant's Product, or paid the amount he did for the purchase of the Product, but for the unqualified "Manufactured in the USA" representations on Defendant's website and advertising on the websites of its third-party vendors which Plaintiff reasonably relied on.

104. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's unqualified and false "Manufactured in the USA" designation set forth on Defendant's website and advertising on the websites of its third-party vendors.

105. In each case when Plaintiff and putative Class members purchased a Class Product, they relied upon Defendant's unqualified "Manufactured in the USA" representation in their purchasing decision, which is typical of most U.S. consumers. Consequently, they were deceived as a result of Defendant's actions. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

106. Defendant's Class Products are made with or contain ingredients and components that are not manufactured in the USA, similar to the Product purchased by Plaintiff. Plaintiff and putative Class members purchased Defendant's misrepresented Class Products over Defendant's competitors' properly and legally marketed products that clearly and adequately qualify "Manufactured in the USA" claims or do not make the "Manufactured in the USA" claims at all. The precise amount of Plaintiff and the Class members' damages will be proven at the time of trial, in large part, by expert testimony.

107. Plaintiff and Class members were undoubtedly injured as a result of Defendant's unqualified and false "Manufactured in the USA" representations that are at issue in this matter.

**CLASS ACTION ALLEGATIONS**

108. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

109. Plaintiff brings this action individually and on behalf of all others similarly situated against Defendant, pursuant to California Code of Civil Procedure Section 378.

110. Plaintiff represents, and is a member of the class, ("the Class") consisting of:


599

KAZEROUNI LAW GROUP, APC

> All persons similarly situated within the state of California, who purchased one or more of Defendant's Class Products, which were represented and/or advertised as "Manufactured in the USA" (or similar words), that were made with or contained ingredients or components that were not manufactured in the USA, within the four years prior to the filing of the Complaint."

111. Excluded from the Class are Defendant and any of its officers, directors, and employees.

112. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

113. The "Class Period" means four years prior to the filing of the Complaint in this action.

114. This action has been brought and may properly be maintained as a class action under the provisions of § 382 of the California Code of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

115. **Ascertainability**. Plaintiff does not know the number of members in the Class, but Plaintiff currently believes that there are hundreds of thousands, if not more, members of the Class within the State of California. Because of the nature of Defendant's products and applicable regulations, Defendant must keep detailed and accurate records of production, manufacturing, sale and distribution. Therefore, the members of the Class are ascertainable through Defendant's records and/or Defendant's agents' records regarding retail and sales, as well as through public notice. This matter should therefore be certified as a Class action to assist in the expeditious litigation of this matter.

116. **Numerosity**. The members of the Class are so numerous and geographically disbursed that joinder of all Class members is impractical, and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court.

117. **Existence and Predominance of Common Questions of Law and Fact**. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. Common questions of fact and law exist in this matter that predominate over questions that may affect individual Class members, including, but not limited to, the following:

a. Whether Defendant committed the wrongful conduct alleged herein;


600

b. Whether Defendant's claims and representations, as alleged herein, are untrue, misleading, and/or reasonably likely to deceive the average consumer;

c. Whether Defendant's acts, transactions, or course of conduct constitute the violations of law alleged herein;

d. Whether Defendant's conduct violates 16 C.F.R. §§ 323, *et seq*.;

e. Whether Defendant's conduct violates California Civil Code §§ 1750, *et seq*.;

f. Whether Defendant's advertising is false, untrue, or misleading within the meaning of California Business & Professions Code §§ 17500, *et seq*.;

g. Whether Defendant's conduct is an unfair, fraudulent, or unlawful act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

h. Whether Defendant's advertising is unfair, deceptive, untrue or misleading within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

i. Whether Defendant acted negligently or intentionally in making the misrepresentations contained regarding the Class Products thought its website and the websites of its third-party vendors;

j. Whether Defendant, through its conduct, received money that, in equity and good conscience, belongs to Plaintiff and members of the Class;

k. Whether the members of the Class sustained and/or continue to sustain damages attributable to Defendant's conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages; and

l. Whether the members of the Class are entitled to injunctive and/or any other equitable relief, including but not limited to restitution and/or disgorgement of ill-gotten gains.

118. **Typicality**. As a person who purchased one or more of Defendant's products, that were advertised as "Manufactured in the USA" but are made with or contain ingredients and/or components that are not manufactured in the USA, Plaintiff is asserting claims that are typical of the Class. Plaintiff's claims involve the same violations of law by Defendant as other Class Members' claims. Plaintiff and members of the Class also sustained damages arising out of Defendant's common


601

course of conduct complained herein. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent members of the Class. Defendant has no defenses unique to the Plaintiff.

119. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of other members of the Class in that Plaintiff has no interests antagonistic to any member of the Class. Further, Plaintiff has retained counsel experienced in handling class action claims and claims involving violations of the consumer laws like violations of the California Business and Professions Code, and, specifically, false and deceptive advertising. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and proposed Class.

120. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent and/or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendant. The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them. Even if the members of the proposed Class could afford such litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable pursuant to Cal. Code of Civil Procedure § 382.

121. Unless the Class is certified, Defendant will retain monies received as a result of Defendant's unlawful and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendant will also likely continue to, or allow its agents to, advertise, market, promote and package




602

KAZEROUNI LAW GROUP, APC

Defendant's Class Products in an unlawful and misleading manner, and members of the Class will continue to be misled, harmed, and denied their rights under California law.

122. Further, Defendant has acted or refused to act on grounds that are generally applicable to the class so that declaratory and injunctive relief is appropriate to the Class as a whole, making class certification appropriate.

**FIRST CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**CAL. CIV. CODE SECTION 1750, ET SEQ.**

123. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

124. Plaintiff asserts CLRA claims as to the Class Products with the CLRA Ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, and (d) *L-Theanine*.

125. Therefore, Plaintiff asserts CLRA claims as to the following Class Products which contain the CLRA Ingredients: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM. (12 Total)

126. California Civil Code §§ 1750 et seq., entitled the Consumers Legal Remedies Act (hereinafter "CLRA"), provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer." The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, inter alia, that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.

127. Defendant's Product and the Class Products, as referenced in this section, constitute "goods" as defined pursuant to Civil Code Section 1761(a).

128. Plaintiff, and the Class members, are each a "consumer" as defined pursuant to Civil Code Section 1761(d).

129. Each of Plaintiff's and the Class members' purchases of Defendant's Class Products, as referenced in this section, constituted a "Transaction" as defined pursuant to Civil Code Section


603

KAZEROUNI LAW GROUP, APC

1761(e).

130. Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) provides that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> > (2) [m]isrepresenting the source, sponsorship, approval, or certification of goods or services;
> > (3) [m]isrepresenting the affiliation, connection, or association with, or certification by, another;
> > (4) [u]sing deceptive representations or designations of geographic origin in connection with goods and services;
> > (5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;
> > (7) [r]epresenting that goods or services are of a particular standard, quality, or grade…; [and]
> > (9) [a]dvertising goods or services with intent not to sell them as advertised."

131. Defendant violated Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) by marketing and representing that its Class Products, as referenced in this section, are "Manufactured in the USA," or some derivative thereof, when they are made with or contain ingredients and components that are not manufactured in the United States.

132. Defendant's "Manufactured in the USA" representations are deceptive and false because Defendant's Class Products, as referenced in this section, are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

133. Pursuant to section 1782(d), by letter dated March 8, 2023, Plaintiff provide Defendant notice in writing by certified mail of the particular violations of section 1770 and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. Defendant failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within thirty days of the date of written notice pursuant to section 1782. Therefore, Plaintiff and the Class further seek actual, punitive, and statutory damages, as deemed appropriate.

134. Attached hereto as Exhibit C is a sworn affidavit from Plaintiff pursuant to Cal. Civ.


604

KAZEROUNI LAW GROUP, APC

Code § 17801(d).

135. On information and belief, Defendant's violations of the CLRA set forth herein were done with awareness of the fact that the conduct alleged was wrongful and was motivated solely for Defendant's self-interest, monetary gain and increased profit. Plaintiff further alleges that Defendant committed these acts knowing the harm that would result to Plaintiff and Defendant engaged in such unfair and deceptive conduct notwithstanding such knowledge.

136. Plaintiff further alleges that Defendant committed these acts knowing the harm that would result to Plaintiff and Defendant engaged in such unfair and deceptive conduct notwithstanding such knowledge.

137. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's unqualified and false "Manufactured in the USA" representations set forth in Defendant's website and the websites of its third-party vendors regarding the Product and the Class Products.

138. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiff and members of the Class are entitled to a declaration that Defendant violated the Consumer Legal Remedies Act.

139. For clarity, as to the CLRA Ingredients in the Class Products only, Plaintiff, on behalf of himself and the Class demands judgment against Defendant for damages, restitution, punitive damages, statutory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

140. As allowed under the CLRA, as to all the Class Products, Plaintiff, on behalf of himself and the Class demands injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper

141. Pursuant to section 1780(e) of the California Civil Code, Plaintiff and the Class make claims for damages and attorneys' fees and costs.

142. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in


605

KAZEROUNI LAW GROUP, APC

class action cases such as this matter.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")**
**BUS. & PROF. CODE §§ 17500, *ET SEQ*.**

143. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

144. Plaintiff's FAL claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff; (a) L-Citruline, (b) Beta Alanine, (c) Betaine Anhydrous, (d) L-Theanine, (e) Caffeine Anhydrous, (f) Theobromine, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

145. Therefore, Plaintiff asserts FAL claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 Total)

146. Plaintiff and Defendant are both "person[s]" as defined by Cal. Bus. & Prof. Code § 17506.

147. Cal. Bus. & Prof. Code § 17535 authorizes a private right of action on both an individual and representative basis.

148. Defendant misrepresented its Class Products as "Manufactured in the USA" without clear and adequate qualification when in fact Defendant's Class Products are made with or contain ingredients and components that are not manufactured in the USA.

149. Defendant's Class Products are made with ingredients/components that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

150. These misrepresentations, acts, and non-disclosures by Defendant constitute false and misleading advertising in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

151. At all times relevant, Defendant's representations and advertising of its Class Products was untrue, misleading, and likely to, and did, deceive the reasonable consumer and the public.

152. Defendant engaged in the false and/or misleading advertising and marketing of its Product, as alleged herein, with the intent to directly or indirectly induce consumers to purchase its

KAZEROUNI LAW GROUP, APC


606

products, which Defendant knew, or had reason to know, that the Class Products were made with or contained ingredients and components that were not manufactured in the USA.

153. Defendant's "Manufactured in the USA" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

154. Because Defendant knew or should have known that the representations and/or omissions alleged herein regarding the Class Products were untrue or misleading, Defendant acted in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

155. Had Defendant clearly, adequately and truthfully qualified and advertised that its Class Products were made with or contained ingredients and components that were not manufactured in the USA, Plaintiff and the putative Class members would not have purchased the Class Products, would have paid a different price, or would have purchased a different product from another company.

156. As a direct and proximate result of the aforementioned acts and omissions by Defendant, Defendant received and continues to hold monies rightfully belonging to Plaintiff and the putative Class members, who were led to purchase Defendant's Class Products during the Class Period.

**THIRD CAUSE OF ACTION**
**VIOLATION OF BUSINESS & PROFESSIONS CODE**
**BUS. & PROF. CODE, SECTION 17200, ET SEQ.**

157. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

158. Plaintiff's UCL claims apply to the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffiene Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

159. Therefore, Plaintiff asserts UCL claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 Total)


607
KAZEROUNI LAW GROUP, APC

160. Plaintiff and Defendant are each "person[s]" as defined by California Business & Professions Code § 17201. California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

161. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

162. By and through Defendant's conduct alleged in further detail above and herein, Defendant engaged in conduct which constitutes unlawful, unfair, and/or fraudulent business practices prohibited by Bus. & Prof. Code §§ 17200, et seq.

***A. "Unlawful" Prong***

163. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

164. The violation of any law constitutes as "unlawful" business practice under the UCL.

165. Beginning at a date currently unknown, Defendant committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code §§ 17200, et seq. by manufacturing, distributing, and/or marketing Defendant's Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq., and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq., by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

166. Defendant violated the MUSA Rule, 16 C.F.R. § 323, by making its representations on the Class Products without clear and adequate qualification that Defendant's Class Products are "Manufactured in the USA" or made with or contain ingredients and components that are not


608

KAZEROUNI LAW GROUP, APC

manufactured in the USA.

167. Defendant's acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of the MUSA Rule, FAL, and the CLRA, as described above.

168. These alleged acts and practices by Defendant were intentional and in violation of the MUSA Rule, FAL, and the CLRA.

169. Pursuant to the UCL, Plaintiff and the Class are entitled to preliminary and permanent injunctive relief and order Defendant to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the Class of all the revenues associated with this unfair and unlawful competition, or such proton of said revenues as the Court may find applicable.

***B. "Unfair" Prong***

170. Beginning at a date currently unknown, Defendant committed acts of unfair competition that are prohibited by Bus. & Prof. Code section 17200 et seq. Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes by engaging in conduct and practices that threaten an incipient violation of law/s or violate the policy or spirit of law/s by manufacturing, distributing, and/or marketing Defendant's Class Products with a false ingredient origin information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein were "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

171. Clearly said, Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

172. Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices that are immoral, unethical, oppressive or unscrupulous, the utility of such conduct, if any, being far outweighed by the harm done to consumers and against public policy by manufacturing, distributing, and/or marketing Defendant's Class Products with false ingredient information, in violation of








609

KAZEROUNI LAW GROUP, APC

California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

173. Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices, including manufacturing, distributing, marketing, and/or advertising Defendant's Class Products with false ingredient information, wherein: (1) the injury to the consumer was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was not of the kind that consumers themselves could not have reasonably avoided.

***C. "Fraudulent" Prong***

174. Beginning at a date currently unknown, Defendant engaged in acts of unfair competition, including those described above and herein, prohibited and in violation of Bus. & Prof. Code § 17200 et seq., by engaging in a pattern of "fraudulent" business practices within the meaning of Bus. & Prof. Code § 17200 et seq, by manufacturing, distributing, and/or marketing Defendant's Class Products in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

175. Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

176. Plaintiff reserves the right to allege further conduct that constitutes other fraudulent business acts or practices. Such conduct is ongoing and continues to this date.

***D. "Unfair, Deceptive, Untrue or Misleading Advertising" Prong***

177. Defendant's advertising was unfair, deceptive, untrue and/or misleading in that consumers were led to believe that Defendant's Class Products are "Manufactured in the USA" when


610
LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use
KAZEROUNI LAW GROUP, APC

Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

178. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendant's representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the Class Products are actually manufactured in the USA with ingredients and components from the USA given the absence of clear and adequate qualification of Defendant's "Manufactured in the USA" representations.

179. Contrary to the representation, Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

180. Defendant's "Manufactured in the United States" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

181. Defendant's unfair, deceptive, untrue, or misleading advertising presented a threat to the public by engaging in unlawful conduct that resulted in harm to consumers.

182. Defendant engaged in these unlawful, unfair, and fraudulent business practices motivated solely by Defendant's self-interest with the primary purpose of collecting unlawful and unauthorized monies from Plaintiff and all others similarly situated; thereby unjustly enriching Defendant.

183. Such acts and omissions by Defendant were unlawful and/or unfair and/or fraudulent and constitute a violation of Business & Professions Code §§ 17200, et seq. Plaintiff reserves the right to identify additional violations by Defendant as may be established through discovery.

184. As a direct and proximate result of the aforementioned acts and representations described above and herein, Defendant received unearned commercial benefits at the expense of its competitors and the public.

185. As a direct and proximate result of Defendant's unlawful, unfair and fraudulent conduct described herein, Defendant has been unjustly enriched by the receipt of ill-gotten gains from customers, including Plaintiff, who unwittingly provided money to Defendant based on Defendant's representations.




611

186. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's false representations set forth on the Defendant's Class Products.

187. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

**FOURTH CAUSE OF ACTION FOR**
**NEGLIGENT MISREPRESENTATION**

188. Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully stated herein.

189. Plaintiff's Negligent Misrepresentation claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff; (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

190. Therefore, Plaintiff asserts Negligent Misrepresentation claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 total)

191. At a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendant represented to the public, including Plaintiff, by packaging, advertising, marketing and other means, that Defendant's Class Products are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

192. Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

193. Defendant made the representations herein alleged with the intention of inducing the public, including Plaintiff and putative class members, to purchase Defendant's Class Products over similar products from competitors which clearly and adequately qualified their "Manufactured in the

USA" representations or made no "Manufactured in the USA" representations at all.

194. Defendant's "Manufactured in the United States" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

195. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendant's advertising representations and, in reliance on them, purchased the Class Products, as described herein.

196. At all times relevant, Defendant made the misrepresentations herein alleged when Defendant should have known these representations to be untrue, and Defendant had no reasonable basis for believing the representations to be true.

197. As a proximate result of Defendant's negligent misrepresentations, Plaintiff and other consumers similarly situated were induced to purchase, purchase more of, purchase instead of, or pay more for Defendant's Class Products, due to the unlawful acts of Defendant, in an amount to be determined at trial, during the Class Period.

## FIFTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION

198. Plaintiff repeats, re-alleges and incorporates herein by reference the above allegations as if fully stated herein.

199. Plaintiff's Intentional Misrepresentation claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

200. Therefore, Plaintiff asserts Intentional Misrepresentation claims ast to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 total)

201. Beginning at a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendant intentionally represented to the public,






613

KAZEROUNI LAW GROUP, APC

including Plaintiff, by promoting and other means, that Defendant's Class Products were "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

202. Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

203. Defendant's "Manufactured in the USA" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

204. Defendant made the representations herein alleged with the intention of inducing the public, including Plaintiff, to purchase Defendant's Class Products for Defendant's own financial gain.

205. Defendant intentionally made such misrepresentations by printing and advertising its misrepresentations its website and the websites of its third-party vendors.

206. Defendant's misrepresentations of the Class Products as "Manufactured in the USA" without clear and adequate qualification was misleading because Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

207. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendant's advertising representations and, in reliance on such representations, purchased the Class Products, as described above.

208. At all times relevant, Defendant intentionally made the misrepresentations herein alleged and allowed the misrepresentations to continue to be made by its resellers when Defendant knew the representations to be false.

209. As a proximate result of Defendant's intentional misrepresentations, Plaintiff and other consumers similarly situated were induced to spend an amount of money to be determined at trial on Defendant's misrepresented Products.

210. Defendant knew that its Class Products were in fact not "Manufactured in the USA" without clear and adequate qualification but instead made with or contain ingredients and components


614

KAZEROUNI LAW GROUP, APC

that are not manufactured in the USA, but nevertheless made the representations described herein with the intention that consumers rely on Defendant's representations.

211. Defendant also knew that its website, as well as the websites of its third-party vendors, were advertising its Class Products as "Manufactured in the USA" without clear and adequate qualification, when Defendant clearly knew that its Class Products were in fact made with or contained ingredients and components that were not manufactured in the USA.

212. Plaintiff and other consumers similarly situated, in purchasing and using the Class Products as herein alleged, did rely on Defendant's representations, including the representations on Defendant's advertisements and website, all to their damage and/or detriment as herein alleged.

213. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendant as follows:

a. The "who" is Defendant;

b. The "what" is representation that Defendant's Class Products were "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

c. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

d. The "where" is in Defendant's product advertisements and marketing;

e. The "to whom" is Plaintiff and the putative class who bought the Class Products;

f. The "by what means" by Defendant representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA;

g. The "how" is the allegation that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

214. By engaging in the acts described above, Defendant is guilty of malice, oppression,




615

KAZEROUNI LAW GROUP, APC

and fraud, and Plaintiff and the Class members are therefore entitled to recover exemplary or punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the Court grant Plaintiff and the putative Class the following relief:

- That this action be certified as a Class Action;
- That Plaintiff be appointed as the Class Representative;
- That Plaintiff's attorneys be appointed as Class Counsel;
- That Defendant's wrongful conduct be adjudged and decreed to violate the consumer protection statutes raised herein;
- That Plaintiff and each of the other members of the Class recover the amounts by which Defendant and Does have been unjustly enriched;
- An order requiring imposition of a constructive trust and and/or disgorgement of Defendant's and Does' ill-gotten gains and to pay restitution to Plaintiff and all members of the Class and to restore to the Plaintiff and members of the class all funds acquired by means of any act or practice declared by this court to be an unlawful, fraudulent or unfair business act or practice, in violation of laws, statutes or regulations, or constituting unfair competition;
- Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery were necessary and as applicable, to prevent Defendant or Does from retaining the benefits of their wrongful conduct;
- That Defendant and Does be enjoined from continuing the wrongful conduct alleged herein and be required to comply with all applicable laws;
- A temporary, preliminary and/or permanent order for injunctive relief requiring Defendant and Does to: (i) discontinue its false and/or misleading statement/s; and (ii) undertake an immediate public information campaign to inform members of the proposed class as to their prior practices;
- Pre-judgment interests from the date of filing of this suit;


616

KAZEROUNI LAW GROUP, APC

- that Plaintiff and each member of the putative Class recover their costs of suit.

**FIRST CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT CAL. BUS. & PROF. CODE §§ 1750, *ET SEQ.***

- Actual damages, injunctive relief, restitution, and punitive damages pursuant to Cal. Civ. Code § 1780(a); and
- an award of costs and attorney's fees pursuant to Cal. Civ. Code § 1780(d).

**SECOND CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17535; and
- Recovery of reasonably attorney's fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**THIRD CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17203; and
- Recovery of reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**FOURTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION**

- A judgment against Defendant and Does for general and compensatory damages in an amount to be determined at trial

**FIFTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION**

- A judgment against Defendant and Does for general and compensatory damages in an amount to be determined at trial;
- Punitive damages pursuant to Cal. Civ. Code § 3294; and
- That Plaintiff and the members of the Class be granted any other relief the Court may deem just and proper.

KAZEROUNI LAW GROUP, APC

**TRIAL BY JURY**

215. Plaintiff is entitled, and demands, a trial by jury on all issues so triable.

Dated: September 25, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: *_/s/ Gustavo Ponce_*
Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*

KAZEROUNI LAW GROUP, APC


618

KAZEROUNI LAW GROUP, APC

# PROOF OF SERVICE

I am over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On September 25, 2025, I served the foregoing document and accompanying attachments by the means indicated below:

**THIRD AMENDED COMPLAINT**

☒ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

☒ ELECTRONIC SERVICE - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m. The electronic filing system sends an e-mail notification of the filing to the parties and counsel of record.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Angela M. Sousa
Anthony Hopp
Melanie A. Ayerh
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
jsingh@steptoe.com
asousa@steptoe.com
ahopp@steptoe.com
mayerh@steptoe.com
*Attorneys for Defendant*
*Nutra Holdings, Inc. d/b/a Jacked Factory*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on September 25, 2025, at Las Vegas, Nevada.

*/s/ Gustavo Ponce*
GUSTAVO PONCE


619

KAZEROUNI LAW GROUP, APC

# EXHIBIT A




620

## CLASS PRODUCTS

1. Altius Pre
2. Androsurge
3. Build PM
4. Build XT
5. Burn XT
6. Burn XT Black
7. Burn XT Powder
8. Burn XT Stick Packs
9. Caffeine
10. Defend XT
11. Dry XT
12. EAA Surge
13. Flex XT
14. GDA XT
15. Green Surge (Capsules)
16. Green Surge (Powder)
17. Green Tea
18. Intra Surge
19. L-Arginine
20. Lean PM
21. Lean XT
22. N.O. XT
23. Nitrosurge Build
24. Nitrosurge Max
25. Nitrosurge Natural
26. Nitrosurge Pre-Workout (the Product)
27. Nitrosurge Shred
28. Primasurge
29. Pro Series Test
30. Pump Surge
31. Red Surge
32. Test PM

Class Products with multiple flavors, packaging sizes or other variations not specifically listed here are all subject to this letter.

KAZEROUNI LAW GROUP, APC


621

KAZEROUNI LAW GROUP, APC

# EXHIBIT B


622

KAZEROUNI
LAW GROUP, APC

245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523
www.kazlg.com

March 8, 2023

**VIA FEDEX**
Nutra Holdings, Inc d/b/a Jacked Factory
c/o John Williams
Chief Executive Officer
145 Aberdeen Avenue, Unit 1
St. John's, NL A1A 5P6
Canada

Nutra Holdings, Inc. d/b/a Jacked Factory
c/o Stewart McKelvey
Cabot Place
100 New Gower Street, Suite 1100
St. John's, NL A1C 6K3
Canada

**AGENT FOR SERVICE; VIA CERTIFIED US MAIL, WITH RETURN RECEIPT REQUESTED**
Nutra Holdings, Inc. d/b/a Jacked Factory's
c/o The Corporation
311 Crossways Park Drive
Woodbury, NY 11797

Nutra Holdings, Inc. d/b/a Jacked Factory's
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

**VIA EMAIL**
support@jackedfactory.com

**RE: Demand Letter Pursuant to California Civil Code § 1750 *Et Seq.***

Dear Sir or Madam:

This letter serves as notice and demand for corrective action by our client, Daniel Rossi, ("Mr. Rossi"),[1] on behalf of himself an all others similarly situated within the State of California pursuant to the Consumers Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*), ("CLRA"). This letter is sent on behalf of Mr. Rossi, a consumer and purchaser of Nutra Holdings, Inc. d/b/a Jacked

[1] This firm represents Daniel Rossi. Please refrain from contacting Mr. Rossi directly. Please direct any and all communications to this office.


623

Factory's ("Jacked Factory") Nitrosurge Pre-workout[2] dietary supplement (the "Product"). We hereby demand that you take immediate corrective action within thirty (30) days as further described below.

On January 24, 2023, Mr. Rossi, a resident of California, searched online for a pre-workout supplement. During his online search, Mr. Rossi discovered the Product on Amazon.com. After reviewing the Product, Mr. Rossi decided to purchase a 30 serving container of the Product from Amazon.com.

Jacked Factory markets and advertises various products, including the Product purchased by our client, as "Manufactured in the USA." This representation, which is displayed prominently on the advertising of Jacked Factory products, including the company's website at www.jackedfactory.com and in the company's Amazon.com product pages, conveys important representations to consumers regarding the quality and characteristics of Jacked Factory's products. Specifically, the term "Manufactured in the USA" conveys to a reasonable consumer that Jacked Factory's products, including the Product, are made entirely in the United States, made of ingredients from the United States, made pursuant to United States labor standards, and are therefore of superior quality (i.e., contain better grown ingredients than non-US made products or raw materials). Mr. Rossi relied on these representations by Jacked Factory when making the decision to purchase the Product for its advertised price of $29.99 plus shipping & handling as well as applicable tax.

Contrary to its "Manufactured in the USA" representation, many, if not all, products produced and sold by Jacked Factory contain or are made with ingredients that are not "Manufactured in the USA." For example, the Product contains L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine, which in this instance, among other ingredients in the product, are not from the United States, yet its advertising states "Manufactured in the USA." Similarly, Jacked Factory's Burn-XT contains acetyl-L-Carnitine HCl, Green Tea Leaf Extract and Black Pepper Fruit Extract, which in this instance, among other ingredients in the product, are not from the United States, yet the advertising on its webpage, at https://www.jackedfactory.com/products/burn-xt, also states "Manufactured in the USA." Jacked Factory's N.O. XT contains Arginine, Glutathione and Citrulline, which in this instance, among other ingredients in the product, are not from the United States, yet its advertising states "Manufactured in the USA" (See https://www.jackedfactory.com/products/no-xt). Additionally, on Jacked Factory's website, it even lists an "FAQ" of "Where is [Product] Manufactured" on each of its product's website pages to which the response by Jacked Factory is "All Jacked Factory products are ***proudly manufactured in the USA*** in a cGMP certified facility using the highest quality control guidelines for maximum potency, quality, & safety." (emphasis added).

The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here. However, it is abundantly clear that Jacked Factory pays no attention to applicable laws regarding the labeling of its products with "Manufactured in the USA", or any

---

[2] As titled on Amazon.com when our client bought the Product: "*NITROSURGE Pre Workout Supplement - Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps - Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White.*"


624

derivative thereof. **Therefore, each and every one of Jacked Factory products[3] regardless of brand, type, configuration or size, including but not limited to the aforementioned brands and products, containing foreign ingredients, components or raw materials and any reference to "Manufactured in the USA" or any derivative thereof, is subject to the demand/s made in this letter. Please note that should this firm file suit on behalf of our client, we will seek to represent the purchasers of any and all of Jacked Factory misrepresented products.**

Section 1770(a) of the CLRA prohibits, among other things, the following unfair methods of competition and unfair or deceptive acts or practices when attempting to sell or selling goods and services to consumers: (2) Misrepresenting the source, sponsorship, approval, or certification of goods or services; (3) Misrepresenting the affiliation, connection, or association with, or certification by, another; (4) Using deceptive representations or designations of geographic origin in connection with goods or services; (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have; (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (9) Advertising goods or services with intent not to sell them as advertised. (*See* Cal. Civil Code sections 1770(a) (2), (3), (4), (5), (7), and (9).)

The above-described representations and/or omissions are false and misleading and constitute unlawful, unfair, or fraudulent acts, or practices and unfair methods of competition in violation of the CLRA, including but not limited to §§ 1770(a)(2), (3), (4), (5), (7), and (9). The representations also violate California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq*; and California's False Advertising Law, California Business & Professions Code §§ 17500, *et seq.* Jacked Factory has and continues to mislead consumers into believing that its products containing the aforementioned ingredients, among others, are "Manufactured in the USA," when in fact that is not true. These misrepresentations allow Jacked Factory to increase its sales and capture market share from its competitors.

If our client had known the true nature of Jacked Factory's products, he would not have purchased the Product. Our client is a citizen of the State of California and is a consumer as defined in California Civil Code § 1761(d) because he purchased the Product for personal, family, or household purposes. Our client saw and read Jacked Factory's advertising representations and relied on such false and deceptive marketing in deciding to purchase the Product. As a result, our client was injured and suffered loss of money.

We hereby demand on behalf of our client and all other similarly situated that Jacked Factory immediately:

> (1) cease and desist from the continued sale of all its misrepresented products with the "Manufactured in the USA" representation, including the Product as well as those in Exhibit A;

---

[3] For a list that includes, but is not limited to, Jacked Factory products subject to this letter see Exhibit A.


625

(2) initiate a corrective advertising campaign to inform consumers about the true nature of its products, including the Product as well as those in Exhibit A;
(3) initiate a full recall with an offer to refund the purchase price of all misrepresented Jacked Factory products, including the Product purchased by our client, as well as those in Exhibit A, plus reimbursement for interest; and
(4) pay reasonable attorneys' fees and costs.

Please comply with this demand within thirty (30) days from receipt of this letter. Please be advised that your failure to comply with this request within thirty (30) calendar days may subject you to the following remedies under the CLRA:

(1) The actual damages suffered;
(2) An order enjoining you for such methods, acts or practices;
(3) For restitution of property if applicable;
(4) Punitive damages;
(5) Court costs and reasonable attorneys' fees; and
(6) Any other relief which the court deems proper.

**NOTICE OF DUTY TO PRESERVE EVIDENCE**

**Since litigation may be filed in this matter, this letter also serves as notice to Jacked Factory, its suppliers, contract manufacturers, web development firms, Amazon firms, marketing agencies and anyone involved in the sourcing, manufacturing, production/creation of packaging, distribution, sales, advertising and marketing of Jacked Factory's products of their duty to preserve and retain all documents, tangible items, and electronically stored information and communications that are potentially relevant to this matter, including, but not limited to, documents detailing revisions of marketing, advertising, packaging and quantities of each product produced and/or sold.**

If Jacked Factory wishes to enter into discussions to resolve the demands asserted in this letter, please contact me immediately. Your cooperation in this matter would be greatly appreciated.

Yours truly,

***/s/ Abbas Kazerounian***

Abbas Kazerounian, Esq.
Direct Line: 800-400-6808 Ext: 2
ak@kazlg.com






626

# Exhibit A

1. Nitrosurge Pre-Workout
2. Nitrosurge Shred
3. Authentic Whey
4. Burn XT
5. Creatine Monohydrate
6. Pump Surge
7. Authentic Protein Cereal
8. Lean PM
9. N.O. XT
10. EAA Surge
11. Andro Surge
12. Build XT
13. Authentic Iso
14. Prima Surge
15. Hydra Surge
16. Intra Surge
17. Green Surge Powder
18. Green Surge Capsules
19. Burn XT Black
20. Lean XT
21. Dry XT
22. Carb Surge
23. Altius Pre
24. Build PM
25. BCAA
26. Vita XT
27. Test PM
28. Defend XT
29. L-Glutamine
30. L-Arginine (Nitrosigine)
31. Burn XT Powder
32. GDA XT
33. Red Surge
34. Green Tea Extract
35. Pro Series Test
36. Authentic Casein
37. Burn XT Stick Packs
38. Authentic Vegan
39. Form XT
40. Caffeine
41. Flex XT
42. Crea Surge
43. Nitro Surge Build


627

44. Nitro Surge Natural
45. Nitro Surge Max
46. Any and all other products that contain “Manufactured in the USA” or any derivative thereof in any of their advertising or marketing.

Products with multiple flavors, packaging or other variations not specifically listed here are all subject to this letter.


628

KAZEROUNI LAW GROUP, APC

# EXHIBIT C


629

**AFFIDAVIT OF JENNIFER HYATT**

I, DANIEL ROSSI, DECLARE:

1. On or about January 25, 2023, I visited Amazon.com and purchased Defendant's Nitrosurge Pre-workout[1] dietary supplement (the "Product").
2. At the time of my purchase and review of the Product, I was in the County of Los Angeles, California, where I also reside.
3. It is my understanding that Defendant Nutra Holdings, Inc. d/b/a Jacked Factory conducts business in the County of Los Angeles, State of California.

I declare under the penalty of perjury under the laws of the state of California that the foregoing is true and correct, executed on August 5___, 2024.

By: Daniel Rossi ____________________________

Daniel Rossi

[1] As titled on Amazon.com when Plaintiff purchased the Product; "NITROSURGE Pre Workout Supplement – Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps – Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White."


630

KAZEROUNI LAW GROUP, APC

citrix | RightSignature

## SIGNATURE CERTIFICATE

**REFERENCE NUMBER**
EFA4F1D1-98FB-457B-9030-0343BD7A643D

### TRANSACTION DETAILS

**Reference Number**
EFA4F1D1-98FB-457B-9030-0343BD7A643D

**Transaction Type**
Signature Request

**Sent At**
08/05/2024 18:01 EDT

**Executed At**
08/05/2024 18:20 EDT

**Identity Method**
email

**Distribution Method**
email

**Signed Checksum**
bba890c0dc1371abd85b79a4695d1b6cb61ea3116e0d5f2b693406999fd01b39

**Signer Sequencing**
Disabled

**Document Passcode**
Disabled

### DOCUMENT DETAILS

**Document Name**
B Exhibit B Daniel Rossi Complaint Affidavit

**Filename**
B_Exhibit_B_Daniel_Rossi_Complaint_Affidavit.pdf

**Pages**
2 pages

**Content Type**
application/pdf

**File Size**
185 KB

**Original Checksum**
e3f80ad1b8a211be093e16f69a568acb9be1dc32e53c8df4624b76eb1aaa7d8e

## SIGNERS

### SIGNER

**Name**
Daniel Rossi

**Email**
dcrossi888@gmail.com

**Components**
2

### E-SIGNATURE

**Status**
signed

**Multi-factor Digital Fingerprint Checksum**
cc1f02c24bbad06c275630f1adf177ec64b339c52a2f166d6bebc9327f46c217

**IP Address**
172.251.234.249

**Device**
Chrome via Mac

**Typed Signature**
Daniel Rossi

**Signature Reference ID**
65C48872

### EVENTS

**Viewed At**
08/05/2024 18:20 EDT

**Identity Authenticated At**
08/05/2024 18:20 EDT

**Signed At**
08/05/2024 18:20 EDT

## AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 08/05/2024 18:01 EDT | Ali Sadrarhami (ali@kazlg.com) created document 'B_Exhibit_B_Daniel_Rossi_Complaint_Affidavit.pdf' on Chrome via Mac from 174.79.245.20. |
| 08/05/2024 18:01 EDT | Daniel Rossi (dcrossi888@gmail.com) was emailed a link to sign. |
| 08/05/2024 18:20 EDT | Daniel Rossi (dcrossi888@gmail.com) viewed the document on Chrome via Mac from 172.251.234.249. |
| 08/05/2024 18:20 EDT | Daniel Rossi (dcrossi888@gmail.com) authenticated via email on Chrome via Mac from 172.251.234.249. |
| 08/05/2024 18:20 EDT | Daniel Rossi (dcrossi888@gmail.com) signed the document on Chrome via Mac from 172.251.234.249. |


631

KAZEROUNI LAW GROUP, APC

# EXHIBIT D


632


Supplement Facts
Serving Size 9.5 g (About 2 Scoops)
Servings Per Container 30
Amount Per Serving
% Daily Value
Calories 5
Total Carbohydrate 1 g <1%*
Total Sugars 0 g **
Magnesium 60 mg 14%
Chloride 190 mg 8%
Sodium 110 mg 5%
Potassium 45 mg 1%
Amino Blend 5 g **
Micronized Taurine, Micronized L-Glutamine, Micronized L-Arginine, Micronized L-Leucine, Beta-Alanine, Micronized L-Citrulline, Micronized L-Isoleucine, Micronized L-Valine, Micronized L-Tyrosine, Micronized L-Histidine, Micronized L-Lysine Hydrochloride, Micronized L-Phenylalanine, Micronized L-Threonine, Micronized L-Methionine
Electrolyte Blend 440 mg **
Sodium Chloride, Magnesium Oxide, Potassium Chloride
Caffeine† 100 mg **
Green Tea Leaf Extract 50 mg **
Green Coffee Bean Extract 10 mg **
*Percent Daily Values are based on a 2,000 calorie diet.
**Daily Value not established.
OTHER INGREDIENTS: Natural and Artificial Flavor, Malic Acid, Citric Acid, Silicon Dioxide, Calcium Silicate, Sucralose, Gum Blend (Cellulose Gum, Xanthan Gum, Carrageenan), Tartaric Acid, Sunflower and/or Soy Lecithin, Beet Juice Powder (color), Inulin.
CONTAINS: SOY.
PHENYLKETONURICS: CONTAINS PHENYLALANINE.
NO ASPARTAME.
SERVING SCOOP INCLUDED, BUT MAY SETTLE TO THE BOTTOM DURING SHIPPING.
† CAFFEINE FROM TEA LEAF AND/OR COFFEE BEAN.
Shake gently before first use.
INFORMED CHOICE
REGULARLY TESTED FOR BANNED SUBSTANCES
ON
MANUFACTURED BY OPTIMUM NUTRITION, INC.
MANUFACTURED IN THE USA
THIS PRODUCT CONTAINS INGREDIENTS OF INTERNATIONAL AND DOMESTIC ORIGIN.
AT TIME OF FILL
AFTER SETTLING
CONTENTS SOLD BY WEIGHT NOT VOLUME. SOME SETTLING WILL OCCUR.
THIS PRODUCT IS NOT INTENDED TO DIAGNOSE, TREAT, CURE OR PREVENT ANY DISEASE.


GREATNESS BY NATURE™
YOUR ELECTROLYTE BOOST™
FUELING UP HAS NEVER TASTED SO GOOD.
SUPPLEMENT FACTS
Serving Size: 3 Gummies
Servings per Container: 20
Amount Per Serving
% DV
Calories 50
Total Carbohydrates 10 g 4%†
Total Sugars 7 g **
Includes 7 g Added Sugars 14%†
Vitamin B6 (as Pyridoxine HCl) 1.7 mg 100%
Vitamin B12 (as Methylcobalamin) 2.4 mcg 100%
Magnesium (as Magnesium Citrate) 10 mg 2%
Sodium 60 mg 3%
Potassium (as Potassium Gluconate) 10 mg <1%
Caffeine (from Green Coffee bean) 75 mg **
†Percent Daily Values (DV) are based on a 2,000 Calorie Diet.
**Daily Value (DV) not established.
Other Ingredients: Electrolyte Blend (Tapioca Syrup, Cane Sugar, Purified Water, Pectin, Natural Flavors, Citric Acid, Sodium Citrate, Coconut Oil, Natural Colors).
Contains: Tree nuts (Coconut).
Carefully crafted for Zhou Nutrition® | Zhou, Inc. | Salt Lake City, UT 84101 USA | 1-855-700-ZHOU | ZhouNutrition.com
DIRECTIONS FOR USE:
GREAT TASTING HYDRATION SUPPORT
#howizhou
8522748 0124
6 69191 24251 6
GMP
GOOD MANUFACTURING PRACTICE
CONSISTENT QUALITY
LAB VERIFIED
PRODUCT BACKED WITH
60-DAY MONEY BACK GUARANTEE
VEGAN
MADE WITH NON-GMO INGREDIENTS
MADE IN THE USA WITH GLOBAL INGREDIENTS


634


Supplement Facts
Serving Size: 1 Scoop (9g)
Servings Per Container: Approx 30
Amount Per 1 Scoop % DV 2 Scoops % DV
Total Carbohydrate <1g 0%* 1g 0%*
Niacin (as nicotinic acid) 15mg 94% 30mg 188%
Choline (as choline bitratrate) 40mg 7% 80mg 15%
Iron 0.2mg 1% 0.5mg 3%
Sodium 5mg <1% 10mg <1%
Potassium 45mg 1% 90mg 2%
Musclebuilding Matrix
Creatine monohydrate 1,500mg † 3,000mg †
Betaine anhydrous 1,250mg † 2,500mg †
Performance & Endurance Compound
Beta-alanine 1,600mg † 3,200mg †
Taurine 500mg † 1,000mg †
Pump Matrix
Nitrosigine® arginine inositol silicate 750mg † 1,500mg †
Hawthorn extract (as Crataegus pinnatifida) (berry) 200mg † 400mg †
Energy+ Matrix
Caffeine anhydrous 190mg † 380mg †
Choline bitartrate 100mg † 200mg †
Neuro-Sensory Blend
L-theanine 62.5mg † 125mg †
Galangal extract (as Alpinia officinarum) (stem & root) 25mg † 50mg †
Yohimbe extract (as Pausinystalia yohimbe) (bark) 20mg † 40mg †
Standardized for 6% yohimbine
* Percent Daily Values (DV) are based on a 2,000 calorie diet.
† Daily Value not established.
Other Ingredients: Citric Acid, Silicon Dioxide, Natural and Artificial Flavors, Malic Acid, Resistant Maltodextrin, Sucralose, Acesulfame-Potassium, Gum Blend (Cellulose Gum, Xanthan Gum, Carrageenan), FD&C Blue No. 1. Processed in a facility that processes milk, egg, wheat, soy, sesame, peanut, tree nut, fish and shellfish ingredients.
WARNING: Not intended for use by persons under 18. Do not use if pregnant or nursing. Do not use if you have had a myocardial infarction (heart attack). Inhalation may amplify the inflammatory airway response in people with asthma. One serving of this product contains up to as much caffeine as 2 cups of coffee. Caffeine-sensitive individuals may experience symptoms including (but not limited to) restlessness, nervousness, tremors, anxiety, increased heart rate, or difficulty sleeping. Do not combine with other sources of caffeine or stimulants. Some individuals may experience a harmless tingling sensation from the concentrated performance dose of beta-alanine. Consult a medical doctor if you have a medical condition or before starting any diet or exercise program. KEEP OUT OF REACH OF CHILDREN.
CONTAINS BIOENGINEERED FOOD INGREDIENTS.
Do not use if packaging has been tampered with. Store in a cool, dry place (60°F to 80°F).
▲ These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.
Nitrosigine
Made in the U.S.A. from international ingredients.
2021 Nitrosigine and the Nitrosigine logo are registered
is patent protected. For lot no. and expiry date: see bottle.
North Market Street, Suite 1330, Wilmington, DE 1980
1858205


635


Supplement Facts
Serving Size 18.5 g (About 1 Scoop)
Servings Per Container 60
Amount Per Serving % Daily Value
Calories 20
Total Carbohydrate 5 g 2%†
Vitamin D 12.5 mcg 63%
Thiamin 2 mg 167%
Niacin 20 mg 125%
Vitamin B6 2 mg 118%
Folate 330 mcg DFE 83%
Vitamin B12 6 mcg 250%
Pantothenic Acid 10 mg 200%
Calcium 40 mg 3%
Magnesium 125 mg 30%
Sodium 140 mg 6%
Potassium 270 mg 6%
N.O.-XPLODE® MASTER PERFORMANCE BLEND*
Myogenic Matrix* 5.1 g **
Creatine Blend (Creatine Monohydrate, Creatine Anhydrous), Taurine, Di-Calcium Phosphate, Di-Sodium Phosphate, AstraGin® Proprietary Blend [Astragalus membranaceus Extract (root), Panax notoginseng Extract (root)]
Endura Shot* 2.9 g **
Beta-Alanine, Potassium Bicarbonate, Sodium Bicarbonate, Magnesium Oxide, Cholecalciferol
Thermic Energy* 1.3 g **
N-Acetyl-L-Tyrosine, L-Tyrosine, Caffeine Anhydrous, Grapefruit Bioflavonoid Complex
N.O. Alpha Fusion* 1 g **
L-Citrulline Malate, Danshen Extract (Salvia miltiorrhiza)(root), Grape Skin Extract, Phyllanthus emblica Extract (fruit) (CAPROS®), Hawthorn Extract (aerial parts), Folic Acid
Shock Composite* 290 mg **
DMAE Bitartrate (2-Dimethylaminoethanol), L-Phenylalanine, Nicotinic Acid, Calcium D-Pantothenate, Toothed Clubmoss Extract (aerial parts), Thiamin Hydrochloride, Pyridoxine Hydrochloride, Cyanocobalamin
†Percent Daily Values are based on a 2,000 calorie diet.
**Daily Value Not Established.
OTHER INGREDIENTS: Natural and Artificial Flavor, Citric Acid, Malic Acid, Calcium Silicate, Silicon Dioxide, Sucralose, Beet Juice Powder (Color), Salt.
MANUFACTURED BY: Bio-Engineered Supplements & Nutrition, Inc., 3500 Lacey Road, Suite 1200, Downers Grove, IL 60515 USA 877.673.3727 www.goBSN.com
MANUFACTURED IN THE USA
This product contains ingredients of international and domestic origin.


636

KAZEROUNI LAW GROUP, APC

# EXHIBIT E


637

Check for updates

EFSA Journal

SCIENTIFIC OPINION

ADOPTED: 24 March 2020

doi: 10.2903/j.efsa.2020.6099

# Safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food pursuant to Regulation (EU) 2015/2283

EFSA Panel on Nutrition, Novel Foods and Food Allergens (NDA),
Dominique Turck, Jacqueline Castenmiller, Stefaan De Henauw, Karen Ildico Hirsch-Ernst, John Kearney, Alexandre Maciuk, Inge Mangelsdorf, Harry J McArdle, Androniki Naska, Carmen Pelaez, Kristina Pentieva, Alfonso Siani, Frank Thies, Sophia Tsabouri, Marco Vinceti, Francesco Cubadda, Karl Heinz Engel, Thomas Frenzel, Marina Heinonen, Rosangela Marchelli, Monika Neuhäuser-Berthold, Morten Poulsen, Josef Rudolf Schlatter, Henk van Loveren, Reinhard Ackerl and Helle Katrine Knutsen

## Abstract

Following a request from the European Commission, the EFSA Panel on Nutrition, Novel Foods and Food Allergens (NDA) was asked to deliver a scientific opinion on a botanical extract derived from both *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food (NF) pursuant to Regulation (EU) 2015/2283. The NF is a combination of an ethanol extract of the roots of *A. membranaceus* and a hot water extract of the roots of *P. notoginseng*. The NF contains 1.5–5% total saponins, 0.1–0.5% ginsenoside Rb1 and 0.01–0.1% astragaloside I. Both plants that are used to produce the NF have a long history of use, especially in traditional Chinese medicine. Information on the production process and the composition of the NF is sufficient and does not raise safety concerns. The applicant proposed to use the NF as a food supplement for the general adult population, excluding pregnant women, at a maximum daily amount of 350 mg. Taking into account these conditions of use, the Panel considers that the consumption of the NF is not nutritionally disadvantageous. The provided genotoxicity studies do not raise concerns for genotoxicity of the NF. Based on the findings of a subchronic toxicity study, supported by a subacute toxicity study, the Panel identified the overall no observed adverse effect level (NOAEL) of the NF at 100 mg/kg body weight (bw) per day. By applying an uncertainty factor of 200, the Panel concludes that the NF is safe at an intake level of 0.5 mg/kg bw per day, corresponding to a maximum daily intake of 35 mg of the NF for the target population, i.e. adults excluding pregnant women.

© 2020 European Food Safety Authority. *EFSA Journal* published by John Wiley and Sons Ltd on behalf of European Food Safety Authority.

**Keywords:** *Panax notoginseng*, *Astragalus membranaceus*, *Astragalus propinquus*, extract, novel food, safety

**Requestor:** European Commission following an application by NuLiv Science

**Question number:** EFSA-Q-2018-00557

**Correspondence:** nda@efsa.europa.eu




638

**Panel members:** Dominique Turck, Jacqueline Castenmiller, Stefaan De Henauw, Karen Ildico Hirsch-Ernst, John Kearney, Helle Katrine Knutsen, Alexandre Maciuk, Inge Mangelsdorf, Harry J McArdle, Androniki Naska, Carmen Pelaez, Kristina Pentieva, Alfonso Siani, Frank Thies, Sophia Tsabouri and Marco Vinceti.

**Suggested citation:** EFSA NDA Panel (EFSA Panel on Nutrition, Novel Foods and Food Allergens), Turck D, Castenmiller J, De Henauw S, Hirsch-Ernst KI, Kearney J, Maciuk A, Mangelsdorf I, McArdle HJ, Naska A, Pelaez C, Pentieva K, Siani A, Thies F, Tsabouri S, Vinceti M, Cubadda F, Engel KH, Frenzel T, Heinonen M, Marchelli R, Neuhäuser-Berthold M, Poulsen M, Schlatter JR, van Loveren H, Ackerl R and Knutsen HK, 2020. Scientific Opinion on the safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food pursuant to Regulation (EU) 2015/2283. EFSA Journal 2020;18(5):6099, 16 pp. https://doi.org/10.2903/j.efsa.2020.6099

**ISSN:** 1831-4732

© 2020 European Food Safety Authority. *EFSA Journal* published by John Wiley and Sons Ltd on behalf of European Food Safety Authority.

This is an open access article under the terms of the Creative Commons Attribution-NoDerivs License, which permits use and distribution in any medium, provided the original work is properly cited and no modifications or adaptations are made.

The EFSA Journal is a publication of the European Food Safety Authority, an agency of the European Union.



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


639

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## Table of contents


Abstract ..... 1
1. Introduction ..... 4
1.1. Background and Terms of Reference as provided by the European Commission ..... 4
2. Data and methodologies ..... 4
2.1. Data ..... 4
2.2. Methodologies ..... 4
3. Assessment ..... 4
3.1. Introduction ..... 4
3.2. Identity of the NF ..... 5
3.2.1. Panax notoginseng (Burkill) F.H. Chen ..... 5
3.2.2. *Astragalus membranaceus* (Fisch.) Bunge ..... 5
3.3. Production process ..... 5
3.4. Compositional data ..... 6
3.4.1. Stability ..... 7
3.5. Specifications ..... 8
3.6. History of use of the NF and/or of its source ..... 9
3.6.1. History of use of the source of the NF ..... 9
3.6.2. History of use of the NF ..... 9
3.7. Proposed uses and use levels ..... 9
3.7.1. Target population ..... 9
3.7.2. Proposed uses and use levels ..... 9
3.8. Absorption, distribution, metabolism and excretion (ADME) ..... 9
3.9. Nutritional information ..... 9
3.10. Toxicological information ..... 10
3.10.1. Genotoxicity ..... 10
3.10.2. Subacute and subchronic toxicity ..... 11
3.10.3. Human data ..... 13
3.11. Allergenicity ..... 13
4. Discussion ..... 13
5. Conclusions ..... 13
Steps taken by EFSA ..... 13
References ..... 14
Abbreviations ..... 15




LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


640

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

# 1. Introduction

## 1.1. Background and Terms of Reference as provided by the European Commission

On 8 June 2018, the company NuLiv Science submitted a request to the European Commission in accordance with Article 10 of Regulation (EU) 2015/2283[1] to place a botanical extract derived from both *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) on the Union market as a novel food (NF).

The NF is intended for use in food supplements and the suggested daily intake for adults is 50 mg.

The target population is the general population, excluding children and pregnant women.

On 22 October 2018, and in accordance with Article 10(3) of Regulation (EU) 2015/2283, the European Commission asked EFSA to provide a scientific opinion on the extract derived from *Panax notoginseng* and *Astragalus membranaceus*.

# 2. Data and methodologies

## 2.1. Data

The safety assessment of this NF is based on data supplied in the application, information provided by the EFSA Working Group on Compendium of Botanicals and information submitted by the applicant following two EFSA requests for supplementary information.

The information in support of this application has been made available through the Commission e-submission portal (NF 2018/0284).

Administrative and scientific requirements for NF applications referred to in Article 10 of Regulation (EU) 2015/2283 are listed in the Commission Implementing Regulation (EU) 2017/2469[2].

A common and structured format on the presentation of NF applications is described in the EFSA guidance on the preparation and presentation of a NF application (EFSA NDA Panel, 2016). As indicated in this guidance, it is the duty of the applicant to provide all of the available (proprietary, confidential and published) scientific data, including both data in favour and not in favour of supporting the safety of the proposed NF.

This NF application includes a request for protection of proprietary data in accordance with Article 26 of Regulation (EU) 2015/2283. Data claimed to be proprietary by the applicant include all the submitted analytical information, the manufacturing process and the toxicity studies provided.

## 2.2. Methodologies

The assessment follows the methodology set out in the EFSA guidance on NF applications (EFSA NDA Panel, 2016) and the principles described in the relevant existing guidance documents from the EFSA Scientific Committee. The legal provisions for the assessment are laid down in Article 11 of Regulation (EU) 2015/2283 and in Article 7 of the Commission Implementing Regulation (EU) 2017/2469.

The information provided by the EFSA Working Group on Compendium of Botanicals is based on extensive literature searches on *P. notoginseng* and *A. membranaceus*, following a search strategy and standard operating procedure as described by Dibusz and Vejvodova (2020).

This assessment concerns only risks that might be associated with consumption of the NF under the proposed conditions of use, and is not an assessment of the efficacy of AstraGin™ with regard to any (claimed) benefit.

# 3. Assessment

## 3.1. Introduction

The NF which is the subject of the application is a combination of root extracts from *P. notoginseng* and *A. membranaceus*, denominated as AstraGin™.

[1] Regulation (EU) 2015/2283 of the European Parliament and of the Council on novel foods, amending Regulation (EU) No 1169/2011 of the European Parliament and of the Council and repealing Regulation (EC) No 258/97 of the European Parliament and of the Council and Commission Regulation (EC) No 1852/2001 (2013/0435 (COD). OJ L 327, 11.12.2015, p. 1–22.

[2] Commission Implementing Regulation (EU) 2017/2469 of 20 December 2017 laying down administrative and scientific requirements for applications referred to in Article 10 of Regulation (EU) 2015/2283 of the European Parliament and of the Council on novel foods. OJ L 351, 30.12.2017, pp. 64–71.




641

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

The NF falls under Regulation 2015/2283, Article 3(2)(a)(iv): food consisting of, isolated from or produced from plants or their parts of.

The NF is proposed by the applicant to be used as a food supplement for the general adult population, except pregnant women.

## 3.2. Identity of the NF

The NF is a combination of an ethanol extract of the roots of *A. membranaceus* (Fisch.) Bunge and a hot water extract of the roots of *P. notoginseng* (Burkill) F.H. Chen.

### 3.2.1. Panax notoginseng (Burkill) F.H. Chen

The full taxonomy of *P. notoginseng* is the following. Kingdom: Plantae, Division: Magnoliophyta, Class: Magnoliopsida, Order: Apiales, Family: Araliaceae, Genus: *Panax*, Species: *Panax notoginseng*.

The plant is also known as *Panax pseudoginseng* var. *notoginseng* (Burkill) G. Hoo & C.L. Tseng and by a number of traditional Chinese names, e.g. Sanqi, San Qi, Shan Qi, Tu San Qi, Tianqi and Tien-chi.

The plant belongs to the genus *Panax*, which includes about 15 species from both Asia and America. Analyses of the 5S-rRNA spacer domains from seven Panax species showed a high degree of genetic similarity with ~ 75% of the spacer domains conserved throughout the genus (Cui et al., 2003).

The root of *P. notoginseng* contains ~ 8–13% saponins by weight (Dong et al., 2003; Wang et al., 2006). More than 150 saponins, mostly of dammarane type with 20(S)-protopanaxadiol or 20(*S*)-protopanaxatriol aglycon moieties have been identified in this species, some of them being present in other *Panax* species, some being specific of *P. notoginseng*. Many other compounds of various chemical classes are found including flavonoids, cyclopeptides, sterols, polyacetylenes, a volatile oil, saccharides and amino acids (Wang et al., 2016). Based on an earlier review, the applicant stated that 56 saponins of *P. notoginseng* have been identified with major ones being ginsenosides Rb1, Rd, Re and Rg1. Five polyacetylenes have been identified, i.e. panaxytriol, panaxydol, notoginsenic acid, β-sophoroside and 10-hydroxydeca-4,6-diynoic acid. The extract also contained the flavonoids quercetin and quercetin-3-*O*-sophoroside, a number of phytosterols and amino acids, the most prevalent ones being arginine, aspartic acid and glutamic acid. The non-proteinogenic amino acid L-dencichin (oxalyldiaminopropionic acid) has also been identified (Wang et al., 2006).

### 3.2.2. *Astragalus membranaceus* (Fisch.) Bunge

The name *A. membranaceus* (Fisch.) Bunge is a synonym of the accepted name *Astragalus propinquus* Schischkin.[3]

The full taxonomy of *A. membranaceus/A. propinquus* is the following. Kingdom: Plantae, Division: Magnoliophyta, Class: Magnoliopsida, Order: Fabales, Family: Fabaceae, Genus: *Astragalus*, Species: *A. membranaceus/A. propinquus*.

The plant is also known as milkvetch root (English), ogi (Japanese), hwanggi (Korean) and huang qi (in Traditional Chinese Medicine).

This species is defined as Radix Astragali in the Pharmacopoeia of China (Fu et al., 2014).

The root of *A. membranaceus/A. propinquus* contains a number of saponins, in particular cycloartane triterpene glycosides (astragalosides I–VII) as well as flavonoids (calycosin and formononetin genins and glycosides, ononin, among others). Other constituents include γ- and α-aminobutyric acids, L-canavanine, choline, betaine, gluconic acid, linoleic acid, asparagine, β-sitosterol (Thorne Research Inc, 2003; Fu et al., 2014).

## 3.3. Production process

According to the information provided, the NF is produced under adherence to good manufacturing practice (GMP) at GMP-certified manufacturing facilities in China. Information was provided on the Hazard Analysis and Critical Control Points (HACCP) scheme applied.

The *A. membranaceus* roots are purchased from growers in Gansu and Inner Mongolia provinces in the north-western region of China while the *P. notoginseng* roots are acquired from growers in Yunnan and Sichuan provinces in the southern region of China.

[3] http://www.theplantlist.org/tpl1.1/record/ild-32156



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


642

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

The roots of both plants are washed with water, dried and pulverised.

The pulverised roots of *A. membranaceus* are then passed through a 10-mesh size sieve and extracted with eightfold volume of 40% ethanol. The extract is centrifuged, filtered, concentrated/dried, smashed and screened through an 80-mesh size sieve. The extract is analysed for the content of total saponins (by ultraviolet (UV) spectrophotometry) and for astragaloside I (by high-performance liquid chromatography-evaporative light scattering detection (HPLC-ELSD)).

The pulverised roots of *P. notoginseng* are passed through a 20-mesh size sieve and extracted with 10-fold volume of water. The extract is centrifuged, filtered and concentrated. The concentrated solution is subsequently absorbed on a resin, which is washed with water, and eluted with 60% ethanol. The eluent is concentrated/dried, smashed and screened through an 80-mesh size sieve. The extract is analysed for the content of total saponins (by UV spectrophotometry) and for ginsenoside Rb1 (by HPLC-UV).

The plant to extract ratios were indicated by the applicant to be 10:1 for the *Astragalus* extract and 50:1 for the *Panax* extract.

At the end of the manufacturing process the extracts are mixed (45–47.5% of each extract) with maltodextrin (5–10%). The blend, i.e. the NF, is analysed for the marker compounds (total saponins, ginsenoside Rb1 and astragaloside I; see the following Section), physicochemical characteristics, heavy metals, pesticides, organic solvent residue and microbial counts before packaging into plastic bags for storage.

The Panel considers that the production process is sufficiently described and does not raise safety concerns.

## 3.4. Compositional data

As described in the previous section, the NF is a blend of an ethanol extract of the roots of *A. membranaceus* and a hot water extract of the roots of *P. notoginseng* (plus maltodextrin as an excipient). The NF contains 1.5–5% total saponins, 0.1–0.5% ginsenoside Rb1 and 0.01–0.1% astragaloside I.

In order to provide information on the variability of the composition of the NF, the applicant submitted batch to batch analyses for total saponins, ginsenoside Rb1, astragaloside I, proximates, a number of organoleptic and physicochemical parameters, contaminants and microbiological quality of the NF (Table 1).

**Table 1:** Batch-to-batch analyses of the NF

| Parameter | Batch number | | | | |
|---|---|---|---|---|---|
| | **C20151209** | **C20160606(1)** | **C20170106** | **C20170515** | **C20171009** |
| Total saponins | 4.10% | 3.79% | 3.12% | 3.56% | 3.09% |
| Ginsenoside Rb1 | 0.10% | 0.17% | 0.14% | 0.11% | 0.10% |
| Astragaloside I | 0.034% | 0.028% | 0.028% | 0.024% | 0.048% |
| Colour | Light yellow | Light yellow | Light yellow | Light yellow | Light yellow |
| Odour | 'Characteristic' | 'Characteristic' | 'Characteristic' | 'Characteristic' | 'Characteristic' |
| Appearance | Fine powder | Fine powder | Fine powder | Fine powder | Fine powder |
| Sieve analysis | 100% through 80 mesh | 99% through 80 mesh | 100% through 80 mesh | 100% through 80 mesh | 100% through 80 mesh |
| Total carbohydrates | 91.8% | 92.2% | 92.1% | 92.4% | 89.6% |
| Protein | 2.1% | 2.5% | 2.4% | 2.5% | 4.3% |
| Fat | 1.4% | 0.8% | 0.7% | 0.7% | 1.1% |
| Moisture | 4.3% | 4.1% | 4.5% | 4.2% | 4.6% |
| Ash | 0.4% | 0.4% | 0.3% | 0.3% | 0.4% |
| Bulk density | 0.59 g/mL | 0.54 g/mL | 0.56 g/mL | 0.55 g/mL | 0.53 g/mL |
| Solubility in water (1 g in 30 mL) | Soluble | Soluble | Soluble | Soluble | Soluble |
| **Contaminants** | | | | | |
| Lead (Pb) | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg |
| Arsenic (As) | 0.19 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg |

| Parameter | Batch number | | | | |
|---|---|---|---|---|---|
| | C20151209 | C20160606(1) | C20170106 | C20170515 | C20171009 |
| Cadmium (Cd) | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg |
| Mercury (Hg) | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg | 0.02 mg/kg | 0.02 mg/kg |
| Ethanol | < 0.5% | < 0.5% | < 0.5% | < 0.5% | < 0.5% |
| **Microbiological** | | | | | |
| Total plate count | 370 CFU/g | 35 CFU/g | 410 CFU/g | 900 CFU/g | < 10 CFU/g |
| Yeast and mould | 210 CFU/g | 20 CFU/g | 60 CFU/g | < 20 CFU/g | < 20 CFU/g |
| Enterobacteriaceae | – | < 10 CFU/g | < 10 CFU/g | < 10 CFU/g | < 10 CFU/g |
| *E. coli* (in 25 g) | Negative | Negative | Negative | Negative | Negative |
| *Salmonella* (in 375 g) | Negative | Negative | Negative | Negative | Negative |
| *Staphylococcus aureus* (in 25 g) | Negative | Negative | Negative | Negative | Negative |

NF: novel food; CFU: colony forming units.
(1): Batch of the NF that was used in the 90-day toxicity study (see Section 3.10.2).

For four additional batches (Table 2) information on the content of total saponins was provided, plus for three of the four batches also the concentrations of astragaloside I and ginsenoside Rb1.

**Table 2:** Total saponins, astragaloside I and ginsenoside Rb1 in the NF

| Parameter | Batch number | | | |
|---|---|---|---|---|
| | 20100621(1) | C20150120(2) | 20100824 | C20140921 |
| Total saponins | 2.35% | 2.68% | 2.92% | 2.0% |
| Ginsenoside Rb1 | 0.17% | 0.10% | 0.10% | Not provided |
| Astragaloside I | 0.054% | 0.033% | 0.039% | Not provided |

NF: novel food.
(1): Batch of the NF that was used in the 28-day toxicity study.
(2): Batch of the NF that was used in the bacterial reverse mutation test and in the *in vitro* mammalian cell gene mutation assay (see Section 3.10.1).

In order to achieve a certain concentration of total saponins and ginsenoside Rb1 and astragaloside I in the NF, the applicant established internal specifications for the two extracts, with total saponins ≥ 0.6% and ginsenoside Rb1 ≥ 0.2% for the *P. notoginseng* extract, and total saponins ≥ 3% and astragaloside I ≥ 0.02% for the *A. membranaceus* extract.

Considering that the genus *Astragalus* is known to accumulate trace elements, the applicant provided a certificate of analysis for one batch of the NF, in which selenium, thallium and uranium were below detection limits (i.e. < 0.1 mg/kg for selenium and thallium and < 0.01 mg/kg for uranium).

Additionally, the applicant provided the analytical results for the concentrations of pesticides and mycotoxins in the NF, which were all below their limits of detection (LODs).

The Panel considers that the information provided on the composition of the NF including the batch to batch variability is sufficient and does not raise safety concerns.

### 3.4.1. Stability

The applicant proposes a shelf-life of 3 years from the time of manufacturing of the NF.

The applicant provided data of a 6 months accelerated (i.e. at 40°C and 75% relative humidity) stability testing performed with three batches of the NF. The batches were analysed for the content of total saponins in the NF, which remained stable throughout the testing period (Table 3). Further parameters were appearance (i.e. light yellow powder), moisture, ash, heavy metals and microbial counts, which all remained within specifications during the testing period.



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


644

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Table 3:** Total saponin content of the NF during the stability testing

| Date of analysis | Batch number | | |
|---|---|---|---|
| | **20100621** | **20100720** | **20100825** |
| 22/10/2010 | 2.35% | 2.65% | 2.92% |
| 22/11/2010 | 2.39% | 2.68% | 2.84% |
| 22/12/2010 | 2.37% | 2.59% | 2.88% |
| 22/1/2011 | 2.41% | 2.61% | 2.86% |
| 22/4/2011 | 2.43% | 2.61% | 2.93% |

NF: novel food.

The Panel considers that, given the low moisture content of the NF, eventual degradation products or microbial activity are unlikely to be of safety concern. Since the product parameters were unchanged for six months under accelerated conditions the product can be expected to be stable for up to 2 years.

## 3.5. Specifications

The specifications of the NF are indicated in Table 4.

The applicant informed that each batch of the NF will be subjected to a series of analytical quality controls to ensure that all product specifications are met, including physicochemical parameters, organoleptic characteristics, microbial counts, heavy metals and pesticide residues.

**Table 4:** Specifications of the NF

**Description:** The NF is a combination of an ethanol extract of the roots of *Astragalus membranaceus* (Fisch.) Bunge and a hot water extract of the roots of *Panax notoginseng* (Burkill) F.H. Chen
Appearance: beige to light brown yellow powder

| Parameter | Specification | Method of analysis |
|---|---|---|
| Total saponins | 1.5–5.0% | UV absorption (at 560 ± 5 nm) |
| Ginsenoside Rb1 | 0.10–0.50% | HPLC-UV |
| Astragaloside I | 0.01–0.10% | HPLC-ELSD |
| Carbohydrates | ≥ 90% | By calculation |
| Protein | ≤ 4.5% | Kjeldahl |
| Moisture | ≤ 5.0% | GB/T 14769 -1993 |
| Ash | ≤ 1.0% | AOAC 942.05, 18th |
| **Contaminants** | | |
| Arsenic (As) | ≤ 0.3 mg/kg | ChP 2015, App. IXB (ICP-MS) |
| **Microbiological** | | |
| Total plate count | ≤ 5,000 CFU/g | ISO 4833-1 |
| Total yeast and mould count | ≤ 500 CFU/g | FDA (BAM) Chapter 18, 8th Ed. |
| Enterobacteriaceae | < 10 CFU/g | ISO 21528-2:2004 |
| *E. coli* | Negative in 25 g | ISO 7251:2005 |
| *Salmonella* | Negative in 375 g | FDA (BAM) Chapter 5, 8th Ed. |
| *Staphylococcus aureus* | Negative in 25 g | GB 5009.22-2016 |

CFU: colony forming units; FDA-BAM: Food and Drug Administration's Bacteriological Analytical Manual; GC–MS: gas chromatography–mass spectrometry; HPLC: high-performance liquid chromatography; ICP-MS:inductively coupled plasma mass spectrometry; UV: ultraviolet; ELSD: evaporative light scattering detector.

The Panel considers that the information provided on the specifications of the NF is sufficient and does not raise safety concerns.




645

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## 3.6. History of use of the NF and/or of its source

### 3.6.1. History of use of the source of the NF

Both plants *A. membranaceus* and *P. notoginseng* have a long history of use in humans, especially in China.

According to the information provided, *A. membranaceus* has a recorded history of use of over 2,000 years (Khan and Abourashed, 2009). Traditionally, it has mainly been used as raw dried root, honey-cured root or as aqueous decoction, although steeping in ethanol has also been described (Reid, 1995; Khan and Abourashed, 2009). Daily doses of the root are reported to range from 9 to 30 g, with more than 60 g in some cases (Duke and Ayensu, 1985; Leung, 1995; Leung and Foster, 1996; Zhu, 1998b; Yu et al., 2007).

Documented use of *P. notoginseng* dates back to the 16th century and its cultivation in certain areas has been reported to exceed 1,000 years, with current production in China of approximately 2,000 tonnes per year (Dong et al., 2003). Typical total daily doses range from approximately 3 to 15 g of roots for a decoction or 1–5 g of root as a ground powder. The use of ethanolic extracts was also reported (Bensky and Gamble, 1986; Zhu, 1998a; Dharmananda, 2004; Wang et al., 2006; Reid, 1987).

The Panel notes that extensive literature searches performed by UCT Prague retrieved 13,581 and 8,116 scientific articles for *A. membranaceus* and *P. notoginseng*, respectively, demonstrating that these species have been extensively studied.

### 3.6.2. History of use of the NF

According to the information provided by the applicant, the NF is already marketed as a food supplement in a number of countries worldwide (e.g. Australia, Brazil, Canada, India).

Sales data have been provided for individual countries for the years 2011, 2012 and 2013 (confidential information).

## 3.7. Proposed uses and use levels

### 3.7.1. Target population

The target population proposed by the applicant is the general adult population, except pregnant women.

### 3.7.2. Proposed uses and use levels

The applicant proposed to use the NF as a food supplement.

Following a request for clarification, the applicant proposed an amount of 50 mg per portion and a maximum daily amount of 350 mg of the NF.

## 3.8. Absorption, distribution, metabolism and excretion (ADME)

The applicant has not provided any toxicokinetic studies that were performed with the NF.

A number of animal studies were submitted, which investigated the absorption, distribution, metabolism and excretion of various saponins. The Panel considers that the studies provided are of limited relevance for the safety assessment of the NF.

## 3.9. Nutritional information

The applicant provided a nutritional analysis of the NF, which indicates that the NF mainly consists of carbohydrates (about 90%), moisture (about 5%), protein (2–5%), fat (about 1%) and ash. The applicant pointed out that some variation can be expected concerning the nutrients in the NF, given the nature of the starting material and its susceptibility to varying weather conditions.

Taking into account the proposed conditions of use (i.e. max. 350 mg/day), the Panel considers that the consumption of the NF is not nutritionally disadvantageous.




646

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## 3.10. Toxicological information

The roots of *A. membranaceus* have been reported to contain the non-proteinogenic amino acid L-canavanine (Thorne Research Inc, 2003; Khan and Abourashed, 2009). L-Canavanine is an antinutrient that is structurally related to L-arginine. Owing to this similarity, in organisms that consume L-canavanine, it is mistakenly incorporated into their own proteins in place of L-arginine, leading to the production of structurally aberrant proteins. L-Canavanine has been suspected of being associated with systemic lupus erythematosus (SLE) activation (Alcocer-Varela et al., 1985; Morimoto et al., 1990). L-Canavanine is found in many legumes where it acts as a nitrogen-storing metabolite and is part of the plant's chemical defence. For example, L-canavanine accounts for up to 5% of the dry weight in the jack bean seed (*Canavalia ensiformis*), 2.4% in the alfalfa plant (*Medicago sativa*) and up to 2.5% in sword bean (*Canavalia gladiate*) (Rosenthal, 2001; Bence and Crooks, 2003). Following an EFSA request to provide information on the content of L-canavanine in the NF, the applicant submitted a certificate of analysis for one batch of the NF in which L-canavanine was detected at a concentration of 0.67 mg/g. The Panel notes that the amount of L-canavanine at the proposed conditions of use for the NF (i.e. 350 mg per day) would be 0.23 mg/day. The Panel considers L-canavanine in the NF unlikely to be of safety concern at the proposed conditions of use.

*P. notoginseng* has been reported to contain the non-proteinogenic amino acid L-dencichin (oxalyldiaminopropionic acid (ODAP)) (Wang et al., 2006), which is a structural analogue of the neurotransmitter glutamate. L-Dencichin is a neurotoxin responsible for lathyrism, a motor neuron degeneration syndrome. Lathyrism may be induced by consumption of the seeds (if consumed at high enough amounts) of the legume *Lathyrus sativus* (grass pea), which is a staple food in some areas of the world and which has been reported to contain L-dencichin at concentrations up to 0.7% (Xu et al., 2017). Following an EFSA request to provide information on the content of L-dencichin in the NF, the applicant submitted a certificate of analysis for one batch of the NF in which L-dencichin was not detected. No LOD was provided. However, information was provided on the method that was used for the analysis (Dezhuang et al., 1998). From the information provided, the limit of quantification (LOQ) for L-dencichin is at a level of about 0.17% for the method used. Taking into consideration the maximum proposed use level of 350 mg NF/day, and assuming an L-dencichin concentration at the LOQ (i.e. 0.17%) in the *P. notoginseng* fraction (i.e. < 50% in the NF), this would correspond to about 0.3 mg L-dencichin/day. The Panel considers L-dencichin in the NF unlikely to be of safety concern at the proposed conditions of use.

### 3.10.1. Genotoxicity

The applicant provided a bacterial reverse mutation assay (Zin, 2016, unpublished study report) and an *in vitro* mammalian cell gene mutation assay (Ruslan et al., 2016, unpublished study report), which were both performed with batch #C20150120 of the NF. This batch contains 2.68% total saponins, 0.033% astragaloside I and 0.10% ginsenoside Rb1 (see also Table 2).

The bacterial reverse mutation test (Zin, 2016, unpublished study report) was performed in compliance with good laboratory practice (GLP) and following OECD Test Guideline (TG) 471. The test was carried out with *Salmonella* Typhimurium strains TA98, TA100, TA1535, TA1537 and *Escherichia coli* strain WP2 *uvrA*, using the pre-incubation method in the presence and in the absence of an exogenous metabolic activation system (i.e. S9-mix). In order to evaluate the cytotoxicity of the test item a dose-finding test was performed with the five strains mentioned above, with and without metabolic activation, using the following five concentrations of the NF dissolved in water: 313, 625, 1,250, 2,500 and 5,000 μg/plate. There was no sign of cytotoxicity and no precipitation of the test material was observed at any concentration. Thus, the main test was performed using the same concentrations. Positive and negative controls were included. The NF induced no biologically relevant increase in the number of revertant colonies compared with the negative controls for all strains, in the presence and absence of S9-mix, in the dose finding test and the main test.

The *in vitro* mammalian cell gene mutation test using the hypoxanthine-guanine phosphoribosyl transferase (*Hprt*) gene (Ruslan et al., 2016, unpublished study report) was performed in compliance with GLP. According to the applicant, the test was conducted in accordance with OECD TG 476. However, the Panel notes that the NF was only tested in the absence and not in the presence of an exogenous metabolic activation system (S9-mix) in the main experiment, which is considered a relevant deviation. No rationale could be provided by the applicant for this deviation. In the absence of activation, the NF did not induce an increase in the number of gene mutations in mammalian cells.

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Following an EFSA request, and in accordance with the EFSA recommendations for genotoxicity testing (EFSA Scientific Committee, 2011), the applicant submitted two *in vitro* mammalian cell micronucleus tests following OECD TG 487. As per the EFSA request, one micronucleus test per plant extract was carried out.

The micronucleus test (Vedic Lifesciences, 2019a, Study Nr. 190503/NL/PC, unpublished study report), submitted for the *P. notoginseng* extract, was performed with a batch (i.e. #20170702) that contained 1.08% total saponins and 0.31% ginsenoside Rb1. The test, which followed OECD TG 487, was carried out in cultured mammalian CHO-K1 cells. In order to evaluate the cytotoxicity of the test item, the cells were exposed to the extract (dissolved in water and diluted with culture medium) at concentrations of 310 μg/mL, 620 μg/mL, 1,250 μg/ml, 2,500 μg/mL and 5,000 μg/mL either for 30 h in the absence of an exogenous metabolic system (S9-mix) or for 3 h in the presence or absence of S9-mix. As the cytotoxicity even at the highest concentration of 5,000 μg/mL was less than 40%, the study coordinators decided to use the following four concentrations of the extract in the main experiment: 620, 1,250, 2,500 and 5,000 μg/mL. In the main test, the cytotoxicity at the highest concentration of 5,000 μg/mL for 30 h without S9-mix was 35.9%. After short-term exposure to this concentration in the presence of metabolic activation, the cytotoxicity was 38.5%, while without metabolic activation it was 27.8%. Appropriate positive controls were used as per OECD TG 487 and an adequate response was seen. Micronuclei were manually scored for at least 2,000 cells per concentration. Compared to the vehicle control, there were no statistically significant differences in the number of micronuclei at any tested concentration with and without metabolic activation.

Another micronucleus test was submitted (Vedic Lifesciences, 2019b; Study Nr. 190502/NL/PC, unpublished study report), which assessed the clastogenic/aneugenic potential of the *A. membranaceus* extract. The tested batch (i.e. #20180225) contained 3.1% total saponins and 0.12% astragaloside I. Also this test, which followed OECD TG 487, was carried out in cultured mammalian CHO-K1 cells. In order to evaluate the cytotoxicity of the test item, the cells were exposed to the extract (dissolved in water and diluted with culture medium) at concentrations of 310 μg/mL, 620 μg/mL, 1,250 μg/mL, 2,500 μg/mL and 5,000 μg/mL for 30 h in the absence or for 3 h in the presence and absence of an exogenous metabolic system (S9-mix). The observed toxicity was up to 29% after exposure for 30 h without S9-mix. After exposure for 3 h with and without metabolic activation, the cytotoxicity amounted to 24% and 18.1%, respectively. As the observed toxicity was less than 35% at any concentration with or without S9-mix, the study coordinators decided to use the following three concentrations of the extract in the main experiment: 500, 1,500 and 5,000 μg/mL. In the main test, the cytotoxicity at the highest concentration of 5,000 μg/mL for 30 h without S9-mix was 28.5%. After short-term exposure to this concentration in the presence of metabolic activation the cytotoxicity was 30.5%, while without metabolic activation it was 29.4%. Appropriate positive controls were used as per OECD TG 487 and an adequate response was seen. Micronuclei were manually scored for at least 2,000 cells per concentration. Compared to the vehicle control there were no statistically significant differences in the number of micronuclei at any tested concentration with and without metabolic activation.

The Panel concludes that the studies provided do not raise concerns for genotoxicity of the NF.

### 3.10.2. Subacute and subchronic toxicity

The applicant provided a 28-day oral toxicity study (Pasics Szakonyiné, 2011, unpublished study report) conducted in compliance with GLP and in accordance with OECD TG 407. Twenty Wistar rats (n = 10 per sex) per group were administered by gavage 0, 100, 300 or 1,000 mg/kg body weight (bw) per day of the NF for 28 days. The batch (#20100621) that was used in this study contained 2.35% total saponins, 0.17% ginsenoside Rb1 and 0.054% astragaloside I (see also Table 2). The test item was prepared daily by suspending the NF in 1%-aqueous methylcellulose vehicle.

There was no mortality during the study period. No clinical signs or abnormalities in behaviour, motor activity or general health were observed in control or treated animals. No relevant differences in body weight or body weight gain or feed consumption were observed among the groups.

A number of statistically significant differences in haematology and clinical chemistry between controls and animals administered the NF were observed (available in a file annexed to the scientific opinion under 'Supporting information'). The number of neutrophils significantly increased in all groups receiving the NF. In male rats, the number of basophils was reduced in the mid-dose group. In females, white blood cells (WBC) and lymphocytes were reduced in the low- and mid-dose groups and in the mid- and high-dose groups, respectively. Furthermore, in female rats, mean corpuscular volume



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


648

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

(MCV) was reduced in the low-dose group, mean corpuscular haemoglobin concentration (MCHC) was decreased in the mid-dose group and platelets were increased in the low-dose group. Activated partial thromboplastin time (APTT) was increased in the high-dose group compared to the control group. The serum concentration of phosphorus increased with dose in both sexes, being statistically significant in the high-dose group of males and in the mid- and high-dose groups for females.

Absolute and relative organ weights were not different between the groups, except for a higher testes to brain weight ratio in the low-dose males and a lower absolute and relative to body weight kidney weight in the high-dose males. However, the differences were small and considered biologically not relevant. No relevant dose-related histopathological findings were observed.

The applicant provided a repeated dose 90-day oral toxicity study (Upadhyaya and Wang, 2017, unpublished study report) which was conducted in accordance with OECD TG 408 and in compliance with GLP.

Wistar rats (n = 10/group and sex) of 6–8 weeks of age were randomly allocated to one of six groups, which were administered the NF daily by gavage for 90 consecutive days at dosages of 0 mg/kg bw per day (control group), 100 mg/kg bw per day, 300 mg/kg bw per day or 1,000 mg/kg bw per day. The study included two additional groups (i.e. recovery groups) that received 0 mg/kg bw per day (controls) or 1,000 mg/kg bw per day, respectively, for 90 days, and thereafter 0 mg/kg bw per day for an additional 2-week period (i.e. recovery period). The batch (#C20160606) that was used in this study contained 3.79% total saponins, 0.17% ginsenoside Rb1 and 0.028% astragaloside I (see also Table 1). The test item was prepared (with water as vehicle) every day before administration.

None of the animals died in the course of the study. No treatment-related clinical signs were observed in any of the animals throughout the study. Ophthalmological and neurobehavioural examinations of the animals did not reveal any differences between the groups. No treatment-related changes in body weight or body weight gain were observed. However, compared to the controls, feed consumption was lower in males in the low-dose group until day 78 and it was higher in females in the mid- and high-dose groups for most of the study duration. On day 91 (day 105 for the recovery groups), animals were subjected to necropsy and a gross pathological examination was performed. No changes were found in gross pathology.

A number of statistically significant differences in clinical chemistry between controls and animals exposed to the NF were observed (A summary of the results can be found in the online version of this output under the 'Supporting information' section: https://doi.org/10.2903/j.efsa.2020.6099). Serum cholesterol and triglyceride concentrations were increased in males and females. Cholesterol was increased in the high-dose group in the males and in females in all the groups that were administered the NF. Triglycerides were increased in the mid- and high-dose groups for both sexes. Increases were also observed for alanine amino transferase (ALT) (in males of the high-dose group and in females in all the treatment groups) and alkaline phosphatase (ALP) (in males of the high-dose group and in females in the low-dose group). Aspartate amino transferase (AST) was increased in females only, i.e. in the low- and mid-dose groups. Furthermore, lactate dehydrogenase (LDH) was increased in both sexes, in males in all treatment groups and in females in the high-dose group. In males, phosphorous was increased in the mid- and high-dose groups and remained higher (statistically significant) also after the recovery period. In females, succinate dehydrogenase (SDH) and total protein were increased (SDH in the mid- and high dose groups, total protein in all groups receiving the NF).

A number of statistically significant findings were observed for absolute and relative organ weights, but the observed changes were small, often not dose-related and in many cases a result of rather low values in the control groups (with respect to historical controls). No differences were seen in urinalysis.

The Panel notes that a considerable number of changes were observed in clinical chemistry, including markers of liver and kidney toxicity. Even though the size of individual changes was rather small and within historical ranges, the effects were seen consistently in both sexes, were often dose-related and, in the case of phosphorus, also observed after the recovery period. The Panel considers that taken together, the findings imply a potentially adverse effect of the NF. The Panel also considers that taking into account the magnitude of the effects seen, the overall lowest observed adverse effect level (LOAEL) is to be set at 300 mg/kg bw per day. Consequently, the Panel considers the lowest dose tested in the study, i.e. 100 mg/kg bw per day, as the overall no observed adverse effect level (NOAEL).




649

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

### 3.10.3. Human data

The applicant did not provide any human studies performed with the NF nor were there any human studies with the NF retrieved by extensive literature searches.

## 3.11. Allergenicity

The Panel notes the protein content (2–5%) of the NF and, thus, the potential of the NF to elicit allergic reactions.

The literature searches carried out by the applicant and by the EFSA contractor (UCT Prague) did not retrieve any studies reporting incidents of allergenicity to the NF or to *A. membranaceus*, one of the two plants that is used to produce the NF.

With respect to *P. notoginseng*, the applicant submitted one review (Dharmananda, 2004), which described 19 case reports of allergic reactions to Sanqi (i.e. dried tuber of *P. notoginseng*). No further information on the allergenicity of *P. notoginseng* was provided.

The Panel notes the limited epidemiological data reported on one of the two plants that is used to produce the NF.

Overall, taking into account the long history of use of both plants (i.e. *A. membranaceus* and *P. notoginseng*) that are used to produce the NF, the Panel considers that the risk of allergic reactions to the NF for the general population is unknown but expected to be low.

# 4. Discussion

The NF is a mixture of the root extracts of *A. membranaceus* and *P. notoginseng*, and contains marker compounds within a specified range (i.e. 1.5–5% total saponins, 0.1–0.5% ginsenoside Rb1 and 0.01–0.1% astragaloside I). The Panel considers that the information provided on the composition of the NF and the production process is sufficient and does not raise safety concerns.

The applicant proposed to use the NF as a food supplement for the general adult population (with the exception of pregnant women) at a maximum daily amount of 350 mg. The Panel considers that, taking into account the proposed conditions of use, the consumption of the NF is not nutritionally disadvantageous.

The provided genotoxicity studies do not raise concerns for genotoxicity of the NF. In view of the maximum daily amount proposed for the NF, contribution of pesticides or contaminants is not of toxicological relevance.

Based on the findings of a subchronic toxicity study, supported by a subacute toxicity study, the Panel identified the overall NOAEL of the NF at 100 mg/kg bw per day.

The Panel considers an uncertainty factor (UF) of 200 appropriate, in order to account for inter- and intra-species variability (UF 10 $\times$ 10) and for the lack of chronic toxicity data (additional UF of 2). The application of this UF to the NOAEL results in a safe intake level for the NF of 0.5 mg/kg bw per day. Considering a standard bodyweight of 70 kg for adults (EFSA Scientific Committee, 2012), this level corresponds to a maximum daily intake of 35 mg NF for the target population, i.e. adults excluding pregnant women.

# 5. Conclusions

The Panel concludes that the NF, i.e. a botanical extract derived from both *P. notoginseng* and *A. membranaceus* roots (AstraGin™), is safe at an intake level of 0.5 mg/kg bw per day. This level corresponds to a maximum intake of 35 mg/day for the target population, i.e. adults excluding pregnant women.

The Panel could not have reached the conclusion on the safety of the NF under the proposed conditions of use without the toxicological data for which protection of proprietary data was requested by the applicant (Pasics Szakonyiné, 2011; Zin, 2016; Upadhyaya and Wang, 2017; Vedic Lifesciences, 2019a,b).

# Steps taken by EFSA

1) Letter from the European Commission to the European Food Safety Authority with the request for a scientific opinion on the safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus*. Ref. Ares(2018)5414664, dated 22 October 2018.

2) On 22 October 2018, EFSA received a valid application from the European Commission on a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food, which was submitted by NuLiv Science (US), and the scientific evaluation procedure started.
3) On 6 March 2019, EFSA requested the applicant to provide additional information to accompany the application and the scientific evaluation was suspended.
4) On 30 August 2019, additional information was provided by the applicant and the scientific evaluation was restarted.
5) On 11 November 2019, EFSA requested the applicant to provide additional information to accompany the application and the scientific evaluation was suspended.
6) On 23 January 2020, additional information was provided by the applicant and the scientific evaluation was restarted.
7) During its meeting on 24 March 2020, the NDA Panel, having evaluated the data, adopted a scientific opinion on the safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* as a NF pursuant to Regulation (EU) 2015/2283.

# References


Alcocer-Varela J, Inglesias A, Llorente L and Alarcon-Segovia D, 1985. Effects of L-canavanine on T cells may explain the induction of systemic lupus erythematosus by alfalfa. Arthritis Rheumatism, 28, 52–57.

Bence AK and Crooks PA, 2003. The mechanism of L-canavanine cytotoxicity: arginyl tRNA synthetase as a novel target for anticancer drug discovery. Journal of Enzyme Inhibition and Medicinal Chemistry, 18, 383–394.

Bensky D and Gamble A, 1986. Radix pseudoginseng. Chinese herbal medicine: materia medica. Eastland Press, Seattle. pp. 359–360.

Cui XM, Lo CK, Yip KL, Dong TT and Tsim KW, 2003. Authentication of *Panax notoginseng* by 5S-rRNA spacer domain and random amplified polymorphic DNA (RAPD) analysis. Planta Medica, 69, 584–586.

Dezhuang J, Cong Z and Zhihua W, 1998. Determination of L-Dencichin in Chinese Red Ginseng and Korean Red Ginseng. Chinese Traditional Patent Medicine, 11, 48.

Dharmananda S, 2004. Rare reactions to a safe herb. Institute for Traditional Medicine, Sanqi (Panax notoginseng). Available online: http://www.itmonline.org/arts/sanqi.htm

Dibusz K and Vejvodova P, 2020. Systematic literature search to assist EFSA in the preparatory work for the safety assessment of novel food applications and traditional food notifications. EFSA supporting publication 2020;EN-1774, 72 pp. Available online https://doi.org/10.2903/sp.efsa.2019.EN-1774

Dong TT, Cui XM, Song ZH, Zhao KJ, Ji ZN, Lo CK and Tsim KW, 2003. Chemical assessment of roots of *Panax notoginseng* in China: regional and seasonal variations in its active constituents. Journal of Agriculture and Food Chemistry, 51, 4617–4623.

Duke J and Ayensu E, 1985. Medicinal plants of China. Vol I. Reference Publications, Inc, Algonac, MI.

EFSA NDA Panel (EFSA Panel on Dietetic Products, Nutrition and Allergies), 2016. Guidance on the preparation and presentation of an application for authorisation of a novel food in the context of Regulation (EU) 2015/2283. EFSA Journal 2016;14(11):4594, 24 pp. https://doi.org/10.2903/j.efsa.2016.4594

EFSA Scientific Committee, 2011. Scientific Opinion on genotoxicity testing strategies applicable to food and feed safety assessment. EFSA Journal 2011;9(9):2379. https://doi.org/10.2903/j.efsa.2011.2379

EFSA Scientific Committee, 2012. Guidance on selected default values to be used by the EFSA Scientific Committee, Scientific Panels and Units in the absence of actual measured data. EFSA Journal 2012;10(3):2579, 32 pp. https://doi.org/10.2903/j.efsa.2012.2579

Fu J, Wang Z, Huang L, Zheng S, Wang D, Chen S, Zhang H and Yang S, 2014. Review of the Botanical Characteristics, Phytochemistry, and Pharmacology of *Astragalus membranaceus* (Huangqi). Phytotherapy Research, 28, 1275–1283.

Khan IA and Abourashed EA, 2009. Leung's Encyclopedia of Common Natural Ingredients: Used in Food, Drugs and Cosmetics, 3rd Edition. Wiley. ISBN 978-0-471-46743-4.

Leung A, 1995. Astragalus. In: Glen Rock NJ (ed.). Better health with (mostly) Chinese herbs and foods. AYSL Corp. pp. 5–6.

Leung A and Foster S, 1996. Astragalus. Encyclopedia of common natural ingredients used in food, drugs, and cosmetics. John Wiley & Sons, New York. pp. 50–53.

Morimoto I, Shiozawa S, Tanaka Y and Fujita T, 1990. L-canavanine acts on suppressorinducer T cells to regulate antibody synthesis: lymphocytes of systemic lupus erythematosus patients are specifically unresponsive to L-canavanine. Clinical Immunology and Immunopathology, 55, 97–108.

Pasics Szakonyiné I, 2011 (unpublished study report, claimed as proprietary by the applicant). Repeated dose 28-day oral gavage toxicity study with AstraGin™ in rats. Study No: 413.407.3084. Toxi-Coop Zrt., Hungary.

Reid D, 1987. Panax notoginseng (Araliacea), notoginseng. Chinese herbal medicine. Shambhala Publications Inc., Boston.

Reid D, 1995. Astragalus. A handbook of Chinese healing herbs. Boston, Shambhala. pp. 63–65.




18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License


651

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License


Rosenthal GA, 2001. L-Canavanine: a higher plant insecticidal allelochemical. Amino Acids, 21, 319–330.

Ruslan NF, Noam SRA, Azhar MS, Dahlan HM, Wang R, Suhailah N and Ping TS, 2016 (unpublished study report, claimed as proprietary by the applicant). AstraGin: *in vitro* mammalian cell gene mutation test (HPRT gene mutation) on V79B cells. Study ID: TL/G/476/15/012. Melaka Biotechnology Corporation. Ayer Keroh, Melaka, Malaysia.

Thorne Research Inc, 2003. A. Astragalus membranaceus. Monograph. Alternative Medicine Review, 8, 72–77.

Upadhyaya S and Wang R, 2017 (unpublished study report, claimed as proprietary by the applicant). 90-days repeated dose oral toxicity study of Astragin® in Wistar rats. 161101/NVS/PC. July 2017. 319pp. Vedic Life Sciences Pvt, Ltd. Mumbai, India.

Vedic Lifesciences, 2019a (unpublished study report, claimed as proprietary by the applicant). *Panax notoginseng* proprietary extract: *in vitro* micronucleus test in CHO-K1 cells. Study Nr. 190503/NL/PC. Mumbai, India.

Vedic Lifesciences, 2019b (unpublished study report, claimed as proprietary by the applicant). *Astragalus membranaceus* extract: *in vitro* micronucleus test in CHO-K1 cells. Study Nr. 190502/NL/PC. Mumbai, India.

Wang CZ, McEntee E, Wicks S, Wu JA and Yuan CS, 2006. Phytochemical and analytical studies of Panax notoginseng (Burk.) FH Chen. Journal of Natural Medicines, 60, 97–106.

Wang T, Guo R, Zhou G, Zhou X, Kou Z, Sui F, Li C, Tang L and Wang Z, 2016. Traditional uses, botany, phytochemistry, pharmacology and toxicology of *Panax notoginseng* (Burk.) F.H. Chen: a review. Journal of Ethnopharmacology, 188, 234–258.

Xu Q, Liu F, Chen P, Jez JM and Krishnan HB, 2017. B-N-Oxalyl-l-α, β-diaminopropionic Acid (β-ODAP) Content in Lathyrus sativus: the Integration of Nitrogen and Sulfur Metabolism through β-Cyanoalanine Synthase. International Journal of Molecular Sciences, 18, 526.

Yu SY, Ouyang HT, Yang JY, Huang XL, Yang T, Duan JP, Cheng JP, Chen YX, Yang YJ and Qiong P, 2007. Subchronic toxicity studies of Radix Astragali extract in rats and dogs. Journal of Ethnopharmacology, 110, 352–355.

Zhu Y, 1998a. San qi (Radix notoginseng – sanchi). Harwood Academic Publishers, Chinese Materia Medica. pp. 423–427.

Zhu Y, 1998b. Huang qi (Radix astragali – milkvetch root). Harwood Academic Publishers, Chinese Materia Medica. pp. 560–564.

Zin HM, 2016 (unpublished study report, claimed as proprietary by the applicant). Bacterial reverse mutation test (Ames test) for AstraGin™. Study code: GLP/J165/2016/48). Environmental Technology Research Centre (ETRC). Shah Alam, Selangor, Malaysia.


## Abbreviations

| | |
|---|---|
| ADME | absorption, distribution, metabolism and excretion |
| ALP | alkaline phosphatase |
| ALT | alanine amino transferase |
| APTT | activated partial thromboplastin time |
| AST | aspartate amino transferase |
| bw | body weight |
| CFU | colony forming units |
| ELSD | evaporative light scattering detector |
| FDA-BAM | Food and Drug Administration's Bacteriological Analytical Manual |
| GC-MS | gas chromatography–mass spectrometry |
| GLP | good laboratory practice |
| GMP | good manufacturing practice |
| HACCP | hazard analysis and critical control points |
| HPLC | high-performance liquid chromatography |
| HPRT | hypoxanthine-guanine phosphoribosyl transferase gene |
| ICP-MS | inductively coupled plasma mass spectrometry |
| LDH | lactate dehydrogenase |
| LOAEL | lowest observed adverse effect level |
| LOD | limit of detection |
| LOQ | limit of quantification |
| MCHC | mean corpuscular haemoglobin concentration |
| MCV | mean corpuscular volume |
| MF | mutation frequency |
| NDA | EFSA Panel on Dietetic Products, Nutrition and Allergies |
| NF | novel food |
| NOAEL | no observed adverse effect level |
| ODAP | oxalyldiaminopropionic acid |




652

| | |
|---|---|
| OECD | Organisation for Co-operation and Development |
| RNA | ribonucleic acid |
| SDH | succinate dehydrogenase |
| SLE | systemic lupus erythematosus |
| TG | test guidelines |
| UF | uncertainty factor |
| UV | ultraviolet |
| WBC | white blood cells |





653

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

# EXHIBIT F


654

| | In CLRA Letter | | | | | | | | | Other foreign ingredients in Product | | | In Complaint |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Citrulline | Beta Alanine | Betaine Anhydrous | Theanine | ALCAR | Green Tea | Black Pepper | Arginine | Glutathione | Caffeine | Theobromine | AstraGin® | Ashwagandha |
| Altius Pre | X | X | X | | | | | | | X | | | |
| Andro Surge | | | | | | | X | | | | | | |
| Build PM | | | | X | | | X | | | | | | X |
| Build XT | | | | | | | | | | | | X | X |
| Burn XT | | | | | X | X | X | | | X | | | |
| Burn XT Black | | | | | X | X | X | | | X | X | | |
| Burn XT Powder | | | | | X | X | X | | | X | | | |
| Burn XT Stick Packs | | | | | X | X | X | | | X | | | |
| Caffeine | | | | | | | | | | X | | | |
| Defend XT | | | | | | | X | | X | | | | |
| Dry XT | | | | | | X | | | | | | | |
| EAA Surge | X | | | | | | | | | | | | |
| Flex XT | | | | | | | X | | | | | | |
| GDA XT | | | | | | | | | | | | X | |
| Green Surge (all forms) | | | | | | X | | | | | | | |
| Green Tea | | | | | | X | | | | | | X | |
| Intra Surge | X | | | | | | | | | | | X | |
| L-Arginine | | | | | | | | X | | | | | |
| Lean PM | | | | X | | | X | | | | | | |
| Lean XT | | | | | X | X | X | | | | | | |
| N.O. XT | X | | | | | | | X | X | | | | |
| Nitro Surge Build | X | X | X | X | | | | | | X | | X | |
| Nitro Surge Max | X | X | X | X | | | | | | | X | X | |
| Nitro Surge Natural | X | X | X | X | | X | | | | X | | | |
| Nitro Surge Pre-Workout (Product) | X | X | X | X | | | | | | X | X | X | |
| Nitro Surge Shred | X | X | | X | X | | X | | | X | X | | |
| Prima Surge | | | | | | | X | | | | | | X |
| Pro Series Test | | | | | | | X | | | | | | X |
| Pump Surge | X | | X | | | | | | | | | X | |
| Red Surge | | | | | | X | | | | | | | |
| Test PM | | | | X | | | X | | | | | | |


655

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**Electronically FILED by Superior Court of California, County of Los Angeles 9/29/2025 12:00 AM David W. Slayton, Executive Officer/Clerk of Court, By J. Nunez, Deputy Clerk**

KAZEROUNI LAW GROUP, APC

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,<br><br>Defendant. | Case No.: 23STCV15674<br><br>**NOTICE OF ERRATA REGARDING THE EXHIBITS ATTACHED TO THIRD AMENDED COMPLAINT** |

///

///

///

///


656

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Plaintiff DANIEL ROSSI ("Plaintiff") hereby respectfully submits this Notice of Errata as to the Exhibits Attached to the Third Amended Complaint filed in the above-captioned matter on September 25, 2025. It came to Plaintiff's attention that inadvertently the Exhibits were not attached the filed Third Amended Complaint. A complete and corrected copy of the Third Amended Complaint with the Exhibits is filed together with this notice.

Dated: September 26, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By:______________________

Gustavo Ponce, Esq.
*Attorneys for Plaintiffs*

KAZEROUNI LAW GROUP, APC



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


657

KAZEROUNI LAW GROUP, APC

## PROOF OF SERVICE

I am over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On September 26, 2025, I served the foregoing document and accompanying attachments by the means indicated below:

**NOTICE OF ERRATA**

☒ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

☒ ELECTRONIC SERVICE - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m. The electronic filing system sends an e-mail notification of the filing to the parties and counsel of record.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Angela M. Sousa
Anthony Hopp
Melanie A. Ayerh
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
jsingh@steptoe.com
asousa@steptoe.com
ahopp@steptoe.com
mayerh@steptoe.com
*Attorneys for Defendant*
*Nutra Holdings, Inc. d/b/a Jacked Factory*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on September 26, 2025, at Las Vegas, Nevada.

GUSTAVO PONCE


658

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

KAZEROUNI LAW GROUP, APC

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No.: 23STCV15674

**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

1) **CONSUMERS LEGAL REMEDIES ACT, CAL. CIVIL CODE §§ 1750, ET SEQ.;**
2) **CALIFORNIA'S FALSE ADVERTISING LAW, BUS. & PROF. CODE §§ 17500 ET SEQ.;**
3) **CALIFORNIA'S UNFAIR COMPETITION LAW, BUS. & PROF. CODE §§ 17200 ET SEQ.;**
4) **NEGLIGENT MISREPRESENTATION; AND**
5) **INTENTIONAL MISREPRESENTATION**

**JURY TRIAL DEMANDED**






659

## INTRODUCTION

1. Plaintiff DANIEL ROSSI ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY ("Defendant") in unlawfully representing and advertising Defendant's dietary supplement products with the false designation and representation that the products were made and/or manufactured in the USA. The unlawfully represented products were sold online on Defendant's website and other third-party vendors, such as Amazon.com ("Amazon"), throughout the United States, and advertised on Defendant's website.[1] Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

2. Specifically, Plaintiff purchased Defendant's Nitrosurge Pre Workout[2] Supplement (hereinafter the "Product"), which, as advertised on Defendant's website and other third-party vendors, was represented by Defendant to Plaintiff and other similarly situated consumers as a product made and/or manufactured in the USA. However, Defendant's Product contains or is made with ingredients that are not "Manufactured in the USA," as discussed further herein.

3. The "Manufactured in the USA" claim (or some derivative thereof) was prominently printed on Defendant's website and advertisements, as well as the websites of third-party vendors, including Amazon, where the Product was purchased by Plaintiff. Contrary to Defendant's representation and in violation of federal rules and California laws, Defendant's Class Products,[3] including the Product purchased by Plaintiff, are actually made with or contain ingredients that are not "Manufactured in the USA," as discussed in further detail herein.

---

[1] Plaintiff seeks class wide relief on behalf of all purchasers of any of Defendant's products that are substantially similar to the dietary supplement product purchased by Plaintiff that were advertised as being "Manufactured in the USA" in violation of California law(s).

[2] As titled on Amazon.com when Plaintiff purchased the Product; "NITROSURGE Pre Workout Supplement – Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps – Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White."

[3] A list of the Class Products is attached hereto as Exhibit A.


660

KAZEROUNI LAW GROUP, APC

4. Defendant's nationwide sale and advertising of deceptively advertised Class Products constitutes violations of: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (2) California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17533.7; (3) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 et seq.; (4) negligent misrepresentation and (5) intentional misrepresentation. This conduct caused Plaintiff, and others similarly situated, damages, and requires restitution and injunctive relief to remedy and prevent further harm.

5. Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of Defendant.

**JURISDICTION AND VENUE**

6. Jurisdiction is proper pursuant to this Court's general jurisdiction.

7. The Court has jurisdiction over Plaintiff's claims for damages, restitution, injunctive relief, and declaratory relief arising from Defendant's unlawful business practices under California's CLRA, FAL, and UCL; as well as negligent and intentional misrepresentation.

8. This Court has personal jurisdiction over Defendant because Defendant conducts substantial business in the State of California and County of Los Angeles, has sufficient minimum contacts with this State and County, and otherwise purposefully avails itself of the markets in this State and County through the promotion, sale, and marketing of its services in this State, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this Court pursuant to California Code of Civil Procedure § 395(a) because Plaintiff resides within this county and many of the acts and transactions giving rise to this action occurred in this county because Defendant:

a. is authorized to conduct business in this county and has intentionally availed itself of the laws and markets within this county;

b. does substantial business within this county; and is subject to personal jurisdiction in this county;


661
KAZEROUNI LAW GROUP, APC

c. and is subject to personal jurisdiction in this county.

## PARTIES

10. Plaintiff is an individual residing in the City of Northridge, County of Los Angeles, State of California.

11. Defendant is a corporation with its principal place of business in St. John's, Newfoundland and Labrador, Canada, which is regularly doing business in the State of California and within this county.

12. Defendant is a manufacturer and seller of dietary supplements that conducts business through its website and the websites of third-party vendors. One of the products sold by Defendant is Nitrosurge Pre Workout, the Product, which was purchased by Plaintiff.

## NATURE OF THE CASE

13. At all times relevant, Defendant made affirmative misrepresentations regarding the Class Products, including the Product purchased by Plaintiff, it manufactures, markets and sells. Specifically, Defendant marketed, advertised, and sold its Class Products as "Manufactured in the USA" without clear and adequate qualification that the Class Products contained foreign ingredients and/or components as required by federal rules and state laws.

14. However, although Defendant represents that its Class Products are "Manufactured in the USA" without clear and adequate qualification, Defendant's Class Products contain or are made with ingredients and/or components that are not "Manufactured in the USA."

15. Federal rules regarding the use of "Made in the United States" claims with respect to products and services are well established and well defined.

16. Specifically, the Made in USA Labeling rule, 16 C.F.R. § 323, (the "MUSA Rule") clearly defines the meaning of "Made in the United States", including synonymous phrases[4], as well as when it can be used without clear and adequate qualification notifying consumers that the good or

---

[4] *See* 16 C.F.R. § 323.1(a) ("The term Made in the United States means any unqualified representation, express or implied, that a product or service, or a specified component thereof, is of U.S. origin, including, but not limited to, a representation that such product or service is "made," "***manufactured***," "built," "produced," "created," or "crafted" in the United States or in America, or any other unqualified U.S.-origin claim.") (emphasis added)


662

KAZEROUNI LAW GROUP, APC

service in question contains or is made with ingredients or components that are not made or sourced in the United States.[5]

17. Despite the clearly established and well-defined federal rules regarding "Made in the United States" claims, Defendant falsely, unfairly and deceptively advertised, marketed and sold its Class Products, including the Product purchased by Plaintiff, as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and/or components as further herein.

18. Defendant's "Manufactured in the United States" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

19. Each consumer, including Plaintiff, was exposed to virtually the same material misrepresentations, as similar advertisements and misrepresentations were prominently placed on all of Defendant's website and the websites of third-party vendors.

20. As of July 2023, when the first complaint in this matter was filed, Defendant's website contained a clear and conspicuous "Manufactured in the USA" claim under iconography of a waiving United States flag encircled by the words "Manufactured in the USA" making it clear that Defendant meant this claim to be applied to ***all*** of its products, including the Class Products. This claim, including iconography, appeared on each and every product page of Defendant's website as well as Defendant's Amazon product pages.

21. Even after the filing of this matter, according to publicly archived webpages[6], as of January 2024 or even later, the main home page of Defendant's website still contained a clear and

---

[5] *See* 16 C.F.R. § 323.2 Prohibited Acts ("In connection with promoting or offering for sale any good or service, in or affecting commerce as "commerce" is defined in section 4 of the Federal Trade Commission Act, 15 U.S.C. 44, ***it is an unfair or deceptive act or practice*** within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), ***to label any product as Made in the United States unless*** the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and ***all or virtually all ingredients or components of the product are made and sourced in the United States***. (emphasis added)

[6] *See* https://web.archive.org/web/20240121011132/https://www.jackedfactory.com/ (archived January 21, 2024)





KAZEROUNI LAW GROUP, APC




663

conspicuous "Manufactured in the USA" claim under same iconography of a waiving United States flag encircled by the words "Manufactured in the USA" thus making it more evident that Defendant meant this claim to be applied to ***all*** its products—even after the Complaint was filed in this matter.




22. According to publicly archived webpages, as of November 2023 or even later, the "Frequently Asked Questions" page of Defendant's website contained the following answer in response to the question: "Where are your products manufactured?" "Answer: **Our products are manufactured in the USA** in a cGMP, FDA Registered manufacturing facility adhering to the strictest quality control." (emphasis added)[7]

23. As a consequence of Defendant's unfair and deceptive practices, Plaintiff and other similarly situated consumers purchased Defendant's Class Products under the false impression that the products were actually manufactured and/or made in the USA with U.S. made ingredients and components.

24. As a result of Defendant's misrepresentations, Plaintiff and other consumers similarly situated overpaid for Defendant's Class Products, and/or purchased the Class Products under the false belief that the product they purchased was made and/or manufactured in the USA with U.S. made ingredients and components. Had Plaintiff and other consumers similarly situated been made aware

[7] *See* https://web.archive.org/web/20231101090125/https://www.jackedfactory.com/pages/common-faqs (archived November 1, 2023)



KAZEROUNI LAW GROUP, APC
LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


664

that Defendant's Class Products were not actually made with all or virtually all ingredients and components being made in the United States, they would not have purchased the products.

25. As a result of Defendant's false and misleading statements and failure to clearly and adequately disclose the presence of foreign ingredients and components, as well as Defendant's other conduct described herein, Plaintiff and other similarly situated consumers purchased thousands, if not millions, of Defendant's Class Products and have suffered injury in fact, including the loss of money and/or property.

26. Defendant's conduct as alleged herein violates federal rules as well as several California laws, as more fully set forth herein.

27. This action seeks, among other things, equitable and injunctive relief; restitution of all amounts illegally retained by Defendant; and disgorgement of all ill-gotten profits from Defendant's wrongdoing alleged herein.

**THE FOREIGN INGREDIENTS IN DEFENDANT'S CLASS PRODUCTS**

28. Pursuant to section 1782(a) of the CLRA, on March 8, 2023, Plaintiff provided Defendant notice in writing sent by certified mail of the particular violations of section 1770, and demanded that Defendant rectify the problems (the "CLRA Letter").[8]

29. Plaintiff's CLRA Letter included a list of products with foreign ingredients, the Class Products, which has since been made reduced. See Exhibit A.

30. Plaintiff's CLRA Letter put Defendant on notice of the following foreign ingredients in its products, including the offending Product (the "CLRA Ingredients"):

a. *L-Citruline,*

b. *Beta Alanine,*

c. *Betaine Anhydrous,*

d. *L-Theanine*

31. The Product purchased by Plaintiff contains the following foreign ingredients:

---

[8] A true and correct copy of Plaintiff's CLRA Letter dated March 8, 2023, is attached hereto as Exhibit B.


665

KAZEROUNI LAW GROUP, APC

a. *L-Citrulline*

b. *Beta Alanine*

c. *Betaine Anhydrous*

d. *L-Theanine*

e. *Caffiene Anhydrous*

f. *Theobromine*

g. *AstraGin,* which is the combination of *Astragalus membranaceus* and *Panax notoginseng* (both which are foreign ingredients)

32. Thus, the CLRA Letter provided Defendant with notice of four (4) foreign ingredients in the Product which Plaintiff's CLRA claims are based on: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*.

33. Plaintiff's UCL, FAL, negligent misrepresentation, and intentional misrepresentation, claims are based on the seven (7) foreign ingredients contained in the Product; (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

34. The Class Products are substantially similar to the Product as they all contain the foreign ingredients included in the Product, and Defendant similarly made the "Manufactured in the USA" representation for each of the Class Products.

35. The Product purchased by Plaintiff contains the following foreign ingredients: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin (*Astragalus membranaceus* and *Panax notoginseng*).

a. Like the Product purchased by Plaintiff, the Class Product Altius Pre contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, and (d) *Caffiene Anhydrous*.

b. Like the Product purchased by Plaintiff, the Class Product Build PM contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Theanine*.


666
KAZEROUNI LAW GROUP, APC

c. Like the Product purchased by Plaintiff, the Class Product Build XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

d. Like the Product purchased by Plaintiff, the Class Product Burn XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous*.

e. Like the Product purchased by Plaintiff, the Class Product Burn XT Black contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous* and (b) *Theobromine*.

f. Like the Product purchased by Plaintiff, the Class Product Burn XT Powder contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous*.

g. Like the Product purchased by Plaintiff, the Class Product EAA Surge contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Citruline*.

h. Like the Product purchased by Plaintiff, the Class Product GDA XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

i. Like the Product purchased by Plaintiff, the Class Product Intra Surge Pre contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, and (b) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

j. Like the Product purchased by Plaintiff, the Class Product Lean PM contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Theanine*.

k. Like the Product purchased by Plaintiff, the Class Product N.O. XT contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Citruline*.


667

l. Like the Product purchased by Plaintiff, the Class Product Nitro Surge Build contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffiene Anhydrous*, and (f) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

m. Like the Product purchased by Plaintiff, the Class Product Nitro Surge Max contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine,* (e) *Theobromine*, and (f) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

n. Like the Product purchased by Plaintiff, the Class Product NitroSurge Shred contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *L-Theanine*, (d) *Caffiene Anhydrous*, and (e) *Theobromine.*

o. Like the Product purchased by Plaintiff, the Class Product Pump Surge contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Betaine Anhydrous*, and (c) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

p. Like the Product purchased by Plaintiff, the Class Product Test PM contains: (a) *L-Theanine*, which is also included in the Product purchased by Plaintiff

36. Plaintiff alleges claims and seeks damages and relief available under the CLRA as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, as they contain the CLRA Ingredients referenced in the CLRA Letter. (12 Total)

37. Plaintiff alleges claims and seeks damages and relief under the UCL, FAL, negligent misrepresentation, and intentional misrepresentation as to all of the Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge


668
KAZEROUNI LAW GROUP, APC

Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT, as they contain foreign ingredients similar to the Product. (17 Total)

**FACTUAL ALLEGATIONS**

38. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

39. Defendant marketed and sold various dietary supplements that were represented and advertised as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and components. Defendant made these representations on its website which resulted in these representations being made on the websites of its third-party vendors, including Walmart.com.[9] These representations were made until, at least, sometime in January 2024 on Defendant's website and even later on third party vendors' websites.

40. Contrary to Defendant's representation, Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

41. Dietary supplements, such those sold by Defendant, are often made with numerous ingredients and components that are foreign sourced due to significant differences in costs of raw material/component production in the United States versus foreign production such as in China.10 In many cases, certain botanical ingredients cannot grow in the United States due to climate reasons or

---

[9] *See* https://www.walmart.com/ip/Nitrosurge-Pre-Workout-Powder-Endless-Energy-Instant-Strength-Gains-Clear-Focus-Intense-Pumps-30-Servings-Blue-Raspberry/383327735 (Under Product Details "Each bottle of Nitrosurge pre-workout is manufactured in a state-of-the-art cGMP manufacturing facility in the USA adhering to the most stringent manufacturing standards."; "Manufactured in the USA in a cGMP-Certified Facility.") (last accessed August 1, 2024)

[10] *See* U.S.-China Economic and Security Review Commission. *Potential Health & Safety Impacts from Pharmaceuticals and Supplements Containing Chinese-Sourced Raw Ingredients*. (2010). https://www.uscc.gov/sites/default/files/Research/NSD_BIO_Pharma_Report--Revised_FINAL_for_PDF--14_%20April_2010.pdf ("This report attempts to shed light and insight on particular issues addressing potential implications of a critical component of a complex supply chain, which contributes to U.S. national health security as China continues to strengthen its position as the world's largest supply source of raw materials for pharmaceuticals and supplements. As first reported in 1998 by the U.S. Government Accounting Office, the U.S. imports an estimated 80% of the raw ingredients contained in both products manufactured, sold and consumed in this country.")


669
KAZEROUNI LAW GROUP, APC

are not grown commercially due to significant differences in costs of domestic versus foreign agricultural production.

42. Pursuant to Section 1782(d) of the CLRA, Plaintiff provided Defendant with written notice by certified mail on March 8, 2023, outlining the specific violations of Section 1770 and demanding that Defendant rectify the issues (the "CLRA Letter").[11]

43. Specifically, the CLRA Letter provided non-exhaustive examples of Defendant's violations of the rules and laws governing unqualified "Manufactured in the USA" claims, using three products as illustrative examples: the Product, Burn-XT, and N.O. XT (the "CLRA Products").

44. The CLRA Letter informed Defendant that the following ingredients, along with potentially other ingredients in the CLRA Products, were not sourced from the United States, contrary to Defendant's unqualified "Manufactured in the USA" representations: L-citrulline, betaine anhydrous, beta alanine, L-theanine, acetyl-L-carnitine HCl, green tea leaf extract, black pepper extract, arginine, and glutathione (the "CLRA Ingredients").[12]

45. Furthermore, the CLRA Letter specifically stated that "The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here."

46. Upon receiving such a letter, a reasonable company would have, at the very least, investigated whether the CLRA Ingredients were, in fact, grown, sourced, or produced outside the United States. In reality, a reasonable company would have conducted an investigation into all of its products to determine whether they contained foreign ingredients or components.

47. Some of the CLRA Ingredients appear in the Product, namely citrulline, beta alanine, betaine anhydrous, and theanine. The Product also contains other foreign ingredients, specifically caffeine, theobromine, and AstraGin®.

48. Had Defendant investigated and found that the CLRA Ingredients, and other ingredients in the Product and the Class Products, were, in fact, grown, sourced, or produced within

---

[11] A true and correct copy of Plaintiff's CLRA Letter dated March 8, 2023, is attached hereto as Exhibit B.

[12] For convenience, certain ingredients may be referred to by their common name or abbreviation when referenced individually. For example: citrulline, theanine, ALCAR (for acetyl-L-carnitine HCl), green tea and black pepper.



KAZEROUNI LAW GROUP, APC

the United States, Defendant would have responded to Plaintiff by correcting Plaintiff's allegations regarding the Product, the CLRA Products and the Class Products and providing evidence of the ingredients' U.S. sourcing.

49. Instead, the Defendant continued to market and sell the Product and Class Products as "Manufactured in the USA"—without qualification—on its website for more than nine months after receiving the CLRA Letter, despite being aware of the foreign ingredients (and potentially components) used in its products. The Class Products continued to be sold with the same unqualified U.S. origin claim on third-party vendor websites for well over nine months after the Defendant received the CLRA Letter.

50. Furthermore, Defendant has yet to provide any evidence that Plaintiff's assertions regarding the origin of the CLRA Ingredients, or other ingredients and components, are incorrect.

51. The Product purchased by Plaintiff contains or is made with ingredients and/or components that are not "Manufactured in the USA." For example, the Product contains AstraGin®, a branded ingredient which is created from the combination of *Astragalus membranaceus* and *Panax notoginseng.*

52. AstraGin® is produced by NuLiv Science U.S.A., Inc. ("NuLiv"), an ingredient supplier. To sell AstraGin® in the European Union, NuLiv had to apply for Novel Food status to the European Food Safety Authority ("EFSA"). The application process requires comprehensive documentation, including sourcing and processing details.

53. The published scientific opinion of the EFSA on NuLiv's application for AstraGin® (*see* Exhibit E)[13] states that AstraGin®'s *Astragalus membranaceus* roots are sourced from Gansu and Inner Mongolia provinces in China, while the *Panax notoginseng* roots are sourced from Yunnan and Sichuan provinces in China (*see* Exhibit E, Section 3.3 Production Process).

54. *Astragalus membranaceus* and *Panax notoginseng,* are native to China and not

---

[13] *See*, https://efsa.onlinelibrary.wiley.com/doi/epdf/10.2903/j.efsa.2020.6099 ("The *A. membranaceus* roots are purchased from growers in Gansu and Inner Mongolia provinces in the north-western region of China while the *P. notoginseng* roots are acquired from growers in Yunnan and Sichuan provinces in the southern region of China.").



KAZEROUNI LAW GROUP, APC


671

commercially grown in the United States.[14] *See* Exhibit E, Section 3.3 Production Process.

55. Irrespective of exactly where *Astragalus membranaceus* and *Panax notoginseng* are sourced, one thing is certain – they are not grown, made, or sourced from within the United States.

56. In addition to foreign *Astragalus membranaceus* and *Panax notoginseng*, the Product contains theobromine, a component of cacao which is not grown commercially in the United States.[15]

57. The Product also contains caffeine, which is generally derived from decaffeination of coffee or tea[16], neither of which is grown commercially or cost effectively in the United States. When not from natural sources, synthetic caffeine is generally produced overseas.[17]

58. One of the CLRA Products, Burn-XT, specifically contains caffeine from coffee bean extract, which cannot be from the United States.[18] Caffeine from coffee appears in other Class Products as well.

59. Thus, upon information and belief, the forms of caffeine contained in the Product and the Class Products are not made or sourced from within the United States.

60. *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are material to the Product's formulation and marketing claims.

---

[14] *See* Ji B, Xuan L, Zhang Y, Zhang G, Meng J, Mu W, Liu J, Paek K-Y, Park S-Y, Wang J, et al. Advances in Biotechnological Production and Metabolic Regulation of *Astragalus membranaceus*. Plants. 2023; 12(9):1858. ("As one of the most popular herbal medicines in the world, *A. membranaceus* is mainly derived from wild and cultivated resources in China. Wild plants of *A. membranaceus* are mainly produced in Inner Mongolia, Gansu, Shanxi, and Ningxia. Wild resources have been over-exploited, seriously damaging the ecological environment. Cultivated plants are mainly derived from Shanxi Hunyuan, Gansu Longxi, Inner Mongolia Niuyingzi, and Shaanxi Zizhou."); Zhao H, Han Z, Li G, Zhang S, Luo Y. Therapeutic Potential and Cellular Mechanisms of *Panax Notoginseng* on Prevention of Aging and Cell Senescence-Associated Diseases. Aging Dis. 2017 Dec 1;8(6):721-739. ("*Panax notoginseng*, distributed in the Southwest of China, Japan, Burma, and Nepal, is both cultivated and gathered from wild forests. *Panax notoginseng* is sensitive to sunlight. It grows primarily in the Wenshan mountain area of Yunnan province and is cultivated commercially in the Southwest regions of China.")

[15] *See* https://www.icco.org/growing-cocoa/

[16] *See* https://web.archive.org/web/20240807011447/https://en.wikipedia.org/wiki/Caffeine ("Commercial supplies of caffeine are not usually manufactured synthetically because the chemical is readily available as a byproduct of decaffeination.").

[17] *See* https://whyy.org/segments/where-you-will-get-your-caffeine-buzz-in-the-future/ ("…synthetic caffeine production (and its pollution) mostly moved overseas, especially to China.")

[18] *See* https://en.wikipedia.org/wiki/Coffee (See "Map showing areas of coffee cultivation" under "Cultivation and Production" – the United States is not a commercial producer of coffee.)


672

KAZEROUNI LAW GROUP, APC

61. Because *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are indisputably foreign, "all or virtually all" ingredients in the Product cannot be made in the United States as required by the MUSA Rule for Defendant to lawfully make an unqualified "Manufactured in the USA" claim.

62. Upon information and belief, it is likely that the remaining ingredients and even the packaging components used to produce the Product are foreign.

63. Similarly, the Class Products contain the same foreign ingredients as those found in the Product.

64. For example, caffeine is included in numerous of Defendant's products other than the Product, including, but not limited to, Altius Pre, Caffeine, Nitrosurge Shred (also contains theobromine), Nitrosurge Build, Burn-XT, Build-XT Black (also contains theobromine), Burn-XT Powder, Burn XT Stick Pack, Nitrosurge Natural and Nitrosurge Shred Max.

65. *Astragalus membranaceus* and *Panax notoginseng* (as AstraGin®) are included in numerous Class Products other than the Product, including but not limited to, Nitrosurge Build, Nitrosurge Max Pump Surge, Build-XT, GDA-XT, Intrasurge, Green Tea Extract, Nitrosurge Build, and Nitrosurge Shred Max.

66. Defendant uses numerous other indisputably foreign ingredients in numerous of its numerous products, including but not limited to KSM-66 ashwagandha[19] and green tea extract[20].

67. Some of the ingredients, components, and even packaging used by Defendant can be sourced either domestically or internationally — and since this information is exclusively known to Defendant at this time — Plaintiff cannot fully allege the extent of Defendant's unqualified "Manufactured in the USA" violations without further discovery. Nevertheless, Defendant's blatant and willful disregard for the laws discussed herein is well established by the aforementioned, non-

---

[19] *See* https://ksm66ashwagandhaa.com/traceability/quality-control/ ("The state of Rajasthan in India is one of the most suited terrains known to grow the best quality ashwagandha in the world and that is where, our ashwagandha farms are located.")

[20] *See* https://en.wikipedia.org/wiki/Tea ("Tea is mainly grown in Asia and Africa, with smaller areas in South America and around the Black and Caspian Seas. The four biggest tea-producing countries are China, India, Kenya and Sri Lanka, together representing 81% of world tea production.")



KAZEROUNI LAW GROUP, APC


673

exhaustive examples.

68. Despite the presence of numerous indisputable foreign ingredients in the Class Products, Defendant made unqualified "Manufactured in the USA" representations on the main page of its website, on each product page for the Class Products, on each Amazon product page for the Class Products, and even in the "Frequently Asked Questions" section of its website.

69. Adequately and properly qualified "Manufactured in the USA" representations are common and ubiquitous in the dietary supplement industry.

70. Numerous competitors of Defendant including, but not limited to, Optimum Nutrition, Zhou Nutrition, MuscleTech, and BSN, clearly, adequately, and properly qualify "Manufactured in the USA" and "Made in the USA" representations on their products.[21]

71. Some dietary supplement products make no "Manufactured in the USA" or "Made in the USA" representations at all.

72. When consumers like Plaintiff see unqualified "Manufactured in the USA" claims, such as those made by Defendant regarding the Class Products, in an industry where qualified claims are so common, they reasonably believe that the products in question are made entirely in the United States, including ingredients and components.

73. Defendant is not a U.S. based company, but rather a company founded in, operated in and from Newfoundland and Labrador, Canada.

74. Given that Defendant is a Canadian company, the purpose of its unqualified "Manufactured in the USA" was clearly not from Defendant's sense of American patriotism or national pride. Instead, Defendant's motive behind representing the Class Products as "Manufactured in the USA" was solely for the intentional purpose of marketing to American consumers seeking and will pay more for products that are made, including ingredients and components, in the United States.[22]

---

[21] *See* Exhibit D.

[22] *See* https://reshoringinstitute.org/wp-content/uploads/2020/09/made-in-usa-survey.pdf ("Slightly more than 83% [of consumers polled] said they would pay up to 20% more for products made domestically.")





KAZEROUNI LAW GROUP, APC




674

75. Unlike general wellness dietary supplement companies that offer a wide variety of products for various applications, such as cognitive, cardiovascular, immune, digestive, and anti-aging health, as well as basic vitamins (e.g., Vitamins C, B, D, E, etc.) and minerals, Defendant's marketing focus and product line are much more specific.

76. Specifically, Defendant's exclusive marketing focus, as reflected in its product line, is on sports and athletic performance dietary supplements.

77. Defendant knew that its unqualified "Manufactured in the USA" representations would resonate with sports- and athletic-minded consumers in the United States, particularly given the strong sense of patriotism and national pride prevalent in this community.

78. Defendant's exclusive focus results in Defendant using a much more limited range of ingredients, both in terms of ingredient categories and specific ingredients, compared to a general wellness dietary supplement company.

79. For example, nearly all of the ingredients in Defendant's products, including the Class Products, fall into one of three categories: Amino Acid/Amino Acid Derivative, Stimulant, or Herbal Performance.

80. Examples of ingredients in these categories include, but are not limited to: (1) Amino Acid/Amino Acid Derivatives: citrulline, beta alanine, betaine anhydrous, theanine, ALCAR, arginine, glutathione, creatine, glutamine, and valine; (2) Stimulants: caffeine and theobromine; and (3) Herbal Performance: green tea, black pepper, AstraGin®, and ashwagandha.

81. As a result of the narrow range of ingredients and ingredient categories, there is significant overlap and shared use of ingredients between the Class Products, the CLRA Products, and the Product.

82. This relationship is partially illustrated[23] in Exhibit F, which depicts the connection between the CLRA Ingredients, other foreign ingredients in the Product, Ashwagandha, and those in the Class Products.

[23] Not all ingredients in the Class Products are represented on the X-axis of the chart. The Class Products contain numerous other foreign ingredients.



KAZEROUNI LAW GROUP, APC

83. Given Defendant's exclusive focus on sports/athletic performance products (and their consumers), its narrow range of ingredients and ingredient categories, as well as the commonality between the ingredients used in the Product, the CLRA Ingredients, and the Class Products, Plaintiff asserts that the Product and the Class Products are substantially similar.[24]

84. Certain of Defendant's products, including but not limited to its protein and cereal bar products, have been excluded from the definition of Class Products. Plaintiff reserves the right to further allege substantial similarity between the excluded products and the Product should, for example, discovery confirm that the same or similar foreign packaging or other components were used across Defendant's product line.

85. Defendant represented, marketed and sold to the general public via its website, the website of its third-party vendors, and other forms of advertising and marketing that the Class Products are "Manufactured in the USA," without clear, adequate, and proper qualification. As such, Defendant inaccurately represented that its Class Products are "Manufactured in the USA," which conveys to a reasonable consumer like Plaintiff that the Class Products, including the Product, are made entirely in the United States, made with ingredients and components from the United States, made pursuant to United States labor standards, and are therefore superior quality (i.e., contain better grown ingredients that non-US made products or raw materials). Defendant possesses superior knowledge of the true facts that were not disclosed regarding the Class Products, thereby tolling the running of any applicable statute of limitations.

86. The types of misrepresentations and/or omissions made by Defendant, as described herein, were considered by Plaintiff, a reasonable consumer, when deciding to purchase the Product.

87. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendant's representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the products were "Manufactured in the

---

[24] *See Miller v. Ghirardelli Chocolate Co*., 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012) (citing cases); ("hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar."); *see also, e.g., Colucci v. ZonePerfect Nutrition Co.*, No. 12-2907, 2012 WL 6737800, at *4 (N.D. Cal. Dec. 28, 2012); *Astiana v. Dreyer's Grand Ice Cream, Inc.*, No. 11-2910, 2012 WL 2990766, at *11-13 (N.D. Cal. July 20, 2012).


676

KAZEROUNI LAW GROUP, APC

USA," when Defendant's Class Products are in fact wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

88. Reasonable consumers, including Plaintiff, attached importance to the "Manufactured in the USA" representations made by Defendant on its Product and the Class Products.

89. Consumers who purchased the Class Products on Defendant's website or through third-party vendor websites were not the only consumers who were exposed to and relied upon the unqualified and false "Manufactured in the USA" representations made by Defendant. Defendant's website contains a "Find A Store" link25 making it highly likely that hundreds of thousands of consumers saw the unqualified and false "Manufactured in the USA" representations and proceeded to purchase Class Products in brick-and-mortar stores like The Vitamin Shoppe.

90. Most consumers possess limited knowledge of the likelihood that products are made with or contain ingredients and components that are not "Manufactured in the USA" when they are advertised and represented to be "Manufactured in the USA." This is a material factor in many individuals' purchasing decisions which they rely upon as they believe they are purchasing a product that is "Manufactured in the USA" with ingredients and components from the United States.

91. Consumers generally believe that products that are "Manufactured in the USA" are made entirely in the United States, made of ingredients and components from the United States, made pursuant to United States labor standards, and are therefore of superior quality (i.e., contain better grown ingredients that non-US made products or raw materials).

92. On information and belief, Defendant's misrepresented Class Products were purchased by consumers over Defendant's competitors' properly and legally marketed products, during the entirety of the relevant four-year statutory time period, based on the unqualified, false and deceptive "Manufactured in the USA" representations (or some derivative thereof) made with respect to Defendant's products. Federal rules and California laws are designed to protect consumers from such false representations and predatory conduct.

93. Defendant's "Manufactured in the USA" representation was misleading to a

[25] *See* https://www.jackedfactory.com/pages/storelocator



KAZEROUNI LAW GROUP, APC

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


677

reasonable consumer.

94. On or about January 24, 2023, Plaintiff searched online for a pre-workout supplement when he discovered the Product and its unqualified and misrepresented "Manufactured in the USA" claim. Plaintiff subsequently purchased the Product on Amazon.

95. At the time of Plaintiff's purchase, the description of the Product described the Product as "Manufactured in the USA," without any qualification, when the Product was actually made with or contained ingredients and/or components that were not "Manufactured in the USA." Accordingly, Defendant was not entitled to lawfully make representations that the Product was "Manufactured in the USA" without qualification as per the MUSA Rule.

96. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendant as follows:

a. The "who" is Defendant;

b. The "what" is representation that Defendant's Class Products are "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

c. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

d. The "where" is in Defendant's advertisements and marketing of the Class Products;

e. The "to whom" is Plaintiff and the putative Class who bought the Class Products;

f. The "by what means" is by Defendant representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA. Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

g. The "how" is the allegation that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and


678

components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

97. It is widely and generally known that consumers prefer products that are "Manufactured in the USA" due to quality, support for local businesses, national economic, environmental and other reasons. The preference is increased when the products are health related and ingestible due to the potential for inferior ingredients and components being manufactured overseas. In making the decision to purchase Defendant's Product, Plaintiff relied upon the advertising, marketing and/or other promotional materials prepared, approved and distributed and/or published by Defendant and its agents and disseminated through its Class Products' advertising containing the misrepresentations alleged herein.

98. Defendant's false representation is that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA, while Defendant knew that fact.

99. Defendant intended to deceive Plaintiff and the Class members into buying the Class Products knowing that consumers would prefer, purchase, and likely pay more for products "Manufactured in the USA" versus other products not "Manufactured in the USA."

100. Plaintiff justifiably relied on Defendant's "Manufactured in the USA" representation. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

101. Plaintiff paid and purchased the Product which was of less or little value than what he paid for.

102. Defendant's "Manufactured in the USA" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

103. Had Plaintiff been made aware that the Product, including its ingredients and components, was not actually "Manufactured in the USA," he would not have purchased the Product, or would not have purchased the Product for the price he paid. In other words, Plaintiff would not



KAZEROUNI LAW GROUP, APC


679

KAZEROUNI LAW GROUP, APC

have purchased Defendant's Product, or paid the amount he did for the purchase of the Product, but for the unqualified "Manufactured in the USA" representations on Defendant's website and advertising on the websites of its third-party vendors which Plaintiff reasonably relied on.

104. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's unqualified and false "Manufactured in the USA" designation set forth on Defendant's website and advertising on the websites of its third-party vendors.

105. In each case when Plaintiff and putative Class members purchased a Class Product, they relied upon Defendant's unqualified "Manufactured in the USA" representation in their purchasing decision, which is typical of most U.S. consumers. Consequently, they were deceived as a result of Defendant's actions. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

106. Defendant's Class Products are made with or contain ingredients and components that are not manufactured in the USA, similar to the Product purchased by Plaintiff. Plaintiff and putative Class members purchased Defendant's misrepresented Class Products over Defendant's competitors' properly and legally marketed products that clearly and adequately qualify "Manufactured in the USA" claims or do not make the "Manufactured in the USA" claims at all. The precise amount of Plaintiff and the Class members' damages will be proven at the time of trial, in large part, by expert testimony.

107. Plaintiff and Class members were undoubtedly injured as a result of Defendant's unqualified and false "Manufactured in the USA" representations that are at issue in this matter.

**CLASS ACTION ALLEGATIONS**

108. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

109. Plaintiff brings this action individually and on behalf of all others similarly situated against Defendant, pursuant to California Code of Civil Procedure Section 378.

110. Plaintiff represents, and is a member of the class, ("the Class") consisting of:


680

> All persons similarly situated within the state of California, who purchased one or more of Defendant's Class Products, which were represented and/or advertised as "Manufactured in the USA" (or similar words), that were made with or contained ingredients or components that were not manufactured in the USA, within the four years prior to the filing of the Complaint."

111. Excluded from the Class are Defendant and any of its officers, directors, and employees.

112. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

113. The "Class Period" means four years prior to the filing of the Complaint in this action.

114. This action has been brought and may properly be maintained as a class action under the provisions of § 382 of the California Code of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

115. **Ascertainability**. Plaintiff does not know the number of members in the Class, but Plaintiff currently believes that there are hundreds of thousands, if not more, members of the Class within the State of California. Because of the nature of Defendant's products and applicable regulations, Defendant must keep detailed and accurate records of production, manufacturing, sale and distribution. Therefore, the members of the Class are ascertainable through Defendant's records and/or Defendant's agents' records regarding retail and sales, as well as through public notice. This matter should therefore be certified as a Class action to assist in the expeditious litigation of this matter.

116. **Numerosity**. The members of the Class are so numerous and geographically disbursed that joinder of all Class members is impractical, and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court.

117. **Existence and Predominance of Common Questions of Law and Fact**. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. Common questions of fact and law exist in this matter that predominate over questions that may affect individual Class members, including, but not limited to, the following:

a. Whether Defendant committed the wrongful conduct alleged herein;

b. Whether Defendant's claims and representations, as alleged herein, are untrue, misleading, and/or reasonably likely to deceive the average consumer;

c. Whether Defendant's acts, transactions, or course of conduct constitute the violations of law alleged herein;

d. Whether Defendant's conduct violates 16 C.F.R. §§ 323, *et seq*.;

e. Whether Defendant's conduct violates California Civil Code §§ 1750, *et seq*.;

f. Whether Defendant's advertising is false, untrue, or misleading within the meaning of California Business & Professions Code §§ 17500, *et seq*.;

g. Whether Defendant's conduct is an unfair, fraudulent, or unlawful act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

h. Whether Defendant's advertising is unfair, deceptive, untrue or misleading within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

i. Whether Defendant acted negligently or intentionally in making the misrepresentations contained regarding the Class Products thought its website and the websites of its third-party vendors;

j. Whether Defendant, through its conduct, received money that, in equity and good conscience, belongs to Plaintiff and members of the Class;

k. Whether the members of the Class sustained and/or continue to sustain damages attributable to Defendant's conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages; and

l. Whether the members of the Class are entitled to injunctive and/or any other equitable relief, including but not limited to restitution and/or disgorgement of ill-gotten gains.

118. **Typicality**. As a person who purchased one or more of Defendant's products, that were advertised as "Manufactured in the USA" but are made with or contain ingredients and/or components that are not manufactured in the USA, Plaintiff is asserting claims that are typical of the Class. Plaintiff's claims involve the same violations of law by Defendant as other Class Members' claims. Plaintiff and members of the Class also sustained damages arising out of Defendant's common


682

course of conduct complained herein. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent members of the Class. Defendant has no defenses unique to the Plaintiff.

119. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of other members of the Class in that Plaintiff has no interests antagonistic to any member of the Class. Further, Plaintiff has retained counsel experienced in handling class action claims and claims involving violations of the consumer laws like violations of the California Business and Professions Code, and, specifically, false and deceptive advertising. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and proposed Class.

120. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent and/or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendant. The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them. Even if the members of the proposed Class could afford such litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable pursuant to Cal. Code of Civil Procedure § 382.

121. Unless the Class is certified, Defendant will retain monies received as a result of Defendant's unlawful and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendant will also likely continue to, or allow its agents to, advertise, market, promote and package


683

Defendant's Class Products in an unlawful and misleading manner, and members of the Class will continue to be misled, harmed, and denied their rights under California law.

122. Further, Defendant has acted or refused to act on grounds that are generally applicable to the class so that declaratory and injunctive relief is appropriate to the Class as a whole, making class certification appropriate.

**FIRST CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**CAL. CIV. CODE SECTION 1750, ET SEQ.**

123. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

124. Plaintiff asserts CLRA claims as to the Class Products with the CLRA Ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, and (d) *L-Theanine*.

125. Therefore, Plaintiff asserts CLRA claims as to the following Class Products which contain the CLRA Ingredients: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM. (12 Total)

126. California Civil Code §§ 1750 et seq., entitled the Consumers Legal Remedies Act (hereinafter "CLRA"), provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer." The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, inter alia, that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.

127. Defendant's Product and the Class Products, as referenced in this section, constitute "goods" as defined pursuant to Civil Code Section 1761(a).

128. Plaintiff, and the Class members, are each a "consumer" as defined pursuant to Civil Code Section 1761(d).

129. Each of Plaintiff's and the Class members' purchases of Defendant's Class Products, as referenced in this section, constituted a "Transaction" as defined pursuant to Civil Code Section


KAZEROUNI LAW GROUP, APC
LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

684

1761(e).

130. Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) provides that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> (2) [m]isrepresenting the source, sponsorship, approval, or certification of goods or services;
> (3) [m]isrepresenting the affiliation, connection, or association with, or certification by, another;
> (4) [u]sing deceptive representations or designations of geographic origin in connection with goods and services;
> (5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;
> (7) [r]epresenting that goods or services are of a particular standard, quality, or grade…; [and]
> (9) [a]dvertising goods or services with intent not to sell them as advertised."

131. Defendant violated Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) by marketing and representing that its Class Products, as referenced in this section, are "Manufactured in the USA," or some derivative thereof, when they are made with or contain ingredients and components that are not manufactured in the United States.

132. Defendant's "Manufactured in the USA" representations are deceptive and false because Defendant's Class Products, as referenced in this section, are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

133. Pursuant to section 1782(d), by letter dated March 8, 2023, Plaintiff provide Defendant notice in writing by certified mail of the particular violations of section 1770 and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. Defendant failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within thirty days of the date of written notice pursuant to section 1782. Therefore, Plaintiff and the Class further seek actual, punitive, and statutory damages, as deemed appropriate.

134. Attached hereto as Exhibit C is a sworn affidavit from Plaintiff pursuant to Cal. Civ.



KAZEROUNI LAW GROUP, APC


685

Code § 17801(d).

135. On information and belief, Defendant's violations of the CLRA set forth herein were done with awareness of the fact that the conduct alleged was wrongful and was motivated solely for Defendant's self-interest, monetary gain and increased profit. Plaintiff further alleges that Defendant committed these acts knowing the harm that would result to Plaintiff and Defendant engaged in such unfair and deceptive conduct notwithstanding such knowledge.

136. Plaintiff further alleges that Defendant committed these acts knowing the harm that would result to Plaintiff and Defendant engaged in such unfair and deceptive conduct notwithstanding such knowledge.

137. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's unqualified and false "Manufactured in the USA" representations set forth in Defendant's website and the websites of its third-party vendors regarding the Product and the Class Products.

138. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiff and members of the Class are entitled to a declaration that Defendant violated the Consumer Legal Remedies Act.

139. For clarity, as to the CLRA Ingredients in the Class Products only, Plaintiff, on behalf of himself and the Class demands judgment against Defendant for damages, restitution, punitive damages, statutory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

140. As allowed under the CLRA, as to all the Class Products, Plaintiff, on behalf of himself and the Class demands injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper

141. Pursuant to section 1780(e) of the California Civil Code, Plaintiff and the Class make claims for damages and attorneys' fees and costs.

142. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in

KAZEROUNI LAW GROUP, APC

class action cases such as this matter.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")**
**BUS. & PROF. CODE §§ 17500, *ET SEQ.***

143. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

144. Plaintiff's FAL claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff; (a) L-Citruline, (b) Beta Alanine, (c) Betaine Anhydrous, (d) L-Theanine, (e) Caffeine Anhydrous, (f) Theobromine, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

145. Therefore, Plaintiff asserts FAL claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 Total)

146. Plaintiff and Defendant are both "person[s]" as defined by Cal. Bus. & Prof. Code § 17506.

147. Cal. Bus. & Prof. Code § 17535 authorizes a private right of action on both an individual and representative basis.

148. Defendant misrepresented its Class Products as "Manufactured in the USA" without clear and adequate qualification when in fact Defendant's Class Products are made with or contain ingredients and components that are not manufactured in the USA.

149. Defendant's Class Products are made with ingredients/components that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

150. These misrepresentations, acts, and non-disclosures by Defendant constitute false and misleading advertising in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

151. At all times relevant, Defendant's representations and advertising of its Class Products was untrue, misleading, and likely to, and did, deceive the reasonable consumer and the public.

152. Defendant engaged in the false and/or misleading advertising and marketing of its Product, as alleged herein, with the intent to directly or indirectly induce consumers to purchase its

KAZEROUNI LAW GROUP, APC



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


687

products, which Defendant knew, or had reason to know, that the Class Products were made with or contained ingredients and components that were not manufactured in the USA.

153. Defendant's "Manufactured in the USA" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

154. Because Defendant knew or should have known that the representations and/or omissions alleged herein regarding the Class Products were untrue or misleading, Defendant acted in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

155. Had Defendant clearly, adequately and truthfully qualified and advertised that its Class Products were made with or contained ingredients and components that were not manufactured in the USA, Plaintiff and the putative Class members would not have purchased the Class Products, would have paid a different price, or would have purchased a different product from another company.

156. As a direct and proximate result of the aforementioned acts and omissions by Defendant, Defendant received and continues to hold monies rightfully belonging to Plaintiff and the putative Class members, who were led to purchase Defendant's Class Products during the Class Period.

**THIRD CAUSE OF ACTION**
**VIOLATION OF BUSINESS & PROFESSIONS CODE**
**BUS. & PROF. CODE, SECTION 17200, ET SEQ.**

157. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

158. Plaintiff's UCL claims apply to the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffiene Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

159. Therefore, Plaintiff asserts UCL claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 Total)

160. Plaintiff and Defendant are each "person[s]" as defined by California Business & Professions Code § 17201. California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

161. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

162. By and through Defendant's conduct alleged in further detail above and herein, Defendant engaged in conduct which constitutes unlawful, unfair, and/or fraudulent business practices prohibited by Bus. & Prof. Code §§ 17200, et seq.

***A. "Unlawful" Prong***

163. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

164. The violation of any law constitutes as "unlawful" business practice under the UCL.

165. Beginning at a date currently unknown, Defendant committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code §§ 17200, et seq. by manufacturing, distributing, and/or marketing Defendant's Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq., and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq., by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

166. Defendant violated the MUSA Rule, 16 C.F.R. § 323, by making its representations on the Class Products without clear and adequate qualification that Defendant's Class Products are "Manufactured in the USA" or made with or contain ingredients and components that are not


KAZEROUNI LAW GROUP, APC
LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

689

manufactured in the USA.

167. Defendant's acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of the MUSA Rule, FAL, and the CLRA, as described above.

168. These alleged acts and practices by Defendant were intentional and in violation of the MUSA Rule, FAL, and the CLRA.

169. Pursuant to the UCL, Plaintiff and the Class are entitled to preliminary and permanent injunctive relief and order Defendant to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the Class of all the revenues associated with this unfair and unlawful competition, or such proton of said revenues as the Court may find applicable.

***B. "Unfair" Prong***

170. Beginning at a date currently unknown, Defendant committed acts of unfair competition that are prohibited by Bus. & Prof. Code section 17200 et seq. Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes by engaging in conduct and practices that threaten an incipient violation of law/s or violate the policy or spirit of law/s by manufacturing, distributing, and/or marketing Defendant's Class Products with a false ingredient origin information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein were "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

171. Clearly said, Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

172. Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices that are immoral, unethical, oppressive or unscrupulous, the utility of such conduct, if any, being far outweighed by the harm done to consumers and against public policy by manufacturing, distributing, and/or marketing Defendant's Class Products with false ingredient information, in violation of

KAZEROUNI LAW GROUP, APC


690

California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

173. Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices, including manufacturing, distributing, marketing, and/or advertising Defendant's Class Products with false ingredient information, wherein: (1) the injury to the consumer was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was not of the kind that consumers themselves could not have reasonably avoided.

***C. "Fraudulent" Prong***

174. Beginning at a date currently unknown, Defendant engaged in acts of unfair competition, including those described above and herein, prohibited and in violation of Bus. & Prof. Code § 17200 et seq., by engaging in a pattern of "fraudulent" business practices within the meaning of Bus. & Prof. Code § 17200 et seq, by manufacturing, distributing, and/or marketing Defendant's Class Products in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

175. Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

176. Plaintiff reserves the right to allege further conduct that constitutes other fraudulent business acts or practices. Such conduct is ongoing and continues to this date.

***D. "Unfair, Deceptive, Untrue or Misleading Advertising" Prong***

177. Defendant's advertising was unfair, deceptive, untrue and/or misleading in that consumers were led to believe that Defendant's Class Products are "Manufactured in the USA" when



KAZEROUNI LAW GROUP, APC
LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


691

Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

178. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendant's representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the Class Products are actually manufactured in the USA with ingredients and components from the USA given the absence of clear and adequate qualification of Defendant's "Manufactured in the USA" representations.

179. Contrary to the representation, Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

180. Defendant's "Manufactured in the United States" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

181. Defendant's unfair, deceptive, untrue, or misleading advertising presented a threat to the public by engaging in unlawful conduct that resulted in harm to consumers.

182. Defendant engaged in these unlawful, unfair, and fraudulent business practices motivated solely by Defendant's self-interest with the primary purpose of collecting unlawful and unauthorized monies from Plaintiff and all others similarly situated; thereby unjustly enriching Defendant.

183. Such acts and omissions by Defendant were unlawful and/or unfair and/or fraudulent and constitute a violation of Business & Professions Code §§ 17200, et seq. Plaintiff reserves the right to identify additional violations by Defendant as may be established through discovery.

184. As a direct and proximate result of the aforementioned acts and representations described above and herein, Defendant received unearned commercial benefits at the expense of its competitors and the public.

185. As a direct and proximate result of Defendant's unlawful, unfair and fraudulent conduct described herein, Defendant has been unjustly enriched by the receipt of ill-gotten gains from customers, including Plaintiff, who unwittingly provided money to Defendant based on Defendant's representations.



KAZEROUNI LAW GROUP, APC


692

186. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's false representations set forth on the Defendant's Class Products.

187. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

**FOURTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION**

188. Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully stated herein.

189. Plaintiff's Negligent Misrepresentation claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff; (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

190. Therefore, Plaintiff asserts Negligent Misrepresentation claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 total)

191. At a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendant represented to the public, including Plaintiff, by packaging, advertising, marketing and other means, that Defendant's Class Products are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

192. Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

193. Defendant made the representations herein alleged with the intention of inducing the public, including Plaintiff and putative class members, to purchase Defendant's Class Products over similar products from competitors which clearly and adequately qualified their "Manufactured in the





KAZEROUNI LAW GROUP, APC




693

USA" representations or made no "Manufactured in the USA" representations at all.

194. Defendant's "Manufactured in the United States" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

195. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendant's advertising representations and, in reliance on them, purchased the Class Products, as described herein.

196. At all times relevant, Defendant made the misrepresentations herein alleged when Defendant should have known these representations to be untrue, and Defendant had no reasonable basis for believing the representations to be true.

197. As a proximate result of Defendant's negligent misrepresentations, Plaintiff and other consumers similarly situated were induced to purchase, purchase more of, purchase instead of, or pay more for Defendant's Class Products, due to the unlawful acts of Defendant, in an amount to be determined at trial, during the Class Period.

**FIFTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION**

198. Plaintiff repeats, re-alleges and incorporates herein by reference the above allegations as if fully stated herein.

199. Plaintiff's Intentional Misrepresentation claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

200. Therefore, Plaintiff asserts Intentional Misrepresentation claims ast to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 total)

201. Beginning at a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendant intentionally represented to the public,



KAZEROUNI LAW GROUP, APC

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


694

including Plaintiff, by promoting and other means, that Defendant's Class Products were "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

202. Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

203. Defendant's "Manufactured in the USA" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

204. Defendant made the representations herein alleged with the intention of inducing the public, including Plaintiff, to purchase Defendant's Class Products for Defendant's own financial gain.

205. Defendant intentionally made such misrepresentations by printing and advertising its misrepresentations its website and the websites of its third-party vendors.

206. Defendant's misrepresentations of the Class Products as "Manufactured in the USA" without clear and adequate qualification was misleading because Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

207. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendant's advertising representations and, in reliance on such representations, purchased the Class Products, as described above.

208. At all times relevant, Defendant intentionally made the misrepresentations herein alleged and allowed the misrepresentations to continue to be made by its resellers when Defendant knew the representations to be false.

209. As a proximate result of Defendant's intentional misrepresentations, Plaintiff and other consumers similarly situated were induced to spend an amount of money to be determined at trial on Defendant's misrepresented Products.

210. Defendant knew that its Class Products were in fact not "Manufactured in the USA" without clear and adequate qualification but instead made with or contain ingredients and components



KAZEROUNI LAW GROUP, APC

that are not manufactured in the USA, but nevertheless made the representations described herein with the intention that consumers rely on Defendant's representations.

211. Defendant also knew that its website, as well as the websites of its third-party vendors, were advertising its Class Products as "Manufactured in the USA" without clear and adequate qualification, when Defendant clearly knew that its Class Products were in fact made with or contained ingredients and components that were not manufactured in the USA.

212. Plaintiff and other consumers similarly situated, in purchasing and using the Class Products as herein alleged, did rely on Defendant's representations, including the representations on Defendant's advertisements and website, all to their damage and/or detriment as herein alleged.

213. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendant as follows:

a. The "who" is Defendant;

b. The "what" is representation that Defendant's Class Products were "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

c. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

d. The "where" is in Defendant's product advertisements and marketing;

e. The "to whom" is Plaintiff and the putative class who bought the Class Products;

f. The "by what means" by Defendant representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA;

g. The "how" is the allegation that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

214. By engaging in the acts described above, Defendant is guilty of malice, oppression,


696
KAZEROUNI LAW GROUP, APC

and fraud, and Plaintiff and the Class members are therefore entitled to recover exemplary or punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the Court grant Plaintiff and the putative Class the following relief:

- That this action be certified as a Class Action;
- That Plaintiff be appointed as the Class Representative;
- That Plaintiff's attorneys be appointed as Class Counsel;
- That Defendant's wrongful conduct be adjudged and decreed to violate the consumer protection statutes raised herein;
- That Plaintiff and each of the other members of the Class recover the amounts by which Defendant and Does have been unjustly enriched;
- An order requiring imposition of a constructive trust and and/or disgorgement of Defendant's and Does' ill-gotten gains and to pay restitution to Plaintiff and all members of the Class and to restore to the Plaintiff and members of the class all funds acquired by means of any act or practice declared by this court to be an unlawful, fraudulent or unfair business act or practice, in violation of laws, statutes or regulations, or constituting unfair competition;
- Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery were necessary and as applicable, to prevent Defendant or Does from retaining the benefits of their wrongful conduct;
- That Defendant and Does be enjoined from continuing the wrongful conduct alleged herein and be required to comply with all applicable laws;
- A temporary, preliminary and/or permanent order for injunctive relief requiring Defendant and Does to: (i) discontinue its false and/or misleading statement/s; and (ii) undertake an immediate public information campaign to inform members of the proposed class as to their prior practices;
- Pre-judgment interests from the date of filing of this suit;


697

KAZEROUNI LAW GROUP, APC

- that Plaintiff and each member of the putative Class recover their costs of suit.

**FIRST CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT CAL. BUS. & PROF. CODE §§ 1750, *ET SEQ.***

- Actual damages, injunctive relief, restitution, and punitive damages pursuant to Cal. Civ. Code § 1780(a); and
- an award of costs and attorney's fees pursuant to Cal. Civ. Code § 1780(d).

**SECOND CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17535; and
- Recovery of reasonably attorney's fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**THIRD CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17203; and
- Recovery of reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**FOURTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION**

- A judgment against Defendant and Does for general and compensatory damages in an amount to be determined at trial

**FIFTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION**

- A judgment against Defendant and Does for general and compensatory damages in an amount to be determined at trial;
- Punitive damages pursuant to Cal. Civ. Code § 3294; and
- That Plaintiff and the members of the Class be granted any other relief the Court may deem just and proper.


698

**TRIAL BY JURY**

215. Plaintiff is entitled, and demands, a trial by jury on all issues so triable.

Dated: September 25, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: *__/s/ Gustavo Ponce__*
Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*

KAZEROUNI LAW GROUP, APC



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


699

KAZEROUNI LAW GROUP, APC

**PROOF OF SERVICE**

I am over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On September 25, 2025, I served the foregoing document and accompanying attachments by the means indicated below:

**THIRD AMENDED COMPLAINT**

☒ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

☒ ELECTRONIC SERVICE - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m. The electronic filing system sends an e-mail notification of the filing to the parties and counsel of record.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Angela M. Sousa
Anthony Hopp
Melanie A. Ayerh
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
jsingh@steptoe.com
asousa@steptoe.com
ahopp@steptoe.com
mayerh@steptoe.com
*Attorneys for Defendant*
*Nutra Holdings, Inc. d/b/a Jacked Factory*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on September 25, 2025, at Las Vegas, Nevada.

*/s/ Gustavo Ponce*
GUSTAVO PONCE



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


700

KAZEROUNI LAW GROUP, APC

# EXHIBIT A


701

KAZEROUNI LAW GROUP, APC

## CLASS PRODUCTS

1. Altius Pre
2. Androsurge
3. Build PM
4. Build XT
5. Burn XT
6. Burn XT Black
7. Burn XT Powder
8. Burn XT Stick Packs
9. Caffeine
10. Defend XT
11. Dry XT
12. EAA Surge
13. Flex XT
14. GDA XT
15. Green Surge (Capsules)
16. Green Surge (Powder)
17. Green Tea
18. Intra Surge
19. L-Arginine
20. Lean PM
21. Lean XT
22. N.O. XT
23. Nitrosurge Build
24. Nitrosurge Max
25. Nitrosurge Natural
26. Nitrosurge Pre-Workout (the Product)
27. Nitrosurge Shred
28. Primasurge
29. Pro Series Test
30. Pump Surge
31. Red Surge
32. Test PM

Class Products with multiple flavors, packaging sizes or other variations not specifically listed here are all subject to this letter.


702

KAZEROUNI LAW GROUP, APC

# EXHIBIT B


703

KAZEROUNI
LAW GROUP, APC

245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523
www.kazlg.com

March 8, 2023

**VIA FEDEX**
Nutra Holdings, Inc d/b/a Jacked Factory
c/o John Williams
Chief Executive Officer
145 Aberdeen Avenue, Unit 1
St. John's, NL A1A 5P6
Canada

Nutra Holdings, Inc. d/b/a Jacked Factory
c/o Stewart McKelvey
Cabot Place
100 New Gower Street, Suite 1100
St. John's, NL A1C 6K3
Canada

**AGENT FOR SERVICE; VIA CERTIFIED US MAIL, WITH RETURN RECEIPT REQUESTED**
Nutra Holdings, Inc. d/b/a Jacked Factory's
c/o The Corporation
311 Crossways Park Drive
Woodbury, NY 11797

Nutra Holdings, Inc. d/b/a Jacked Factory's
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

**VIA EMAIL**
support@jackedfactory.com

**RE: Demand Letter Pursuant to California Civil Code § 1750 *Et Seq*.**

Dear Sir or Madam:

This letter serves as notice and demand for corrective action by our client, Daniel Rossi, ("Mr. Rossi"),[1] on behalf of himself an all others similarly situated within the State of California pursuant to the Consumers Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*), ("CLRA"). This letter is sent on behalf of Mr. Rossi, a consumer and purchaser of Nutra Holdings, Inc. d/b/a Jacked

[1] This firm represents Daniel Rossi. Please refrain from contacting Mr. Rossi directly. Please direct any and all communications to this office.


704

Factory's ("Jacked Factory") Nitrosurge Pre-workout[2] dietary supplement (the "Product"). We hereby demand that you take immediate corrective action within thirty (30) days as further described below.

On January 24, 2023, Mr. Rossi, a resident of California, searched online for a pre-workout supplement. During his online search, Mr. Rossi discovered the Product on Amazon.com. After reviewing the Product, Mr. Rossi decided to purchase a 30 serving container of the Product from Amazon.com.

Jacked Factory markets and advertises various products, including the Product purchased by our client, as "Manufactured in the USA." This representation, which is displayed prominently on the advertising of Jacked Factory products, including the company's website at www.jackedfactory.com and in the company's Amazon.com product pages, conveys important representations to consumers regarding the quality and characteristics of Jacked Factory's products. Specifically, the term "Manufactured in the USA" conveys to a reasonable consumer that Jacked Factory's products, including the Product, are made entirely in the United States, made of ingredients from the United States, made pursuant to United States labor standards, and are therefore of superior quality (i.e., contain better grown ingredients than non-US made products or raw materials). Mr. Rossi relied on these representations by Jacked Factory when making the decision to purchase the Product for its advertised price of $29.99 plus shipping & handling as well as applicable tax.

Contrary to its "Manufactured in the USA" representation, many, if not all, products produced and sold by Jacked Factory contain or are made with ingredients that are not "Manufactured in the USA." For example, the Product contains L-Citrulline, Betaine Anhydrous, Beta Alanine, and L-Theanine, which in this instance, among other ingredients in the product, are not from the United States, yet its advertising states "Manufactured in the USA." Similarly, Jacked Factory's Burn-XT contains acetyl-L-Carnitine HCl, Green Tea Leaf Extract and Black Pepper Fruit Extract, which in this instance, among other ingredients in the product, are not from the United States, yet the advertising on its webpage, at https://www.jackedfactory.com/products/burn-xt, also states "Manufactured in the USA." Jacked Factory's N.O. XT contains Arginine, Glutathione and Citrulline, which in this instance, among other ingredients in the product, are not from the United States, yet its advertising states "Manufactured in the USA" (See https://www.jackedfactory.com/products/no-xt). Additionally, on Jacked Factory's website, it even lists an "FAQ" of "Where is [Product] Manufactured" on each of its product's website pages to which the response by Jacked Factory is "All Jacked Factory products are ***proudly manufactured in the USA*** in a cGMP certified facility using the highest quality control guidelines for maximum potency, quality, & safety." (emphasis added).

The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here. However, it is abundantly clear that Jacked Factory pays no attention to applicable laws regarding the labeling of its products with "Manufactured in the USA", or any

[2] As titled on Amazon.com when our client bought the Product: "*NITROSURGE Pre Workout Supplement - Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps - Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White.*"


705

derivative thereof. **Therefore, each and every one of Jacked Factory products[3] regardless of brand, type, configuration or size, including but not limited to the aforementioned brands and products, containing foreign ingredients, components or raw materials and any reference to "Manufactured in the USA" or any derivative thereof, is subject to the demand/s made in this letter. Please note that should this firm file suit on behalf of our client, we will seek to represent the purchasers of any and all of Jacked Factory misrepresented products.**

Section 1770(a) of the CLRA prohibits, among other things, the following unfair methods of competition and unfair or deceptive acts or practices when attempting to sell or selling goods and services to consumers: (2) Misrepresenting the source, sponsorship, approval, or certification of goods or services; (3) Misrepresenting the affiliation, connection, or association with, or certification by, another; (4) Using deceptive representations or designations of geographic origin in connection with goods or services; (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have; (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (9) Advertising goods or services with intent not to sell them as advertised. (*See* Cal. Civil Code sections 1770(a) (2), (3), (4), (5), (7), and (9).)

The above-described representations and/or omissions are false and misleading and constitute unlawful, unfair, or fraudulent acts, or practices and unfair methods of competition in violation of the CLRA, including but not limited to §§ 1770(a)(2), (3), (4), (5), (7), and (9). The representations also violate California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq*; and California's False Advertising Law, California Business & Professions Code §§ 17500, *et seq.* Jacked Factory has and continues to mislead consumers into believing that its products containing the aforementioned ingredients, among others, are "Manufactured in the USA," when in fact that is not true. These misrepresentations allow Jacked Factory to increase its sales and capture market share from its competitors.

If our client had known the true nature of Jacked Factory's products, he would not have purchased the Product. Our client is a citizen of the State of California and is a consumer as defined in California Civil Code § 1761(d) because he purchased the Product for personal, family, or household purposes. Our client saw and read Jacked Factory's advertising representations and relied on such false and deceptive marketing in deciding to purchase the Product. As a result, our client was injured and suffered loss of money.

We hereby demand on behalf of our client and all other similarly situated that Jacked Factory immediately:

> (1) cease and desist from the continued sale of all its misrepresented products with the "Manufactured in the USA" representation, including the Product as well as those in Exhibit A;

---

[3] For a list that includes, but is not limited to, Jacked Factory products subject to this letter see Exhibit A.


706

(2) initiate a corrective advertising campaign to inform consumers about the true nature of its products, including the Product as well as those in Exhibit A;
(3) initiate a full recall with an offer to refund the purchase price of all misrepresented Jacked Factory products, including the Product purchased by our client, as well as those in Exhibit A, plus reimbursement for interest; and
(4) pay reasonable attorneys' fees and costs.

Please comply with this demand within thirty (30) days from receipt of this letter. Please be advised that your failure to comply with this request within thirty (30) calendar days may subject you to the following remedies under the CLRA:

(1) The actual damages suffered;
(2) An order enjoining you for such methods, acts or practices;
(3) For restitution of property if applicable;
(4) Punitive damages;
(5) Court costs and reasonable attorneys' fees; and
(6) Any other relief which the court deems proper.

## NOTICE OF DUTY TO PRESERVE EVIDENCE

**Since litigation may be filed in this matter, this letter also serves as notice to Jacked Factory, its suppliers, contract manufacturers, web development firms, Amazon firms, marketing agencies and anyone involved in the sourcing, manufacturing, production/creation of packaging, distribution, sales, advertising and marketing of Jacked Factory's products of their duty to preserve and retain all documents, tangible items, and electronically stored information and communications that are potentially relevant to this matter, including, but not limited to, documents detailing revisions of marketing, advertising, packaging and quantities of each product produced and/or sold.**

If Jacked Factory wishes to enter into discussions to resolve the demands asserted in this letter, please contact me immediately. Your cooperation in this matter would be greatly appreciated.

Yours truly,

***/s/ Abbas Kazerounian***

Abbas Kazerounian, Esq.
Direct Line: 800-400-6808 Ext: 2
ak@kazlg.com




707

# Exhibit A

1. Nitrosurge Pre-Workout
2. Nitrosurge Shred
3. Authentic Whey
4. Burn XT
5. Creatine Monohydrate
6. Pump Surge
7. Authentic Protein Cereal
8. Lean PM
9. N.O. XT
10. EAA Surge
11. Andro Surge
12. Build XT
13. Authentic Iso
14. Prima Surge
15. Hydra Surge
16. Intra Surge
17. Green Surge Powder
18. Green Surge Capsules
19. Burn XT Black
20. Lean XT
21. Dry XT
22. Carb Surge
23. Altius Pre
24. Build PM
25. BCAA
26. Vita XT
27. Test PM
28. Defend XT
29. L-Glutamine
30. L-Arginine (Nitrosigine)
31. Burn XT Powder
32. GDA XT
33. Red Surge
34. Green Tea Extract
35. Pro Series Test
36. Authentic Casein
37. Burn XT Stick Packs
38. Authentic Vegan
39. Form XT
40. Caffeine
41. Flex XT
42. Crea Surge
43. Nitro Surge Build


708

44. Nitro Surge Natural
45. Nitro Surge Max
46. Any and all other products that contain "Manufactured in the USA" or any derivative thereof in any of their advertising or marketing.

Products with multiple flavors, packaging or other variations not specifically listed here are all subject to this letter.




709

KAZEROUNI LAW GROUP, APC

# EXHIBIT C


710

KAZEROUNI LAW GROUP, APC

**AFFIDAVIT OF JENNIFER HYATT**

I, DANIEL ROSSI, DECLARE:

1. On or about January 25, 2023, I visited Amazon.com and purchased Defendant's Nitrosurge Pre-workout[1] dietary supplement (the "Product").
2. At the time of my purchase and review of the Product, I was in the County of Los Angeles, California, where I also reside.
3. It is my understanding that Defendant Nutra Holdings, Inc. d/b/a Jacked Factory conducts business in the County of Los Angeles, State of California.

I declare under the penalty of perjury under the laws of the state of California that the foregoing is true and correct, executed on August 5___, 2024.

By: Daniel Rossi

Daniel Rossi

[1] As titled on Amazon.com when Plaintiff purchased the Product; "NITROSURGE Pre Workout Supplement – Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps – Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White."


711

citrix | RightSignature

## SIGNATURE CERTIFICATE

**REFERENCE NUMBER**
EFA4F1D1-98FB-457B-9030-0343BD7A643D

| TRANSACTION DETAILS | DOCUMENT DETAILS |
|---|---|
| **Reference Number**<br>EFA4F1D1-98FB-457B-9030-0343BD7A643D | **Document Name**<br>B Exhibit B Daniel Rossi Complaint Affidavit |
| **Transaction Type**<br>Signature Request | **Filename**<br>B_Exhibit_B_Daniel_Rossi_Complaint_Affidavit.pdf |
| **Sent At**<br>08/05/2024 18:01 EDT | **Pages**<br>2 pages |
| **Executed At**<br>08/05/2024 18:20 EDT | **Content Type**<br>application/pdf |
| **Identity Method**<br>email | **File Size**<br>185 KB |
| **Distribution Method**<br>email | **Original Checksum**<br>e3f80ad1b8a211be093e16f69a568acb9be1dc32e53c8df4624b76eb1aaa7d8e |
| **Signed Checksum**<br>bba890c0dc1371abd85b79a4695d1b6cb61ea3116e0d5f2b693406999fd01b39 | |
| **Signer Sequencing**<br>Disabled | |
| **Document Passcode**<br>Disabled | |

## SIGNERS

| SIGNER | E-SIGNATURE | EVENTS |
|---|---|---|
| **Name**<br>Daniel Rossi<br>**Email**<br>dcrossi888@gmail.com<br>**Components**<br>2 | **Status**<br>signed<br>**Multi-factor Digital Fingerprint Checksum**<br>cc1f02c24bbad06c275630f1adf177ec64b339c52a2f166d6bebc9327f46c217<br>**IP Address**<br>172.251.234.249<br>**Device**<br>Chrome via Mac<br>**Typed Signature**<br>Daniel Rossi<br>**Signature Reference ID**<br>65C48872 | **Viewed At**<br>08/05/2024 18:20 EDT<br>**Identity Authenticated At**<br>08/05/2024 18:20 EDT<br>**Signed At**<br>08/05/2024 18:20 EDT |

## AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 08/05/2024 18:01 EDT | Ali Sadrarhami (ali@kazlg.com) created document 'B_Exhibit_B_Daniel_Rossi_Complaint_Affidavit.pdf' on Chrome via Mac from 174.79.245.20. |
| 08/05/2024 18:01 EDT | Daniel Rossi (dcrossi888@gmail.com) was emailed a link to sign. |
| 08/05/2024 18:20 EDT | Daniel Rossi (dcrossi888@gmail.com) viewed the document on Chrome via Mac from 172.251.234.249. |
| 08/05/2024 18:20 EDT | Daniel Rossi (dcrossi888@gmail.com) authenticated via email on Chrome via Mac from 172.251.234.249. |
| 08/05/2024 18:20 EDT | Daniel Rossi (dcrossi888@gmail.com) signed the document on Chrome via Mac from 172.251.234.249. |


712

KAZEROUNI LAW GROUP, APC

# EXHIBIT D


713


Supplement Facts
Serving Size 9.5 g (About 2 Scoops)
Servings Per Container 30
Amount Per Serving
% Daily Value
Calories 5
Total Carbohydrate 1 g <1%*
Total Sugars 0 g **
Magnesium 60 mg 14%
Chloride 190 mg 8%
Sodium 110 mg 5%
Potassium 45 mg 1%
Amino Blend 5 g **
Micronized Taurine, Micronized L-Glutamine, Micronized L-Arginine, Micronized L-Leucine, Beta-Alanine, Micronized L-Citrulline, Micronized L-Isoleucine, Micronized L-Valine, Micronized L-Tyrosine, Micronized L-Histidine, Micronized L-Lysine Hydrochloride, Micronized L-Phenylalanine, Micronized L-Threonine, Micronized L-Methionine
Electrolyte Blend 440 mg **
Sodium Chloride, Magnesium Oxide, Potassium Chloride
Caffeine† 100 mg **
Green Tea Leaf Extract 50 mg **
Green Coffee Bean Extract 10 mg **
*Percent Daily Values are based on a 2,000 calorie diet.
**Daily Value not established.
OTHER INGREDIENTS: Natural and Artificial Flavor, Malic Acid, Citric Acid, Silicon Dioxide, Calcium Silicate, Sucralose, Gum Blend (Cellulose Gum, Xanthan Gum, Carrageenan), Tartaric Acid, Sunflower and/or Soy Lecithin, Beet Juice Powder (color), Inulin.
CONTAINS: SOY.
PHENYLKETONURICS: CONTAINS PHENYLALANINE.
NO ASPARTAME.
SERVING SCOOP INCLUDED. MAY SETTLE TO THE BOTTOM DURING SHIPPING.
Shake gently before first use.
INFORMED CHOICE
REGULARLY TESTED FOR BANNED SUBSTANCES
ON
MANUFACTURED BY OPTIMUM NUTRITION, INC.
MANUFACTURED IN THE USA
THIS PRODUCT CONTAINS INGREDIENTS OF INTERNATIONAL AND DOMESTIC ORIGIN.
TIME OF FILL
AFTER SETTLING
CONTENTS SOLD BY WEIGHT NOT VOLUME. SOME SETTLING WILL OCCUR.




LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


Supplement Facts
Serving Size: 1 Scoop (9g)
Servings Per Container: Approx 30
Amount Per 1 Scoop % DV 2 Scoops % DV
Total Carbohydrate <1g 0%* 1g 0%*
Niacin (as nicotinic acid) 15mg 94% 30mg 188%
Choline (as choline bitratrate) 40mg 7% 80mg 15%
Iron 0.2mg 1% 0.5mg 3%
Sodium 5mg <1% 10mg <1%
Potassium 45mg 1% 90mg 2%
Musclebuilding Matrix
Creatine monohydrate 1,500mg † 3,000mg †
Betaine anhydrous 1,250mg † 2,500mg †
Performance & Endurance Compound
Beta-alanine 1,600mg † 3,200mg †
Taurine 500mg † 1,000mg †
Pump Matrix
Nitrosigine® arginine inositol silicate 750mg † 1,500mg †
Hawthorn extract (as Crataegus pinnatifida) (berry) 200mg † 400mg †
Energy+ Matrix
Caffeine anhydrous 190mg † 380mg †
Choline bitartrate 100mg † 200mg †
Neuro-Sensory Blend
L-theanine 62.5mg † 125mg †
Galangal extract (as Alpinia officinarum) (stem & root) 25mg † 50mg †
Yohimbe extract (as Pausinystalia yohimbe) (bark) 20mg † 40mg †
Standardized for 6% yohimbine
* Percent Daily Values (DV) are based on a 2,000 calorie diet.
† Daily Value not established.
Other Ingredients: Citric Acid, Silicon Dioxide, Natural and Artificial Flavors, Malic Acid, Resistant Maltodextrin, Sucralose, Acesulfame-Potassium, Gum Blend (Cellulose Gum, Xanthan Gum, Carrageenan), FD&C Blue No. 1. Processed in a facility that processes milk, egg, wheat, soy, sesame, peanut, tree nut, fish and shellfish ingredients.
WARNING: Not intended for use by persons under 18. Do not use if pregnant or nursing. Do not use if you have had a myocardial infarction (heart attack). Inhalation may amplify the inflammatory airway response in people with asthma. One serving of this product contains up to as much caffeine as 2 cups of coffee. Caffeine-sensitive individuals may experience symptoms including (but not limited to) restlessness, nervousness, tremors, anxiety, increased heart rate, or difficulty sleeping. Do not combine with other sources of caffeine or stimulants. Some individuals may experience a harmless tingling sensation from the concentrated performance dose of beta-alanine. Consult a medical doctor if you have a medical condition or before starting any diet or exercise program.
KEEP OUT OF REACH OF CHILDREN.
CONTAINS BIOENGINEERED FOOD INGREDIENTS.
Do not use if packaging has been tampered with. Store in a cool, dry place (60°F to 80°F).
▲ These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.
Nitrosigine
Made in the U.S.A. from international ingredients. © 2021. Nitrosigine and the Nitrosigine logo are registered
North Market Street, Suite 1330, Wilmington, DE 19801
protected. For lot no. and expiry date: see bottle.
18582US




716


Supplement Facts
Serving Size 18.5 g (About 1 Scoop)
Servings Per Container 60
Amount Per Serving
% Daily Value
Calories 20
Total Carbohydrate 5 g 2%†
Vitamin D 12.5 mcg 63%
Thiamin 2 mg 167%
Niacin 20 mg 125%
Vitamin B6 2 mg 118%
Folate 330 mcg DFE 83%
Vitamin B12 6 mcg 250%
Pantothenic Acid 10 mg 200%
Calcium 40 mg 3%
Magnesium 125 mg 30%
Sodium 140 mg 6%
Potassium 270 mg 6%
N.O.-XPLODE® MASTER PERFORMANCE BLEND*
Myogenic Matrix* 5.1 g **
Creatine Blend (Creatine Monohydrate, Creatine Anhydrous), Taurine, Di-Calcium Phosphate, Di-Sodium Phosphate, AstraGIN® Proprietary Blend [Astragalus membranaceus Extract (root), Panax notoginseng Extract (root)]
Endura Shot* 2.9 g **
Beta-Alanine, Potassium Bicarbonate, Sodium Bicarbonate, Magnesium Oxide, Cholecalciferol
Thermic Energy* 1.3 g **
N-Acetyl-L-Tyrosine, L-Tyrosine, Caffeine Anhydrous, Grapefruit Bioflavonoid Complex
N.O. Alpha Fusion* 1 g **
L-Citrulline Malate, Danshen Extract (Salvia miltiorrhiza)(root), Grape Skin Extract, Phyllanthus emblica Extract (fruit) (CAPROS®), Hawthorn Extract (aerial parts), Folic Acid
Shock Composite* 290 mg **
DMAE Bitartrate (2-Dimethylaminoethanol), L-Phenylalanine, Nicotinic Acid, Calcium D-Pantothenate, Toothed Clubmoss Extract (aerial parts), Thiamin Hydrochloride, Pyridoxine Hydrochloride, Cyanocobalamin
†Percent Daily Values are based on a 2,000 calorie diet.
**Daily Value Not Established.
OTHER INGREDIENTS: Natural and Artificial Flavor, Citric Acid, Malic Acid, Calcium Silicate, Silicon Dioxide, Sucralose, Beet Juice Powder (Color), Salt.
MANUFACTURED BY: Bio-Engineered Supplements & Nutrition, Inc., 3500 Lacey Road, Suite 1200, Downers Grove, IL 60515 USA 877.673.3727 www.goBSN.com
MANUFACTURED IN THE USA
This product contains ingredients of international and domestic origin


717

KAZEROUNI LAW GROUP, APC

# EXHIBIT E


718

Check for updates

EFSA Journal

SCIENTIFIC OPINION

ADOPTED: 24 March 2020

doi: 10.2903/j.efsa.2020.6099

# Safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food pursuant to Regulation (EU) 2015/2283

EFSA Panel on Nutrition, Novel Foods and Food Allergens (NDA), Dominique Turck, Jacqueline Castenmiller, Stefaan De Henauw, Karen Ildico Hirsch-Ernst, John Kearney, Alexandre Maciuk, Inge Mangelsdorf, Harry J McArdle, Androniki Naska, Carmen Pelaez, Kristina Pentieva, Alfonso Siani, Frank Thies, Sophia Tsabouri, Marco Vinceti, Francesco Cubadda, Karl Heinz Engel, Thomas Frenzel, Marina Heinonen, Rosangela Marchelli, Monika Neuhäuser-Berthold, Morten Poulsen, Josef Rudolf Schlatter, Henk van Loveren, Reinhard Ackerl and Helle Katrine Knutsen

## Abstract

Following a request from the European Commission, the EFSA Panel on Nutrition, Novel Foods and Food Allergens (NDA) was asked to deliver a scientific opinion on a botanical extract derived from both *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food (NF) pursuant to Regulation (EU) 2015/2283. The NF is a combination of an ethanol extract of the roots of *A. membranaceus* and a hot water extract of the roots of *P. notoginseng*. The NF contains 1.5–5% total saponins, 0.1–0.5% ginsenoside Rb1 and 0.01–0.1% astragaloside I. Both plants that are used to produce the NF have a long history of use, especially in traditional Chinese medicine. Information on the production process and the composition of the NF is sufficient and does not raise safety concerns. The applicant proposed to use the NF as a food supplement for the general adult population, excluding pregnant women, at a maximum daily amount of 350 mg. Taking into account these conditions of use, the Panel considers that the consumption of the NF is not nutritionally disadvantageous. The provided genotoxicity studies do not raise concerns for genotoxicity of the NF. Based on the findings of a subchronic toxicity study, supported by a subacute toxicity study, the Panel identified the overall no observed adverse effect level (NOAEL) of the NF at 100 mg/kg body weight (bw) per day. By applying an uncertainty factor of 200, the Panel concludes that the NF is safe at an intake level of 0.5 mg/kg bw per day, corresponding to a maximum daily intake of 35 mg of the NF for the target population, i.e. adults excluding pregnant women.

© 2020 European Food Safety Authority. *EFSA Journal* published by John Wiley and Sons Ltd on behalf of European Food Safety Authority.

**Keywords:** *Panax notoginseng*, *Astragalus membranaceus*, *Astragalus propinquus*, extract, novel food, safety

**Requestor:** European Commission following an application by NuLiv Science

**Question number:** EFSA-Q-2018-00557

**Correspondence:** nda@efsa.europa.eu



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


719

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Panel members:** Dominique Turck, Jacqueline Castenmiller, Stefaan De Henauw, Karen Ildico Hirsch-Ernst, John Kearney, Helle Katrine Knutsen, Alexandre Maciuk, Inge Mangelsdorf, Harry J McArdle, Androniki Naska, Carmen Pelaez, Kristina Pentieva, Alfonso Siani, Frank Thies, Sophia Tsabouri and Marco Vinceti.

**Suggested citation:** EFSA NDA Panel (EFSA Panel on Nutrition, Novel Foods and Food Allergens), Turck D, Castenmiller J, De Henauw S, Hirsch-Ernst KI, Kearney J, Maciuk A, Mangelsdorf I, McArdle HJ, Naska A, Pelaez C, Pentieva K, Siani A, Thies F, Tsabouri S, Vinceti M, Cubadda F, Engel KH, Frenzel T, Heinonen M, Marchelli R, Neuhäuser-Berthold M, Poulsen M, Schlatter JR, van Loveren H, Ackerl R and Knutsen HK, 2020. Scientific Opinion on the safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food pursuant to Regulation (EU) 2015/2283. EFSA Journal 2020;18(5):6099, 16 pp. https://doi.org/10.2903/j.efsa.2020.6099

**ISSN:** 1831-4732

© 2020 European Food Safety Authority. *EFSA Journal* published by John Wiley and Sons Ltd on behalf of European Food Safety Authority.

This is an open access article under the terms of the Creative Commons Attribution-NoDerivs License, which permits use and distribution in any medium, provided the original work is properly cited and no modifications or adaptations are made.

The EFSA Journal is a publication of the European Food Safety Authority, an agency of the European Union.



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


720

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## Table of contents


Abstract ........ 1
1. Introduction ........ 4
1.1. Background and Terms of Reference as provided by the European Commission ........ 4
2. Data and methodologies ........ 4
2.1. Data ........ 4
2.2. Methodologies ........ 4
3. Assessment ........ 4
3.1. Introduction ........ 4
3.2. Identity of the NF ........ 5
3.2.1. Panax notoginseng (Burkill) F.H. Chen ........ 5
3.2.2. *Astragalus membranaceus* (Fisch.) Bunge ........ 5
3.3. Production process ........ 5
3.4. Compositional data ........ 6
3.4.1. Stability ........ 7
3.5. Specifications ........ 8
3.6. History of use of the NF and/or of its source ........ 9
3.6.1. History of use of the source of the NF ........ 9
3.6.2. History of use of the NF ........ 9
3.7. Proposed uses and use levels ........ 9
3.7.1. Target population ........ 9
3.7.2. Proposed uses and use levels ........ 9
3.8. Absorption, distribution, metabolism and excretion (ADME) ........ 9
3.9. Nutritional information ........ 9
3.10. Toxicological information ........ 10
3.10.1. Genotoxicity ........ 10
3.10.2. Subacute and subchronic toxicity ........ 11
3.10.3. Human data ........ 13
3.11. Allergenicity ........ 13
4. Discussion ........ 13
5. Conclusions ........ 13
Steps taken by EFSA ........ 13
References ........ 14
Abbreviations ........ 15




LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


721

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

# 1. Introduction

## 1.1. Background and Terms of Reference as provided by the European Commission

On 8 June 2018, the company NuLiv Science submitted a request to the European Commission in accordance with Article 10 of Regulation (EU) 2015/2283[1] to place a botanical extract derived from both *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) on the Union market as a novel food (NF).

The NF is intended for use in food supplements and the suggested daily intake for adults is 50 mg.

The target population is the general population, excluding children and pregnant women.

On 22 October 2018, and in accordance with Article 10(3) of Regulation (EU) 2015/2283, the European Commission asked EFSA to provide a scientific opinion on the extract derived from *Panax notoginseng* and *Astragalus membranaceus*.

# 2. Data and methodologies

## 2.1. Data

The safety assessment of this NF is based on data supplied in the application, information provided by the EFSA Working Group on Compendium of Botanicals and information submitted by the applicant following two EFSA requests for supplementary information.

The information in support of this application has been made available through the Commission e-submission portal (NF 2018/0284).

Administrative and scientific requirements for NF applications referred to in Article 10 of Regulation (EU) 2015/2283 are listed in the Commission Implementing Regulation (EU) 2017/2469[2].

A common and structured format on the presentation of NF applications is described in the EFSA guidance on the preparation and presentation of a NF application (EFSA NDA Panel, 2016). As indicated in this guidance, it is the duty of the applicant to provide all of the available (proprietary, confidential and published) scientific data, including both data in favour and not in favour of supporting the safety of the proposed NF.

This NF application includes a request for protection of proprietary data in accordance with Article 26 of Regulation (EU) 2015/2283. Data claimed to be proprietary by the applicant include all the submitted analytical information, the manufacturing process and the toxicity studies provided.

## 2.2. Methodologies

The assessment follows the methodology set out in the EFSA guidance on NF applications (EFSA NDA Panel, 2016) and the principles described in the relevant existing guidance documents from the EFSA Scientific Committee. The legal provisions for the assessment are laid down in Article 11 of Regulation (EU) 2015/2283 and in Article 7 of the Commission Implementing Regulation (EU) 2017/2469.

The information provided by the EFSA Working Group on Compendium of Botanicals is based on extensive literature searches on *P. notoginseng* and *A. membranaceus*, following a search strategy and standard operating procedure as described by Dibusz and Vejvodova (2020).

This assessment concerns only risks that might be associated with consumption of the NF under the proposed conditions of use, and is not an assessment of the efficacy of AstraGin™ with regard to any (claimed) benefit.

# 3. Assessment

## 3.1. Introduction

The NF which is the subject of the application is a combination of root extracts from *P. notoginseng* and *A. membranaceus*, denominated as AstraGin™.

[1] Regulation (EU) 2015/2283 of the European Parliament and of the Council on novel foods, amending Regulation (EU) No 1169/2011 of the European Parliament and of the Council and repealing Regulation (EC) No 258/97 of the European Parliament and of the Council and Commission Regulation (EC) No 1852/2001 (2013/0435 (COD). OJ L 327, 11.12.2015, p. 1–22.

[2] Commission Implementing Regulation (EU) 2017/2469 of 20 December 2017 laying down administrative and scientific requirements for applications referred to in Article 10 of Regulation (EU) 2015/2283 of the European Parliament and of the Council on novel foods. OJ L 351, 30.12.2017, pp. 64–71.



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


722

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

The NF falls under Regulation 2015/2283, Article 3(2)(a)(iv): food consisting of, isolated from or produced from plants or their parts of.

The NF is proposed by the applicant to be used as a food supplement for the general adult population, except pregnant women.

## 3.2. Identity of the NF

The NF is a combination of an ethanol extract of the roots of *A. membranaceus* (Fisch.) Bunge and a hot water extract of the roots of *P. notoginseng* (Burkill) F.H. Chen.

### 3.2.1. Panax notoginseng (Burkill) F.H. Chen

The full taxonomy of *P. notoginseng* is the following. Kingdom: Plantae, Division: Magnoliophyta, Class: Magnoliopsida, Order: Apiales, Family: Araliaceae, Genus: *Panax*, Species: *Panax notoginseng*.

The plant is also known as *Panax pseudoginseng* var. *notoginseng* (Burkill) G. Hoo & C.L. Tseng and by a number of traditional Chinese names, e.g. Sanqi, San Qi, Shan Qi, Tu San Qi, Tianqi and Tien-chi.

The plant belongs to the genus *Panax*, which includes about 15 species from both Asia and America. Analyses of the 5S-rRNA spacer domains from seven Panax species showed a high degree of genetic similarity with ~ 75% of the spacer domains conserved throughout the genus (Cui et al., 2003).

The root of *P. notoginseng* contains ~ 8–13% saponins by weight (Dong et al., 2003; Wang et al., 2006). More than 150 saponins, mostly of dammarane type with 20(S)-protopanaxadiol or 20(*S*)-protopanaxatriol aglycon moieties have been identified in this species, some of them being present in other *Panax* species, some being specific of *P. notoginseng*. Many other compounds of various chemical classes are found including flavonoids, cyclopeptides, sterols, polyacetylenes, a volatile oil, saccharides and amino acids (Wang et al., 2016). Based on an earlier review, the applicant stated that 56 saponins of *P. notoginseng* have been identified with major ones being ginsenosides Rb1, Rd, Re and Rg1. Five polyacetylenes have been identified, i.e. panaxytriol, panaxydol, notoginsenic acid, β-sophoroside and 10-hydroxydeca-4,6-diynoic acid. The extract also contained the flavonoids quercetin and quercetin-3-*O*-sophoroside, a number of phytosterols and amino acids, the most prevalent ones being arginine, aspartic acid and glutamic acid. The non-proteinogenic amino acid L-dencichin (oxalyldiaminopropionic acid) has also been identified (Wang et al., 2006).

### 3.2.2. *Astragalus membranaceus* (Fisch.) Bunge

The name *A. membranaceus* (Fisch.) Bunge is a synonym of the accepted name *Astragalus propinquus* Schischkin.[3]

The full taxonomy of *A. membranaceus/A. propinquus* is the following. Kingdom: Plantae, Division: Magnoliophyta, Class: Magnoliopsida, Order: Fabales, Family: Fabaceae, Genus: *Astragalus*, Species: *A. membranaceus*/*A. propinquus*.

The plant is also known as milkvetch root (English), ogi (Japanese), hwanggi (Korean) and huang qi (in Traditional Chinese Medicine).

This species is defined as Radix Astragali in the Pharmacopoeia of China (Fu et al., 2014).

The root of *A. membranaceus*/*A. propinquus* contains a number of saponins, in particular cycloartane triterpene glycosides (astragalosides I–VII) as well as flavonoids (calycosin and formononetin genins and glycosides, ononin, among others). Other constituents include γ- and α-aminobutyric acids, L-canavanine, choline, betaine, gluconic acid, linoleic acid, asparagine, β-sitosterol (Thorne Research Inc, 2003; Fu et al., 2014).

## 3.3. Production process

According to the information provided, the NF is produced under adherence to good manufacturing practice (GMP) at GMP-certified manufacturing facilities in China. Information was provided on the Hazard Analysis and Critical Control Points (HACCP) scheme applied.

The *A. membranaceus* roots are purchased from growers in Gansu and Inner Mongolia provinces in the north-western region of China while the *P. notoginseng* roots are acquired from growers in Yunnan and Sichuan provinces in the southern region of China.

3 http://www.theplantlist.org/tpl1.1/record/ild-32156




723

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

The roots of both plants are washed with water, dried and pulverised.

The pulverised roots of *A. membranaceus* are then passed through a 10-mesh size sieve and extracted with eightfold volume of 40% ethanol. The extract is centrifuged, filtered, concentrated/dried, smashed and screened through an 80-mesh size sieve. The extract is analysed for the content of total saponins (by ultraviolet (UV) spectrophotometry) and for astragaloside I (by high-performance liquid chromatography-evaporative light scattering detection (HPLC-ELSD)).

The pulverised roots of *P. notoginseng* are passed through a 20-mesh size sieve and extracted with 10-fold volume of water. The extract is centrifuged, filtered and concentrated. The concentrated solution is subsequently absorbed on a resin, which is washed with water, and eluted with 60% ethanol. The eluent is concentrated/dried, smashed and screened through an 80-mesh size sieve. The extract is analysed for the content of total saponins (by UV spectrophotometry) and for ginsenoside Rb1 (by HPLC-UV).

The plant to extract ratios were indicated by the applicant to be 10:1 for the *Astragalus* extract and 50:1 for the *Panax* extract.

At the end of the manufacturing process the extracts are mixed (45–47.5% of each extract) with maltodextrin (5–10%). The blend, i.e. the NF, is analysed for the marker compounds (total saponins, ginsenoside Rb1 and astragaloside I; see the following Section), physicochemical characteristics, heavy metals, pesticides, organic solvent residue and microbial counts before packaging into plastic bags for storage.

The Panel considers that the production process is sufficiently described and does not raise safety concerns.

## 3.4. Compositional data

As described in the previous section, the NF is a blend of an ethanol extract of the roots of *A. membranaceus* and a hot water extract of the roots of *P. notoginseng* (plus maltodextrin as an excipient). The NF contains 1.5–5% total saponins, 0.1–0.5% ginsenoside Rb1 and 0.01–0.1% astragaloside I.

In order to provide information on the variability of the composition of the NF, the applicant submitted batch to batch analyses for total saponins, ginsenoside Rb1, astragaloside I, proximates, a number of organoleptic and physicochemical parameters, contaminants and microbiological quality of the NF (Table 1).

**Table 1:** Batch-to-batch analyses of the NF

| Parameter | Batch number | | | | |
|---|---|---|---|---|---|
| | **C20151209** | **C20160606[(1)]** | **C20170106** | **C20170515** | **C20171009** |
| Total saponins | 4.10% | 3.79% | 3.12% | 3.56% | 3.09% |
| Ginsenoside Rb1 | 0.10% | 0.17% | 0.14% | 0.11% | 0.10% |
| Astragaloside I | 0.034% | 0.028% | 0.028% | 0.024% | 0.048% |
| Colour | Light yellow | Light yellow | Light yellow | Light yellow | Light yellow |
| Odour | 'Characteristic' | 'Characteristic' | 'Characteristic' | 'Characteristic' | 'Characteristic' |
| Appearance | Fine powder | Fine powder | Fine powder | Fine powder | Fine powder |
| Sieve analysis | 100% through 80 mesh | 99% through 80 mesh | 100% through 80 mesh | 100% through 80 mesh | 100% through 80 mesh |
| Total carbohydrates | 91.8% | 92.2% | 92.1% | 92.4% | 89.6% |
| Protein | 2.1% | 2.5% | 2.4% | 2.5% | 4.3% |
| Fat | 1.4% | 0.8% | 0.7% | 0.7% | 1.1% |
| Moisture | 4.3% | 4.1% | 4.5% | 4.2% | 4.6% |
| Ash | 0.4% | 0.4% | 0.3% | 0.3% | 0.4% |
| Bulk density | 0.59 g/mL | 0.54 g/mL | 0.56 g/mL | 0.55 g/mL | 0.53 g/mL |
| Solubility in water (1 g in 30 mL) | Soluble | Soluble | Soluble | Soluble | Soluble |
| **Contaminants** | | | | | |
| Lead (Pb) | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg |
| Arsenic (As) | 0.19 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg | < 0.1 mg/kg |




724

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

| Parameter | Batch number | | | | |
|---|---|---|---|---|---|
| | C20151209 | C20160606[(1)] | C20170106 | C20170515 | C20171009 |
| Cadmium (Cd) | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg |
| Mercury (Hg) | < 0.01 mg/kg | < 0.01 mg/kg | < 0.01 mg/kg | 0.02 mg/kg | 0.02 mg/kg |
| Ethanol | < 0.5% | < 0.5% | < 0.5% | < 0.5% | < 0.5% |
| **Microbiological** | | | | | |
| Total plate count | 370 CFU/g | 35 CFU/g | 410 CFU/g | 900 CFU/g | < 10 CFU/g |
| Yeast and mould | 210 CFU/g | 20 CFU/g | 60 CFU/g | < 20 CFU/g | < 20 CFU/g |
| Enterobacteriaceae | – | < 10 CFU/g | < 10 CFU/g | < 10 CFU/g | < 10 CFU/g |
| *E. coli* (in 25 g) | Negative | Negative | Negative | Negative | Negative |
| *Salmonella* (in 375 g) | Negative | Negative | Negative | Negative | Negative |
| *Staphylococcus aureus* (in 25 g) | Negative | Negative | Negative | Negative | Negative |

NF: novel food; CFU: colony forming units.
(1): Batch of the NF that was used in the 90-day toxicity study (see Section 3.10.2).

For four additional batches (Table 2) information on the content of total saponins was provided, plus for three of the four batches also the concentrations of astragaloside I and ginsenoside Rb1.

**Table 2:** Total saponins, astragaloside I and ginsenoside Rb1 in the NF

| Parameter | Batch number | | | |
|---|---|---|---|---|
| | 20100621[(1)] | C20150120[(2)] | 20100824 | C20140921 |
| Total saponins | 2.35% | 2.68% | 2.92% | 2.0% |
| Ginsenoside Rb1 | 0.17% | 0.10% | 0.10% | Not provided |
| Astragaloside I | 0.054% | 0.033% | 0.039% | Not provided |

NF: novel food.
(1): Batch of the NF that was used in the 28-day toxicity study.
(2): Batch of the NF that was used in the bacterial reverse mutation test and in the *in vitro* mammalian cell gene mutation assay (see Section 3.10.1).

In order to achieve a certain concentration of total saponins and ginsenoside Rb1 and astragaloside I in the NF, the applicant established internal specifications for the two extracts, with total saponins ≥ 0.6% and ginsenoside Rb1 ≥ 0.2% for the *P. notoginseng* extract, and total saponins ≥ 3% and astragaloside I ≥ 0.02% for the *A. membranaceus* extract.

Considering that the genus *Astragalus* is known to accumulate trace elements, the applicant provided a certificate of analysis for one batch of the NF, in which selenium, thallium and uranium were below detection limits (i.e. < 0.1 mg/kg for selenium and thallium and < 0.01 mg/kg for uranium).

Additionally, the applicant provided the analytical results for the concentrations of pesticides and mycotoxins in the NF, which were all below their limits of detection (LODs).

The Panel considers that the information provided on the composition of the NF including the batch to batch variability is sufficient and does not raise safety concerns.

### 3.4.1. Stability

The applicant proposes a shelf-life of 3 years from the time of manufacturing of the NF.

The applicant provided data of a 6 months accelerated (i.e. at 40°C and 75% relative humidity) stability testing performed with three batches of the NF. The batches were analysed for the content of total saponins in the NF, which remained stable throughout the testing period (Table 3). Further parameters were appearance (i.e. light yellow powder), moisture, ash, heavy metals and microbial counts, which all remained within specifications during the testing period.



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


725

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**Table 3:** Total saponin content of the NF during the stability testing

| Date of analysis | Batch number | | |
|---|---|---|---|
| | **20100621** | **20100720** | **20100825** |
| 22/10/2010 | 2.35% | 2.65% | 2.92% |
| 22/11/2010 | 2.39% | 2.68% | 2.84% |
| 22/12/2010 | 2.37% | 2.59% | 2.88% |
| 22/1/2011 | 2.41% | 2.61% | 2.86% |
| 22/4/2011 | 2.43% | 2.61% | 2.93% |

NF: novel food.

The Panel considers that, given the low moisture content of the NF, eventual degradation products or microbial activity are unlikely to be of safety concern. Since the product parameters were unchanged for six months under accelerated conditions the product can be expected to be stable for up to 2 years.

## 3.5. Specifications

The specifications of the NF are indicated in Table 4.

The applicant informed that each batch of the NF will be subjected to a series of analytical quality controls to ensure that all product specifications are met, including physicochemical parameters, organoleptic characteristics, microbial counts, heavy metals and pesticide residues.

**Table 4:** Specifications of the NF

**Description:** The NF is a combination of an ethanol extract of the roots of *Astragalus membranaceus* (Fisch.) Bunge and a hot water extract of the roots of *Panax notoginseng* (Burkill) F.H. Chen
Appearance: beige to light brown yellow powder

| Parameter | Specification | Method of analysis |
|---|---|---|
| Total saponins | 1.5–5.0% | UV absorption (at 560 ± 5 nm) |
| Ginsenoside Rb1 | 0.10–0.50% | HPLC-UV |
| Astragaloside I | 0.01–0.10% | HPLC-ELSD |
| Carbohydrates | ≥ 90% | By calculation |
| Protein | ≤ 4.5% | Kjeldahl |
| Moisture | ≤ 5.0% | GB/T 14769 -1993 |
| Ash | ≤ 1.0% | AOAC 942.05, 18th |
| **Contaminants** | | |
| Arsenic (As) | ≤ 0.3 mg/kg | ChP 2015, App. IXB (ICP-MS) |
| **Microbiological** | | |
| Total plate count | ≤ 5,000 CFU/g | ISO 4833-1 |
| Total yeast and mould count | ≤ 500 CFU/g | FDA (BAM) Chapter 18, 8th Ed. |
| Enterobacteriaceae | < 10 CFU/g | ISO 21528-2:2004 |
| *E. coli* | Negative in 25 g | ISO 7251:2005 |
| *Salmonella* | Negative in 375 g | FDA (BAM) Chapter 5, 8th Ed. |
| *Staphylococcus aureus* | Negative in 25 g | GB 5009.22-2016 |

CFU: colony forming units; FDA-BAM: Food and Drug Administration's Bacteriological Analytical Manual; GC–MS: gas chromatography–mass spectrometry; HPLC: high-performance liquid chromatography; ICP-MS:inductively coupled plasma mass spectrometry; UV: ultraviolet; ELSD: evaporative light scattering detector.

The Panel considers that the information provided on the specifications of the NF is sufficient and does not raise safety concerns.




726

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## 3.6. History of use of the NF and/or of its source

### 3.6.1. History of use of the source of the NF

Both plants *A. membranaceus* and *P. notoginseng* have a long history of use in humans, especially in China.

According to the information provided, *A. membranaceus* has a recorded history of use of over 2,000 years (Khan and Abourashed, 2009). Traditionally, it has mainly been used as raw dried root, honey-cured root or as aqueous decoction, although steeping in ethanol has also been described (Reid, 1995; Khan and Abourashed, 2009). Daily doses of the root are reported to range from 9 to 30 g, with more than 60 g in some cases (Duke and Ayensu, 1985; Leung, 1995; Leung and Foster, 1996; Zhu, 1998b; Yu et al., 2007).

Documented use of *P. notoginseng* dates back to the 16th century and its cultivation in certain areas has been reported to exceed 1,000 years, with current production in China of approximately 2,000 tonnes per year (Dong et al., 2003). Typical total daily doses range from approximately 3 to 15 g of roots for a decoction or 1–5 g of root as a ground powder. The use of ethanolic extracts was also reported (Bensky and Gamble, 1986; Zhu, 1998a; Dharmananda, 2004; Wang et al., 2006; Reid, 1987).

The Panel notes that extensive literature searches performed by UCT Prague retrieved 13,581 and 8,116 scientific articles for *A. membranaceus* and *P. notoginseng*, respectively, demonstrating that these species have been extensively studied.

### 3.6.2. History of use of the NF

According to the information provided by the applicant, the NF is already marketed as a food supplement in a number of countries worldwide (e.g. Australia, Brazil, Canada, India).

Sales data have been provided for individual countries for the years 2011, 2012 and 2013 (confidential information).

## 3.7. Proposed uses and use levels

### 3.7.1. Target population

The target population proposed by the applicant is the general adult population, except pregnant women.

### 3.7.2. Proposed uses and use levels

The applicant proposed to use the NF as a food supplement.

Following a request for clarification, the applicant proposed an amount of 50 mg per portion and a maximum daily amount of 350 mg of the NF.

## 3.8. Absorption, distribution, metabolism and excretion (ADME)

The applicant has not provided any toxicokinetic studies that were performed with the NF.

A number of animal studies were submitted, which investigated the absorption, distribution, metabolism and excretion of various saponins. The Panel considers that the studies provided are of limited relevance for the safety assessment of the NF.

## 3.9. Nutritional information

The applicant provided a nutritional analysis of the NF, which indicates that the NF mainly consists of carbohydrates (about 90%), moisture (about 5%), protein (2–5%), fat (about 1%) and ash. The applicant pointed out that some variation can be expected concerning the nutrients in the NF, given the nature of the starting material and its susceptibility to varying weather conditions.

Taking into account the proposed conditions of use (i.e. max. 350 mg/day), the Panel considers that the consumption of the NF is not nutritionally disadvantageous.



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


727

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## 3.10. Toxicological information

The roots of *A. membranaceus* have been reported to contain the non-proteinogenic amino acid L-canavanine (Thorne Research Inc, 2003; Khan and Abourashed, 2009). L-Canavanine is an antinutrient that is structurally related to L-arginine. Owing to this similarity, in organisms that consume L-canavanine, it is mistakenly incorporated into their own proteins in place of L-arginine, leading to the production of structurally aberrant proteins. L-Canavanine has been suspected of being associated with systemic lupus erythematosus (SLE) activation (Alcocer-Varela et al., 1985; Morimoto et al., 1990). L-Canavanine is found in many legumes where it acts as a nitrogen-storing metabolite and is part of the plant's chemical defence. For example, L-canavanine accounts for up to 5% of the dry weight in the jack bean seed (*Canavalia ensiformis*), 2.4% in the alfalfa plant (*Medicago sativa*) and up to 2.5% in sword bean (*Canavalia gladiate*) (Rosenthal, 2001; Bence and Crooks, 2003). Following an EFSA request to provide information on the content of L-canavanine in the NF, the applicant submitted a certificate of analysis for one batch of the NF in which L-canavanine was detected at a concentration of 0.67 mg/g. The Panel notes that the amount of L-canavanine at the proposed conditions of use for the NF (i.e. 350 mg per day) would be 0.23 mg/day. The Panel considers L-canavanine in the NF unlikely to be of safety concern at the proposed conditions of use.

*P. notoginseng* has been reported to contain the non-proteinogenic amino acid L-dencichin (oxalyldiaminopropionic acid (ODAP)) (Wang et al., 2006), which is a structural analogue of the neurotransmitter glutamate. L-Dencichin is a neurotoxin responsible for lathyrism, a motor neuron degeneration syndrome. Lathyrism may be induced by consumption of the seeds (if consumed at high enough amounts) of the legume *Lathyrus sativus* (grass pea), which is a staple food in some areas of the world and which has been reported to contain L-dencichin at concentrations up to 0.7% (Xu et al., 2017). Following an EFSA request to provide information on the content of L-dencichin in the NF, the applicant submitted a certificate of analysis for one batch of the NF in which L-dencichin was not detected. No LOD was provided. However, information was provided on the method that was used for the analysis (Dezhuang et al., 1998). From the information provided, the limit of quantification (LOQ) for L-dencichin is at a level of about 0.17% for the method used. Taking into consideration the maximum proposed use level of 350 mg NF/day, and assuming an L-dencichin concentration at the LOQ (i.e. 0.17%) in the *P. notoginseng* fraction (i.e. < 50% in the NF), this would correspond to about 0.3 mg L-dencichin/day. The Panel considers L-dencichin in the NF unlikely to be of safety concern at the proposed conditions of use.

### 3.10.1. Genotoxicity

The applicant provided a bacterial reverse mutation assay (Zin, 2016, unpublished study report) and an *in vitro* mammalian cell gene mutation assay (Ruslan et al., 2016, unpublished study report), which were both performed with batch #C20150120 of the NF. This batch contains 2.68% total saponins, 0.033% astragaloside I and 0.10% ginsenoside Rb1 (see also Table 2).

The bacterial reverse mutation test (Zin, 2016, unpublished study report) was performed in compliance with good laboratory practice (GLP) and following OECD Test Guideline (TG) 471. The test was carried out with *Salmonella* Typhimurium strains TA98, TA100, TA1535, TA1537 and *Escherichia coli* strain WP2 *uvrA*, using the pre-incubation method in the presence and in the absence of an exogenous metabolic activation system (i.e. S9-mix). In order to evaluate the cytotoxicity of the test item a dose-finding test was performed with the five strains mentioned above, with and without metabolic activation, using the following five concentrations of the NF dissolved in water: 313, 625, 1,250, 2,500 and 5,000 μg/plate. There was no sign of cytotoxicity and no precipitation of the test material was observed at any concentration. Thus, the main test was performed using the same concentrations. Positive and negative controls were included. The NF induced no biologically relevant increase in the number of revertant colonies compared with the negative controls for all strains, in the presence and absence of S9-mix, in the dose finding test and the main test.

The *in vitro* mammalian cell gene mutation test using the hypoxanthine-guanine phosphoribosyl transferase (*Hprt*) gene (Ruslan et al., 2016, unpublished study report) was performed in compliance with GLP. According to the applicant, the test was conducted in accordance with OECD TG 476. However, the Panel notes that the NF was only tested in the absence and not in the presence of an exogenous metabolic activation system (S9-mix) in the main experiment, which is considered a relevant deviation. No rationale could be provided by the applicant for this deviation. In the absence of activation, the NF did not induce an increase in the number of gene mutations in mammalian cells.




728

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Following an EFSA request, and in accordance with the EFSA recommendations for genotoxicity testing (EFSA Scientific Committee, 2011), the applicant submitted two *in vitro* mammalian cell micronucleus tests following OECD TG 487. As per the EFSA request, one micronucleus test per plant extract was carried out.

The micronucleus test (Vedic Lifesciences, 2019a, Study Nr. 190503/NL/PC, unpublished study report), submitted for the *P. notoginseng* extract, was performed with a batch (i.e. #20170702) that contained 1.08% total saponins and 0.31% ginsenoside Rb1. The test, which followed OECD TG 487, was carried out in cultured mammalian CHO-K1 cells. In order to evaluate the cytotoxicity of the test item, the cells were exposed to the extract (dissolved in water and diluted with culture medium) at concentrations of 310 μg/mL, 620 μg/mL, 1,250 μg/ml, 2,500 μg/mL and 5,000 μg/mL either for 30 h in the absence of an exogenous metabolic system (S9-mix) or for 3 h in the presence or absence of S9-mix. As the cytotoxicity even at the highest concentration of 5,000 μg/mL was less than 40%, the study coordinators decided to use the following four concentrations of the extract in the main experiment: 620, 1,250, 2,500 and 5,000 μg/mL. In the main test, the cytotoxicity at the highest concentration of 5,000 μg/mL for 30 h without S9-mix was 35.9%. After short-term exposure to this concentration in the presence of metabolic activation, the cytotoxicity was 38.5%, while without metabolic activation it was 27.8%. Appropriate positive controls were used as per OECD TG 487 and an adequate response was seen. Micronuclei were manually scored for at least 2,000 cells per concentration. Compared to the vehicle control, there were no statistically significant differences in the number of micronuclei at any tested concentration with and without metabolic activation.

Another micronucleus test was submitted (Vedic Lifesciences, 2019b; Study Nr. 190502/NL/PC, unpublished study report), which assessed the clastogenic/aneugenic potential of the *A. membranaceus* extract. The tested batch (i.e. #20180225) contained 3.1% total saponins and 0.12% astragaloside I. Also this test, which followed OECD TG 487, was carried out in cultured mammalian CHO-K1 cells. In order to evaluate the cytotoxicity of the test item, the cells were exposed to the extract (dissolved in water and diluted with culture medium) at concentrations of 310 μg/mL, 620 μg/mL, 1,250 μg/mL, 2,500 μg/mL and 5,000 μg/mL for 30 h in the absence or for 3 h in the presence and absence of an exogenous metabolic system (S9-mix). The observed toxicity was up to 29% after exposure for 30 h without S9-mix. After exposure for 3 h with and without metabolic activation, the cytotoxicity amounted to 24% and 18.1%, respectively. As the observed toxicity was less than 35% at any concentration with or without S9-mix, the study coordinators decided to use the following three concentrations of the extract in the main experiment: 500, 1,500 and 5,000 μg/mL. In the main test, the cytotoxicity at the highest concentration of 5,000 μg/mL for 30 h without S9-mix was 28.5%. After short-term exposure to this concentration in the presence of metabolic activation the cytotoxicity was 30.5%, while without metabolic activation it was 29.4%. Appropriate positive controls were used as per OECD TG 487 and an adequate response was seen. Micronuclei were manually scored for at least 2,000 cells per concentration. Compared to the vehicle control there were no statistically significant differences in the number of micronuclei at any tested concentration with and without metabolic activation.

The Panel concludes that the studies provided do not raise concerns for genotoxicity of the NF.

### 3.10.2. Subacute and subchronic toxicity

The applicant provided a 28-day oral toxicity study (Pasics Szakonyiné, 2011, unpublished study report) conducted in compliance with GLP and in accordance with OECD TG 407. Twenty Wistar rats (n = 10 per sex) per group were administered by gavage 0, 100, 300 or 1,000 mg/kg body weight (bw) per day of the NF for 28 days. The batch (#20100621) that was used in this study contained 2.35% total saponins, 0.17% ginsenoside Rb1 and 0.054% astragaloside I (see also Table 2). The test item was prepared daily by suspending the NF in 1%-aqueous methylcellulose vehicle.

There was no mortality during the study period. No clinical signs or abnormalities in behaviour, motor activity or general health were observed in control or treated animals. No relevant differences in body weight or body weight gain or feed consumption were observed among the groups.

A number of statistically significant differences in haematology and clinical chemistry between controls and animals administered the NF were observed (available in a file annexed to the scientific opinion under 'Supporting information'). The number of neutrophils significantly increased in all groups receiving the NF. In male rats, the number of basophils was reduced in the mid-dose group. In females, white blood cells (WBC) and lymphocytes were reduced in the low- and mid-dose groups and in the mid- and high-dose groups, respectively. Furthermore, in female rats, mean corpuscular volume




729

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

(MCV) was reduced in the low-dose group, mean corpuscular haemoglobin concentration (MCHC) was decreased in the mid-dose group and platelets were increased in the low-dose group. Activated partial thromboplastin time (APTT) was increased in the high-dose group compared to the control group. The serum concentration of phosphorus increased with dose in both sexes, being statistically significant in the high-dose group of males and in the mid- and high-dose groups for females.

Absolute and relative organ weights were not different between the groups, except for a higher testes to brain weight ratio in the low-dose males and a lower absolute and relative to body weight kidney weight in the high-dose males. However, the differences were small and considered biologically not relevant. No relevant dose-related histopathological findings were observed.

The applicant provided a repeated dose 90-day oral toxicity study (Upadhyaya and Wang, 2017, unpublished study report) which was conducted in accordance with OECD TG 408 and in compliance with GLP.

Wistar rats (n = 10/group and sex) of 6–8 weeks of age were randomly allocated to one of six groups, which were administered the NF daily by gavage for 90 consecutive days at dosages of 0 mg/kg bw per day (control group), 100 mg/kg bw per day, 300 mg/kg bw per day or 1,000 mg/kg bw per day. The study included two additional groups (i.e. recovery groups) that received 0 mg/kg bw per day (controls) or 1,000 mg/kg bw per day, respectively, for 90 days, and thereafter 0 mg/kg bw per day for an additional 2-week period (i.e. recovery period). The batch (#C20160606) that was used in this study contained 3.79% total saponins, 0.17% ginsenoside Rb1 and 0.028% astragaloside I (see also Table 1). The test item was prepared (with water as vehicle) every day before administration.

None of the animals died in the course of the study. No treatment-related clinical signs were observed in any of the animals throughout the study. Ophthalmological and neurobehavioural examinations of the animals did not reveal any differences between the groups. No treatment-related changes in body weight or body weight gain were observed. However, compared to the controls, feed consumption was lower in males in the low-dose group until day 78 and it was higher in females in the mid- and high-dose groups for most of the study duration. On day 91 (day 105 for the recovery groups), animals were subjected to necropsy and a gross pathological examination was performed. No changes were found in gross pathology.

A number of statistically significant differences in clinical chemistry between controls and animals exposed to the NF were observed (A summary of the results can be found in the online version of this output under the 'Supporting information' section: https://doi.org/10.2903/j.efsa.2020.6099). Serum cholesterol and triglyceride concentrations were increased in males and females. Cholesterol was increased in the high-dose group in the males and in females in all the groups that were administered the NF. Triglycerides were increased in the mid- and high-dose groups for both sexes. Increases were also observed for alanine amino transferase (ALT) (in males of the high-dose group and in females in all the treatment groups) and alkaline phosphatase (ALP) (in males of the high-dose group and in females in the low-dose group). Aspartate amino transferase (AST) was increased in females only, i.e. in the low- and mid-dose groups. Furthermore, lactate dehydrogenase (LDH) was increased in both sexes, in males in all treatment groups and in females in the high-dose group. In males, phosphorous was increased in the mid- and high-dose groups and remained higher (statistically significant) also after the recovery period. In females, succinate dehydrogenase (SDH) and total protein were increased (SDH in the mid- and high dose groups, total protein in all groups receiving the NF).

A number of statistically significant findings were observed for absolute and relative organ weights, but the observed changes were small, often not dose-related and in many cases a result of rather low values in the control groups (with respect to historical controls). No differences were seen in urinalysis.

The Panel notes that a considerable number of changes were observed in clinical chemistry, including markers of liver and kidney toxicity. Even though the size of individual changes was rather small and within historical ranges, the effects were seen consistently in both sexes, were often dose-related and, in the case of phosphorus, also observed after the recovery period. The Panel considers that taken together, the findings imply a potentially adverse effect of the NF. The Panel also considers that taking into account the magnitude of the effects seen, the overall lowest observed adverse effect level (LOAEL) is to be set at 300 mg/kg bw per day. Consequently, the Panel considers the lowest dose tested in the study, i.e. 100 mg/kg bw per day, as the overall no observed adverse effect level (NOAEL).




730

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

### 3.10.3. Human data

The applicant did not provide any human studies performed with the NF nor were there any human studies with the NF retrieved by extensive literature searches.

## 3.11. Allergenicity

The Panel notes the protein content (2–5%) of the NF and, thus, the potential of the NF to elicit allergic reactions.

The literature searches carried out by the applicant and by the EFSA contractor (UCT Prague) did not retrieve any studies reporting incidents of allergenicity to the NF or to *A. membranaceus*, one of the two plants that is used to produce the NF.

With respect to *P. notoginseng*, the applicant submitted one review (Dharmananda, 2004), which described 19 case reports of allergic reactions to Sanqi (i.e. dried tuber of *P. notoginseng*). No further information on the allergenicity of *P. notoginseng* was provided.

The Panel notes the limited epidemiological data reported on one of the two plants that is used to produce the NF.

Overall, taking into account the long history of use of both plants (i.e. *A. membranaceus* and *P. notoginseng*) that are used to produce the NF, the Panel considers that the risk of allergic reactions to the NF for the general population is unknown but expected to be low.

# 4. Discussion

The NF is a mixture of the root extracts of *A. membranaceus* and *P. notoginseng*, and contains marker compounds within a specified range (i.e. 1.5–5% total saponins, 0.1–0.5% ginsenoside Rb1 and 0.01–0.1% astragaloside I). The Panel considers that the information provided on the composition of the NF and the production process is sufficient and does not raise safety concerns.

The applicant proposed to use the NF as a food supplement for the general adult population (with the exception of pregnant women) at a maximum daily amount of 350 mg. The Panel considers that, taking into account the proposed conditions of use, the consumption of the NF is not nutritionally disadvantageous.

The provided genotoxicity studies do not raise concerns for genotoxicity of the NF. In view of the maximum daily amount proposed for the NF, contribution of pesticides or contaminants is not of toxicological relevance.

Based on the findings of a subchronic toxicity study, supported by a subacute toxicity study, the Panel identified the overall NOAEL of the NF at 100 mg/kg bw per day.

The Panel considers an uncertainty factor (UF) of 200 appropriate, in order to account for inter- and intra-species variability (UF 10 $\times$ 10) and for the lack of chronic toxicity data (additional UF of 2). The application of this UF to the NOAEL results in a safe intake level for the NF of 0.5 mg/kg bw per day. Considering a standard bodyweight of 70 kg for adults (EFSA Scientific Committee, 2012), this level corresponds to a maximum daily intake of 35 mg NF for the target population, i.e. adults excluding pregnant women.

# 5. Conclusions

The Panel concludes that the NF, i.e. a botanical extract derived from both *P. notoginseng* and *A. membranaceus* roots (AstraGin™), is safe at an intake level of 0.5 mg/kg bw per day. This level corresponds to a maximum intake of 35 mg/day for the target population, i.e. adults excluding pregnant women.

The Panel could not have reached the conclusion on the safety of the NF under the proposed conditions of use without the toxicological data for which protection of proprietary data was requested by the applicant (Pasics Szakonyiné, 2011; Zin, 2016; Upadhyaya and Wang, 2017; Vedic Lifesciences, 2019a,b).

# Steps taken by EFSA

1) Letter from the European Commission to the European Food Safety Authority with the request for a scientific opinion on the safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus*. Ref. Ares(2018)5414664, dated 22 October 2018.




731

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

2) On 22 October 2018, EFSA received a valid application from the European Commission on a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* (AstraGin™) as a novel food, which was submitted by NuLiv Science (US), and the scientific evaluation procedure started.
3) On 6 March 2019, EFSA requested the applicant to provide additional information to accompany the application and the scientific evaluation was suspended.
4) On 30 August 2019, additional information was provided by the applicant and the scientific evaluation was restarted.
5) On 11 November 2019, EFSA requested the applicant to provide additional information to accompany the application and the scientific evaluation was suspended.
6) On 23 January 2020, additional information was provided by the applicant and the scientific evaluation was restarted.
7) During its meeting on 24 March 2020, the NDA Panel, having evaluated the data, adopted a scientific opinion on the safety of a botanical extract derived from *Panax notoginseng* and *Astragalus membranaceus* as a NF pursuant to Regulation (EU) 2015/2283.

## References


Alcocer-Varela J, Inglesias A, Llorente L and Alarcon-Segovia D, 1985. Effects of L-canavanine on T cells may explain the induction of systemic lupus erythematosus by alfalfa. Arthritis Rheumatism, 28, 52–57.

Bence AK and Crooks PA, 2003. The mechanism of L-canavanine cytotoxicity: arginyl tRNA synthetase as a novel target for anticancer drug discovery. Journal of Enzyme Inhibition and Medicinal Chemistry, 18, 383–394.

Bensky D and Gamble A, 1986. Radix pseudoginseng. Chinese herbal medicine: materia medica. Eastland Press, Seattle. pp. 359–360.

Cui XM, Lo CK, Yip KL, Dong TT and Tsim KW, 2003. Authentication of *Panax notoginseng* by 5S-rRNA spacer domain and random amplified polymorphic DNA (RAPD) analysis. Planta Medica, 69, 584–586.

Dezhuang J, Cong Z and Zhihua W, 1998. Determination of L-Dencichin in Chinese Red Ginseng and Korean Red Ginseng. Chinese Traditional Patent Medicine, 11, 48.

Dharmananda S, 2004. Rare reactions to a safe herb. Institute for Traditional Medicine, Sanqi (Panax notoginseng). Available online: http://www.itmonline.org/arts/sanqi.htm

Dibusz K and Vejvodova P, 2020. Systematic literature search to assist EFSA in the preparatory work for the safety assessment of novel food applications and traditional food notifications. EFSA supporting publication 2020;EN-1774, 72 pp. Available online https://doi.org/10.2903/sp.efsa.2019.EN-1774

Dong TT, Cui XM, Song ZH, Zhao KJ, Ji ZN, Lo CK and Tsim KW, 2003. Chemical assessment of roots of *Panax notoginseng* in China: regional and seasonal variations in its active constituents. Journal of Agriculture and Food Chemistry, 51, 4617–4623.

Duke J and Ayensu E, 1985. Medicinal plants of China. Vol I. Reference Publications, Inc, Algonac, MI.

EFSA NDA Panel (EFSA Panel on Dietetic Products, Nutrition and Allergies), 2016. Guidance on the preparation and presentation of an application for authorisation of a novel food in the context of Regulation (EU) 2015/2283. EFSA Journal 2016;14(11):4594, 24 pp. https://doi.org/10.2903/j.efsa.2016.4594

EFSA Scientific Committee, 2011. Scientific Opinion on genotoxicity testing strategies applicable to food and feed safety assessment. EFSA Journal 2011;9(9):2379. https://doi.org/10.2903/j.efsa.2011.2379

EFSA Scientific Committee, 2012. Guidance on selected default values to be used by the EFSA Scientific Committee, Scientific Panels and Units in the absence of actual measured data. EFSA Journal 2012;10(3):2579, 32 pp. https://doi.org/10.2903/j.efsa.2012.2579

Fu J, Wang Z, Huang L, Zheng S, Wang D, Chen S, Zhang H and Yang S, 2014. Review of the Botanical Characteristics, Phytochemistry, and Pharmacology of *Astragalus membranaceus* (Huangqi). Phytotherapy Research, 28, 1275–1283.

Khan IA and Abourashed EA, 2009. Leung's Encyclopedia of Common Natural Ingredients: Used in Food, Drugs and Cosmetics, 3rd Edition. Wiley. ISBN 978-0-471-46743-4.

Leung A, 1995. Astragalus. In: Glen Rock NJ (ed.). Better health with (mostly) Chinese herbs and foods. AYSL Corp. pp. 5–6.

Leung A and Foster S, 1996. Astragalus. Encyclopedia of common natural ingredients used in food, drugs, and cosmetics. John Wiley & Sons, New York. pp. 50–53.

Morimoto I, Shiozawa S, Tanaka Y and Fujita T, 1990. L-canavanine acts on suppressorinducer T cells to regulate antibody synthesis: lymphocytes of systemic lupus erythematosus patients are specifically unresponsive to L-canavanine. Clinical Immunology and Immunopathology, 55, 97–108.

Pasics Szakonyiné I, 2011 (unpublished study report, claimed as proprietary by the applicant). Repeated dose 28-day oral gavage toxicity study with AstraGin™ in rats. Study No: 413.407.3084. Toxi-Coop Zrt., Hungary.

Reid D, 1987. Panax notoginseng (Araliacea), notoginseng. Chinese herbal medicine. Shambhala Publications Inc., Boston.

Reid D, 1995. Astragalus. A handbook of Chinese healing herbs. Boston, Shambhala. pp. 63–65.





732

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Rosenthal GA, 2001. L-Canavanine: a higher plant insecticidal allelochemical. Amino Acids, 21, 319–330.

Ruslan NF, Noam SRA, Azhar MS, Dahlan HM, Wang R, Suhailah N and Ping TS, 2016 (unpublished study report, claimed as proprietary by the applicant). AstraGin: *in vitro* mammalian cell gene mutation test (HPRT gene mutation) on V79B cells. Study ID: TL/G/476/15/012. Melaka Biotechnology Corporation. Ayer Keroh, Melaka, Malaysia.

Thorne Research Inc, 2003. A. Astragalus membranaceus. Monograph. Alternative Medicine Review, 8, 72–77.

Upadhyaya S and Wang R, 2017 (unpublished study report, claimed as proprietary by the applicant). 90-days repeated dose oral toxicity study of Astragin® in Wistar rats. 161101/NVS/PC. July 2017. 319pp. Vedic Life Sciences Pvt, Ltd. Mumbai, India.

Vedic Lifesciences, 2019a (unpublished study report, claimed as proprietary by the applicant). *Panax notoginseng* proprietary extract: *in vitro* micronucleus test in CHO-K1 cells. Study Nr. 190503/NL/PC. Mumbai, India.

Vedic Lifesciences, 2019b (unpublished study report, claimed as proprietary by the applicant). *Astragalus membranaceus* extract: *in vitro* micronucleus test in CHO-K1 cells. Study Nr. 190502/NL/PC. Mumbai, India.

Wang CZ, McEntee E, Wicks S, Wu JA and Yuan CS, 2006. Phytochemical and analytical studies of Panax notoginseng (Burk.) FH Chen. Journal of Natural Medicines, 60, 97–106.

Wang T, Guo R, Zhou G, Zhou X, Kou Z, Sui F, Li C, Tang L and Wang Z, 2016. Traditional uses, botany, phytochemistry, pharmacology and toxicology of *Panax notoginseng* (Burk.) F.H. Chen: a review. Journal of Ethnopharmacology, 188, 234–258.

Xu Q, Liu F, Chen P, Jez JM and Krishnan HB, 2017. B-N-Oxalyl-l-α, β-diaminopropionic Acid (β-ODAP) Content in Lathyrus sativus: the Integration of Nitrogen and Sulfur Metabolism through β-Cyanoalanine Synthase. International Journal of Molecular Sciences, 18, 526.

Yu SY, Ouyang HT, Yang JY, Huang XL, Yang T, Duan JP, Cheng JP, Chen YX, Yang YJ and Qiong P, 2007. Subchronic toxicity studies of Radix Astragali extract in rats and dogs. Journal of Ethnopharmacology, 110, 352–355.

Zhu Y, 1998a. San qi (Radix notoginseng – sanchi). Harwood Academic Publishers, Chinese Materia Medica. pp. 423–427.

Zhu Y, 1998b. Huang qi (Radix astragali – milkvetch root). Harwood Academic Publishers, Chinese Materia Medica. pp. 560–564.

Zin HM, 2016 (unpublished study report, claimed as proprietary by the applicant). Bacterial reverse mutation test (Ames test) for AstraGin™. Study code: GLP/J165/2016/48). Environmental Technology Research Centre (ETRC). Shah Alam, Selangor, Malaysia.

## Abbreviations

| | |
|---|---|
| ADME | absorption, distribution, metabolism and excretion |
| ALP | alkaline phosphatase |
| ALT | alanine amino transferase |
| APTT | activated partial thromboplastin time |
| AST | aspartate amino transferase |
| bw | body weight |
| CFU | colony forming units |
| ELSD | evaporative light scattering detector |
| FDA-BAM | Food and Drug Administration's Bacteriological Analytical Manual |
| GC-MS | gas chromatography–mass spectrometry |
| GLP | good laboratory practice |
| GMP | good manufacturing practice |
| HACCP | hazard analysis and critical control points |
| HPLC | high-performance liquid chromatography |
| HPRT | hypoxanthine-guanine phosphoribosyl transferase gene |
| ICP-MS | inductively coupled plasma mass spectrometry |
| LDH | lactate dehydrogenase |
| LOAEL | lowest observed adverse effect level |
| LOD | limit of detection |
| LOQ | limit of quantification |
| MCHC | mean corpuscular haemoglobin concentration |
| MCV | mean corpuscular volume |
| MF | mutation frequency |
| NDA | EFSA Panel on Dietetic Products, Nutrition and Allergies |
| NF | novel food |
| NOAEL | no observed adverse effect level |
| ODAP | oxalyldiaminopropionic acid |




733

| | |
|---|---|
| OECD | Organisation for Co-operation and Development |
| RNA | ribonucleic acid |
| SDH | succinate dehydrogenase |
| SLE | systemic lupus erythematosus |
| TG | test guidelines |
| UF | uncertainty factor |
| UV | ultraviolet |
| WBC | white blood cells |

18314732, 2020, 5, Downloaded from https://efsa.onlinelibrary.wiley.com/doi/10.2903/j.efsa.2020.6099, Wiley Online Library on [22/01/2025]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License




734

# EXHIBIT F


735

| | In CLRA Letter | | | | | | | | | Other foreign ingredients in Product | | | In Complaint |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Citrulline | Beta Alanine | Betaine Anhydrous | Theanine | ALCAR | Green Tea | Black Pepper | Arginine | Glutathione | Caffeine | Theobromine | AstraGin® | Ashwagandha |
| Altius Pre | X | X | X | | | | | | | X | | | |
| Andro Surge | | | | | | | X | | | | | | |
| Build PM | | | | X | | | X | | | | | | X |
| Build XT | | | | | | | | | | | | X | X |
| Burn XT | | | | | X | X | X | | | X | | | |
| Burn XT Black | | | | | X | X | X | | | X | X | | |
| Burn XT Powder | | | | | X | X | X | | | X | | | |
| Burn XT Stick Packs | | | | | X | X | X | | | X | | | |
| Caffeine | | | | | | | | | | X | | | |
| Defend XT | | | | | | | X | | X | | | | |
| Dry XT | | | | | | X | | | | | | | |
| EAA Surge | X | | | | | | | | | | | | |
| Flex XT | | | | | | | X | | | | | | |
| GDA XT | | | | | | | | | | | | X | |
| Green Surge (all forms) | | | | | | X | | | | | | | |
| Green Tea | | | | | | X | | | | | | X | |
| Intra Surge | X | | | | | | | | | | | X | |
| L-Arginine | | | | | | | | X | | | | | |
| Lean PM | | | | X | | | X | | | | | | |
| Lean XT | | | | | X | X | X | | | | | | |
| N.O. XT | X | | | | | | | X | X | | | | |
| Nitro Surge Build | X | X | X | X | | | | | | X | | X | |
| Nitro Surge Max | X | X | X | X | | | | | | | X | X | |
| Nitro Surge Natural | X | X | X | X | | X | | | | X | | | |
| Nitro Surge Pre-Workout (Product) | X | X | X | X | | | | | | X | X | X | |
| Nitro Surge Shred | X | X | | X | X | | X | | | X | X | | |
| Prima Surge | | | | | | | X | | | | | | X |
| Pro Series Test | | | | | | | X | | | | | | X |
| Pump Surge | X | | X | | | | | | | | | X | |
| Red Surge | | | | | | X | | | | | | | |
| Test PM | | | | X | | | X | | | | | | |


736

FILED
Superior Court of California
County of Los Angeles
09/25/2025
David W. Slayton, Executive Officer / Clerk of Court
By: F. Sims Deputy

Electronically Received 09/25/2025 12:14 PM

KAZEROUNI LAW GROUP, APC

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No.: 23STCV15674

**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

1) **CONSUMERS LEGAL REMEDIES ACT, CAL. CIVIL CODE §§ 1750, ET SEQ.;**
2) **CALIFORNIA'S FALSE ADVERTISING LAW, BUS. & PROF. CODE §§ 17500 ET SEQ.;**
3) **CALIFORNIA'S UNFAIR COMPETITION LAW, BUS. & PROF. CODE §§ 17200 ET SEQ.;**
4) **NEGLIGENT MISREPRESENTATION; AND**
5) **INTENTIONAL MISREPRESENTATION**

**JURY TRIAL DEMANDED**


737

KAZEROUNI LAW GROUP, APC

## INTRODUCTION

1. Plaintiff DANIEL ROSSI ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY ("Defendant") in unlawfully representing and advertising Defendant's dietary supplement products with the false designation and representation that the products were made and/or manufactured in the USA. The unlawfully represented products were sold online on Defendant's website and other third-party vendors, such as Amazon.com ("Amazon"), throughout the United States, and advertised on Defendant's website.[1] Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

2. Specifically, Plaintiff purchased Defendant's Nitrosurge Pre Workout[2] Supplement (hereinafter the "Product"), which, as advertised on Defendant's website and other third-party vendors, was represented by Defendant to Plaintiff and other similarly situated consumers as a product made and/or manufactured in the USA. However, Defendant's Product contains or is made with ingredients that are not "Manufactured in the USA," as discussed further herein.

3. The "Manufactured in the USA" claim (or some derivative thereof) was prominently printed on Defendant's website and advertisements, as well as the websites of third-party vendors, including Amazon, where the Product was purchased by Plaintiff. Contrary to Defendant's representation and in violation of federal rules and California laws, Defendant's Class Products,[3] including the Product purchased by Plaintiff, are actually made with or contain ingredients that are not "Manufactured in the USA," as discussed in further detail herein.

---

[1] Plaintiff seeks class wide relief on behalf of all purchasers of any of Defendant's products that are substantially similar to the dietary supplement product purchased by Plaintiff that were advertised as being "Manufactured in the USA" in violation of California law(s).

[2] As titled on Amazon.com when Plaintiff purchased the Product; "NITROSURGE Pre Workout Supplement – Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps – Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White."

[3] A list of the Class Products is attached hereto as Exhibit A.


738

4. Defendant's nationwide sale and advertising of deceptively advertised Class Products constitutes violations of: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (2) California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17533.7; (3) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 et seq.; (4) negligent misrepresentation and (5) intentional misrepresentation. This conduct caused Plaintiff, and others similarly situated, damages, and requires restitution and injunctive relief to remedy and prevent further harm.

5. Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of Defendant.

**JURISDICTION AND VENUE**

6. Jurisdiction is proper pursuant to this Court's general jurisdiction.

7. The Court has jurisdiction over Plaintiff's claims for damages, restitution, injunctive relief, and declaratory relief arising from Defendant's unlawful business practices under California's CLRA, FAL, and UCL; as well as negligent and intentional misrepresentation.

8. This Court has personal jurisdiction over Defendant because Defendant conducts substantial business in the State of California and County of Los Angeles, has sufficient minimum contacts with this State and County, and otherwise purposefully avails itself of the markets in this State and County through the promotion, sale, and marketing of its services in this State, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this Court pursuant to California Code of Civil Procedure § 395(a) because Plaintiff resides within this county and many of the acts and transactions giving rise to this action occurred in this county because Defendant:

a. is authorized to conduct business in this county and has intentionally availed itself of the laws and markets within this county;

b. does substantial business within this county; and is subject to personal jurisdiction in this county;





739
KAZEROUNI LAW GROUP, APC

c. and is subject to personal jurisdiction in this county.

## PARTIES

10. Plaintiff is an individual residing in the City of Northridge, County of Los Angeles, State of California.

11. Defendant is a corporation with its principal place of business in St. John's, Newfoundland and Labrador, Canada, which is regularly doing business in the State of California and within this county.

12. Defendant is a manufacturer and seller of dietary supplements that conducts business through its website and the websites of third-party vendors. One of the products sold by Defendant is Nitrosurge Pre Workout, the Product, which was purchased by Plaintiff.

## NATURE OF THE CASE

13. At all times relevant, Defendant made affirmative misrepresentations regarding the Class Products, including the Product purchased by Plaintiff, it manufactures, markets and sells. Specifically, Defendant marketed, advertised, and sold its Class Products as "Manufactured in the USA" without clear and adequate qualification that the Class Products contained foreign ingredients and/or components as required by federal rules and state laws.

14. However, although Defendant represents that its Class Products are "Manufactured in the USA" without clear and adequate qualification, Defendant's Class Products contain or are made with ingredients and/or components that are not "Manufactured in the USA."

15. Federal rules regarding the use of "Made in the United States" claims with respect to products and services are well established and well defined.

16. Specifically, the Made in USA Labeling rule, 16 C.F.R. § 323, (the "MUSA Rule") clearly defines the meaning of "Made in the United States", including synonymous phrases[4], as well as when it can be used without clear and adequate qualification notifying consumers that the good or

[4] *See* 16 C.F.R. § 323.1(a) ("The term Made in the United States means any unqualified representation, express or implied, that a product or service, or a specified component thereof, is of U.S. origin, including, but not limited to, a representation that such product or service is "made," "***manufactured***," "built," "produced," "created," or "crafted" in the United States or in America, or any other unqualified U.S.-origin claim.") (emphasis added)


740

KAZEROUNI LAW GROUP, APC

service in question contains or is made with ingredients or components that are not made or sourced in the United States.[5]

17. Despite the clearly established and well-defined federal rules regarding "Made in the United States" claims, Defendant falsely, unfairly and deceptively advertised, marketed and sold its Class Products, including the Product purchased by Plaintiff, as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and/or components as further herein.

18. Defendant's "Manufactured in the United States" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

19. Each consumer, including Plaintiff, was exposed to virtually the same material misrepresentations, as similar advertisements and misrepresentations were prominently placed on all of Defendant's website and the websites of third-party vendors.

20. As of July 2023, when the first complaint in this matter was filed, Defendant's website contained a clear and conspicuous "Manufactured in the USA" claim under iconography of a waiving United States flag encircled by the words "Manufactured in the USA" making it clear that Defendant meant this claim to be applied to <u>*all*</u> of its products, including the Class Products. This claim, including iconography, appeared on each and every product page of Defendant's website as well as Defendant's Amazon product pages.

21. Even after the filing of this matter, according to publicly archived webpages[6], as of January 2024 or even later, the main home page of Defendant's website still contained a clear and

---

[5] *See* 16 C.F.R. § 323.2 Prohibited Acts ("In connection with promoting or offering for sale any good or service, in or affecting commerce as "commerce" is defined in section 4 of the Federal Trade Commission Act, 15 U.S.C. 44, ***it is an unfair or deceptive act or practice*** within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), ***to label any product as Made in the United States unless*** the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and ***all or virtually all ingredients or components of the product are made and sourced in the United States***. (emphasis added)

[6] *See* https://web.archive.org/web/20240121011132/https://www.jackedfactory.com/ (archived January 21, 2024)


741

KAZEROUNI LAW GROUP, APC

conspicuous "Manufactured in the USA" claim under same iconography of a waiving United States flag encircled by the words "Manufactured in the USA" thus making it more evident that Defendant meant this claim to be applied to ***all*** its products—even after the Complaint was filed in this matter.




22. According to publicly archived webpages, as of November 2023 or even later, the "Frequently Asked Questions" page of Defendant's website contained the following answer in response to the question: "Where are your products manufactured?" "Answer: **Our products are manufactured in the USA** in a cGMP, FDA Registered manufacturing facility adhering to the strictest quality control." (emphasis added)[7]

23. As a consequence of Defendant's unfair and deceptive practices, Plaintiff and other similarly situated consumers purchased Defendant's Class Products under the false impression that the products were actually manufactured and/or made in the USA with U.S. made ingredients and components.

24. As a result of Defendant's misrepresentations, Plaintiff and other consumers similarly situated overpaid for Defendant's Class Products, and/or purchased the Class Products under the false belief that the product they purchased was made and/or manufactured in the USA with U.S. made ingredients and components. Had Plaintiff and other consumers similarly situated been made aware

---

[7] *See* https://web.archive.org/web/20231101090125/https://www.jackedfactory.com/pages/common-faqs (archived November 1, 2023)

KAZEROUNI LAW GROUP, APC


742

that Defendant's Class Products were not actually made with all or virtually all ingredients and components being made in the United States, they would not have purchased the products.

25. As a result of Defendant's false and misleading statements and failure to clearly and adequately disclose the presence of foreign ingredients and components, as well as Defendant's other conduct described herein, Plaintiff and other similarly situated consumers purchased thousands, if not millions, of Defendant's Class Products and have suffered injury in fact, including the loss of money and/or property.

26. Defendant's conduct as alleged herein violates federal rules as well as several California laws, as more fully set forth herein.

27. This action seeks, among other things, equitable and injunctive relief; restitution of all amounts illegally retained by Defendant; and disgorgement of all ill-gotten profits from Defendant's wrongdoing alleged herein.

**THE FOREIGN INGREDIENTS IN DEFENDANT'S CLASS PRODUCTS**

28. Pursuant to section 1782(a) of the CLRA, on March 8, 2023, Plaintiff provided Defendant notice in writing sent by certified mail of the particular violations of section 1770, and demanded that Defendant rectify the problems (the "CLRA Letter").[8]

29. Plaintiff's CLRA Letter included a list of products with foreign ingredients, the Class Products, which has since been made reduced. See Exhibit A.

30. Plaintiff's CLRA Letter put Defendant on notice of the following foreign ingredients in its products, including the offending Product (the "CLRA Ingredients"):

a. *L-Citruline,*

b. *Beta Alanine,*

c. *Betaine Anhydrous,*

d. *L-Theanine*

31. The Product purchased by Plaintiff contains the following foreign ingredients:

---

[8] A true and correct copy of Plaintiff's CLRA Letter dated March 8, 2023, is attached hereto as Exhibit B.

KAZEROUNI LAW GROUP, APC


743

a. *L-Citrulline*

b. *Beta Alanine*

c. *Betaine Anhydrous*

d. *L-Theanine*

e. *Caffiene Anhydrous*

f. *Theobromine*

g. *AstraGin,* which is the combination of *Astragalus membranaceus* and *Panax notoginseng* (both which are foreign ingredients)

32. Thus, the CLRA Letter provided Defendant with notice of four (4) foreign ingredients in the Product which Plaintiff's CLRA claims are based on: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*.

33. Plaintiff's UCL, FAL, negligent misrepresentation, and intentional misrepresentation, claims are based on the seven (7) foreign ingredients contained in the Product; (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

34. The Class Products are substantially similar to the Product as they all contain the foreign ingredients included in the Product, and Defendant similarly made the "Manufactured in the USA" representation for each of the Class Products.

35. The Product purchased by Plaintiff contains the following foreign ingredients: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin (*Astragalus membranaceus* and *Panax notoginseng*).

a. Like the Product purchased by Plaintiff, the Class Product Altius Pre contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, and (d) *Caffiene Anhydrous*.

b. Like the Product purchased by Plaintiff, the Class Product Build PM contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Theanine*.


744

KAZEROUNI LAW GROUP, APC

c. Like the Product purchased by Plaintiff, the Class Product Build XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

d. Like the Product purchased by Plaintiff, the Class Product Burn XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous*.

e. Like the Product purchased by Plaintiff, the Class Product Burn XT Black contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous* and (b) *Theobromine*.

f. Like the Product purchased by Plaintiff, the Class Product Burn XT Powder contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous*.

g. Like the Product purchased by Plaintiff, the Class Product EAA Surge contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Citruline*.

h. Like the Product purchased by Plaintiff, the Class Product GDA XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

i. Like the Product purchased by Plaintiff, the Class Product Intra Surge Pre contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, and (b) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

j. Like the Product purchased by Plaintiff, the Class Product Lean PM contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Theanine*.

k. Like the Product purchased by Plaintiff, the Class Product N.O. XT contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Citruline*.


745

KAZEROUNI LAW GROUP, APC

l. Like the Product purchased by Plaintiff, the Class Product Nitro Surge Build contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffiene Anhydrous*, and (f) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

m. Like the Product purchased by Plaintiff, the Class Product Nitro Surge Max contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine,* (e) *Theobromine*, and (f) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

n. Like the Product purchased by Plaintiff, the Class Product NitroSurge Shred contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *L-Theanine*, (d) *Caffiene Anhydrous*, and (e) *Theobromine.*

o. Like the Product purchased by Plaintiff, the Class Product Pump Surge contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Betaine Anhydrous*, and (c) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

p. Like the Product purchased by Plaintiff, the Class Product Test PM contains: (a) *L-Theanine*, which is also included in the Product purchased by Plaintiff

36. Plaintiff alleges claims and seeks damages and relief available under the CLRA as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, as they contain the CLRA Ingredients referenced in the CLRA Letter. (12 Total)

37. Plaintiff alleges claims and seeks damages and relief under the UCL, FAL, negligent misrepresentation, and intentional misrepresentation as to all of the Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge




746

KAZEROUNI LAW GROUP, APC

Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT, as they contain foreign ingredients similar to the Product. (17 Total)

**FACTUAL ALLEGATIONS**

38. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

39. Defendant marketed and sold various dietary supplements that were represented and advertised as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and components. Defendant made these representations on its website which resulted in these representations being made on the websites of its third-party vendors, including Walmart.com.[9] These representations were made until, at least, sometime in January 2024 on Defendant's website and even later on third party vendors' websites.

40. Contrary to Defendant's representation, Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

41. Dietary supplements, such those sold by Defendant, are often made with numerous ingredients and components that are foreign sourced due to significant differences in costs of raw material/component production in the United States versus foreign production such as in China.10 In many cases, certain botanical ingredients cannot grow in the United States due to climate reasons or

---

[9] *See* https://www.walmart.com/ip/Nitrosurge-Pre-Workout-Powder-Endless-Energy-Instant-Strength-Gains-Clear-Focus-Intense-Pumps-30-Servings-Blue-Raspberry/383327735 (Under Product Details "Each bottle of Nitrosurge pre-workout is manufactured in a state-of-the-art cGMP manufacturing facility in the USA adhering to the most stringent manufacturing standards."; "Manufactured in the USA in a cGMP-Certified Facility.") (last accessed August 1, 2024)

[10] *See* U.S.-China Economic and Security Review Commission. *Potential Health & Safety Impacts from Pharmaceuticals and Supplements Containing Chinese-Sourced Raw Ingredients*. (2010). https://www.uscc.gov/sites/default/files/Research/NSD_BIO_Pharma_Report--Revised_FINAL_for_PDF--14_%20April_2010.pdf ("This report attempts to shed light and insight on particular issues addressing potential implications of a critical component of a complex supply chain, which contributes to U.S. national health security as China continues to strengthen its position as the world's largest supply source of raw materials for pharmaceuticals and supplements. As first reported in 1998 by the U.S. Government Accounting Office, the U.S. imports an estimated 80% of the raw ingredients contained in both products manufactured, sold and consumed in this country.")




747

KAZEROUNI LAW GROUP, APC

are not grown commercially due to significant differences in costs of domestic versus foreign agricultural production.

42. Pursuant to Section 1782(d) of the CLRA, Plaintiff provided Defendant with written notice by certified mail on March 8, 2023, outlining the specific violations of Section 1770 and demanding that Defendant rectify the issues (the "CLRA Letter").[11]

43. Specifically, the CLRA Letter provided non-exhaustive examples of Defendant's violations of the rules and laws governing unqualified "Manufactured in the USA" claims, using three products as illustrative examples: the Product, Burn-XT, and N.O. XT (the "CLRA Products").

44. The CLRA Letter informed Defendant that the following ingredients, along with potentially other ingredients in the CLRA Products, were not sourced from the United States, contrary to Defendant's unqualified "Manufactured in the USA" representations: L-citrulline, betaine anhydrous, beta alanine, L-theanine, acetyl-L-carnitine HCl, green tea leaf extract, black pepper extract, arginine, and glutathione (the "CLRA Ingredients").[12]

45. Furthermore, the CLRA Letter specifically stated that "The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here."

46. Upon receiving such a letter, a reasonable company would have, at the very least, investigated whether the CLRA Ingredients were, in fact, grown, sourced, or produced outside the United States. In reality, a reasonable company would have conducted an investigation into all of its products to determine whether they contained foreign ingredients or components.

47. Some of the CLRA Ingredients appear in the Product, namely citrulline, beta alanine, betaine anhydrous, and theanine. The Product also contains other foreign ingredients, specifically caffeine, theobromine, and AstraGin®.

48. Had Defendant investigated and found that the CLRA Ingredients, and other ingredients in the Product and the Class Products, were, in fact, grown, sourced, or produced within

---

[11] A true and correct copy of Plaintiff's CLRA Letter dated March 8, 2023, is attached hereto as Exhibit B.

[12] For convenience, certain ingredients may be referred to by their common name or abbreviation when referenced individually. For example: citrulline, theanine, ALCAR (for acetyl-L-carnitine HCl), green tea and black pepper.








748

KAZEROUNI LAW GROUP, APC

the United States, Defendant would have responded to Plaintiff by correcting Plaintiff's allegations regarding the Product, the CLRA Products and the Class Products and providing evidence of the ingredients' U.S. sourcing.

49. Instead, the Defendant continued to market and sell the Product and Class Products as "Manufactured in the USA"—without qualification—on its website for more than nine months after receiving the CLRA Letter, despite being aware of the foreign ingredients (and potentially components) used in its products. The Class Products continued to be sold with the same unqualified U.S. origin claim on third-party vendor websites for well over nine months after the Defendant received the CLRA Letter.

50. Furthermore, Defendant has yet to provide any evidence that Plaintiff's assertions regarding the origin of the CLRA Ingredients, or other ingredients and components, are incorrect.

51. The Product purchased by Plaintiff contains or is made with ingredients and/or components that are not "Manufactured in the USA." For example, the Product contains AstraGin®, a branded ingredient which is created from the combination of *Astragalus membranaceus* and *Panax notoginseng*.

52. AstraGin® is produced by NuLiv Science U.S.A., Inc. ("NuLiv"), an ingredient supplier. To sell AstraGin® in the European Union, NuLiv had to apply for Novel Food status to the European Food Safety Authority ("EFSA"). The application process requires comprehensive documentation, including sourcing and processing details.

53. The published scientific opinion of the EFSA on NuLiv's application for AstraGin® (*see* Exhibit E)[13] states that AstraGin®'s *Astragalus membranaceus* roots are sourced from Gansu and Inner Mongolia provinces in China, while the *Panax notoginseng* roots are sourced from Yunnan and Sichuan provinces in China (*see* Exhibit E, Section 3.3 Production Process).

54. *Astragalus membranaceus* and *Panax notoginseng,* are native to China and not

[13] *See*, https://efsa.onlinelibrary.wiley.com/doi/epdf/10.2903/j.efsa.2020.6099 ("The *A. membranaceus* roots are purchased from growers in Gansu and Inner Mongolia provinces in the north-western region of China while the *P. notoginseng* roots are acquired from growers in Yunnan and Sichuan provinces in the southern region of China.").


749

KAZEROUNI LAW GROUP, APC

commercially grown in the United States.[14] *See* Exhibit E, Section 3.3 Production Process.

55. Irrespective of exactly where *Astragalus membranaceus* and *Panax notoginseng* are sourced, one thing is certain – they are not grown, made, or sourced from within the United States.

56. In addition to foreign *Astragalus membranaceus* and *Panax notoginseng*, the Product contains theobromine, a component of cacao which is not grown commercially in the United States.[15]

57. The Product also contains caffeine, which is generally derived from decaffeination of coffee or tea[16], neither of which is grown commercially or cost effectively in the United States. When not from natural sources, synthetic caffeine is generally produced overseas.[17]

58. One of the CLRA Products, Burn-XT, specifically contains caffeine from coffee bean extract, which cannot be from the United States.[18] Caffeine from coffee appears in other Class Products as well.

59. Thus, upon information and belief, the forms of caffeine contained in the Product and the Class Products are not made or sourced from within the United States.

60. *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are material to the Product's formulation and marketing claims.

---

[14] *See* Ji B, Xuan L, Zhang Y, Zhang G, Meng J, Mu W, Liu J, Paek K-Y, Park S-Y, Wang J, et al. Advances in Biotechnological Production and Metabolic Regulation of *Astragalus membranaceus*. Plants. 2023; 12(9):1858. ("As one of the most popular herbal medicines in the world, *A. membranaceus* is mainly derived from wild and cultivated resources in China. Wild plants of *A. membranaceus* are mainly produced in Inner Mongolia, Gansu, Shanxi, and Ningxia. Wild resources have been over-exploited, seriously damaging the ecological environment. Cultivated plants are mainly derived from Shanxi Hunyuan, Gansu Longxi, Inner Mongolia Niuyingzi, and Shaanxi Zizhou."); Zhao H, Han Z, Li G, Zhang S, Luo Y. Therapeutic Potential and Cellular Mechanisms of *Panax Notoginseng* on Prevention of Aging and Cell Senescence-Associated Diseases. Aging Dis. 2017 Dec 1;8(6):721-739. ("*Panax notoginseng*, distributed in the Southwest of China, Japan, Burma, and Nepal, is both cultivated and gathered from wild forests. *Panax notoginseng* is sensitive to sunlight. It grows primarily in the Wenshan mountain area of Yunnan province and is cultivated commercially in the Southwest regions of China.")

[15] *See* https://www.icco.org/growing-cocoa/

[16] *See* https://web.archive.org/web/20240807011447/https://en.wikipedia.org/wiki/Caffeine ("Commercial supplies of caffeine are not usually manufactured synthetically because the chemical is readily available as a byproduct of decaffeination.").

[17] *See* https://whyy.org/segments/where-you-will-get-your-caffeine-buzz-in-the-future/ ("…synthetic caffeine production (and its pollution) mostly moved overseas, especially to China.")

[18] *See* https://en.wikipedia.org/wiki/Coffee (See "Map showing areas of coffee cultivation" under "Cultivation and Production" – the United States is not a commercial producer of coffee.)




750

KAZEROUNI LAW GROUP, APC

61. Because *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are indisputably foreign, "all or virtually all" ingredients in the Product cannot be made in the United States as required by the MUSA Rule for Defendant to lawfully make an unqualified "Manufactured in the USA" claim.

62. Upon information and belief, it is likely that the remaining ingredients and even the packaging components used to produce the Product are foreign.

63. Similarly, the Class Products contain the same foreign ingredients as those found in the Product.

64. For example, caffeine is included in numerous of Defendant's products other than the Product, including, but not limited to, Altius Pre, Caffeine, Nitrosurge Shred (also contains theobromine), Nitrosurge Build, Burn-XT, Build-XT Black (also contains theobromine), Burn-XT Powder, Burn XT Stick Pack, Nitrosurge Natural and Nitrosurge Shred Max.

65. *Astragalus membranaceus* and *Panax notoginseng* (as AstraGin®) are included in numerous Class Products other than the Product, including but not limited to, Nitrosurge Build, Nitrosurge Max Pump Surge, Build-XT, GDA-XT, Intrasurge, Green Tea Extract, Nitrosurge Build, and Nitrosurge Shred Max.

66. Defendant uses numerous other indisputably foreign ingredients in numerous of its numerous products, including but not limited to KSM-66 ashwagandha[19] and green tea extract[20].

67. Some of the ingredients, components, and even packaging used by Defendant can be sourced either domestically or internationally — and since this information is exclusively known to Defendant at this time — Plaintiff cannot fully allege the extent of Defendant's unqualified "Manufactured in the USA" violations without further discovery. Nevertheless, Defendant's blatant and willful disregard for the laws discussed herein is well established by the aforementioned, non-

---

[19] *See* https://ksm66ashwagandhaa.com/traceability/quality-control/ ("The state of Rajasthan in India is one of the most suited terrains known to grow the best quality ashwagandha in the world and that is where, our ashwagandha farms are located.")

[20] *See* https://en.wikipedia.org/wiki/Tea ("Tea is mainly grown in Asia and Africa, with smaller areas in South America and around the Black and Caspian Seas. The four biggest tea-producing countries are China, India, Kenya and Sri Lanka, together representing 81% of world tea production.")


751

KAZEROUNI LAW GROUP, APC

exhaustive examples.

68. Despite the presence of numerous indisputable foreign ingredients in the Class Products, Defendant made unqualified "Manufactured in the USA" representations on the main page of its website, on each product page for the Class Products, on each Amazon product page for the Class Products, and even in the "Frequently Asked Questions" section of its website.

69. Adequately and properly qualified "Manufactured in the USA" representations are common and ubiquitous in the dietary supplement industry.

70. Numerous competitors of Defendant including, but not limited to, Optimum Nutrition, Zhou Nutrition, MuscleTech, and BSN, clearly, adequately, and properly qualify "Manufactured in the USA" and "Made in the USA" representations on their products.[21]

71. Some dietary supplement products make no "Manufactured in the USA" or "Made in the USA" representations at all.

72. When consumers like Plaintiff see unqualified "Manufactured in the USA" claims, such as those made by Defendant regarding the Class Products, in an industry where qualified claims are so common, they reasonably believe that the products in question are made entirely in the United States, including ingredients and components.

73. Defendant is not a U.S. based company, but rather a company founded in, operated in and from Newfoundland and Labrador, Canada.

74. Given that Defendant is a Canadian company, the purpose of its unqualified "Manufactured in the USA" was clearly not from Defendant's sense of American patriotism or national pride. Instead, Defendant's motive behind representing the Class Products as "Manufactured in the USA" was solely for the intentional purpose of marketing to American consumers seeking and will pay more for products that are made, including ingredients and components, in the United States.[22]

---

[21] *See* Exhibit D.

[22] *See* https://reshoringinstitute.org/wp-content/uploads/2020/09/made-in-usa-survey.pdf ("Slightly more than 83% [of consumers polled] said they would pay up to 20% more for products made domestically.")




752

KAZEROUNI LAW GROUP, APC

75. Unlike general wellness dietary supplement companies that offer a wide variety of products for various applications, such as cognitive, cardiovascular, immune, digestive, and anti-aging health, as well as basic vitamins (e.g., Vitamins C, B, D, E, etc.) and minerals, Defendant's marketing focus and product line are much more specific.

76. Specifically, Defendant's exclusive marketing focus, as reflected in its product line, is on sports and athletic performance dietary supplements.

77. Defendant knew that its unqualified "Manufactured in the USA" representations would resonate with sports- and athletic-minded consumers in the United States, particularly given the strong sense of patriotism and national pride prevalent in this community.

78. Defendant's exclusive focus results in Defendant using a much more limited range of ingredients, both in terms of ingredient categories and specific ingredients, compared to a general wellness dietary supplement company.

79. For example, nearly all of the ingredients in Defendant's products, including the Class Products, fall into one of three categories: Amino Acid/Amino Acid Derivative, Stimulant, or Herbal Performance.

80. Examples of ingredients in these categories include, but are not limited to: (1) Amino Acid/Amino Acid Derivatives: citrulline, beta alanine, betaine anhydrous, theanine, ALCAR, arginine, glutathione, creatine, glutamine, and valine; (2) Stimulants: caffeine and theobromine; and (3) Herbal Performance: green tea, black pepper, AstraGin®, and ashwagandha.

81. As a result of the narrow range of ingredients and ingredient categories, there is significant overlap and shared use of ingredients between the Class Products, the CLRA Products, and the Product.

82. This relationship is partially illustrated[23] in Exhibit F, which depicts the connection between the CLRA Ingredients, other foreign ingredients in the Product, Ashwagandha, and those in the Class Products.

---

[23] Not all ingredients in the Class Products are represented on the X-axis of the chart. The Class Products contain numerous other foreign ingredients.



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use


753

KAZEROUNI LAW GROUP, APC

83. Given Defendant's exclusive focus on sports/athletic performance products (and their consumers), its narrow range of ingredients and ingredient categories, as well as the commonality between the ingredients used in the Product, the CLRA Ingredients, and the Class Products, Plaintiff asserts that the Product and the Class Products are substantially similar.[24]

84. Certain of Defendant's products, including but not limited to its protein and cereal bar products, have been excluded from the definition of Class Products. Plaintiff reserves the right to further allege substantial similarity between the excluded products and the Product should, for example, discovery confirm that the same or similar foreign packaging or other components were used across Defendant's product line.

85. Defendant represented, marketed and sold to the general public via its website, the website of its third-party vendors, and other forms of advertising and marketing that the Class Products are "Manufactured in the USA," without clear, adequate, and proper qualification. As such, Defendant inaccurately represented that its Class Products are "Manufactured in the USA," which conveys to a reasonable consumer like Plaintiff that the Class Products, including the Product, are made entirely in the United States, made with ingredients and components from the United States, made pursuant to United States labor standards, and are therefore superior quality (i.e., contain better grown ingredients that non-US made products or raw materials). Defendant possesses superior knowledge of the true facts that were not disclosed regarding the Class Products, thereby tolling the running of any applicable statute of limitations.

86. The types of misrepresentations and/or omissions made by Defendant, as described herein, were considered by Plaintiff, a reasonable consumer, when deciding to purchase the Product.

87. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendant's representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the products were "Manufactured in the

---

[24] *See Miller v. Ghirardelli Chocolate Co.*, 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012) (citing cases); ("hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar."); *see also, e.g., Colucci v. ZonePerfect Nutrition Co.*, No. 12-2907, 2012 WL 6737800, at *4 (N.D. Cal. Dec. 28, 2012); *Astiana v. Dreyer's Grand Ice Cream, Inc.*, No. 11-2910, 2012 WL 2990766, at *11-13 (N.D. Cal. July 20, 2012).


754
KAZEROUNI LAW GROUP, APC

USA," when Defendant's Class Products are in fact wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

88. Reasonable consumers, including Plaintiff, attached importance to the "Manufactured in the USA" representations made by Defendant on its Product and the Class Products.

89. Consumers who purchased the Class Products on Defendant's website or through third-party vendor websites were not the only consumers who were exposed to and relied upon the unqualified and false "Manufactured in the USA" representations made by Defendant. Defendant's website contains a "Find A Store" link25 making it highly likely that hundreds of thousands of consumers saw the unqualified and false "Manufactured in the USA" representations and proceeded to purchase Class Products in brick-and-mortar stores like The Vitamin Shoppe.

90. Most consumers possess limited knowledge of the likelihood that products are made with or contain ingredients and components that are not "Manufactured in the USA" when they are advertised and represented to be "Manufactured in the USA." This is a material factor in many individuals' purchasing decisions which they rely upon as they believe they are purchasing a product that is "Manufactured in the USA" with ingredients and components from the United States.

91. Consumers generally believe that products that are "Manufactured in the USA" are made entirely in the United States, made of ingredients and components from the United States, made pursuant to United States labor standards, and are therefore of superior quality (i.e., contain better grown ingredients that non-US made products or raw materials).

92. On information and belief, Defendant's misrepresented Class Products were purchased by consumers over Defendant's competitors' properly and legally marketed products, during the entirety of the relevant four-year statutory time period, based on the unqualified, false and deceptive "Manufactured in the USA" representations (or some derivative thereof) made with respect to Defendant's products. Federal rules and California laws are designed to protect consumers from such false representations and predatory conduct.

93. Defendant's "Manufactured in the USA" representation was misleading to a

[25] *See* https://www.jackedfactory.com/pages/storelocator


755

KAZEROUNI LAW GROUP, APC

reasonable consumer.

94. On or about January 24, 2023, Plaintiff searched online for a pre-workout supplement when he discovered the Product and its unqualified and misrepresented "Manufactured in the USA" claim. Plaintiff subsequently purchased the Product on Amazon.

95. At the time of Plaintiff's purchase, the description of the Product described the Product as "Manufactured in the USA," without any qualification, when the Product was actually made with or contained ingredients and/or components that were not "Manufactured in the USA." Accordingly, Defendant was not entitled to lawfully make representations that the Product was "Manufactured in the USA" without qualification as per the MUSA Rule.

96. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendant as follows:

a. The "who" is Defendant;

b. The "what" is representation that Defendant's Class Products are "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

c. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

d. The "where" is in Defendant's advertisements and marketing of the Class Products;

e. The "to whom" is Plaintiff and the putative Class who bought the Class Products;

f. The "by what means" is by Defendant representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA. Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

g. The "how" is the allegation that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and

KAZEROUNI LAW GROUP, APC


756

components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

97. It is widely and generally known that consumers prefer products that are "Manufactured in the USA" due to quality, support for local businesses, national economic, environmental and other reasons. The preference is increased when the products are health related and ingestible due to the potential for inferior ingredients and components being manufactured overseas. In making the decision to purchase Defendant's Product, Plaintiff relied upon the advertising, marketing and/or other promotional materials prepared, approved and distributed and/or published by Defendant and its agents and disseminated through its Class Products' advertising containing the misrepresentations alleged herein.

98. Defendant's false representation is that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA, while Defendant knew that fact.

99. Defendant intended to deceive Plaintiff and the Class members into buying the Class Products knowing that consumers would prefer, purchase, and likely pay more for products "Manufactured in the USA" versus other products not "Manufactured in the USA."

100. Plaintiff justifiably relied on Defendant's "Manufactured in the USA" representation. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

101. Plaintiff paid and purchased the Product which was of less or little value than what he paid for.

102. Defendant's "Manufactured in the USA" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

103. Had Plaintiff been made aware that the Product, including its ingredients and components, was not actually "Manufactured in the USA," he would not have purchased the Product, or would not have purchased the Product for the price he paid. In other words, Plaintiff would not




KAZEROUNI LAW GROUP, APC

have purchased Defendant's Product, or paid the amount he did for the purchase of the Product, but for the unqualified "Manufactured in the USA" representations on Defendant's website and advertising on the websites of its third-party vendors which Plaintiff reasonably relied on.

104. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's unqualified and false "Manufactured in the USA" designation set forth on Defendant's website and advertising on the websites of its third-party vendors.

105. In each case when Plaintiff and putative Class members purchased a Class Product, they relied upon Defendant's unqualified "Manufactured in the USA" representation in their purchasing decision, which is typical of most U.S. consumers. Consequently, they were deceived as a result of Defendant's actions. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

106. Defendant's Class Products are made with or contain ingredients and components that are not manufactured in the USA, similar to the Product purchased by Plaintiff. Plaintiff and putative Class members purchased Defendant's misrepresented Class Products over Defendant's competitors' properly and legally marketed products that clearly and adequately qualify "Manufactured in the USA" claims or do not make the "Manufactured in the USA" claims at all. The precise amount of Plaintiff and the Class members' damages will be proven at the time of trial, in large part, by expert testimony.

107. Plaintiff and Class members were undoubtedly injured as a result of Defendant's unqualified and false "Manufactured in the USA" representations that are at issue in this matter.

**CLASS ACTION ALLEGATIONS**

108. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

109. Plaintiff brings this action individually and on behalf of all others similarly situated against Defendant, pursuant to California Code of Civil Procedure Section 378.

110. Plaintiff represents, and is a member of the class, ("the Class") consisting of:


758

KAZEROUNI LAW GROUP, APC

> All persons similarly situated within the state of California, who purchased one or more of Defendant's Class Products, which were represented and/or advertised as "Manufactured in the USA" (or similar words), that were made with or contained ingredients or components that were not manufactured in the USA, within the four years prior to the filing of the Complaint."

111. Excluded from the Class are Defendant and any of its officers, directors, and employees.

112. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

113. The "Class Period" means four years prior to the filing of the Complaint in this action.

114. This action has been brought and may properly be maintained as a class action under the provisions of § 382 of the California Code of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

115. **Ascertainability**. Plaintiff does not know the number of members in the Class, but Plaintiff currently believes that there are hundreds of thousands, if not more, members of the Class within the State of California. Because of the nature of Defendant's products and applicable regulations, Defendant must keep detailed and accurate records of production, manufacturing, sale and distribution. Therefore, the members of the Class are ascertainable through Defendant's records and/or Defendant's agents' records regarding retail and sales, as well as through public notice. This matter should therefore be certified as a Class action to assist in the expeditious litigation of this matter.

116. **Numerosity**. The members of the Class are so numerous and geographically disbursed that joinder of all Class members is impractical, and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court.

117. **Existence and Predominance of Common Questions of Law and Fact**. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. Common questions of fact and law exist in this matter that predominate over questions that may affect individual Class members, including, but not limited to, the following:

a. Whether Defendant committed the wrongful conduct alleged herein;




759

KAZEROUNI LAW GROUP, APC

b. Whether Defendant's claims and representations, as alleged herein, are untrue, misleading, and/or reasonably likely to deceive the average consumer;

c. Whether Defendant's acts, transactions, or course of conduct constitute the violations of law alleged herein;

d. Whether Defendant's conduct violates 16 C.F.R. §§ 323, *et seq*.;

e. Whether Defendant's conduct violates California Civil Code §§ 1750, *et seq*.;

f. Whether Defendant's advertising is false, untrue, or misleading within the meaning of California Business & Professions Code §§ 17500, *et seq*.;

g. Whether Defendant's conduct is an unfair, fraudulent, or unlawful act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

h. Whether Defendant's advertising is unfair, deceptive, untrue or misleading within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

i. Whether Defendant acted negligently or intentionally in making the misrepresentations contained regarding the Class Products thought its website and the websites of its third-party vendors;

j. Whether Defendant, through its conduct, received money that, in equity and good conscience, belongs to Plaintiff and members of the Class;

k. Whether the members of the Class sustained and/or continue to sustain damages attributable to Defendant's conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages; and

l. Whether the members of the Class are entitled to injunctive and/or any other equitable relief, including but not limited to restitution and/or disgorgement of ill-gotten gains.

118. **Typicality**. As a person who purchased one or more of Defendant's products, that were advertised as "Manufactured in the USA" but are made with or contain ingredients and/or components that are not manufactured in the USA, Plaintiff is asserting claims that are typical of the Class. Plaintiff's claims involve the same violations of law by Defendant as other Class Members' claims. Plaintiff and members of the Class also sustained damages arising out of Defendant's common


760
KAZEROUNI LAW GROUP, APC

course of conduct complained herein. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent members of the Class. Defendant has no defenses unique to the Plaintiff.

119. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of other members of the Class in that Plaintiff has no interests antagonistic to any member of the Class. Further, Plaintiff has retained counsel experienced in handling class action claims and claims involving violations of the consumer laws like violations of the California Business and Professions Code, and, specifically, false and deceptive advertising. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and proposed Class.

120. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent and/or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendant. The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them. Even if the members of the proposed Class could afford such litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable pursuant to Cal. Code of Civil Procedure § 382.

121. Unless the Class is certified, Defendant will retain monies received as a result of Defendant's unlawful and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendant will also likely continue to, or allow its agents to, advertise, market, promote and package



761

KAZEROUNI LAW GROUP, APC

Defendant's Class Products in an unlawful and misleading manner, and members of the Class will continue to be misled, harmed, and denied their rights under California law.

122. Further, Defendant has acted or refused to act on grounds that are generally applicable to the class so that declaratory and injunctive relief is appropriate to the Class as a whole, making class certification appropriate.

**FIRST CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**CAL. CIV. CODE SECTION 1750, ET SEQ.**

123. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

124. Plaintiff asserts CLRA claims as to the Class Products with the CLRA Ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, and (d) *L-Theanine*.

125. Therefore, Plaintiff asserts CLRA claims as to the following Class Products which contain the CLRA Ingredients: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM. (12 Total)

126. California Civil Code §§ 1750 et seq., entitled the Consumers Legal Remedies Act (hereinafter "CLRA"), provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer." The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, inter alia, that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.

127. Defendant's Product and the Class Products, as referenced in this section, constitute "goods" as defined pursuant to Civil Code Section 1761(a).

128. Plaintiff, and the Class members, are each a "consumer" as defined pursuant to Civil Code Section 1761(d).

129. Each of Plaintiff's and the Class members' purchases of Defendant's Class Products, as referenced in this section, constituted a "Transaction" as defined pursuant to Civil Code Section

KAZEROUNI LAW GROUP, APC






762

1761(e).

130. Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) provides that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> > (2) [m]isrepresenting the source, sponsorship, approval, or certification of goods or services;
> > (3) [m]isrepresenting the affiliation, connection, or association with, or certification by, another;
> > (4) [u]sing deceptive representations or designations of geographic origin in connection with goods and services;
> > (5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;
> > (7) [r]epresenting that goods or services are of a particular standard, quality, or grade…; [and]
> > (9) [a]dvertising goods or services with intent not to sell them as advertised."

131. Defendant violated Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) by marketing and representing that its Class Products, as referenced in this section, are "Manufactured in the USA," or some derivative thereof, when they are made with or contain ingredients and components that are not manufactured in the United States.

132. Defendant's "Manufactured in the USA" representations are deceptive and false because Defendant's Class Products, as referenced in this section, are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

133. Pursuant to section 1782(d), by letter dated March 8, 2023, Plaintiff provide Defendant notice in writing by certified mail of the particular violations of section 1770 and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. Defendant failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within thirty days of the date of written notice pursuant to section 1782. Therefore, Plaintiff and the Class further seek actual, punitive, and statutory damages, as deemed appropriate.

134. Attached hereto as Exhibit C is a sworn affidavit from Plaintiff pursuant to Cal. Civ.


763

KAZEROUNI LAW GROUP, APC

Code § 17801(d).

135. On information and belief, Defendant's violations of the CLRA set forth herein were done with awareness of the fact that the conduct alleged was wrongful and was motivated solely for Defendant's self-interest, monetary gain and increased profit. Plaintiff further alleges that Defendant committed these acts knowing the harm that would result to Plaintiff and Defendant engaged in such unfair and deceptive conduct notwithstanding such knowledge.

136. Plaintiff further alleges that Defendant committed these acts knowing the harm that would result to Plaintiff and Defendant engaged in such unfair and deceptive conduct notwithstanding such knowledge.

137. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's unqualified and false "Manufactured in the USA" representations set forth in Defendant's website and the websites of its third-party vendors regarding the Product and the Class Products.

138. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiff and members of the Class are entitled to a declaration that Defendant violated the Consumer Legal Remedies Act.

139. For clarity, as to the CLRA Ingredients in the Class Products only, Plaintiff, on behalf of himself and the Class demands judgment against Defendant for damages, restitution, punitive damages, statutory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

140. As allowed under the CLRA, as to all the Class Products, Plaintiff, on behalf of himself and the Class demands injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper

141. Pursuant to section 1780(e) of the California Civil Code, Plaintiff and the Class make claims for damages and attorneys' fees and costs.

142. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in


764

class action cases such as this matter.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")**
**BUS. & PROF. CODE §§ 17500, *ET SEQ*.**

143. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

144. Plaintiff's FAL claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff; (a) L-Citruline, (b) Beta Alanine, (c) Betaine Anhydrous, (d) L-Theanine, (e) Caffeine Anhydrous, (f) Theobromine, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

145. Therefore, Plaintiff asserts FAL claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 Total)

146. Plaintiff and Defendant are both "person[s]" as defined by Cal. Bus. & Prof. Code § 17506.

147. Cal. Bus. & Prof. Code § 17535 authorizes a private right of action on both an individual and representative basis.

148. Defendant misrepresented its Class Products as "Manufactured in the USA" without clear and adequate qualification when in fact Defendant's Class Products are made with or contain ingredients and components that are not manufactured in the USA.

149. Defendant's Class Products are made with ingredients/components that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

150. These misrepresentations, acts, and non-disclosures by Defendant constitute false and misleading advertising in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

151. At all times relevant, Defendant's representations and advertising of its Class Products was untrue, misleading, and likely to, and did, deceive the reasonable consumer and the public.

152. Defendant engaged in the false and/or misleading advertising and marketing of its Product, as alleged herein, with the intent to directly or indirectly induce consumers to purchase its

KAZEROUNI LAW GROUP, APC



LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

765

products, which Defendant knew, or had reason to know, that the Class Products were made with or contained ingredients and components that were not manufactured in the USA.

153. Defendant's "Manufactured in the USA" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

154. Because Defendant knew or should have known that the representations and/or omissions alleged herein regarding the Class Products were untrue or misleading, Defendant acted in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

155. Had Defendant clearly, adequately and truthfully qualified and advertised that its Class Products were made with or contained ingredients and components that were not manufactured in the USA, Plaintiff and the putative Class members would not have purchased the Class Products, would have paid a different price, or would have purchased a different product from another company.

156. As a direct and proximate result of the aforementioned acts and omissions by Defendant, Defendant received and continues to hold monies rightfully belonging to Plaintiff and the putative Class members, who were led to purchase Defendant's Class Products during the Class Period.

**THIRD CAUSE OF ACTION**
**VIOLATION OF BUSINESS & PROFESSIONS CODE**
**BUS. & PROF. CODE, SECTION 17200, ET SEQ.**

157. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

158. Plaintiff's UCL claims apply to the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffiene Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

159. Therefore, Plaintiff asserts UCL claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 Total)




766

KAZEROUNI LAW GROUP, APC

160. Plaintiff and Defendant are each "person[s]" as defined by California Business & Professions Code § 17201. California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

161. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

162. By and through Defendant's conduct alleged in further detail above and herein, Defendant engaged in conduct which constitutes unlawful, unfair, and/or fraudulent business practices prohibited by Bus. & Prof. Code §§ 17200, et seq.

***A. "Unlawful" Prong***

163. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

164. The violation of any law constitutes as "unlawful" business practice under the UCL.

165. Beginning at a date currently unknown, Defendant committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code §§ 17200, et seq. by manufacturing, distributing, and/or marketing Defendant's Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq., and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq., by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

166. Defendant violated the MUSA Rule, 16 C.F.R. § 323, by making its representations on the Class Products without clear and adequate qualification that Defendant's Class Products are "Manufactured in the USA" or made with or contain ingredients and components that are not

KAZEROUNI LAW GROUP, APC


767

manufactured in the USA.

167. Defendant's acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of the MUSA Rule, FAL, and the CLRA, as described above.

168. These alleged acts and practices by Defendant were intentional and in violation of the MUSA Rule, FAL, and the CLRA.

169. Pursuant to the UCL, Plaintiff and the Class are entitled to preliminary and permanent injunctive relief and order Defendant to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the Class of all the revenues associated with this unfair and unlawful competition, or such proton of said revenues as the Court may find applicable.

***B. "Unfair" Prong***

170. Beginning at a date currently unknown, Defendant committed acts of unfair competition that are prohibited by Bus. & Prof. Code section 17200 et seq. Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes by engaging in conduct and practices that threaten an incipient violation of law/s or violate the policy or spirit of law/s by manufacturing, distributing, and/or marketing Defendant's Class Products with a false ingredient origin information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein were "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

171. Clearly said, Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

172. Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices that are immoral, unethical, oppressive or unscrupulous, the utility of such conduct, if any, being far outweighed by the harm done to consumers and against public policy by manufacturing, distributing, and/or marketing Defendant's Class Products with false ingredient information, in violation of








768

KAZEROUNI LAW GROUP, APC

California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

173. Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices, including manufacturing, distributing, marketing, and/or advertising Defendant's Class Products with false ingredient information, wherein: (1) the injury to the consumer was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was not of the kind that consumers themselves could not have reasonably avoided.

***C. "Fraudulent" Prong***

174. Beginning at a date currently unknown, Defendant engaged in acts of unfair competition, including those described above and herein, prohibited and in violation of Bus. & Prof. Code § 17200 et seq., by engaging in a pattern of "fraudulent" business practices within the meaning of Bus. & Prof. Code § 17200 et seq, by manufacturing, distributing, and/or marketing Defendant's Class Products in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

175. Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

176. Plaintiff reserves the right to allege further conduct that constitutes other fraudulent business acts or practices. Such conduct is ongoing and continues to this date.

***D. "Unfair, Deceptive, Untrue or Misleading Advertising" Prong***

177. Defendant's advertising was unfair, deceptive, untrue and/or misleading in that consumers were led to believe that Defendant's Class Products are "Manufactured in the USA" when








769

Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

178. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendant's representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the Class Products are actually manufactured in the USA with ingredients and components from the USA given the absence of clear and adequate qualification of Defendant's "Manufactured in the USA" representations.

179. Contrary to the representation, Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

180. Defendant's "Manufactured in the United States" representations are deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

181. Defendant's unfair, deceptive, untrue, or misleading advertising presented a threat to the public by engaging in unlawful conduct that resulted in harm to consumers.

182. Defendant engaged in these unlawful, unfair, and fraudulent business practices motivated solely by Defendant's self-interest with the primary purpose of collecting unlawful and unauthorized monies from Plaintiff and all others similarly situated; thereby unjustly enriching Defendant.

183. Such acts and omissions by Defendant were unlawful and/or unfair and/or fraudulent and constitute a violation of Business & Professions Code §§ 17200, et seq. Plaintiff reserves the right to identify additional violations by Defendant as may be established through discovery.

184. As a direct and proximate result of the aforementioned acts and representations described above and herein, Defendant received unearned commercial benefits at the expense of its competitors and the public.

185. As a direct and proximate result of Defendant's unlawful, unfair and fraudulent conduct described herein, Defendant has been unjustly enriched by the receipt of ill-gotten gains from customers, including Plaintiff, who unwittingly provided money to Defendant based on Defendant's representations.

KAZEROUNI LAW GROUP, APC


770

186. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendant as a result of Defendant's false representations set forth on the Defendant's Class Products.

187. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

**FOURTH CAUSE OF ACTION FOR**
**NEGLIGENT MISREPRESENTATION**

188. Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully stated herein.

189. Plaintiff's Negligent Misrepresentation claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff; (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

190. Therefore, Plaintiff asserts Negligent Misrepresentation claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 total)

191. At a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendant represented to the public, including Plaintiff, by packaging, advertising, marketing and other means, that Defendant's Class Products are "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

192. Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

193. Defendant made the representations herein alleged with the intention of inducing the public, including Plaintiff and putative class members, to purchase Defendant's Class Products over similar products from competitors which clearly and adequately qualified their "Manufactured in the

KAZEROUNI LAW GROUP, APC

USA" representations or made no "Manufactured in the USA" representations at all.

194. Defendant's "Manufactured in the United States" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

195. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendant's advertising representations and, in reliance on them, purchased the Class Products, as described herein.

196. At all times relevant, Defendant made the misrepresentations herein alleged when Defendant should have known these representations to be untrue, and Defendant had no reasonable basis for believing the representations to be true.

197. As a proximate result of Defendant's negligent misrepresentations, Plaintiff and other consumers similarly situated were induced to purchase, purchase more of, purchase instead of, or pay more for Defendant's Class Products, due to the unlawful acts of Defendant, in an amount to be determined at trial, during the Class Period.

## FIFTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION

198. Plaintiff repeats, re-alleges and incorporates herein by reference the above allegations as if fully stated herein.

199. Plaintiff's Intentional Misrepresentation claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

200. Therefore, Plaintiff asserts Intentional Misrepresentation claims ast to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 total)

201. Beginning at a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendant intentionally represented to the public,

KAZEROUNI LAW GROUP, APC


772

including Plaintiff, by promoting and other means, that Defendant's Class Products were "Manufactured in the USA" without clear and adequate qualification when Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

202. Defendant's Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

203. Defendant's "Manufactured in the USA" representations were deceptive and false because Defendant's Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

204. Defendant made the representations herein alleged with the intention of inducing the public, including Plaintiff, to purchase Defendant's Class Products for Defendant's own financial gain.

205. Defendant intentionally made such misrepresentations by printing and advertising its misrepresentations its website and the websites of its third-party vendors.

206. Defendant's misrepresentations of the Class Products as "Manufactured in the USA" without clear and adequate qualification was misleading because Defendant's Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

207. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendant's advertising representations and, in reliance on such representations, purchased the Class Products, as described above.

208. At all times relevant, Defendant intentionally made the misrepresentations herein alleged and allowed the misrepresentations to continue to be made by its resellers when Defendant knew the representations to be false.

209. As a proximate result of Defendant's intentional misrepresentations, Plaintiff and other consumers similarly situated were induced to spend an amount of money to be determined at trial on Defendant's misrepresented Products.

210. Defendant knew that its Class Products were in fact not "Manufactured in the USA" without clear and adequate qualification but instead made with or contain ingredients and components






773

KAZEROUNI LAW GROUP, APC

that are not manufactured in the USA, but nevertheless made the representations described herein with the intention that consumers rely on Defendant's representations.

211. Defendant also knew that its website, as well as the websites of its third-party vendors, were advertising its Class Products as "Manufactured in the USA" without clear and adequate qualification, when Defendant clearly knew that its Class Products were in fact made with or contained ingredients and components that were not manufactured in the USA.

212. Plaintiff and other consumers similarly situated, in purchasing and using the Class Products as herein alleged, did rely on Defendant's representations, including the representations on Defendant's advertisements and website, all to their damage and/or detriment as herein alleged.

213. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendant as follows:

a. The "who" is Defendant;

b. The "what" is representation that Defendant's Class Products were "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

c. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

d. The "where" is in Defendant's product advertisements and marketing;

e. The "to whom" is Plaintiff and the putative class who bought the Class Products;

f. The "by what means" by Defendant representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA;

g. The "how" is the allegation that Defendant did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

214. By engaging in the acts described above, Defendant is guilty of malice, oppression,

KAZEROUNI LAW GROUP, APC






774

and fraud, and Plaintiff and the Class members are therefore entitled to recover exemplary or punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the Court grant Plaintiff and the putative Class the following relief:

- That this action be certified as a Class Action;
- That Plaintiff be appointed as the Class Representative;
- That Plaintiff's attorneys be appointed as Class Counsel;
- That Defendant's wrongful conduct be adjudged and decreed to violate the consumer protection statutes raised herein;
- That Plaintiff and each of the other members of the Class recover the amounts by which Defendant and Does have been unjustly enriched;
- An order requiring imposition of a constructive trust and and/or disgorgement of Defendant's and Does' ill-gotten gains and to pay restitution to Plaintiff and all members of the Class and to restore to the Plaintiff and members of the class all funds acquired by means of any act or practice declared by this court to be an unlawful, fraudulent or unfair business act or practice, in violation of laws, statutes or regulations, or constituting unfair competition;
- Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery were necessary and as applicable, to prevent Defendant or Does from retaining the benefits of their wrongful conduct;
- That Defendant and Does be enjoined from continuing the wrongful conduct alleged herein and be required to comply with all applicable laws;
- A temporary, preliminary and/or permanent order for injunctive relief requiring Defendant and Does to: (i) discontinue its false and/or misleading statement/s; and (ii) undertake an immediate public information campaign to inform members of the proposed class as to their prior practices;
- Pre-judgment interests from the date of filing of this suit;


775

KAZEROUNI LAW GROUP, APC

- that Plaintiff and each member of the putative Class recover their costs of suit.

**FIRST CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT CAL. BUS. & PROF. CODE §§ 1750, *ET SEQ.***

- Actual damages, injunctive relief, restitution, and punitive damages pursuant to Cal. Civ. Code § 1780(a); and
- an award of costs and attorney's fees pursuant to Cal. Civ. Code § 1780(d).

**SECOND CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17535; and
- Recovery of reasonably attorney's fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**THIRD CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17203; and
- Recovery of reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**FOURTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION**

- A judgment against Defendant and Does for general and compensatory damages in an amount to be determined at trial

**FIFTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION**

- A judgment against Defendant and Does for general and compensatory damages in an amount to be determined at trial;
- Punitive damages pursuant to Cal. Civ. Code § 3294; and
- That Plaintiff and the members of the Class be granted any other relief the Court may deem just and proper.


776

KAZEROUNI LAW GROUP, APC

**TRIAL BY JURY**

215. Plaintiff is entitled, and demands, a trial by jury on all issues so triable.

Dated: September 25, 2025

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: */s/ Gustavo Ponce*
Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*

KAZEROUNI LAW GROUP, APC

**PROOF OF SERVICE**

I am over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On September 25, 2025, I served the foregoing document and accompanying attachments by the means indicated below:

**THIRD AMENDED COMPLAINT**

☒ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

☒ ELECTRONIC SERVICE - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m. The electronic filing system sends an e-mail notification of the filing to the parties and counsel of record.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Angela M. Sousa
Anthony Hopp
Melanie A. Ayerh
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
jsingh@steptoe.com
asousa@steptoe.com
ahopp@steptoe.com
mayerh@steptoe.com
*Attorneys for Defendant*
*Nutra Holdings, Inc. d/b/a Jacked Factory*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on September 25, 2025, at Las Vegas, Nevada.

*/s/ Gustavo Ponce*
GUSTAVO PONCE

KAZEROUNI LAW GROUP, APC


778

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | FOR COURT USE ONLY<br><br>FILED<br>Superior Court of California<br>County of Los Angeles<br>09/11/2025<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | |
| PLAINTIFF(S)/PETITIONER(S):<br>Daniel Rossi | |
| DEFENDANT(S)/RESPONDENT(S):<br>Nutra Holdings, Inc. | |
| **CLERK'S CERTIFICATE OF SERVICE BY ELECTRONIC SERVICE** | CASE NUMBER:<br>23STCV15674 |

I, David W. Slayton, Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein and that on this date I served the

**Stipulation and Order Re Briefing Schedule on Plaintiff's Motion for Class Certification of 09/11/2025**

upon each party or counsel of record in the above entitled action by electronically serving to the party or parties at the electronic address as listed below:

**"Kazerounian, Abbas" <ak@kazlg.com>**
**"Sousa, Angela M." <asousa@steptoe.com>**
**"Brophy, Carol R." <cbrophy@steptoe.com>**
**"Ponce, Gustavo" <gustavo@kazlg.com>**
**"Ayerh, Melanie A." <mayerh@steptoe.com>**
**ahopp@steptoe.com**

The electronic transmission originated from the Superior Court of California, County of Los Angeles email address eService-DoNotReply@lacourt.org at the Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA 90012.

Dated: 09/11/2025

David W. Slayton, Executive Officer / Clerk of Court

By: A. He
Deputy Clerk

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | FOR COURT USE ONLY |
|---|---|
| COURTHOUSE ADDRESS: Spring Street Courthouse 312 North Spring Street, Los Angeles, CA 90012 | FILED Superior Court of California County of Los Angeles 09/14/2026 David W. Slayton, Executive Officer / Clerk of Court By: A. He Deputy |
| PLAINTIFF(S)/PETITIONER(S): Daniel Rossi | |
| DEFENDANT(S)/RESPONDENT(S): Nutra Holdings, Inc. | |
| **CLERK'S CERTIFICATE OF SERVICE BY ELECTRONIC SERVICE** | CASE NUMBER: 23STCV15674 |

I, David W. Slayton, Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein and that on this date I served the

**Stipulation for Leave to File Fourth Amended Complaint; Order of 09/14/2026**

upon each party or counsel of record in the above entitled action by electronically serving to the party or parties at the electronic address as listed below:

**"Kazerounian, Abbas" <ak@kazlg.com>**
**"Sousa, Angela M." <asousa@steptoe.com>**
**"Hopp, Anthony G." <ahopp@steptoe.com>**
**"Brophy, Carol R." <cbrophy@steptoe.com>**
**"Mcglothlin, David J." <david@kazlg.com>**
**"Ponce, Gustavo" <gustavo@kazlg.com>**
**"Singh, Jennifer K." <jsingh@steptoe.com>**
**"Ayerh, Melanie A." <mayerh@steptoe.com>**
**"Amini, Mona" <mona@kazlg.com>**

The electronic transmission originated from the Superior Court of California, County of Los Angeles email address eService-DoNotReply@lacourt.org at the Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA 90012.

Dated: 09/14/2026

David W. Slayton, Executive Officer / Clerk of Court

By: A. He
Deputy Clerk


780

FILED
Superior Court of California
County of Los Angeles
09/14/2026
David W. Slayton, Executive Officer / Clerk of Court
By: F. Sims Deputy

Electronically Received 09/14/2026 11:44 AM

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. a/b/a JACKED FACTORY and JACKED FACTORY HOLDINGS INC.,<br><br>Defendants. | Case No.: 23STCV15674<br><br>**FOURTH AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>**1) CONSUMERS LEGAL REMEDIES ACT, CAL. CIVIL CODE §§ 1750, ET SEQ.;**<br>**2) CALIFORNIA'S FALSE ADVERTISING LAW, BUS. & PROF. CODE §§ 17500 ET SEQ.;**<br>**3) CALIFORNIA'S UNFAIR COMPETITION LAW, BUS. & PROF. CODE §§ 17200 ET SEQ.;**<br>**4) NEGLIGENT MISREPRESENTATION; AND**<br>**5) INTENTIONAL MISREPRESENTATION**<br><br>**JURY TRIAL DEMANDED** |




781

**INTRODUCTION**

1. Plaintiff DANIEL ROSSI ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of Defendants NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY and JACKED FACTORY HOLDINGS INC. (jointly as the "Defendants") in unlawfully representing and advertising Defendants' dietary supplement products with the false designation and representation that the products were made and/or manufactured in the USA. The unlawfully represented products were sold online on Defendants' website and other third-party vendors, such as Amazon.com ("Amazon"), throughout the United States, and advertised on Defendants' website.[1] Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

2. Specifically, Plaintiff purchased Defendants' Nitrosurge Pre Workout[2] Supplement (hereinafter the "Product"), which, as advertised on Defendants' website and other third-party vendors, was represented by Defendants to Plaintiff and other similarly situated consumers as a product made and/or manufactured in the USA. However, Defendants' Product contains or is made with ingredients that are not "Manufactured in the USA," as discussed further herein.

3. The "Manufactured in the USA" claim (or some derivative thereof) was prominently printed on Defendants' website and advertisements, as well as the websites of third-party vendors, including Amazon, where the Product was purchased by Plaintiff. Contrary to Defendants' representation and in violation of federal rules and California laws, Defendants' Class Products,[3]

---

[1] Plaintiff seeks class wide relief on behalf of all purchasers of any of Defendants' products that are substantially similar to the dietary supplement product purchased by Plaintiff that were advertised as being "Manufactured in the USA" in violation of California law(s).

[2] As titled on Amazon.com when Plaintiff purchased the Product; "NITROSURGE Pre Workout Supplement – Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps – Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White."

[3] A list of the Class Products is attached hereto as Exhibit A.


782

KAZEROUNI LAW GROUP, APC

including the Product purchased by Plaintiff, are actually made with or contain ingredients that are not "Manufactured in the USA," as discussed in further detail herein.

4. Defendants' nationwide sale and advertising of deceptively advertised Class Products constitute violations of: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (2) California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17533.7; (3) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 et seq.; (4) negligent misrepresentation and (5) intentional misrepresentation. This conduct caused Plaintiff, and others similarly situated, damages, and requires restitution and injunctive relief to remedy and prevent further harm.

5. Unless otherwise indicated, the use of Defendants' name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of Defendants.

**JURISDICTION AND VENUE**

6. Jurisdiction is proper pursuant to this Court's general jurisdiction.

7. The Court has jurisdiction over Plaintiff's claims for damages, restitution, injunctive relief, and declaratory relief arising from Defendants' unlawful business practices under California's CLRA, FAL, and UCL; as well as negligent and intentional misrepresentation.

8. This Court has personal jurisdiction over Defendants because Defendants conducts substantial business in the State of California and County of Los Angeles, has sufficient minimum contacts with this State and County, and otherwise purposefully avails itself of the markets in this State and County through the promotion, sale, and marketing of its services in this State, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this Court pursuant to California Code of Civil Procedure § 395(a) because Plaintiff resides within this county and many of the acts and transactions giving rise to this action occurred in this county because Defendants:

a. is authorized to conduct business in this county and has intentionally availed itself of the laws and markets within this county;

b. does substantial business within this county; and is subject to personal jurisdiction in this county;

c. and is subject to personal jurisdiction in this county.

**PARTIES**

10. Plaintiff is an individual residing in the City of Northridge, County of Los Angeles, State of California.

11. Defendants NUTRA HOLDINGS, INC. d/b/a JACKED FACTORY is a corporation with its principal place of business in St. John's, Newfoundland and Labrador, Canada, which is regularly doing business in the State of California and within this county.

12. Defendants JACKED FACTORY HOLDINGS INC. is a corporation with its principal place of business in St. John's, Newfoundland and Labrador, Canada, which is regularly doing business in the State of California and within this county.

13. Defendants are a manufacturer and seller of dietary supplements that conducts business through its website and the websites of third-party vendors. One of the products sold by Defendants is Nitrosurge Pre Workout, the Product, which was purchased by Plaintiff.

**NATURE OF THE CASE**

14. At all times relevant, Defendants made affirmative misrepresentations regarding the Class Products, including the Product purchased by Plaintiff, it manufactures, markets and sells. Specifically, Defendants marketed, advertised, and sold its Class Products as "Manufactured in the USA" without clear and adequate qualification that the Class Products contained foreign ingredients and/or components as required by federal rules and state laws.

15. However, although Defendants represents that its Class Products are "Manufactured in the USA" without clear and adequate qualification, Defendants' Class Products contain or are made with ingredients and/or components that are not "Manufactured in the USA."

16. Federal rules regarding the use of "Made in the United States" claims with respect to products and services are well established and well defined.

17. Specifically, the Made in USA Labeling rule, 16 C.F.R. § 323, (the "MUSA Rule")

KAZEROUNI LAW GROUP, APC


784

clearly defines the meaning of "Made in the United States", including synonymous phrases[4], as well as when it can be used without clear and adequate qualification notifying consumers that the good or service in question contains or is made with ingredients or components that are not made or sourced in the United States.[5]

18. Despite the clearly established and well-defined federal rules regarding "Made in the United States" claims, Defendants falsely, unfairly and deceptively advertised, marketed and sold its Class Products, including the Product purchased by Plaintiff, as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and/or components as further herein.

19. Defendants' "Manufactured in the United States" representations were deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

20. Each consumer, including Plaintiff, was exposed to virtually the same material misrepresentations, as similar advertisements and misrepresentations were prominently placed on all of Defendants' website and the websites of third-party vendors.

21. As of July 2023, when the first complaint in this matter was filed, Defendants' website contained a clear and conspicuous "Manufactured in the USA" claim under iconography of a waiving United States flag encircled by the words "Manufactured in the USA" making it clear that Defendants meant this claim to be applied to <u>*all*</u> of its products, including the Class Products. This claim,

---

[4] *See* 16 C.F.R. § 323.1(a) ("The term Made in the United States means any unqualified representation, express or implied, that a product or service, or a specified component thereof, is of U.S. origin, including, but not limited to, a representation that such product or service is "made," "***manufactured***," "built," "produced," "created," or "crafted" in the United States or in America, or any other unqualified U.S.-origin claim.") (emphasis added)

[5] *See* 16 C.F.R. § 323.2 Prohibited Acts ("In connection with promoting or offering for sale any good or service, in or affecting commerce as "commerce" is defined in section 4 of the Federal Trade Commission Act, 15 U.S.C. 44, ***it is an unfair or deceptive act or practice*** within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), ***to label any product as Made in the United States unless*** the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and ***all or virtually all ingredients or components of the product are made and sourced in the United States***. (emphasis added)

KAZEROUNI LAW GROUP, APC

including iconography, appeared on each and every product page of Defendants' website as well as Defendants' Amazon product pages.

22. Even after the filing of this matter, according to publicly archived webpages[6], as of January 2024 or even later, the main home page of Defendants' website still contained a clear and conspicuous "Manufactured in the USA" claim under same iconography of a waiving United States flag encircled by the words "Manufactured in the USA" thus making it more evident that Defendants meant this claim to be applied to ***all*** its products—even after the Complaint was filed in this matter.




23. According to publicly archived webpages, as of November 2023 or even later, the "Frequently Asked Questions" page of Defendants' website contained the following answer in response to the question: "Where are your products manufactured?" "Answer: **Our products are manufactured in the USA** in a cGMP, FDA Registered manufacturing facility adhering to the strictest quality control." (emphasis added)[7]

24. As a consequence of Defendants' unfair and deceptive practices, Plaintiff and other similarly situated consumers purchased Defendants' Class Products under the false impression that the products were actually manufactured and/or made in the USA with U.S. made ingredients and components.

---

[6] *See* https://web.archive.org/web/20240121011132/https://www.jackedfactory.com/ (archived January 21, 2024)

[7] *See* https://web.archive.org/web/20231101090125/https://www.jackedfactory.com/pages/common-faqs (archived November 1, 2023)

KAZEROUNI LAW GROUP, APC


786

25. As a result of Defendants' misrepresentations, Plaintiff and other consumers similarly situated overpaid for Defendants' Class Products, and/or purchased the Class Products under the false belief that the product they purchased was made and/or manufactured in the USA with U.S. made ingredients and components. Had Plaintiff and other consumers similarly situated been made aware that Defendants' Class Products were not actually made with all or virtually all ingredients and components being made in the United States, they would not have purchased the products.

26. As a result of Defendants' false and misleading statements and failure to clearly and adequately disclose the presence of foreign ingredients and components, as well as Defendants' other conduct described herein, Plaintiff and other similarly situated consumers purchased thousands, if not millions, of Defendants' Class Products and have suffered injury in fact, including the loss of money and/or property.

27. Defendants' conduct as alleged herein violates federal rules as well as several California laws, as more fully set forth herein.

28. This action seeks, among other things, equitable and injunctive relief; restitution of all amounts illegally retained by Defendants; and disgorgement of all ill-gotten profits from Defendants' wrongdoing alleged herein.

**THE FOREIGN INGREDIENTS IN DEFENDANTS' CLASS PRODUCTS**

29. Pursuant to section 1782(a) of the CLRA, on March 8, 2023, Plaintiff provided Defendants notice in writing sent by certified mail of the particular violations of section 1770, and demanded that Defendants rectify the problems (the "CLRA Letter").[8]

30. Plaintiff's CLRA Letter included a list of products with foreign ingredients, the Class Products, which has since been made reduced. See Exhibit A.

31. Plaintiff's CLRA Letter put Defendants on notice of the following foreign ingredients in its products, including the offending Product (the "CLRA Ingredients"):

a. *L-Citruline,*

---

[8] A true and correct copy of Plaintiff's CLRA Letter dated March 8, 2023, is attached hereto as Exhibit B.

KAZEROUNI LAW GROUP, APC

b. *Beta Alanine,*

c. *Betaine Anhydrous,*

d. *L-Theanine*

32. The Product purchased by Plaintiff contains the following foreign ingredients:

a. *L-Citrulline*

b. *Beta Alanine*

c. *Betaine Anhydrous*

d. *L-Theanine*

e. *Caffiene Anhydrous*

f. *Theobromine*

g. *AstraGin,* which is the combination of *Astragalus membranaceus* and *Panax notoginseng* (both which are foreign ingredients)

33. Thus, the CLRA Letter provided Defendants with notice of four (4) foreign ingredients in the Product which Plaintiff's CLRA claims are based on: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*.

34. Plaintiff's UCL, FAL, negligent misrepresentation, and intentional misrepresentation, claims are based on the seven (7) foreign ingredients contained in the Product; (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

35. The Class Products are substantially similar to the Product as they all contain the foreign ingredients included in the Product, and Defendants similarly made the "Manufactured in the USA" representation for each of the Class Products.

36. The Product purchased by Plaintiff contains the following foreign ingredients: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin (*Astragalus membranaceus* and *Panax notoginseng*).

a. Like the Product purchased by Plaintiff, the Class Product Altius Pre contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, and (d) *Caffiene*


788

KAZEROUNI LAW GROUP, APC

*Anhydrous*.

b. Like the Product purchased by Plaintiff, the Class Product Build PM contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Theanine*.

c. Like the Product purchased by Plaintiff, the Class Product Build XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

d. Like the Product purchased by Plaintiff, the Class Product Burn XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous*.

e. Like the Product purchased by Plaintiff, the Class Product Burn XT Black contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous* and (b) *Theobromine*.

f. Like the Product purchased by Plaintiff, the Class Product Burn XT Powder contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous*.

g. Like the Product purchased by Plaintiff, the Class Product EAA Surge contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Citruline*.

h. Like the Product purchased by Plaintiff, the Class Product GDA XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

i. Like the Product purchased by Plaintiff, the Class Product Intra Surge Pre contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, and (b) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

j. Like the Product purchased by Plaintiff, the Class Product Lean PM contains the following foreign ingredient which is also included in the Product purchased by


789
KAZEROUNI LAW GROUP, APC

Plaintiff: (a) *L-Theanine*.

k. Like the Product purchased by Plaintiff, the Class Product N.O. XT contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Citruline*.

l. Like the Product purchased by Plaintiff, the Class Product Nitro Surge Build contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffiene Anhydrous*, and (f) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

m. Like the Product purchased by Plaintiff, the Class Product Nitro Surge Max contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine,* (e) *Theobromine*, and (f) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

n. Like the Product purchased by Plaintiff, the Class Product NitroSurge Shred contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *L-Theanine*, (d) *Caffiene Anhydrous*, and (e) *Theobromine.*

o. Like the Product purchased by Plaintiff, the Class Product Pump Surge contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Betaine Anhydrous*, and (c) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

p. Like the Product purchased by Plaintiff, the Class Product Test PM contains: (a) *L-Theanine*, which is also included in the Product purchased by Plaintiff

37. Plaintiff alleges claims and seeks damages and relief available under the CLRA as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, as they contain the CLRA Ingredients referenced in the CLRA Letter. (12 Total)

KAZEROUNI LAW GROUP, APC


790

38. Plaintiff alleges claims and seeks damages and relief under the UCL, FAL, negligent misrepresentation, and intentional misrepresentation as to all of the Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT, as they contain foreign ingredients similar to the Product. (17 Total)

**FACTUAL ALLEGATIONS**

39. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

40. Defendants marketed and sold various dietary supplements that were represented and advertised as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and components. Defendants made these representations on its website which resulted in these representations being made on the websites of its third-party vendors, including Walmart.com.[9] These representations were made until, at least, sometime in January 2024 on Defendants' website and even later on third party vendors' websites.

41. Contrary to Defendants' representation, Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

42. Dietary supplements, such those sold by Defendants, are often made with numerous ingredients and components that are foreign sourced due to significant differences in costs of raw material/component production in the United States versus foreign production such as in China.10 In

---

[9] *See* https://www.walmart.com/ip/Nitrosurge-Pre-Workout-Powder-Endless-Energy-Instant-Strength-Gains-Clear-Focus-Intense-Pumps-30-Servings-Blue-Raspberry/383327735 (Under Product Details "Each bottle of Nitrosurge pre-workout is manufactured in a state-of-the-art cGMP manufacturing facility in the USA adhering to the most stringent manufacturing standards."; "Manufactured in the USA in a cGMP-Certified Facility.") (last accessed August 1, 2024)

[10] *See* U.S.-China Economic and Security Review Commission. *Potential Health & Safety Impacts from Pharmaceuticals and Supplements Containing Chinese-Sourced Raw Ingredients*. (2010). https://www.uscc.gov/sites/default/files/Research/NSD_BIO_Pharma_Report--Revised_FINAL_for_PDF--14_%20April_2010.pdf ("This report attempts to shed light and insight on particular issues addressing potential implications of a critical component of a complex supply chain, which contributes to U.S. national health security as China continues to strengthen its position as the world's largest supply source of raw materials for pharmaceuticals and supplements. As first reported in 1998 by the U.S. Government Accounting Office, the U.S. imports an estimated


791
KAZEROUNI LAW GROUP, APC

many cases, certain botanical ingredients cannot grow in the United States due to climate reasons or are not grown commercially due to significant differences in costs of domestic versus foreign agricultural production.

43. Pursuant to Section 1782(d) of the CLRA, Plaintiff provided Defendants with written notice by certified mail on March 8, 2023, outlining the specific violations of Section 1770 and demanding that Defendants rectify the issues (the "CLRA Letter").[11]

44. Specifically, the CLRA Letter provided non-exhaustive examples of Defendants' violations of the rules and laws governing unqualified "Manufactured in the USA" claims, using three products as illustrative examples: the Product, Burn-XT, and N.O. XT (the "CLRA Products").

45. The CLRA Letter informed Defendants that the following ingredients, along with potentially other ingredients in the CLRA Products, were not sourced from the United States, contrary to Defendants' unqualified "Manufactured in the USA" representations: L-citrulline, betaine anhydrous, beta alanine, L-theanine, acetyl-L-carnitine HCl, green tea leaf extract, black pepper extract, arginine, and glutathione (the "CLRA Ingredients").[12]

46. Furthermore, the CLRA Letter specifically stated that "The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here."

47. Upon receiving such a letter, a reasonable company would have, at the very least, investigated whether the CLRA Ingredients were, in fact, grown, sourced, or produced outside the United States. In reality, a reasonable company would have conducted an investigation into all of its products to determine whether they contained foreign ingredients or components.

48. Some of the CLRA Ingredients appear in the Product, namely citrulline, beta alanine, betaine anhydrous, and theanine. The Product also contains other foreign ingredients, specifically

80% of the raw ingredients contained in both products manufactured, sold and consumed in this country.")

[11] A true and correct copy of Plaintiff's CLRA Letter dated March 8, 2023, is attached hereto as Exhibit B.

[12] For convenience, certain ingredients may be referred to by their common name or abbreviation when referenced individually. For example: citrulline, theanine, ALCAR (for acetyl-L-carnitine HCl), green tea and black pepper.




792

KAZEROUNI LAW GROUP, APC

caffeine, theobromine, and AstraGin®.

49. Had Defendants investigated and found that the CLRA Ingredients, and other ingredients in the Product and the Class Products, were, in fact, grown, sourced, or produced within the United States, Defendants would have responded to Plaintiff by correcting Plaintiff's allegations regarding the Product, the CLRA Products and the Class Products and providing evidence of the ingredients' U.S. sourcing.

50. Instead, the Defendants continued to market and sell the Product and Class Products as "Manufactured in the USA"—without qualification—on its website for more than nine months after receiving the CLRA Letter, despite being aware of the foreign ingredients (and potentially components) used in its products. The Class Products continued to be sold with the same unqualified U.S. origin claim on third-party vendor websites for well over nine months after the Defendants received the CLRA Letter.

51. Furthermore, Defendants has yet to provide any evidence that Plaintiff's assertions regarding the origin of the CLRA Ingredients, or other ingredients and components, are incorrect.

52. The Product purchased by Plaintiff contains or is made with ingredients and/or components that are not "Manufactured in the USA." For example, the Product contains AstraGin®, a branded ingredient which is created from the combination of *Astragalus membranaceus* and *Panax notoginseng*.

53. AstraGin® is produced by NuLiv Science U.S.A., Inc. ("NuLiv"), an ingredient supplier. To sell AstraGin® in the European Union, NuLiv had to apply for Novel Food status to the European Food Safety Authority ("EFSA"). The application process requires comprehensive documentation, including sourcing and processing details.

54. The published scientific opinion of the EFSA on NuLiv's application for AstraGin® (*see* Exhibit E)[13] states that AstraGin®'s *Astragalus membranaceus* roots are sourced from Gansu and

---

[13] *See*, https://efsa.onlinelibrary.wiley.com/doi/epdf/10.2903/j.efsa.2020.6099 ("The *A. membranaceus* roots are purchased from growers in Gansu and Inner Mongolia provinces in the north-western region of China while the *P. notoginseng* roots are acquired from growers in Yunnan and Sichuan provinces in the southern region of China.").




793

KAZEROUNI LAW GROUP, APC

Inner Mongolia provinces in China, while the *Panax notoginseng* roots are sourced from Yunnan and Sichuan provinces in China (*see* Exhibit E, Section 3.3 Production Process).

55. *Astragalus membranaceus* and *Panax notoginseng,* are native to China and not commercially grown in the United States.[14] *See* Exhibit E, Section 3.3 Production Process.

56. Irrespective of exactly where *Astragalus membranaceus* and *Panax notoginseng* are sourced, one thing is certain – they are not grown, made, or sourced from within the United States.

57. In addition to foreign *Astragalus membranaceus* and *Panax notoginseng*, the Product contains theobromine, a component of cacao which is not grown commercially in the United States.[15]

58. The Product also contains caffeine, which is generally derived from decaffeination of coffee or tea[16], neither of which is grown commercially or cost effectively in the United States. When not from natural sources, synthetic caffeine is generally produced overseas.[17]

59. One of the CLRA Products, Burn-XT, specifically contains caffeine from coffee bean extract, which cannot be from the United States.[18] Caffeine from coffee appears in other Class Products as well.

60. Thus, upon information and belief, the forms of caffeine contained in the Product and

---

[14] *See* Ji B, Xuan L, Zhang Y, Zhang G, Meng J, Mu W, Liu J, Paek K-Y, Park S-Y, Wang J, et al. Advances in Biotechnological Production and Metabolic Regulation of *Astragalus membranaceus*. Plants. 2023; 12(9):1858. ("As one of the most popular herbal medicines in the world, *A. membranaceus* is mainly derived from wild and cultivated resources in China. Wild plants of *A. membranaceus* are mainly produced in Inner Mongolia, Gansu, Shanxi, and Ningxia. Wild resources have been over-exploited, seriously damaging the ecological environment. Cultivated plants are mainly derived from Shanxi Hunyuan, Gansu Longxi, Inner Mongolia Niuyingzi, and Shaanxi Zizhou."); Zhao H, Han Z, Li G, Zhang S, Luo Y. Therapeutic Potential and Cellular Mechanisms of *Panax Notoginseng* on Prevention of Aging and Cell Senescence-Associated Diseases. Aging Dis. 2017 Dec 1;8(6):721-739. ("*Panax notoginseng*, distributed in the Southwest of China, Japan, Burma, and Nepal, is both cultivated and gathered from wild forests. *Panax notoginseng* is sensitive to sunlight. It grows primarily in the Wenshan mountain area of Yunnan province and is cultivated commercially in the Southwest regions of China.")

[15] *See* https://www.icco.org/growing-cocoa/

[16] *See* https://web.archive.org/web/20240807011447/https://en.wikipedia.org/wiki/Caffeine ("Commercial supplies of caffeine are not usually manufactured synthetically because the chemical is readily available as a byproduct of decaffeination.").

[17] *See* https://whyy.org/segments/where-you-will-get-your-caffeine-buzz-in-the-future/ ("…synthetic caffeine production (and its pollution) mostly moved overseas, especially to China.")

[18] *See* https://en.wikipedia.org/wiki/Coffee (See "Map showing areas of coffee cultivation" under "Cultivation and Production" – the United States is not a commercial producer of coffee.)


794

KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

the Class Products are not made or sourced from within the United States.

61. *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are material to the Product's formulation and marketing claims.

62. Because *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are indisputably foreign, "all or virtually all" ingredients in the Product cannot be made in the United States as required by the MUSA Rule for Defendants to lawfully make an unqualified "Manufactured in the USA" claim.

63. Upon information and belief, it is likely that the remaining ingredients and even the packaging components used to produce the Product are foreign.

64. Similarly, the Class Products contain the same foreign ingredients as those found in the Product.

65. For example, caffeine is included in numerous of Defendants' products other than the Product, including, but not limited to, Altius Pre, Caffeine, Nitrosurge Shred (also contains theobromine), Nitrosurge Build, Burn-XT, Build-XT Black (also contains theobromine), Burn-XT Powder, Burn XT Stick Pack, Nitrosurge Natural and Nitrosurge Shred Max.

66. *Astragalus membranaceus* and *Panax notoginseng* (as AstraGin®) are included in numerous Class Products other than the Product, including but not limited to, Nitrosurge Build, Nitrosurge Max Pump Surge, Build-XT, GDA-XT, Intrasurge, Green Tea Extract, Nitrosurge Build, and Nitrosurge Shred Max.

67. Defendants use numerous other indisputably foreign ingredients in numerous of its numerous products, including but not limited to KSM-66 ashwagandha[19] and green tea extract[20].

68. Some of the ingredients, components, and even packaging used by Defendants can be sourced either domestically or internationally — and since this information is exclusively known to

---

[19] *See* https://ksm66ashwagandhaa.com/traceability/quality-control/ ("The state of Rajasthan in India is one of the most suited terrains known to grow the best quality ashwagandha in the world and that is where, our ashwagandha farms are located.")

[20] *See* https://en.wikipedia.org/wiki/Tea ("Tea is mainly grown in Asia and Africa, with smaller areas in South America and around the Black and Caspian Seas. The four biggest tea-producing countries are China, India, Kenya and Sri Lanka, together representing 81% of world tea production.")




795

Defendants at this time — Plaintiff cannot fully allege the extent of Defendants' unqualified "Manufactured in the USA" violations without further discovery. Nevertheless, Defendants' blatant and willful disregard for the laws discussed herein is well established by the aforementioned, non-exhaustive examples.

69. Despite the presence of numerous indisputable foreign ingredients in the Class Products, Defendants made unqualified "Manufactured in the USA" representations on the main page of its website, on each product page for the Class Products, on each Amazon product page for the Class Products, and even in the "Frequently Asked Questions" section of its website.

70. Adequately and properly qualified "Manufactured in the USA" representations are common and ubiquitous in the dietary supplement industry.

71. Numerous competitors of Defendants including, but not limited to, Optimum Nutrition, Zhou Nutrition, MuscleTech, and BSN, clearly, adequately, and properly qualify "Manufactured in the USA" and "Made in the USA" representations on their products.[21]

72. Some dietary supplement products make no "Manufactured in the USA" or "Made in the USA" representations at all.

73. When consumers like Plaintiff see unqualified "Manufactured in the USA" claims, such as those made by Defendants regarding the Class Products, in an industry where qualified claims are so common, they reasonably believe that the products in question are made entirely in the United States, including ingredients and components.

74. Defendants is not a U.S. based company, but rather a company founded in, operated in and from Newfoundland and Labrador, Canada.

75. Given that Defendants is a Canadian company, the purpose of its unqualified "Manufactured in the USA" was clearly not from Defendants' sense of American patriotism or national pride. Instead, Defendants' motive behind representing the Class Products as "Manufactured in the USA" was solely for the intentional purpose of marketing to American consumers seeking and will pay more for products that are made, including ingredients and components, in the United

---

[21] *See* Exhibit D.

KAZEROUNI LAW GROUP, APC


796

States.[22]

76. Unlike general wellness dietary supplement companies that offer a wide variety of products for various applications, such as cognitive, cardiovascular, immune, digestive, and anti-aging health, as well as basic vitamins (e.g., Vitamins C, B, D, E, etc.) and minerals, Defendants' marketing focus and product line are much more specific.

77. Specifically, Defendants' exclusive marketing focus, as reflected in its product line, is on sports and athletic performance dietary supplements.

78. Defendants knew that its unqualified "Manufactured in the USA" representations would resonate with sports- and athletic-minded consumers in the United States, particularly given the strong sense of patriotism and national pride prevalent in this community.

79. Defendants' exclusive focus results in Defendants using a much more limited range of ingredients, both in terms of ingredient categories and specific ingredients, compared to a general wellness dietary supplement company.

80. For example, nearly all of the ingredients in Defendants' products, including the Class Products, fall into one of three categories: Amino Acid/Amino Acid Derivative, Stimulant, or Herbal Performance.

81. Examples of ingredients in these categories include, but are not limited to: (1) Amino Acid/Amino Acid Derivatives: citrulline, beta alanine, betaine anhydrous, theanine, ALCAR, arginine, glutathione, creatine, glutamine, and valine; (2) Stimulants: caffeine and theobromine; and (3) Herbal Performance: green tea, black pepper, AstraGin®, and ashwagandha.

82. As a result of the narrow range of ingredients and ingredient categories, there is significant overlap and shared use of ingredients between the Class Products, the CLRA Products, and the Product.

83. This relationship is partially illustrated[23] in Exhibit F, which depicts the connection

---

[22] *See* https://reshoringinstitute.org/wp-content/uploads/2020/09/made-in-usa-survey.pdf ("Slightly more than 83% [of consumers polled] said they would pay up to 20% more for products made domestically.")

[23] Not all ingredients in the Class Products are represented on the X-axis of the chart. The Class Products contain numerous other foreign ingredients.




797

KAZEROUNI LAW GROUP, APC

between the CLRA Ingredients, other foreign ingredients in the Product, Ashwagandha, and those in the Class Products.

84. Given Defendants' exclusive focus on sports/athletic performance products (and their consumers), its narrow range of ingredients and ingredient categories, as well as the commonality between the ingredients used in the Product, the CLRA Ingredients, and the Class Products, Plaintiff asserts that the Product and the Class Products are substantially similar.[24]

85. Certain of Defendants' products, including but not limited to its protein and cereal bar products, have been excluded from the definition of Class Products. Plaintiff reserves the right to further allege substantial similarity between the excluded products and the Product should, for example, discovery confirm that the same or similar foreign packaging or other components were used across Defendants' product line.

86. Defendants represented, marketed and sold to the general public via its website, the website of its third-party vendors, and other forms of advertising and marketing that the Class Products are "Manufactured in the USA," without clear, adequate, and proper qualification. As such, Defendants inaccurately represented that its Class Products are "Manufactured in the USA," which conveys to a reasonable consumer like Plaintiff that the Class Products, including the Product, are made entirely in the United States, made with ingredients and components from the United States, made pursuant to United States labor standards, and are therefore superior quality (i.e., contain better grown ingredients that non-US made products or raw materials). Defendants possess superior knowledge of the true facts that were not disclosed regarding the Class Products, thereby tolling the running of any applicable statute of limitations.

87. The types of misrepresentations and/or omissions made by Defendants, as described herein, were considered by Plaintiff, a reasonable consumer, when deciding to purchase the Product.

88. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were,

---

[24] *See Miller v. Ghirardelli Chocolate Co.*, 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012) (citing cases); ("hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar."); *see also, e.g., Colucci v. ZonePerfect Nutrition Co.*, No. 12-2907, 2012 WL 6737800, at *4 (N.D. Cal. Dec. 28, 2012); *Astiana v. Dreyer's Grand Ice Cream, Inc.*, No. 11-2910, 2012 WL 2990766, at *11-13 (N.D. Cal. July 20, 2012).



KAZEROUNI LAW GROUP, APC


798

deceived and misled by Defendants' representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the products were "Manufactured in the USA," when Defendants' Class Products are in fact wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

89. Reasonable consumers, including Plaintiff, attached importance to the "Manufactured in the USA" representations made by Defendants on its Product and the Class Products.

90. Consumers who purchased the Class Products on Defendants' website or through third-party vendor websites were not the only consumers who were exposed to and relied upon the unqualified and false "Manufactured in the USA" representations made by Defendants. Defendants' website contains a "Find A Store" link25 making it highly likely that hundreds of thousands of consumers saw the unqualified and false "Manufactured in the USA" representations and proceeded to purchase Class Products in brick-and-mortar stores like The Vitamin Shoppe.

91. Most consumers possess limited knowledge of the likelihood that products are made with or contain ingredients and components that are not "Manufactured in the USA" when they are advertised and represented to be "Manufactured in the USA." This is a material factor in many individuals' purchasing decisions which they rely upon as they believe they are purchasing a product that is "Manufactured in the USA" with ingredients and components from the United States.

92. Consumers generally believe that products that are "Manufactured in the USA" are made entirely in the United States, made of ingredients and components from the United States, made pursuant to United States labor standards, and are therefore of superior quality (i.e., contain better grown ingredients that non-US made products or raw materials).

93. On information and belief, Defendants' misrepresented Class Products were purchased by consumers over Defendants' competitors' properly and legally marketed products, during the entirety of the relevant four-year statutory time period, based on the unqualified, false and deceptive "Manufactured in the USA" representations (or some derivative thereof) made with respect to Defendants' products. Federal rules and California laws are designed to protect consumers from

---

[25] *See* https://www.jackedfactory.com/pages/storelocator




799

KAZEROUNI LAW GROUP, APC

such false representations and predatory conduct.

94. Defendants' "Manufactured in the USA" representation was misleading to a reasonable consumer.

95. On or about January 24, 2023, Plaintiff searched online for a pre-workout supplement when he discovered the Product and its unqualified and misrepresented "Manufactured in the USA" claim. Plaintiff subsequently purchased the Product on Amazon.

96. At the time of Plaintiff's purchase, the description of the Product described the Product as "Manufactured in the USA," without any qualification, when the Product was actually made with or contained ingredients and/or components that were not "Manufactured in the USA." Accordingly, Defendants was not entitled to lawfully make representations that the Product was "Manufactured in the USA" without qualification as per the MUSA Rule.

97. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendants as follows:

a. The "who" is Defendants;

b. The "what" is representation that Defendants' Class Products are "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

c. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

d. The "where" is in Defendants' advertisements and marketing of the Class Products;

e. The "to whom" is Plaintiff and the putative Class who bought the Class Products;

f. The "by what means" is by Defendants representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA. Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

KAZEROUNI LAW GROUP, APC


800

g. The "how" is the allegation that Defendants did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

98. It is widely and generally known that consumers prefer products that are "Manufactured in the USA" due to quality, support for local businesses, national economic, environmental and other reasons. The preference is increased when the products are health related and ingestible due to the potential for inferior ingredients and components being manufactured overseas. In making the decision to purchase Defendants' Product, Plaintiff relied upon the advertising, marketing and/or other promotional materials prepared, approved and distributed and/or published by Defendants and its agents and disseminated through its Class Products' advertising containing the misrepresentations alleged herein.

99. Defendants' false representation is that Defendants did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA, while Defendants knew that fact.

100. Defendants intended to deceive Plaintiff and the Class members into buying the Class Products knowing that consumers would prefer, purchase, and likely pay more for products "Manufactured in the USA" versus other products not "Manufactured in the USA."

101. Plaintiff justifiably relied on Defendants' "Manufactured in the USA" representation. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

102. Plaintiff paid and purchased the Product which was of less or little value than what he paid for.

103. Defendants' "Manufactured in the USA" representations were deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

104. Had Plaintiff been made aware that the Product, including its ingredients and



KAZEROUNI LAW GROUP, APC

components, was not actually "Manufactured in the USA," he would not have purchased the Product, or would not have purchased the Product for the price he paid. In other words, Plaintiff would not have purchased Defendants' Product, or paid the amount he did for the purchase of the Product, but for the unqualified "Manufactured in the USA" representations on Defendants' website and advertising on the websites of its third-party vendors which Plaintiff reasonably relied on.

105. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendants as a result of Defendants' unqualified and false "Manufactured in the USA" designation set forth on Defendants' website and advertising on the websites of its third-party vendors.

106. In each case when Plaintiff and putative Class members purchased a Class Product, they relied upon Defendants' unqualified "Manufactured in the USA" representation in their purchasing decision, which is typical of most U.S. consumers. Consequently, they were deceived as a result of Defendants' actions. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

107. Defendants' Class Products are made with or contain ingredients and components that are not manufactured in the USA, similar to the Product purchased by Plaintiff. Plaintiff and putative Class members purchased Defendants' misrepresented Class Products over Defendants' competitors' properly and legally marketed products that clearly and adequately qualify "Manufactured in the USA" claims or do not make the "Manufactured in the USA" claims at all. The precise amount of Plaintiff and the Class members' damages will be proven at the time of trial, in large part, by expert testimony.

108. Plaintiff and Class members were undoubtedly injured as a result of Defendants' unqualified and false "Manufactured in the USA" representations that are at issue in this matter.

**CLASS ACTION ALLEGATIONS**

109. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

110. Plaintiff brings this action individually and on behalf of all others similarly situated against Defendants, pursuant to California Code of Civil Procedure Section 378.


802

KAZEROUNI LAW GROUP, APC

111. Plaintiff represents, and is a member of the class, ("the Class") consisting of:

> All persons similarly situated within the state of California, who purchased one or more of Defendants' Class Products, which were represented and/or advertised as "Manufactured in the USA" (or similar words), that were made with or contained ingredients or components that were not manufactured in the USA, within the four years prior to the filing of the Complaint."

112. Excluded from the Class are Defendants and any of its officers, directors, and employees.

113. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

114. The "Class Period" means four years prior to the filing of the Complaint in this action.

115. This action has been brought and may properly be maintained as a class action under the provisions of § 382 of the California Code of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

116. **Ascertainability**. Plaintiff does not know the number of members in the Class, but Plaintiff currently believes that there are hundreds of thousands, if not more, members of the Class within the State of California. Because of the nature of Defendants' products and applicable regulations, Defendants must keep detailed and accurate records of production, manufacturing, sale and distribution. Therefore, the members of the Class are ascertainable through Defendants' records and/or Defendants' agents' records regarding retail and sales, as well as through public notice. This matter should therefore be certified as a Class action to assist in the expeditious litigation of this matter.

117. **Numerosity**. The members of the Class are so numerous and geographically disbursed that joinder of all Class members is impractical, and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court.

118. **Existence and Predominance of Common Questions of Law and Fact**. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. Common questions of fact and law exist in this matter that predominate over questions


803
KAZEROUNI LAW GROUP, APC

that may affect individual Class members, including, but not limited to, the following:

a. Whether Defendants committed the wrongful conduct alleged herein;

b. Whether Defendants' claims and representations, as alleged herein, are untrue, misleading, and/or reasonably likely to deceive the average consumer;

c. Whether Defendants' acts, transactions, or course of conduct constitute the violations of law alleged herein;

d. Whether Defendants' conduct violates 16 C.F.R. §§ 323, *et seq*.;

e. Whether Defendants' conduct violates California Civil Code §§ 1750, *et seq*.;

f. Whether Defendants' advertising is false, untrue, or misleading within the meaning of California Business & Professions Code §§ 17500, *et seq*.;

g. Whether Defendants' conduct is an unfair, fraudulent, or unlawful act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

h. Whether Defendants' advertising is unfair, deceptive, untrue or misleading within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

i. Whether Defendants acted negligently or intentionally in making the misrepresentations contained regarding the Class Products thought its website and the websites of its third-party vendors;

j. Whether Defendants, through its conduct, received money that, in equity and good conscience, belongs to Plaintiff and members of the Class;

k. Whether the members of the Class sustained and/or continue to sustain damages attributable to Defendants' conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages; and

l. Whether the members of the Class are entitled to injunctive and/or any other equitable relief, including but not limited to restitution and/or disgorgement of ill-gotten gains.

119. **Typicality**. As a person who purchased one or more of Defendants' products, that were advertised as "Manufactured in the USA" but are made with or contain ingredients and/or components that are not manufactured in the USA, Plaintiff is asserting claims that are typical of the


804

KAZEROUNI LAW GROUP, APC

Class. Plaintiff's claims involve the same violations of law by Defendants as other Class Members' claims. Plaintiff and members of the Class also sustained damages arising out of Defendants' common course of conduct complained herein. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent members of the Class. Defendants have no defenses unique to the Plaintiff.

120. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of other members of the Class in that Plaintiff has no interests antagonistic to any member of the Class. Further, Plaintiff has retained counsel experienced in handling class action claims and claims involving violations of the consumer laws like violations of the California Business and Professions Code, and, specifically, false and deceptive advertising. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and proposed Class.

121. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent and/or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants. The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them. Even if the members of the proposed Class could afford such litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable pursuant to Cal. Code of Civil Procedure § 382.

122. Unless the Class is certified, Defendants will retain monies received as a result of


805

Defendants' unlawful and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendants will also likely continue to, or allow its agents to, advertise, market, promote and package Defendants' Class Products in an unlawful and misleading manner, and members of the Class will continue to be misled, harmed, and denied their rights under California law.

123. Further, Defendants has acted or refused to act on grounds that are generally applicable to the class so that declaratory and injunctive relief is appropriate to the Class as a whole, making class certification appropriate.

**FIRST CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**CAL. CIV. CODE SECTION 1750, ET SEQ.**

124. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

125. Plaintiff asserts CLRA claims as to the Class Products with the CLRA Ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, and (d) *L-Theanine*.

126. Therefore, Plaintiff asserts CLRA claims as to the following Class Products which contain the CLRA Ingredients: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM. (12 Total)

127. California Civil Code §§ 1750 et seq., entitled the Consumers Legal Remedies Act (hereinafter "CLRA"), provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer." The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, inter alia, that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.

128. Defendants' Product and the Class Products, as referenced in this section, constitute "goods" as defined pursuant to Civil Code Section 1761(a).

129. Plaintiff, and the Class members, are each a "consumer" as defined pursuant to Civil Code Section 1761(d).




806

KAZEROUNI LAW GROUP, APC

130. Each of Plaintiff's and the Class members' purchases of Defendants' Class Products, as referenced in this section, constituted a "Transaction" as defined pursuant to Civil Code Section 1761(e).

131. Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) provides that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> (2) [m]isrepresenting the source, sponsorship, approval, or certification of goods or services;
> (3) [m]isrepresenting the affiliation, connection, or association with, or certification by, another;
> (4) [u]sing deceptive representations or designations of geographic origin in connection with goods and services;
> (5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;
> (7) [r]epresenting that goods or services are of a particular standard, quality, or grade…; [and]
> (9) [a]dvertising goods or services with intent not to sell them as advertised."

132. Defendants violated Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) by marketing and representing that its Class Products, as referenced in this section, are "Manufactured in the USA," or some derivative thereof, when they are made with or contain ingredients and components that are not manufactured in the United States.

133. Defendants' "Manufactured in the USA" representations are deceptive and false because Defendants' Class Products, as referenced in this section, are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

134. Pursuant to section 1782(d), by letter dated March 8, 2023, Plaintiff provide Defendants notice in writing by certified mail of the particular violations of section 1770 and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act. Defendants failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within thirty days of the date of written notice pursuant to section 1782. Therefore,



807
KAZEROUNI LAW GROUP, APC

Plaintiff and the Class further seek actual, punitive, and statutory damages, as deemed appropriate.

135. Attached hereto as Exhibit C is a sworn affidavit from Plaintiff pursuant to Cal. Civ. Code § 17801(d).

136. On information and belief, Defendants' violations of the CLRA set forth herein were done with awareness of the fact that the conduct alleged was wrongful and was motivated solely for Defendants' self-interest, monetary gain and increased profit. Plaintiff further alleges that Defendants committed these acts knowing the harm that would result to Plaintiff and Defendants engaged in such unfair and deceptive conduct notwithstanding such knowledge.

137. Plaintiff further alleges that Defendants committed these acts knowing the harm that would result to Plaintiff and Defendants engaged in such unfair and deceptive conduct notwithstanding such knowledge.

138. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendants as a result of Defendants' unqualified and false "Manufactured in the USA" representations set forth in Defendants' website and the websites of its third-party vendors regarding the Product and the Class Products.

139. As a direct and proximate result of Defendants' violations of the CLRA, Plaintiff and members of the Class are entitled to a declaration that Defendants violated the Consumer Legal Remedies Act.

140. For clarity, as to the CLRA Ingredients in the Class Products only, Plaintiff, on behalf of himself and the Class demands judgment against Defendants for damages, restitution, punitive damages, statutory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

141. As allowed under the CLRA, as to all the Class Products, Plaintiff, on behalf of himself and the Class demands injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper

142. Pursuant to section 1780(e) of the California Civil Code, Plaintiff and the Class make claims for damages and attorneys' fees and costs.


808

KAZEROUNI LAW GROUP, APC

143. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")**
**BUS. & PROF. CODE §§ 17500, *ET SEQ*.**

144. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

145. Plaintiff's FAL claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff; (a) L-Citruline, (b) Beta Alanine, (c) Betaine Anhydrous, (d) L-Theanine, (e) Caffeine Anhydrous, (f) Theobromine, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

146. Therefore, Plaintiff asserts FAL claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 Total)

147. Plaintiff and Defendants are both "person[s]" as defined by Cal. Bus. & Prof. Code § 17506.

148. Cal. Bus. & Prof. Code § 17535 authorizes a private right of action on both an individual and representative basis.

149. Defendants misrepresented its Class Products as "Manufactured in the USA" without clear and adequate qualification when in fact Defendants' Class Products are made with or contain ingredients and components that are not manufactured in the USA.

150. Defendants' Class Products are made with ingredients/components that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

151. These misrepresentations, acts, and non-disclosures by Defendants constitute false and misleading advertising in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

152. At all times relevant, Defendants' representations and advertising of its Class Products was untrue, misleading, and likely to, and did, deceive the reasonable consumer and the public.



KAZEROUNI LAW GROUP, APC

153. Defendants engaged in the false and/or misleading advertising and marketing of its Product, as alleged herein, with the intent to directly or indirectly induce consumers to purchase its products, which Defendants knew, or had reason to know, that the Class Products were made with or contained ingredients and components that were not manufactured in the USA.

154. Defendants' "Manufactured in the USA" representations are deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

155. Because Defendants knew or should have known that the representations and/or omissions alleged herein regarding the Class Products were untrue or misleading, Defendants acted in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

156. Had Defendants clearly, adequately and truthfully qualified and advertised that its Class Products were made with or contained ingredients and components that were not manufactured in the USA, Plaintiff and the putative Class members would not have purchased the Class Products, would have paid a different price, or would have purchased a different product from another company.

157. As a direct and proximate result of the aforementioned acts and omissions by Defendants, Defendants received and continues to hold monies rightfully belonging to Plaintiff and the putative Class members, who were led to purchase Defendants' Class Products during the Class Period.

**THIRD CAUSE OF ACTION**
**VIOLATION OF BUSINESS & PROFESSIONS CODE**
**BUS. & PROF. CODE, SECTION 17200, ET SEQ.**

158. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

159. Plaintiff's UCL claims apply to the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffiene Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

160. Therefore, Plaintiff asserts UCL claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro




810
KAZEROUNI LAW GROUP, APC

Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 Total)

161. Plaintiff and Defendants are each "person[s]" as defined by California Business & Professions Code § 17201. California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

162. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

163. By and through Defendants' conduct alleged in further detail above and herein, Defendants engaged in conduct which constitutes unlawful, unfair, and/or fraudulent business practices prohibited by Bus. & Prof. Code §§ 17200, et seq.

***A. "Unlawful" Prong***

164. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

165. The violation of any law constitutes as "unlawful" business practice under the UCL.

166. Beginning at a date currently unknown, Defendants committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code §§ 17200, et seq. by manufacturing, distributing, and/or marketing Defendants' Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq., and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq., by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

167. Defendants violated the MUSA Rule, 16 C.F.R. § 323, by making its representations



KAZEROUNI LAW GROUP, APC

on the Class Products without clear and adequate qualification that Defendants' Class Products are "Manufactured in the USA" or made with or contain ingredients and components that are not manufactured in the USA.

168. Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of the MUSA Rule, FAL, and the CLRA, as described above.

169. These alleged acts and practices by Defendants were intentional and in violation of the MUSA Rule, FAL, and the CLRA.

170. Pursuant to the UCL, Plaintiff and the Class are entitled to preliminary and permanent injunctive relief and order Defendants to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the Class of all the revenues associated with this unfair and unlawful competition, or such proton of said revenues as the Court may find applicable.

***B. "Unfair" Prong***

171. Beginning at a date currently unknown, Defendants committed acts of unfair competition that are prohibited by Bus. & Prof. Code section 17200 et seq. Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes by engaging in conduct and practices that threaten an incipient violation of law/s or violate the policy or spirit of law/s by manufacturing, distributing, and/or marketing Defendants' Class Products with a false ingredient origin information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein were "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

172. Clearly said, Defendants' Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

173. Alternatively, Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices that are immoral, unethical, oppressive or unscrupulous, the utility of such conduct, if any, being far

KAZEROUNI LAW GROUP, APC


812

outweighed by the harm done to consumers and against public policy by manufacturing, distributing, and/or marketing Defendants' Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

174. Alternatively, Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices, including manufacturing, distributing, marketing, and/or advertising Defendants' Class Products with false ingredient information, wherein: (1) the injury to the consumer was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was not of the kind that consumers themselves could not have reasonably avoided.

***C. "Fraudulent" Prong***

175. Beginning at a date currently unknown, Defendants engaged in acts of unfair competition, including those described above and herein, prohibited and in violation of Bus. & Prof. Code § 17200 et seq., by engaging in a pattern of "fraudulent" business practices within the meaning of Bus. & Prof. Code § 17200 et seq, by manufacturing, distributing, and/or marketing Defendants' Class Products in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

176. Defendants' Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

177. Plaintiff reserves the right to allege further conduct that constitutes other fraudulent business acts or practices. Such conduct is ongoing and continues to this date.

***D. "Unfair, Deceptive, Untrue or Misleading Advertising" Prong***

KAZEROUNI LAW GROUP, APC


813

178. Defendants' advertising was unfair, deceptive, untrue and/or misleading in that consumers were led to believe that Defendants' Class Products are "Manufactured in the USA" when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

179. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendants' representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the Class Products are actually manufactured in the USA with ingredients and components from the USA given the absence of clear and adequate qualification of Defendants' "Manufactured in the USA" representations.

180. Contrary to the representation, Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

181. Defendants' "Manufactured in the United States" representations are deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

182. Defendants' unfair, deceptive, untrue, or misleading advertising presented a threat to the public by engaging in unlawful conduct that resulted in harm to consumers.

183. Defendants engaged in these unlawful, unfair, and fraudulent business practices motivated solely by Defendants' self-interest with the primary purpose of collecting unlawful and unauthorized monies from Plaintiff and all others similarly situated; thereby unjustly enriching Defendants.

184. Such acts and omissions by Defendants were unlawful and/or unfair and/or fraudulent and constitute a violation of Business & Professions Code §§ 17200, et seq. Plaintiff reserves the right to identify additional violations by Defendants as may be established through discovery.

185. As a direct and proximate result of the aforementioned acts and representations described above and herein, Defendants received unearned commercial benefits at the expense of its competitors and the public.

186. As a direct and proximate result of Defendants' unlawful, unfair and fraudulent conduct described herein, Defendants has been unjustly enriched by the receipt of ill-gotten gains


814

from customers, including Plaintiff, who unwittingly provided money to Defendants based on Defendants' representations.

187. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendants as a result of Defendants' false representations set forth on the Defendants' Class Products.

188. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

**FOURTH CAUSE OF ACTION FOR**
**NEGLIGENT MISREPRESENTATION**

189. Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully stated herein.

190. Plaintiff's Negligent Misrepresentation claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff; (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

191. Therefore, Plaintiff asserts Negligent Misrepresentation claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 total)

192. At a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendants represented to the public, including Plaintiff, by packaging, advertising, marketing and other means, that Defendants' Class Products are "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

193. Defendants' Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.


815
KAZEROUNI LAW GROUP, APC

194. Defendants made the representations herein alleged with the intention of inducing the public, including Plaintiff and putative class members, to purchase Defendants' Class Products over similar products from competitors which clearly and adequately qualified their "Manufactured in the USA" representations or made no "Manufactured in the USA" representations at all.

195. Defendants' "Manufactured in the United States" representations were deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

196. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendants' advertising representations and, in reliance on them, purchased the Class Products, as described herein.

197. At all times relevant, Defendants made the misrepresentations herein alleged when Defendants should have known these representations to be untrue, and Defendants had no reasonable basis for believing the representations to be true.

198. As a proximate result of Defendants' negligent misrepresentations, Plaintiff and other consumers similarly situated were induced to purchase, purchase more of, purchase instead of, or pay more for Defendants' Class Products, due to the unlawful acts of Defendants, in an amount to be determined at trial, during the Class Period.

**FIFTH CAUSE OF ACTION FOR**
**INTENTIONAL MISREPRESENTATION**

199. Plaintiff repeats, re-alleges and incorporates herein by reference the above allegations as if fully stated herein.

200. Plaintiff's Intentional Misrepresentation claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

201. Therefore, Plaintiff asserts Intentional Misrepresentation claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT

Black, Burn XT Powder, GDA XT. (17 total)

202. Beginning at a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendants intentionally represented to the public, including Plaintiff, by promoting and other means, that Defendants' Class Products were "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

203. Defendants' Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

204. Defendants' "Manufactured in the USA" representations were deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

205. Defendants made the representations herein alleged with the intention of inducing the public, including Plaintiff, to purchase Defendants' Class Products for Defendants' own financial gain.

206. Defendants intentionally made such misrepresentations by printing and advertising its misrepresentations its website and the websites of its third-party vendors.

207. Defendants' misrepresentations of the Class Products as "Manufactured in the USA" without clear and adequate qualification was misleading because Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

208. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendants' advertising representations and, in reliance on such representations, purchased the Class Products, as described above.

209. At all times relevant, Defendants intentionally made the misrepresentations herein alleged and allowed the misrepresentations to continue to be made by its resellers when Defendants knew the representations to be false.

210. As a proximate result of Defendants' intentional misrepresentations, Plaintiff and other consumers similarly situated were induced to spend an amount of money to be determined at

KAZEROUNI LAW GROUP, APC

trial on Defendants' misrepresented Products.

211. Defendants knew that its Class Products were in fact not "Manufactured in the USA" without clear and adequate qualification but instead made with or contain ingredients and components that are not manufactured in the USA, but nevertheless made the representations described herein with the intention that consumers rely on Defendants' representations.

212. Defendants also knew that its website, as well as the websites of its third-party vendors, were advertising its Class Products as "Manufactured in the USA" without clear and adequate qualification, when Defendants clearly knew that its Class Products were in fact made with or contained ingredients and components that were not manufactured in the USA.

213. Plaintiff and other consumers similarly situated, in purchasing and using the Class Products as herein alleged, did rely on Defendants' representations, including the representations on Defendants' advertisements and website, all to their damage and/or detriment as herein alleged.

214. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendants as follows:

a. The "who" is Defendants;

b. The "what" is representation that Defendants' Class Products were "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

c. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

d. The "where" is in Defendants' product advertisements and marketing;

e. The "to whom" is Plaintiff and the putative class who bought the Class Products;

f. The "by what means" by Defendants representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA;

g. The "how" is the allegation that Defendants did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and








818

KAZEROUNI LAW GROUP, APC

components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

215. By engaging in the acts described above, Defendants is guilty of malice, oppression, and fraud, and Plaintiff and the Class members are therefore entitled to recover exemplary or punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the Court grant Plaintiff and the putative Class the following relief:

- That this action be certified as a Class Action;
- That Plaintiff be appointed as the Class Representative;
- That Plaintiff's attorneys be appointed as Class Counsel;
- That Defendants' wrongful conduct be adjudged and decreed to violate the consumer protection statutes raised herein;
- That Plaintiff and each of the other members of the Class recover the amounts by which Defendants and Does have been unjustly enriched;
- An order requiring imposition of a constructive trust and and/or disgorgement of Defendants' and Does' ill-gotten gains and to pay restitution to Plaintiff and all members of the Class and to restore to the Plaintiff and members of the class all funds acquired by means of any act or practice declared by this court to be an unlawful, fraudulent or unfair business act or practice, in violation of laws, statutes or regulations, or constituting unfair competition;
- Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery were necessary and as applicable, to prevent Defendants or Does from retaining the benefits of their wrongful conduct;
- That Defendants and Does be enjoined from continuing the wrongful conduct alleged herein and be required to comply with all applicable laws;
- A temporary, preliminary and/or permanent order for injunctive relief requiring Defendants and Does to: (i) discontinue its false and/or misleading statement/s; and (ii)


819

undertake an immediate public information campaign to inform members of the proposed class as to their prior practices;

- Pre-judgment interests from the date of filing of this suit;
- that Plaintiff and each member of the putative Class recover their costs of suit.

**FIRST CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT CAL. BUS. & PROF. CODE §§ 1750, *ET SEQ.***

- Actual damages, injunctive relief, restitution, and punitive damages pursuant to Cal. Civ. Code § 1780(a); and
- an award of costs and attorney's fees pursuant to Cal. Civ. Code § 1780(d).

**SECOND CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17535; and
- Recovery of reasonably attorney's fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**THIRD CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17203; and
- Recovery of reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**FOURTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION**

- A judgment against Defendants and Does for general and compensatory damages in an amount to be determined at trial

**FIFTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION**

- A judgment against Defendants and Does for general and compensatory damages in an amount to be determined at trial;


820

KAZEROUNI LAW GROUP, APC

- Punitive damages pursuant to Cal. Civ. Code § 3294; and
- That Plaintiff and the members of the Class be granted any other relief the Court may deem just and proper.

**TRIAL BY JURY**

216. Plaintiff is entitled, and demands, a trial by jury on all issues so triable.

Dated: September 14, 2026

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: *_/s/ Gustavo Ponce_*
Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*

KAZEROUNI LAW GROUP, APC


821

KAZEROUNI LAW GROUP, APC

# PROOF OF SERVICE

I am over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On September 14, 2026, I served the foregoing document and accompanying attachments by the means indicated below:

**FOURTH AMENDED COMPLAINT**

☒ E-MAIL - by transmitting via e-mail the document(s) listed e-mail address listed below on this date before 11:59 p.m.

☒ ELECTRONIC SERVICE - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m. The electronic filing system sends an e-mail notification of the filing to the parties and counsel of record.

**STEPTOE LLP**
Carol R. Brophy
Jennifer K. Singh
Angela M. Sousa
Anthony Hopp
Melanie A. Ayerh
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105
cbrophy@steptoe.com
jsingh@steptoe.com
asousa@steptoe.com
ahopp@steptoe.com
mayerh@steptoe.com
*Attorneys for Defendants*
*Nutra Holdings, Inc. d/b/a Jacked Factory and Jacked Factory Holdings Inc.*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on September 14, 2026, at Las Vegas, Nevada.

*/s/ Gustavo Ponce*
GUSTAVO PONCE

Electronically Received 09/10/2026 05:05 PM

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

FILED
Superior Court of California
County of Los Angeles
09/14/2026
David W. Slayton, Executive Officer / Clerk of Court
By: A. He Deputy

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY,

Defendant.

Case No.: 23STCV15674

**STIPULATION FOR LEAVE TO FILE FOURTH AMENDED COMPLAINT; ~~[PROPOSED~~] ORDER**

[Assigned for all purposes to the Honorable Theresa M. Traber]

Complaint Filed: July 6, 2023
First Amended Complaint: August 16, 2024
Second Amended Complaint: March 27, 2025
Third Amended Complaint: September 25, 2025

Plaintiff Daniel Rossi ("Plaintiff") and defendant Nutra Holdings, Inc. d/b/a Jacked Factory ("Defendant" and, together with Plaintiff, the "Parties"), through their respective undersigned counsel, hereby stipulate as follows:

WHEREAS, the Parties met and conferred and agreed that the recently incorporated JF Holdings is substantially related to Defendant and is appropriate as party to this action, and that Plaintiff be given leave to amend the Complaint to enjoin JF Holdings as a defendant.

WHEREAS, Plaintiff's proposed amended complaint, attached hereto as Exhibit A, does not substantially alter Plaintiff's claims or allegations.

WHEREAS, no party would be prejudiced by granting Plaintiff leave to file an amended complaint.

WHEREAS, Counsel for Defendant will accept service on behalf of JF Holdings.

WHEREAS, the case schedule and deadlines in this matter should remain largely unaffected.

WHEREAS, this request for leave to file an amended complaint is brought in good faith, and not for purposes of delay.

**THEREFORE, THE PARTIES STIPULATE AND RESPECTFULLY REQUEST THAT THE COURT ORDER AS FOLLOWS:**

1. Plaintiff be granted leave to file their proposed Fourth Amended Complaint within fourteen (14) days of the Court's order granting leave.

Dated: September 10, 2026

**KAZEROUNI LAW GROUP, APC**

By: */s/ Gustavo Ponce*
Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*

Dated: September 10, 2026

**STEPTOE LLP**

By: */s/ Anthony Hopp*
Carol R. Brophy
Jennifer K. Singh
Anthony Hopp
Angela M. Sousa
Melanie A. Ayerh
*Attorneys for Defendant NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY*


824
KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

**~~[PROPOSED]~~ ORDER**

PURSUANT TO STIPULATION OF THE PARTIES AND GOOD CAUSE APPEARING THEREFOR, IT IS ORDERED that:

1. Plaintiff is hereby granted leave to file their proposed Fourth Amended Complaint
2. Plaintiff shall file their Fourth Amended Complaint within fourteen (14) days of ~~the~~ this Order.

**IT IS SO ORDERED.**

DATE: 09/14/2026

Honorable Theresa M. Traber
Superior Court Judge


825

## PROOF OF SERVICE

I am a resident of the State of Nevada, over the age of eighteen years, and not a party to the within action. My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, CA 92626. September 10, 2026, I served the herein described document(s):

**STIPULATION FOR LEAVE TO FILE FOURTH AMENDED COMPLAINT; [PROPOSED] ORDER; EXHIBIT A – REDLINED PROPOSED AMENDED COMPLAINT**

☐ FACSIMILE - by transmitting via facsimile the document(s) listed above to the fax number(s) set forth on the attached Telecommunications Cover Page(s) on this date before 11:59 p.m.

☒ MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Costa Mesa, California addressed as set forth below.

☐ PERSONAL SERVICE - by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

Carol R. Brophy (SBN 155767)
cbrophy@steptoe.com
STEPTOE LLP
One Market Plaza
Steuart Tower, Suite 1070
San Francisco, California 94105

Anthony Hopp (*pro hac vice* forthcoming)
ahopp@steptoe.com
STEPTOE LLP
227 West Monroe Street, Suite 4700
Chicago, Illinois 60606

Melanie A. Ayerh (SBN 303211)
mayerh@steptoe.com
John P. Wallan (SBN 353689)
jwallan@steptoe.com
STEPTOE LLP
633 W. Fifth Street, Suite 1900
Los Angeles, CA 90071

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on September 10, 2026, at Las Vegas, Nevada.

By: */s/ Gustavo Ponce*
Gustavo Ponce

KAZEROUNI LAW GROUP, APC


826

KAZEROUNI LAW GROUP, APC

# EXHIBIT A


827

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

KAZEROUNI LAW GROUP, APC

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. a/b/a JACKED FACTORY and JACKED FACTORY HOLDINGS INC.,

Defendants.

Case No.: 23STCV15674

**FOURTH AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

1) **CONSUMERS LEGAL REMEDIES ACT, CAL. CIVIL CODE §§ 1750, ET SEQ.;**
2) **CALIFORNIA'S FALSE ADVERTISING LAW, BUS. & PROF. CODE §§ 17500 ET SEQ.;**
3) **CALIFORNIA'S UNFAIR COMPETITION LAW, BUS. & PROF. CODE §§ 17200 ET SEQ.;**
4) **NEGLIGENT MISREPRESENTATION; AND**
5) **INTENTIONAL MISREPRESENTATION**

**JURY TRIAL DEMANDED**

**INTRODUCTION**

1. Plaintiff DANIEL ROSSI ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of Defendants NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY and JACKED FACTORY HOLDINGS INC. (jointly as the "Defendants") in unlawfully representing and advertising Defendants' dietary supplement products with the false designation and representation that the products were made and/or manufactured in the USA. The unlawfully represented products were sold online on Defendants' website and other third-party vendors, such as Amazon.com ("Amazon"), throughout the United States, and advertised on Defendants' website.[1] Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

2. Specifically, Plaintiff purchased Defendants' Nitrosurge Pre Workout[2] Supplement (hereinafter the "Product"), which, as advertised on Defendants' website and other third-party vendors, was represented by Defendants to Plaintiff and other similarly situated consumers as a product made and/or manufactured in the USA. However, Defendants' Product contains or is made with ingredients that are not "Manufactured in the USA," as discussed further herein.

3. The "Manufactured in the USA" claim (or some derivative thereof) was prominently printed on Defendants' website and advertisements, as well as the websites of third-party vendors, including Amazon, where the Product was purchased by Plaintiff. Contrary to Defendants' representation and in violation of federal rules and California laws, Defendants' Class Products,[3]

---

[1] Plaintiff seeks class wide relief on behalf of all purchasers of any of Defendants' products that are substantially similar to the dietary supplement product purchased by Plaintiff that were advertised as being "Manufactured in the USA" in violation of California law(s).

[2] As titled on Amazon.com when Plaintiff purchased the Product; "NITROSURGE Pre Workout Supplement – Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps – Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White."

[3] A list of the Class Products is attached hereto as Exhibit A.


829
KAZEROUNI LAW GROUP, APC

including the Product purchased by Plaintiff, are actually made with or contain ingredients that are not "Manufactured in the USA," as discussed in further detail herein.

4. Defendants' nationwide sale and advertising of deceptively advertised Class Products constitute violations of: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (2) California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17533.7; (3) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 et seq.; (4) negligent misrepresentation and (5) intentional misrepresentation. This conduct caused Plaintiff, and others similarly situated, damages, and requires restitution and injunctive relief to remedy and prevent further harm.

5. Unless otherwise indicated, the use of Defendants' name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of Defendants.

**JURISDICTION AND VENUE**

6. Jurisdiction is proper pursuant to this Court's general jurisdiction.

7. The Court has jurisdiction over Plaintiff's claims for damages, restitution, injunctive relief, and declaratory relief arising from Defendants' unlawful business practices under California's CLRA, FAL, and UCL; as well as negligent and intentional misrepresentation.

8. This Court has personal jurisdiction over Defendants because Defendants conducts substantial business in the State of California and County of Los Angeles, has sufficient minimum contacts with this State and County, and otherwise purposefully avails itself of the markets in this State and County through the promotion, sale, and marketing of its services in this State, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this Court pursuant to California Code of Civil Procedure § 395(a) because Plaintiff resides within this county and many of the acts and transactions giving rise to this action occurred in this county because Defendants:

a. is authorized to conduct business in this county and has intentionally availed itself of the laws and markets within this county;


830

b. does substantial business within this county; and is subject to personal jurisdiction in this county;

c. and is subject to personal jurisdiction in this county.

## PARTIES

10. Plaintiff is an individual residing in the City of Northridge, County of Los Angeles, State of California.

11. Defendants NUTRA HOLDINGS, INC. d/b/a JACKED FACTORY is a corporation with its principal place of business in St. John's, Newfoundland and Labrador, Canada, which is regularly doing business in the State of California and within this county.

12. Defendants JACKED FACTORY HOLDINGS INC. is a corporation with its principal place of business in St. John's, Newfoundland and Labrador, Canada, which is regularly doing business in the State of California and within this county.

13. Defendants are a manufacturer and seller of dietary supplements that conducts business through its website and the websites of third-party vendors. One of the products sold by Defendants is Nitrosurge Pre Workout, the Product, which was purchased by Plaintiff.

## NATURE OF THE CASE

14. At all times relevant, Defendants made affirmative misrepresentations regarding the Class Products, including the Product purchased by Plaintiff, it manufactures, markets and sells. Specifically, Defendants marketed, advertised, and sold its Class Products as "Manufactured in the USA" without clear and adequate qualification that the Class Products contained foreign ingredients and/or components as required by federal rules and state laws.

15. However, although Defendants represents that its Class Products are "Manufactured in the USA" without clear and adequate qualification, Defendants' Class Products contain or are made with ingredients and/or components that are not "Manufactured in the USA."

16. Federal rules regarding the use of "Made in the United States" claims with respect to products and services are well established and well defined.

17. Specifically, the Made in USA Labeling rule, 16 C.F.R. § 323, (the "MUSA Rule")

KAZEROUNI LAW GROUP, APC


831

clearly defines the meaning of "Made in the United States", including synonymous phrases[4], as well as when it can be used without clear and adequate qualification notifying consumers that the good or service in question contains or is made with ingredients or components that are not made or sourced in the United States.[5]

18. Despite the clearly established and well-defined federal rules regarding "Made in the United States" claims, Defendants falsely, unfairly and deceptively advertised, marketed and sold its Class Products, including the Product purchased by Plaintiff, as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and/or components as further herein.

19. Defendants' "Manufactured in the United States" representations were deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

20. Each consumer, including Plaintiff, was exposed to virtually the same material misrepresentations, as similar advertisements and misrepresentations were prominently placed on all of Defendants' website and the websites of third-party vendors.

21. As of July 2023, when the first complaint in this matter was filed, Defendants' website contained a clear and conspicuous "Manufactured in the USA" claim under iconography of a waiving United States flag encircled by the words "Manufactured in the USA" making it clear that Defendants meant this claim to be applied to <u>*all*</u> of its products, including the Class Products. This claim,

---

[4] *See* 16 C.F.R. § 323.1(a) ("The term Made in the United States means any unqualified representation, express or implied, that a product or service, or a specified component thereof, is of U.S. origin, including, but not limited to, a representation that such product or service is "made," "***manufactured***," "built," "produced," "created," or "crafted" in the United States or in America, or any other unqualified U.S.-origin claim.") (emphasis added)

[5] *See* 16 C.F.R. § 323.2 Prohibited Acts ("In connection with promoting or offering for sale any good or service, in or affecting commerce as "commerce" is defined in section 4 of the Federal Trade Commission Act, 15 U.S.C. 44, ***it is an unfair or deceptive act or practice*** within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), ***to label any product as Made in the United States unless*** the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and ***all or virtually all ingredients or components of the product are made and sourced in the United States***. (emphasis added)


832

KAZEROUNI LAW GROUP, APC

including iconography, appeared on each and every product page of Defendants' website as well as Defendants' Amazon product pages.

22. Even after the filing of this matter, according to publicly archived webpages[6], as of January 2024 or even later, the main home page of Defendants' website still contained a clear and conspicuous "Manufactured in the USA" claim under same iconography of a waiving United States flag encircled by the words "Manufactured in the USA" thus making it more evident that Defendants meant this claim to be applied to *all* its products—even after the Complaint was filed in this matter.




23. According to publicly archived webpages, as of November 2023 or even later, the "Frequently Asked Questions" page of Defendants' website contained the following answer in response to the question: "Where are your products manufactured?" "Answer: **Our products are manufactured in the USA** in a cGMP, FDA Registered manufacturing facility adhering to the strictest quality control." (emphasis added)[7]

24. As a consequence of Defendants' unfair and deceptive practices, Plaintiff and other similarly situated consumers purchased Defendants' Class Products under the false impression that the products were actually manufactured and/or made in the USA with U.S. made ingredients and components.

---

[6] *See* https://web.archive.org/web/20240121011132/https://www.jackedfactory.com/ (archived January 21, 2024)

[7] *See* https://web.archive.org/web/20231101090125/https://www.jackedfactory.com/pages/common-faqs (archived November 1, 2023)

KAZEROUNI LAW GROUP, APC


833

25. As a result of Defendants' misrepresentations, Plaintiff and other consumers similarly situated overpaid for Defendants' Class Products, and/or purchased the Class Products under the false belief that the product they purchased was made and/or manufactured in the USA with U.S. made ingredients and components. Had Plaintiff and other consumers similarly situated been made aware that Defendants' Class Products were not actually made with all or virtually all ingredients and components being made in the United States, they would not have purchased the products.

26. As a result of Defendants' false and misleading statements and failure to clearly and adequately disclose the presence of foreign ingredients and components, as well as Defendants' other conduct described herein, Plaintiff and other similarly situated consumers purchased thousands, if not millions, of Defendants' Class Products and have suffered injury in fact, including the loss of money and/or property.

27. Defendants' conduct as alleged herein violates federal rules as well as several California laws, as more fully set forth herein.

28. This action seeks, among other things, equitable and injunctive relief; restitution of all amounts illegally retained by Defendants; and disgorgement of all ill-gotten profits from Defendants' wrongdoing alleged herein.

**THE FOREIGN INGREDIENTS IN DEFENDANTS' CLASS PRODUCTS**

29. Pursuant to section 1782(a) of the CLRA, on March 8, 2023, Plaintiff provided Defendants notice in writing sent by certified mail of the particular violations of section 1770, and demanded that Defendants rectify the problems (the "CLRA Letter").[8]

30. Plaintiff's CLRA Letter included a list of products with foreign ingredients, the Class Products, which has since been made reduced. See Exhibit A.

31. Plaintiff's CLRA Letter put Defendants on notice of the following foreign ingredients in its products, including the offending Product (the "CLRA Ingredients"):

a. *L-Citruline,*

[8] A true and correct copy of Plaintiff's CLRA Letter dated March 8, 2023, is attached hereto as Exhibit B.

KAZEROUNI LAW GROUP, APC








834

b. *Beta Alanine,*

c. *Betaine Anhydrous,*

d. *L-Theanine*

32. The Product purchased by Plaintiff contains the following foreign ingredients:

a. *L-Citrulline*

b. *Beta Alanine*

c. *Betaine Anhydrous*

d. *L-Theanine*

e. *Caffiene Anhydrous*

f. *Theobromine*

g. *AstraGin,* which is the combination of *Astragalus membranaceus* and *Panax notoginseng* (both which are foreign ingredients)

33. Thus, the CLRA Letter provided Defendants with notice of four (4) foreign ingredients in the Product which Plaintiff's CLRA claims are based on: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*.

34. Plaintiff's UCL, FAL, negligent misrepresentation, and intentional misrepresentation, claims are based on the seven (7) foreign ingredients contained in the Product; (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

35. The Class Products are substantially similar to the Product as they all contain the foreign ingredients included in the Product, and Defendants similarly made the "Manufactured in the USA" representation for each of the Class Products.

36. The Product purchased by Plaintiff contains the following foreign ingredients: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin (*Astragalus membranaceus* and *Panax notoginseng*).

a. Like the Product purchased by Plaintiff, the Class Product Altius Pre contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, and (d) *Caffiene*





KAZEROUNI LAW GROUP, APC

*Anhydrous*.

b. Like the Product purchased by Plaintiff, the Class Product Build PM contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Theanine*.

c. Like the Product purchased by Plaintiff, the Class Product Build XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

d. Like the Product purchased by Plaintiff, the Class Product Burn XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous*.

e. Like the Product purchased by Plaintiff, the Class Product Burn XT Black contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous* and (b) *Theobromine*.

f. Like the Product purchased by Plaintiff, the Class Product Burn XT Powder contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous*.

g. Like the Product purchased by Plaintiff, the Class Product EAA Surge contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Citruline*.

h. Like the Product purchased by Plaintiff, the Class Product GDA XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

i. Like the Product purchased by Plaintiff, the Class Product Intra Surge Pre contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, and (b) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

j. Like the Product purchased by Plaintiff, the Class Product Lean PM contains the following foreign ingredient which is also included in the Product purchased by

Plaintiff: (a) *L-Theanine*.

k. Like the Product purchased by Plaintiff, the Class Product N.O. XT contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Citruline*.

l. Like the Product purchased by Plaintiff, the Class Product Nitro Surge Build contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffiene Anhydrous*, and (f) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

m. Like the Product purchased by Plaintiff, the Class Product Nitro Surge Max contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine,* (e) *Theobromine*, and (f) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

n. Like the Product purchased by Plaintiff, the Class Product NitroSurge Shred contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *L-Theanine*, (d) *Caffiene Anhydrous*, and (e) *Theobromine.*

o. Like the Product purchased by Plaintiff, the Class Product Pump Surge contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Betaine Anhydrous*, and (c) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

p. Like the Product purchased by Plaintiff, the Class Product Test PM contains: (a) *L-Theanine*, which is also included in the Product purchased by Plaintiff

37. Plaintiff alleges claims and seeks damages and relief available under the CLRA as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, as they contain the CLRA Ingredients referenced in the CLRA Letter. (12 Total)

KAZEROUNI LAW GROUP, APC

38. Plaintiff alleges claims and seeks damages and relief under the UCL, FAL, negligent misrepresentation, and intentional misrepresentation as to all of the Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT, as they contain foreign ingredients similar to the Product. (17 Total)

**FACTUAL ALLEGATIONS**

39. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

40. Defendants marketed and sold various dietary supplements that were represented and advertised as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and components. Defendants made these representations on its website which resulted in these representations being made on the websites of its third-party vendors, including Walmart.com.[9] These representations were made until, at least, sometime in January 2024 on Defendants' website and even later on third party vendors' websites.

41. Contrary to Defendants' representation, Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

42. Dietary supplements, such those sold by Defendants, are often made with numerous ingredients and components that are foreign sourced due to significant differences in costs of raw material/component production in the United States versus foreign production such as in China.10 In

---

[9] *See* https://www.walmart.com/ip/Nitrosurge-Pre-Workout-Powder-Endless-Energy-Instant-Strength-Gains-Clear-Focus-Intense-Pumps-30-Servings-Blue-Raspberry/383327735 (Under Product Details "Each bottle of Nitrosurge pre-workout is manufactured in a state-of-the-art cGMP manufacturing facility in the USA adhering to the most stringent manufacturing standards."; "Manufactured in the USA in a cGMP-Certified Facility.") (last accessed August 1, 2024)

[10] *See* U.S.-China Economic and Security Review Commission. *Potential Health & Safety Impacts from Pharmaceuticals and Supplements Containing Chinese-Sourced Raw Ingredients*. (2010). https://www.uscc.gov/sites/default/files/Research/NSD_BIO_Pharma_Report--Revised_FINAL_for_PDF--14_%20April_2010.pdf ("This report attempts to shed light and insight on particular issues addressing potential implications of a critical component of a complex supply chain, which contributes to U.S. national health security as China continues to strengthen its position as the world's largest supply source of raw materials for pharmaceuticals and supplements. As first reported in 1998 by the U.S. Government Accounting Office, the U.S. imports an estimated


838

KAZEROUNI LAW GROUP, APC

many cases, certain botanical ingredients cannot grow in the United States due to climate reasons or are not grown commercially due to significant differences in costs of domestic versus foreign agricultural production.

43. Pursuant to Section 1782(d) of the CLRA, Plaintiff provided Defendants with written notice by certified mail on March 8, 2023, outlining the specific violations of Section 1770 and demanding that Defendants rectify the issues (the "CLRA Letter").[11]

44. Specifically, the CLRA Letter provided non-exhaustive examples of Defendants' violations of the rules and laws governing unqualified "Manufactured in the USA" claims, using three products as illustrative examples: the Product, Burn-XT, and N.O. XT (the "CLRA Products").

45. The CLRA Letter informed Defendants that the following ingredients, along with potentially other ingredients in the CLRA Products, were not sourced from the United States, contrary to Defendants' unqualified "Manufactured in the USA" representations: L-citrulline, betaine anhydrous, beta alanine, L-theanine, acetyl-L-carnitine HCl, green tea leaf extract, black pepper extract, arginine, and glutathione (the "CLRA Ingredients").[12]

46. Furthermore, the CLRA Letter specifically stated that "The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here."

47. Upon receiving such a letter, a reasonable company would have, at the very least, investigated whether the CLRA Ingredients were, in fact, grown, sourced, or produced outside the United States. In reality, a reasonable company would have conducted an investigation into all of its products to determine whether they contained foreign ingredients or components.

48. Some of the CLRA Ingredients appear in the Product, namely citrulline, beta alanine, betaine anhydrous, and theanine. The Product also contains other foreign ingredients, specifically

---

80% of the raw ingredients contained in both products manufactured, sold and consumed in this country.")

[11] A true and correct copy of Plaintiff's CLRA Letter dated March 8, 2023, is attached hereto as Exhibit B.

[12] For convenience, certain ingredients may be referred to by their common name or abbreviation when referenced individually. For example: citrulline, theanine, ALCAR (for acetyl-L-carnitine HCl), green tea and black pepper.


839

KAZEROUNI LAW GROUP, APC

caffeine, theobromine, and AstraGin®.

49. Had Defendants investigated and found that the CLRA Ingredients, and other ingredients in the Product and the Class Products, were, in fact, grown, sourced, or produced within the United States, Defendants would have responded to Plaintiff by correcting Plaintiff's allegations regarding the Product, the CLRA Products and the Class Products and providing evidence of the ingredients' U.S. sourcing.

50. Instead, the Defendants continued to market and sell the Product and Class Products as "Manufactured in the USA"—without qualification—on its website for more than nine months after receiving the CLRA Letter, despite being aware of the foreign ingredients (and potentially components) used in its products. The Class Products continued to be sold with the same unqualified U.S. origin claim on third-party vendor websites for well over nine months after the Defendants received the CLRA Letter.

51. Furthermore, Defendants has yet to provide any evidence that Plaintiff's assertions regarding the origin of the CLRA Ingredients, or other ingredients and components, are incorrect.

52. The Product purchased by Plaintiff contains or is made with ingredients and/or components that are not "Manufactured in the USA." For example, the Product contains AstraGin®, a branded ingredient which is created from the combination of *Astragalus membranaceus* and *Panax notoginseng.*

53. AstraGin® is produced by NuLiv Science U.S.A., Inc. ("NuLiv"), an ingredient supplier. To sell AstraGin® in the European Union, NuLiv had to apply for Novel Food status to the European Food Safety Authority ("EFSA"). The application process requires comprehensive documentation, including sourcing and processing details.

54. The published scientific opinion of the EFSA on NuLiv's application for AstraGin® (*see* Exhibit E)[13] states that AstraGin®'s *Astragalus membranaceus* roots are sourced from Gansu and

---

[13] *See*, https://efsa.onlinelibrary.wiley.com/doi/epdf/10.2903/j.efsa.2020.6099 ("The *A. membranaceus* roots are purchased from growers in Gansu and Inner Mongolia provinces in the north-western region of China while the *P. notoginseng* roots are acquired from growers in Yunnan and Sichuan provinces in the southern region of China.").


840

KAZEROUNI LAW GROUP, APC

Inner Mongolia provinces in China, while the *Panax notoginseng* roots are sourced from Yunnan and Sichuan provinces in China (*see* Exhibit E, Section 3.3 Production Process).

55. *Astragalus membranaceus* and *Panax notoginseng,* are native to China and not commercially grown in the United States.[14] *See* Exhibit E, Section 3.3 Production Process.

56. Irrespective of exactly where *Astragalus membranaceus* and *Panax notoginseng* are sourced, one thing is certain – they are not grown, made, or sourced from within the United States.

57. In addition to foreign *Astragalus membranaceus* and *Panax notoginseng*, the Product contains theobromine, a component of cacao which is not grown commercially in the United States.[15]

58. The Product also contains caffeine, which is generally derived from decaffeination of coffee or tea[16], neither of which is grown commercially or cost effectively in the United States. When not from natural sources, synthetic caffeine is generally produced overseas.[17]

59. One of the CLRA Products, Burn-XT, specifically contains caffeine from coffee bean extract, which cannot be from the United States.[18] Caffeine from coffee appears in other Class Products as well.

60. Thus, upon information and belief, the forms of caffeine contained in the Product and

---

[14] *See* Ji B, Xuan L, Zhang Y, Zhang G, Meng J, Mu W, Liu J, Paek K-Y, Park S-Y, Wang J, et al. Advances in Biotechnological Production and Metabolic Regulation of *Astragalus membranaceus*. Plants. 2023; 12(9):1858. ("As one of the most popular herbal medicines in the world, *A. membranaceus* is mainly derived from wild and cultivated resources in China. Wild plants of *A. membranaceus* are mainly produced in Inner Mongolia, Gansu, Shanxi, and Ningxia. Wild resources have been over-exploited, seriously damaging the ecological environment. Cultivated plants are mainly derived from Shanxi Hunyuan, Gansu Longxi, Inner Mongolia Niuyingzi, and Shaanxi Zizhou."); Zhao H, Han Z, Li G, Zhang S, Luo Y. Therapeutic Potential and Cellular Mechanisms of *Panax Notoginseng* on Prevention of Aging and Cell Senescence-Associated Diseases. Aging Dis. 2017 Dec 1;8(6):721-739. ("*Panax notoginseng*, distributed in the Southwest of China, Japan, Burma, and Nepal, is both cultivated and gathered from wild forests. *Panax notoginseng* is sensitive to sunlight. It grows primarily in the Wenshan mountain area of Yunnan province and is cultivated commercially in the Southwest regions of China.")

[15] *See* https://www.icco.org/growing-cocoa/

[16] *See* https://web.archive.org/web/20240807011447/https://en.wikipedia.org/wiki/Caffeine ("Commercial supplies of caffeine are not usually manufactured synthetically because the chemical is readily available as a byproduct of decaffeination.").

[17] *See* https://whyy.org/segments/where-you-will-get-your-caffeine-buzz-in-the-future/ ("…synthetic caffeine production (and its pollution) mostly moved overseas, especially to China.")

[18] *See* https://en.wikipedia.org/wiki/Coffee (See "Map showing areas of coffee cultivation" under "Cultivation and Production" – the United States is not a commercial producer of coffee.)








841

KAZEROUNI LAW GROUP, APC

the Class Products are not made or sourced from within the United States.

61. *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are material to the Product's formulation and marketing claims.

62. Because *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are indisputably foreign, "all or virtually all" ingredients in the Product cannot be made in the United States as required by the MUSA Rule for Defendants to lawfully make an unqualified "Manufactured in the USA" claim.

63. Upon information and belief, it is likely that the remaining ingredients and even the packaging components used to produce the Product are foreign.

64. Similarly, the Class Products contain the same foreign ingredients as those found in the Product.

65. For example, caffeine is included in numerous of Defendants' products other than the Product, including, but not limited to, Altius Pre, Caffeine, Nitrosurge Shred (also contains theobromine), Nitrosurge Build, Burn-XT, Build-XT Black (also contains theobromine), Burn-XT Powder, Burn XT Stick Pack, Nitrosurge Natural and Nitrosurge Shred Max.

66. *Astragalus membranaceus* and *Panax notoginseng* (as AstraGin®) are included in numerous Class Products other than the Product, including but not limited to, Nitrosurge Build, Nitrosurge Max Pump Surge, Build-XT, GDA-XT, Intrasurge, Green Tea Extract, Nitrosurge Build, and Nitrosurge Shred Max.

67. Defendants use numerous other indisputably foreign ingredients in numerous of its numerous products, including but not limited to KSM-66 ashwagandha[19] and green tea extract[20].

68. Some of the ingredients, components, and even packaging used by Defendants can be sourced either domestically or internationally — and since this information is exclusively known to

---

[19] *See* https://ksm66ashwagandhaa.com/traceability/quality-control/ ("The state of Rajasthan in India is one of the most suited terrains known to grow the best quality ashwagandha in the world and that is where, our ashwagandha farms are located.")

[20] *See* https://en.wikipedia.org/wiki/Tea ("Tea is mainly grown in Asia and Africa, with smaller areas in South America and around the Black and Caspian Seas. The four biggest tea-producing countries are China, India, Kenya and Sri Lanka, together representing 81% of world tea production.")


842

KAZEROUNI LAW GROUP, APC

Defendants at this time — Plaintiff cannot fully allege the extent of Defendants' unqualified "Manufactured in the USA" violations without further discovery. Nevertheless, Defendants' blatant and willful disregard for the laws discussed herein is well established by the aforementioned, non-exhaustive examples.

69. Despite the presence of numerous indisputable foreign ingredients in the Class Products, Defendants made unqualified "Manufactured in the USA" representations on the main page of its website, on each product page for the Class Products, on each Amazon product page for the Class Products, and even in the "Frequently Asked Questions" section of its website.

70. Adequately and properly qualified "Manufactured in the USA" representations are common and ubiquitous in the dietary supplement industry.

71. Numerous competitors of Defendants including, but not limited to, Optimum Nutrition, Zhou Nutrition, MuscleTech, and BSN, clearly, adequately, and properly qualify "Manufactured in the USA" and "Made in the USA" representations on their products.[21]

72. Some dietary supplement products make no "Manufactured in the USA" or "Made in the USA" representations at all.

73. When consumers like Plaintiff see unqualified "Manufactured in the USA" claims, such as those made by Defendants regarding the Class Products, in an industry where qualified claims are so common, they reasonably believe that the products in question are made entirely in the United States, including ingredients and components.

74. Defendants is not a U.S. based company, but rather a company founded in, operated in and from Newfoundland and Labrador, Canada.

75. Given that Defendants is a Canadian company, the purpose of its unqualified "Manufactured in the USA" was clearly not from Defendants' sense of American patriotism or national pride. Instead, Defendants' motive behind representing the Class Products as "Manufactured in the USA" was solely for the intentional purpose of marketing to American consumers seeking and will pay more for products that are made, including ingredients and components, in the United

---

[21] *See* Exhibit D.

KAZEROUNI LAW GROUP, APC


843

KAZEROUNI LAW GROUP, APC

States.[22]

76. Unlike general wellness dietary supplement companies that offer a wide variety of products for various applications, such as cognitive, cardiovascular, immune, digestive, and anti-aging health, as well as basic vitamins (e.g., Vitamins C, B, D, E, etc.) and minerals, Defendants' marketing focus and product line are much more specific.

77. Specifically, Defendants' exclusive marketing focus, as reflected in its product line, is on sports and athletic performance dietary supplements.

78. Defendants knew that its unqualified "Manufactured in the USA" representations would resonate with sports- and athletic-minded consumers in the United States, particularly given the strong sense of patriotism and national pride prevalent in this community.

79. Defendants' exclusive focus results in Defendants using a much more limited range of ingredients, both in terms of ingredient categories and specific ingredients, compared to a general wellness dietary supplement company.

80. For example, nearly all of the ingredients in Defendants' products, including the Class Products, fall into one of three categories: Amino Acid/Amino Acid Derivative, Stimulant, or Herbal Performance.

81. Examples of ingredients in these categories include, but are not limited to: (1) Amino Acid/Amino Acid Derivatives: citrulline, beta alanine, betaine anhydrous, theanine, ALCAR, arginine, glutathione, creatine, glutamine, and valine; (2) Stimulants: caffeine and theobromine; and (3) Herbal Performance: green tea, black pepper, AstraGin®, and ashwagandha.

82. As a result of the narrow range of ingredients and ingredient categories, there is significant overlap and shared use of ingredients between the Class Products, the CLRA Products, and the Product.

83. This relationship is partially illustrated[23] in Exhibit F, which depicts the connection

---

[22] *See* https://reshoringinstitute.org/wp-content/uploads/2020/09/made-in-usa-survey.pdf ("Slightly more than 83% [of consumers polled] said they would pay up to 20% more for products made domestically.")
[23] Not all ingredients in the Class Products are represented on the X-axis of the chart. The Class Products contain numerous other foreign ingredients.








844

between the CLRA Ingredients, other foreign ingredients in the Product, Ashwagandha, and those in the Class Products.

84. Given Defendants' exclusive focus on sports/athletic performance products (and their consumers), its narrow range of ingredients and ingredient categories, as well as the commonality between the ingredients used in the Product, the CLRA Ingredients, and the Class Products, Plaintiff asserts that the Product and the Class Products are substantially similar.[24]

85. Certain of Defendants' products, including but not limited to its protein and cereal bar products, have been excluded from the definition of Class Products. Plaintiff reserves the right to further allege substantial similarity between the excluded products and the Product should, for example, discovery confirm that the same or similar foreign packaging or other components were used across Defendants' product line.

86. Defendants represented, marketed and sold to the general public via its website, the website of its third-party vendors, and other forms of advertising and marketing that the Class Products are "Manufactured in the USA," without clear, adequate, and proper qualification. As such, Defendants inaccurately represented that its Class Products are "Manufactured in the USA," which conveys to a reasonable consumer like Plaintiff that the Class Products, including the Product, are made entirely in the United States, made with ingredients and components from the United States, made pursuant to United States labor standards, and are therefore superior quality (i.e., contain better grown ingredients that non-US made products or raw materials). Defendants possess superior knowledge of the true facts that were not disclosed regarding the Class Products, thereby tolling the running of any applicable statute of limitations.

87. The types of misrepresentations and/or omissions made by Defendants, as described herein, were considered by Plaintiff, a reasonable consumer, when deciding to purchase the Product.

88. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were,

---

[24] *See Miller v. Ghirardelli Chocolate Co.*, 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012) (citing cases); ("hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar."); *see also, e.g., Colucci v. ZonePerfect Nutrition Co.*, No. 12-2907, 2012 WL 6737800, at *4 (N.D. Cal. Dec. 28, 2012); *Astiana v. Dreyer's Grand Ice Cream, Inc.*, No. 11-2910, 2012 WL 2990766, at *11-13 (N.D. Cal. July 20, 2012).


845

deceived and misled by Defendants' representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the products were "Manufactured in the USA," when Defendants' Class Products are in fact wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

89. Reasonable consumers, including Plaintiff, attached importance to the "Manufactured in the USA" representations made by Defendants on its Product and the Class Products.

90. Consumers who purchased the Class Products on Defendants' website or through third-party vendor websites were not the only consumers who were exposed to and relied upon the unqualified and false "Manufactured in the USA" representations made by Defendants. Defendants' website contains a "Find A Store" link25 making it highly likely that hundreds of thousands of consumers saw the unqualified and false "Manufactured in the USA" representations and proceeded to purchase Class Products in brick-and-mortar stores like The Vitamin Shoppe.

91. Most consumers possess limited knowledge of the likelihood that products are made with or contain ingredients and components that are not "Manufactured in the USA" when they are advertised and represented to be "Manufactured in the USA." This is a material factor in many individuals' purchasing decisions which they rely upon as they believe they are purchasing a product that is "Manufactured in the USA" with ingredients and components from the United States.

92. Consumers generally believe that products that are "Manufactured in the USA" are made entirely in the United States, made of ingredients and components from the United States, made pursuant to United States labor standards, and are therefore of superior quality (i.e., contain better grown ingredients that non-US made products or raw materials).

93. On information and belief, Defendants' misrepresented Class Products were purchased by consumers over Defendants' competitors' properly and legally marketed products, during the entirety of the relevant four-year statutory time period, based on the unqualified, false and deceptive "Manufactured in the USA" representations (or some derivative thereof) made with respect to Defendants' products. Federal rules and California laws are designed to protect consumers from

---

[25] *See* https://www.jackedfactory.com/pages/storelocator


846

KAZEROUNI LAW GROUP, APC

such false representations and predatory conduct.

94. Defendants' "Manufactured in the USA" representation was misleading to a reasonable consumer.

95. On or about January 24, 2023, Plaintiff searched online for a pre-workout supplement when he discovered the Product and its unqualified and misrepresented "Manufactured in the USA" claim. Plaintiff subsequently purchased the Product on Amazon.

96. At the time of Plaintiff's purchase, the description of the Product described the Product as "Manufactured in the USA," without any qualification, when the Product was actually made with or contained ingredients and/or components that were not "Manufactured in the USA." Accordingly, Defendants was not entitled to lawfully make representations that the Product was "Manufactured in the USA" without qualification as per the MUSA Rule.

97. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendants as follows:

a. The "who" is Defendants;

b. The "what" is representation that Defendants' Class Products are "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

c. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

d. The "where" is in Defendants' advertisements and marketing of the Class Products;

e. The "to whom" is Plaintiff and the putative Class who bought the Class Products;

f. The "by what means" is by Defendants representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA. Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

KAZEROUNI LAW GROUP, APC




847

g. The "how" is the allegation that Defendants did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

98. It is widely and generally known that consumers prefer products that are "Manufactured in the USA" due to quality, support for local businesses, national economic, environmental and other reasons. The preference is increased when the products are health related and ingestible due to the potential for inferior ingredients and components being manufactured overseas. In making the decision to purchase Defendants' Product, Plaintiff relied upon the advertising, marketing and/or other promotional materials prepared, approved and distributed and/or published by Defendants and its agents and disseminated through its Class Products' advertising containing the misrepresentations alleged herein.

99. Defendants' false representation is that Defendants did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA, while Defendants knew that fact.

100. Defendants intended to deceive Plaintiff and the Class members into buying the Class Products knowing that consumers would prefer, purchase, and likely pay more for products "Manufactured in the USA" versus other products not "Manufactured in the USA."

101. Plaintiff justifiably relied on Defendants' "Manufactured in the USA" representation. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

102. Plaintiff paid and purchased the Product which was of less or little value than what he paid for.

103. Defendants' "Manufactured in the USA" representations were deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

104. Had Plaintiff been made aware that the Product, including its ingredients and

KAZEROUNI LAW GROUP, APC


848

components, was not actually "Manufactured in the USA," he would not have purchased the Product, or would not have purchased the Product for the price he paid. In other words, Plaintiff would not have purchased Defendants' Product, or paid the amount he did for the purchase of the Product, but for the unqualified "Manufactured in the USA" representations on Defendants' website and advertising on the websites of its third-party vendors which Plaintiff reasonably relied on.

105. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendants as a result of Defendants' unqualified and false "Manufactured in the USA" designation set forth on Defendants' website and advertising on the websites of its third-party vendors.

106. In each case when Plaintiff and putative Class members purchased a Class Product, they relied upon Defendants' unqualified "Manufactured in the USA" representation in their purchasing decision, which is typical of most U.S. consumers. Consequently, they were deceived as a result of Defendants' actions. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

107. Defendants' Class Products are made with or contain ingredients and components that are not manufactured in the USA, similar to the Product purchased by Plaintiff. Plaintiff and putative Class members purchased Defendants' misrepresented Class Products over Defendants' competitors' properly and legally marketed products that clearly and adequately qualify "Manufactured in the USA" claims or do not make the "Manufactured in the USA" claims at all. The precise amount of Plaintiff and the Class members' damages will be proven at the time of trial, in large part, by expert testimony.

108. Plaintiff and Class members were undoubtedly injured as a result of Defendants' unqualified and false "Manufactured in the USA" representations that are at issue in this matter.

**CLASS ACTION ALLEGATIONS**

109. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

110. Plaintiff brings this action individually and on behalf of all others similarly situated against Defendants, pursuant to California Code of Civil Procedure Section 378.


849

111. Plaintiff represents, and is a member of the class, ("the Class") consisting of:

> All persons similarly situated within the state of California, who purchased one or more of Defendants' Class Products, which were represented and/or advertised as "Manufactured in the USA" (or similar words), that were made with or contained ingredients or components that were not manufactured in the USA, within the four years prior to the filing of the Complaint."

112. Excluded from the Class are Defendants and any of its officers, directors, and employees.

113. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

114. The "Class Period" means four years prior to the filing of the Complaint in this action.

115. This action has been brought and may properly be maintained as a class action under the provisions of § 382 of the California Code of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

116. **Ascertainability**. Plaintiff does not know the number of members in the Class, but Plaintiff currently believes that there are hundreds of thousands, if not more, members of the Class within the State of California. Because of the nature of Defendants' products and applicable regulations, Defendants must keep detailed and accurate records of production, manufacturing, sale and distribution. Therefore, the members of the Class are ascertainable through Defendants' records and/or Defendants' agents' records regarding retail and sales, as well as through public notice. This matter should therefore be certified as a Class action to assist in the expeditious litigation of this matter.

117. **Numerosity**. The members of the Class are so numerous and geographically disbursed that joinder of all Class members is impractical, and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court.

118. **Existence and Predominance of Common Questions of Law and Fact**. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. Common questions of fact and law exist in this matter that predominate over questions


850

that may affect individual Class members, including, but not limited to, the following:

a. Whether Defendants committed the wrongful conduct alleged herein;

b. Whether Defendants' claims and representations, as alleged herein, are untrue, misleading, and/or reasonably likely to deceive the average consumer;

c. Whether Defendants' acts, transactions, or course of conduct constitute the violations of law alleged herein;

d. Whether Defendants' conduct violates 16 C.F.R. §§ 323, *et seq*.;

e. Whether Defendants' conduct violates California Civil Code §§ 1750, *et seq*.;

f. Whether Defendants' advertising is false, untrue, or misleading within the meaning of California Business & Professions Code §§ 17500, *et seq*.;

g. Whether Defendants' conduct is an unfair, fraudulent, or unlawful act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

h. Whether Defendants' advertising is unfair, deceptive, untrue or misleading within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

i. Whether Defendants acted negligently or intentionally in making the misrepresentations contained regarding the Class Products thought its website and the websites of its third-party vendors;

j. Whether Defendants, through its conduct, received money that, in equity and good conscience, belongs to Plaintiff and members of the Class;

k. Whether the members of the Class sustained and/or continue to sustain damages attributable to Defendants' conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages; and

l. Whether the members of the Class are entitled to injunctive and/or any other equitable relief, including but not limited to restitution and/or disgorgement of ill-gotten gains.

119. **Typicality**. As a person who purchased one or more of Defendants' products, that were advertised as "Manufactured in the USA" but are made with or contain ingredients and/or components that are not manufactured in the USA, Plaintiff is asserting claims that are typical of the






851

KAZEROUNI LAW GROUP, APC

Class. Plaintiff's claims involve the same violations of law by Defendants as other Class Members' claims. Plaintiff and members of the Class also sustained damages arising out of Defendants' common course of conduct complained herein. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent members of the Class. Defendants have no defenses unique to the Plaintiff.

120. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of other members of the Class in that Plaintiff has no interests antagonistic to any member of the Class. Further, Plaintiff has retained counsel experienced in handling class action claims and claims involving violations of the consumer laws like violations of the California Business and Professions Code, and, specifically, false and deceptive advertising. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and proposed Class.

121. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent and/or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants. The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them. Even if the members of the proposed Class could afford such litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable pursuant to Cal. Code of Civil Procedure § 382.

122. Unless the Class is certified, Defendants will retain monies received as a result of



KAZEROUNI LAW GROUP, APC

Defendants' unlawful and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendants will also likely continue to, or allow its agents to, advertise, market, promote and package Defendants' Class Products in an unlawful and misleading manner, and members of the Class will continue to be misled, harmed, and denied their rights under California law.

123. Further, Defendants has acted or refused to act on grounds that are generally applicable to the class so that declaratory and injunctive relief is appropriate to the Class as a whole, making class certification appropriate.

**FIRST CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**CAL. CIV. CODE SECTION 1750, ET SEQ.**

124. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

125. Plaintiff asserts CLRA claims as to the Class Products with the CLRA Ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, and (d) *L-Theanine*.

126. Therefore, Plaintiff asserts CLRA claims as to the following Class Products which contain the CLRA Ingredients: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM. (12 Total)

127. California Civil Code §§ 1750 et seq., entitled the Consumers Legal Remedies Act (hereinafter "CLRA"), provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer." The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, inter alia, that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.

128. Defendants' Product and the Class Products, as referenced in this section, constitute "goods" as defined pursuant to Civil Code Section 1761(a).

129. Plaintiff, and the Class members, are each a "consumer" as defined pursuant to Civil Code Section 1761(d).


853
KAZEROUNI LAW GROUP, APC
LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

130. Each of Plaintiff's and the Class members' purchases of Defendants' Class Products, as referenced in this section, constituted a "Transaction" as defined pursuant to Civil Code Section 1761(e).

131. Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) provides that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> (2) [m]isrepresenting the source, sponsorship, approval, or certification of goods or services;
> (3) [m]isrepresenting the affiliation, connection, or association with, or certification by, another;
> (4) [u]sing deceptive representations or designations of geographic origin in connection with goods and services;
> (5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;
> (7) [r]epresenting that goods or services are of a particular standard, quality, or grade…; [and]
> (9) [a]dvertising goods or services with intent not to sell them as advertised."

132. Defendants violated Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) by marketing and representing that its Class Products, as referenced in this section, are "Manufactured in the USA," or some derivative thereof, when they are made with or contain ingredients and components that are not manufactured in the United States.

133. Defendants' "Manufactured in the USA" representations are deceptive and false because Defendants' Class Products, as referenced in this section, are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

134. Pursuant to section 1782(d), by letter dated March 8, 2023, Plaintiff provide Defendants notice in writing by certified mail of the particular violations of section 1770 and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act. Defendants failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within thirty days of the date of written notice pursuant to section 1782. Therefore,


854

KAZEROUNI LAW GROUP, APC

Plaintiff and the Class further seek actual, punitive, and statutory damages, as deemed appropriate.

135. Attached hereto as Exhibit C is a sworn affidavit from Plaintiff pursuant to Cal. Civ. Code § 17801(d).

136. On information and belief, Defendants' violations of the CLRA set forth herein were done with awareness of the fact that the conduct alleged was wrongful and was motivated solely for Defendants' self-interest, monetary gain and increased profit. Plaintiff further alleges that Defendants committed these acts knowing the harm that would result to Plaintiff and Defendants engaged in such unfair and deceptive conduct notwithstanding such knowledge.

137. Plaintiff further alleges that Defendants committed these acts knowing the harm that would result to Plaintiff and Defendants engaged in such unfair and deceptive conduct notwithstanding such knowledge.

138. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendants as a result of Defendants' unqualified and false "Manufactured in the USA" representations set forth in Defendants' website and the websites of its third-party vendors regarding the Product and the Class Products.

139. As a direct and proximate result of Defendants' violations of the CLRA, Plaintiff and members of the Class are entitled to a declaration that Defendants violated the Consumer Legal Remedies Act.

140. For clarity, as to the CLRA Ingredients in the Class Products only, Plaintiff, on behalf of himself and the Class demands judgment against Defendants for damages, restitution, punitive damages, statutory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

141. As allowed under the CLRA, as to all the Class Products, Plaintiff, on behalf of himself and the Class demands injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper

142. Pursuant to section 1780(e) of the California Civil Code, Plaintiff and the Class make claims for damages and attorneys' fees and costs.




855

KAZEROUNI LAW GROUP, APC

143. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")
## BUS. & PROF. CODE §§ 17500, *ET SEQ.*

144. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

145. Plaintiff's FAL claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff; (a) L-Citruline, (b) Beta Alanine, (c) Betaine Anhydrous, (d) L-Theanine, (e) Caffeine Anhydrous, (f) Theobromine, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

146. Therefore, Plaintiff asserts FAL claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 Total)

147. Plaintiff and Defendants are both "person[s]" as defined by Cal. Bus. & Prof. Code § 17506.

148. Cal. Bus. & Prof. Code § 17535 authorizes a private right of action on both an individual and representative basis.

149. Defendants misrepresented its Class Products as "Manufactured in the USA" without clear and adequate qualification when in fact Defendants' Class Products are made with or contain ingredients and components that are not manufactured in the USA.

150. Defendants' Class Products are made with ingredients/components that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

151. These misrepresentations, acts, and non-disclosures by Defendants constitute false and misleading advertising in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

152. At all times relevant, Defendants' representations and advertising of its Class Products was untrue, misleading, and likely to, and did, deceive the reasonable consumer and the public.


856

153. Defendants engaged in the false and/or misleading advertising and marketing of its Product, as alleged herein, with the intent to directly or indirectly induce consumers to purchase its products, which Defendants knew, or had reason to know, that the Class Products were made with or contained ingredients and components that were not manufactured in the USA.

154. Defendants' "Manufactured in the USA" representations are deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

155. Because Defendants knew or should have known that the representations and/or omissions alleged herein regarding the Class Products were untrue or misleading, Defendants acted in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

156. Had Defendants clearly, adequately and truthfully qualified and advertised that its Class Products were made with or contained ingredients and components that were not manufactured in the USA, Plaintiff and the putative Class members would not have purchased the Class Products, would have paid a different price, or would have purchased a different product from another company.

157. As a direct and proximate result of the aforementioned acts and omissions by Defendants, Defendants received and continues to hold monies rightfully belonging to Plaintiff and the putative Class members, who were led to purchase Defendants' Class Products during the Class Period.

**THIRD CAUSE OF ACTION**
**VIOLATION OF BUSINESS & PROFESSIONS CODE**
**BUS. & PROF. CODE, SECTION 17200, ET SEQ.**

158. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

159. Plaintiff's UCL claims apply to the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffiene Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

160. Therefore, Plaintiff asserts UCL claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro

KAZEROUNI LAW GROUP, APC


857

Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 Total)

161. Plaintiff and Defendants are each "person[s]" as defined by California Business & Professions Code § 17201. California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

162. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

163. By and through Defendants' conduct alleged in further detail above and herein, Defendants engaged in conduct which constitutes unlawful, unfair, and/or fraudulent business practices prohibited by Bus. & Prof. Code §§ 17200, et seq.

***A. "Unlawful" Prong***

164. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

165. The violation of any law constitutes as "unlawful" business practice under the UCL.

166. Beginning at a date currently unknown, Defendants committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code §§ 17200, et seq. by manufacturing, distributing, and/or marketing Defendants' Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq., and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq., by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

167. Defendants violated the MUSA Rule, 16 C.F.R. § 323, by making its representations


858

KAZEROUNI LAW GROUP, APC

KAZEROUNI LAW GROUP, APC

on the Class Products without clear and adequate qualification that Defendants' Class Products are "Manufactured in the USA" or made with or contain ingredients and components that are not manufactured in the USA.

168. Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of the MUSA Rule, FAL, and the CLRA, as described above.

169. These alleged acts and practices by Defendants were intentional and in violation of the MUSA Rule, FAL, and the CLRA.

170. Pursuant to the UCL, Plaintiff and the Class are entitled to preliminary and permanent injunctive relief and order Defendants to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the Class of all the revenues associated with this unfair and unlawful competition, or such proton of said revenues as the Court may find applicable.

***B. "Unfair" Prong***

171. Beginning at a date currently unknown, Defendants committed acts of unfair competition that are prohibited by Bus. & Prof. Code section 17200 et seq. Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes by engaging in conduct and practices that threaten an incipient violation of law/s or violate the policy or spirit of law/s by manufacturing, distributing, and/or marketing Defendants' Class Products with a false ingredient origin information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein were "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

172. Clearly said, Defendants' Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

173. Alternatively, Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices that are immoral, unethical, oppressive or unscrupulous, the utility of such conduct, if any, being far


859

outweighed by the harm done to consumers and against public policy by manufacturing, distributing, and/or marketing Defendants' Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

174. Alternatively, Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices, including manufacturing, distributing, marketing, and/or advertising Defendants' Class Products with false ingredient information, wherein: (1) the injury to the consumer was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was not of the kind that consumers themselves could not have reasonably avoided.

***C. "Fraudulent" Prong***

175. Beginning at a date currently unknown, Defendants engaged in acts of unfair competition, including those described above and herein, prohibited and in violation of Bus. & Prof. Code § 17200 et seq., by engaging in a pattern of "fraudulent" business practices within the meaning of Bus. & Prof. Code § 17200 et seq, by manufacturing, distributing, and/or marketing Defendants' Class Products in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

176. Defendants' Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

177. Plaintiff reserves the right to allege further conduct that constitutes other fraudulent business acts or practices. Such conduct is ongoing and continues to this date.

***D. "Unfair, Deceptive, Untrue or Misleading Advertising" Prong***


860

KAZEROUNI LAW GROUP, APC

178. Defendants' advertising was unfair, deceptive, untrue and/or misleading in that consumers were led to believe that Defendants' Class Products are "Manufactured in the USA" when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

179. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendants' representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the Class Products are actually manufactured in the USA with ingredients and components from the USA given the absence of clear and adequate qualification of Defendants' "Manufactured in the USA" representations.

180. Contrary to the representation, Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

181. Defendants' "Manufactured in the United States" representations are deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

182. Defendants' unfair, deceptive, untrue, or misleading advertising presented a threat to the public by engaging in unlawful conduct that resulted in harm to consumers.

183. Defendants engaged in these unlawful, unfair, and fraudulent business practices motivated solely by Defendants' self-interest with the primary purpose of collecting unlawful and unauthorized monies from Plaintiff and all others similarly situated; thereby unjustly enriching Defendants.

184. Such acts and omissions by Defendants were unlawful and/or unfair and/or fraudulent and constitute a violation of Business & Professions Code §§ 17200, et seq. Plaintiff reserves the right to identify additional violations by Defendants as may be established through discovery.

185. As a direct and proximate result of the aforementioned acts and representations described above and herein, Defendants received unearned commercial benefits at the expense of its competitors and the public.

186. As a direct and proximate result of Defendants' unlawful, unfair and fraudulent conduct described herein, Defendants has been unjustly enriched by the receipt of ill-gotten gains


861
KAZEROUNI LAW GROUP, APC

from customers, including Plaintiff, who unwittingly provided money to Defendants based on Defendants' representations.

187. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendants as a result of Defendants' false representations set forth on the Defendants' Class Products.

188. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

## FOURTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION

189. Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully stated herein.

190. Plaintiff's Negligent Misrepresentation claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff; (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

191. Therefore, Plaintiff asserts Negligent Misrepresentation claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 total)

192. At a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendants represented to the public, including Plaintiff, by packaging, advertising, marketing and other means, that Defendants' Class Products are "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

193. Defendants' Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.


862

KAZEROUNI LAW GROUP, APC

194. Defendants made the representations herein alleged with the intention of inducing the public, including Plaintiff and putative class members, to purchase Defendants' Class Products over similar products from competitors which clearly and adequately qualified their "Manufactured in the USA" representations or made no "Manufactured in the USA" representations at all.

195. Defendants' "Manufactured in the United States" representations were deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

196. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendants' advertising representations and, in reliance on them, purchased the Class Products, as described herein.

197. At all times relevant, Defendants made the misrepresentations herein alleged when Defendants should have known these representations to be untrue, and Defendants had no reasonable basis for believing the representations to be true.

198. As a proximate result of Defendants' negligent misrepresentations, Plaintiff and other consumers similarly situated were induced to purchase, purchase more of, purchase instead of, or pay more for Defendants' Class Products, due to the unlawful acts of Defendants, in an amount to be determined at trial, during the Class Period.

## FIFTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION

199. Plaintiff repeats, re-alleges and incorporates herein by reference the above allegations as if fully stated herein.

200. Plaintiff's Intentional Misrepresentation claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

201. Therefore, Plaintiff asserts Intentional Misrepresentation claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT

KAZEROUNI LAW GROUP, APC


863

Black, Burn XT Powder, GDA XT. (17 total)

202. Beginning at a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendants intentionally represented to the public, including Plaintiff, by promoting and other means, that Defendants' Class Products were "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

203. Defendants' Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

204. Defendants' "Manufactured in the USA" representations were deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

205. Defendants made the representations herein alleged with the intention of inducing the public, including Plaintiff, to purchase Defendants' Class Products for Defendants' own financial gain.

206. Defendants intentionally made such misrepresentations by printing and advertising its misrepresentations its website and the websites of its third-party vendors.

207. Defendants' misrepresentations of the Class Products as "Manufactured in the USA" without clear and adequate qualification was misleading because Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

208. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendants' advertising representations and, in reliance on such representations, purchased the Class Products, as described above.

209. At all times relevant, Defendants intentionally made the misrepresentations herein alleged and allowed the misrepresentations to continue to be made by its resellers when Defendants knew the representations to be false.

210. As a proximate result of Defendants' intentional misrepresentations, Plaintiff and other consumers similarly situated were induced to spend an amount of money to be determined at

KAZEROUNI LAW GROUP, APC


864

trial on Defendants' misrepresented Products.

211. Defendants knew that its Class Products were in fact not "Manufactured in the USA" without clear and adequate qualification but instead made with or contain ingredients and components that are not manufactured in the USA, but nevertheless made the representations described herein with the intention that consumers rely on Defendants' representations.

212. Defendants also knew that its website, as well as the websites of its third-party vendors, were advertising its Class Products as "Manufactured in the USA" without clear and adequate qualification, when Defendants clearly knew that its Class Products were in fact made with or contained ingredients and components that were not manufactured in the USA.

213. Plaintiff and other consumers similarly situated, in purchasing and using the Class Products as herein alleged, did rely on Defendants' representations, including the representations on Defendants' advertisements and website, all to their damage and/or detriment as herein alleged.

214. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendants as follows:

a. The "who" is Defendants;

b. The "what" is representation that Defendants' Class Products were "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

c. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

d. The "where" is in Defendants' product advertisements and marketing;

e. The "to whom" is Plaintiff and the putative class who bought the Class Products;

f. The "by what means" by Defendants representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA;

g. The "how" is the allegation that Defendants did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and




865

KAZEROUNI LAW GROUP, APC

components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

215. By engaging in the acts described above, Defendants is guilty of malice, oppression, and fraud, and Plaintiff and the Class members are therefore entitled to recover exemplary or punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the Court grant Plaintiff and the putative Class the following relief:

- That this action be certified as a Class Action;
- That Plaintiff be appointed as the Class Representative;
- That Plaintiff's attorneys be appointed as Class Counsel;
- That Defendants' wrongful conduct be adjudged and decreed to violate the consumer protection statutes raised herein;
- That Plaintiff and each of the other members of the Class recover the amounts by which Defendants and Does have been unjustly enriched;
- An order requiring imposition of a constructive trust and and/or disgorgement of Defendants' and Does' ill-gotten gains and to pay restitution to Plaintiff and all members of the Class and to restore to the Plaintiff and members of the class all funds acquired by means of any act or practice declared by this court to be an unlawful, fraudulent or unfair business act or practice, in violation of laws, statutes or regulations, or constituting unfair competition;
- Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery were necessary and as applicable, to prevent Defendants or Does from retaining the benefits of their wrongful conduct;
- That Defendants and Does be enjoined from continuing the wrongful conduct alleged herein and be required to comply with all applicable laws;
- A temporary, preliminary and/or permanent order for injunctive relief requiring Defendants and Does to: (i) discontinue its false and/or misleading statement/s; and (ii)

KAZEROUNI LAW GROUP, APC


866

undertake an immediate public information campaign to inform members of the proposed class as to their prior practices;

- Pre-judgment interests from the date of filing of this suit;
- that Plaintiff and each member of the putative Class recover their costs of suit.

**FIRST CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT CAL. BUS. & PROF. CODE §§ 1750, *ET SEQ.***

- Actual damages, injunctive relief, restitution, and punitive damages pursuant to Cal. Civ. Code § 1780(a); and
- an award of costs and attorney's fees pursuant to Cal. Civ. Code § 1780(d).

**SECOND CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17535; and
- Recovery of reasonably attorney's fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**THIRD CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17203; and
- Recovery of reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**FOURTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION**

- A judgment against Defendants and Does for general and compensatory damages in an amount to be determined at trial

**FIFTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION**

- A judgment against Defendants and Does for general and compensatory damages in an amount to be determined at trial;


KAZEROUNI LAW GROUP, APC
LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

- Punitive damages pursuant to Cal. Civ. Code § 3294; and
- That Plaintiff and the members of the Class be granted any other relief the Court may deem just and proper.

**TRIAL BY JURY**

216. Plaintiff is entitled, and demands, a trial by jury on all issues so triable.

Dated: September 10, 2026

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: *\/s/ Gustavo Ponce*
Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*

KAZEROUNI LAW GROUP, APC

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | FOR COURT USE ONLY<br><br>FILED<br>Superior Court of California<br>County of Los Angeles<br>08/07/2026<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. He Deputy |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA, 90012 | |
| PLAINTIFF(S)/PETITIONER(S):<br>Daniel Rossi | |
| DEFENDANT(S)/RESPONDENT(S):<br>Nutra Holdings, Inc. | |
| **CLERK'S CERTIFICATE OF SERVICE<br>BY ELECTRONIC SERVICE** | CASE NUMBER:<br>23STCV15674 |

I, David W. Slayton, Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein and that on this date I served the

**Minute Order of 08/07/2026**
**Order Granting Verified Application of Anthony G. Hopp to Appear as Counsel Pro Hac Vice for Defendant Jacked Factory of 08/07/2026**

upon each party or counsel of record in the above entitled action by electronically serving to the party or parties at the electronic address as listed below:

**"Melanie A. Ayerh" <mayerh@steptoe.com>,**
**"Carol R. Brophy" <cbrophy@steptoe.com>,**
**"Anthony G. Hopp" <ahopp@steptoe.com>,**
**"Abbas Kazerounian" <ak@kazlg.com>,**
**"Gustavo Ponce" <gustavo@kazlg.com>,**
**"Angela M. Sousa" <asousa@steptoe.com>,**
**"Jennifer K. Singh" <jsingh@steptoe.com>**

The electronic transmission originated from the Superior Court of California, County of Los Angeles email address eService-DoNotReply@lacourt.org at the Spring Street Courthouse, 312 North Spring Street, Los Angeles, CA, 90012.

Dated: 08/7/2026

David W. Slayton, Executive Officer / Clerk of Court

By: A. He
Deputy Clerk


869

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Spring Street Courthouse, Department 1

**23STCV15674**
**DANIEL ROSSI vs NUTRA HOLDINGS, INC.**

August 7, 2026
9:59 AM

Judge: Honorable Theresa M. Traber
Judicial Assistant: A. He
Courtroom Assistant: None

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Court Order Re: Pro Hac Vice Application of Anthony G. Hopp, Esq.

The Application of Anthony G. Hopp, Esq. to Appear as Counsel Pro Hac Vice for Defendant Jacked Factory, Inc. filed on 07/30/2026 is granted.

Pursuant to Government Code § 70617(e)(2), an attorney whose application to appear as counsel pro hac vice has been granted shall pay to the superior court, on or before the anniversary of the date the application was granted, an annual renewal fee of five hundred dollars ($500) for each year that the attorney maintains pro hac vice status in the case in which the application was granted.

Non-Appearance Case Review Re: Payment of Pro Hac Vice Renewal Fee (Hopp) is scheduled for 08/09/2027 at 04:00 PM in Department 1 at Spring Street Courthouse.

Certificate of Service is attached.


870

Electronically Received 07/30/2026 03:26 PM

FILED
Superior Court of California
County of Los Angeles
08/07/2026
David W. Slayton, Executive Officer / Clerk of Court
By: A. He Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - CIVIL COMPLEX**

| | |
|---|---|
| DANIEL ROSSI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY<br><br>Defendant. | Case No.: 23STCV15674<br>[*Assigned to the Hon. Theresa M. Traber*]<br><br>**~~[PROPOSED]~~ ORDER GRANTING VERIFIED APPLICATION OF ANTHONY G. HOPP TO APPEAR AS COUNSEL PRO HAC VICE FOR DEFENDANT JACKED FACTORY**<br><br>Dept. 1<br>TAC Filed: September 25, 2025 |


871

The Court, having considered the Verified Application of Anthony G. Hopp, Esq. to appear as counsel *pro hac vice* on behalf of Defendant Jacked Factory, Inc. and all relevant papers and arguments submitted in support thereof, and good cause appearing, finds that the Application of Anthony G. Hopp, Esq. complies with Rule 9.40 of the California Rules of Court and is therefore GRANTED.

Anthony G. Hopp, Attorney at Law, is hereby admitted as counsel *pro hac vice* on behalf of Defendant Jacked Factory, Inc. in the above-captioned matter.

SO ORDERED on this 7th day of August, ~~2024~~ 2026 in Department One of the Los Angeles Superior Court.

Honorable Theresa M. Traber, Superior Court Judge


872

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 633 West Fifth Street, Suite 1900, Los Angeles, California 90071.

On July 30, 2026, I served true copies of the following document(s) described as **[PROPOSED] ORDER GRANTING VERIFIED APPLICATION OF ANTHONY G. HOPP TO APPEAR AS COUNSEL PRO HAC VICE FOR DEFENDANT JACKED FACTORY** on the interested parties in this action as follows:

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address gcalderon@steptoe.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SERVICE LIST ON THE FOLLOWING PAGE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 30, 2026, at Los Angeles, California.

/s/ Grace Calderon
Grace Calderon


873

**SERVICE LIST**

Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
*ak@kazlg.com*
*david@kazlg.com*
*mona@kazlg.com*
*gustavo@kazlg.com*

*Attorneys for Plaintiff Daniel Rossi*


874

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
David J. McGlothlin, Esq. (SBN: 253265)
david@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
Gustavo Ponce, Esq. (SBN: 343430)
gustavo@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Daniel Rossi

KAZEROUNI LAW GROUP, APC

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CIVIL COMPLEX**

DANIEL ROSSI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

NUTRA HOLDINGS, INC. a/b/a JACKED FACTORY and JACKED FACTORY HOLDINGS INC.,

Defendants.

Case No.: 23STCV15674

**FOURTH AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

1) **CONSUMERS LEGAL REMEDIES ACT, CAL. CIVIL CODE §§ 1750, ET SEQ.;**
2) **CALIFORNIA'S FALSE ADVERTISING LAW, BUS. & PROF. CODE §§ 17500 ET SEQ.;**
3) **CALIFORNIA'S UNFAIR COMPETITION LAW, BUS. & PROF. CODE §§ 17200 ET SEQ.;**
4) **NEGLIGENT MISREPRESENTATION; AND**
5) **INTENTIONAL MISREPRESENTATION**

**JURY TRIAL DEMANDED**


LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

828

KAZEROUNI LAW GROUP, APC

## INTRODUCTION

1. Plaintiff DANIEL ROSSI ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of Defendants NUTRA HOLDINGS, INC. D/B/A JACKED FACTORY and JACKED FACTORY HOLDINGS INC. (jointly as the "Defendants") in unlawfully representing and advertising Defendants' dietary supplement products with the false designation and representation that the products were made and/or manufactured in the USA. The unlawfully represented products were sold online on Defendants' website and other third-party vendors, such as Amazon.com ("Amazon"), throughout the United States, and advertised on Defendants' website.[1] Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

2. Specifically, Plaintiff purchased Defendants' Nitrosurge Pre Workout[2] Supplement (hereinafter the "Product"), which, as advertised on Defendants' website and other third-party vendors, was represented by Defendants to Plaintiff and other similarly situated consumers as a product made and/or manufactured in the USA. However, Defendants' Product contains or is made with ingredients that are not "Manufactured in the USA," as discussed further herein.

3. The "Manufactured in the USA" claim (or some derivative thereof) was prominently printed on Defendants' website and advertisements, as well as the websites of third-party vendors, including Amazon, where the Product was purchased by Plaintiff. Contrary to Defendants' representation and in violation of federal rules and California laws, Defendants' Class Products,[3]

[1] Plaintiff seeks class wide relief on behalf of all purchasers of any of Defendants' products that are substantially similar to the dietary supplement product purchased by Plaintiff that were advertised as being "Manufactured in the USA" in violation of California law(s).

[2] As titled on Amazon.com when Plaintiff purchased the Product; "NITROSURGE Pre Workout Supplement – Endless Energy, Instant Strength Gains, Clear Focus, Intense Pumps – Nitric Oxide Booster & Powerful Preworkout Energy Powder Servings, Arctic White."

[3] A list of the Class Products is attached hereto as Exhibit A.


829

including the Product purchased by Plaintiff, are actually made with or contain ingredients that are not "Manufactured in the USA," as discussed in further detail herein.

4. Defendants' nationwide sale and advertising of deceptively advertised Class Products constitute violations of: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (2) California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17533.7; (3) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 et seq.; (4) negligent misrepresentation and (5) intentional misrepresentation. This conduct caused Plaintiff, and others similarly situated, damages, and requires restitution and injunctive relief to remedy and prevent further harm.

5. Unless otherwise indicated, the use of Defendants' name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers of Defendants.

**JURISDICTION AND VENUE**

6. Jurisdiction is proper pursuant to this Court's general jurisdiction.

7. The Court has jurisdiction over Plaintiff's claims for damages, restitution, injunctive relief, and declaratory relief arising from Defendants' unlawful business practices under California's CLRA, FAL, and UCL; as well as negligent and intentional misrepresentation.

8. This Court has personal jurisdiction over Defendants because Defendants conducts substantial business in the State of California and County of Los Angeles, has sufficient minimum contacts with this State and County, and otherwise purposefully avails itself of the markets in this State and County through the promotion, sale, and marketing of its services in this State, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this Court pursuant to California Code of Civil Procedure § 395(a) because Plaintiff resides within this county and many of the acts and transactions giving rise to this action occurred in this county because Defendants:

a. is authorized to conduct business in this county and has intentionally availed itself of the laws and markets within this county;

b. does substantial business within this county; and is subject to personal jurisdiction in this county;

c. and is subject to personal jurisdiction in this county.

**PARTIES**

10. Plaintiff is an individual residing in the City of Northridge, County of Los Angeles, State of California.

11. Defendants NUTRA HOLDINGS, INC. d/b/a JACKED FACTORY is a corporation with its principal place of business in St. John's, Newfoundland and Labrador, Canada, which is regularly doing business in the State of California and within this county.

12. Defendants JACKED FACTORY HOLDINGS INC. is a corporation with its principal place of business in St. John's, Newfoundland and Labrador, Canada, which is regularly doing business in the State of California and within this county.

13. Defendants are a manufacturer and seller of dietary supplements that conducts business through its website and the websites of third-party vendors. One of the products sold by Defendants is Nitrosurge Pre Workout, the Product, which was purchased by Plaintiff.

**NATURE OF THE CASE**

14. At all times relevant, Defendants made affirmative misrepresentations regarding the Class Products, including the Product purchased by Plaintiff, it manufactures, markets and sells. Specifically, Defendants marketed, advertised, and sold its Class Products as "Manufactured in the USA" without clear and adequate qualification that the Class Products contained foreign ingredients and/or components as required by federal rules and state laws.

15. However, although Defendants represents that its Class Products are "Manufactured in the USA" without clear and adequate qualification, Defendants' Class Products contain or are made with ingredients and/or components that are not "Manufactured in the USA."

16. Federal rules regarding the use of "Made in the United States" claims with respect to products and services are well established and well defined.

17. Specifically, the Made in USA Labeling rule, 16 C.F.R. § 323, (the "MUSA Rule")


831
KAZEROUNI LAW GROUP, APC

clearly defines the meaning of "Made in the United States", including synonymous phrases[4], as well as when it can be used without clear and adequate qualification notifying consumers that the good or service in question contains or is made with ingredients or components that are not made or sourced in the United States.[5]

18. Despite the clearly established and well-defined federal rules regarding "Made in the United States" claims, Defendants falsely, unfairly and deceptively advertised, marketed and sold its Class Products, including the Product purchased by Plaintiff, as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and/or components as further herein.

19. Defendants' "Manufactured in the United States" representations were deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

20. Each consumer, including Plaintiff, was exposed to virtually the same material misrepresentations, as similar advertisements and misrepresentations were prominently placed on all of Defendants' website and the websites of third-party vendors.

21. As of July 2023, when the first complaint in this matter was filed, Defendants' website contained a clear and conspicuous "Manufactured in the USA" claim under iconography of a waiving United States flag encircled by the words "Manufactured in the USA" making it clear that Defendants meant this claim to be applied to <u>*all*</u> of its products, including the Class Products. This claim,

---

[4] *See* 16 C.F.R. § 323.1(a) ("The term Made in the United States means any unqualified representation, express or implied, that a product or service, or a specified component thereof, is of U.S. origin, including, but not limited to, a representation that such product or service is "made," "***manufactured***," "built," "produced," "created," or "crafted" in the United States or in America, or any other unqualified U.S.-origin claim.") (emphasis added)

[5] *See* 16 C.F.R. § 323.2 Prohibited Acts ("In connection with promoting or offering for sale any good or service, in or affecting commerce as "commerce" is defined in section 4 of the Federal Trade Commission Act, 15 U.S.C. 44, ***it is an unfair or deceptive act or practice*** within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), ***to label any product as Made in the United States unless*** the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and ***all or virtually all ingredients or components of the product are made and sourced in the United States***. (emphasis added)


832

KAZEROUNI LAW GROUP, APC

including iconography, appeared on each and every product page of Defendants' website as well as Defendants' Amazon product pages.

22. Even after the filing of this matter, according to publicly archived webpages[6], as of January 2024 or even later, the main home page of Defendants' website still contained a clear and conspicuous "Manufactured in the USA" claim under same iconography of a waiving United States flag encircled by the words "Manufactured in the USA" thus making it more evident that Defendants meant this claim to be applied to ***all*** its products—even after the Complaint was filed in this matter.




23. According to publicly archived webpages, as of November 2023 or even later, the "Frequently Asked Questions" page of Defendants' website contained the following answer in response to the question: "Where are your products manufactured?" "Answer: **Our products are manufactured in the USA** in a cGMP, FDA Registered manufacturing facility adhering to the strictest quality control." (emphasis added)[7]

24. As a consequence of Defendants' unfair and deceptive practices, Plaintiff and other similarly situated consumers purchased Defendants' Class Products under the false impression that the products were actually manufactured and/or made in the USA with U.S. made ingredients and components.

---

[6] *See* https://web.archive.org/web/20240121011132/https://www.jackedfactory.com/ (archived January 21, 2024)

[7] *See* https://web.archive.org/web/20231101090125/https://www.jackedfactory.com/pages/common-faqs (archived November 1, 2023)

KAZEROUNI LAW GROUP, APC

25. As a result of Defendants' misrepresentations, Plaintiff and other consumers similarly situated overpaid for Defendants' Class Products, and/or purchased the Class Products under the false belief that the product they purchased was made and/or manufactured in the USA with U.S. made ingredients and components. Had Plaintiff and other consumers similarly situated been made aware that Defendants' Class Products were not actually made with all or virtually all ingredients and components being made in the United States, they would not have purchased the products.

26. As a result of Defendants' false and misleading statements and failure to clearly and adequately disclose the presence of foreign ingredients and components, as well as Defendants' other conduct described herein, Plaintiff and other similarly situated consumers purchased thousands, if not millions, of Defendants' Class Products and have suffered injury in fact, including the loss of money and/or property.

27. Defendants' conduct as alleged herein violates federal rules as well as several California laws, as more fully set forth herein.

28. This action seeks, among other things, equitable and injunctive relief; restitution of all amounts illegally retained by Defendants; and disgorgement of all ill-gotten profits from Defendants' wrongdoing alleged herein.

**THE FOREIGN INGREDIENTS IN DEFENDANTS' CLASS PRODUCTS**

29. Pursuant to section 1782(a) of the CLRA, on March 8, 2023, Plaintiff provided Defendants notice in writing sent by certified mail of the particular violations of section 1770, and demanded that Defendants rectify the problems (the "CLRA Letter").[8]

30. Plaintiff's CLRA Letter included a list of products with foreign ingredients, the Class Products, which has since been made reduced. See Exhibit A.

31. Plaintiff's CLRA Letter put Defendants on notice of the following foreign ingredients in its products, including the offending Product (the "CLRA Ingredients"):

a. *L-Citruline,*

[8] A true and correct copy of Plaintiff's CLRA Letter dated March 8, 2023, is attached hereto as Exhibit B.




834

KAZEROUNI LAW GROUP, APC

b. *Beta Alanine,*

c. *Betaine Anhydrous,*

d. *L-Theanine*

32. The Product purchased by Plaintiff contains the following foreign ingredients:

a. *L-Citrulline*

b. *Beta Alanine*

c. *Betaine Anhydrous*

d. *L-Theanine*

e. *Caffiene Anhydrous*

f. *Theobromine*

g. *AstraGin,* which is the combination of *Astragalus membranaceus* and *Panax notoginseng* (both which are foreign ingredients)

33. Thus, the CLRA Letter provided Defendants with notice of four (4) foreign ingredients in the Product which Plaintiff's CLRA claims are based on: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*.

34. Plaintiff's UCL, FAL, negligent misrepresentation, and intentional misrepresentation, claims are based on the seven (7) foreign ingredients contained in the Product; (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

35. The Class Products are substantially similar to the Product as they all contain the foreign ingredients included in the Product, and Defendants similarly made the "Manufactured in the USA" representation for each of the Class Products.

36. The Product purchased by Plaintiff contains the following foreign ingredients: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin (*Astragalus membranaceus* and *Panax notoginseng*).

a. Like the Product purchased by Plaintiff, the Class Product Altius Pre contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, and (d) *Caffiene*


835

KAZEROUNI LAW GROUP, APC

*Anhydrous*.

b. Like the Product purchased by Plaintiff, the Class Product Build PM contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Theanine*.

c. Like the Product purchased by Plaintiff, the Class Product Build XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

d. Like the Product purchased by Plaintiff, the Class Product Burn XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous*.

e. Like the Product purchased by Plaintiff, the Class Product Burn XT Black contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous* and (b) *Theobromine*.

f. Like the Product purchased by Plaintiff, the Class Product Burn XT Powder contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *Caffiene Anhydrous*.

g. Like the Product purchased by Plaintiff, the Class Product EAA Surge contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Citruline*.

h. Like the Product purchased by Plaintiff, the Class Product GDA XT contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

i. Like the Product purchased by Plaintiff, the Class Product Intra Surge Pre contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, and (b) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

j. Like the Product purchased by Plaintiff, the Class Product Lean PM contains the following foreign ingredient which is also included in the Product purchased by



KAZEROUNI LAW GROUP, APC

Plaintiff: (a) *L-Theanine*.

k. Like the Product purchased by Plaintiff, the Class Product N.O. XT contains the following foreign ingredient which is also included in the Product purchased by Plaintiff: (a) *L-Citruline*.

l. Like the Product purchased by Plaintiff, the Class Product Nitro Surge Build contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffiene Anhydrous*, and (f) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

m. Like the Product purchased by Plaintiff, the Class Product Nitro Surge Max contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine,* (e) *Theobromine*, and (f) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

n. Like the Product purchased by Plaintiff, the Class Product NitroSurge Shred contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *L-Theanine*, (d) *Caffiene Anhydrous*, and (e) *Theobromine.*

o. Like the Product purchased by Plaintiff, the Class Product Pump Surge contains the following foreign ingredients which are also included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Betaine Anhydrous*, and (c) *AstraGin* (*Astragalus membranaceus* and *Panax notoginseng*).

p. Like the Product purchased by Plaintiff, the Class Product Test PM contains: (a) *L-Theanine*, which is also included in the Product purchased by Plaintiff

37. Plaintiff alleges claims and seeks damages and relief available under the CLRA as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, as they contain the CLRA Ingredients referenced in the CLRA Letter. (12 Total)

KAZEROUNI LAW GROUP, APC


837

38. Plaintiff alleges claims and seeks damages and relief under the UCL, FAL, negligent misrepresentation, and intentional misrepresentation as to all of the Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT, as they contain foreign ingredients similar to the Product. (17 Total)

## FACTUAL ALLEGATIONS

39. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

40. Defendants marketed and sold various dietary supplements that were represented and advertised as "Manufactured in the USA" without clear and adequate qualification informing consumers of the presence of foreign ingredients and components. Defendants made these representations on its website which resulted in these representations being made on the websites of its third-party vendors, including Walmart.com.[9] These representations were made until, at least, sometime in January 2024 on Defendants' website and even later on third party vendors' websites.

41. Contrary to Defendants' representation, Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

42. Dietary supplements, such those sold by Defendants, are often made with numerous ingredients and components that are foreign sourced due to significant differences in costs of raw material/component production in the United States versus foreign production such as in China.10 In

---

[9] *See* https://www.walmart.com/ip/Nitrosurge-Pre-Workout-Powder-Endless-Energy-Instant-Strength-Gains-Clear-Focus-Intense-Pumps-30-Servings-Blue-Raspberry/383327735 (Under Product Details "Each bottle of Nitrosurge pre-workout is manufactured in a state-of-the-art cGMP manufacturing facility in the USA adhering to the most stringent manufacturing standards."; "Manufactured in the USA in a cGMP-Certified Facility.") (last accessed August 1, 2024)

[10] *See* U.S.-China Economic and Security Review Commission. *Potential Health & Safety Impacts from Pharmaceuticals and Supplements Containing Chinese-Sourced Raw Ingredients*. (2010). https://www.uscc.gov/sites/default/files/Research/NSD_BIO_Pharma_Report--Revised_FINAL_for_PDF--14_%20April_2010.pdf ("This report attempts to shed light and insight on particular issues addressing potential implications of a critical component of a complex supply chain, which contributes to U.S. national health security as China continues to strengthen its position as the world's largest supply source of raw materials for pharmaceuticals and supplements. As first reported in 1998 by the U.S. Government Accounting Office, the U.S. imports an estimated


838

KAZEROUNI LAW GROUP, APC

many cases, certain botanical ingredients cannot grow in the United States due to climate reasons or are not grown commercially due to significant differences in costs of domestic versus foreign agricultural production.

43. Pursuant to Section 1782(d) of the CLRA, Plaintiff provided Defendants with written notice by certified mail on March 8, 2023, outlining the specific violations of Section 1770 and demanding that Defendants rectify the issues (the "CLRA Letter").[11]

44. Specifically, the CLRA Letter provided non-exhaustive examples of Defendants' violations of the rules and laws governing unqualified "Manufactured in the USA" claims, using three products as illustrative examples: the Product, Burn-XT, and N.O. XT (the "CLRA Products").

45. The CLRA Letter informed Defendants that the following ingredients, along with potentially other ingredients in the CLRA Products, were not sourced from the United States, contrary to Defendants' unqualified "Manufactured in the USA" representations: L-citrulline, betaine anhydrous, beta alanine, L-theanine, acetyl-L-carnitine HCl, green tea leaf extract, black pepper extract, arginine, and glutathione (the "CLRA Ingredients").[12]

46. Furthermore, the CLRA Letter specifically stated that "The comprehensive list of all of Jacked Factory's misrepresentations of its products is simply too long to demonstrate here."

47. Upon receiving such a letter, a reasonable company would have, at the very least, investigated whether the CLRA Ingredients were, in fact, grown, sourced, or produced outside the United States. In reality, a reasonable company would have conducted an investigation into all of its products to determine whether they contained foreign ingredients or components.

48. Some of the CLRA Ingredients appear in the Product, namely citrulline, beta alanine, betaine anhydrous, and theanine. The Product also contains other foreign ingredients, specifically

---

80% of the raw ingredients contained in both products manufactured, sold and consumed in this country.")

[11] A true and correct copy of Plaintiff's CLRA Letter dated March 8, 2023, is attached hereto as Exhibit B.

[12] For convenience, certain ingredients may be referred to by their common name or abbreviation when referenced individually. For example: citrulline, theanine, ALCAR (for acetyl-L-carnitine HCl), green tea and black pepper.


839
KAZEROUNI LAW GROUP, APC

caffeine, theobromine, and AstraGin®.

49. Had Defendants investigated and found that the CLRA Ingredients, and other ingredients in the Product and the Class Products, were, in fact, grown, sourced, or produced within the United States, Defendants would have responded to Plaintiff by correcting Plaintiff's allegations regarding the Product, the CLRA Products and the Class Products and providing evidence of the ingredients' U.S. sourcing.

50. Instead, the Defendants continued to market and sell the Product and Class Products as "Manufactured in the USA"—without qualification—on its website for more than nine months after receiving the CLRA Letter, despite being aware of the foreign ingredients (and potentially components) used in its products. The Class Products continued to be sold with the same unqualified U.S. origin claim on third-party vendor websites for well over nine months after the Defendants received the CLRA Letter.

51. Furthermore, Defendants has yet to provide any evidence that Plaintiff's assertions regarding the origin of the CLRA Ingredients, or other ingredients and components, are incorrect.

52. The Product purchased by Plaintiff contains or is made with ingredients and/or components that are not "Manufactured in the USA." For example, the Product contains AstraGin®, a branded ingredient which is created from the combination of *Astragalus membranaceus* and *Panax notoginseng.*

53. AstraGin® is produced by NuLiv Science U.S.A., Inc. ("NuLiv"), an ingredient supplier. To sell AstraGin® in the European Union, NuLiv had to apply for Novel Food status to the European Food Safety Authority ("EFSA"). The application process requires comprehensive documentation, including sourcing and processing details.

54. The published scientific opinion of the EFSA on NuLiv's application for AstraGin® (*see* Exhibit E)[13] states that AstraGin®'s *Astragalus membranaceus* roots are sourced from Gansu and

---

[13] *See*, https://efsa.onlinelibrary.wiley.com/doi/epdf/10.2903/j.efsa.2020.6099 ("The *A. membranaceus* roots are purchased from growers in Gansu and Inner Mongolia provinces in the north-western region of China while the *P. notoginseng* roots are acquired from growers in Yunnan and Sichuan provinces in the southern region of China.").




840

KAZEROUNI LAW GROUP, APC

Inner Mongolia provinces in China, while the *Panax notoginseng* roots are sourced from Yunnan and Sichuan provinces in China (*see* Exhibit E, Section 3.3 Production Process).

55. *Astragalus membranaceus* and *Panax notoginseng,* are native to China and not commercially grown in the United States.[14] *See* Exhibit E, Section 3.3 Production Process.

56. Irrespective of exactly where *Astragalus membranaceus* and *Panax notoginseng* are sourced, one thing is certain – they are not grown, made, or sourced from within the United States.

57. In addition to foreign *Astragalus membranaceus* and *Panax notoginseng*, the Product contains theobromine, a component of cacao which is not grown commercially in the United States.[15]

58. The Product also contains caffeine, which is generally derived from decaffeination of coffee or tea[16], neither of which is grown commercially or cost effectively in the United States. When not from natural sources, synthetic caffeine is generally produced overseas.[17]

59. One of the CLRA Products, Burn-XT, specifically contains caffeine from coffee bean extract, which cannot be from the United States.[18] Caffeine from coffee appears in other Class Products as well.

60. Thus, upon information and belief, the forms of caffeine contained in the Product and

---

[14] *See* Ji B, Xuan L, Zhang Y, Zhang G, Meng J, Mu W, Liu J, Paek K-Y, Park S-Y, Wang J, et al. Advances in Biotechnological Production and Metabolic Regulation of *Astragalus membranaceus*. Plants. 2023; 12(9):1858. ("As one of the most popular herbal medicines in the world, *A. membranaceus* is mainly derived from wild and cultivated resources in China. Wild plants of *A. membranaceus* are mainly produced in Inner Mongolia, Gansu, Shanxi, and Ningxia. Wild resources have been over-exploited, seriously damaging the ecological environment. Cultivated plants are mainly derived from Shanxi Hunyuan, Gansu Longxi, Inner Mongolia Niuyingzi, and Shaanxi Zizhou."); Zhao H, Han Z, Li G, Zhang S, Luo Y. Therapeutic Potential and Cellular Mechanisms of *Panax Notoginseng* on Prevention of Aging and Cell Senescence-Associated Diseases. Aging Dis. 2017 Dec 1;8(6):721-739. ("*Panax notoginseng*, distributed in the Southwest of China, Japan, Burma, and Nepal, is both cultivated and gathered from wild forests. *Panax notoginseng* is sensitive to sunlight. It grows primarily in the Wenshan mountain area of Yunnan province and is cultivated commercially in the Southwest regions of China.")

[15] *See* https://www.icco.org/growing-cocoa/

[16] *See* https://web.archive.org/web/20240807011447/https://en.wikipedia.org/wiki/Caffeine ("Commercial supplies of caffeine are not usually manufactured synthetically because the chemical is readily available as a byproduct of decaffeination.").

[17] *See* https://whyy.org/segments/where-you-will-get-your-caffeine-buzz-in-the-future/ ("…synthetic caffeine production (and its pollution) mostly moved overseas, especially to China.")

[18] *See* https://en.wikipedia.org/wiki/Coffee (See "Map showing areas of coffee cultivation" under "Cultivation and Production" – the United States is not a commercial producer of coffee.)


841

KAZEROUNI LAW GROUP, APC

the Class Products are not made or sourced from within the United States.

61. *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are material to the Product's formulation and marketing claims.

62. Because *Astragalus membranaceus*, *Panax notoginseng*, theobromine and caffeine are indisputably foreign, "all or virtually all" ingredients in the Product cannot be made in the United States as required by the MUSA Rule for Defendants to lawfully make an unqualified "Manufactured in the USA" claim.

63. Upon information and belief, it is likely that the remaining ingredients and even the packaging components used to produce the Product are foreign.

64. Similarly, the Class Products contain the same foreign ingredients as those found in the Product.

65. For example, caffeine is included in numerous of Defendants' products other than the Product, including, but not limited to, Altius Pre, Caffeine, Nitrosurge Shred (also contains theobromine), Nitrosurge Build, Burn-XT, Build-XT Black (also contains theobromine), Burn-XT Powder, Burn XT Stick Pack, Nitrosurge Natural and Nitrosurge Shred Max.

66. *Astragalus membranaceus* and *Panax notoginseng* (as AstraGin®) are included in numerous Class Products other than the Product, including but not limited to, Nitrosurge Build, Nitrosurge Max Pump Surge, Build-XT, GDA-XT, Intrasurge, Green Tea Extract, Nitrosurge Build, and Nitrosurge Shred Max.

67. Defendants use numerous other indisputably foreign ingredients in numerous of its numerous products, including but not limited to KSM-66 ashwagandha[19] and green tea extract[20].

68. Some of the ingredients, components, and even packaging used by Defendants can be sourced either domestically or internationally — and since this information is exclusively known to

---

[19] *See* https://ksm66ashwagandhaa.com/traceability/quality-control/ ("The state of Rajasthan in India is one of the most suited terrains known to grow the best quality ashwagandha in the world and that is where, our ashwagandha farms are located.")

[20] *See* https://en.wikipedia.org/wiki/Tea ("Tea is mainly grown in Asia and Africa, with smaller areas in South America and around the Black and Caspian Seas. The four biggest tea-producing countries are China, India, Kenya and Sri Lanka, together representing 81% of world tea production.")


842

KAZEROUNI LAW GROUP, APC

Defendants at this time — Plaintiff cannot fully allege the extent of Defendants' unqualified "Manufactured in the USA" violations without further discovery. Nevertheless, Defendants' blatant and willful disregard for the laws discussed herein is well established by the aforementioned, non-exhaustive examples.

69. Despite the presence of numerous indisputable foreign ingredients in the Class Products, Defendants made unqualified "Manufactured in the USA" representations on the main page of its website, on each product page for the Class Products, on each Amazon product page for the Class Products, and even in the "Frequently Asked Questions" section of its website.

70. Adequately and properly qualified "Manufactured in the USA" representations are common and ubiquitous in the dietary supplement industry.

71. Numerous competitors of Defendants including, but not limited to, Optimum Nutrition, Zhou Nutrition, MuscleTech, and BSN, clearly, adequately, and properly qualify "Manufactured in the USA" and "Made in the USA" representations on their products.[21]

72. Some dietary supplement products make no "Manufactured in the USA" or "Made in the USA" representations at all.

73. When consumers like Plaintiff see unqualified "Manufactured in the USA" claims, such as those made by Defendants regarding the Class Products, in an industry where qualified claims are so common, they reasonably believe that the products in question are made entirely in the United States, including ingredients and components.

74. Defendants is not a U.S. based company, but rather a company founded in, operated in and from Newfoundland and Labrador, Canada.

75. Given that Defendants is a Canadian company, the purpose of its unqualified "Manufactured in the USA" was clearly not from Defendants' sense of American patriotism or national pride. Instead, Defendants' motive behind representing the Class Products as "Manufactured in the USA" was solely for the intentional purpose of marketing to American consumers seeking and will pay more for products that are made, including ingredients and components, in the United

[21] *See* Exhibit D.

KAZEROUNI LAW GROUP, APC


843

KAZEROUNI LAW GROUP, APC

States.[22]

76. Unlike general wellness dietary supplement companies that offer a wide variety of products for various applications, such as cognitive, cardiovascular, immune, digestive, and anti-aging health, as well as basic vitamins (e.g., Vitamins C, B, D, E, etc.) and minerals, Defendants' marketing focus and product line are much more specific.

77. Specifically, Defendants' exclusive marketing focus, as reflected in its product line, is on sports and athletic performance dietary supplements.

78. Defendants knew that its unqualified "Manufactured in the USA" representations would resonate with sports- and athletic-minded consumers in the United States, particularly given the strong sense of patriotism and national pride prevalent in this community.

79. Defendants' exclusive focus results in Defendants using a much more limited range of ingredients, both in terms of ingredient categories and specific ingredients, compared to a general wellness dietary supplement company.

80. For example, nearly all of the ingredients in Defendants' products, including the Class Products, fall into one of three categories: Amino Acid/Amino Acid Derivative, Stimulant, or Herbal Performance.

81. Examples of ingredients in these categories include, but are not limited to: (1) Amino Acid/Amino Acid Derivatives: citrulline, beta alanine, betaine anhydrous, theanine, ALCAR, arginine, glutathione, creatine, glutamine, and valine; (2) Stimulants: caffeine and theobromine; and (3) Herbal Performance: green tea, black pepper, AstraGin®, and ashwagandha.

82. As a result of the narrow range of ingredients and ingredient categories, there is significant overlap and shared use of ingredients between the Class Products, the CLRA Products, and the Product.

83. This relationship is partially illustrated[23] in Exhibit F, which depicts the connection

---

[22] *See* https://reshoringinstitute.org/wp-content/uploads/2020/09/made-in-usa-survey.pdf ("Slightly more than 83% [of consumers polled] said they would pay up to 20% more for products made domestically.")

[23] Not all ingredients in the Class Products are represented on the X-axis of the chart. The Class Products contain numerous other foreign ingredients.


844

between the CLRA Ingredients, other foreign ingredients in the Product, Ashwagandha, and those in the Class Products.

84. Given Defendants' exclusive focus on sports/athletic performance products (and their consumers), its narrow range of ingredients and ingredient categories, as well as the commonality between the ingredients used in the Product, the CLRA Ingredients, and the Class Products, Plaintiff asserts that the Product and the Class Products are substantially similar.[24]

85. Certain of Defendants' products, including but not limited to its protein and cereal bar products, have been excluded from the definition of Class Products. Plaintiff reserves the right to further allege substantial similarity between the excluded products and the Product should, for example, discovery confirm that the same or similar foreign packaging or other components were used across Defendants' product line.

86. Defendants represented, marketed and sold to the general public via its website, the website of its third-party vendors, and other forms of advertising and marketing that the Class Products are "Manufactured in the USA," without clear, adequate, and proper qualification. As such, Defendants inaccurately represented that its Class Products are "Manufactured in the USA," which conveys to a reasonable consumer like Plaintiff that the Class Products, including the Product, are made entirely in the United States, made with ingredients and components from the United States, made pursuant to United States labor standards, and are therefore superior quality (i.e., contain better grown ingredients that non-US made products or raw materials). Defendants possess superior knowledge of the true facts that were not disclosed regarding the Class Products, thereby tolling the running of any applicable statute of limitations.

87. The types of misrepresentations and/or omissions made by Defendants, as described herein, were considered by Plaintiff, a reasonable consumer, when deciding to purchase the Product.

88. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were,

---

[24] *See Miller v. Ghirardelli Chocolate Co.*, 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012) (citing cases); ("hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar."); *see also, e.g., Colucci v. ZonePerfect Nutrition Co.*, No. 12-2907, 2012 WL 6737800, at *4 (N.D. Cal. Dec. 28, 2012); *Astiana v. Dreyer's Grand Ice Cream, Inc.*, No. 11-2910, 2012 WL 2990766, at *11-13 (N.D. Cal. July 20, 2012).


845
KAZEROUNI LAW GROUP, APC

deceived and misled by Defendants' representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the products were "Manufactured in the USA," when Defendants' Class Products are in fact wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

89. Reasonable consumers, including Plaintiff, attached importance to the "Manufactured in the USA" representations made by Defendants on its Product and the Class Products.

90. Consumers who purchased the Class Products on Defendants' website or through third-party vendor websites were not the only consumers who were exposed to and relied upon the unqualified and false "Manufactured in the USA" representations made by Defendants. Defendants' website contains a "Find A Store" link25 making it highly likely that hundreds of thousands of consumers saw the unqualified and false "Manufactured in the USA" representations and proceeded to purchase Class Products in brick-and-mortar stores like The Vitamin Shoppe.

91. Most consumers possess limited knowledge of the likelihood that products are made with or contain ingredients and components that are not "Manufactured in the USA" when they are advertised and represented to be "Manufactured in the USA." This is a material factor in many individuals' purchasing decisions which they rely upon as they believe they are purchasing a product that is "Manufactured in the USA" with ingredients and components from the United States.

92. Consumers generally believe that products that are "Manufactured in the USA" are made entirely in the United States, made of ingredients and components from the United States, made pursuant to United States labor standards, and are therefore of superior quality (i.e., contain better grown ingredients that non-US made products or raw materials).

93. On information and belief, Defendants' misrepresented Class Products were purchased by consumers over Defendants' competitors' properly and legally marketed products, during the entirety of the relevant four-year statutory time period, based on the unqualified, false and deceptive "Manufactured in the USA" representations (or some derivative thereof) made with respect to Defendants' products. Federal rules and California laws are designed to protect consumers from

[25] *See* https://www.jackedfactory.com/pages/storelocator






846

KAZEROUNI LAW GROUP, APC

such false representations and predatory conduct.

94. Defendants' "Manufactured in the USA" representation was misleading to a reasonable consumer.

95. On or about January 24, 2023, Plaintiff searched online for a pre-workout supplement when he discovered the Product and its unqualified and misrepresented "Manufactured in the USA" claim. Plaintiff subsequently purchased the Product on Amazon.

96. At the time of Plaintiff's purchase, the description of the Product described the Product as "Manufactured in the USA," without any qualification, when the Product was actually made with or contained ingredients and/or components that were not "Manufactured in the USA." Accordingly, Defendants was not entitled to lawfully make representations that the Product was "Manufactured in the USA" without qualification as per the MUSA Rule.

97. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendants as follows:

a. The "who" is Defendants;

b. The "what" is representation that Defendants' Class Products are "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

c. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

d. The "where" is in Defendants' advertisements and marketing of the Class Products;

e. The "to whom" is Plaintiff and the putative Class who bought the Class Products;

f. The "by what means" is by Defendants representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA. Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

KAZEROUNI LAW GROUP, APC


847

g. The "how" is the allegation that Defendants did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

98. It is widely and generally known that consumers prefer products that are "Manufactured in the USA" due to quality, support for local businesses, national economic, environmental and other reasons. The preference is increased when the products are health related and ingestible due to the potential for inferior ingredients and components being manufactured overseas. In making the decision to purchase Defendants' Product, Plaintiff relied upon the advertising, marketing and/or other promotional materials prepared, approved and distributed and/or published by Defendants and its agents and disseminated through its Class Products' advertising containing the misrepresentations alleged herein.

99. Defendants' false representation is that Defendants did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA, while Defendants knew that fact.

100. Defendants intended to deceive Plaintiff and the Class members into buying the Class Products knowing that consumers would prefer, purchase, and likely pay more for products "Manufactured in the USA" versus other products not "Manufactured in the USA."

101. Plaintiff justifiably relied on Defendants' "Manufactured in the USA" representation. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

102. Plaintiff paid and purchased the Product which was of less or little value than what he paid for.

103. Defendants' "Manufactured in the USA" representations were deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

104. Had Plaintiff been made aware that the Product, including its ingredients and

KAZEROUNI LAW GROUP, APC


848

components, was not actually "Manufactured in the USA," he would not have purchased the Product, or would not have purchased the Product for the price he paid. In other words, Plaintiff would not have purchased Defendants' Product, or paid the amount he did for the purchase of the Product, but for the unqualified "Manufactured in the USA" representations on Defendants' website and advertising on the websites of its third-party vendors which Plaintiff reasonably relied on.

105. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendants as a result of Defendants' unqualified and false "Manufactured in the USA" designation set forth on Defendants' website and advertising on the websites of its third-party vendors.

106. In each case when Plaintiff and putative Class members purchased a Class Product, they relied upon Defendants' unqualified "Manufactured in the USA" representation in their purchasing decision, which is typical of most U.S. consumers. Consequently, they were deceived as a result of Defendants' actions. Plaintiff believed at the time he purchased the Product that he was purchasing a superior quality product that was manufactured in the USA with ingredients and components from the United States.

107. Defendants' Class Products are made with or contain ingredients and components that are not manufactured in the USA, similar to the Product purchased by Plaintiff. Plaintiff and putative Class members purchased Defendants' misrepresented Class Products over Defendants' competitors' properly and legally marketed products that clearly and adequately qualify "Manufactured in the USA" claims or do not make the "Manufactured in the USA" claims at all. The precise amount of Plaintiff and the Class members' damages will be proven at the time of trial, in large part, by expert testimony.

108. Plaintiff and Class members were undoubtedly injured as a result of Defendants' unqualified and false "Manufactured in the USA" representations that are at issue in this matter.

**CLASS ACTION ALLEGATIONS**

109. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

110. Plaintiff brings this action individually and on behalf of all others similarly situated against Defendants, pursuant to California Code of Civil Procedure Section 378.


849

111. Plaintiff represents, and is a member of the class, ("the Class") consisting of:

> All persons similarly situated within the state of California, who purchased one or more of Defendants' Class Products, which were represented and/or advertised as "Manufactured in the USA" (or similar words), that were made with or contained ingredients or components that were not manufactured in the USA, within the four years prior to the filing of the Complaint."

112. Excluded from the Class are Defendants and any of its officers, directors, and employees.

113. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

114. The "Class Period" means four years prior to the filing of the Complaint in this action.

115. This action has been brought and may properly be maintained as a class action under the provisions of § 382 of the California Code of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

116. **Ascertainability**. Plaintiff does not know the number of members in the Class, but Plaintiff currently believes that there are hundreds of thousands, if not more, members of the Class within the State of California. Because of the nature of Defendants' products and applicable regulations, Defendants must keep detailed and accurate records of production, manufacturing, sale and distribution. Therefore, the members of the Class are ascertainable through Defendants' records and/or Defendants' agents' records regarding retail and sales, as well as through public notice. This matter should therefore be certified as a Class action to assist in the expeditious litigation of this matter.

117. **Numerosity**. The members of the Class are so numerous and geographically disbursed that joinder of all Class members is impractical, and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court.

118. **Existence and Predominance of Common Questions of Law and Fact**. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. Common questions of fact and law exist in this matter that predominate over questions


850

KAZEROUNI LAW GROUP, APC

that may affect individual Class members, including, but not limited to, the following:

a. Whether Defendants committed the wrongful conduct alleged herein;

b. Whether Defendants' claims and representations, as alleged herein, are untrue, misleading, and/or reasonably likely to deceive the average consumer;

c. Whether Defendants' acts, transactions, or course of conduct constitute the violations of law alleged herein;

d. Whether Defendants' conduct violates 16 C.F.R. §§ 323, *et seq*.;

e. Whether Defendants' conduct violates California Civil Code §§ 1750, *et seq*.;

f. Whether Defendants' advertising is false, untrue, or misleading within the meaning of California Business & Professions Code §§ 17500, *et seq*.;

g. Whether Defendants' conduct is an unfair, fraudulent, or unlawful act or practice within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

h. Whether Defendants' advertising is unfair, deceptive, untrue or misleading within the meaning of California Business & Professions Code §§ 17200, *et seq*.;

i. Whether Defendants acted negligently or intentionally in making the misrepresentations contained regarding the Class Products thought its website and the websites of its third-party vendors;

j. Whether Defendants, through its conduct, received money that, in equity and good conscience, belongs to Plaintiff and members of the Class;

k. Whether the members of the Class sustained and/or continue to sustain damages attributable to Defendants' conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages; and

l. Whether the members of the Class are entitled to injunctive and/or any other equitable relief, including but not limited to restitution and/or disgorgement of ill-gotten gains.

119. **Typicality**. As a person who purchased one or more of Defendants' products, that were advertised as "Manufactured in the USA" but are made with or contain ingredients and/or components that are not manufactured in the USA, Plaintiff is asserting claims that are typical of the


851

KAZEROUNI LAW GROUP, APC

Class. Plaintiff's claims involve the same violations of law by Defendants as other Class Members' claims. Plaintiff and members of the Class also sustained damages arising out of Defendants' common course of conduct complained herein. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent members of the Class. Defendants have no defenses unique to the Plaintiff.

120. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of other members of the Class in that Plaintiff has no interests antagonistic to any member of the Class. Further, Plaintiff has retained counsel experienced in handling class action claims and claims involving violations of the consumer laws like violations of the California Business and Professions Code, and, specifically, false and deceptive advertising. Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and proposed Class.

121. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent and/or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants. The injury suffered by each individual member of the proposed class is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the proposed Class to individually redress effectively the wrongs to them. Even if the members of the proposed Class could afford such litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Therefore, a class action is maintainable pursuant to Cal. Code of Civil Procedure § 382.

122. Unless the Class is certified, Defendants will retain monies received as a result of


852

KAZEROUNI LAW GROUP, APC

Defendants' unlawful and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendants will also likely continue to, or allow its agents to, advertise, market, promote and package Defendants' Class Products in an unlawful and misleading manner, and members of the Class will continue to be misled, harmed, and denied their rights under California law.

123. Further, Defendants has acted or refused to act on grounds that are generally applicable to the class so that declaratory and injunctive relief is appropriate to the Class as a whole, making class certification appropriate.

**FIRST CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**CAL. CIV. CODE SECTION 1750, ET SEQ.**

124. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

125. Plaintiff asserts CLRA claims as to the Class Products with the CLRA Ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, and (d) *L-Theanine*.

126. Therefore, Plaintiff asserts CLRA claims as to the following Class Products which contain the CLRA Ingredients: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM. (12 Total)

127. California Civil Code §§ 1750 et seq., entitled the Consumers Legal Remedies Act (hereinafter "CLRA"), provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer." The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, inter alia, that its terms are to be:

> Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.

128. Defendants' Product and the Class Products, as referenced in this section, constitute "goods" as defined pursuant to Civil Code Section 1761(a).

129. Plaintiff, and the Class members, are each a "consumer" as defined pursuant to Civil Code Section 1761(d).

KAZEROUNI LAW GROUP, APC


853

130. Each of Plaintiff's and the Class members' purchases of Defendants' Class Products, as referenced in this section, constituted a "Transaction" as defined pursuant to Civil Code Section 1761(e).

131. Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) provides that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> (2) [m]isrepresenting the source, sponsorship, approval, or certification of goods or services;
> (3) [m]isrepresenting the affiliation, connection, or association with, or certification by, another;
> (4) [u]sing deceptive representations or designations of geographic origin in connection with goods and services;
> (5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;
> (7) [r]epresenting that goods or services are of a particular standard, quality, or grade…; [and]
> (9) [a]dvertising goods or services with intent not to sell them as advertised."

132. Defendants violated Civil Code Section 1770(a)(2), (3), (4), (5), (7) and (9) by marketing and representing that its Class Products, as referenced in this section, are "Manufactured in the USA," or some derivative thereof, when they are made with or contain ingredients and components that are not manufactured in the United States.

133. Defendants' "Manufactured in the USA" representations are deceptive and false because Defendants' Class Products, as referenced in this section, are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

134. Pursuant to section 1782(d), by letter dated March 8, 2023, Plaintiff provide Defendants notice in writing by certified mail of the particular violations of section 1770 and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act. Defendants failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within thirty days of the date of written notice pursuant to section 1782. Therefore,


854

KAZEROUNI LAW GROUP, APC

Plaintiff and the Class further seek actual, punitive, and statutory damages, as deemed appropriate.

135. Attached hereto as Exhibit C is a sworn affidavit from Plaintiff pursuant to Cal. Civ. Code § 17801(d).

136. On information and belief, Defendants' violations of the CLRA set forth herein were done with awareness of the fact that the conduct alleged was wrongful and was motivated solely for Defendants' self-interest, monetary gain and increased profit. Plaintiff further alleges that Defendants committed these acts knowing the harm that would result to Plaintiff and Defendants engaged in such unfair and deceptive conduct notwithstanding such knowledge.

137. Plaintiff further alleges that Defendants committed these acts knowing the harm that would result to Plaintiff and Defendants engaged in such unfair and deceptive conduct notwithstanding such knowledge.

138. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendants as a result of Defendants' unqualified and false "Manufactured in the USA" representations set forth in Defendants' website and the websites of its third-party vendors regarding the Product and the Class Products.

139. As a direct and proximate result of Defendants' violations of the CLRA, Plaintiff and members of the Class are entitled to a declaration that Defendants violated the Consumer Legal Remedies Act.

140. For clarity, as to the CLRA Ingredients in the Class Products only, Plaintiff, on behalf of himself and the Class demands judgment against Defendants for damages, restitution, punitive damages, statutory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

141. As allowed under the CLRA, as to all the Class Products, Plaintiff, on behalf of himself and the Class demands injunctive and declaratory relief prohibiting such conduct in the future, costs incurred in bringing this action, and any other relief as this Court deems just and proper

142. Pursuant to section 1780(e) of the California Civil Code, Plaintiff and the Class make claims for damages and attorneys' fees and costs.


855

143. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")**
**BUS. & PROF. CODE §§ 17500, *ET SEQ.***

144. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

145. Plaintiff's FAL claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff; (a) L-Citruline, (b) Beta Alanine, (c) Betaine Anhydrous, (d) L-Theanine, (e) Caffeine Anhydrous, (f) Theobromine, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

146. Therefore, Plaintiff asserts FAL claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 Total)

147. Plaintiff and Defendants are both "person[s]" as defined by Cal. Bus. & Prof. Code § 17506.

148. Cal. Bus. & Prof. Code § 17535 authorizes a private right of action on both an individual and representative basis.

149. Defendants misrepresented its Class Products as "Manufactured in the USA" without clear and adequate qualification when in fact Defendants' Class Products are made with or contain ingredients and components that are not manufactured in the USA.

150. Defendants' Class Products are made with ingredients/components that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

151. These misrepresentations, acts, and non-disclosures by Defendants constitute false and misleading advertising in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

152. At all times relevant, Defendants' representations and advertising of its Class Products was untrue, misleading, and likely to, and did, deceive the reasonable consumer and the public.


856

KAZEROUNI LAW GROUP, APC

153. Defendants engaged in the false and/or misleading advertising and marketing of its Product, as alleged herein, with the intent to directly or indirectly induce consumers to purchase its products, which Defendants knew, or had reason to know, that the Class Products were made with or contained ingredients and components that were not manufactured in the USA.

154. Defendants' "Manufactured in the USA" representations are deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

155. Because Defendants knew or should have known that the representations and/or omissions alleged herein regarding the Class Products were untrue or misleading, Defendants acted in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

156. Had Defendants clearly, adequately and truthfully qualified and advertised that its Class Products were made with or contained ingredients and components that were not manufactured in the USA, Plaintiff and the putative Class members would not have purchased the Class Products, would have paid a different price, or would have purchased a different product from another company.

157. As a direct and proximate result of the aforementioned acts and omissions by Defendants, Defendants received and continues to hold monies rightfully belonging to Plaintiff and the putative Class members, who were led to purchase Defendants' Class Products during the Class Period.

**THIRD CAUSE OF ACTION**
**VIOLATION OF BUSINESS & PROFESSIONS CODE**
**BUS. & PROF. CODE, SECTION 17200, ET SEQ.**

158. Plaintiff re-alleges and incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

159. Plaintiff's UCL claims apply to the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffiene Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

160. Therefore, Plaintiff asserts UCL claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro


857

KAZEROUNI LAW GROUP, APC

Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 Total)

161. Plaintiff and Defendants are each "person[s]" as defined by California Business & Professions Code § 17201. California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

162. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

163. By and through Defendants' conduct alleged in further detail above and herein, Defendants engaged in conduct which constitutes unlawful, unfair, and/or fraudulent business practices prohibited by Bus. & Prof. Code §§ 17200, et seq.

***A. "Unlawful" Prong***

164. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

165. The violation of any law constitutes as "unlawful" business practice under the UCL.

166. Beginning at a date currently unknown, Defendants committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code §§ 17200, et seq. by manufacturing, distributing, and/or marketing Defendants' Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq., and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq., by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

167. Defendants violated the MUSA Rule, 16 C.F.R. § 323, by making its representations





858
KAZEROUNI LAW GROUP, APC

on the Class Products without clear and adequate qualification that Defendants' Class Products are "Manufactured in the USA" or made with or contain ingredients and components that are not manufactured in the USA.

168. Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of the MUSA Rule, FAL, and the CLRA, as described above.

169. These alleged acts and practices by Defendants were intentional and in violation of the MUSA Rule, FAL, and the CLRA.

170. Pursuant to the UCL, Plaintiff and the Class are entitled to preliminary and permanent injunctive relief and order Defendants to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the Class of all the revenues associated with this unfair and unlawful competition, or such proton of said revenues as the Court may find applicable.

***B. "Unfair" Prong***

171. Beginning at a date currently unknown, Defendants committed acts of unfair competition that are prohibited by Bus. & Prof. Code section 17200 et seq. Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes by engaging in conduct and practices that threaten an incipient violation of law/s or violate the policy or spirit of law/s by manufacturing, distributing, and/or marketing Defendants' Class Products with a false ingredient origin information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein were "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

172. Clearly said, Defendants' Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

173. Alternatively, Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices that are immoral, unethical, oppressive or unscrupulous, the utility of such conduct, if any, being far

KAZEROUNI LAW GROUP, APC


859

outweighed by the harm done to consumers and against public policy by manufacturing, distributing, and/or marketing Defendants' Class Products with false ingredient information, in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

174. Alternatively, Defendants engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statute/s by engaging in practices, including manufacturing, distributing, marketing, and/or advertising Defendants' Class Products with false ingredient information, wherein: (1) the injury to the consumer was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was not of the kind that consumers themselves could not have reasonably avoided.

***C. "Fraudulent" Prong***

175. Beginning at a date currently unknown, Defendants engaged in acts of unfair competition, including those described above and herein, prohibited and in violation of Bus. & Prof. Code § 17200 et seq., by engaging in a pattern of "fraudulent" business practices within the meaning of Bus. & Prof. Code § 17200 et seq, by manufacturing, distributing, and/or marketing Defendants' Class Products in violation of California's CLRA, Civil Code § 1750, et seq. and California's False Advertisement statute, Bus. & Prof. Code §§ 17500 et seq. by falsely representing that the Class Products referenced herein are "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

176. Defendants' Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

177. Plaintiff reserves the right to allege further conduct that constitutes other fraudulent business acts or practices. Such conduct is ongoing and continues to this date.

***D. "Unfair, Deceptive, Untrue or Misleading Advertising" Prong***


860
KAZEROUNI LAW GROUP, APC

178. Defendants' advertising was unfair, deceptive, untrue and/or misleading in that consumers were led to believe that Defendants' Class Products are "Manufactured in the USA" when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

179. Plaintiff, a reasonable consumer, and the public would likely be, and, in fact were, deceived and misled by Defendants' representations and advertising as they would, and did, interpret the representation in accord with its ordinary usage, that the Class Products are actually manufactured in the USA with ingredients and components from the USA given the absence of clear and adequate qualification of Defendants' "Manufactured in the USA" representations.

180. Contrary to the representation, Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

181. Defendants' "Manufactured in the United States" representations are deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

182. Defendants' unfair, deceptive, untrue, or misleading advertising presented a threat to the public by engaging in unlawful conduct that resulted in harm to consumers.

183. Defendants engaged in these unlawful, unfair, and fraudulent business practices motivated solely by Defendants' self-interest with the primary purpose of collecting unlawful and unauthorized monies from Plaintiff and all others similarly situated; thereby unjustly enriching Defendants.

184. Such acts and omissions by Defendants were unlawful and/or unfair and/or fraudulent and constitute a violation of Business & Professions Code §§ 17200, et seq. Plaintiff reserves the right to identify additional violations by Defendants as may be established through discovery.

185. As a direct and proximate result of the aforementioned acts and representations described above and herein, Defendants received unearned commercial benefits at the expense of its competitors and the public.

186. As a direct and proximate result of Defendants' unlawful, unfair and fraudulent conduct described herein, Defendants has been unjustly enriched by the receipt of ill-gotten gains




861

KAZEROUNI LAW GROUP, APC

from customers, including Plaintiff, who unwittingly provided money to Defendants based on Defendants' representations.

187. Plaintiff suffered an "injury in fact" because Plaintiff's money was taken by Defendants as a result of Defendants' false representations set forth on the Defendants' Class Products.

188. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

## FOURTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION

189. Plaintiff repeats, re-alleges and incorporates by reference the above allegations as if fully stated herein.

190. Plaintiff's Negligent Misrepresentation claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff; (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

191. Therefore, Plaintiff asserts Negligent Misrepresentation claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT Black, Burn XT Powder, GDA XT. (17 total)

192. At a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendants represented to the public, including Plaintiff, by packaging, advertising, marketing and other means, that Defendants' Class Products are "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

193. Defendants' Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

KAZEROUNI LAW GROUP, APC


862

194. Defendants made the representations herein alleged with the intention of inducing the public, including Plaintiff and putative class members, to purchase Defendants' Class Products over similar products from competitors which clearly and adequately qualified their "Manufactured in the USA" representations or made no "Manufactured in the USA" representations at all.

195. Defendants' "Manufactured in the United States" representations were deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

196. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendants' advertising representations and, in reliance on them, purchased the Class Products, as described herein.

197. At all times relevant, Defendants made the misrepresentations herein alleged when Defendants should have known these representations to be untrue, and Defendants had no reasonable basis for believing the representations to be true.

198. As a proximate result of Defendants' negligent misrepresentations, Plaintiff and other consumers similarly situated were induced to purchase, purchase more of, purchase instead of, or pay more for Defendants' Class Products, due to the unlawful acts of Defendants, in an amount to be determined at trial, during the Class Period.

## FIFTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION

199. Plaintiff repeats, re-alleges and incorporates herein by reference the above allegations as if fully stated herein.

200. Plaintiff's Intentional Misrepresentation claims are based on the Class Products with the following foreign ingredients, which are similarly included in the Product purchased by Plaintiff: (a) *L-Citruline*, (b) *Beta Alanine*, (c) *Betaine Anhydrous*, (d) *L-Theanine*, (e) *Caffeine Anhydrous*, (f) *Theobromine*, and (g) AstraGin® (*Astragalus membranaceus* and *Panax notoginseng*).

201. Therefore, Plaintiff asserts Intentional Misrepresentation claims as to the following Class Products: the Product, Altius Pre, Build PM, EAA Surge, Intra Surge, Lean PM, N.O. XT, Nitro Surge Build, Nitro Surge Max, Nitrosurge, Pump Surge, Test PM, Build XT, Burn XT, Burn XT

KAZEROUNI LAW GROUP, APC






863

Black, Burn XT Powder, GDA XT. (17 total)

202. Beginning at a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, and as set forth above, Defendants intentionally represented to the public, including Plaintiff, by promoting and other means, that Defendants' Class Products were "Manufactured in the USA" without clear and adequate qualification when Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

203. Defendants' Class Products are made with components/ingredients that are not manufactured in the USA and/or or contain ingredients that are not manufactured in the USA.

204. Defendants' "Manufactured in the USA" representations were deceptive and false because Defendants' Class Products are wholly and/or substantially made with ingredients and/or components that are not "Manufactured in the USA."

205. Defendants made the representations herein alleged with the intention of inducing the public, including Plaintiff, to purchase Defendants' Class Products for Defendants' own financial gain.

206. Defendants intentionally made such misrepresentations by printing and advertising its misrepresentations its website and the websites of its third-party vendors.

207. Defendants' misrepresentations of the Class Products as "Manufactured in the USA" without clear and adequate qualification was misleading because Defendants' Class Products are in fact made with or contain ingredients and components that are not manufactured in the USA.

208. Plaintiff and other similarly situated persons in California saw, believed, and relied upon Defendants' advertising representations and, in reliance on such representations, purchased the Class Products, as described above.

209. At all times relevant, Defendants intentionally made the misrepresentations herein alleged and allowed the misrepresentations to continue to be made by its resellers when Defendants knew the representations to be false.

210. As a proximate result of Defendants' intentional misrepresentations, Plaintiff and other consumers similarly situated were induced to spend an amount of money to be determined at



KAZEROUNI LAW GROUP, APC

trial on Defendants' misrepresented Products.

211. Defendants knew that its Class Products were in fact not "Manufactured in the USA" without clear and adequate qualification but instead made with or contain ingredients and components that are not manufactured in the USA, but nevertheless made the representations described herein with the intention that consumers rely on Defendants' representations.

212. Defendants also knew that its website, as well as the websites of its third-party vendors, were advertising its Class Products as "Manufactured in the USA" without clear and adequate qualification, when Defendants clearly knew that its Class Products were in fact made with or contained ingredients and components that were not manufactured in the USA.

213. Plaintiff and other consumers similarly situated, in purchasing and using the Class Products as herein alleged, did rely on Defendants' representations, including the representations on Defendants' advertisements and website, all to their damage and/or detriment as herein alleged.

214. Plaintiff alleges the "who, what, when, where, and how" of the alleged deception by Defendants as follows:

a. The "who" is Defendants;

b. The "what" is representation that Defendants' Class Products were "Manufactured in the USA" when in fact the Class Products are made with or contain ingredients and components that are not manufactured in the USA;

c. The "when" is the date Plaintiff purchased the Product and the Class Period of four years prior to the filing of the Complaint;

d. The "where" is in Defendants' product advertisements and marketing;

e. The "to whom" is Plaintiff and the putative class who bought the Class Products;

f. The "by what means" by Defendants representing on its Class Products that they are "Manufactured in the USA" when components/ingredients are actually not manufactured in the USA and/or or those products contain ingredients that are not manufactured in the USA;

g. The "how" is the allegation that Defendants did not disclose that its Class Products are in fact not "Manufactured in the USA" with all or virtually all ingredients and



KAZEROUNI LAW GROUP, APC

components coming from the USA but instead are made with or contain ingredients and components not manufactured in the USA.

215. By engaging in the acts described above, Defendants is guilty of malice, oppression, and fraud, and Plaintiff and the Class members are therefore entitled to recover exemplary or punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the Court grant Plaintiff and the putative Class the following relief:

- That this action be certified as a Class Action;
- That Plaintiff be appointed as the Class Representative;
- That Plaintiff's attorneys be appointed as Class Counsel;
- That Defendants' wrongful conduct be adjudged and decreed to violate the consumer protection statutes raised herein;
- That Plaintiff and each of the other members of the Class recover the amounts by which Defendants and Does have been unjustly enriched;
- An order requiring imposition of a constructive trust and and/or disgorgement of Defendants' and Does' ill-gotten gains and to pay restitution to Plaintiff and all members of the Class and to restore to the Plaintiff and members of the class all funds acquired by means of any act or practice declared by this court to be an unlawful, fraudulent or unfair business act or practice, in violation of laws, statutes or regulations, or constituting unfair competition;
- Distribution of any monies recovered on behalf of members of the Class via fluid recovery or *cy pres* recovery were necessary and as applicable, to prevent Defendants or Does from retaining the benefits of their wrongful conduct;
- That Defendants and Does be enjoined from continuing the wrongful conduct alleged herein and be required to comply with all applicable laws;
- A temporary, preliminary and/or permanent order for injunctive relief requiring Defendants and Does to: (i) discontinue its false and/or misleading statement/s; and (ii)

KAZEROUNI LAW GROUP, APC


866

undertake an immediate public information campaign to inform members of the proposed class as to their prior practices;

- Pre-judgment interests from the date of filing of this suit;
- that Plaintiff and each member of the putative Class recover their costs of suit.

**FIRST CAUSE OF ACTION FOR**
**VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT**
**CAL. BUS. & PROF. CODE §§ 1750, *ET SEQ.***

- Actual damages, injunctive relief, restitution, and punitive damages pursuant to Cal. Civ. Code § 1780(a); and
- an award of costs and attorney's fees pursuant to Cal. Civ. Code § 1780(d).

**SECOND CAUSE OF ACTION FOR**
**VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW**
**CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17535; and
- Recovery of reasonably attorney's fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**THIRD CAUSE OF ACTION FOR**
**VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.***

- Restitution and injunctive relief pursuant to Bus. & Prof. Code § 17203; and
- Recovery of reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

**FOURTH CAUSE OF ACTION FOR**
**NEGLIGENT MISREPRESENTATION**

- A judgment against Defendants and Does for general and compensatory damages in an amount to be determined at trial

**FIFTH CAUSE OF ACTION FOR**
**INTENTIONAL MISREPRESENTATION**

- A judgment against Defendants and Does for general and compensatory damages in an amount to be determined at trial;


867

KAZEROUNI LAW GROUP, APC

- Punitive damages pursuant to Cal. Civ. Code § 3294; and
- That Plaintiff and the members of the Class be granted any other relief the Court may deem just and proper.

**TRIAL BY JURY**

216. Plaintiff is entitled, and demands, a trial by jury on all issues so triable.

Dated: September 10, 2026

Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: *<u>/s/ Gustavo Ponce</u>*
Abbas Kazerounian, Esq.
David J. McGlothlin, Esq.
Mona Amini, Esq.
Gustavo Ponce, Esq.
*Attorneys for Plaintiff*

KAZEROUNI LAW GROUP, APC


868